UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES<br>2100 L STREET NW<br>WASHINGTON, D.C. 20037<br><br>and<br><br>HARVEY DILLENBURG<br>3305 MARION AVENUE<br>CRESTON, IA 50801<br><br>and<br><br><u>IOWA CITIZENS FOR COMMUNITY IMPROVEMENT</u><br><u>2001 FOREST AVENUE</u><br><u>DES MOINES, IOWA 50311</u><br><br>         PLAINTIFFS<br>   V.<br><br>TOM VILSACK, SECRETARY OF THE<br>UNITED STATES DEPARTMENT OF AGRICULTURE<br>1400 INDEPENDENCE AVE. SW<br>WASHINGTON, D.C. 20250<br><br>         DEFENDANT | CIVIL ACTION NO. 1:12-CV-1582 ABJ |

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. This action challenges expenditures by the United States Department of Agriculture ("USDA") and the National Pork Board ("Board") for the purchase of "Pork, The Other White Meat" ("PTOWM") and related intellectual property for $60,000,000 from the National Pork Producers Council ("NPPC"), a political lobbying group. As described herein, the unlawful authorizations to purchase PTOWM—the value of which had been developed with half a billion dollars of pork producer funds—and the ongoing payments of three

million dollars per year under the terms of the purchase agreement violate provisions of the Pork Promotion, Research, and Consumer Information Act of 1985 ("Pork Act"), 7 U.S.C. § 4801 *et seq.*, the Pork Promotion, Research, and Consumer Information Order ("Pork Order"), 7 C.F.R. § 1230.1 *et seq.*, and the USDA guidelines for checkoff program operations. These unlawful expenditures are not only arbitrary, capricious, an abuse of discretion, and/or contrary to law within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706, they also allow the Board and the NPPC to evade federal restrictions against the use of pork checkoff dollars for purposes of influencing legislation and government policy. Because the illegal purchase, ongoing annual payments, and resulting lobbying use of the funds at issue all violate federal laws and regulations, and constitute a gross misuse of federal checkoff assessments, Plaintiffs request that the Court set aside the unlawful expenditure approvals and immediately enjoin further payments from the Board to NPPC under the contract at issue.

## <u>JURISDICTION</u>

2.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (Administrative Procedure Act).

## <u>VENUE</u>

3.  Venue is proper in this judicial district under 28 U.S.C. § 1391(e). Defendant resides in this district, and a substantial part of the events or omissions giving rise to this action occurred or will occur in this district.

## THE PARTIES

4.   Plaintiff The Humane Society of the United States ("HSUS") is a nonprofit animal protection organization headquartered in the District of Columbia and incorporated in Delaware. HSUS brings this action on its own behalf and on behalf of its members. HSUS is the largest animal protection organization in the United States, representing 11 million members and constituents. HSUS actively advocates against practices that injure, harass, or abuse animals, and provides its members and the public with information regarding inhumane treatment on a variety of topics, including the application of state and federal laws that protect farm animals.

5.   HSUS has standing to bring this action on its own behalf. NPPC has consistently expended significant funds to fight HSUS policy and legislative reforms related to humane practices in the care of farm animals.

6.   Just months after securing the long-term revenue stream of checkoff dollars from the sale of PTOWM, NPPC at its 2007 annual meeting passed a resolution to "form a task force to develop [a] comprehensive strategy to address animal welfare issues such as state ballot initiatives driven by animal rights organizations and legislation supported by these groups for the purpose of mandating animal care practices."

7.   HSUS has worked extensively to eliminate the use of gestation crates, narrow metal cages so small that sows are not able even to turn around. Sows are isolated in these stalls day and night during their four-month pregnancies and repeatedly throughout their lives.

8.   HSUS has devoted significant staff time and resources to work with various companies to prohibit these intensive confinement practices. In the past year, announcements to phase out the use of gestation crates have been made by major food service corporations. Many of these companies have directly acknowledged the work with

HSUS that helped bring about their decisions to demand more humane animal care practices.

9.  The Board and NPPC have repeatedly issued public statements and commentary opposing these corporate decisions to eliminate gestation crates and urging others against working with HSUS to achieve similar animal care improvements.

10. HSUS has also worked for legislative prohibitions against the use of gestation crates. HSUS was instrumental in obtaining passage of California's Proposition 2 initiative, which phases out, among other practices, the confinement of sows in gestation crates. HSUS has also devoted time and resources to activities that have contributed to the passage of legal prohibitions against the use of gestation crates in eight other states, as well. NPPC has consistently worked against these efforts.

11. Most recently, NPPC has actively campaigned to block passage of a federal bill, the Egg Products Inspection Act Amendments of 2012 (H.R. 3798/S. 3239) that would provide humane improvements in the living conditions for the nation's egg-laying hens. HSUS has dedicated significant human and financial resources to the drafting, promotion, and lobbying of Congress for its passage. The HSUS continues to dedicate such resources in an effort to counteract repeated activity aimed at preventing passage of the bill, led in large part by NPPC. Despite the broad support for the bill among egg producers and animal protection groups—and despite its application strictly to the confinement conditions of the country's egg-laying hens—NPPC has expended great effort and resources to block its support.

12. HSUS has had to divert and devote resources to counter NPPC's activities to obstruct its work. Since HSUS resources would otherwise be spent on advocacy, legislation, and education related to improving the treatment of pigs and other animals, Defendant's

unlawful conduct directly impedes Plaintiff's activities, and causes a significant drain on its resources and time.

13. The $3 million annual PTOWM payment from the Board constitutes a major source of NPPC's annual revenue, which furthers its lobbying and other efforts to fight HSUS' advocacy for humane care for farm animals. NPPC has reported as much as 32% of its annual budgeted revenue is from the sale. HSUS must expend additional resources to counter the improper actions of the Board and NPPC arising from the unlawful checkoff expenditures at issue. The relief sought in this action would redress HSUS's injuries by eliminating the necessity to spend organization resources to counter NPPC's use of unlawful checkoff expenditures to lobby against and obstruct HSUS's core mission to promote humane care, oppose intensive confinement, and advance the legal protections that promote the well-being of animals.

14. HSUS has standing to bring this action on behalf of its members as well. One of HSUS's national priorities is protecting the interests of its farmer members who share the organization's values of humane animal care. HSUS's members have been, are being, and will be adversely affected by Defendant's unlawful actions. Joe Maxwell, for example, is a member of HSUS and the organization's Director of Rural Development and Outreach, as well as being an active hog producer who is compelled to pay the mandatory assessments into the checkoff program. Mr. Maxwell is opposed to the unlawful use of such funds for purposes that, as complained of herein, are harmful to his economic interests as a producer and his interests in ensuring the integrity of public information about industrial animal confinement practices and preventing corporate agribusiness trade associations from engaging in lobbying efforts to block industry welfare reform. HSUS consistently dedicates resources to advocate and advance animal welfare issues on behalf of its farmer members.

HSUS's injuries would be redressed by the relief requested because the checkoff funds at issue would not be unlawfully used to further policies that are adverse to its members.

15. Plaintiff Harvey Dillenburg is a pork producer who resides in Adair County, Iowa. At all times relevant to this action, Mr. Dillenburg has been paying and continues to pay the compelled checkoff assessments pursuant to the Pork Act and Pork Order. Mr. Dillenburg's interests are impacted by misuse of checkoff funds, as such misuse diminishes the resources available for promotions or other legitimate programs in support of the nation's pork industry for which expenditures under the Pork Act and Pork Order are mandated. Unlawful checkoff expenditures prevent these mandates from being fully implemented, thereby diminishing Mr. Dillenburg's return on his compelled checkoff investment.

16. Mr. Dillenburg is further harmed by the improper use of the unlawful expenditures that are distributed to NPPC, a lobbying organization that pushes for policies that Mr. Dillenburg considers harmful to his operations as an independent producer. In a 1999 audit report, the USDA Inspector General specifically acknowledged that not all producers agree with NPPC's priorities and some even oppose NPPC itself. NPPC claims on its website and in news releases to be the "global voice" for the U.S. pork industry and protector of the country's 67,000 pork producers. At the time of the PTOWM sale, however, NPPC counted less than 2,000 producers as actual members. Mr. Dillenburg is not a member of NPPC.

17. Checkoff funds are expressly prohibited from being used for the purpose of influencing legislation or government policy, yet the funds at issue here provide a major source of NPPC's annual revenues, which further NPPC's programs that lobby for policies that Mr. Dillenburg believes are harmful to his interests.

18. Granting the requested relief would eliminate the unlawful expenditures of checkoff funds addressed herein and fully redress Mr. Dillenburg's injuries.

19. Plaintiff Iowa Citizens for Community Improvement ("ICCI") is a non-profit membership organization headquartered in Polk County, Iowa. ICCI was established more than 35 years ago and actively advocates against practices and policies that are harmful to family and independent farmers, who comprise the majority of ICCI's membership. ICCI brings this action on its own behalf and on behalf of its members.

20. One of ICCI's mission priorities is protecting the interests of its members who share the organization's values of responsible and sustainable family farming. ICCI membership includes pig producers, who are compelled to pay the mandatory pork checkoff assessments. The interests of these members are adversely affected by misuse of checkoff funds, as such misuse diminishes the resources available for promotions or other legitimate programs in support of the nation's pork industry for which expenditures under the Pork Act and Pork Order are mandated. The unlawful checkoff expenditures at issue prevent these mandates from being fully implemented, thereby diminishing the value of the contribution compelled from ICCI's members.

21. Moreover, the unlawful expenditures at issue provide a major source of NPPC's annual revenues, which further NPPC's programs that lobby for policies that Iowa CCI believes are harmful to its interests and to the interests of its members. ICCI has devoted resources to counter NPPC's lobbying efforts on issues relating to factory farming and the environment and the defense of independent and family farmers. ICCI opposes the unlawful use of such funds for purposes that, as complained of herein, are harmful to the economic interests of their producer members, as well as to their interests in preventing lobbying that promotes factory farms or large-scale corporate agribusiness.

22. ICCI's injuries would be redressed by the relief requested because the checkoff funds at issue would not be unlawfully used to further policies that are adverse to the organization and to its members.

23. Defendant Tom Vilsack is the Secretary of the USDA and, in his official capacity, is responsible for implementing the Pork Act, 7 U.S.C. §§ 4801-19, including approval of the Board's annual budget and expenditures, and enforcing the prohibition against unreasonable expenditures of checkoff funds. The Administrator of the Agricultural Marketing Service is authorized by rule to exercise the functions of the Secretary of Agriculture contained in the Pork Act. 7 C.F.R. § 2.22; 7 C.F.R. § 2.79.

24. The Board is a quasi-governmental entity created as a result of Congress' passage of the Pork Act. Under the Pork Act and its implementing regulations, the Board collects a mandatory checkoff assessment, which is a per-capita fee on all hogs sold or imported in the United States. The Board consists of 15 members, all of whom are pork producers or importers nominated by Pork Act Delegates at the National Pork Forum and appointed by the Secretary of Agriculture. The Board also has an administrative staff that carries out the Board's activities.

25. Plaintiffs' injuries will be redressed if Plaintiffs prevail in this action, because Defendant's approval of the unlawful expenditures and future payment obligations complained of will be set aside and future unlawful payments that are currently obligated under the long-term deal would be enjoined. Such result would prevent the injurious misuse of checkoff funds complained of herein and instead ensure their use in lawful activities prescribed by the Pork Act and Order.

## STATUTORY AND REGULATORY FRAMEWORK

### A.  Pork Promotion, Research, and Consumer Information Act of 1985

26. The Pork Act, 7 U.S.C. §§ 4801-19, was enacted on December 23, 1985. In its legislative findings and declaration of purpose for the Pork Act, Congress stated that it was intended to create and implement a process for financing and carrying out "an effective and

coordinated program of promotion, research, and consumer information" for the benefit of the pork industry. 7 U.S.C. § 4801.

27. Under the Pork Act, the powers and expenditures of the Board are strictly limited. All projects, plans, budgets, and contracts must be approved by the Secretary prior to execution. 7 U.S.C. §§ 4808-4809.

28. The Pork Act expressly prohibits the expenditure of checkoff funds on lobbying or other activities designed to influence government policy. 7 U.S.C. § 4809.

29. Checkoff assessments and proceeds from the investment of those assessments may be used only to cover administrative expenses, held in a reserve fund, or used to fund plans and projects that comply with the Act. 7 U.S.C. § 4809. The payment of costs associated with contracts is authorized only for the "development and conduct" of activities authorized by the Pork Order. 7 U.S.C. § 4808.

## B. Pork Promotion, Research, and Consumer Information Order

30. The Pork Act provides that after notice and opportunity for public comment, the Secretary shall issue a pork promotion, research, and consumer information order. On February 14, 1986, Defendant published an invitation to submit proposals for an initial order. 51 Fed. Reg. 5542. NPPC submitted a proposed order in response—51 Fed. Reg. 9602 (March 19, 1986)—which Defendant later adopted with "minor modifications" as a Final Rule, titled Pork Promotion, Research, and Consumer Information Order. 51 Fed. Reg. 31898 (September 5, 1986).

31. The Pork Order is published as regulations in Title 7 of the Code of Federal Regulations, 7 C.F.R. Part 1230. Under the Pork Order, checkoff assessments and proceeds from the investment of those assessments may be used only to fund plans and projects that comply with the Act, administrative expenses and a reserve. 7 C.F.R. § 1230.73. The Board

is only authorized to incur such expenses "as the Secretary finds ***are reasonable*** and likely to be incurred by the Board for its administration, maintenance, and functioning and to enable it to exercise its powers and perform its duties in accordance with the provisions of this subpart, including financing plans and projects." 7 C.F.R. § 1230.70 (emphasis added).

32. The Pork Order requires that the Secretary review each plan and project to ensure that it effectively contributes to the purposes of the Pork Act and the Pork Order *mandates* the termination of projects that do not. 7 C.F.R. § 1230.60.

33. Regarding the ownership of intellectual property, the Pork Order specifies that "patents, copyrights, trademarks, inventions, or publications developed through the use of funds collected under the provisions of [the Pork Order] *shall be the property of the United States Government as represented by the Board*, and shall, along with any rents, royalties, residual payments, or other income from the rental, sale, leasing, franchising, or other uses of such patents, copyrights, inventions, or publications inure to the benefit of the Board as income and be subject to the same fiscal, budget, and audit controls as other funds of the Board." 7 C.F.R. § 1230.88 (emphasis added).

34. Like the Pork Act, the Pork Order also expressly prohibits the expenditure of funds for the purpose of influencing legislation or for the purpose of influencing governmental policy or action. 7 C.F.R. § 1230.74.

35. Also like the Pork Act, the Pork Order authorizes payment of costs associated with contracts only for the "development and conduct" of activities authorized by the Order. 7 C.F.R. § 1230.58.

**C. USDA Guidelines for Oversight of Research and Promotion Boards**

36. The USDA's Agricultural Marketing Service ("AMS"), to which the Secretary has delegated responsibility for checkoff programs, has published Guidelines for AMS Oversight of Commodity Research and Promotion Programs ("Guidelines").

37. Consistent with the Pork Act and Order, the Guidelines require that research and promotion boards—including the Pork Board—"must receive AMS' approval of budgets prior to obligating any funds." Section II.

38. The Guidelines also require that all boards comply with approved contracting procedures that "meet the fiduciary responsibilities of the board, and avoid any conflict of interest or a situation that could reasonably be perceived by a third party as a conflict of interest." Section IV.A.

39. AMS reviews Board contracts for conformance with the requirements of the Pork Act, Order and Guidelines. As with budgets, commodity board contracts "must be approved by AMS before funds are obligated." Section IV.B.

40. With AMS approval, multi-year contracts that require Board funding for more than a single budget year may be entered by boards only if the "contracts require extensions consistent with the budget year and include an 'escape clause'—clear language that the board may cancel the project at any time and for any reason without incurring the full contract cost." Section IV.D.

41. The Guidelines require that commodity boards "establish and maintain the *minimum level of annual administrative expenses necessary* to efficiently and effectively carry out the programs mandated by law." Section XI.E.1. (Emphasis added.)

42. The Guidelines require that commodity boards expend all funds in accordance with the act, order, regulations, and AMS policy. This includes the prohibition against

expenditures for the purpose of influencing legislation or government policy. Boards are responsible for taking action to remedy any fraud or misuse of funds.

## FACTS GIVING RISE TO CLAIMS FOR RELIEF

### A.  The Pork Act and the Checkoff Program

43. The Pork Act was enacted on December 23, 1985, and became effective on January 1, 1986. The enactment triggered a series of events to facilitate the implementation of the newly created Pork Checkoff Program. Among the actions taken by Defendant was a public invitation to submit proposals for an initial Pork Order. In response to that invitation, NPPC submitted a proposal that Defendant published as a proposed rule on March 19, 1986.

44. On September 5, 1986, Defendant issued a final rule that adopted the NPPC-submission with "minor modifications" as the initial Pork Order. The order became effective immediately, except for section 1230.71, relating to the collection of mandatory checkoff assessments, which became effective November 1, 1986.

45. In addition to drafting the proposal that would eventually be issued as the final pork order, NPPC in early 1986 began preparing for the operational launch of the checkoff program. NPPC had lobbied for the passage of the Pork Act and, under its terms, the organization was authorized to receive a portion of the mandatory checkoff assessments imposed on producers during the early phases of the implementation of the Pork Act and Pork Order.  These funds and any proceeds from their investment are required by the Pork Act and Pork Order to be used only in accordance with the requirements and restrictions of the checkoff program.

B. **The Other White Meat Promotional Campaign**

46. In 1986, after the enactment of the Pork Act, NPPC began inviting proposals from advertising agencies for new campaigns for a checkoff-funded promotion program. Upon learning of the planned checkoff campaign and the NPPC request, advertising executive Mark Williams contacted NPPC on behalf of the Bozell advertising agency about Bozell's interest in being one of the firms to present a campaign proposal.

47. Over the next several months, the Bozell team conducted market research to assess public perception of pork and test the effectiveness of various advertising concepts and slogans for pork promotion. This research and development effort was conducted at Bozell's expense as an investment aimed at creating a campaign strategy and slogan that would land the checkoff-funded promotion account for the agency.

48. As a result of the research, Williams concluded that the public image of pork was extremely poor and that Bozell's campaign approach would have to focus on changing that image by associating pork with the more favorable public perception of white meat at the time. To achieve this, Williams and Bozell settled on an approach that repositioned pork as "The Other White Meat."

49. In the fall of 1986, Williams—on behalf of Bozell—proposed "The Other White Meat" as the slogan on which to base the new checkoff-funded advertising campaign. NPPC liked the proposal, but needed the approval of the Pork Board before there could be any funding for promotions based on the newly created slogan. Williams agreed to present the PTOWM campaign proposal directly to the Board.

50. At the presentation meeting, the Board approved the PTOWM concept and campaign strategy that would make PTOWM the primary message of its advertising on behalf of producers. The Board then committed 4.5 million checkoff dollars at the proposal meeting to fund the initial promotional campaign of PTOWM. NPPC, which had become the

"general contractor" for the Board, would then work with Bozell on the Board's behalf to implement the checkoff campaign.

51. Although the Pork Order dictates that trademarks developed with checkoff funds shall belong to the United States Government and inure to the benefit of the Board (7 C.F.R. § 1230.88), no contracts regarding ownership of the current or future value of the trademarks related to PTOWM were executed prior to committing millions in checkoff funds to the promotion. Moreover, neither the Board nor NPPC executed any licensing agreements or fee arrangements prior to obligating these checkoff funds to the PTOWM campaign.

52. In March 1987, the Board officially launched the first PTOWM promotional campaign. The campaign was funded entirely with checkoff assessments.

53. In August 1987, NPPC filed an application to register the "The Other White Meat" as a trademark, listing itself alone as owner of the mark. The date of first use of the mark is listed as November 4, 1986, by which time the Pork Act, Pork Order, and mandatory checkoff assessments had already become effective. Registration of the mark was granted to NPPC in April of 1988.

54. PTOWM continued to be the Board's primary advertising message each year from its inception through the 2006 purchase date. All of this advertising was paid for *entirely* from producer assessments. As a direct result of these checkoff-funded promotions, PTOWM became one of the most well-known advertisement tag lines in the country.

**C.  The OIG Report, Referendum Litigation, and the Forced "Separation" of the Board and NPPC**

55. In March 1999, the USDA Office of Inspector General ("OIG") issued an audit report that concluded, among other things, that the Board had "relinquished too much authority to

its primary contractor, the National Pork Producers Council (NPPC), and has placed the NPPC in a position to exert undue influence over Board budgets and grant proposals." The OIG recommended separation of operations and greater accountability for checkoff expenditures. At the time of the OIG audit, NPPC had approximately 90 employees working on checkoff programs; the Pork Board, by contrast, had a staff of just two employees (one executive and one assistant), who were responsible for implementing and supervising all Pork Board programs, contracts, and finances.

56. The following year, a referendum was held in which a majority of the participating producers voted to discontinue the checkoff program. In January 2001, Secretary Dan Glickman announced that the checkoff would be terminated.

57. NPPC and several affiliated plaintiffs then filed a lawsuit to enjoin termination of the checkoff. Shortly after the case was filed, a new administration took office. The following month, Secretary Ann Veneman reached a settlement agreement with NPPC, which permitted the checkoff to continue, but called for an operational "separation" of the Pork Board and NPPC.

58. The official date of what is now commonly referred to as "the Separation" of the Board and NPPC was July 1, 2001. On that day, most employees of the NPPC who had been employed solely to work on checkoff activities simply became employees of the Board.

59. As part of the separation process, most trademarks and property ownership that had been registered in NPPC's name were assigned to the Board. However, NPPC claimed that it was the sole owner of PTOWM and so retained the registration for the associated marks. The Board did at that time, however, execute an exclusive license agreement with NPPC to permit continued use of PTOWM *at the rate of one dollar per year*.

**D.  NPPC's Need for Lobbying Revenue and the Board's Renegotiation of the PTOWM Annual License Rate**

60. After the separation from the Board, NPPC went through a period of reevaluating its operations and organized a task force to make recommendations on the future restructuring of NPPC, focusing on such key issues as funding, membership structure, and organizational priorities. Primary NPPC funding at the time amounted to just $2.6 million annually, which was far less than the Pork Board's $40 million in checkoff revenues collected from producers, and far below what the task force reported would be needed for NPPC to be effective.

61. By 2003, the Pork Board and NPPC were jointly exploring options for a new collaborative union. At its annual meeting that year, NPPC passed a resolution to "encourage the Pork Act delegates to approve the implementation of a plan to create a single industry organization funded by voluntary contributions from producers and others. The structure of the single organization will be determined by a task force formed jointly by the National Pork Producers Council and the National Pork Board."

62. At the following annual meeting in 2004, NPPC proposed a resolution that would have its "One Organization Task Force" make final recommendations to the boards of NPPC *and the National Pork Board* regarding the issues of sustained funding, representation, governance and the establishment of a single board, staff, and office for the unified organization.

63. Also in 2004, the Board entered a new agreement with NPPC relating to the annual license for PTOWM. Under the new license, the Board increased its annual payment to NPPC from one dollar to $818,000. In a message to the president of the Pork Board about the agreement, Board CEO Steve Murphy wrote that the increase in the annual license rate

to $818,000, up from one dollar, would "allow the NPPC to get the money they need for the next four years."

64. Although Steve Meyer, an agricultural economist and consultant to the Board on the valuation of PTOWM, had previously prepared a report recommending that the Board should pay no more than $375,000 annually to license the mark, the Board agreed to this new fee rate of more than double that valuation.

65. The $800,000 annual fee increase—paid for entirely with producer-funded checkoff dollars—and the "renegotiated" license contract were approved by Defendant.

### E. **The Board's Purchase of PTOWM**

66. In late 2005, the Board and NPPC began discussions about executing a purchase agreement for PTOWM and related marks.

67. At some point in either December 2005 or January 2006, the Board contracted with a consultant for more than $30,000 in checkoff funds to gather appraisals for the valuation of PTOWM. Although checkoff boards are prohibited from executing contracts that involve actual or even apparent conflicts of interest, the consultant that the Board hired to gather appraisals to determine the value of PTOWM was Mark Williams—the same advertising executive who created and ran the PTOWM campaign while at the Bozell agency. Williams was paid with checkoff funds to gather appraisals about how much *his own work* was worth.

68. Ultimately, the Board decided not to rely on the appraisals Williams gathered. Instead, CEO of the Board, Steve Murphy, and Williams agreed to use what they termed a "replacement value" of the trademark, based on a "brand rebuild" model. On February 3, 2006, Williams sent a letter to Murphy providing a valuation model that estimated the

brand could be rebuilt over a period of seven years at an incremental price of 36.1 million dollars.

69. Just three days after the date of the Williams letter, on February 6, 2006, the Board and NPPC met in Omaha, Nebraska to discuss terms for an Asset Purchase Agreement for PTOWM. By the end of the meeting, all fundamental terms of purchase had been agreed upon.

70. On or about February 14, 2006, the Board's CEO, Steve Murphy, and its president, Danita Rodibaugh, sent a letter to AMS about the results of the meeting. The letter included an *Acquisition Proposal* and a *Tentative Term Sheet* for the Board's purchase of PTOWM. The purchase price was based on a "rebuild strategy," which the Board calculated as the incremental cost that it would have to expend over a seven year period to rebuild its brand. The Pork Board's stated objective in this letter was to achieve a PTOWM purchase price that was *less than* the estimated seven-year, $36.1 million rebuild cost.

71. The term sheet that the Board submitted to USDA with the acquisition proposal indicated that a purchase price was set at $34.597 million. However, it was also proposed that payments would be made in annual increments and would include an interest rate of 6.75%, resulting in a payout of $3 million annually to NPPC for the following 20 years. Ultimately, the total purchase price, which would be paid by producers from checkoff assessments, under the agreement was not $34.597 million, but $60 million ($60,000,000).

72. Although the Board's express statement in its acquisition proposal that its "primary objective" was to achieve a purchase price that would be less than the estimated seven-year, $36.1 million cost to rebuild a new brand identity, the proposed—and later approved—purchase terms obligated nearly double that amount of checkoff expenditures and a significantly longer payout. Defendant approved a $60 million purchase, paid over two decades, to avoid a $36 million rebuild, paid over just seven years.

73. As part of its rationale for this acquisition proposal, the Board asserted to Defendant that the licensing fee for PTOWM in future agreements was "expected to increase substantially" and that any further investment of checkoff funds in PTOWM would impair the Board's "ability to negotiate a favorable license fee in the future."

74. However, at no time prior to the agreement to purchase PTOWM did the Board actually inquire or discuss with NPPC the possibility of extending its current license agreement, or any rate expected to be charged as part of such future agreements.

75. At no time prior to the agreement to purchase PTOWM did NPPC advise the Board that it was unwilling to renew the license or that there would be any change in the annual rate.

76. No one representing the Board made any verification to Defendant that the continued use of PTOWM was even jeopardized prior to the Board proposing to purchase the mark at more than three times the annual rate it was paying at the time for an exclusive license to use it.

77. At the $818,000 license rate the Board was paying in 2006, it would have taken *more than 70 years* to reach the $60 million dollars of checkoff funds it ultimately obligated to purchase PTOWM.

78. Additionally, the Board asserted in the acquisition proposal to Defendant that the timing for the proposed purchase is important because "no organization should build its business model around a brand it doesn't own" and claimed that the Board's pre-2006 investment has been minimal:

> The NPB has the strongest position it will have regarding its ability to negotiate favorable purchase terms for PTOWM, since minimal investment has been put into the brand strategy, resulting in minimal brand equity.

79. Contrary to this claim of minimal investment, however, by 2006, the Board had already expended five hundred million dollars ($500,000,000) in checkoff funds promoting PTOWM in its advertising programs. Every national campaign from the inception of the mark was funded entirely by mandatory checkoff assessments collected from pork producers.

80. It was the investment of checkoff assessments in PTOWM promotions that increased the mark's value from the very beginning in 1986 through 2006, yet the proceeds from that investment of producer funds—the increased equitable value of the mark—were not treated as property of the U.S. government and applied to the benefit of the Board and producers as required by 7 C.F.R. § 1230.88. Instead, the opposite of this legal requirement was applied and the increased value of PTOWM that developed from two decades of checkoff-funded promotion operated *to the detriment* of producers in the form of an increased purchase price.

81. On information and belief, the Board never even looked into how much equitable value that either the Board or NPPC could each claim it had put into the mark over its 20 years of checkoff-funded promotional activity. Neither the Board's ownership interest from PTOWM's initial development for the checkoff program nor the equity derived from its two decades of producer-funded promotion through that program was credited to the Board in the purchase agreement, resulting in the Board paying NPPC millions of checkoff dollars *for value created entirely by checkoff dollars*.

82. For its part, Defendant authorized the purchase of PTOWM to proceed without any requirement of such an accounting to credit the Board for the value directly developed in the mark as a result of the *half billion dollars* of producer-funded promotion.

83. Regarding the negotiation of a purchase price, the Board was aware that it was in a powerful position to dictate favorable terms to NPPC. Dr. Steve Meyer, the agricultural economist who had previously prepared reports for the Board and USDA on PTOWM's

value, had advised the Board that NPPC was in a weak bargaining position for the sale of the mark. Meyer concluded that there would have been little market other than the Board to purchase the generic slogan so closely identified with the Board. He also advised that it would be politically difficult for NPPC to sell the mark *that was built with producer funds* to any individual company.

84. In fact, NPPC had no other offers to purchase PTOWM.

85. In furtherance of the effort to receive USDA authorization to acquire PTOWM pursuant to the terms agreed on with NPPC, the Board's CEO and president flew to Washington, D.C., to meet and discuss the Board's intentions directly with AMS representatives Barry Carpenter and Randall Jones.

86. Following that meeting, on or about February 28, 2006, the USDA issued a decision memorandum authorizing the Board to proceed with its proposed acquisition of PTOWM from NPPC. The rationale for the authorization mirrored the assertions made in the Board's acquisition proposal and tentative terms sheet.

87. With respect to NPPC's ability to claim value or ownership interest in PTOWM, the USDA memo stated that "substantial ideation, strategy development efforts, and producer and consumer research investment preceded the Pork Checkoff Program and all at NPPC's expense."

88. However, no NPPC activities related to the development of PTOWM had occurred prior to the enactment of the Pork Act.

89. The ideation, strategy and research cost incurred in order to create PTOWM was paid for not by NPPC, but by the Bozell ad agency as an investment aimed at landing the checkoff-funded campaign account.

90. All promotional expenditures since PTOWM's inception have been made with checkoff funds.

91. The USDA also noted in its decision memo that the valuation model and the "rebuild" estimates from which the Board determined a "fair purchase price" were arrived at by the Board's solicitation of appraisals from "independent advertising experts." This claim is incorrect. The appraisals were gathered not by disinterested "experts" but by Mark Williams, the advertising executive responsible for the initial development and promotion of PTOWM.

92. In fact, Defendant was not in a position to assess whether the written valuation appraisals were fair or accurate because of deliberate efforts to prevent the appraisals from open review or scrutiny. In order to prevent the appraisals from being obtainable through Freedom of Information Act requests and potentially cause problems in getting USDA approval, the Board—through CEO Steve Murphy—deliberately refused to take possession of any written appraisals and, in fact, never directly reviewed them. Murphy has expressly stated that his reason for not accepting written appraisals was in order to keep that information "sealed" and out of the "public domain."

93. Nonetheless, with USDA authorization to proceed, the Board and NPPC continued to negotiate the provisions of the Asset Purchase Agreement through 2006.

94. Several payment deferral agreements were executed during the negotiations in order to avoid having to pay the annual license fee for PTOWM that would otherwise have become due in July.

95. Sometime between September 25th and October 3rd of 2006, the Board and NPPC approved a final version of an Asset Purchase Agreement for PTOWM. The agreement involved the four marks related to the Pork design and "The Other White Meat": registration numbers 1418703, 1486548, 3126072, 3129186.

96. Also at some point between September 25th and October 3rd of 2006, USDA approved the final Asset Purchase Agreement, which included the expenditure of $60 million in checkoff funds to NPPC over the following two decades.

97. On October 3, 2006, NPPC and the Board executed the Asset Purchase Agreement and related documents, thereby giving legal effect to the obligation of checkoff funds to NPPC for PTOWM.

98. Each of the $3,000,000 PTOWM checkoff payments is submitted annually for Defendant's review for compliance with the terms and restrictions of the Pork Act, Pork Order, and AMS Guidelines. Defendant has approved every annual payment for PTOWM to date.

### F. **The Board's Launch of a New Advertising "Identity" and Ongoing Annual Payments for PTOWM after PTOWM was Replaced.**

99. Less than five years after purchasing PTOWM, the Board requested and received USDA approval for an expenditure of $5,630,850 to launch "a new brand position for pork" in March 2011. The project entailed a fully integrated marketing campaign—"launch measureables include 582 million advertising impressions, 85 million public relations impressions, integration of new brand position with top 10 retailers and exposure to retail and foodservice industry via aggressive communications and trade media strategies."

100.     On March 4, 2011, the Board issued a news release announcing a campaign that would replace PTOWM with a "proud new brand identity." The announced slogan and identity for the new "branding position" was *Pork: Be Inspired*.

101.     Also announced in the release was PTOWM's relegation to what the Board called a "heritage brand." More specifically, the release expressly stated that "*The Other White Meat* campaign will not be featured in advertising."

102.     Consistent with AMS requirements for multi-year contracts under checkoff programs, the Asset Purchase Agreement for PTOWM includes an "escape clause." The clause permits the Board to voluntarily terminate the agreement for any reason by giving advance written notice of 365 days. The Board would be obligated to make the next annual installment of $3 million following written notice of termination, but no further payments after that.

103.     Despite the public declaration of an entirely new brand identity for pork and the end of PTOWM being featured in advertising campaigns, the Board did not exercise the early termination clause of the purchase agreement that would have excused it from all but one of the remaining *fourteen* annual payments of three million checkoff dollars.

104.     As of the date of this complaint—more than a year after the removal of PTOWM from advertising—the Board has still not exercised the termination clause. The Board's 2012 budget, approved by Defendant, includes the $3 million annual payment for PTOWM without making that expenditure contingent on termination of the purchase agreement that would prevent the $40 million remaining balance from being unlawfully removed from checkoff promotions and fed into NPPC's lobbying operations.

105.     The purported justification for the purchase of PTOWM was the major role it would play as the focal point of checkoff advertising. The purchase price PTOWM was premised on the avoidance of the cost of rebuilding a new brand over seven years. With the replacement of PTOWM, the Board now must commit—and, in fact, is committing—checkoff dollars to building *Pork: Be Inspired* as its "new brand identity." This means that

the Board is now spending checkoff funds to rebuild its brand and simultaneously spending checkoff funds *to avoid* rebuilding its brand.

106.     In the Board's 2010 and 2011 annual auditing statements, PTOWM is accounted for as an intangible asset that has an indefinite lifespan. By the end of 2010, however, the Board requested Defendant's approval to replace PTOWM with a new promotion campaign in 2011 and to remove PTOWM from advertising. The actual life of the PTOWM as the primary branding message of the checkoff program lasted less than five years from the purchase date, which is contrary to the claims of long-term use on which the purchase of PTOWM was approved. The intended advertising use for which Defendant granted approval is no longer a valid basis for continued payments.

107.     Although PTOWM was removed from advertising and replaced with an entirely new promotional identity—an event that marked a significant decrease in use of PTOWM—the Board's 2011 financial report states that no "indicators of impairment were identified during the years ended December 31, 2011 and 2010." The report provides no details relating to how "fair value" was determined for an unused trademark that had already been replaced.

108.     Despite these significant changes to the circumstances under which the purchase agreement was initially approved, there has been no change in Defendant's approvals of annual checkoff expenditures for PTOWM. The full three million dollar payment has been approved every year, including after the removal of PTOWM from checkoff promotions.

109.     Moreover, the Board featured PTOWM in advertising for just two years beyond the period for which the Board already had secured under its 2004 license agreement with NPPC. That 2004 agreement was effective through 2009, with the annual rate for the final two years of the license reverting back to the original one dollar per year.

Had the Board not purchased PTOWM in 2006, the total licensing cost to the Board for the exclusive use of PTOWM between 2006 and the 2009 license expiration would have been less than one million dollars.

110.　　　　If the escape cost is not exercised, the ultimate checkoff cost to producers for *just two additional years* of advertising PTOWM will be $59 million more than would have been expended under the licensing agreement through 2009.

**CLAIMS FOR RELIEF**

**COUNT I: Violation Relating to the Unlawful Authorization to Purchase and Annual Payments for PTOWM**

111.　　　　Plaintiffs hereby incorporate by reference all the preceding paragraphs as if fully set forth herein.

112.　　　　Under the terms of Pork Act, Pork Order and AMS guidelines, Defendant must approve all expenditures of checkoff assessments prior to their obligation; such expenditures may only be approved if they comply with the restrictions set out in this statutory, regulatory, and agency framework and detailed herein.

113.　　　　Defendant's approval of the Board's expenditure of $60 million ($60,000,000) in checkoff funds for the acquisition of PTOWM pursuant to the terms of the 2006 Asset Purchase Agreement, and each of the subsequent annually approved payments for PTOWM, violated restrictions on the lawful use of checkoff expenditures, including those set out in 7 U.S.C. §§ 4808-4809, 7 C.F.R. §§ 1230.58-70, § 1230.73, § 1230.88, and AMS Guidelines.

114.　　　　Defendant's approval of the unlawful purchase agreement and each of the subsequent annually approved PTOWM payments results in checkoff expenditures being used to further NPPC programs that are intended to influence legislation and government

policy, which constitute prohibited uses under 7 U.S.C. § 4809, 7 C.F.R. § 1230.74, and AMS Guidelines, Section VII.

115.     Consequently, Defendant's approval of the unlawful expenditure of $60 million ($60,000,000) in checkoff funds and each of the annually approved payments for PTOWM was, for the reasons stated herein, arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law, and is thus subject to the review and relief provided for in the Administrative Procedure Act, 5 U.S.C. § 706.


**COUNT II: Violation Relating to the Unlawful Approval of Checkoff Expenditures to Replace PTOWM without Terminating Annual PTOWM Payments**

116.     Plaintiffs hereby incorporate by reference all the preceding paragraphs as if fully set forth herein.

117.     Under the terms of Pork Act, Pork Order and AMS guidelines, Defendant must approve all expenditures of checkoff assessments prior to their obligation; such expenditures may only be approved if they comply with the restrictions set out in this statutory, regulatory and agency framework and detailed herein.

118.     Defendant's approval of the expenditure of $5,630,850 to launch "a new brand position for pork" in March 2011 without requiring that the expenditure of funds for the replaced brand be terminated was unlawful. Approval of both expenditures results in irreconcilably conflicting authorizations to build a new advertising identity and simultaneously *to avoid* the necessity of building that new advertising identity which is contrary to the permissible uses of checkoff assessments set out in 7 U.S.C. §§ 4808-4809, 7 C.F.R. §§ 1230.58-70, § 1230.73, and AMS Guidelines.

119.     Defendant's failure to cancel the PTOWM contract after the mark was removed from advertising violates the restrictions of the Pork Act and Order, which

authorizes checkoff contract expenditures only for the "development and conduct" of plans and which require the termination of plans and projects that no longer contribute to effective promotion. 7 U.S.C. § 4808, 7 C.F.R. §§ 1230.58-60, AMS Guidelines.

120.     Defendant's failure to require cancellation of the PTOWM contract after the mark was removed from advertising also violates Section XI.E.1 of the Guidelines, which requires the Board to maintain administrative expenses at the minimum necessary level.

121.     Defendant's unqualified approval of the Board's annual PTOWM payment while also approving payment for its replacement deprives producers of the use of checkoff funds for lawful promotions and effectively *gives* those funds to NPPC to use in programs intended to influence legislation and government policy, which constitute prohibited uses under 7 U.S.C. § 4809, 7 C.F.R. § 1230.74, and AMS Guidelines, Section VII.

122.     Consequently, Defendant's unlawful approval of the expenditures for a new advertising brand identity to replace PTOWM without requiring termination of the Asset Purchase Agreement that would save producers the balance remaining on the PTOWM contract was, for the reasons stated herein, arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law, and is thus subject to the review and relief provided for in the Administrative Procedure Act, 5 U.S.C. § 706.

## COUNT III: Violation Relating to the Unlawful Approval of Checkoff Expenditures for a PTOWM Payment in the Board's 2012 Budget

123.     Plaintiffs hereby incorporate by reference all the preceding paragraphs as if fully set forth herein.

124.     Under the terms of Pork Act, Pork Order and AMS guidelines, Defendant must approve all expenditures of checkoff assessments prior to their obligation; such

expenditures may only be approved if they comply with the restrictions set out in this statutory, regulatory and agency framework and detailed herein.

125.     It was unlawful for the Defendant to approve the expenditure of $3,000,000 in the 2012 budget for the annual PTOWM payment without making such approval contingent on exercising the termination clause that would end future payments and save producers from having to pay the remaining balance of nearly $40 million ($40,000,000) for a brand identity that is no longer featured in checkoff advertising.

126.     Defendant's failure to require cancellation the PTOWM contract *after* the mark was removed from advertising is contrary to the requirements of the Pork Act and Order, which authorize only reasonable expenses, mandate the termination of plans and projects that no longer contribute to effective promotion and that limit checkoff contract expenditures only to the "development and conduct" of plans and projects. 7 U.S.C. §§ 4808-4809, 7 C.F.R. §§ 1230.58-70, § 1230.73, and AMS Guidelines.

127.     Defendant's failure to cancel the PTOWM contract after the mark was removed from advertising also violates Section XI.E.1 of the Guidelines, which requires the Board to maintain administrative expenses at the minimum necessary level.

128.     Defendant's approval of the Board's annual payment *after* PTOWM had already been replaced deprives producers of the use of checkoff funds for lawful promotions and effectively *gives* those funds to NPPC to use in programs intended to influence legislation and government policy, which constitute prohibited uses under 7 U.S.C. § 4809, 7 C.F.R. § 1230.74, and AMS Guidelines, Section VII.

129.     Consequently, Defendant's unlawful approval of such expenditures in the 2012 budget was, for the reasons stated herein, arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law, and is thus subject to the review and relief provided for in the Administrative Procedure Act, 5 U.S.C. § 706.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that the Court issue an Order:

A. Declaring that the authorizations and expenditures of checkoff funds alleged herein were unlawful;

B. Setting aside the unlawful approvals and expenditures of checkoff funds alleged herein and ordering Defendant to recover the already distributed funds from NPPC;

C. Enjoining Defendant from further unlawful authorizations or expenditures of checkoff funds related to the PTOWM marks;

D. Awarding Plaintiffs costs and reasonable attorneys' fees; and

E. Awarding Plaintiffs any other relief that is just and proper.


Respectfully submitted on October 2, 2012.


/s/ Matthew E. Penzer
_____
Matthew E. Penzer, Bar ID CO0016
Jonathan R. Lovvorn, Bar ID 461163

THE HUMANE SOCIETY OF THE UNITED STATES
2100 L. St., N.W.
Washington, DC  20037
(240) 271-6144
(202) 676-2357 Facsimile

Counsel for Plaintiffs