# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
THE HUMANE SOCIETY OF                   )
THE UNITED STATES, *et al.*,            )
                                        )
                Plaintiffs,             )
                                        )
        v.                              )         Civil Action No. 12-1582 (ABJ)
                                        )
TOM VILSACK, *Secretary of the*         )
*U.S. Department of Agriculture*        )
                                        )
                Defendant.              )
_____)

## MEMORANDUM OPINION

Plaintiffs, the Humane Society of the United States ("Humane Society"), Harvey Dillenburg, and the Iowa Citizens for Community Improvement ("ICCI"), have brought this suit against Tom Vilsack, the Secretary of the United States Department of Agriculture ("USDA") under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2012). Am. Compl. [Dkt. # 3] ¶¶ 1–2. They challenge the Secretary's approval of the National Pork Board's purchase of the slogan "Pork, The Other White Meat" from the National Pork Producers Council ("NPPC"), a trade association. *Id.* ¶ 1. They also challenge the Secretary's annual approval of the payments made to NPPC under the terms of the Purchase Agreement. *Id.* Plaintiffs allege that the Secretary's approval was arbitrary, capricious, an abuse of discretion, and contrary to law because the contract between the Board and NPPC results in the use of pork checkoff dollars to influence legislation, and the Board is prohibited from using pork producers' contributions for that purpose. *Id.* Specifically, plaintiffs allege that NPPC, endowed with funds from the Board,

has opposed legislative efforts – that plaintiffs support – to mandate the more humane treatment of pigs and other animals. *Id.* ¶¶ 10–11.

Plaintiffs ask the Court to declare that the approvals and expenditures were unlawful, to set aside the allegedly unlawful approvals and expenditures, to order the Secretary to recover the prior payments from NPPC, and to enjoin further payments from the Board to NPPC under the purchase agreement. Am. Compl., Relief Requested ¶¶ A–C.

Defendant has moved to dismiss plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Def.'s Mot. to Dismiss ("Def.'s Mot.") [Dkt. # 10] at 1. Specifically, defendant asserts that: (1) plaintiffs lack standing; (2) their claims fall outside of the applicable waivers of sovereign immunity; and (3) their claim regarding the legality of the original trademark purchase agreement is time-barred. Def.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s Mem.") [Dkt. # 10] at 2–4. The Court will grant defendant's motion because plaintiffs have failed to allege that they have constitutional standing to bring this suit. The Humane Society and the ICCI do not have a stake in how the Board spends the checkoff funds, and there has been no showing that Mr. Dillenburg or the individual members of the associations have suffered an injury in fact that was caused by the Secretary's actions and can be redressed by this lawsuit.

## BACKGROUND

### I. The Pork Act, the Pork Order, and the Purchase of the "Pork, The Other White Meat" Trademarks

In 1985, Congress enacted the Pork Promotion, Research, and Consumer Information Act ("Pork Act") "to authorize the establishment of an orderly procedure for financing, through adequate assessments, and carrying out an effective and coordinated program of promotion, research, and consumer information designed to (A) strengthen the position of the pork industry

in the marketplace; and (B) maintain, develop, and expand markets for pork and pork products." 7 U.S.C. § 4801(b)(1) (2012).  To carry out the goals of the pork checkoff program, the Pork Act instructed the Secretary of Agriculture to issue a pork promotion, research, and consumer information order applicable to persons engaged in the production and sale of porcine animals, pork, and pork products in the United States and their importation into the United States.  *Id.* § 4803.  The Secretary issued this order in 1986.  *See* Pork Promotion, Research, and Consumer Information Order ("Pork Order"), 7 C.F.R. pt. 1230(A) (2013).

The Pork Act also established a fifteen-member National Pork Board ("Pork Board" or "Board") to develop proposals for promotion, research, and consumer information plans and projects; to submit the proposals to the Secretary for approval; to administer the Pork Order in accordance with the Act; and to receive, investigate, and report to the Secretary complaints of violations of the Pork Order.  7 U.S.C. § 4808.  The Pork Order requires pork producers to pay assessments to the Pork Board.  7 C.F.R. § 1230.71(a)(1).  The Board is then required to use those assessments for financing plans and projects, paying administrative expenses, and creating a reserve for the pork checkoff program.  *Id.* § 1230.73(c).

The Pork Order requires the Secretary to review and approve each plan and project that the Board develops prior to its execution.  7 U.S.C. § 4808(b)(3); 7 C.F.R. § 1230.60(a).  With the approval of the Secretary, the Board may enter into contracts for "the development and conduct of activities authorized under" the Pork Order.  7 U.S.C. § 4808(4)(A)(i).  The Board must also periodically review each plan and project for effectiveness and terminate any projects that do not further the purposes of the Act.  7 C.F.R. § 1230.60(b).  The Pork Act is one of several promotional programs established by Congress; the USDA is also involved in, for example, the marketing of eggs and milk.  The Secretary has delegated responsibility for these

checkoff programs to the USDA's Agricultural Marketing Service ("AMS").  Am. Compl. ¶ 36.

AMS has published Guidelines for Oversight of Commodity Research and Promotion Programs.

*Id.*  This case arises out of a core principle governing the pork promotion program:  the Pork Act,

the Pork Order, and the AMS Guidelines all prohibit the Board from using funds collected

through assessments "for the purpose of influencing legislation."  7 U.S.C. § 4809(e); 7 C.F.R.

§ 1230.74; *see* Am. Compl. ¶ 42.

NPPC is a trade association that lobbied for the passage of Pork Act and submitted the

proposed rule that was later adopted, with minor modifications, as the initial Pork Order.  Am.

Compl. ¶¶ 43–44.  Under the Pork Act, NPPC was authorized to receive a portion of the

mandatory checkoff assessments during the early implementation of the Pork Act and Order.  7

U.S.C. § 4809(c)(2).  NPPC also acted as the Pork Board's primary contractor for implementing

the checkoff program.  Am. Compl. ¶¶ 50, 55.  Between 1986 and 1988, NPPC developed and

registered the trademarks for the Pork, the Other White Meat slogan.  *Id.* ¶¶ 46–53.  The Board

adopted the slogan as its primary advertising campaign in 1987, and continued to use the slogan

until March of 2011. *Id.* ¶¶ 52, 99–100. Between 2001 and 2006, the Board paid a licensing fee to NPPC for the exclusive use of the trademarks. *Id.* ¶¶ 59–65.[1]

On February 14, 2006, the Board asked the Secretary for approval to purchase the Other White Meat trademarks from NPPC for $34.597 million. Am. Compl. ¶¶ 70–71. The USDA authorized the Board to proceed with its proposed acquisition on February 28, 2006. *Id.* ¶ 86. The trademark purchase agreement that the Board negotiated did not require it to pay the full purchase price for the slogan on the agreement's closing date; rather, under the financing terms of the agreement, the Board agreed to pay NPPC $3 million annually for twenty years. *Id.* ¶ 71 (explaining that the annual payments were based on an interest rate of 6.75%). The agreement also gave the Board the option to terminate the contract, with a year's notice, in which case, ownership of the Other White Meat trademarks would revert to NPPC. *Id.* ¶ 102.

On July 18, 2006, the Board requested the Secretary's approval of the terms of the Purchase Agreement. Ex. A to Def.'s Mot. to Dismiss [Dkt. # 10-1]. On September 13, 2006, the USDA sent a letter to the Board stating that it had "reviewed and approve[d] the terms of the Agreement." *Id.* Plaintiffs allege that the Secretary approved the final version of the asset

---

1       The complaint goes into considerable history concerning the relationship between the Pork Board and NPPC. After the enactment of the Pork Act, NPPC issued a request for proposals from advertising agencies for a new campaign for the checkoff program. Am. Compl. ¶ 46. In the fall of 1986, the Bozell advertising firm proposed "Pork, The Other White Meat" as the slogan for the checkoff advertising campaign. *Id.* ¶ 49. After receiving a presentation from NPPC and Bozell, the Board approved the Other White Meat as its primary advertising slogan. *Id.* ¶¶ 49–50.

       In March of 1999, the USDA Office of Inspector General ("OIG") issued an audit report that concluded that the Board had "relinquished too much authority to its primary contractor, the National Pork Producers Council (NPPC), and ha[d] placed NPPC in a position to exert undue influence over Board budgets and grant proposals." *Id.* ¶ 55. As a result of that report, on July 1, 2001, the Secretary implemented a separation of the Board and NPPC. *Id.* ¶ 58. After the separation, the Board executed an exclusive license agreement with NPPC to permit it to continue to use the Other White Meat for its advertising at the rate of one dollar per year. *Id.* ¶ 59. In 2004, the Board, with the Secretary's approval, agreed to increase its payment for the trademark license to $818,000 a year. *Id.* ¶¶ 63, 65.

purchase agreement sometime between September 25 and October 3, 2006. Am. Compl. ¶ 96. On October 3, 2006, NPPC and the Board executed the agreement, and the Board gained ownership of the four trademarks related to the Other White Meat slogan and design. *Id.* ¶¶ 95, 97. To date, the Secretary has approved every annual payment under the agreement. *Id.* ¶ 98.

In March of 2011, the Board requested and received the Secretary's approval to launch a new brand identity for pork, centered around the slogan "Pork: Be Inspired." *Id.* ¶¶ 99–100. Concurrently, the Board has designated the Other White Meat as a "heritage brand" and stated that the slogan would no longer be featured in its advertising. *Id.* ¶ 101. However, the Pork: Be Inspired advertising still uses the Other White Meat trademark logos and design. *Compare Branding Guidelines and FPO Logos*, Pork Be Inspired, http://www.porkbeinspired.com/pork_promoBranding.aspx (last visited Sept. 20, 2013) *with The Other White Meat Brand*, Pork Be Inspired, http://www.porkbeinspired.com/About_OurHeritageBrand.aspx (last visited Sep. 20, 2013).

## II. Procedural History

On September 24, 2012, plaintiffs, the Humane Society of the United States ("Humane Society") and Harvey Dillenburg brought this suit against the Secretary challenging his approval of the purchase agreement and of the subsequent payments. Compl. [Dkt. # 1] ¶ 1. Plaintiffs amended their complaint to add the Iowa Citizens for Community Improvement ("ICCI") as a third plaintiff on October 2, 2012. *See* Am. Compl. ¶¶ 19–22.

Plaintiffs assert three causes of action against defendant under the APA, 5 U.S.C. § 706. Count I alleges that the Secretary's "approval of the Board's expenditure of $60 million ($60,000,000) in checkoff funds for the acquisition of PTOWM pursuant to the terms of the 2006 Asset Purchase Agreement, and each of the subsequent annually approved payments for PTOWM, violated restrictions on the lawful use of checkoff expenditures, including those set out

in" the Pork Act, the Pork Order, and the AMS Guidelines. Am. Compl. ¶ 113. Plaintiffs contend that the approvals were unlawful because they "result[] in checkoff expenditures being used to further NPPC programs that are intended to influence legislation and government policy." *Id.* ¶ 114.

Count II alleges that the Secretary's approval of the use of checkoff funds to launch a new advertising campaign – Pork: Be Inspired – without requiring the termination of the Purchase Agreement is contrary to the permissible use of checkoff assessments under the Pork Act, the Pork Order, and the AMS Guidelines because once the new brand was launched, the Other White Meat slogan ceased contributing to the effective promotion of pork. Am. Compl. ¶¶ 117–22. Count III alleges that the Secretary's approval of the $3 million payment under the Purchase Agreement in the 2012 budget without conditioning that approval on the termination of the agreement was unlawful. *Id.* ¶¶ 124–29. According to plaintiffs, all of these approvals were "arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with" the Pork Act, Pork Order, and AMS Guidelines. *Id.* ¶¶ 115, 122, 129.

Plaintiffs ask the Court to remedy the Secretary's allegedly unlawful actions by issuing an order:

> A. Declaring that the authorizations and expenditures of checkoff funds alleged herein were unlawful;
>
> B. Setting aside the unlawful approvals and expenditures of checkoff funds alleged herein and ordering Defendant to recover the already distributed funds from NPPC;
>
> C. Enjoining Defendant from further unlawful authorizations or expenditures of checkoff funds related to the PTOWM marks;
>
> D. Awarding Plaintiffs costs and reasonable attorneys' fees; and
>
> E. Awarding Plaintiffs any other relief that is just and proper.

Am. Compl., Relief Requested ¶¶ A–E.

Defendant has moved to dismiss the amended complaint under Rule 12(b)(1) for lack of subject matter jurisdiction. Def.'s Mot. at 1. Specifically, he argues that: plaintiffs lack constitutional and prudential standing, their claims fall outside of the applicable waivers of sovereign immunity, and their challenge to the original purchase agreement is time-barred. Def.'s Mem. at 2–4; *see also* Def.'s Reply Mem. in Supp. of Mot. to Dismiss ("Def.'s Reply") [Dkt. # 12]. Plaintiffs have opposed the motion. Pls.' Mem. in Opp. to Def.'s Mot. to Dismiss ("Pls.' Opp.") [Dkt. # 11]. On May 31, 2013, the Court held a hearing on defendant's motion. After the hearing, the Court granted plaintiffs ten days to submit a supplemental memorandum "that addresses whether the individual plaintiff (or an individual member of the organizational defendants) has the injury in fact needed for constitutional standing purposes in response to the arguments set out in pages 12–13 of defendant's reply memorandum." Minute Order (May 31, 2013). Plaintiffs have submitted that memorandum. Pls.' Supplemental Mem. Addressing Pork Producer Standing to Challenge Violations of the Pork Act and Order ("Pls.' Supplemental Mem.") [Dkt. # 14]. Defendant's motion is now ripe for decision.

## STANDARD OF REVIEW

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002). Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-

matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

In evaluating a motion to dismiss under Rule 12(b)(1), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (citations omitted); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharm.*, *Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## ANALYSIS

Plaintiffs sue in five capacities: Dillenburg has brought this suit in his individual capacity, and the organizational plaintiffs have sued on behalf of themselves and their members. Am. Compl. ¶¶ 5, 14, 15, 19. Defendant contends that the Court does not have jurisdiction to

adjudicate this matter because none of the plaintiffs have constitutional standing to challenge the Secretary's approval of the purchase agreement and payments under the agreement. Def.'s Mem. at 2.

"To state a case or controversy under Article III, a plaintiff must establish standing." *Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1442 (2011); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing is a necessary predicate to any exercise of federal jurisdiction, and if it is lacking, then the dispute is not a proper case or controversy under Article III, and federal courts have no subject-matter jurisdiction to decide the case. *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1361 (D.C. Cir. 2012).

To establish constitutional standing, a plaintiff must demonstrate: (1) that he has suffered an "injury in fact"; (2) that the injury is "fairly traceable" to the challenged action of the defendant; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (internal quotation marks omitted); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000).

The party invoking federal jurisdiction bears the burden of establishing standing. *Lujan*, 504 U.S. at 561. When the suit challenges the legality of government action, the standing analysis is relatively straightforward if the plaintiff himself is the object of the action in question. *Id.*

> When, however, . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction – and perhaps on the response of others as well. The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and

> legitimate discretion the courts cannot presume either to control or to
> predict," and it becomes the burden of the plaintiff to adduce facts
> showing that those choices have been or will be made in such manner as to
> produce causation and permit redressability of injury. Thus, when the
> plaintiff is not himself the object of the government action or inaction he
> challenges, standing is not precluded, but it is ordinarily "substantially
> more difficult" to establish.

*Id.* at 561 (citations omitted).

When reviewing the standing question, the Court must be "careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *In re Navy Chaplaincy*, 534 F.3d 756, 760 (D.C. Cir. 2008). Therefore, for the purposes of the standing analysis, the Court will assume that the Secretary's approvals of the purchase agreement and the subsequent payments were unlawful. Even with this assumption, the Court finds that plaintiffs do not have standing to bring this suit – in any of the five capacities in which they sue – because they have failed to plausibly allege that the Secretary's actions caused them an injury in fact that will likely be redressed by a favorable decision in this case. The Court will address the standing of the individual pork producer first, since that determination also affects the standing of the organizations to sue on behalf of their members.

## I. Plaintiff Harvey Dillenburg does not have standing to bring this action.

### A. Injury in fact

The injury in fact test requires a plaintiff to allege that he has suffered an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, as opposed to merely conjectural or hypothetical. *Lujan*, 504 U.S. at 560. An injury is particularized if it affects the plaintiff in a personal and individual manner. *Id.* at 560 n.1. A "plaintiff raising only a generally available grievance about government – claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking

relief that no more directly and tangibly benefits him than it does the public at large – does not state an Article III case or controversy." *Id.* at 573–74.

Dillenburg contends that the Secretary's allegedly unlawful approvals of the purchase agreement and the subsequent payments injured him in two ways. First, he asserts that the "unlawful checkoff expenditures" diminished the return on his "compelled checkoff investment." Am. Compl. ¶ 15. Second, he alleges that he "is further harmed by the improper use of the unlawful expenditures that are distributed to NPPC, a lobbying organization that pushes for policies that Mr. Dillenburg considers harmful to his operations as an independent producer." *Id.* ¶ 16. The Court will consider each of these injuries in turn.

### 1. *Return on investment*

Defendant argues that Dillenburg's interest in the lawful and prudent use of Pork Act assessments is not particularized, but that it is rather a generalized grievance that is shared by the public at large. Def.'s Reply at 12–14. He points to *In re McDowell*, 67 Agric. Dec. 1230 (U.S.D.A. 2008), in which a number of pork producers alleged that the Board's expenditure of pork checkoff funds for an Air Emissions Study violated the Pork Act and the Pork Order. *Id.* at 1237. The USDA found that the harm the plaintiffs described was merely an injury to their interest in the Board's lawful expenditure of its funds. *Id.* It then dismissed the case on the grounds that the plaintiffs' injury was a generalized grievance that did not meet the injury in fact requirement for constitutional standing. *Id.* at 1237–38.

Plaintiffs counter by arguing that their return on investment injury is not a generalized grievance, but rather it is the type of legally protected interest that was at issue in *Stark v. Wickard*, 321 U.S. 288 (1944). Pls.' Supplemental Mem. at 2. In *Stark*, dairy producers challenged certain deductions that the Secretary of Agriculture made from the "producer

settlement fund" that was established in relation to the milk market order in effect at the time. 321 U.S. at 301–02. The Court found that the Agricultural Marketing Agreement Act of 1937 had endowed milk producers with the definite personal right to be paid a minimum price for their milk. *Id.* at 303–04. It then held that the plaintiffs had alleged a concrete and particularized injury to this legally protected right because the right was "not possessed by the people generally" and "the challenged deduction reduces pro tanto the amount actually received by the producers for their milk." 321 U.S. at 302–04.[2]

Neither *McDowell* nor *Stark* is exactly on point. This case is different from *McDowell* because Dillenburg is not asserting that he has been injured merely because the challenged expenditures were illegal.[3] Instead, he argues that like the milk producers in *Stark*, his interest in the return on checkoff funds is "not possessed by the people generally" because members of the public do not pay assessments to the Pork Board, and they therefore have no interest in the return on that assessment. *See* Pls.' Supplemental Mem. at 2. But even if he is correct about that, the claimed reduced return on investment is merely hypothetical and therefore fails to satisfy the injury in fact test. *See Lujan*, 504 U.S. at 560.

---

2 Plaintiffs also cite a number of other cases in their supplemental memorandum. *See* Pls.' Supplemental Mem. at 3–5, citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 353 n.4 (1984); *Ark. Dairy Co-op Ass'n v. U.S. Dep't of Agric.*, 573 F.3d 815, 821 (D.C. Cir. 2009); *Edaleen Dairy, LLC v. Johanns*, 467 F.3d 778, 784 (D.C. Cir. 2006); *Alto Dairy v. Veneman*, 336 F.3d 560, 562 (7th Cir. 2003); *Ry. Labor Execs.' Ass'n v. United States*, 987 F.2d 806 (D.C. Cir. 1993). These cases do not analyze constitutional standing, and therefore, they have no precedential effect on the Court's jurisdictional analysis. *See Hagans v. Lavine*, 415 U.S. 528, 533 n.5 (1974) (stating that when a jurisdictional question is not squarely raised or addressed in a decision, the Court is not bound by that decision in a subsequent case that presents that jurisdictional question).

3 For the same reason, Dillenburg's case is different from the other cases that defendant cites to support his generalized grievance argument. Def.'s Reply at 12–13, citing *Allen v. Wright*, 468 U.S. 737, 754 (1984), *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 483 (1982), *Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 45 (D.D.C. 2012).

The Pork Act and Order authorize the collection of assessments from pork producers for the creation of "an effective and coordinated program" for promoting pork, the pork industry, and pork products in the marketplace. 7 U.S.C. § 4801(b)(1); 7 C.F.R. § 1230.71(a)(1). And the Pork Board endeavors to measure the economic and financial benefit to producers of pork checkoff-funded programs in terms of net return on investment. *See* Robert H. Beach et al., An Economic Analysis of the Effectiveness of the Pork Checkoff Program ES-2 (2007) [hereinafter "2007 Economic Analysis"], *available at* http://www.pork.org/filelibrary/returnoninvestment/2007PorkCheckoffROIFinRpt070515.pdf. From 1999 to 2005, the average producer dollar invested in the checkoff program produced a net return of $13.8; this means that producers would gain an additional $13.80 for each additional $1 of program expenditures. *Id.* at ES-9. Between 2006 and 2010 – after the trademark purchase – the net return rose to $17.4. Pls.' Supplemental Mem. at 2; *see also* Harry M. Kaiser, An Economic Analysis of the National Pork Board Checkoff Program 32 (2012), *available at* http://www.pork.org/filelibrary/ReturnOnInvestment/2011ROIStudyCornellUnivDrHarryKaiser ReportComplete.pdf. Despite this increase in the return on pork checkoff assessments, Dillenburg argues that the trademark purchase and subsequent payments injured him because his return on investment would have been even higher if the money had been spent on "other legitimate programs." Am. Compl. ¶ 15. This argument is entirely conjectural and unsupported by facts.

In *Stark*, the Court concluded that the milk producers' injury was concrete because every dollar deducted from the settlement pool reduced the amount they actually received for their milk. 321 U.S. at 302. Here, although Dillenburg has alleged that the challenged expenditures were unlawful, Am. Compl. ¶ 15, he has not alleged, or provided any facts from which the Court

could infer, that they were ineffective at promoting pork and consequently reduced the return on his checkoff assessment. He has also failed to provide any facts to support his conclusion that the return on his assessment would have been higher if the Board had spent the $3 million annual payments in some other unspecified manner. In the absence of such facts, the Court concludes that the claimed injury to the individual pork producers' return on investment is "speculative at best," and therefore, it is insufficient to meet the injury in fact test. *See Dominguez*, 666 F.3d at 1363–64 (holding that the plaintiff failed to state an injury in fact where he failed to show that the airline's challenged policy caused him to pay a higher price for his ticket).

### 2. NPPC lobbying efforts

Dillenburg also alleges that he is "harmed by the improper use of the unlawful expenditures that are distributed to NPPC, a lobbying organization that pushes for policies that Mr. Dillenburg considers harmful to his operations as an independent producer." Am. Compl. ¶ 16. This allegation does not state an injury: Dillenburg is not asserting that NPPC's lobbying efforts had an impact on his operations or his interests; he alleges only that he *considers* the lobbying efforts to be harmful to his operations. *Id.*; *see also id.* ¶ 17 (alleging that NPPC lobbies for polices that Dillenburg *believes* are harmful to his interests). Moreover, Dillenburg has not provided any facts that could support an inference that NPPC's lobbying actually harmed his operations, nor has he identified the policies that he considers harmful. The amended complaint mentions NPPC's opposition to state legislation prohibiting the use of gestation crates and a federal bill regarding the confinement conditions of egg-laying hens, *id.* ¶¶ 9–11, but Dillenburg has not explained how NPPC's activities regarding these issues could affect his operations as a pork producer.

In relation to the first issue, the amended complaint states that NPPC worked against efforts to pass legal prohibitions on the use of gestation crates, including a ban on the confinement of sows in such crates, in California and eight other unnamed states. Am. Compl. ¶ 10. Dillenburg is from Iowa, not California, *id.* ¶ 15, and he has not alleged that Iowa was one of the eight other states where NPPC got involved. Even if Iowa was one of those eight states, Dillenburg has not alleged that NPPC succeeded in blocking the ban; indeed, the amended complaint states that despite NPPC's efforts, at least one of the nine states passed a ballot initiative banning gestation crates. *Id.* ¶ 10. Further, even if NPPC were to succeed forestalling legislation banning gestation crates in Iowa, the lack of a ban would not require anyone to use them, and Dillenburg could always choose to operate in a manner consistent with his objection to the crates. So, even if NPPC lobbied in Iowa, and even if it was successful – and neither of those facts is set out in the complaint – NPPC's work could not harm Dillenburg's operations.[4]

With respect to the second issue, the amended complaint states that the proposed federal bill applies "strictly to the confinement conditions of the country's egg-laying hens." Am. Compl. ¶ 11. Dillenburg has not explained how a bill that applies only to egg-laying hens affects his operations as a pork producer; he seems to be seeking to advance a general concern for the welfare of animals. Therefore, Dillenburg has not plausibly alleged that NPPC's lobbying

---

4       In that scenario, an assertion that Dillenburg has been injured by NPPC's successful efforts to stop a ban on gestation crates because it forces him to use them in order to compete with other pork producers would fail to satisfy the injury in fact test. This circuit has explained that such an injury is "a 'self-inflicted harm' not fairly traceable to the challenged government conduct." *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 177–78 (D.C. Cir. 2012).

efforts caused him an injury in fact for Article III purposes.[5] But the larger problem here is that it is NPPC, a trade association, that is taking a legislative stance with which Dillenburg disagrees, not the defendant. So, even if Dillenburg could articulate a valid injury in fact, he still would not have Article III standing because his claims raise insurmountable causation and redressability problems.

B. Causation

"It is well established that [c]ausation, or traceability, examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff." *Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169, 176 (D.C. Cir. 2012) (alteration in original) (internal quotation marks omitted); *see also Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 418 (D.C. Cir. 1994) (stating that "fair traceability turns on the causal nexus between the agency action and the asserted injury"). To prove causation, then, Dillenburg must allege facts from which it reasonably could be inferred that, absent the Secretary's approvals of the purchase agreement and the subsequent payments, there is a substantial probability that Dillenburg would not have suffered his injuries. *See Warth v. Seldin*, 422 U.S. 490, 504 (1975). Dillenburg has failed to meet this standard for both of his alleged injuries.

*1. Return on investment*

In the amended complaint, Dillenburg contends that the expenditures under the purchase agreement caused a reduction in the return on his assessments because it "diminishe[d] the

---

5       During the motions hearing, the Court asked plaintiffs to list the cases they believed best supported their assertion that the individual pork producers have an injury in fact. Plaintiffs cited *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243 (D.C. Cir. 2004) and *Hettinga v. United States*, 560 F.3d 498 (D.C. Cir. 2009). But these cases are about exhaustion of administrative remedies. Therefore, they have no precedential effect on the Court's constitutional standing analysis. *See Hagans*, 415 U.S. at 533 n.5.

resources available for promotions or other legitimate programs" and prevented those programs from being fully implemented. Am. Compl. ¶ 15. Even assuming that Dillenburg actually suffered a reduced return on his checkoff assessment, this argument fails to establish the necessary causal link between the Secretary's approvals of the expenditures and that reduction.

The Pork Board's net return on investment figure measures the checkoff program's "effectiveness in enhancing the demand for – and in the case of agricultural research, the supply of – U.S. hogs and pork." *See* 2007 Economic Analysis at ES-2. To demonstrate that the Secretary's approval of the unlawful expenditures caused a reduction in the net return on his assessment dollars, Dillenburg has to factually allege that the challenged expenditure was used for a purpose that (1) was itself ineffective in promoting pork; or (2) reduced the overall effectiveness of the checkoff program. Between 1987 and 2011, the Board used the Other White Meat and the associated logos as its primary advertising message. *See* Am. Compl. ¶¶ 54, 100–01. Dillenburg has not alleged that this advertising campaign – and consequently the Board's payments to NPPC in relation to this campaign – was ineffective at promoting pork or reduced the effectiveness of the overall pork checkoff program.

Dillenburg does allege, however, that the Other White Meat slogan stopped contributing to the effective promotion of pork in 2011 when the Board replaced it with Pork: Be Inspired. Am. Compl. ¶¶ 101, 119. This assertion overlooks the fact that the transaction included more than the purchase of the slogan. The 2006 Purchase Agreement also gave the Board ownership of the associated trademarks, including the design and logo. *Id.* ¶ 95. Although the Board has retired the Other White Meat slogan, it still uses its trademark design and logos in the current Pork: Be Inspired advertising campaign. *Compare Branding Guidelines and FPO Logos*, Pork Be Inspired, http://www.porkbeinspired.com/pork_promoBranding.aspx (last visited Sept. 20,

2013), *with The Other White Meat Brand*, Pork Be Inspired, http://www.porkbeinspired.com/About_OurHeritageBrand.aspx (last visited Sep. 20, 2013). Therefore, the Board is still gaining some value from the trademark purchase agreement, and Dillenburg has not alleged that the continued use of the Other White Meat trademark design and logos are ineffective in helping achieve the pork checkoff program's goals.

Dillenburg's argument that the Board could use the money that is currently spent on the trademark purchase agreement to fully implement "legitimate programs" does not solve his causation problem. This argument assumes that other programs are not being fully implemented because of the payments for the purchase agreement. It also assumes that an increase in funding for "legitimate programs" would make those programs more effective at promoting pork than the Other White Meat trademarks and therefore increase the return on his assessment. This kind of speculation without factual support fails to satisfy the causation requirement. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45 (1976) (holding that a plaintiff fails to prove causation where "[s]peculative inferences are necessary to connect their injury to the challenged actions of" the agency). In sum, Dillenburg has failed to factually allege that the Board's "unlawful checkoff expenditures" – or the Secretary's approval of those expenditures – caused a reduction in the net return on his assessments.[6]

### 2. *NPPC lobbying efforts*

Dillenburg also alleges that he has been injured in fact by NPPC's improper use of checkoff funds for lobbying. Am. Compl. ¶ 16. But the statutes at issue do not govern how the trade association spends its funds, and NPPC is not even a defendant. So, injury at the hands of

---

6     Even if the Court reads Dillenburg's claims more narrowly as alleging that the unlawful use of checkoff funds for lobbying reduced the return on his assessment dollars, that still fails to meet the causation requirement because he has not alleged that this unlawful use was ineffective in promoting pork.

NPPC is insufficient by itself to establish a case or controversy here. The only defendant is the Secretary of Agriculture, and the case or controversy limitation of Article III means that a federal court can only act to redress injury that fairly can be traced to the challenged action of the defendant, "and not injury that results from the independent action of some third party not before the court." *See Simon*, 426 U.S. at 41–42.

Dillenburg contends that he has satisfied the causation requirement because he has alleged that "the millions in expenditures of federal checkoff funds for lobbying purposes would be illegal but for Defendant's improper approval of the transfer of funds to a private lobbying organization." Pls.' Opp. at 22. A plaintiff meets the causation requirement for constitutional standing if he demonstrates that "the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise." *Animal Legal Defense Fund, Inc. v. Glickman* ("*ALDF*"), 154 F.3d 426, 440 (D.C. Cir. 1998) (en banc). In *ALDF*, the plaintiffs challenged the USDA's regulations concerning the treatment of primates by zoos and other exhibits based on aesthetic injuries that they allegedly suffered after observing primates living in inhumane conditions. *Id.* at 429–30. They alleged that the USDA's regulations caused the inhumane conditions because they permitted third party exhibitors to maintain primates in inhumane conditions, even though such conduct was prohibited by the relevant statute and therefore would have been illegal in the absence of those regulations. *Id.* at 438.

In holding that the plaintiffs had standing to sue the Secretary of Agriculture, the Court explained that the causation and redressability elements were satisfied in these types of "causation by authorization" cases "because the intervening choices of third parties are not truly independent of government policy"; the third parties were able to act in a certain manner *because*

*the challenged regulation permitted that action.  See Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 940–41 (D.C. Cir. 2004) (explaining the holding in *ALDF*).  The court further explained that since the relief sought by the plaintiffs would make the third party conduct complained of illegal, the third parties could only preclude redress if they took the extraordinary measure of continuing their injurious conduct in violation of the law.  *See ALDF*, 154 F.3d at 441.

This case is distinguishable from *ALDF*.  The conduct that caused Dillenburg's alleged second injury is NPPC's use of the funds it received from the Pork Board for lobbying purposes.  Am. Compl. ¶ 16.  Even if the Secretary's challenged approvals of the Pork Board's expenditures enabled NPPC to receive the funds and use them in this manner, NPPC's lobbying is completely lawful.  So, unlike the situation in ALDF, the challenged agency decision did not authorize a third party to do something that is otherwise illegal, and it is not necessary to strike down an action by the agency to bring about a change in the third party's conduct.  What is unlawful under the statute here is the Pork Board's use of the checkoff funds for lobbying purposes.

And the amended complaint does not allege that the Board entered into the purchase agreement or that it has continued to make payments under the agreement in order to fund lobbying activities, which is what would make the payments illegal.  *See* Am. Compl. ¶¶ 17, 21 ("[T]he funds at issue here provide a major source of NPPC's annual revenues, which further NPPC's programs that lobby for policies that Mr. Dillenburg believes are harmful to his interests."); *see also id.* ¶ 114 ("Defendant's approval of the unlawful purchase agreement and each of the subsequent annually approved PTOWM payments results in checkoff expenditures being used to further NPPC programs that are intended to influence legislation and government policy . . . .").

These paragraphs do not allege that the funds for the PTOWM purchase were intended for lobbying; they simply say that the Secretary's approval of the challenged expenditures "results in" checkoff funds "being used" to further NPPC's lobbying activities. The use of the passive voice is telling; Dillenburg has not alleged that the Board "used" checkoff funds for that unlawful purpose. The entire case rests on the allegation that the use of checkoff funds for lobbying was one of the downstream effects of the purchase agreement. Therefore, unlike the plaintiffs in *ALDF* who alleged that the agency action specifically permitted the injurious conduct, here, the amended complaint does not allege anywhere that what the *Board* is doing – and therefore, what the Secretary permitted – is using the checkoff funds for lobbying.

The Egg Board case cited by plaintiffs is also distinguishable. Pls.' Opp. at 21–22, citing *Californians for Humane Farms v. Schafer*, No. C 08-03843 MPH, 2008 WL 4449583, at *6 (N.D. Cal. Sept. 29, 2008). It was brought by an advocacy group whose legislative agenda was being opposed by the lobbying efforts being unlawfully sponsored by the Egg Board. The unpublished opinion of the Northern District of California is not directly on point; it only analyzes the preliminary injunction factors and does not address the standing issue. *See id.* at *5–9. Nor does it indicate that the government even raised standing at that stage of the proceedings. But the court recites facts that demonstrate that the lobbying effort was directly funded by the Egg Board, and that it was specifically designed to directly counter the plaintiff's efforts to pass a ballot initiative entitled the "Prevention of Farm Animal Cruelty Act." *Id.* at *6–7. Additionally, the court found that the USDA viewed the Egg Board's campaign as part of the effort to defeat the ballot initiative. *Id.* at *3, *7. So at most, that case would stand for the proposition that an advocacy group might have standing to challenge the USDA's approval of an

agricultural board's decision – in violation of federal law – to use checkoff funds to influence legislation itself.

In this case, plaintiffs simply allege that the ultimate effect of the flow of money was to enable another entity to have the means to fight against legislative initiatives that Dillenburg supports. It is true that the complaint – which the Court has to accept as true – suggests that the whole purpose of the trademark agreement was to funnel money to NPPC, but the amended complaint does not allege that the purpose was to fund NPPC's lobbying efforts in general, or its lobbying against the issues of interest to the plaintiffs in particular. Therefore, Dillenburg has failed to show that the injuries that he allegedly suffered from "checkoff expenditures being used to further NPPC programs," including its lobbying efforts, are fairly traceable to the Secretary's challenged actions.

C. Redressability

To satisfy the third requirement for standing, plaintiffs must demonstrate that it is "'likely' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561. Dillenburg seeks the nullification of the trademark agreement, the recovery of the payments already made under that agreement, and an injunction against further unlawful authorizations or expenditures of checkoff funds in relation to the Other White Meat trademarks. Am. Compl., Relief Requested ¶¶ A–C. But since Dillenburg has failed to allege that any diminished return on his assessment is fairly traceable to the Secretary's approval of the challenged expenditures, *supra* Analysis § I(B)(1), the Court cannot find that the relief he seeks would redress that alleged injury.

Similarly, Dillenburg has also failed to allege that the relief he seeks would redress the injuries that are supposedly caused by the lobbying activities of NPPC. In *Lujan*, the Court explained that there is a "further impediment to redressability" where the funds that a plaintiff

seeks to block account for only a fraction of the funding for the particular project that caused the injury. 504 U.S. at 571. In that case, the funds in question accounted for less than 10% of the injurious project's budget, and the plaintiffs produced nothing to indicate that the project would either be suspended or do less harm if that fraction was eliminated. *Id.* The Court therefore held that the *Lujan* plaintiffs had not met the redressability requirement because it was "entirely conjectural whether the nonagency activity that affects respondents [would] be altered or affected by the agency activity they seek to achieve." *Id.*

Dillenburg argues that a favorable decision in this case would likely redress his injuries because it will "ensure that NPPC is not armed with millions of dollars in unlawful resources to fund" its lobbying operations. Pls.' Opp. at 22. But as in *Lujan*, the annual payments from the Purchase Agreement account for only a portion of NPPC's annual revenue. *See* Am. Compl. ¶ 13 (stating that the funds from the Other White Meat sale represent "as much as 32%" of NPPC's annual budgeted revenue). So, even if plaintiffs were successful, NPPC's advocacy could continue unabated. Also, if the current trademark purchase agreement is nullified, ownership of the Other White Meat and its associated logos would revert back to NPPC. *See* Am. Compl. ¶ 102. Since the Board is still using the design and logos associated with the Other White Meat for its new advertising campaign, it would need to enter into another agreement with

NPPC to purchase or license these logos, and NPPC would continue to receive checkoff funds.[7]
Therefore, Dillenburg has failed to allege that it is "'likely' as opposed to merely 'speculative,' that his injury will be 'redressed by a favorable decision.'" *See Lujan*, 504 U.S. at 561.[8]

Accordingly, Dillenburg does not have Article III standing to bring this suit because he has failed to plausibly allege that the Secretary's approvals of the trademark purchase and the subsequent payments caused him to suffer an injury in fact that is likely to be redressed by a favorable decision in this case.

## II. The Humane Society and ICCI do not have associational standing.

An association has standing to sue on behalf of its members if it can demonstrate that: "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the

_____

[7] The relief that plaintiffs have requested includes: "Enjoining Defendant from further unlawful authorizations or expenditures of checkoff funds related to the PTOWM marks." Am. Compl., Relief Requested ¶ C. Plaintiffs only requested that the Court enjoin "unlawful" authorizations or expenditures, not all expenditures related to the Other White Meat marks. The Court's grant of this injunctive relief would not necessarily prevent the Board from licensing or buying the Other White Meat logos from NPPC because conceivably, the Board could enter into a lawful contract with NPPC in relation to these trademarks. *See id.* ¶¶ 59–65 (failing to allege that the Board's licensing of the trademarks between 2001 and 2006 was unlawful).

Plaintiffs also allege that the value of the Other White Meat trademarks was developed with half a billion dollars of producer-funded promotion. *Id.* ¶ 82. They also note that the Pork Order states that "patents, copyrights, trademarks, inventions, or publications developed through the use of funds collected under the provisions of [the Order] *shall be the property of the United States Government as represented by the Board*." *Id.* ¶ 33, citing 7 C.F.R. § 1230.88. So they argue that before NPPC can re-license or re-sell the trademarks, it must account for the value added to them through checkoff promotions and credit that value back to the pork producers. Pls.' Opp. at 23. Even if this were true, plaintiffs have not alleged that this accounting would not result in a situation whereby the Board would still have to pay checkoff funds to NPPC to license or buy the Other White Meat design trademarks.

[8] Plaintiffs rely on *Californians for Humane Farms* to support their redressability argument. Pls.' Opp. at 23–24. But as the Court has noted, unlike in that case, here plaintiffs have not alleged that the Pork Board is using checkoff funds for lobbying, and therefore it has failed to allege that reversing the purchase agreement would redress their injury. *See supra* Analysis § I(B)(2).

relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002), citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342–43 (1977). The organizational defendants have not satisfied the first two requirements, and therefore, the Court need not address the third.

A. The organizational plaintiffs have not plausibly alleged that at least one of their members has standing to bring the suit in his own right.

As the Court has concluded, Dillenburg and other pork producers who share his alleged injuries do not have standing to bring this suit in their own right, *see supra* Analysis § I, so – assuming that there are some pork producers who are members of the Humane Society or the ICCI – the Humane Society and ICCI do not have standing to bring this action on their behalf. *See* Am. Compl. ¶¶ 14, 20 (asserting standing on behalf of members who suffer the same injuries as Dillenburg).

In the amended complaint, the Humane Society provides an example of a farmer-member, Joe Maxwell, whose rights it is attempting to vindicate. Maxwell is the Humane Society's Director of Rural Development and Outreach and an "active hog producer" who pays assessments into the pork checkoff program. *Id.* ¶ 14. The Humane Society asserts that the challenged expenditures are harmful to Maxwell's "economic interests as a producer and his interests in ensuring the integrity of public information about industrial animal confinement practices and preventing corporate agribusiness trade associations from engaging in lobbying efforts to block industry welfare reform." *Id.* As with Dillenburg, the Humane Society has not provided any factual support or explanation that would demonstrate how NPPC's use of the proceeds from the purchase agreement harms Maxwell's economic interests; the organization and its members are concerned about animal welfare in general, and they take issue with the positions advanced by a trade association that is not a party to the lawsuit.

Moreover, Maxwell's other interests, such as ensuring the integrity of public information about animal confinement practices, are not legally protected by the Pork Act or Order. The sole purpose of the Pork Act is to promote pork in the marketplace. *See* 7 U.S.C. § 4801(b)(1). The Act expressly disavows any interest in imposing quality standards for pork or pork products, providing for control of the production of pork or pork products, or limiting the right of an individual pork producer to produce pork or pork products. *Id.* § 4801(b)(3). Therefore, harm to these interests does not constitute an injury in fact for Article III purposes. *See Lujan*, 504 U.S. at 560 (stating that to meet the injury in fact test, a plaintiff has to allege that he has suffered "an invasion of a legally protected interest").

B. The organizational plaintiffs have not alleged that the interests they seek to protect are germane to their purpose.

There are situations when an organization does have standing to bring an action on behalf of its members. Associational standing allows associations to "draw upon a pre-existing reservoir of . . . specialized expertise and research resources relating to the subject matter of the lawsuit that individual plaintiffs lack." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 289 (1986). To ensure that associations that bring lawsuits on behalf of their members have the necessary specialized expertise, the Supreme Court has required the organization to show that the interests it seeks to represent are "germane" to its purpose. *Hunt*, 432 U.S. at 343. The germaneness requirement is not rigorous: it requires "only that an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 56 (D.C. Cir. 1988). The purpose of the germaneness test is "preventing litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care." *Id.* at 57.

According to plaintiffs, "Defendant's payment approvals of an insupportable asset purchase that effectively misdirects producer checkoff funds that should be used for promotions or other legitimate programs to a lobbying group that consistently expends significant funds to oppose key policies supported by both the organizations and their members . . . is the focus of the case." Pls.' Opp. at 15, citing Am. Compl. ¶¶ 14, 20–21. As alleged in the amended complaint, the Humane Society is a nonprofit animal protection organization whose "core mission [is] to promote humane care, oppose intensive confinement, and advance the legal protections that promote the well-being of animals." Am. Compl. ¶¶ 4, 13. Similarly, the Iowa Citizens for Community Improvement is a nonprofit membership organization comprised of "thousands of Iowans from all walks of life – urban and rural" that focuses on "putting people first" in a panoply of issues including immigrants' rights, "clean" elections, economic justice, and opposing "factory" farms. *Who We Are*, Iowa Citizens for Community Improvement, http://iowacci.org/who-we-are/ (last visited Sep. 20, 2013); *Issues*, Iowa Citizens for Community Improvement, http://iowacci.org/issues/ (last visited Sept. 20, 2013). The goals that bring the memberships of these two organizations together are protecting animals and assuring their humane treatment, and promoting responsible and sustainable farming. *See Hodel*, 840 F.2d at 59 (discussing the Humane Society's goals); Am. Compl. ¶ 20. Their special expertise lies in those areas.

But that is not what this case is about. The organizations have not alleged that they have any special expertise in the subject of this suit: the implementation of the Pork Act and the manner pork checkoff funds can be used. Nonetheless, the organizational plaintiffs maintain that determining whether the checkoff funds were used lawfully and effectively is germane to their purpose because one of their priorities is protecting the interests of their farmer-members. Pls.'

Opp. at 15. It is true that both of these organizations have members who are farmers, but that does not give them special expertise in checkoff programs or make them "farmer-representing organizations." *See id.* at 12. The Humane Society and ICCI do not represent the general interests of their farmer-members; instead, the amended complaint makes it clear that these organizations represent those farmers whose principles and interests align with the organizations' primary purposes. *See* Am. Compl. ¶ 14 (stating that one of the Humane Society's priorities is "protecting the interests of its farmer members who share the organization's values of humane animal care"); *id.* ¶ 20 (stating that one of ICCI's priorities is "protecting the interests of its members who share the organization's values of responsible and sustainable family farming"). So the fact that some members of the organization may be farmers, or even pork producers, does not alter the germaneness analysis; it does not change the fact that determining the appropriate or lawful use of checkoff funds or valuing asset purchases are not the grounds that bring their members together or the areas in which they have special expertise.

Since the organizational plaintiffs have failed to meet the first two requirements of associational standing, they do not have standing to bring this suit on behalf of their members.

**III. The Humane Society and ICCI do not have constitutional standing to bring this suit as organizational plaintiffs.**

To sue on its own behalf, an organization must meet the standing requirements applicable to individuals: (1) injury in fact, (2) causation, and (3) redressability. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982); *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995).

The organizational plaintiffs assert that their alleged harm – having to devote significant resources to counter "NPPC's checkoff-funded lobbying activities" – constitutes a cognizable injury in fact under *Havens* and this circuit's precedent applying that decision. Pls.' Opp. at 18–

19, citing Am. Compl. ¶¶ 12–13, 20–21. To allege an injury in fact under the *Havens* line of

cases, an organization must assert that it has suffered a "concrete and demonstrable injury to the

organization's activities – with [a] consequent drain on the organization's resources –

constitut[ing] . . . more than simply a setback to the organization's abstract social interests."

*Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (alterations in original)

(internal quotation marks omitted), citing *Havens*, 455 U.S. at 378–79.

Specifically, the "organization must allege that discrete programmatic concerns are being

directly and adversely affected by the challenged action." *Nat'l Taxpayers Union*, 68 F.3d at

1433 (internal quotation marks omitted); *see also Havens*, 455 U.S. at 379 (finding that the

organizational plaintiff alleged an injury in fact where it asserted that the defendant's racial

steering practices "perceptibly impaired" its ability to provide counseling and referral services to

low- and moderate-income homeseekers); *Abigail Alliance for Better Access to Developmental*

*Drugs v. Eschenbach*, 469 F.3d 129, 132–33 (D.C. Cir. 2006) (finding an injury in fact where the

organizational plaintiff alleged that it had to divert significant time and resources from its

activities, including assisting its members and the public in accessing potentially life-saving

drugs, counseling, referral, advocacy, and educational services, in order to help its members and

the public address new FDA requirements).

But the D.C. Circuit has not found standing when "the only 'service' impaired is pure

issue-advocacy." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005).

In *Center for Law and Education*, the organizational plaintiffs alleged that the challenged federal

regulations had injured them because they "force[d] them to change their lobbying strategies [to]

a more costly form of lobbying." *Id.* at 1161. In rejecting this alleged harm, the court observed:

"This Court has not found standing when the only 'injury' arises from the effect of the

regulations on the organizations' lobbying activities (as opposed to the effect on non-lobbying activities) . . . ." *Id.*; *see also Nat'l Treas. Emps. Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) ("[C]onflict between a defendant's conduct and an organization's mission is alone insufficient to establish Article III standing. Frustration of an organization's 'objectives is the type of abstract concern that does not impart standing.'").

Similarly, in *National Taxpayers Union*, the National Taxpayers Union ("NTU"), a nonprofit organization formed to promote fair, responsible, and legal revenue-raising practices by the U.S. government, sought to enjoin the enforcement of Section 13208 of the Omnibus Budget Reconciliation Act of 1993 ("Section 13208"), Pub. L. No. 103-66, 107 Stat. 312, which set the maximum federal estate and gift tax rates. 68 F.3d at 1430. The organization argued that its injuries included "the drying up of its donations, the costs of NTU's anti-Section 13028 [sic] education and lobbying efforts, and NTU's moral despair at seeing its goals frustrated." *Id.* at 1432 (alteration in original). The court held that these alleged injuries were insufficient for Article III purposes. Specifically, the court explained that the impact of Section 13208 upon NTU's educational and legislative initiatives did not constitute an injury in fact because an organization cannot "manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit." *Id.* at 1434, citing *Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization."). The court explained that unlike in *Havens*, where the defendant's practices perceptibly impaired the organization's ability to provide services to its clients, Section 13208 did not force NTU to spend resources in a way that kept it from pursuing its true purpose of

monitoring the government's revenue practices. *Id.* ("NTU cannot convert its ordinary program costs into an injury in fact from Section 13208.").

Here, the organizational plaintiffs have not alleged that NPPC's lobbying efforts "impaired" their ability to deliver any sort of services to clients or third parties. Rather, they assert one injury: being required to devote significant resources to counter "NPPC's checkoff-funded lobbying activities." Pls.' Opp. at 18–19. As was the situation with the advocacy and lobbying organizations in *National Taxpayers Union* and *Center for Law and Education*, spending funds to counteract opposition to a legislative agenda is a normal and critical part of the Humane Society and ICCI's mission and operations. Put another way: lobbying is what these organizations do, so being prompted to do it can hardly qualify as an injury that confers constitutional standing. Indeed, the organizations explain that they would have directed their funds to advocacy, legislation, and education related to improving the treatment of pigs and other animals – and promoting independent and small family farming – anyway. Am. Compl. ¶¶ 12, 20–21. So, the fact that they have decided to redirect some of their resources from one legislative agenda to another is insufficient to give them standing.[9] *See Nat'l Taxpayers Union*, 68 F.3d at 1434. The organizational plaintiffs cannot convert an ordinary program cost –

_____

[9]     In *Fair Employment Council of Greater Washington., Inc. v. BMC Marketing Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994), the D.C. Circuit explicitly rejected a fair-housing organization's argument that it had standing because the mere expense of sending racially diverse "testers" to an employment agency that was allegedly discriminating on the basis of race was an injury in fact fairly traceable to the agency's conduct. The court explained: "The diversion of resources to testing might well harm the Council's other programs, for money spent on testing is money that is not spent on other things. But this particular harm is self-inflicted; it results not from any actions taken by [the defendant], but rather from the [plaintiff's] own budgetary choices." *Id.* The court explained that to meet the injury in fact requirement, the organization had to show that the agency's discriminatory actions "perceptibly impaired" its programs. *Id.* Similar to testing, here, advocacy and legislation for animal care and small family farming is at the core of the organizational plaintiffs' mission. *See* Am. Compl. ¶¶ 13, 19. And the diversion of the organizational plaintiffs' resources to challenge NPPC's lobbying efforts is not sufficient for injury in fact.

lobbying for their interests – into an injury in fact.[10] Therefore, the organizational plaintiffs have not alleged an injury in fact sufficient for Article III purposes.

Even if the Court were to find that the organizational plaintiffs have alleged an injury in fact, they still would not have standing because they have failed to meet the causation and redressability prongs for the same reason that plaintiff Dillenburg faltered: the defendant did not cause, and cannot cure, their injury.

The cases that plaintiffs cite to support their organizational standing argument underscore this point. *See* Pls.' Opp. at 19–22. In *Havens*, the equal opportunity housing organization sued an apartment complex owner for allegedly discriminating between potential renters on the basis of their race. 455 U.S. at 367–68. Similarly, in *Abigail Alliance*, a non-profit organization, comprised of terminally ill patients and their supporters, that advocated for access to developmental drugs, sued the FDA because its policy barred the sale of investigative drugs to terminally ill patients. 469 F.3d at 131–32. In *Humane Society of the United States v. U.S. Postal Service*, the Humane Society sued USPS for refusing to declare a monthly periodical that allegedly violated the Animal Welfare Act, 7 U.S.C. § 2156, to be nonmailable. 609 F. Supp. 2d 85, 90–91 (D.D.C. 2009).

In each case, the organization sued the entity that directly caused the injury. But here plaintiffs have not sued the organization responsible for their alleged harm: NPPC. As the Court has already concluded, plaintiffs have not plausibly alleged that the injury supposedly caused by checkoff funds "being used" for lobbying activity is fairly traceable to the challenged agency action or that it is likely to be redressed by a favorable decision in this case. *See supra* Analysis

---

10    The amended complaint explains that NPPC is not the sole opponent of the organizational plaintiffs' legislative efforts. Am. Compl. ¶ 11 (stating that opposition to the bill is "led in large part by NPPC"). So even absent NPPC's lobbying, the organizational plaintiffs would still have to spend resources countering the opposition of others.

§ I(B)(2)–(C).  Therefore, the organizational plaintiffs have failed to plausibly allege that they have standing in their own capacities to bring this action.

## CONCLUSION

For the reasons stated above, the Court will grant defendant's motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction because plaintiffs lack constitutional standing to bring this suit.  A separate order will issue.[11]


AMY BERMAN JACKSON
United States District Judge

DATE: September 25, 2013

---

[11]     The Court also notes that there is a statute of limitations issue in this case.  Part of Count I challenges the approval of the purchase agreement, and it was on September 13, 2006, that the USDA sent a letter to the Board stating that it had "reviewed and approve[d] the terms of the [Trademark Purchase] Agreement."  Ex. A to Def.'s Mot. to Dismiss.  Plaintiffs filed their complaint on September 24, 2012, which is after the expiration of the six year statute of limitations for APA claims.  *See* 28 U.S.C. § 2401(a) (2006).  Plaintiffs allege that the Secretary approved the final version of the Other White Meat asset purchase agreement sometime between September 25 and October 3, 2006.  Am. Compl. ¶ 96.  But they have provided no evidence to support this allegation.  In any event, the Court need not decide this issue because plaintiffs have failed to plausibly allege that they have constitutional standing to bring this suit.