## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **THE HUMANE SOCIETY OF THE UNITED STATES** *et al.*,<br><br>    **Plaintiffs,**<br><br>**v.**<br><br>**TOM VILSACK, Secretary of the U.S. Department of Agriculture,**<br><br>    **Defendant.** | **Civil Action No. 1:12-cv-1582 (ABJ)** |

### JOINT APPENDIX

In accordance with Local Rule 7(n), Plaintiffs file this Joint Appendix, which has been prepared and agreed on by the parties. The Joint Appendix contains the following portions of the Administrative Record, which are cited or otherwise relied upon in memoranda of the parties:

- AR 1-12
- AR 71-73
- AR 153-198
- AR 199-203
- AR 204-282
- AR 283-359
- AR 437-535
- AR 543-556
- AR 704
- AR 737
- AR 777-784
- AR 787
- AR 790-791
- AR 802
- AR 803-806
- AR 810-812
- AR 813-816
- AR 819-885
- AR Supp. 903
- AR Supp. 1049

June 2, 2017

Respectfully submitted,

 */s/ Matthew E. Penzer*
MATTHEW E. PENZER
1255 23rd Street, N.W., Suite 450
Washington, D.C. 20037
(240) 271-6144
mpenzer@humanesociety.org

*Counsel for Plaintiffs*

 **Agricultural Marketing Service**

Office of the
Deputy Administrator
Livestock, Poultry, and
Seed Program

1400 Independence Avenue, SW.
Room 2092-S, STOP 0249
Washington, D.C.  20250-0249

APR 2 0 2016

Mr. Calvin Vandekrol
National Pork Board
Post Office Box 9114
Des Moines, Iowa  50306

Dear Mr. Vandekrol:

This is in response to your November 23, 2015, email requesting approval of the fiscal year (FY) 2016 National Pork Board (Board) budget, as approved by the Board.

On December 24, 2015, we approved $61.2 million of the Board's $64.1 million FY 2016 budget request.  We held in abeyance approval of the $3 million payment for the purchase of the trademark "Pork. The Other White Meat" under the Agreement between the Board and the National Pork Producers Council pending AMS' review of the Agreement and valuation.

Payment to NPPC cannot be made until May 16, 2016.  At that time, the Board may submit a purchase order for our approval of the $3 million payment to NPPC.

Sincerely,

Craig A. Morris
Deputy Administrator
Livestock, Poultry, and Seed Program

1



| | Office of the | 1400 Independence Avenue, SW. |
| **USDA**  **Agricultural Marketing Service** | Deputy Administrator | Room 2096-S, STOP 0249 |
| | Livestock, Poultry, | Washington, DC  20250-0249 |
| | and Seed Program | |

April 20, 2016

INFORMATIONAL MEMORANDUM

TO:  Dana Coale
Acting Associate Administrator

FROM:  Craig A. Morris
Deputy Administrator
Livestock, Poultry, and Seed Program

SUBJECT:  Review of Contract for the Purchase of Trademarks Relating to Pork

The Agricultural Marketing Service (AMS) has completed its review of the annual expenditure of $3 million pursuant to the Asset Purchase Agreement (Contract) between the National Pork Board (NPB) and the National Pork Producers Council (NPPC) for the purchase of the following four trademarks:  "PORK and Design," Reg. # 1418703 (the word "pork" in distinctive lettering set against a pork loin silhouette); "THE OTHER WHITE MEAT," Reg. # 1486548; "THE OTHER WHITE MEAT and Design," Reg. # 3126072, and "THE OTHER WHITE MEAT," Reg. # 3129186 (collectively "the Pork trademarks").  After careful review of the Contract, the valuation report by Stout Risius Ross (SRR), the submissions by NPPC and the Humane Society of the U.S. (HSUS), and U.S. Department of Agriculture (USDA) documents, I have decided to approve the continuing annual payments of $3 million under the terms of the Contract.

BACKGROUND

On July 1, 2006, NPB and NPPC entered into the Contract to transfer ownership of the Pork trademarks from NPPC to NPB for $34,597,000.  The purchase price was based on multiple valuations conducted by experts who valued the Pork trademarks from $35 million to over $200  million, including an estimate that the incremental rebuilding/replacement costs of the brand were approximately $36 million over seven years.  The Contract included financing of the purchase with an annual interest rate of 6.75% for a term of 20 years.[1]  Thus NPB agreed to pay NPPC an annual principal and interest payment of $3 million per year for 20 years.  AMS approved NPB's purchase of the Pork trademarks in a decision memorandum dated February 28, 2006, and has approved NPB's annual budgets providing for installment payments in the succeeding ten years.  Under the Contract, NPB may terminate the Contract for any reason, as long as it provides one year notice, but would forfeit its ownership interest in the Pork

---

[1] In July 2006, the prime interest rate in July 2006 was 8.25% and the Treasury Bill rate was 4.948%.

Page 2

trademarks. Currently, there are 10 remaining annual payments of $3 million for a total $30 million, with approximately $20.5 million of that amount in unpaid principal.

In 2011, NPB designated "THE OTHER WHITE MEAT" as a "heritage" brand and ceased to use the three trademarks that include the slogan as part of its primary marketing campaign, though it continues to use the three trademarks on its website and in nutritional materials. At the same time, NPB built on the "PORK and Design" trademark through a new marketing campaign titled "Pork: Be Inspired," which utilizes the lettering and pork loin silhouette from the "PORK and Design" trademark. Some of the State associations[2] continue to use "THE OTHER WHITE MEAT" in their merchandising. Many State associations currently use a stylized "PORK and Design" as part of their logos.

In 2012, HSUS brought suit against USDA for approving the Contract in 2006 and for continuing to approve the annual payments, after NPB decided not to use the "THE OTHER WHITE MEAT" trademarks in its primary marketing campaign.[3] While the district court initially dismissed the case for lack of standing, the Court of Appeals reversed and remanded for further proceedings. In light of questions raised in the litigation and the change in the use of the Pork trademarks associated with the introduction of the "Pork: Be Inspired" campaign, USDA deemed it appropriate to obtain an independent valuation and review the Contract for the purchase of the Pork trademarks before deciding whether to approve the inclusion of the 2016 installment payment in NPB's 2016 budget. AMS invited both HSUS and NPPC to submit materials for consideration as part of this process.

As part of its review, AMS directed NPB to contract for an independent valuation of the current value of the Pork trademarks. AMS provided a list of potential contractors to NPB. After discussions with NPB, AMS identified SRR as the most qualified company among those that submitted a proposal because of the breadth and depth of the analyses in their valuation methodology as described in their proposals. Submissions from HSUS and NPPC dated February 15 and February 29, 2016, which included valuation reports from experts obtained by each organization, were provided to SRR. SRR delivered its final valuation report to AMS on March 30, 2016. On that same day USDA provided a copy of the SRR valuation report to HSUS and NPPC to allow them an opportunity to review and provide comment by April 13, 2016, if they chose to do so. In order to inform such comments, on April 5, 2016, AMS provided NPPC and HSUS with copies of one another's submissions, redacting material NPPC or HSUS had indicated was privileged or confidential. Both organizations made additional submissions on April 13, 2016. Although it is my understanding that both organizations have been in contact with USDA counsel during the course of this review, my consideration and decision here have been confined to their February 15, February 29, and April 13 submissions.

---

[2] Under the Pork Promotion, Research and Consumer Information Order (Pork Order), 7 C.F.R. part 1230. State associations receive a portion of the assessments paid to the National Pork Board. 7 C.F.R. § 1230.72.

[3] Pursuant to an advisement adopted during the March 3-5, 2016 meeting of the National Pork Producers Delegate Body, USDA was petitioned by the Delegate Body to "mount a vigorous defense" of HSUS's lawsuit. AMS views that advisement as separate from its review and will address it separately as appropriate.

Page 3

Set forth below is AMS's evaluation of the independent report submitted by SRR, the expert valuations and comments submitted or referenced by HSUS and NPPC in their submissions and my conclusion as to whether to approve continued payments under the Contract.

## VALUE OF PORK TRADEMARKS

### A. Expert Valuations

In addition to the independent valuation report prepared by SRR, both HSUS and NPPC submitted valuation reports in support of their submissions. AMS received and considered the CONSOR Intellectual Asset Management (CONSOR) report submitted by HSUS and the Cupitor Consulting LLC (Cupitor) report submitted by NPPC. AMS also received from HSUS a CONSOR critique of the SRR valuation report. AMS accepts that each expert has the credentials to conduct a valuation of the Pork trademarks. All three valuation experts agree that there are three methods available to conduct valuations of trademarks: the market approach, the income approach, and the cost approach. The relief from royalty approach is considered either an income approach or a hybrid of the market and income approach. Weston Anson, the Chairman of CONSOR, noted in his book, The Tangible Assets Handbook:[4]

- The Market Approach should be used in all instances where comparable sales or other transactions can be identified that are very similar to the intangible asset being valued.
- The Cost Approach, using either the replacement or reproduction focus for the analysis, is often used as a secondary method to measure the value of an asset.
- The Income Approach, and/or Relief from Royalty Approach, are used where specific income levels and/or streams of real or imputed royalties can be identified for a given asset.

SRR's valuation as of January 1, 2016 ranged from $113 million to $132 million. CONSOR's valuation as of July 1, 2006 ranged from $2,533,595 to $17,558,403. Cupitor's fair market valuation as of December 31, 2016 is $175 million. For the reasons set forth below it is my opinion that SRR's valuation represents the most accurate and reliable of the valuations reviewed by AMS, and it therefore provides the best basis for deciding whether to approve continuing payments under the Contract at this time.

### 1. SRR Valuation

In arriving at its valuation range, SRR primarily adopted the cost approach because of problems with valuing the trademarks using an income or market approach and the availability of reliable data for use in the cost approach. The cost approach calculates the cost of replacing the trademark, i.e., the cost for an organization to develop a new trademark with the same level of effectiveness as measured by aided awareness studies of the percentage of people who are aware of the trademark. "THE OTHER WHITE MEAT" had an aided awareness of 82%, one of the

---

[4] http://www.consor.com/intellectual-property-advice/traditional-intangible-assets-valuation-techniques.html

4

Page 4

most recognizable trademarks in the United States. SRR took into account the discontinued use of three trademarks in NPB's primary marketing campaign by modeling the replacement cost to achieve only 35% and 45% aided awareness. In calculating the replacement cost, SRR calculated the cost of four indications of value: expected costs of launching a new brand, slogan, or marketing campaign by a generic large company, NPB's cost to develop the "Pork: Be Inspired" campaign, NPB's cost in the development and promotion of the Pork trademarks, and cost of other checkoff program marketing campaigns. SRR then weighed these four indications to calculate its final valuation range for the Pork trademarks at $113 million to $132 million. Finally, it conducted a test using the relief from royalty approach to determine if its valuation was reasonable by using reasonable assumptions.

I found SRR's valuation to be helpful. It identifies four separate indications of the value of the Pork trademarks and weighs each indicia of value according to its usefulness to produce a single blended estimate. And it separately includes reasonableness checks to test the consistency of its estimate with alternative valuation methodologies, finding its estimate to satisfy these tests.

As part of its submission on April 13, 2016, HSUS included a critique of the SRR valuation report by CONSOR. CONSOR stated that SRR should not have used the cost approach because it is not appropriate for an older or unique asset. They argued that (1) using replacement cost to substitute a unique name is not an indicator of value, citing the Coke brand as an example of why the replacement cost is not a reliable indicator of value; (2) aided awareness is a poor metric of brand value, especially if the brand has negative connotations; (3) generic marketing campaigns do not increase value or profit, citing the Ford Company's EDSEL; and (4) it was not appropriate to use the cost of the "Pork: Be Inspired" to calculate the value of the Pork trademarks.

I found CONSOR's critiques to be unpersuasive.

(a) Cost Approach Methodology

CONSOR asserted that SRR mistakenly applied the cost approach to the valuation because this approach is often a poor measure of value when applied to intellectual property and should only be used if the property is a start-up or is being valued for the original owner. According to CONSOR, cost did not equate to value, especially in the case of "THE OTHER WHITE MEAT", because NPB has concluded that its value had been exhausted and decided to rebrand pork. It further argued that the cost approach is ineffective in estimating value in the marketplace and the income approach (i.e. relief from royalty) is the appropriate methodology because it estimates the market value of a trademark.

The cost approach is a recognized approach and SRR adequately explained the reasons for using this approach in its report. While the market approach is the preferred method, there is little or no public information on transactions to conduct an analysis. Due to these difficulties, SRR then moved to the cost method and was able to access reliable information to conduct a valuation using replacement cost.

Page 5

CONSOR criticized SRR's indications of value by generally concluding that they do not indicate value. Beyond this general criticism, they found SRR's use of costs for "Pork: Be Inspired" as one indication of value as not feasible because this trademark is part of an active marketing campaign while the value of "THE OTHER WHITE MEAT" has been exhausted. However, that criticism failed to recognize that the "Pork: Be Inspired" campaign includes the "PORK and Design" trademark. It is reasonable for SRR to consider the cost of the "Pork: Be Inspired" campaign as part the replacement cost since it uses the "PORK and Design" trademark.

SRR also considered the possibility of using the relief from royalty approach whereby the value is based on the amount of royalty fees an organization avoids by owning the trademark. The key factors in determining the value are the royalty rate and the royalty base. In his book, Mr. Anson cautioned that the "Relief from Royalty Approach has become misused and abused. Too many valuations are based on theoretical 'marketplace royalty rates.' It is true that some intellectual property, particularly trademarks, patents, brands, and copyrights, do have comparable market royalty rates that are readily established. However, for many intangible asset valuations, comparable royalty rates are speculative at best." SRR researched comparable royalty rates for a trademark with a slogan that promotes a generic commodity. They found only one comparable trademark---the "Got Milk?" trademark slogan---and thus concluded that they could not determine a comparable royalty rate. There were also difficulties in determining the royalty base. As discussed below, CONSOR's own failures in selecting a proper royalty base bolster SRR's conclusion that such an approach would be problematic.

Although SRR did not use the relief from royalty approach in its valuation, it did use this approach to test the reasonableness of its valuation under the cost approach. SRR based its analysis on the revenue of the pork industry. CONSOR found it contradictory that SRR would reject this approach in their valuation but use it in their reasonableness test, but this criticism misunderstands the purpose of the reasonableness test. The purpose is not to place an independent value on the Pork trademarks. Rather, the test simply confirmed the reasonableness of the SRR valuation because the inputs and assumptions necessary to arrive at the midpoint of the valuation range were conservative and reasonable. CONSOR also asserted that SRR used unrealistic royalty rates, ranging from 0.27% to 3.76%, based on the 7% rate for "Got Milk?" because it does not consider "Got Milk?" as a comparable for "THE OTHER WHITE MEAT" trademarks. CONSOR's arguments are not compelling because six of the ten test scenarios that SRR presented used a royalty rate of 1.1% or less, which is within range of the 0.92% royalty rate that CONSOR used in its valuation. Additionally, "Got Milk?" is as least as comparable as, if not more so than, any other trademarks that the valuation experts used in their valuations because it is used to promote an agricultural commodity in a program similar to the Pork Order.

(b) Aided Awareness

CONSOR cited to several articles to support its claim that awareness is not a valid indicator of value. In its response to CONSOR's critique, SRR provided several articles that support the idea of using awareness to determine value. From a practical standpoint, organizations engage in marketing campaigns to promote and raise consumer awareness of their brand and trademarks. Awareness is a method to evaluate the effectiveness of the marketing campaign and effectiveness

6

Page 6

is a strong indicator of value. Thus it logically follows that awareness is a reasonable metric to use to determine replacement cost.

### (c) Fair Market Value

CONSOR asserted that SRR should have valued the Pork trademarks at fair market value and not at investment value, in part, because of the 2001 settlement which requires that contracts between NPB and NPPC be at fair market value. CONSOR misunderstood the purpose of AMS's review of the Contract. While fair market value is appropriate to determine whether NPB may have entered into the Contract with NPPC to acquire the Pork trademarks in 2006,[5] this AMS review concerns the decision to approve the annual payment under the Contract. Since NPB already has ownership of the Pork trademarks, it is appropriate to use investment value because, as defined by the American Institute of Certified Public Accountants, it is "the value to a particular investor based on individual requirements and expectations." In this case, NPB is the investor.

### (d) Sources of Value

CONSOR also questioned SRR's use of the exclusivity, the option value, and annualized growth rate of the hog and pig farming industry as sources of value. I find CONSOR's arguments to be unpersuasive because they appear to misunderstand the purpose of SRR's analysis. SRR used these analyses to support the conclusion that the Pork trademarks had value but did not use those sources directly to calculate the value of the Pork trademarks using the cost approach. By exclusivity, SRR referred to the efforts and resources that NPB expended to defend the Pork trademarks in infringement suits and to investigate possible infringements of the Pork trademarks. I find that attempts to infringe upon the Pork trademarks are indicators that other organizations find value in the trademark and thus are a legitimate source of value even though they are not quantified. I also agree with SRR's conclusion that the Pork trademarks have value because NPB has the option to license those trademarks for a fee in the future. Since there is no indication that NPB has attempted to do so in the past, it is not possible to calculate how much in licensing fees NPB would be able to realize, but the possibility that the Pork trademarks could generate licensing fees is an indicator of value. As for the annualized growth rate of the hog and pig farming industry, CONSOR questions whether SRR should have used it as a positive indicator of value. This annualized growth rate was one of 21 factors that SRR used to analyze whether the Pork trademarks have value. Even if CONSOR's contention that this factor should be neutral-at-best was accepted, this would not affect SRR's valuation of the Pork trademarks.

### 2. *CONSOR Valuation*

In a valuation report submitted by HSUS on February 29, 2016, CONSOR used the relief from royalty approach based on NPB's revenues to approximate the value of the Pork trademarks.

---

[5] Section III.D of the Settlement Agreement for *Michigan Pork Producers Association, et al., v. Veneman, et al.,* Number 1:01-CV-34 (W. D. Mich.) states "… nothing herein shall prevent the Board from *entering into specific contracts* with NPPC, or successor or similar organizations, provided any such contracts are at fair market value." (emphasis added).

7

Page 7

The CONSOR valuation is problematic for three reasons. First, and most fundamentally, CONSOR used the NPB's revenues as the royalty base. This decision fails to recognize the unique nature of NPB as a research and promotion board under the oversight of the Secretary of Agriculture. The goal of NPB's marketing campaign is to promote pork as a whole. The Pork Order clearly states that NPB's responsibilities include: "[t]he establishment, issuance, effectuation, and administration of appropriate plans and projects for promotion, research, and consumer information with respect to *pork and pork products designed to strengthen the position of the pork industry in the marketplace* and to maintain, develop, and expand domestic and foreign markets for pork and pork products." 7 C.F.R § 1230.60(a)(1) (emphasis added). NPB's marketing campaigns, including those using the Pork trademarks, are such plans and projects with the goal of increasing demand and consumption of all pork products. The purpose of using the Pork trademarks is to strengthen the entire market for pork, not to increase NPB revenues. Thus, when applying the relief from royalty analysis, CONSOR should have based the royalties on the pork industry revenues as a whole, which would have resulted in a higher valuation by orders of magnitude.

Second, CONSOR's valuation is based on the value of the Pork trademarks in 2006. In reviewing the Contract, AMS is focused on the value of the Pork trademarks at the present and moving forward, not their valuation in 2006 when the Contract was executed, as the question currently before AMS is whether continued payments under the Contract are appropriate at this time.

Third, comparables that CONSOR used to determine their royalty rate of 0.92% included the American Animal Hospital Association, King Features Syndicate, Agway, Inc., Inc., and AT&T. It is unclear why animal hospitals or a telecommunication company would be considered as comparable to trademarks used to promote an agricultural commodity. It appears that the royalty rate derived from these sources would be considered "speculative" as Mr. Anson cautioned in his book.

Notably, if CONSOR's proposed royalty rate is accepted and applied to the correct royalty base and time period, the valuation would far exceed all the valuations that AMS has received, as demonstrated in the tables included in SRR's response to CONSOR's critiques. Assuming a conservative estimate of the retail value of pork from 2016-2020 based on Nielsen data and a 5-year useful life remaining in the Pork trademarks, the valuation would be approximately $790 million. Although not all retail revenue of pork products can be attributed to NPB's marketing campaigns, there is no information available to NPB or AMS that would permit it to attribute portions of profit to the campaign. The inability to ascertain this amount means that attempts to calculate the appropriate royalty base would be abstract and unsubstantiated and illustrates why the relief from royalty approach is problematic if applied to the Pork trademarks.

### 3. Cupitor Valuation

In a valuation reported submitted on February 29, 2016, Cupitor valued the Pork trademarks at $175 million as of December 31, 2015, using both the cost approach and relief from royalty method. Under the cost approach, the valuation was $164,000,000 and under the relief from

Page 8

royalty method, the valuation was $183,600,000. It is not clear whether Cupitor took into account the discontinued use of three trademarks in NPB's marketing campaign in its cost approach, which may have resulted in an overvaluation of the Pork trademarks. Accordingly, while the report lends support to continued payment, it is my view that SRR's approach resulted in a more accurate approximate value.

### 4. Meyer Valuation

HSUS also submitted copies of two valuations conducted by Steve R. Meyer, Ph.D., in 2001 and 2003. These valuations appear to have been prepared for NPB to support NPB's negotiations with NPPC over a licensing fee for the Pork trademarks. That fact, as well as their age and their superficial treatment of many of the difficult valuation issues explored in greater depth by SRR, CONSOR, and Cupitor makes these valuations unhelpful as indicia of present-day value. Furthermore, both valuations use an approach that is based on NPB's spending on advertising using the Pork trademarks in a given year, which causes the valuations to shift dramatically from $7,107,057 in 2001 to $3,314,078 in 2003, further undermining their reliability.

### 5. Williams Valuation

The 2006 acquisition was supported by a range of expert appraisals valuing the Pork trademarks from $35 million to more than $200 million. These included an estimate prepared by Mark Williams that it would cost $36.1 million to rebuild the brand over a 7 year period. Again, in comparison to the analyses of SRR, CONSOR, and Cupitor, which are far more in depth and current, the Williams valuation is not a helpful additional indication of present day value. It is more relevant to the reasonableness of the decision to acquire the Pork trademarks for $34.6 million in 2006.

### 6. Conclusion Regarding Valuations

For the reasons discussed above, I have determined SRR's range of $113 million to $132 million to be the most reliable estimate of the value of the trademarks.

B. Additional Issues Raised as Counseling Against Continued Payments[6]

1. Diminished Use

In its submissions to AMS, HSUS provided documents demonstrating that NPB ceased to use the three "THE OTHER WHITE MEAT" trademarks as part of a primary marketing campaign beginning in 2011. While it is true that the use of three of the Pork trademarks has been significantly reduced by NPB and the state associations, the fourth "PORK and design" trademark continues to play a prominent role in the "Pork: Be Inspired" campaign. Some of the sources quoted by HSUS or statements included in its submission regarding the ongoing usefulness of the trademarks appear to have over-stated their obsolescence as a negotiating or

---

[6] NPPC's submissions raised numerous additional issues as weighing in favor of continued payments. In light of AMS's conclusion that continued payment is warranted, those issues are not discussed here.

Page 9

marketing tactic. In any event, SRR took these considerations into account and recognized that the NPB's diminished use of the three "THE OTHER WHITE MEAT" trademarks affects the valuation of the trademarks and accounted for it by significantly reducing a key metric in its valuation, the aided awareness percentage. Reducing this metric decreased the cost of replacing the trademark and thus its value.[7]

Even if SRR's valuation did not already account for the fact that NPB's diminished current use of the three "THE OTHER WHITE MEAT" trademarks affects the value of the trademarks to NPB, it would still be much more likely than not that the trademarks are worth more annually to NPB and pork producers than the $30 million due under the Contract over the next ten years. Based on the middle of SRR's valuation range— $122.5 million—the remaining $30 million in payments would be justified so long as NPB's current use reflects 25% of this potential value. It plainly does. The "PORK and Design" trademark remains a part of NPB's primary advertising campaign, so NPB would need to either redesign that campaign entirely or start fresh if it were to lose access to the trademark. Furthermore, NPB continues to use the other three trademarks on its website and in its promotional materials, as do state councils in their logos. And finally, the value to NPB of being able to exclude others from using the trademarks discussed by SRR, as well as the option value of being able to expand use of the three "THE OTHER WHITE MEAT" trademarks in the future, as also discussed by SRR, are unaffected by the fact that the three "THE OTHER WHITE MEAT" trademarks are no longer part of NPB's current primary marketing campaign.

   2.   Fair Market Value

HSUS raises the possibility that, regardless whether the trademarks are worth more to NPB and pork producers than the remaining payments due on the Contract, continued payments under the Contract are unwarranted because NPB could obtain access to the trademarks at a lower price. First, HSUS raises the possibility that the fair market value of the trademarks is less than their value to NPB. Investment value takes into account buyer-specific considerations that do not necessarily influence fair market value.

In their response to CONSOR's critique regarding fair market value, SRR stated that they "would have possibly weighed the four indications of value [they] relied upon to conclude on a value differently, but the determined value would still almost certainly have been higher than the price paid by NPB to NPPC" for the Pork trademarks. Additionally, Cupitor concluded that the fair market value of the Pork trademarks using the cost approach is $164 million, which is not much higher than SRR's investment value.

Because NPB has already made ten years of payments on the Contract, is obliged to make one additional payment even if it terminates (due to the one-year notice requirement), and the trademarks would revert in full to NPPC despite these payments if NPB were to terminate the Contract, the relevant number in determining whether NPB could obtain access to the trademarks

---

[7] NPB informed SRR that it does not have current plans to use the three "THE OTHER WHITE MEAT" trademarks in its primary marketing campaign. SRR noted that, if NPB does revive these trademarks in its primary marketing campaign, its valuation was understated.

Page 10

going forward at a better price is the remaining principal balance on the Contract, approximately $20.5 million. It is unlikely that NPB could negotiate a better deal than this if it were to terminate the Contract. The lowest indicia of value considered by SRR that was not NPB-specific and was based on independent research indicated a value of $21,928,428. The highest indicia considered by SRR that was not NPB specific, based on other industry campaigns, indicated a value of $120,854,812. If the fair market value of the trademark is anywhere in this range, then the remaining $20.5 million owed on the Contract is a better price. If the fair market value is toward the midpoint of this range, or $70 million dollars, then NPB's purchase of the trademarks for $60 million in principal and interest was a good investment. Relatedly, it is not possible to determine that NPB ought to expect to obtain so significant a premium on fair market value in any negotiation as to make it likely that NPB could obtain access to the trademarks on better terms.

### 3. 2006 Approval

HSUS also submitted documents pertaining to the decision in 2006 to negotiate and execute the Contract. HSUS alleges that the Contract was not negotiated at arm's length because of the close relationship between NPB and NPPC and that it was a bad faith effort to divert checkoff funds to NPPC for lobbying purposes. The basis for the 2006 decision is set forth in a 2006 decision memorandum. However, the propriety of that decision, made 10 years ago, is not material to the question of whether continued payments are justified and should therefore be approved by AMS. Regardless of whether NPB could have gotten a better deal on the purchase at the time it was made or the prior approval was valid, if NPB's continued ownership of the trademarks by making additional payments to NPPC under the Contract furthers the purposes of the Pork Promotion, Research and Consumer Information Act of 1985 (Pork Act), 7 U.S.C. §§ 4801-4819, and the Pork Order at this time, then continued payments should be approved.

That said, AMS is committed to meaningful exercise of its oversight responsibilities in order to ensure NPB's compliance with all applicable statutory and regulatory requirements. Were there some violation of these requirements apparent in NPB's 2006 purchase of the trademarks or AMS's approval of that purchase, AMS would explore the appropriateness of alternative remedial measures, other than cessation of ongoing payments, consistent with its oversight responsibilities and statutory and regulatory requirements.

Relatedly, HSUS argued that NPB had an ownership interest in the trademarks prior to its purchase by virtue of its investment in their development that should have been taken into account at the time of purchase. AMS's 2006 decision approving the purchase notes, however, that "NPPC currently owns the tag line and the associated marks of PTOWM, which it filed with the U.S. Patent and Trademark Office on August 24, 1987," is accurate. The possibility raised by HSUS that NPB could separately have sought some other legal recourse is distinct from the question presented here, which is whether to authorize further payments by NPB under the Contract.

11

Page 11

CONCLUSION

NPB's use of the Pork trademarks, including "THE OTHER WHITE MEAT," is consistent with the statutory scheme, in that it advances the purposes of the Pork Act and the Pork Order to further the "position of the pork industry" in the marketplace and help to "maintain, develop, and expand" markets for pork and pork products. 7 U.S.C. § 4801. NPB uses all of the Pork trademarks on its website and in its nutritional materials, and the "PORK and Design" trademark is built into NPB's current marketing campaign. All of these actions are taken "to present a favorable image" of pork and to "stimulat[e] sales" of pork. 7 C.F.R. § 1230.22. In light of the conclusion that continued ownership of the trademarks is worth the continued payment of $3 million a year to NPB (and pork producers), I conclude that continued payment by the Board pursuant to the Contract for the purchase of the trademarks is justified at this time.

The decision to approve continued annual payment under the terms of the Contract was based on the considerations addressed above, which included the following factors, among others:

- The remaining principal balance for the Pork trademarks under the Contract is $20.5 million and the remaining total of payments is $30 million.
- Using the cost approach, SRR concluded that, as of January 1, 2016, the investment value of the Pork trademarks is between $113 million and $132 million. This valuation, which I have concluded after reviewing the submissions is reliable and accurate, far exceeds the purchase price for the Pork trademarks and the remaining principal balance under the Contract.
- CONSOR's substantially lower valuation improperly uses the Pork Board's revenues as the basis for its relief from royalty analysis and does not represent a present-day valuation.
- The "PORK and Design" trademark is built into NPB's current primary marketing campaign, "Pork: Be Inspired." It would be disruptive and costly for NPB to cease using this trademark.
- NPB's ownership and use of the trademarks further the purposes of the Pork Act and Order.

Accordingly, given that the value of the Pork trademarks is so much greater than the cost of NPB's remaining payments under the Contract and the significance that the Pork trademarks continue to play in NPB's promotion efforts, I have approved NPB's request to make continued payments for the trademarks under the Contract.

12

| | |
|---|---|
| **From:** | Scott Weingust |
| **To:** | Morris, Craig - AMS; Dinh, Mai - OGC |
| **Subject:** | Addressing Jeff Anderson"s supplemental opinion letter |
| **Date:** | Friday, April 15, 2016 2:10:40 PM |
| **Attachments:** | image001.png |
| | Calculating the Dollar Value of Brand Equity.pdf |
| | Brand Awareness Effects on Consumer Decisoin Making for Common, Repeat P....pdf |
| | Consumer Based Brand Equity Conceptualization and Measurement.pdf |
| | Reviewing-the-Concept-of-Brand-Equity-and-Evaluating-Consumer-Based-Bran....pdf |
| | National Pork Board Valuation_Relief from Royalty calculations_April 15 ....pdf |

Mai and Craig:

Per our discussion yesterday, this email is meant to address various issues associated with the Jeff Anderson's supplemental opinion letter, dated April 13, 2016.

**1.   Standard of Value**

In his supplemental opinion letter dated April 13, 2016, Jeff Anderson from CONSOR stated: "SRR misunderstood, and incorrectly applied the investment value standard."  Mr. Anderson goes on to state that the appropriate standard of value to use for the valuation of the Subject Assets is fair market value.

Fair Market Value ("FMV") is defined by the International Glossary of Business Valuation Terms as "the price, expressed in terms of cash equivalents, at which property would change hands between a **hypothetical** willing and able **buyer** and a **hypothetical** willing and able **seller**, acting at arms length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts" (emphasis added).  Alternatively, investment value is defined by the same source as "the value to a particular investor based on individual requirements and expectations."

We understand that the valuation SRR performed for the National Pork Board ("NPB") is being used to assess the reasonableness of the purchase price paid by NPB to NPPC for the Subject Assets.  Because the NPB and NPPC are two specifically-defined parties – and not hypothetical, unidentified parties – we properly chose to use the investment value standard.

If we had used the FMV standard, our valuation conclusion would likely been different but the approaches and methodologies relied upon (i.e., cost approach) would have still been the same.  In addition, if we had used the FMV standard, we would have possibly weighed the four indications of value we relied upon to conclude on a value differently, but the determined value would still almost certainly have been higher than the price paid by NPB to NPPC for the Subject Assets.

**2.   "Awareness" as a Source of Value of the Subject Assets**

In an effort to support the idea that the Subject Assets do, in fact, have value from a qualitative perspective (as opposed to the quantitative determination of a dollar value for the Subject Assets), SRR identified three "main sources of value that the Subject Assets provide to NPB" along with performing a qualitative assessment of value of 21 different value characteristics associated with trademarks.  One of the three main sources of value relates to the fact that there is a significant level of awareness (i.e., recognition) of the Subject Assets among the general public in the U.S  In response to SRR's discussion of the value of the awareness of the Subject Assets, in his supplemental opinion letter, Mr. Anderson refutes my assertion that the high level of awareness associated with the Subject Assets supports that fact that they are valuable.  For example, Mr. Anderson states: "Awareness is a poor metric of brand value" and "…the associated between trademark value and awareness as an indication of economic value has marginal merit," and "the awareness metric is not a satisfactory indication of brand value."

To the contrary of Mr. Anderson's statements, there is a very large body of academic study that has concluded that brand awareness is, in fact, a source of brand value.  Attached are four articles/academic papers (among dozens of others that exist) supporting this perspective.  Relevant excerpts from these four sources are as follows:

71

"Calculating the Dollar Value of Brand Equity," February 1, 20015, Stanford Graduate School of Business

Simple brand awareness is one source of brand equity. "If you can get your name to pop up in people's minds when they think of the product category, you've won a big part of the battle," [V. "Seenu" Srinivasan, the Adams Distinguished Professor in Management at the Graduate School of Business] says.

In doing calculations on cellular phone brands in Korea, Srinivasan found that simple awareness—getting the brand's name to pop up in consumers' minds—generates the largest return.

"Brand Awareness Effects on Consumer Decision Making for a Common, Repeat Purchase Product: A Replication," Emma K. Macdonald and Byron M. Sharp, Journal of Business Research 48, 5–15 (2000)

This article is a replication of a study of Hoyer and Brown that used a controlled experiment to examine the role of brand awareness in the consumer choice process…Results support the original study's findings that brand awareness is a dominant choice tactic among awareness group subjects. Subjects choosing from a set of brands with marked awareness differentials showed an overwhelming preference for the high awareness brand, despite quality and price differentials.

"Consumer Based Brand Equity Conceptualization & Measurement: A Literature Review," George Christodoulides, Leslie de Chernatony, International Journal of Market Research, July 2009

According to Keller (1993), brand knowledge is a key antecedent of consumer based brand equity and is in turn conceptualized as a brand node in memory to which a variety of associations have been linked. Brand knowledge is then decomposed into two separate constructs, brand awareness and brand image (associations). The majority of conceptual studies summarized in Table 1.1 agree that awareness and associations are important components of consumer based brand equity.

"Reviewing the Concept of Brand Equity and Evaluating Consumer-Based Brand Equity (CBBE) Models," Sanaz Farjam, Xu Hongyi, International Journal of Management Science and Business Administration," Volume 1, Issue 8, July 2015, Pages 14-29

Aaker (1992) provided the most comprehensive brand equity model which consists of five different assets that are the source of the value creation. These assets include: brand loyalty; brand name awareness; perceived brand quality; brand associations in addition to perceived quality; and other proprietary brand assets - e.g., patents, trademarks, and channel relationships.

Brand awareness is a key and essential element of brand equity which is often overlooked (Aaker, 1996). Brand awareness refers to "the ability of a potential buyer to recognize or recall that a brand is a member of a certain product category" (Aaker, 1991). Brand awareness has different level; at the recognition level, it can provide the brand with a sense of the familiarity as well as a signal of substance, commitment and awareness and at the recall level, it further affects choice by influencing what brands get considered and selected. For many companies, brand awareness is pivotal and it underlies the strength of successful brands (Aaker, 1992). Awareness plays an important role in most of conceptual models of brand equity. Brand awareness generates a high level of purchase, mainly because consumers are likely to buy those brands they are familiar with enhancing the firm's profitability and sales (Baldauf et al., 2003).

3.  **Relief from Royalty Method Calculations**

In our valuation report, SRR relied exclusively on the use of Cost Approaches to determine the value of the Subject Assets and rejected the reliance on the Income Approach for providing a reasonable and reliable indication of value based on the specific facts and circumstances of this particular valuation. Alternatively, in his letter regarding the value of the Subject Assets, dated February 26, 2016, Mr. Anderson exclusively relies on the Income Approach. More specifically, Mr. Anderson relied on a Relief from Royalty Method for determining the value of the Subject Assets. In my report, I explain why the use of a Relief from Royalty Method for determining the value of the Subject Assets is unreliable. However, at your request, SRR has

calculated the net present value of royalties associated with the Subject Assets using (1) Mr. Anderson's highly flawed and completed incorrect royalty rate of 0.92% applied to (2) a royalty base of all retail sales of the U.S. pork industry (the base of sales that benefit from the use of the Subject Assets).  SRR has performed six versions of this calculation using two different estimated market sizes for the U.S. retail pork industry.  For each of the two market sizes, SRR has calculated the present value of royalties for three different time periods similar to Mr. Anderson's calculations (5 years, 20 years, and indefinite life).  The range of present values of future royalties resulting from these six calculations are $789.9 million to $10.3 billion.  The schedules supporting these calculations can be found attached.

The primary difference between SRR's Relief from Royalty Method calculations and those relied on by Mr. Anderson is that, while we use the same incorrect royalty rate (0.92%), we use different royalty bases.  SRR's royalty base, as described above, is the total value of retail pork sales in the U.S. as these are the sale that are benefits by the use of the Subject Assets by the NPB.  Alternatively, Mr. Anderson incorrectly relied on a royalty base equal to the NPB's revenues. When attempting to determine the appropriate royalty base for this calculation, it may be helpful to think of the entire pork industry as a single player (i.e., "PorkCo") in the broader food industry competing again other food industry participants such as beef, chicken, lamb, fish, etc. as these are the animal proteins presented to consumers for purchase at a typical grocery store.  When considering this analogy, the Subject Assets can be thought to promote PorkCo's products and the NPB can essentially be thought of at least one part of the marketing "department" for PorkCo.  Within this analogy, the money spent developing and promoting the Subject Assets is essentially a portion of the marketing budget for PorkCo.  To use the marketing budget as a royalty base instead of the retail sales of pork product make no sense given the way the Relief from Royalty Method is meant to be properly implemented.

* * * * *

I hope this email is helpful to you.  If you have any questions, comments, or further requests, please contact me.

Best Regards,
Scott



**Scott Weingust** | Director, Intellectual Property Services
Stout Risius Ross, Inc.
One South Wacker Drive, 38th Floor, Chicago, IL 60606
D  312.752.3388 | M  312.420.7288 | sweingust@srr.com
www.SRR.com

**Celebrating 25 years of delivering client success.**

SRR is a trade name for Stout Risius Ross, Inc. and Stout Risius Ross Advisors, LLC, a FINRA registered broker-dealer and SIPC member firm. This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message and are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited. SRR is not a CPA firm.

73

## Third Submission of Review Materials – April 13, 2016*

1) **Supplemental Opinion Letter – CONSOR**
   a. SRR and CLL "severely overvalued PTOWM."
   b. "Investment Value" should not have been used as the standard to value PTOWM.
   c. SRR's alleged sources of value (awareness, exclusivity, and option value) are not significant drivers of value.
   d. SRR's reasonableness checks were flawed (and contradictory).
   e. CCL's income approach is "nonsensical."

2) **Testimony of Steve Murphy, CEO of the Pork Board (excerpt)**
   Testimony that the Board never looked into how much value it could claim it put into PTOWM before the purchase.

3) **Testimony of Steve Meyer (excerpt)**
   Questions "whether any branded companies like Hormel or Smithfield would really want to invest in a label that represents generic pork."

*This submission is made pursuant to the recent circulation of additional materials for review and response. Submitters received the 79-page SRR valuation report on March 30, 2016. On April 5, 2016, we received more than 200 pages of materials submitted by NPPC, some of which were heavily redacted. The deadline to review and make additional submissions in response to these additional materials was April 13, 2016. Our submissions today represent a thorough and fully considered supplement in response to those materials we were able to review within the very limited time allowed. To fully and meaningfully respond to the entire package of materials provided to us last week, more time would have been required.

*The comments included in the above list and on the separator pages are added only to highlight certain information of particular relevance, but are not intended to limit consideration of the submitted materials in their entirety.

*The materials include testimony and exhibits from U.S. Trademark Trial and Appeal Board Case No. 91166701. Submitters include selected excerpts from relevant testimony in order to avoid an excessively voluminous submission, but transcripts of the referenced testimonies are available online from the TTAB site: http://ttabvue.uspto.gov/ttabvue/v?qt=adv&procstatus=All&pno=91166701. (Submitters note, however, that these records should already be in possession of the government in their entirety.)

* Submitters note that the stipulation between the parties calls for the Secretary to conduct a contract review (which includes a valuation). The Secretary must make a determination about the reasonableness of the ongoing payments called for by the current contract. That is, in addition to the valuation considerations, the Secretary must make additional determinations that are supported by substantial—*not hypothetical*—evidence.

## Supplemental Opinion Letter – CONSOR

a. SRR and CLL "severely overvalued PTOWM."

b. "Investment Value" should not have been used as the standard to value PTOWM.

c. SRR's alleged sources of value (awareness, exclusivity, and option value) were not significant drivers of value.

d. SRR's reasonableness checks were flawed (and contradictory).

e. CCL's income approach is "nonsensical."

**PRIVILEGED AND CONFIDENTIAL**
**SUPPLEMENTAL OPINON LETTER**

**April 13, 2016**

Mr. Matthew Penzer
Special Counsel
Animal Protection Litigation
The Humane Society of the United States
2100 L Street NW
Washington D.C. 20037
Ph. 240.271.6144

*Re: PTOWM Supplemental Opinion Letter*

Dear Mr. Penzer:

This supplemental opinion letter summarizes the conclusions we have reached, pursuant to our engagement to provide our professional opinion to the Humane Society of the United States ("HSUS"). In our previous opinion letter (the "CONSOR Opinion Letter"),[1] we were asked to provide an opinion regarding the value of the trademark "Pork, The Other White Meat" and related intellectual property (collectively "PTOWM"), as of July 1, 2006 when the National Pork Board (the "Board") entered an Asset Purchase Agreement ("Asset Purchase Agreement") with the National Pork Producers Council ("NPPC").[2]

PTOWM consists of the following registered trademarks and service marks:[3]

1. "PORK and Design," Registration Number 1418703;
2. "THE OTHER WHITE MEAT," Registration Number 1486548;
3. "THE OTHER WHITE MEAT and Design," Registration Number 3126072;
4. "THE OTHER WHITE MEAT," Registration Number 3129186;

The analysis detailed in the CONSOR Opinion Letter was conducted with a valuation date of July 1, 2006 and presented as of February 26, 2016.

On March 30, 2016, Stout Risius Ross, Inc. ("SRR") a financial services firm, and their expert Scott Weingust ("Mr. Weingust") submitted a report on behalf of the Board.[4] In the report, SRR

---

[1] Doc 37
[2] Doc 4
[3] Doc 4
[4] Doc 38



analyzes the value of PTOWM as of January 1, 2016. Counsel has asked CONSOR to evaluate the opinions provided by SRR.

Furthermore, a week prior to the Report Date, USDA circulated certain NPPC submissions to counsel, which included a heavily redacted valuation prepared by Cupitor Consulting LLC ("CCL"). We were additionally asked to review and comment on this report.

Our analysis of the reports submitted by SRR and CCL is presented as of April 13, 2016 (the "Report Date"). Our opinions are subject to the conditions presented at Appendix A.  CONSOR qualifications are presented at Appendix C.

## I.   SUMMARY OF OPINIONS

Our general conclusion from our analysis of the SRR and CCL valuations are as following:

- SRR and CCL should not have used the cost approach; by using it, they severely overvalued PTOWM. Both reports disregarded the fact that cost does not equal value in an arm's length transaction;

- If PTOWM was as valuable as SRR and CCL claimed, then a typical seller in an arm's length transaction would seek to terminate, not defend, the Asset Purchase Agreement so that PTOWM could be sold for the stated higher value.

- SRR should have valued PTOWM at fair market value, and not investment value;

- SRR's alleged sources of value (awareness, exclusivity, and option value) are not significant drivers of value;

- SRR ignored the income approach. By doing so, they evaded the relevant inputs (for the income approach) that would have been clear from the licensing transactions between NPPC and the Board, and other royalty free agreements;

- SRR used a flawed reasonableness check and contradicted itself by using an income approach to do so;

- The "Got Milk?" and "Marvel Classic Characters" agreements presented by SRR and CCL were not comparable to PTOWM;

- CCL income approach was nonsensical and heavily redacted; and,

- SRR and CLL used many incorrect assumptions in their reports, and additionally, contain significant contradictions.

CONSOR®
Intellectual Asset Management

## II.   COMPANY BACKGROUND

**Humane Society of the United States ("HSUS")**

HSUS "is a nonprofit animal protection organization headquartered in the District of Columbia… HSUS is the largest animal protection organization in the United States, representing 11 million members and constituents. HSUS actively advocates against practices that injure, harass, or abuse animals, and provides its members and the public with information regarding inhumane treatment on a variety of topics, including the application of state and federal laws that protect farm animals."[5] HSUS is counsel for plaintiffs in the lawsuit related to this dispute, and is our primary contact in this matter.

**National Pork Board (the "Board")**

"The Board is a quasi-governmental entity created as a result of Congress' passage of the Pork Act. Under the Pork Act and its implementing regulations, the Board collects a mandatory checkoff assessment, which is a per-capita fee on all hogs sold or imported in the United States. The Board consists of 15 members, all of whom are pork producers or importers nominated by Pork Act Delegates at the National Pork Forum and appointed by the Secretary of Agriculture. The Board also has an administrative staff that carries out the Board's activities."[6] The Secretary of the Department of Agriculture is charged with reviewing and approving the Board's actions and expenditures.[7]

As of the Report Date, "U.S. pork producers and importers pay $0.40 per $100 of value when pigs are sold and when pigs or pork products are brought into the United States."[8] These funds are intended to be used for "carrying out an effective and coordinated program of promotion, research, and consumer information designed to" benefit the pork industry.[9]

Each year the Board must prepare and submit a budget proposal to the Secretary of the United States Department of Agriculture ("USDA") for approval.[10] Funds are expressly prohibited from being used in an attempt to influence government policy.[11] As stated in 7 U.S. Code § 4809, "[n]o funds collected through assessments authorized by this section may, in any manner, be used for the purpose of influencing legislation." [12]

On October 3, 2006, the Board entered into an Asset Purchase Agreement with NPPC to acquire PTOWM for $60,000,000 via 20 annual payments of $3,000,000.[13] Under the terms of the

---

[5] Doc 1
[6] Doc 1
[7] Doc 23
[8] Doc 21
[9] Doc 22
[10] Doc 23
[11] Doc 24
[12] Doc 24
[13] Doc 1

agreement the Board "may at any time and for any reason elect to terminate its obligation to pay the unpaid balance of the purchase price."[14]

**National Pork Producers Council ("NPPC")**

NPPC engages in public policy activities on behalf of 43 affiliated state associations.[15] "In addition to working on legislation, regulations and trade initiatives, NPPC gets involved in the political process through its political action committee, PorkPAC. The PAC educates and supports candidates at the state and federal levels who support the U.S. pork industry."[16]

"In March 1999, the USDA Office of Inspector General ("OIG") issued an audit report that concluded, among other things, that the Board had 'relinquished too much authority to its primary contractor, [NPPC], and has placed the NPPC in a position to exert undue influence over Board budgets and grant proposals.' The OIG recommended separation of operations and greater accountability for checkoff expenditures."[17]

**Figure 1. 2008 NPPC Revenue**



Revenue from the sale of PTOWM to the Board continues to provide a significant source of financing for NPPC's activities. In 2008, revenue from the Asset Purchase Agreement accounted for 32% of NPPC revenue.[18] As of 2014, NPPC no longer disclosed the percentage of revenue generated from the sale of PTOWM. Instead they presented a category labeled as "Other." A

---

[14] Doc 2
[15] Doc 25
[16] Doc 25
[17] Doc 1
[18] Doc 26



complete breakdown of NPPC 2008 revenue is presented at Figure 1. NPPC 2014 budgeted revenue is presented at Figure 2.

**Figure 2. 2014 NPPC Revenue (Budgeted)**



## III.    CASE BACKGROUND

In 2012, HSUS filed Civil Action No. 1:12-cv-1582 ABJ against the USDA and the Board challenging expenditures related to the $60,000,000 acquisition of PTOWM from NPPC. The complaint alleges ongoing payments of $3,000,000 per year "violate provisions of the Pork Promotion, Research, and Consumer Information Act of 1985 ("Pork Act"), 7 U.S.C. § 4801 et seq., the Pork Promotion, Research, and Consumer Information Order ("Pork Order"), 7 C.F.R. § 1230.1 et seq., and the USDA guidelines for checkoff program operations…they also allow the Board and the NPPC to evade federal restrictions against the use of pork checkoff dollars for purposes of influencing legislation and government policy."[19]

## IV.    SRR ASSUMPTION ERRORS

### A.  SRR Incorrectly Applied the Investment Value Standard

SRR used the American Institute of Certified Public Accountants ("AICPA") standards to guide their selection and definition of "standard of value."[20] AICPA defines investment value as "the value to a particular investor based on individual investment requirements and expectation."[21] SRR misunderstood, and incorrectly applied the investment value standard. We explain the numerous errors SRR made in the following paragraphs.

---

[19] Doc 1
[20] Doc 38 and Doc 39
[21] Doc 38 and Doc 39



The definition and explanation of investment value by SRR (and their subsequent incorrect application of the standard) was incomplete. A thorough explanation by Mr. Reilly and Mr. Schweihs in *Valuing Intangible Assets* is as follows:

> *"[T]he value of an intangible asset given a particular defined set of individual investment criteria (e.g., given a definite set of internal rate of return or payback period investment criteria). This standard of value does not necessarily contemplate a sale transaction with regard to the subject intangible asset."[22]*

The key components of investment value, by definition, is that there must be an investment requirement criterion, and that this standard does not consider an arm's length transaction of the intellectual property assets, PTOWM.

SRR failed to establish a reasonable investment criterion. The only attempt that may be construed as value attributable to the trademark was under the section "Sources of Value of the Subject Assets."[23] Mr. Weingust attempted to determine value by way of awareness, exclusivity, option value, and the qualitative assessment of value. However, those are not economic metrics that provide a connection between the intellectual property and an economic benefit that would be achieved from the investment.

An investor would not spend more money on an investment than the present value of his future economic benefit. Instead, using the investment value standard, an investor would likely assess what return he/she may receive from a given investment. Mr. Reilly and Mr. Schweihs provded examples for the application of investment value.

> *"This standard of value may be relevant to answering questions such as: What is the value of the subject intangible if it is only in commercial use for the next five years? What is the value of the subject intangible asset if its owner requires an 18 percent after-tax, cash-on-cash internal rate of return on his or her investment in that class of intangibles?"[24]*

Previously there was a transaction between the Board and the NPPC, where the Board agreed to acquire PTWOM for $60,000,000 by way of twenty annual $3,000,000 payments.[25] Since this was supposedly an arm-length transaction between independent parties, we used the fair market value ("FMV") standard instead of the investment value. Additionally, a written agreement between USDA that was entered to ensure independent operations of the Board and NPPC requires that contracts between the two are only permitted at fair market value.[26]

The FMV standard is described as a hypothetical transaction that represents value and price of the assets between a willing buy and willing seller. Both of the participants have a reasonable

---

[22] Doc 40, p 60
[23] Doc 38, p 9
[24] Doc 40, p 60
[25] Doc 37, Exhibit 5, p 3 (pdf), and p 10 (pdf)
[26] Doc 62



understanding of all the facts, and neither is under compulsion to act. FMV is characterized as an arm's length transaction.[27]

> *"what a typical (hypothetical) willing buyer will pay to a typical (hypothetical) willing seller with neither being under undue influence to transact."*[28]

Using FMV allowed us to find comparable license agreements and apply them to the Board's revenue to estimate what a business would pay to license its own intellectual property assets in an arms-length transaction.[29] In doing so, we provided the nexus between the benefits a buyer would receive from the trademark, and the monetary value the seller would acquire.

At Appendix C of the SRR report, it is disclosed the firm was asked to conduct its analysis of PTOWM using the investment value standard. [30] The Secretary of the United States Department of Agriculture is required to approve all Board expenditures. [31] It is unclear why a valuation using the investment value standard would be approved when all contracts between the Board and NPPC are only permitted at fair market value.[32]

> *"The valuation is being performed for the purpose of determining the Investment Value of the Subject Assets to advise the Secretary of Agriculture on how to evaluate the 2006 contract for the purchase of the Subject Assets. At the NPB's request, the valuation is being performed using an Investment Value standard."*[33]

In addition, no explanation was given as to why the purchase agreement was not used as an indication of value. The fact was ignored completely despite the fact that Mr. Weingust acknowledged its existence in his report.

> *"The Schwan Food Company, and General Mills Sales, Inc., among other entities on a royalty-free basis. In October 2006, the NPB and the NPPC entered into an Asset Purchase Agreement in which the NPB agreed to pay $3,000,000 annually for twenty years to purchase the Subject Assets."*[34]

We next discuss SRR's analysis of trademark value, as well as why awareness, exclusivity, option value, and the qualitative assessment do not provide an accurate indication of future economic benefit.

---

[27] Doc 40, p 59
[28] Doc 40, p 59
[29] Doc 37, p 8 (pdf) and p 10 (pdf); referred to as the Relief from Royalty Analysis
[30] Doc 38
[31] Doc 23
[32] Doc 62
[33] Doc 38
[34] Doc 38, p 8

**B.   SRR Misrepresented the Sources of Value for PTOWM**

A trademark is a business asset and should be perceived in the context of a commercial enterprise.[35] Gordon V. Smith, a Harvard University graduate with over 30 years in valuation experience, and the author of the book "Trademark Valuation" said the following.

> "[A trademark's] task is to contribute to the profitability of the parent enterprise. Commerce is driven by return on investment (ROI) principles, and trademarks are t exempted from that requirement."[36]

Mr. Smith, included for-profit and non-for-profit entities as well.

> "Even trademarks that are associated with non-profit, governmental, or institutional organizations are used for a purpose and promoted with an objective in mind."[37]

The Board's purpose is not only to promote, research, and provide information for consumers, but also drive pork purchases by consumers.[38] This is the underlying reason pork producers and importers pay a percentage of their sales to the Board, not simply "awareness".  We will discuss each of SRR's alleged sources of value next.

Awareness

Awareness is a poor metric of brand value. A brand must trigger emotions that lead a customer to connect with it. This is important because 76% of people do not care if brands disappear.[39] The key component of brands is understanding how they are relevant to consumers, especially with the proliferation of social media platforms (i.e. Facebook). Social media brought consumers an outlet that pushes a massive amount of information on them. The amount of content has diluted the "awareness" component of advertising. Whether consumers are aware of brands becomes less important because they essentially have seconds to either connect with it, or move on to the next.[40]

For example, a survey was conducted to examine the role of using music to engage consumers. The survey found the following.

> "The survey examined the role of music in engaging consumers. The survey found that: 'With music is the most universal of passions, it is an effective

---

[35] Doc 41, p 38
[36] Doc 41, p 38
[37] Doc 41, p 38
[38] Doc 22
[39] Doc 42
[40] Doc 42



*channel for brands looking to connect with target audiences through what they love. However brands need to understand the motivations and behaviours [sic] of music fans in order to target them effectively.'"[41]*

Additionally, David Lamoureux, a brand strategist and founder of Fluid Drive Media with over 25 years' experience explained the shortcomings of awareness and not attributing an economic value in branding. His particular comments were also in part, his response to a survey including 243 Chief Marketing Officers ("CMO"). [42]

*"Fully half the respondents in the CMO survey didn't include any financial outcomes when defining marketing ROI, many of them falling back on brand awareness as the only metric. Brand awareness can really suck as a measurement tool because people who hate your product are aware of it.* **In the long run it has nothing to do with revenue or sales**.

*And how does one monetize brand awareness?* **If 50% of the market is aware of your service or product, what is that worth? 8.645% of the US population being aware of your service or product doesn't mean anybody is going to buy from you.** *It's possibly a good number to know, but what does it have to do with marketing ROI or future strategy? Nothing. Absolutely nothing.*

*A lack of solid metrics are part of the problem when valuing a brand. But marketing ROI doesn't need to be. The metrics are there. Pick some, see if they work – if what they report matches results – and keep revising those systems"*[43]

In an attempt to draw an inference between trademarks value and a business entity. Mr. Weingust asserted that trademarks are a significant source of value. He explained:

*"For companies or organizations that target large industries, metrics such as awareness typically indicate value associated with their trademarks, as it allows them to distinguish their products from competitors"*[44]

In an August 2009 Pork Checkoff document citing "key findings from branding research," the limited relationship between consumer awareness and the ability to generate future sales was discussed:

*"Recognition of The Other White Meat is very high – but it may be time to look at other brand identities that are more relevant and effective with consumers."*[45]

[41] Doc 42
[42] Doc 43
[43] Doc 43
[44] Doc 38, p 9
[45] Doc 58

As noted, the value of a trademark is based on its ability to generate future economic benefits. If a trademark is unable to influence the purchase decisions of consumers, its value is inherently limited. This was the basis of the Board electing to launch a new branding campaign under the trademark "Pork. Be Inspired."[46]

> *"'Research showed us that Pork. The Other White Meat may have played itself out,' Meimann says. Consumers' views on pork's healthfulness had changed, so it wasn't having the same level of impact it once had.*
>
> *'Consumers had gotten the message, so we needed something that could drive us further downt [sic] the road and touch consumers in a fresh creative way.'"[47]*

Mr. Weingust then cited a list of 10 brands that ranged from 80 billion to 247 billion in brand value. The entities were Apple, Google, Microsoft, IBM, Visa, AT&T, Verizon, Coca-Cola, McDonald's, and Marlboro.[48]

As we previously discussed, awareness of a brand is only one component, and the comparison Mr. Weingust was trying to draw was grossly misleading for two primary reasons.

First, the companies Mr. Weingust presented, and their corresponding brand values, are supported by billions of dollars in sales. They are the top global brands because customers do not only know of them, or even because they see it as a different product, but because they are compelled to buy their products.

> *"The protection of trademarks is the law's recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. A trademark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with that drawing power of a congenial symbol...to convey, through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trademark owner has something of value."[49]*

Therefore, the association between trademark value and awareness as an indication of economic value has marginal merit.

The second reason the provided 10 companies were misleading was due to the differences between the two industries. A trademark classification system exists in order to describe the type of product or service with which a trademark will be associated. This helps to prevent two (or

---

[46] Doc 53
[47] Doc 53
[48] Doc 38, p 9
[49] Doc 41, pp 38-39

more) marks from not being confusingly similar.[50] The classification scheme is presented in Figure 3.

**Figure 3.[51] Classification Scheme**

The classification scheme starts from industrial to consumer goods. As the classification moves towards consumer goods, the higher the relative value. A summary chart is presented in Figure 4.

---

[50] Doc 41, p 52
[51] Doc 41, pp 53-55

CONSOR®
Intellectual Asset Management

**Figure 4.**[52] **Relationship of Relative Value and Trademark Classification**



Mr. Weingust equated the brand value of two different industries, in two different classification ends. The top 10 brands would be on the right most spectrum, and the Board would be towards the left most spectrum, as presented in Figure 4.

As described above, the awareness metric is not a satisfactory indication of brand value. SRR specified that the Board spent over $200 million promoting the PTOWM slogan.[53] This is again irrelevant to what the actual value of the slogan (trademark), which we will discuss in the following sections.

<u>Exclusivity</u>

It is important to protect an owner's intellectual property, which the government, represented by the Board, has done as SRR pointed out.[54] The owner should be proactive and monitor for potential infringers, and other possible contentions such as genericness, counterfeiting and confusion.[55] However, the connection between defending an owner's intellectual property and its economic value can not be determined. Additionally, defending one's property is not an activity that should merit special treatment due to its explicit importance.

---

[52] Doc 41, p 55
[53] Doc 38, p 10
[54] Doc 38, pp 10-11
[55] Doc 41, pp 46-50, pp 187-188, and pp 199-200

Option Value

There are three primary flaws in Mr. Weingust's evaluation of the option value. The first, was that the Board would use the PTOWM trademark in the future. Mr. Weingust admitted that the awareness of the PTOWM trademark has been, and will continue to decline to near 0%.[56] By his own standards, that would imply a value of near 0% as well. The reduction in awareness will happen by way of attrition as older generations get replaced by newer generations that were not exposed to the PTOWM trademark.[57] Additionally, the Board "*currently [has] no plans to return use of the PTOWM campaign to a primary role within the marketing activities of the organization. [SRR's] valuation analysis is premised, at least in part, on this assumption.*"[58] It is unclear why there would be any value allocated to an asset that will continue to decline rapidly, and why the valuation is premised only "in part" to such a fact.

Second, Mr. Weingust assumed that the Asset Purchase Agreement would not be voluntarily terminated by the Board. This is important because if the Asset Purchase Agreement is terminated the PTOWM trademark reverts back to NPPC. If that were to happen, the Board would only be able to sublicense the PTOWM trademark,[59] per the 2003 Trademark Agreement (the "2003 Agreement"), 2004 Trademark Agreement (the "2005 Agreement"), and Asset Purchase Agreement.[60] We were not provided the information in regards to the sublicenses. However, SRR claimed that the Board had licensed to other entities on a royalty free basis.[61]

There are three important issues with converting from a royalty free license, to a royalty license. A) Since PTOWM was used to advertise pork on an industry wide basis, it is unlikely that branded companies would pay to license the trademark. B) From a business licensing customs and practices perspective, it is very unlikely that the Board would be able to convince pork producers and importers to pay an additional fee. The reason this is an "additional fee" is because the pork producers and importers already pay .4% of sales to the Board, which is essentially a royalty payment.[62,63] The ability to charge is highly speculative and thorough analysis of royalty economics must be conducted.[64]

And C), Mr. Weingust assumed that the PTOWM trademark would be licensed to the "*entire pork industry.*" This issue arises from the fact that the industry participants not only already pay a portion of their sales to the Board, but also would likely not want to pay another fee to help their

---

[56] Doc 38, p 8, pp 16-17
[57] Doc 38, p 8, pp 16-17
[58] Doc 38, p 8
[59] Doc 1, p 18, Doc 2, Doc 3, and Doc 4
[60] Doc 1, p 18, Doc 2, Doc 3, and Doc 4
[61] Doc 38, p 11
[62] Doc 2
[63] In the event the Asset Purchase Agreement is to be terminated. The Board would only be able to sublicense the PTOWM trademarks. In the circumstance the Board convinces sublicensee's to pay the additional royalty, the majority (if not all) of the royalties would be transferred to NPPC. (Doc 44, pp 9-10 and Doc 45, p 524)
[64] Doc 41, pp 167-183

competitors. SRR has not put forth any analysis, such as price elasticity[65], to support their argument that the entire pork industry would be able to even afford a license to the PTOWM trademarks.[66]

Third, Mr. Weingust compared the "Got Milk" trademark and its commercialization, to the PTOWM trademark.[67] SRR stated that the "Got Milk" trademark "which *has significant similarities to the PTOWM Trademarks, was licensed for 7% to a **milk distributor** in the past*."[68]

Mr. Weingust seemed to have misinterpreted the "Got Milk" license agreement and its relevance to PTOWM. The 7% license was applied to gross sales of straws, toys, novelties, and other products sold by Food Market Merchandising, Inc. This was not a license related to the distribution of milk.

> *"Food Market Merchandising, Inc., which once had a licensing agreement with the California Milk Processor Board (CMPB) to sell flavored drinking **straws, toys, novelties and other products with got milk? on the label** has filed suit seeking ownership of the trademark."*
>
> ...
>
> *"The lawsuit appears to be in response to demands by the CMPB that Food Market **Merchandising** stop using the trademark because its licensing agreement was terminated at the end of 2013."*
>
> ...
>
> *"The 2011 licensing agreement required FMMI to **pay 7 percent of its gross sales** to the CMPB."*
>
> ...
>
> *"The got milk? trademark was registered the same year the board was formed and has since been **licensed** for use by other dairy **processors** and **merchandisers**."*[69]

Conversely, PTOWM license agreements were very different. The 2004 Agreement's license grant stated.

> *"In consideration of the **royalty payments** referred to in paragraph 3 below, and other good and valuable consideration, NPPC hereby grants to the Pork Board an exclusive world-wide license to use the Licensed Marks in connection with the **Pork Board's programs** for any application or purpose during the term*

---

[65] Doc 46
[66] Doc 38, p 15 and pp 23-24
[67] Doc 38, p 11 and Doc 47
[68] Doc 38
[69] Doc 47

*of this Agreement, and to sublicense others (each, an "Authorized Sublicensee")
to use the Licensed Marks in connection with the Pork Board's programs during
the term of this Agreement."*[70]

It is clear that the PTOWM license was between two non-profit groups. The royalty was also not primarily associated with the sale of novelty products. Additionally, PTOWM has never generated any revenue from licensing. It is purely speculative--and highly doubtful--that any future royalties of any significance could be generated from a trademark that has "played itself out."[71]

Qualitative Assessment of Value

SRR provided their own qualitative assessment of PTOWM using their *"21 factors that influence the value of trademarks."*[72] Mr. Weingust determined that the PTOWM trademark does have value. We have reviewed the 21 factors and will comment on factors 18 and 20. We have elected to specifically address these two factors since Mr. Weingust's positive assessment of them is most likely to skew his valuation conclusions. The opinions presented by Mr. Weingust on many of the other factors are addressed throughout this report.[73]

Factor 18 stated that the annualized growth rate of the hog and pig farming industry is expected to grow at 2%. The rate is slightly below the 3.22% rate of U.S. long-term inflation.[74] The low growth rate is to be expected because pork is a commodity. However, Mr. Weingust rated this factor as positive. In our opinion, it should be at best, neutral because the growth rate is not incrementally significant.

Factor 20 was assessed to be a positive indicator due to the 82.3% awareness in an aided survey.[75] As mentioned earlier, awareness is a poor metric of brand value. A brand must trigger emotions that lead a customer to connect with it. This is important because 76% of people do not care if brands disappear.[76] The key component of brands is understanding how they are relevant to consumers, especially with the proliferation of social media platforms (i.e. Facebook). Social media brought consumers an outlet that pushes a massive amount of information on them. The amount of content has diluted the "awareness" component of advertising. Whether consumers are aware of brands becomes less important because they essential have seconds to either connect with it, or move on to the next.[77]

---

[70] Doc 2, NPB000967 and Doc 4, NPB 015420
[71] Doc 53
[72] Doc, 38, p 11 and Doc 38, Exhibit 11
[73] Failure to address certain factors in this section should not be understood to be an endorsement of the opinions presented by Mr. Weingust.
[74] Doc 48
[75] Doc 38, Exhibit 11
[76] Doc 42
[77] Doc 42



Sources of Value Conclusion

SRR's underlying assumptions of what gave PTOWM value was incorrect. Most notably, we determined that the "standard of value," investment value, was not appropriate, and that awareness, exclusivity, option value, and the qualitative assessment of value had significant flaws. These flaws compounded the numerous errors in their valuation, which we address next.

## V.    VALUATION METHODOLOGY ERRORS

This section first addresses what makes the income approach useful. Subsequently, we address the incorrect uses of the income (subsection A) and cost valuation methodologies (subsection B) by SRR.

The income approach is often the most important method for valuation. This is because investors and parties to a transaction seek to know the financial gains that will be generated from a particular asset.

The income approach focuses on a consideration of the income-producing capability of a property. The property is to provide a return on investment required to create it. The income approach estimates the market value which is defined as the "*present value of the future economic benefits of ownership.*"[78] There are three main inputs for an income approach. A) the economic benefit from exploitation of a property. B) the pattern by which the economic benefit will be received. And C) an assumption of risk associated with actually realizing the economic benefit.[79]

One of the main income approaches used for a trademark valuation is the relief from royalty method. The concept is simple, if a company owns the intellectual property, it does not have to then pay a royalty. Therefore, it is relieved form paying it.[80]

There are several important benefits to using an income approach:[81]

- Requires the analyst to explicitly consider all the critical economic variables associated with the subject intangible asset, including income-generating capacity, allocation of income between the intangible asset and associated assets, the expected remaining life of the intangible, and the risk associated with an investment in the intangible.

- Intangible asset creators, owners, buyers, sellers, licensors, and licensees all analyze possible transactions, implicitly or explicitly, from an income approach analysis perspective.

---

[78] Doc 34, p 185
[79] Doc 45, p 150
[80] Doc 45, p 194
[81] Doc 40, pp 173-174

- Emulates the actual decision making processes of intangible asset market participants.

The income approach is a crucial method for valuing intangible assets due to its focus on the income generated from it. The income approach often is the ultimate indicator of value in an arm's length transaction where a buyer and seller transact.

**A. SRR Errors in Determining the Income Approach was Not Possible to Determine**

Mr. Weingust discussed why he did not use the income approach to value PTOWM. His explanation for not using it was the following:

> "We considered the applicability of the Relief from Royalty Method for the valuation of the Subject Assets and concluded that the unique nature of the NPB's use of the Subject Assets to indirectly benefit the entire pork industry causes the Relief from Royalty Method to be unreliable for this valuation. More specifically, we believe that an accurate and reliable determination of a royalty rate matched to the appropriate royalty base is not possible.
>
> In our attempt to implement the Relief from Royalty Method, we identified the proper royalty base as the total retail sales of pork in the United States given that the Subject Assets are used by the NPB to benefit the entire pork industry."[82]

There are three errors in SRR's assessment.

First, Mr. Weingust did not think an income approach was appropriate due to the "*unique nature of the NPB's use.*" [83] His justification, however, was simply not true. There was nothing unusual with the nature of "use," which was clear in the three license agreements between the Board and NPPC, which Mr. Weingust largely ignored.[84] The agreements stated the grant, payments terms, the participants, and all the standard requirements seen in license agreements.

Second, Mr. Weingust stated that applying an income approach would be unreliable. He justified the assertion by explaining that it was because PTOWM benefited the "*entire pork industry*" (the royalty base).[85] Specifically, Mr. Weingust contended that because PTOWM was advertised to end-consumers, which gave the pork industry an indirect benefit, the income approach could not be applied.

SRR is also incorrect in concluding that revenues generated by the entire pork industry would be the appropriate royalty base. Value of a trademark, or any asset, is based on the future economic benefit generated from use of the asset. Therefore, the appropriate royalty base would be the

---

[82] Doc 38, p 15
[83] Doc 38, p 15
[84] Doc 2, Doc 3, and Doc 4
[85] Doc 38, p 15

revenues of the potential buyer, not the entire industry. In addition, PTOWM can only be used on fresh pork products.[86] This further limits the scope of a potential royalty base.

Furthermore, at the time the Asset Purchase Agreement was entered, it is unlikely that there were any potential buyers for PTOWM other than the Board. Typically, trademarks used by individual corporations serve to differentiate their products from those of their competitors. Since PTOWM had an extensive history of use to market the entire industry it is unlikely that it would have been economically viable for an individual corporation to acquire.

The lack of potential buyers for PTOWM, other than the Board, was even acknowledged in a February 2006 Decision Memorandom for the Acting Under Secretary of the United States Department of Agriculture. In the memorandum it is noted:

> "At this time, the Board is unaware of any other orginazation competing to purchase PTOWM."[87]

In addition to not identifying the correct royalty base, Mr. Weingust's conclusion that an income approach was not applicable was nonsensical. There were three agreements that purport to represent an arm's length transaction between the Board and NPPC (in addition to the other royalty-free licenses and sublicenses).[88] It was indeed possible to apply a relief from royalty approach on that information.

The third error involved finding an appropriate royalty rate. Though we admit that there is no such thing as a perfect comparable agreement, it is important to consider a broad range of agreements to identify the ones that are most applicable.

In a previous section, we described why the "Got Milk?" license (the only one identified) was not comparable. To reiterate, the "Got Milk?" 7% license was applied to gross sales of straws, toys, novelties, and other products sold by Food Market Merchandising, Inc. The license was not for the distribution of milk.[89] Conversely, The PTOWM license was between two non-profit groups. The royalty was also not connected to a product, where the "Got Milk?" license was. Thus, "Got Milk" was an unsuitable proxy for PTOWM.[90]

Even if the 7% "Got Milk?" agreement was applicable, it would be economically unrealistic. The margins of packaged foods and meat producers are very slim. See Figure 5 for a summary of margins.

[86] Doc 61
[87] Doc 60
[88] Doc 38, p 8
[89] Doc 47
[90] Doc 2, NPB000969

173

**Figure 5.**[91] **Packaged Foods and Meats Net Income Margins**

| Company | Net Income Margin% |
|---|---|
| Smithfield Foods, Inc. | 3.13% |
| Tyson Foods, Inc. | 3.46% |
| ConAgra Foods, Inc. | -3.70% |
| Hormel Foods Corporation | 8.18% |
| NH Foods Limited | 2.21% |
| **Average** | **2.66%** |

In addition to the aforementioned errors discussed in this section. After Mr. Weingust explained that using the income approach was not applicable for valuing the PTOWM trademark, however, As described at Figure 6, SRR inconceivably went ahead and later used it anyway for SRR's reasonableness check.

**Figure 6.**[92] **SRR Advocating Both For and Against the Income Approach**

| SRR advocating **against** the Income Approach | SRR advocating **for** the Income Approach |
|---|---|
| *"We considered the applicability of the Relief from Royalty Method for the valuation of the Subject Assets and concluded that the unique nature of the NPB's use of the Subject Assets to indirectly benefit the entire pork industry causes the Relief from Royalty Method to be unreliable for this valuation. More specifically, we believe that an accurate and reliable determination of a royalty rate matched to the appropriate royalty base is not possible"*[93] | "In an effort to determine the reasonableness of our value conclusion, **we have performed various alternative analyses that are rely on the implementation of an Income Approach** in the forms of a licensing business model or a **Relief from Royalty Analysis**"[94] |

## B.  SRR Errors in Using the Cost Approach and Replacement Cost

The cost approach, when valuing intellectual property, is often a poor measure of value. The cost approach measures the future benefits of ownership by quantifying the amount of money that would be required to replace the future service capability of the property.[95] However, this approach is only used in certain circumstances. One being when the property is a start-up and

---

[91] Doc 52
[92] Doc 38
[93] Doc 38, p 15
[94] Doc 38, p 23
[95] Doc 45, p 148

just being developed, which can be easily substituted, such as software. A second, when estimating value to the original owner.[96]

The cost approach is not applicable when the intangible asset is an older or unique asset. This includes when the intellectual property is a trademark, patent, or copyright. For example, using the cost approach to estimate the Coca-Cola trade name is not practical. That is because the name is one of a kind. The cost then to recreate a substitute name for a Coca-Cola would not be the best indication of value.[97]

The approach is of very little help when estimating value to the marketplace. The reason is that a buyer is interested in the expected future economic benefits associated with the intangible asset, and not the cost to create it.[98]

> *"[T]he price of new property is commensurate with the present economic value of this service that the property can provide during its life. The marketplace is the test of this equation. If, for example, the price of a new machine were set at a level far above the present value of the future economic benefits of owning the machine, then none would be sold."[99]*

One important concept to keep in mind is that cost does not equal value. At the time this book was written, the trademark EDSEL was very well recognized.

> *"This automobile name still has recognition among many people in the United States. **The cost to create an automobile name of similar strength could easily reach tens of millions of dollars**. Yet current ownership of this name is **not** likely to **contribute** much in the **way of profits** for today's car manufacturer. Indeed, the name **could be a detriment**; association with an old and discontinued product probably would not inspire consumers with confidence. Therefore, the **market value of an asset can be significantly degraded** by the economics of the business to which it is devoted. The extent to which it is degraded depends on the type of asset. **Unique assets may suffer considerably** because they have **little use outside of a particular business**. Other assets that have general use may only suffer in value to the extent of the costs that would be incurred to remove them from the business and transport and install them in a new business and location for use in a more profitable industry."[100]*

[96] Doc 40, p 120
[97] Doc 40, p 120
[98] Doc 40, p 120
[99] Doc 45, p 148
[100] Doc 45, p 165

The Cost Approach and Achieving 40% Awareness

In the earlier sections we provided explanations for why awareness was, and still is, a poor metric of brand value. Some of the reasons were that it does not necessarily motivate consumers to act,[101] it is not synonymous an economic value, and may (in extreme cases) even damage the brand. [102] As illustrated in this section, the cost approach was also a poor indication of value with many disadvantages when used as a method for valuing intangible property.

In addition to the drawback of using awareness and the cost approach. Mr. Weingust used an awareness target of 40% to determine the length of time to conduct his cost approach analysis.

> "After analyzing the percentage of aided awareness of the PTOWM Trademarks over their development and use from 1987 to 2015, we determined that the NPB expended development and promotional costs for approximately 7 to 9 years in order to achieve an aided awareness among consumers ranging from 35% to 45% (See Exhibit 7). As a result, we projected the NPB to spend between 7 and 9 years of marketing costs to develop replacements for the Subject Assets while accounting for functional obsolescence."[103]

The length of the cost approach analysis is likely incorrect because of its premise on questionable methods for deriving value.

Next, we address some of the issues with Mr. Weingust's cost approach applications.

Cost Approach: Third-Party Research for a Generic Marketing Campaign

SRR assumed that because the Board promotes for the entire pork industry, it would use all marking channels, continuously, for a period of 7 and 9 years, to promote a replacement campaign for PTOWM. SRR also assumed two types of costs, initial setup and ongoing promotion costs.[104]

Trademarks are unique, and it is not practical to ascertain a value for PTOWM using replacement cost. It is not feasible for the reasons it was not for the Coca-Cola and EDSEL examples mentioned above. In fact, the Board admitted that any value PTOWM had was exhausted, which is why they are rebranding in the first place.[105] Similar to EDSEL, the automobile name was very recognizable. The company could have spent tens of millions promoting it, but inevitably, the ownership value did not increase and neither did profits.[106]

---

[101] Doc 42
[102] Doc 43
[103] Doc 38, p 17
[104] Doc 38, p 18
[105] Doc 53 and Doc 58
[106] Doc 34, p 165

176



In addition to the practical challenges just mentioned, SRR's assumptions for this analysis were unfounded and speculative. Mr. Weingust did not align the marketing costs assumptions with actual operations data. His analysis simply showed marketing costs and assumed that the majority of them will apply to promoting a replacement campaign. There was no attempt to justify these expenses that would be incurred, other than stating that it would be for the entire pork industry.[107]

It was unclear why Mr. Weingust used the "High-End" for start-up costs other than, again, stating it would be for the entire pork industry.[108] If this was a replacement campaign then presumably there would have been synergies so to not incur the highest possible costs.

It is also important to recognize that SRR did not perform any analysis to substantiate that the Board can sustain such an expensive marketing program. In fact, SRR projected the Board to run a deficit in 2016, the year these extraordinary costs would be incurred.[109]

Cost Approach: "Be Inspired" Historical Expenditures

SRR assumed that applying the cost incurred by the Board to launch the "Be Inspired" campaign, would serve as a proxy for what it would cost to replace PTOWM.[110] The replacement cost would therefore serve as a value for PTOWM.

This method incorrectly determined the value of PTOWM for the similar reasons as the previous cost approach (Third-Party Research for a Generic Marketing Campaign). Essentially, Mr. Weingust valued PTOWM based on the cost of marketing and promoting the "Be Inspired" brand. However, if PTOWM was truly as valuable as "Be Inspired," then why would the Board spend the money on rolling out and promoting "Be Inspired" in the first place. There are several other reasons why this cost approach was not appropriate.

First, Trademarks are unique, and it is not practical to ascertain a value for PTOWM using the cost approach. It is not feasible for the reasons it was not for the Coca-Cola and EDSEL examples mentioned above. Second, the Board admitted that any value PTOWM had, has been exhausted, which is why they are rebranding.[111]

Essentially, Mr. Weingust is comparing two trademarks in two disparate life cycles. He attributed the "Be Inspired" trademark that has not been in decline, to the PTOWM, which has been in decline. Third, as discussed, cost does not equal value. Therefore, a cost comparison does not indicate the value of an asset.[112]

---

[107] Doc 38, p 18, Doc 38, Exhibit 2A, Exhibit 2.1A, Exhibit 2.1B, Exhibit 2.2A, Exhibit 2.2B
[108] Doc 38, p 18, Doc 38, Exhibit 2A, Exhibit 2.1A, Exhibit 2.1B, Exhibit 2.2A, Exhibit 2.2B
[109] Doc 38, Exhibit 6
[110] Doc 38, pp 18-19
[111] Doc 53 and Doc 58
[112] Doc 34, p 165

Cost Approach: "The Other White Meat" Historical Expenditures

SRR assumed that the inflation adjusted historical costs incurred to promote PTOWM was indicative of its replacement cost and, therefore, value.[113]

This method was again incorrect because replacement cost is not indicative of PTOWM value. As we described at length, the true value of an intangible asset is the future economic benefit it generates.  The cost approach is not applicable when the intangible asset is an older or unique asset. This includes when the intellectual property is a trademark, patent, or copyright. For example, using the cost approach to estimate the Coca-Cola trade name is not practical. That is because the name is one of a kind. The cost to recreate a substitute name for a Coca-Cola would not be the best indication of value.[114]

Generally, the price of an asset should be commensurate with the present economic value of the utility that the property can provide during its remaining useful life.[115]

Cost/Market Hybrid Approach: Other Checkoff Program Marketing Campaigns

The market approach indicates value by observing what others have agreed upon as a fair price in an arm's length transaction. The transaction must involve properties that are similar. They should also be part of an active and/or public market. [116] In regards to intellectual property, there are a limited amount of public comparable transactions. The Intellectual property market is generally non-transparent, which makes this approach difficult to execute.

SRR attempted to calculate the pork industry implied yearly expenditure for running a marketing campaign. SRR did this by first calculating the effective yearly branding expenditure per industry dollar[117], and then multiplying it by the pork industry revenue.[118]

The issues with this approach were implied in the way Mr. Weingust titled it, "Cost/Market Approach." The approach was still premised on approximating how much companies spend on branding. In this respect, the approach was very similar to Mr. Weingust's first cost approach method.[119] Therefore, it is not an indication of value for the same reasons. This approach was rooted in equating cost with value, which we discussed earlier, is not applicable. [120,121,122]

---

[113] Doc 38, p 19
[114] Doc 40, p 120
[115] Doc 45, p 148
[116] Doc 45, p 169
[117] Annual branding expenditures of industry Z / yearly industry Z revenue
[118] Doc 38, p 19 and Doc 38, Exhibit 5.1A and Exhibit 5.1B
[119] Doc 38, p 18
[120] Doc 34, p 165
[121] Doc 53 and Doc 58
[122] Doc 40, p 120

CONSOR®
Intellectual Asset Management

Additionally, the source data from the "New Hope 360 Blog" called "I need $40 million & a killer slogan" Mr. Weingust used, was at best, questionable.[123] Strangely, it was not clear why Mr. Weingust replaced the blog's industry size revenue data with an IBISWorld industry reports, but did not replace the branding expenditure data.[124]

However, if the numbers were used as presented in the blog, the concluded value would have been higher by over a factor of 2.[125] The annual expenditures on marketing would have been nearly $55 million dollars annually, an extraordinary financial expense assumption with no support for its viability.[126]

In any event, this approach was built upon using cost to derive value, and structured on questionable data. A clearly improper methodology. Therefore, SRR's value conclusions were incorrect.

Cost Approach Conclusion

SRR tried to value PTOWM using various cost approaches. The cost approach, as it relates to intellectual property, is not a viable method for valuating PTOMW.

**C.   SRR Errors in Using Reasonableness Check**

The purpose of a reasonableness check is to use a completely disparate method from the original one to compare the results. SRR attempted to provide two reasonableness checks for their conclusion in the form of a relief from royalty approach. The relief from royalty approach is an income approach, an approach that SRR stated was "*unreliable*" to apply.[127] In this section, we point out a number of errors with SRR's reasonableness approach.

SRR Did Not Present a Reasonableness Check

Mr. Weingust did not actually perform a reasonableness check. He used his cost approach conclusions as a starting point, then solved for various underlying assumptions, such as a royalty rate, and claimed this confirmed his original conclusion.[128]

In his first reasonableness check, the cost approach conclusion was relabeled to "Total Present Value of Incremental Profit,"[129] and "Total Present Value of Royalty Payments" for the second

---

[123] Doc 54
[124] Doc 54
[125] Doc 55
[126] Doc 55
[127] Doc 38, p 23 and p 15
[128] Doc 38, pp 23-24, Doc 38, Exhibits 9.1.1 to 10.2; SRR used a $122.5mm median by taking their 7 year ($113mm) and 9 year ($132mm) cost approach conclusions
[129] Doc 38, Exhibit 9

reasonableness approach.[130] We must point out that the cost approach is not a measure of incremental profits or the value of royalty payments. To have presented them as such was grossly misleading.

SRR Royalty Rates Are Not Practical

Mr. Weingust concluded that the royalty rates between 0.27% to 3.76% were lower than the 7% "Got Milk?" royalty rate, and therefore reasonable.[131] As stated before, the "Got Milk?" agreement was not only inapplicable to PTOWM, but also the 7% royalty that was not practical.[132] The average profit margin for packaged foods and meat companies are approximately 2.6%.[133] The profit margin is far below the 7% "Got Milk?" comparable, which makes a royalty payment that high unfeasible. Additionally, Mr. Weingust's royalty rate conclusion, on average (which is 2%)[134], would comprise 75%[135] of a packaged foods and meats company's profit, which would be nonsensical in practice. SRR also applied the royalty on an industry wide basis, which would be an incorrect royalty base.

Reasonableness Check Conclusion

The reasonableness check was not correct because Mr. Weingust did not actually present one. The method was a recalculation of the same cost approach disguised as a "reasonableness check." Even if it were a proper check, the conclusions were still not practical.

## VI.   ERRORS IN THE CUPITOR CONSULTING PTOWM VALUATION

We have have been asked to address the report from Cupitor Consulting LLC ("CCL") which was retained by NPPC. This report was produced to us one week from the date our report was required to be submitted, which left us with insufficient time to address all the flaws contained in the report. Rather than attempting to address every flaw within a limited timeframe, we have provided an overview of the most egregious flaws.

The CCL report was also heavily redacted. We first explain the flaws in the valuation methodologies, followed by errors made by CCL in a bullet point fashion.

[130] Doc 38, Exhibit 10
[131] Doc 38, p 23
[132] Doc 47
[133] Doc 52
[134] Average of 0.27% and 3.76%
[135] 2% / 2.6%

## A.  Cost Approach Errors

CCL used two cost approaches to determine the value for PTOWM.[136] Our report explains at length why the cost approach is not a proper methodology for valuing the PTOWM in the context of this case. Below we summarize the two approaches and compare them with SRR.

Cost Approach 1

This approach analyzed the historical advertising amounts spent on PTOWM, adjusted it for inflation and a recent decline in awareness, which lead CCL to a $128mm valuation for an 82% awareness.[137] SRR concluded that the value for PTOWM would be between $113mm and $132mm to reach 35%-45% awareness.[138] This comparison indicates that the valuations are highly inaccurate. The cost approach between these two appraisals effectively had no difference in value between CCL's valuation at 82% awareness and SRR's valuation at 40% (averaged 35% and 45%) awareness.

Cost Approach 2

CCL arbitrarily took the 88% awareness of PTOWM and the "Be Inspired" awareness of 20% to estimate a cost multiple (which was 4.1x) for achieving the 82% awareness for replacing the PTWOM asset. The multiple was multiplied by $40 million, the adverting expenditures for "Be Inspired" to arrive at a $164 million valuation.  This approach was nonsensical because awareness is not an accurate indication of value, and applying a multiple to advertising expense is not based on any form of economics.[139]

When comparing the second cost approach conclusion, with SRR cost approach conclusions, an interesting insight emerges. CCL concluded that the value for PTOWM would be $164mm to reach 82% awareness.[140] SRR concluded that the value for PTOMW would be between $113mm and $132mm to reach 35%-45% awareness.[141]  By comparing what SRR cost approach valuation would yield at 82% awareness, it is clear that awareness is an inconsistent indication of value, as presented in Figure 7.

---

[136] Doc 57, p 31 (pdf)
[137] Doc 72, p 30 (pdf)
[138] Doc 38, p 21
[139] Doc 57, p 31 (pdf)
[140] Doc 57, p 31 (pdf)
[141] Doc 38, p 21

CONSOR®
Intellectual Asset Management

**Figure 7.**[142] **SRR and CCL Cost Approach Comparison at 82% Awareness**

| Firm | Cost Valuation | Awareness | Conversion to 82% Awareness | Implied Valuation at 82% Awareness |
|------|---------------|-----------|------------------------------|-------------------------------------|
| SRR | $113,000,000 | 35% | 2.34 | $264,742,857 |
|     | $132,000,000 | 45% | 1.82 | $240,533,333 |
| CCL | $164,000,000 | 82% | n/a | $164,000,000 |

The cost approach rarely provides an accurate indication of the fair market value of intellectual property assets. In addition, awareness of a trademark does not provide a strong indication of the trademark's ability to affect consumer's purchase decisions and generate future economic benefits. This is evidenced by the Board's decision to rebrand with the trademark "Pork. Be Inspired" despite the high consumer awareness of PTOWM.[143]

## B.  Income Approach Errors

The majority of the income approach section was redacted. From the portions that were not, we were able to understand the following. CCL applied a 2% royalty on the pork retail level. As discussed in this report, the retail level is not an appropriate royalty base. [144] The income approach should have been based on the Asset Purchase Agreement, with the assumption that it was an arm's length transaction.

Additionally, the 2% royalty agreement from "Marvel Classic Characters" is not comparable to PTOWM.[145]

## C.  CCL Incorrect Assumptions

* CCL explained that if the Board lost PTOWM, then it would have to rebrand itself.[146] However, the Board has admitted that PTOWM "played itself out" and was no longer successful in influencing consumer's purchase decisions.[147] This was the reason "Pork. Be Inspired" was launched.[148] Therefore, CCL's conclusion that the loss of PTOWM would cause the Board to undertake a rebranding initiative was inaccurate. In addition, at the time the Asset Purchase Agreement was entered there was a strong indication the Board was the only potential buyer of PTOWM. This was acknowledged by the USDA in February 2006.[149]

---

[142] Doc 57, p 31 (pdf) and Doc 27, p 21
[143] Doc 53 and 58
[144] Doc 57, pp 31-33 (pdf)
[145] Doc 57, p 32 (pdf)
[146] Doc 57, p 4(pdf)
[147] Doc 53
[148] Doc 53
[149] Doc 60

CONSOR®
Intellectual Asset Management

- CCL presented data that PTOWM was more recognizable than Nike's "Just Do It" slogan in an attempted indication of value.[150] As explained throughout this report, awareness is not a reliable metric for value. Nike continues to generate billions of dollars of revenue because they successfully motivate their customers to buy. PTOWM, however, has stagnated as identified by the futurist panel *"There is significant questioning of the value of The Other White Meat... The Other White Meat is viewed as a defensive position versus leadership position... Recognition of The Other White Meat is very high – but it may be time to look at other brand identities that are more relevant and effective with customers."*[151]

- CCL presented various surveys that claimed a benefit to the pork industry per a certain amount of spending.[152] However, the surveys do not measure the value of PTOWM. They measure if checkoff programs raise awareness, which is not a meaningful indication of value for the trademark.

- CCL explained that the reason they did not use the Asset Purchase Agreement as a driver of value, was because it could have been terminated.[153] CCL's logic is absurd because Termination clauses are mandatory for checkoff contracts that exceed one-year. This is required so that the Secretary of the USDA can review and approve or reject the entire spending budget of the checkoff programs (to assure maximum effectiveness) every year, in accordance with statutory requirements.[154] CCL should have, indeed, considered the terms of the Asset Purchase Agreement for their income approach.

### D. CCL Contradicts SSR

- CCL mentioned that PTOWM has lost "v*irtually no consumer brand recognition or value... it would have no problem returning to the market in the future and retaining its tremendous fame and value."* [155] This contradicted SRR which explained that *"'The Other White Meat' will continue to decline as time passes, due to what is commonly referred to as functional obsolescence ... it is reasonable to expect the aided awareness of the Subject Assets will decrease to levels as low as approximately 1% of aided recognition in the future."*[156] Therefore, it is highly unlikely that the Board could ever bring back PTOWM or extract licensing revenues. CCL also made the connection between awareness (recognition) as an indicator of significant value, which was incorrect. The reasons why have been provided in the sections above.

---

[150] Doc 57, p 16 (pdf)
[151] Doc 58
[152] Doc 57, p 16 (pdf)
[153] Doc 57, p 28 (pdf)
[154] Doc 23
[155] Doc 57, p 4(pdf)
[156] Doc 38, pp 16-17



Additionally, CCL claimed that PTOWM had "*no indication that the functional obsolescence of the Asset has occurred.*"[157] This directly contradicts SRR which stated "'*The Other White Meat' will continue to decline as time passes, due to what is commonly referred to as functional obsolescence.*"[158] The Board itself even acknowledged the functional obsolescence of PTOWM in 2011 noting "research showed us that Pork. The Other White Meat may have played itself out."[159]

## VII.    CONCLUSION

Based on our review of the documents we have received, our own internal research, and our analysis of the information available, we have arrived at the following opinions.

Our general conclusion from our analysis of the SRR and CCL valuations are the following:

- SRR and CCL should not have used the cost approach; by using it, they severely overvalued PTOWM. Both reports disregarded the fact that cost does not equal value in an arm's length transaction;

- If PTOWM was as valuable as SRR and CCL claimed, then a typical seller in an arm's length transaction would seek to terminate, not defend, the Asset Purchase Agreement so that PTOWM could be sold for the stated higher value.

- SRR should have valued PTOWM at fair market value, and not investment value;

- SRR's alleged sources of value (awareness, exclusivity, and option value) are not significant drivers of value;

- SRR ignored the income approach. By doing so, they evaded the relevant inputs (for the income approach) that would have been clear from the licensing transactions between NPPC and the Board, and other royalty free agreements;

- SRR used a flawed reasonableness check and contradicted itself by using an income approach to do so;

- The "Got Milk?" and "Marvel Classic Characters" agreements presented by SRR and CCL were not comparable to PTOWM;

- CCL income approach was nonsensical and heavily redacted; and,

- SRR and CLL used many incorrect assumptions in their reports, and additionally, contain significant contradictions.

---

[157] Doc 57, p 30 (pdf)
[158] Doc 38, p 16
[159] Doc 53

These opinions are based upon the documents and information reviewed as of the date of this report, as well as our expertise in financial analysis and intellectual property valuation.  We reserve the right to revisit this analysis and amend these conclusions should additional information and/or documents become available for review.

Sincerely,

**Jeff Anderson**
Director, Valuation and Analytics



**APPENDIX A**
**STATEMENT OF LIMITING CONDITIONS**

1.  Information furnished by others, upon which all or portions of this analysis are based, is believed to be reliable but has not been verified except as set forth in this Letter. No warranty is given as to the accuracy of such information.

2.  Neither CONSOR nor any individual signing or associated with this Letter shall be required by reason of this Letter to give further consultation, provide testimony, or appear in court or at other legal proceedings unless specific arrangements therefor have been made.

3.  No responsibility is taken for changes in market conditions, and no obligation is assumed to revise this Letter to reflect events or conditions which occur subsequent to the date hereof.

4.  Responsible ownership and competent management are assumed.



**APPENDIX B**
**DOCUMENTS CONSIDERED**

| Doc # | Description |
|---|---|
| 1 | First Amended Complaint for Declaratory and Injunctive Relief |
| 2 | ASSET PURCHASE AGREEMENT dated as of July 1, 2006 by and between National Pork Producers Council, an Iowa non profit corporation ("Seller") and National Pork Board, an instrumentality of the United States of America created under the Pork Promotion Research and Consumer Information Act of 1985 ("Buyer") |
| 3 | 2003 National Pork Producers Council Pork the Other White Meat "PORK and Design" Trademark License Agreement with the National Pork Board |
| 4 | 2004 Pork the Other White Meat "PORK and Design" Amended and Restated Trademark License Agreement |
| 5 | National Pork Board 2005 Annual Report |
| 6 | National Pork Board 2006 Annual Report |
| 7 | National Pork Board 2007 Annual Report |
| 8 | National Pork Board 2008 Annual Report |
| 9 | National Pork Board 2009 Annual Report |
| 10 | National Pork Board 2010 Annual Report |
| 11 | National Pork Board 2011 Annual Report |
| 12 | National Pork Board 2012 Annual Report |
| 13 | National Pork Board 2013 Annual Report |
| 14 | National Pork Board 2014 Annual Report |
| 15 | National Pork Board Financial Report for the Year Ended December 31, 2014 |
| 16 | Smith, Gordon V. and Parr, Russell L. Intellectual Property: Valuation, Exploitation and Infringement Damages. John Wiley & Sons, Inc. 2005 |
| 17 | Smith, Gordon V. Trademark Valuation. John Wiley & Sons, Inc. 1997 |

**CONSOR** ®
Intellectual Asset Management

| | |
|---|---|
| 18 | Long Term U.S. Inflation. InflationData.com |
| 19 | Email Correspondence: John Caspers, Craig Christensen, and Steve Murphy. September 14-15, 2003 |
| 20 | Miller, Marlys. Tallying 25 years of NP and National Pork Checkoff. November 15, 2011. Pork Network. http://www.porknetwork.com/pork-news/Tallying-25-years-of-NPB-and-National-Pork-Checkoff--133923673.html |
| 21 | About Pork Checkoff and the National Pork Board. http://www.pork.org/about-us/ |
| 22 | 7 U.S. Code § 4801 - Congressional findings and declaration of purpose. https://www.law.cornell.edu/uscode/text/7/4801 |
| 23 | 7 U.S. Code § 4808 - National Pork Board. http://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUSC-prelim-title7-section4808&num=0&saved=%7CZ3JhbnVsZWlkOlVTQy1wcmVsaW0tdGl0bGU3LXNlY3Rpb2400ODA5%7C%7C%7C0%7Cfalse%7Cprelim |
| 24 | 7 U.S. Code § 4809 – Assessments. http://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUSC-prelim-title7-section4809&num=0&saved=%7CZ3JhbnVsZWlkOlVTQy1wcmVsaW0tdGl0bGU3LXNlY3Rpb2400ODA5%7C%7C%7C0%7Cfalse%7Cprelim |
| 25 | About Us. Mission and Governance. National Pork Producers Council. http://www.nppc.org/about-us/ |
| 26 | NPPC Revenue Chart 2008 |
| 27 | NPPC Revenue Chart 2014 |
| 28 | U. S. TRADEMARK LAW. RULES OF PRACTICE & FEDERAL STATUTES. U. S. PATENT & TRADEMARK OFFICE. August 9, 2012 |
| 29 | Ibbotson Associates Cost of Capital 2005 Yearbook. Standard and Poor's Compustat. McGraw-Hill Companies, Inc. |
| 30 | LICENSE AGREEMENT effective July 1, 2008, between the AMERICAN ANIMAL HOSPITAL ASSOCIATION and MWI Veterinary Supply Co. |
| 31 | LICENSE AGREEMENT made January 1, 1981 by and between KING FEATURES SYNDICATE, Division of THE HEARST CORPORATION and POPEYES FAMOUS FRIED CHICKEN, INC. |

CONSOR®
Intellectual Asset Management

| 32 | AGREEMENT dated as of June 20, 2000, by and between AGWAY, INC., a Delaware corporation ("Agway") and SOUTHERN STATES COOPERATIVE, INC., a Virginia agricultural cooperative corporation |
|----|----|
| 33 | Agreement, made this 22nd day of September, 1999 (the "Effective Date"), by THE FRESH JUICE COMPANY OF CALIFORNIA, INC. and HANSEN BEVERAGE COMPANY |
| 34 | LICENSE AGREEMENT, made this 24th day of July, 2002 by and between Land O'Lakes, Inc. and Dean Foods Company |
| 35 | SERVICE MARK LICENSE AGREEMENT SERVICE MARK LICENSE AGREEMENT dated as of November 18, 1999 by and between AT&T CORP., a New York corporation ("Licensor"), and KIRI INC. |
| 36 | Google search. "Pork the Other White Meat" |
| 37 | CONSOR Opinion Letter dated February 26, 2016 |
| 38 | SRR Valuation Report dated March 30, 2016 |
| 39 | "Statements on Standards For Valuation Services," *AICPA*, dated June 2007 |
| 40 | "Valuing Intangible Assets," *McGraw-Hill*, dated 1999 |
| 41 | "Trademark Valuation," *John Wiley & Sons*, dated 1997 |
| 42 | "Moving beyond brand awareness," *Branding News*, dated August 2015 |
| 43 | "Marketing: The Shocking Truth About Marketing ROI – Nobody Cares?" *Fluid Drive Media* |
| 44 | "Licensing Royalty Rates," *Wolters Kluwer*, dated 2014 |
| 45 | "Intellectual Property: Valuation, Exploitation, and Infringement Damages," *Gordon v. Smith and Russel L. Parr*, dated 2005 |
| 46 | "Price elasticity of demand," *Economics Online* |
| 47 | "Got trademark? Minn. Firm tries to seize slogan from Calif. milk processors," *ABC*, dated May 2015 |
| 48 | "Long Term U.S. Inflation," *Inflationdata*, dated April 2014 |
| 49 | "Hog Farmers Value Chain," *North Carolina in the Global Economy*, dated 2012 |

| 50 | "A Value Chain Analysis of the U.S. Pork Industry," *Center on Globalization Governance & Competitiveness*, dated 2008 |
|----|----|
| 51 | "Managing Supply Chain Networks: From Value Chain to Value Network," *Pearson*, dated July 2014 |
| 52 | "Packaged Foods and Meats Margins," *CaptialIQ* |
| 53 | "Tallying 25 years of NPB and National Pork Checkoff," *PorkNetwork*, dated November 2011 |
| 54 | "I need $40 million & a killer slogan," *New Hope 360 Blog*, dated April 2011 |
| 55 | CONSOR Recreation of Source Documents for Cost/Market Approach |
| 56 | NPB PTOWM Qualitative Analysis - 2014 |
| 57 | NPPC Submission Feb. 29 2016_Redacted (MP Annotations) |
| 58 | Input form the Futurist Panel |
| 59 | 2001 Texas A&N Study |
| 60 | Decision Memorandum for the Acting Under Secretary. USDA, February 2006 |
| 61 | Testimony of James Merimann, Page 71. http://ttabvue.uspto.gov/ttabvue/v?pno=91166701&pty=OPP&eno=69 |
| 62 | 2001 Agreement between USDA and NPPC |



**APPENDIX C**
**CONSOR Qualifications**

CONSOR specializes in providing intellectual property valuations, royalty rate opinions, and intellectual property licensing.  For the past 25 years, we have had a focused approach to this area, basing our opinions on well-documented research and on our proprietary personal knowledge of intellectual property transactions.  In addition, we are active in all major intellectual property and licensing organizations around the world.

CONSOR personnel have served on the Board of Directors of the French Licensing Association, MICEL, as well as being active in the American Intellectual Property Law Association (AIPLA), the American Society of Appraisers (ASA), and The Institute of Property Taxation (IPT).  Our Chairman is a certified official arbitrator/mediator for the World Intellectual Property Organization (WIPO). We are also active in the American Bankruptcy Institute.  Our Chairman has also served as the Chair and Co-Chair of the Global IP Standards Committee for WIPO and LESI.

CONSOR personnel have served for 15 years on the International Board of Delegates of the Licensing Executives Society (LES).  LES functions as a non-profit professional and educational society encouraging high standards and ethics among persons engaged in the domestic and international licensing of intellectual property rights. In addition, Weston Anson has served as Chairman of the following committees: the Valuation Committee, the Trademark Licensing Committee, the Internet Committee, and the Asset Sales Committee.

CONSOR personnel belong to the International Trademark Association (INTA), and our Chairman has served on multiple committees. Presently, he is serving as section head on the ROP committee. INTA is dedicated to the support and advancement of trademark and related intellectual property concepts.  The organization serves the common purposes of its worldwide members through advocacy, communication, and education to members. He has also served on various IP related committees for the American Bar Association (ABA).

CONSOR personnel have also served on the Board of the Licensing Industry Merchandisers' Association (LIMA) for a decade.  With its main office in New York City, LIMA is a non-profit organization of licensors, manufacturers, and support organizations working to advance professionalism in licensing.  Its main objectives are to institute and maintain a standard of ethical business practices in the licensed merchandise industry and to establish and promote the industry with the government, the business community, other associations, the public, and the trade and consumer media. Members of our firm have served as members of both LES and LESI, as Chairman of the Trademark, Copyright and Character committee, and Chairman of the valuation committee.



Some of our clients over the years include:



Our professionals have published well over 100 articles worldwide and are active in all of the major international trademark and licensing associations as speakers and/or officers.  Our Chairman has also published a series of six books on the topic of intellectual property valuation for the American Bar Association. We travel extensively, counseling major multi-national corporations and small companies in the U.S. and overseas.

## <u>Testimony of Steve Murphy, Pork Board CEO</u>

**Testimony that the Board never looked into how much value it could claim it put into PTOWM before the purchase.**

00036

right?

A.   I was -- that was 15 years before my arrival.  I'm not aware of what they spent.

Q.   So in doing your due diligence for this sale, you never looked into how much value the National Pork Producers Council could claim they had put into this mark, right?

A.   No, we did not.

Q.   And you, therefore, also did not look into in doing your due diligence how much the National Pork Board could claim it had put into the mark over 20 years, correct?

A.   We did not look into that number, no.

Q.   Are you aware, sir, that prior to 2004, there had never been an annual license fee for this trademark?

MR. BEALL:  Objection.  Misstates the record. Assumes facts not in evidence.

BY MS. KIRK:

Q.   That's right.  In 1997 they had a one dollar fee a year.

MR. BEALL:  No.  Look at '97.

THE WITNESS:  Fifty thousand.

MS. KIRK:  That wasn't a yearly fee.  Mr.

**Murphy, Steve (Testimony)      Page 36**

## Testimony of Steve Meyer (excerpt)

Questions "whether any branded companies like Hormel or Smithfield would really want to invest in a label that represents generic pork."

CONFIDENTIAL

67

**REDACTED**

Q.   You wrote, "Furthermore, it appears to me that NPPC is in a very weak position as a seller." Why was NPPC in a very weak position?

A.   Well, this paragraph goes on to point out why they really are, and there's several reasons.

Q.   Okay.

A.   Should I just go on?

Q.   Yes, please.

A.   At the time NPPC was a newly independent organization that was trying to fund its operations, and they didn't have extra money to do that, to fund--to build that brand name.

I questioned here whether any branded companies like Hormel or Smithfield would really want to invest in a label that represents generic pork.  I mean if I was those companies, I would want my name on it.  I wouldn't want something that had represented all of pork in the past.

Finally, I didn't think--since NPPC had producer members, that's their membership, I didn't think that they could politically sell this brand name to anybody other than the National Pork Board,

CONFIDENTIAL

68

which was also producers.  I just didn't think politically they could get that done.

Q.    Why is that, sir?

A.    Well, it would be very unpopular if you were to sell it to a corporation or if--you know, and I don't have any evidence that this was ever an idea that was thrown around.  If the chicken business bought the thing and just buried it, I mean it would be very politically unpopular.

Q.    It would be politically unpopular because pork producers were basically paying taxes for it?

A.    No, I'm not talking about politics in Washington.  I'm talking about politics within the organization.

Q.    Got it.  And I hope I didn't interrupt you.  Were there any other reasons why you felt that NPPC was in a weak position?

A.    No.  I think I've listed them there.

Q.    And what did you mean by generic label, sir?

A.    I meant a label that represents a generic product.  I realize that generic label has some legal meanings, but I'm not a legal person, so that has no connotation to me.

"Pork.  The Other White Meat" has represented all pork for many years, and I couldn't

CONFIDENTIAL

69

imagine why somebody that had a brand name, like Hormel or Smithfield or Tyson, would want to use something that represented all pork.

Q.    What do you mean by all pork?

A.    Well, it had been used as a label on pork sold in the United States.

Q.    By all pork producers?

A.    Well, yeah.  It could have been used in all those instances.  There were restrictions.  I mean it had to be applied to some products, and those kind of things, but it represented the generic product we know as pork.

Q.    And not any particular producer of pork?

A.    Correct.

**REDACTED**

April 13, 2016

Dr. Craig Morris
Deputy Administrator
United States Department of Agriculture
Agricultural Marketing Service
1400 Independence Avenue, S.W., Room 2092
Washington, DC 20250-0249

      Re:     Supplemental Submission of Information for Review of The Other White Meat®

Dear Dr. Morris:

The National Pork Producers Council ("NPPC") hereby submits this supplemental submission to the Agricultural Marketing Service ("AMS") for its review of the "The Other White Meat®" trademarks ("TOWM"), as requested by the United States Department of Agriculture ("USDA"). NPPC makes this submission to the AMS' "review" of TOWM and reiterates the following objections made, in part, in prior NPPC submissions: (1) NPPC did not receive sufficient notice of this review to adequately prepare its full submission by February 15, 2016; (2) NPPC was not given the opportunity to participate in the settlement and/or other discussions that led to the entry of the December 23, 2015 joint stipulation; (3) NPPC disputes whether there is any legal basis under the Pork Act for USDA, AMS or the Secretary to conduct such a "review;" and (4) NPPC has not been afforded an opportunity to meet with policy-making officials of AMS or USDA with respect to the "review."

Notwithstanding the foregoing objections, NPPC submits the enclosed additional information to AMS for consideration on April 13, 2016.

## I.      Commentary on the SRR Valuation Study

While we believe that the valuation study conducted by Cupitor Consulting LLC offers the most accurate assessment of the current value of TOWM, we are pleased to see that the SRR valuation study (hereafter, "SRR Report") demonstrates once more that the TOWM trademarks continue to have substantial value. The awareness of TOWM among consumers today makes it some of the most recognizable intellectual property in existence. The SRR Report confirms that this awareness translates into value. In addition, the SRR Report appears to confirm many of the conclusions reached in the valuation study conducted by Cupitor Consulting LLC.[1]

While we believe that the SRR Report is headed in the right direction, there are a number of ways in which the report actually understates the true value of TOWM. Here are a few examples:

---

[1] Based upon the information provided by USDA to NPPC, the submission by HSUS appears to be irrelevant to the issues before the agency. In this regard, NPPC's assessment of HSUS's position has been hindered in part due to the fact that HSUS's valuation submission was redacted in its entirety without explanation.

- The SRR Report acknowledges that one of the TOWM marks is used by NPB in the Be Inspired® campaign, but it fails to calculate the value of this prominent use in the Be Inspired® campaign.  Page 9 of the SRR Report states: "[O]ne of the Subject Assets still is prominently displayed alongside its current slogan, 'Be Inspired,' in its latest campaign."  On page 16, the SRR Report suddenly reverses its prior position with regard to the current use of TOWM and states "…the Subject Assets no longer are a part of the NPB's primary marketing campaign (and are not expected to be used in a primary market campaign in the future), and thus do not receive the same level of promotion and investment from the NPB as they previously did."  *Compare* SRR Report at pages 9 and 16.  All four of the TOWM trademarks continue to be in use by NPB, and the pork chop design service mark is still a prominent part of the current primary marketing campaign of NPB, so this latter quoted language is inaccurate.  Because the SRR Report relies on the purported "functional obsolescence of the Subject Assets", this understates the value of the TOWM intellectual property.  Far from being functionally obsolescent, the pork chop design service mark is part of the current primary marketing campaign of NPB and the remaining three trademarks included in TOWM are in current use by NPB – and could become the primary marketing campaign of NPB in the future.  The SRR Report understates the value of TOWM, because it has failed to address the added value of this usage.

- The SRR Report appears to predict a decline in awareness of TOWM that is too aggressive.  The suggested rate of decline will be a lot slower than what the SRR Report suggests, because Generation X, Generation Y and Baby Boomers will be part of consumer population for a long time to come.  The SRR Report argues that current generations will not forget the slogan, but that they will be replaced by new generations.  Given those assumptions, it will be a very long time until awareness reaches 1%, or even the 40% that the report purports to replace.

- When calculating the replacement cost, the hypothetical replacement should have the same awareness level of 80% as TOWM.  The SRR Report inexplicably lowers the expected awareness of a replacement to 40%, which causes the replacement value of TOWM to be understated.  *See* SRR Report at 17.

- To the extent that the SRR Report limits its testing of reasonableness to the next 5 years, this limitation is unnecessary.  There is value in the intellectual property beyond the next 5 years.

- The SRR Report vastly understates the cost of advertising in its Cost Approach analysis.  *See* SRR Report at Exhibit 2.2A (marked as page 5 of 36 at the bottom).  The SRR Report errs in its application of the two primary sources to estimate the advertising costs needed to replace the Subject Assets. For example, their first source (at www.webpagefx.com/blog/business-advice/the-cost-of-advertising-nationally-brokendown-by-medium/) states that continuing advertising investment would include advertising agency hourly services PLUS media costs, yet the SRR Report forecasts only the advertising agency hourly services. The second source cited (at

www.jasonfalls.com/marketing-pricing-guide) provides a range of up to $50,000 per month (or $600,000 per year) for costs of advertising agency hourly services. That source also notes: "And that's just for the staff member's time and expertise. You'll also have to budget for production costs, media buys and the like." Yet the SRR Report forecasts annual total advertising cost for the national television advertising portion of its campaign at $600,000, as shown in its Exhibit 2.2. This $600,000 forecast is not enough for even two 30-second television commercials which, according to the SRR Report's first source, average $342,000 each. Although the SRR Report claims to have used the "high end" of the advertising cost estimates in its sources, its resultant projected annual advertising costs for all media combined is $2.4 million. Their error in applying the information from their own sources should be apparent given that the Be Inspired® campaign spends around $30 million per year in advertising.  Since the SRR Report weights this flawed indication of value at 15% of its concluded value of TOWM, it understates the overall value of the intellectual property.

Based upon the foregoing points, the SRR Report undervalues the TOWM intellectual property.

## II.    TOWM and Be Inspired® Are Intertwined and Inseparable

It is important to keep in mind that there are four (4) federal trademarks at issue in the lawsuit. One of them – PORK & Design mark (or "pork chop design service mark") – does not actually contain the "The Other White Meat®" slogan.  As both the SRR and Cupitor valuation studies point out, the pork chop design service mark is actually still being used as part of the Be Inspired® campaign.  (*See* SRR Report at 9; Cupitor Report at 5.)  Unfortunately, the decision from the DC Circuit and media stories (which were, in turn, based on HSUS's allegations in the complaint) conflate the four marks into one "Pork The Other White Meat®" slogan and, as a result, oversimplify and misstate the current status of use of the marks.

As a result, the Be Inspired® campaign is intertwined with TOWM and the continued success of the Be Inspired® campaign depends on NPB having common ownership of both the TOWM marks (including the critically important pork chop design service mark that was transferred from NPPC to NPB in 2006 as part of the TOWM transaction) and the Be Inspired® intellectual property.  In short, TOWM and Be Inspired® are inseparable due to the overlapping use of the pork chop design service mark.  If NPB were to lose ownership of the pork chop design service mark, it would effectively lose control of both TOWM and Be Inspired® and would be at the mercy of an unknown future owner of the pork chop design service mark.  NPB, AMS and USDA must be cognizant of this important fact, if there is still any question as to whether NPB should remain the proper home for the four TOWM marks.

If TOWM were in the hands of a new owner, NPB might be able to continue use of the "Be Inspired®" wording, but not the pork chop design service mark or the other marks included in the lawsuit. There is a significant body of case law indicating that use of a trademark or a confusingly similar mark by an assignor, a terminated dealer, or a former licensee constitutes trademark infringement. *See, e.g.*, *Barr v. Sasser*, 24 U.S.P.Q.2D 1942 (N.D. Okla. 1993) (holding assignor's use of KEN SASSER FABRIC AND TRIM after assigning "DRAPERIES BY KEN SASSER" trademark constituted trademark infringement); *Century 21 Real Estate*

*Corp. v. Sandlin*, 846 F.2d 1175 (9th Cir. 1988) (use of "CENTURY INVESTMENTS & REALTY" by former franchisee of "CENTURY 21" actionable trademark infringement). These cases stand for the proposition that after the permission to use a mark has ended, use of the mark must cease, and by analogy, if NPB has returned ownership of the trademarks to NPPC, NPB's use of the marks or a similar variation thereof must also cease.

Furthermore, in instances where the infringer previously had rights to use the mark, courts have recognized a stronger case for enjoining the infringement because of an increased risk of consumer confusion. For instance, the Second Circuit has said that "[t]here is a compelling need for injunctive relief especially when the case involves a former licensee because, after a license has been revoked, there is an increased danger that consumers will be confused and believe that the former licensee is still an authorized representative of the trademark holder." *Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17 (2d Cir. 2004). Some courts, though not all, will also impose an affirmative duty on former trademark users to avoid any misrepresentation that it is still affiliated with or related to the trademark owner. *See, e.g., Louisiana-Pac. Corp., Weather-Seal Div. v. Nu-Sash of Pittsburgh, Inc.*, No. 73-415, 1974 WL 20246, at *7 (W.D. Pa. Oct. 30, 1974) ("The defendant, as an ex-distributor of the plaintiff's "NU-SASH" windows, has an affirmative duty to distinguish its present sales of replacement windows from that of the plaintiff.")  While those cases deal with license agreements, some of the same considerations are relevant to trademark assignments.  It would be reasonable to expect that if NPB transferred the marks back to NPPC, NPB would need to rebrand and cease using and/or associating itself with the transferred marks.

## III.    The View of the Pork Industry

The pork industry supports - in the strongest terms possible - keeping TOWM in the hands of the National Pork Board and vigorously defending the above-referenced lawsuit brought by HSUS. There is no known support within the pork industry for the USDA to settle the lawsuit with HSUS and the other plaintiffs.  Three independent valuation studies now show that the TOWM marks are worth more than the remaining principal left on the NPB's payment plan with NPPC. It is in the interest of pork producers that have paid in checkoff dollars to see their investment in TOWM (including the pork chop design mark) continue to appreciate in value in the hands of NPB.  It would make no sense for NPB to give away such an asset, when it continues to appreciate in value and is now worth far more than the purchase price.

In addition, the pork industry would like to see the USDA vigorously defend the lawsuit against HSUS, because the lawsuit simply lacks merit.  NPB purchased TOWM in good faith for an amount that was negotiated in good faith and then financed over 20 years.  It is inexplicable that the USDA neither appealed the decision of the Court of Appeals for the D.C. Circuit on the issue of standing nor presented even a minimal defense of the underlying lawsuit after that decision was reached.  USDA needs to defend the ability of all checkoff programs to be able to do business, without the threat of a lawsuit by an individual producer challenging the program's decision-making.  The USDA may have opened the floodgates to a wave of frivolous litigation that will only interfere with the valuable promotional work of NPB and other checkoff programs. It is not too late for USDA to do the right thing and vigorously defend the lawsuit against HSUS.

Moreover, if NPB terminates the TOWM contract and gives the assets back to NPPC (as it must under the contract), NPB will either have to (1) reformulate their current campaign to avoid trademark infringement; (2) hope to get a reasonable license of the pork chop design service mark from NPPC in the face of the SRR Report valuation (which indicates that such a license will cost considerably more[2] than the one NPB had prior to 2006); or (3) scrap the current campaign entirely and go with something completely new – at a considerable (and unnecessary) cost to producers.  It makes more sense for NPB to continue to use TOWM as both a heritage brand and as part of the Be Inspired® campaign – and preserve the option of shifting its primary campaign back to the "The Other White Meat®" slogan in the future.  Preserving that option is in the best interests of the pork industry.

## IV.    Conclusion

NPB made a good decision when it purchased TOWM from NPPC.  That investment has paid off.  TOWM is now worth considerably more than it was worth in 2006.  The USDA made a sound decision in approving the purchase of TOWM in 2006 and the USDA was correct to approve each subsequent annual payment of $3 million to NPPC.

In the view of the pork industry, The Other White Meat® - including the pork chop design service mark - should continue to be owned by the National Pork Board to maximize its use for the benefit of the entire industry and USDA should continue to vigorously defend itself in the lawsuit against HSUS.  In addition, NPB should not terminate the Purchase Agreement it signed in good faith with NPPC over nine years ago.  USDA should not dismantle both TOWM and Be Inspired® marketing campaigns, leaving NPB without an industry-wide marketing slogan at its full disposal.

We stand ready to answer any questions you may have.  That said, we look forward to receiving information concerning the results of the USDA's review process.


_____          _____
Neil Dierks, CEO                         John Weber, President
National Pork Producers Council          National Pork Producers Council


_____          _____
Ken Maschhoff, President -Elect          Jim Heimerl, Vice President
National Pork Producers Council          National Pork Producers Council


---

[2] The SRR Report values an annual licensing fee at $7-8 million.  *See* SRR Report at 24.

# NATIONAL PORK BOARD

**Valuation of Certain Trademarks
Owned by The National Pork Board
as of January 1, 2016**

**Issued:  March 30, 2016**

**[This page is intentionally left blank.]**

*For more information, please contact:*

Scott Weingust
Director
+1.312.752.3388
sweingust@srr.com



Atlanta | Baltimore | Chicago | Cleveland | Dallas | Denver | Detroit | Houston | Los Angeles | New York | Tysons Corner | Washington, D.C.

**www.srr.com**

206

March 30, 2016

Mr. John A. Johnson
Chief Operating Officer
National Pork Board
1776 NW 114th Street
Clive, IA 50325

Dear Mr. Johnson,

Stout Risius Ross, Inc. ("SRR") has been engaged to determine the Investment Value ("Investment Value") of certain trademarks the National Pork Board ("NPB") uses to promote sales of pork in the United States (the "Subject Assets") as of January 1, 2016 (the "Valuation Date"). The valuation is being performed to advise the Secretary of Agriculture on how to evaluate the 2006 contract for the purchase of the Subject Assets. The valuation was performed using the Investment Value standard.

Based upon the valuation analysis we performed and described in this report, as of January 1, 2016, we have concluded the Investment Value of the Subject Assets to be within the range:

### *ONE HUNDRED THIRTEEN MILLION DOLLARS AND ONE HUNDRED THIRTY-TWO MILLION DOLLARS*

*$113,000,000 - $132,000,000*

\*    \*    \*    \*    \*    \*    \*

A description of our procedures, methodologies, assumptions, and conclusions is contained in the accompanying report.  This valuation is subject to the assumptions and limiting conditions outlined in Appendix C and elsewhere in the attached report.  This letter should not be separated from, nor considered independent of, the attached report, of which it is a part.

Yours very truly,

**STOUT RISIUS ROSS, INC.**



Valuation & Financial Opinions

**I.**    Introduction ..................................................................................................................................... 1

**II.**    Background ....................................................................................................................................... 5

**III.**    Valuation Approaches and Methods Considered ............................................................................. 12

**IV.**    Valuation Approaches and Methods Used ........................................................................................ 14

**V.**    Value Conclusion ............................................................................................................................ 22

**Appendix A**.................................................................................................................... List of the Subject Assets

**Appendix B**...................................................................................................................... Sources of Information

**Appendix C**..............................................................................................................Assumptions and Limiting Conditions

**Appendix D**........................................................................................................ Representation of the Valuation Analyst

**Appendix E**..........................................................................................................Qualifications of the Valuation Analyst

**Appendix F** .......................................................................................................... Exhibits Supporting the Valuation Analysis

# Section I

## Introduction

## Purpose and Intended Use of the Valuation

Stout Risius Ross, Inc. ("SRR") has been engaged to determine the Investment Value ("Investment Value") of certain trademarks the National Pork Board ("NPB" or the "Organization") uses to promote sales of pork in the United States (the "Subject Assets") as of January 1, 2016 (the "Valuation Date"). The valuation is being performed for the purpose of determining the Investment Value of the Subject Assets to advise the Secretary of Agriculture on how to evaluate the 2006 contract for the purchase of the Subject Assets. No other use of this report is intended or inferred.

## Intended Users of the Valuation

This report has been created exclusively for the NPB, USDA, and the Secretary of the Agriculture (the "Primary Users") for the purposes described in the previous section. To the extent this report is disseminated to people or organizations other than the Primary Users, SRR takes no responsibility for any reliance, quotation, or comment by/from such parties related to this report and its conclusions without SRR's prior written consent. Further, the analyses, opinions, and conclusions in this report should be considered in their entirety. The use of, or reliance on, any portion of this report outside of the context of the entire report may be misleading. Finally, to the extent reasonably possible, the Primary Users should consult, and obtain guidance from, SRR regarding any oral or written comments made relating to this report and analysis.

## Identity of the Subject Assets

The Subject Assets are four trademarks that are used by the NPB to promote pork sales in the United States:

- "PORK and Design" - U.S. Trademark Registration Number 1418703
- "THE OTHER WHITE MEAT" - U.S. Trademark Registration Number 1486548
- "THE OTHER WHITE MEAT and Design" - U.S. Trademark Registration Number 3126072
- "THE OTHER WHITE MEAT" - U.S. Trademark Registration Number 3129186.

## Description of the Subject Interest

SRR has valued a 100% interest in the Subject Assets.

## Type of Report, Valuation Date, and Report Date

This report was created, and SRR's valuation procedures were performed, in compliance with the "Statement on Standards for Valuation Services, Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset," ("SSVS") promulgated by the American Institute of Certified Public Accountants ("AICPA"). AICPA-compliant valuation reports are commonly identified as "detailed," "summary," or "oral." This report was created consistent with content required in a detailed report.

The valuation was performed as of January 1, 2016 and the date of the report is March 30, 2016.

## Applicable Premise and Standard of Value

This report and valuation analysis is premised upon a going concern value which is defined in the SSVS as "the value of a business enterprise that is expected to continue to operate into the future."[1]

---

[1] SSVS, p. 33.

The term "Investment Value" is defined as "the value to a particular investor based on individual investment requirements and expectations."[2]

## Assumptions and Limiting Conditions

A statement of Assumptions and Limiting Conditions is listed in Appendix C. Additional assumptions relevant to this report and our Investment Value conclusions are described in the Valuation Approaches and Methods Used sections of this report and in the various exhibits found in Appendix F.

## Restrictions and Limitations in the Scope of Work or Data Available for Analysis

SRR's scope of work and choice of valuation approaches were consistent with the executed letter of engagement, dated February 3, 2016, and were not restricted beyond the normal valuation constraints arising from the availability of meaningful and relevant data.

## Hypothetical Conditions Used in the Valuation Engagement, Including the Basis for Use

There are a variety of hypothetical conditions that affected our analysis. Such hypotheticals are discussed throughout this report in the appropriate sections.

## Reliance on the Work of Specialists

Consistent with the description of specialists found in the SSVS, we have not relied on the work of specialists for purposes of performing this valuation.[3]

## Disclosure of Subsequent Events

We have not formally conducted procedures designed to determine if events subsequent to the date of this valuation have occurred that would materially impact the results our analysis if the valuation date were at a later point in time. Further, no such subsequent events have come to our attention as of this report.

## Any Application of the Jurisdictional Exception

SRR is not aware of any jurisdictional exceptions or restrictions that are relevant to this report.

## Sources of Information

The principal sources of information used in performing our valuation included, but were not limited to (see Appendix B for a complete detailed listing of sources of information):

- Discussions and email communications with NPB and USDA personnel (in alphabetical order):
  o Jill Criss, Vice President, Operations and Human Resources, NPB
  o Mai Dinh, Assistant General Counsel, Office of the General Counsel, USDA
  o John A. Johnson, Chief Operating Officer, NPB
  o Charles Kendall, Trial Attorney, Office of the General Counsel, USDA
  o Craig A. Morris, Deputy Administrator, Livestock, Poultry and Seed Program, Agriculture Marketing Service, USDA
  o Kenneth Payne, Director, Livestock, Poultry and Seed Program, Agricultural Marketing Service, USDA
  o Craig Shackelford, Marketing Specialist, Livestock, Poultry and Seed Program, Agricultural Marketing Service, USDA
  o Angie Snyder, Associate Deputy Administrator, Livestock, Poultry and Seed Program, Agricultural Marketing Service, USDA
  o Ceci Snyder, Vice President, Consumer Marketing, NPB

---

[2] SSVS, p. 34.

[3] SSVS, p. 12.



- o    Calvin VandeKrol, Vice President of Finance, NPB

- ▪ Various documents provided by the NPB and from the NPPC and The Humane Society of the United States ("HSUS") through the USDA.; and

- ▪ Various public websites and articles.

## Conclusion

In accordance with the foregoing, we determined the Investment Value of the Subject Assets as of the Valuation Date to be within the range of $113 million to $132 million.



# Section II

## Background

## Industry Description and Overview

### Pork Industry

The pork industry is made up of hog and pig producers whose operations include breeding, farrowing, weaning and raising feeder pigs or market-size hogs.[4] These pigs and hogs are ultimately sold to pork processors, who in turn sell and distribute pork products to the general public through wholesale channels.[5] According to the USDA, the scale of hog and pig production has changed during the past twenty years. The number of hog farms has decreased by seventy percent, while the hog inventory has remained constant.[6] This trend is the result of years of consolidation in which larger operations that specialize in single phases of production have replaced smaller operations that previously performed all phases of hog raising.[7]

Profit margins for the pork industry are driven by two key factors: (1) the commodity price of red meat; and (2) the price of inputs such as feed. Higher prices for red meat increases farmers' revenue because consumers usually pay the increased price. The price of red meat is generally expected to increase in the near future, leading to an overall expected increase in pork production as producers generally devote more resources towards pork production in times of increasing prices. Raw material inputs such as feed impact the pork industry. Profit margins and production volumes decrease as feed costs increase. The domestic price of feed is expected to remain flat in the next five years, leading to increased profits for pork producers.[8]

Industry revenue dropped sharply in 2009 due to the H1N1 outbreak (commonly referred to as "Swine Flu"), which increased raw material costs and decreased consumer spending on pork. However, the industry has seen a steady increase in performance during the past five years due to a resurgence in demand for pork products.[9] This is due to steady demand for pork, historically high pork product prices, and decreases in feed prices.[10]

## Key Parties

### The National Pork Board[11]

The National Pork Board is a quasi-governmental entity created as a result of The Pork Promotion, Research and Consumer Information Act of 1985 (the "Pork Act").[12] The NPB consists of 15 members selected by the Secretary of Agriculture who are producers or importers of pork product. According to the Pork Act, the NPB was formed "to authorize the establishment of an orderly procedure for financing…and carrying out an effective and coordinated program of promotion, research, and consumer information."[13]

The NPB is funded by a mandatory checkoff program for pork producers and importers, requiring them to contribute to a fund (the "Checkoff"). Currently, U.S.

---

[4] IBISWorld Industry Report 11221, Hog & Pig Farming in the US (April 2015), p. 2.

[5] IBISWorld Industry Report 11221, Hog & Pig Farming in the US (April 2015), p. 4.

[6] USDA Report, "The Changing Economics of U.S. Hog Production" (December 2007), p. 5.

[7] IBISWorld Industry Report 11221, Hog & Pig Farming in the US (April 2015), p. 4.

[8] IBISWorld Industry Report 11221, Hog & Pig Farming in the US (April 2015), p. 4.

[9] Over the next five years, the pork industry is expected to grow approximately 2.0% to $26.7 billion in 2020, per IBISWorld Industry Report 11221, Hog & Pig Farming in the US

[10] IBISWorld Industry Report 11221, Hog & Pig Farming in the US (April 2015), p. 6-8.

[11] Unless otherwise noted, information in this section was obtained from the following sources: http://www.porkbeinspired.com/about-the-national-pork-board/, http://www.pork.org/about-us/, and First Amended Complaint of Declaratory and Injunctive Relief, dated October 2, 2012.

[12] Pork Promotion, Research, and Consumer Information Act of 1985, effective January 1, 1986 (http://www.pork.org/wp-content/uploads/2010/01/porkact.pdf).

[13] Pork Promotion, Research, and Consumer Information Act of 1985, effective January 1, 1986 (http://www.pork.org/wp-content/uploads/2010/01/porkact.pdf).

 

pork producers and importers pay $0.40 per $100 of value when pigs are sold or pork products are brought into the United States.[14] The NPB allocates fund monies to different programs according to pork producer's priorities. These priorities are determined through committees and a national business meeting. The NPB's key role is to oversee these programs that are beneficial to pork producers.[15]

Over the past 30 years, the NPB has funded advertising campaigns to increase awareness about pork's benefits to consumers. Past campaigns included the promotion of various slogans, including: (1) "The Other White Meat;"[16] (2) "Don't be blah;"[17] (3) "Taste What's Next;"[18] and (4) "Be Inspired."[19]

**The National Pork Producers Council**

The NPPC, based out of Des Moines, Iowa, is an organization that conducts public policy outreach on behalf of 43 state-level pork producer associations. This organization is mainly involved in promoting advantageous legislation and regulations for pork producers across the United States. The main public policy issues the organization focuses on are agriculture and industry, animal health, food safety, the environment, energy, and international trade.[20]

**The Humane Society**

The HSUS, headquartered in Washington D.C., is an American nonprofit organization whose general mission is to promote and defend animal rights.[21] The HSUS promotes these rights through several major campaigns. Campaign issues targeted by this organization include, but are not limited to: factory farming, animal fighting, the fur trade, puppy mills, and wildlife abuse.[22]

**Checkoff Programs**

As previously mentioned, the National Pork Board is funded through the Checkoff. Generally, commodity checkoff groups are tasked with increasing demand for various collective agricultural products. The groups fund advertising and promotional programs aimed at increasing the collective economic welfare of the producers that support the programs. Programs are funded with mandatory contributions from the producers, known as checkoff fees. In addition to the Pork Checkoff, other examples of checkoff programs exist for the following commodity products: beef, soybeans, eggs, cotton, dairy, mushrooms, honey, peanuts, popcorn, potatoes, watermelon, blueberries, Haas avocados, and mangos.[23] There are multiple examples of marketing campaigns funded through checkoff programs other than the pork Checkoff.[24]

## National Pork Board Marketing Campaigns

**"The Other White Meat"**

In 1986, the NPPC hired the Bozell advertising agency ("Bozell") to launch a new campaign for a checkoff-funded promotional program. After assessing the perception of pork through market research, Bozell concluded that the public image of pork was poor, relative to other meat products.[25] As a result, they devised a campaign with the aim of reimaging pork as a versatile and nutritious meat.[26] Bozell

---

[14] http://www.pork.org/about-us/.
[15] http://www.porkbeinspired.com/about-the-national-pork-board/.
[16] http://www.porkbeinspired.com/about-the-national-pork-board/the-other-white-meat-brand/.
[17] "The Pork Industry's 'Other White Meat' Campaign Is Taken in New Directions", dated March 4, 2005.
[18] https://www.youtube.com/watch?v=EFE218yBxiw/.
[19] http://www.porkbeinspired.com/.
[20] http://www.nppc.org/about-us/.

[21] http://www.humanesociety.org/about/?credit=web_id93480558.
[22] http://www.humanesociety.org/issues/campaigns/.
[23] http://www.choicesmagazine.org/2006-2/checkoff/2006-2-01.htm.
[24] http://newhope.com/blog/i-need-40-million-killer-slogan.
[25] First Amended Complaint of Declaratory and Injunctive Relief, dated October 2, 2012, pp. 13.
[26] http://www.porkbeinspired.com/about-the-national-pork-board/the-other-white-meat-brand/

had identified that the public has a more positive perception of white meat, therefore they repositioned pork as "The Other White Meat".[27]

The NPB approved of the campaign and dedicated $4.5 million to fund the initial promotion of PTOWM.[28] In 1986, the NPPC filed a trademark application for "The Other White Meat" (See Appendix A). In March 1987, the NPPC worked on the NPB's behalf to launch the campaign nationwide. Since 2001, the NPB has had different exclusive license agreements with the NPPC to license out the Subject Assets.[29] In addition, we understand that the NPB sublicensed the Subject Assets to multiple pork retailers, including Tyson Foods, Inc., Swift & Company, The Schwan Food Company, and General Mills Sales, Inc., among other entities on a royalty-free basis.[30] In October 2006, the NPB and the NPPC entered into an Asset Purchase Agreement in which the NPB agreed to pay $3,000,000 annually for twenty years to purchase the Subject Assets.[31]

Beginning in March 1987, the NPB ran a series of broadcast and print advertisements which featured pork meals that are typically associated with other meats. The PTOWM campaign also featured a recipe book to inspire consumers towards using more interesting cuts of pork.[32] In recent years, this campaign has used additional forms of advertisements, such as online advertisements, banner advertisements, and streaming videos.[33] The advertising campaign has resulted in high brand awareness for the industry and has positioned pork positively as a healthy diet option. As referenced in Appendix A, three of the four Subject Assets relate to the use of the term "The Other White Meat" (the "PTOWM Trademarks").

From discussions with NPB personnel, we understand that there are currently no plans to return use of the PTOWM campaign to a primary role within the marketing activities of the organization. Our valuation analysis is premised, at least in part, on this assumption. To the extent the NPB decides to incorporate the PTOWM Trademarks into its primary marketing campaign in the future, our value conclusion may be understated.

**"Be Inspired"**

In March 2011, the NPB announced "Pork Be Inspired" as its new, primary brand identity. The new campaign targeted the more than eighty-two million Americans that already consume pork. According to its official announcement, consumer segmentation research conducted by the NPB showed that twenty-eight percent of U.S. households are responsible for sixty-eight percent of in-home pork consumption. Thus, Pork Be Inspired is aimed at inspiring these consumers with ways to enjoy pork more frequently.[34] From discussions with personnel at the National Pork Board, we understand that, with the introduction of the "Pork Be Inspired" campaign, the marketing focus and promotional spending for "The Other White Meat" has declined in recent years.[35]

**Current Use of the Subject Assets**

Three of the four trademarks that make up the Subject Assets, the PTOWM Trademarks, specifically relate to the use of the term "The Other White Meat." The original goal of the PTOWM campaign was to increase the consumer demand for

---

[27] First Amended Complaint of Declaratory and Injunctive Relief, dated October 2, 2012, pp. 13.
[28] First Amended Complaint of Declaratory and Injunctive Relief, dated October 2, 2012, pp. 13.
[29] First Amended Complaint of Declaratory and Injunctive Relief, dated October 2, 2012, pp. 14-16.
[30] Per discussions with the National Pork Board and license agreements sent on March 7, 2016.
[31] This agreement valued the Subject Assets at approximately $34.597 million plus 6.75% in annual interest, resulting in a total purchase price of $60 million. Sources: First Amended

Complaint of Declaratory and Injunctive Relief, dated October 2, 2012, pp. 18 and 23; Asset Purchase Agreement, dated July 1, 2006, p. 2.
[32] http://www.nytimes.com/1987/01/15/business/advertising-dressing-pork-for-success.html.
[33] http://www.nytimes.com/2005/03/04/business/media/the-pork-industrys-other-white-meat-campaign-is-taken-in-new-directions.html.
[34] http://www.pork.org/new-national-pork-board-campaign-evolves-celebrate-proud-new-brand-identity-pork-inspiredsm/.
[35] Per discussions with NPB management.

pork products, and to combat pork's reputation as a fatty source of protein.[36] Over the past decades, the campaign has gained recognition among consumers and has successfully positioned pork as a nutritious meat option.[37] Once the NPB launched "Be Inspired" as their new advertising campaign, "The Other White Meat" assumed a role as a heritage brand.[38] Although not the focus of the NPB's current promotional campaign, "The Other White Meat" slogan and related trademarks that make up the Subject Assets continue to be used on the NPB website and in nutritional communications.[39] In fact, as suggested by an aided awareness rate above 80% in recent studies, it is clear that the Subject Assets still remain relevant to many consumers as of the Valuation Date.

Alternatively, one of the Subject Assets still is prominently displayed alongside its current slogan, "Be Inspired," in its latest campaign.[40] In fact, the "PORK and Design" trademark is placed adjacent to the "Be Inspired" trademark on the NPB's main consumer website for the brand.[41] Although the trademark is not the focal point of the message to consumers in the way slogan "Be Inspired" is, this particular trademark demonstrates an example of the NPB's continued, prominent use of at least a portion of the Subject Assets as of the Valuation Date.

## Trademark Value Across Industries

A trademark by definition is a "word, name, symbol, device, or any combination, used or intended to be used to identify and distinguish the goods/services of one seller or provider from those of others."[42] For many companies, trademarks are significant sources of value. For companies or organizations that target large industries, metrics such as awareness typically indicate value associated with their trademarks, as it allows them to distinguish their products from competitors.

Trademarks are typically the primary value-driving assets associated with famous and valuable brands. According to a 2015 BrandZ report on top global brands, the brands of large multinational corporations have been valued in the billions of dollars. The following table summarizes these values:[43]

| Company | Brand Value ($mm) |
|---|---|
| Apple | 246,992 |
| Google | 173,652 |
| Microsoft | 115,500 |
| IBM | 93,987 |
| Visa | 91,962 |
| AT&T | 89,492 |
| Verizon | 86,009 |
| Coca-Cola | 83,841 |
| McDonald's | 81,162 |
| Marlboro | 80,352 |

## Sources of Value of the Subject Assets

According the National Pork Board, "The Other White Meat" brand continues to have high consumer recognition and is a valuable asset of the pork industry."[44] There are

---

[36] http://www.porkbeinspired.com/about-the-national-pork-board/the-other-white-meat-brand/.
[37] http://www.porkbeinspired.com/about-the-national-pork-board/the-other-white-meat-brand/.
[38] http://www.pork.org/new-national-pork-board-campaign-evolves-celebrate-proud-new-brand-identity-pork-inspiredsm/.
[39] http://www.pork.org/new-national-pork-board-campaign-evolves-celebrate-proud-new-brand-identity-pork-inspiredsm/.

[40] "PORK and Design" - U.S. Trademark Registration Number 1418703.
[41] http://www.porkbeinspired.com/.
[42] http://www.uspto.gov/trademarks-getting-started/trademark-basics.
[43] BrandZ™ Top 100 Most Valuable Global Brands 2015, p. 23.
[44] http://www.porkbeinspired.com/about-the-national-pork-board/the-other-white-meat-brand/.

 

at least three main sources of value that the Subject Assets provide to NPB: (1) the overall awareness of the Subject Assets contributing to purchases of pork; (2) the ability to exclude others from using the Subject Assets; and (3) the value of having the option to utilize the Subject Assets more extensively in the future compared to their use as of the Valuation Date.

**Awareness**

As noted previously, the Subject Assets are still actively used in the NPB's marketing efforts as of the Valuation Date, even after the launch of the "Be Inspired" campaign. The NPB has made significant investments in the Subject Assets over the years. Since the registration of the Subject Assets, the NPB has spent over $200 million promoting a national marketing campaign for the PTOWM slogan.[45] This significant investment in "The Other White Meat" has caused significant recognition of the Subject Assets over this period of time.

In order to determine the effectiveness of the investment the NPB made over the years, the NPB has tracked the recognition of the Subject Assets in multiple surveys over the last fifteen years. In 2000, Northwestern University conducted a study on slogan recognition. Among 114 other slogans, "The Other White Meat" ranked 5th with 69% aided-awareness recognition.[46] In more recent years, NPB has conducted surveys to track brand awareness. At roughly its peak aggregate investment in the PTOWM campaign in 2010, 92.6% of respondents were aware of "The Other White Meat" in an aided survey. This number has since decreased to 82.3% in 2015 as the NPB has focused its efforts around developing the "Be Inspired" campaign.[47] The findings of these studies indicate that the Subject Assets are still actively associated with pork products and generally recognized by a large majority of the public.[48]

Importantly, although awareness of the PTOWM Trademarks has decreased since the introduction of the "Be Inspired" campaign in 2011 (and that awareness is expected to continue to decrease in the future assuming the PTOWM Trademarks continue to be used as a subordinate marketing message for the pork industry), we believe that PTOWM Trademarks will have strong awareness for at least one group of consumers for many years into the future. Ultimately, those generations of consumers who were exposed to the PTOWM Trademarks during their use over the 25 year PTOWM marketing campaign will have the positive connotations associated with the PTOWM Trademarks ingrained in their thoughts about pork. These entrenched feelings are likely unable to be eradicated over the course of these consumers' lifetimes. Conversely, those current and future consumers that are too young to have experienced the PTOWM marketing campaign likely have a very low current awareness of the PTOWM Trademarks and (assuming the PTOWM Trademarks continue to be used as a subordinate market message for the pork industry) this low level of awareness will likely remain unchanged. Although the PTOWM Trademarks are not the primary focus of current and expected future pork industry marketing campaigns, they have significant residual value as a result of 25 years' worth of extremely high awareness amongst a large portion of the pork consuming population.

**Exclusivity**

Because of this continued awareness and association with the pork industry, it is important for the NPB to ensure that it is solely in control of how the Subject Assets are used. The pork industry can be injured if another organization or a company obtains ownership of the Subject Assets or if potential infringers utilize the Subject

---

[45] According to a document provided by the National Pork Board, it has spent over $224 million from 1987 to 2009 in advertising costs promoting "The Other White Meat" (Source: TOWM Advertising.xls).

[46] Rule 26(a)(2) Notice of Disclosure of Expert Testimony for Anders Gronstedt, Ph.D., dated July 27, 2007.

[47] Submission of Information for Review of The Other White Meat®, Attachment D.

[48] As previously mentioned, recent studies conducted by the National Pork Board show that "The Other White Meat" still scores over 80% in aided awareness as recently as late 2015.



Assets in a manner that is not consistent with the use of current and historical use of the Subject Assets by the NPB.

Consistent with these concepts, we understand that the NPB has defended the Subject Assets in infringement suits and actively investigates potential infringers. As of the date of this report, the NPB has spent approximately $1 million in fees actively defending the Subject Assets.[49] One case, in particular, involved potential infringement by the Supreme Lobster and Seafood Company and its efforts to register the "The Other Red Meat" trademark.[50] This example, along with numerous others, exemplifies the continued efforts made by the NPB to defend the Subject Assets and retain exclusivity over their use. This trademark defense ultimately protects the brand and identity of the PTOWM campaign. We also understand that the NPB plans to continue to invest in these efforts for the foreseeable future. This investment in protective measures further supports the notion that there is inherent value in the Subject Assets that the NPB is willing to protect.

**Option Value**

Although the NPB has recently significantly decreased its use of the PTOWM Trademarks, owning these trademarks provide options to the NPB for future use and these options have value. For example, although the NPB has licensed some or all of the PTOWM Trademarks to others on a royalty-free basis in the past, the NPB has the option of generating positive royalty revenue in the future through new licensing efforts. This business model has been successfully adopted by the California Milk Processor Board ("CMPB") the owners of the "Got Milk" trademark. This trademark, which has significant similarities to the PTOWM Trademarks, was licensed for 7% to a milk distributor in the past.[51]  As another example, ownership of

the PTOWM trademarks allows for the future use of the trademarks in a new marketing campaign similar to the successful PTOWM campaign.

**Qualitative Assessment of Value**

In addition to considering the three primary sources of value for the Subject Assets, we performed a qualitative assessment of the Subject Assets in order to better understand their value. This assessment focuses on 21 factors that influence the value of trademarks. These factors take into account various attributes of the Subject Assets, including, but not limited to: age, geography, connotation, association, expense of promotion, and name recognition. The results of the analysis found that seven attributes associated with the Subjects Assets had a positive influence on value, eleven attributes had a neutral influence on value, and three attributes had a negative influence on value (See Appendix F, Exhibit 11). Based on this analysis, we have determined that the Subject Assets have value as of the Valuation Date.

---

[49] Document named, "NPB Other White Meat Info.xls," outlining 75 separate investigations and/or litigations in connection to the Subject Assets, totaling approximately $1 million in fees over the life of the Subject Assets.

[50] Hearing by the Trademark Trial and Appeal Board in the case of National Pork Board and National Pork Producers Council v. Supreme Lobster and Seafood Company, dated December 16, 2009.
[51] http://legacy.abc10.com/story/news/2015/05/20/firm-tries-to-seize-got-mi k-trademark/27653805/.

 

# Section III

## Valuation Approaches and Methods Considered

## Valuation Approaches and Methods Considered

Three approaches are typically considered in estimating the value of intangible assets[52] such as the Subject Assets.  The results derived from these various approaches and methodologies are characteristically evaluated based on their respective merits, on a case-by-case basis, to arrive at a conclusion regarding value.

The three primary approaches are defined as follows:[53]

- **Income Approach**: a general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more methods that convert anticipated economic benefits into a present single amount.

- **Market Approach**: a general way of determining a value indication of a business, business ownership interest, security, or intangible asset by using one or more methods that compare the subject to similar businesses, business ownership interests, securities, or intangible assets that have been sold.

- **Cost Approach**: a general way of determining a value indication of an individual asset by quantifying the amount of money required to replace the future service capability of that asset.

The weight given to the Income, Market, or Cost Approaches varies with the facts and circumstances of each valuation effort and the availability of appropriate data; however, the attempted application of multiple approaches is generally preferred over the reliance on a single methodology.  In conducting our analyses in this matter, we considered all three approaches.

---

[52] Intangible assets are nonphysical assets such as franchises, trademarks, patents, copyrights, goodwill, equities, mineral rights, securities and contracts (as distinguished from physical assets) that grant rights and privileges and have value for the owner.  See SSVS, p. 34.

[53] SSVS, pp. 11 - 12.



# Section IV

## Valuation Approaches and Methods Used

## Valuation Approaches and Methods Used

As mentioned previously, we considered all three approaches in determining the Investment Value of the Subject Assets. Based on the usefulness and reliability of available data that could be used to perform this valuation, we determined a conclusion of value of the Subject Assets by relying primarily on three Cost Approach methodologies, and one Cost/Market Hybrid Approach:

- A cost of replacement of the Subject Assets using third-party researched expected costs to launch a marketing campaign;

- A cost of replacement of the Subject Assets using the NPB's historical expenditures for the "Be Inspired" slogan;

- A cost of replacement of the Subject Assets using the NPB's historical expenditures for the PTOWM slogan; and

- A cost of replacement of the Subject Assets based upon annual marketing expenditure incurred to promote a brand for other similar checkoff-related industry programs.

In the sections below, we outline the consideration of the three approaches in detail, with reasoning behind our decision to rely upon, or conversely to not rely upon, each methodology in our valuation analysis.

## Income Approach

We considered relying upon an Income Approach to determine the Investment Value of the Subject Assets to the NPB. A common methodology used in valuing IP such as trademarks is a hybrid Income/Market Approach known as the Relief from Royalty Method. The Relief from Royalty Method is based on the premise that the only value that a purchaser of an intangible asset receives is the exemption from paying a royalty for its use. Application of this method usually involves quantifying the present value of the stream of royalty payments that the owner of the intangible asset is exempted from or "relieved" from paying.[54] Typically, the royalty rate used for this analysis is determined through research of the public domain for royalty rates from license agreements executed in the past for comparable IP in a similar context. The royalty rate is typically expressed as a percentage and applied to the sales revenue of the products for which the trademark is associated.

We considered the applicability of the Relief from Royalty Method for the valuation of the Subject Assets and concluded that the unique nature of the NPB's use of the Subject Assets to indirectly benefit the entire pork industry causes the Relief from Royalty Method to be unreliable for this valuation. More specifically, we believe that an accurate and reliable determination of a royalty rate matched to the appropriate royalty base is not possible.

In our attempt to implement the Relief from Royalty Method, we identified the proper royalty base as the total retail sales of pork in the United States given that the Subject Assets are used by the NPB to benefit the entire pork industry.

To determine an appropriate royalty rate to match the identified royalty base, we conducted (1) searches of three commercial databases – ktMINE, RoyaltySource, and Markables[55] – along with (2) a general search of the internet. From the results of our searches, we disregarded any royalty rates associated with trademarks that are not slogans such as the PTOWM Trademarks. For example, any agreements associated with company or product names were deemed to be insufficiently comparable to the Subject Assets.

The results of our searches yielded only a single royalty rate data point that we considered somewhat comparable to the Subject Assets. This rate relates to the agreement in which the California Milk Processor Board ("CMPB") licensed the famous "Got Milk?" trademarked slogan to a milk processor and distributor for 7% of

---

[54] SSVS, pp. 53-54.
[55] http://www.ktmine.com/; http://www.royaltysource.com/; http://www.markables.net/.

 

sales as recently as 2011.[56] Similar to the Subject Assets, the "Got Milk?" trademark has also been shown to be highly recognizable in marketing surveys, resulting in 90% recognition among Americans.[57] While the nature of the "Got Milk?" trademark is similar to the Subject Assets, we noted that at the time of the CMPB license, the "Got Milk?" trademark was the primary focus of the milk industry's marketing campaign for milk, while the Subject Assets support marketing efforts that are subordinate to the NPB's "Be Inspired" marketing campaign as of the valuation date. This difference requires a downward adjustment to the 7% "Got Milk?" royalty rate.

In addition to the Relief from Royalty Method, we explored other methods for implementing an Income Approach we did not have data suitable to successfully rely upon such approaches. However, notably, we did rely on a form of the Income Approach/Relief From Royalty Method for several reasonableness tests that we performed.

## Market Approach

We considered relying upon a Market Approach to determine the Investment Value of the Subject Assets. The use of the Market Approach typically entails searching through the public domain for prices paid for assets that are comparable to the Subject Assets. From our searches of the public domain as described previously in the Income Approach section above, we found no lump sum dollar-value transactions for assets that are comparable to the Subject Assets. As a result, we did not rely upon the Market Approach in determining the Investment Value of the Subject Assets to the NPB. Although we did not utilize a pure Market Approach in our valuation analysis, we did take into consideration market data in one of our Cost Approach analyses and in our reasonableness tests.

## Cost Approach

Given our inability to implement an Income Approach and Market Approach, along with the availability of reliable information surrounding the expected costs to replace the Subject Assets, we ultimately relied upon the Cost Approach to determine the Investment Value of the Subject Assets. We calculated multiple indications of value using three pure Cost Approach analyses and one Cost/Market Hybrid Approach.

### Functional Obsolescence of the Subject Assets

It is generally accepted that trademarks, from a legal perspective, have an indefinite life.[58] However, as described previously in the Background section, the Subject Assets no longer are a part of the NPB's primary marketing campaign (and are not expected to be used in a primary market campaign in the future), and thus do not receive the same level of promotion and investment from the NPB as they previously did. According to the awareness studies conducted by the NPB, the aided awareness of the "The Other White Meat" has slowly begun to diminish since 2011, the year the NPB designated the slogan as a "heritage brand" and began to promote "Be Inspired" as the focus of its primary marketing campaign.[59]

Although the Subject Assets have an indefinite legal life, it is evident that the recognition of "The Other White Meat" will continue to decline as time passes, due to what is commonly referred to as functional obsolescence. Functional obsolescence is the reduction in the value of an intangible asset due to its "inability to perform the function for which it was designed."[60] As a result, we believe that the Subject Assets have a finite economic useful life as of the Valuation Date. When implementing the Cost Approach, functional obsolescence is commonly factored into the underlying calculations, when appropriate. In the case of the Subject Assets, we expect that, with little investment in the promotion of the PTOWM Trademarks, they

[56] http://legacy.abc10.com/story/news/2015/05/20/firm-tries-to-seize-got-milk-trademark/27653805/.
[57] http://adage.com/article/cmo-strategy/coming-grocery-stores-milk-branded-food/298727/.
[58] http://www.markables.net/trademark_useful_life.

[59] Submission of Information for Review of The Other White Meat®, Attachment D; http://www.pork.org/new-national-pork-board-campaign-evolves-celebrate-proud-new-brand-identity-pork-inspiredsm/.
[60] *Guide to Intangible Asset Valuation,* p. 227.

 

will continue to be subject to a decrease in their level of aided awareness among pork consumers due to this factor. Eventually, it is reasonable to expect the aided awareness of the Subject Assets will decrease to levels as low as approximately 1% of aided recognition in the future.

We believe that groups of consumers today who have a high awareness of the Subject Assets as a result of being subject to the NPB's 25-year marketing campaign focusing on "The Other White Meat" will likely continue to have a high awareness into the future. These consumers will eventually be replaced by new consumers who will be less (or not at all) familiar with the Subject Assets. For example, consumers in the Baby Boomer generation, Generation X, and Generation Y will reasonably have high recognition, likely near the current aided recognition rate of 80% despite a reduction in the use of the PTOWM Trademarks in a primary market campaign, as they have been heavily exposed to the NPB's past marketing efforts using the Subject Assets (See Exhibit 7). However, as years pass, these generations will be replaced by future generations of pork consumers that may have relatively low aided recognition depending on when the consumer was born.

Thus, in the future, the Subject Assets will likely weigh less or have virtually no impact in consumer purchasing decisions, on average, which is ultimately the main source of the value of trademarks. As a result, we concluded that it was reasonable to assume that the aided awareness percentages for the Subject Assets could fall between a maximum of roughly 80% (the level of awareness as of the Valuation Date) to a minimum somewhere between 0% and 1% (the long term expected awareness) over the remaining economic useful life of the PWOTM Trademarks.[61]

It is important to understand the fact that a trademark does have an indefinite legal life, but that may not reconcile with its remaining economic useful life. In our analysis, we determined that the Subject Assets may exist for an indefinite life in a legal sense but the remaining economic useful life is, in all likelihood, shorter due to their limited

expected future use. As a result, through our Cost Approach analyses, we estimate the investment required to replace the Subject Assets' value at an average level of awareness across their overall remaining economic useful life. This would entail creating a replacement marketing campaign that would garner approximately 40% aided awareness (the mid-point of the range of 80% and 1% expected aided awareness over the remaining useful life of the Subject Assets discussed earlier).

**Length of Cost Approach Analyses**

As mentioned in the Functional Obsolescence of the Subject Assets section previously, we sought to determine the Investment Value of the Subject Assets in order to achieve the average aided awareness of the Subject Assets over the course of their expected remaining economic useful life. As a result, the NPB will only need to spend an amount necessary to create a replacement trademark or slogan with an aided awareness of around 40%.

After analyzing the percentage of aided awareness of the PTOWM Trademarks over their development and use from 1987 to 2015, we determined that the NPB expended development and promotional costs for approximately 7 to 9 years in order to achieve an aided awareness among consumers ranging from 35% to 45% (See Exhibit 7). As a result, we projected the NPB to spend between 7 and 9 years of marketing costs to develop replacements for the Subject Assets while accounting for functional obsolescence.

In addition, when analyzing the percentage of awareness of the "Be Inspired" campaign from its inception in 2011 to the end of 2015, we determined that "Be Inspired" has achieved an aided awareness of 22% in four years (See Exhibit 7). This is highly comparable to the first four years of aided awareness achieved by "The Other White Meat" (See Exhibit 7).[62] As a result, we believe that it is reasonable to expect "Be Inspired" and other replacement campaigns for the Subject Assets to

---

[61] Due to the indefinite legal protection and the potential for usage in the future, we believe that it is unl kely that the Subject Assets would ever reach 0% recognition among consumers.

[62] Historical aided awareness trends were determined based upon data provided by the NPB.



**Valuation & Financial Opinions**    **SRR** STOUT | RISIUS | ROSS

gain an aided awareness of approximately 40% between 7 to 9 years of investment. We ultimately implemented two analyses for each Cost Approach in determining our range of Investment Value of the Subject Assets, a 7 year cost of replacement and a 9 year cost of replacement.

**Indications of Value Resulting from Four Cost-Based Methods**

After determining the length of time that the NPB would expect to spend on an effort to develop replacements for the Subject Assets to obtain the equivalent level of aided awareness expected for the Subject Assets over their remaining useful life, we then determined the amount the NPB could expect to spend on such an effort on an annual basis. The following descriptions of the three Cost Approach methodologies and one Cost/Market Hybrid Approach further explain the different estimations of annual expenditure we used to calculate the range of Investment Value of the Subject Assets:

### 1. Cost Approach: Third-Party Research for a Generic Marketing Campaign

In order to determine the cost the NPB would expect to spend starting on the Valuation Date, we researched the typical amount companies spend in order to launch and promote a new marketing campaign, brand, or slogan.

We learned through our research that a company often incurs two types of costs in developing a new marketing campaign: (1) initial setup costs; and (2) costs to continue the promotion. The initial setup costs, as shown in Exhibits 2.1A and 2.1B, include the design and production of magazine, newspaper, and television materials. In addition, these costs include web-related expenditures, including search engine optimization, email marketing, web content marketing, and online advertisement pay-per-click costs.[63] Our source of information included ranges for the costs a company would expect to incur in the initial setup phase of a

campaign. Because the NPB is tasked to promote the entire pork industry through its marketing campaigns, we believe it is appropriate to utilize the high end of these ranges in our analysis. The costs to continue to promote the replacement campaign, as outlined in Exhibits 2.2A and 2.2B, are broken down into the same categories as the initial setup costs. However, these costs include monthly estimates of expenditures for the new campaign. We assumed that the NPB would use all of the relevant marketing channels for all twelve months each year. In using both the initial setup costs and costs to continue the promotion of the replacement campaign, we created schedules outlining the expected costs that would be incurred over 7 and 9 years, the estimated periods of time necessary to develop a replacement for the Subject Assets as described earlier (See Exhibits 1A and 1B).

### 2. Cost Approach: "Be Inspired" Historical Expenditures

Similar to the previously described Cost Approach methodology, in this second analysis we determined what the NPB would expect to spend on a marketing campaign to replace the Subject Assets. However, rather than estimating the annual marketing expenditure associated with the hypothetical replacement slogan, we utilized the actual costs incurred by the NPB to develop the "Be Inspired" campaign. We believe that this campaign represents an excellent proxy for the costs to replace the Subject Assets as the "Be Inspired" campaign was in fact launched in 2011 to essentially replace the Subject Assets as the NPB's primary marketing slogan.[64] As shown in Exhibits 3A and 3B, the historical marketing expenditures from 2011 to 2015 were available. We used the inflation-adjusted historical expenditures for the first 5 years of this analysis using the change in the Consumer Price Index ("CPI"). For subsequent years in the cost of replacement projections, we used the compound annual growth rate ("CAGR") from the CPI adjusted costs from 2011 to 2015. As a result, we were

---

[63] http://www.webpagefx.com/blog/business-advice/the-cost-of-advertising-nationally-broken-down-by-medium/.

[64] http://www.pork.org/new-national-pork-board-campaign-evolves-celebrate-proud-new-brand-identity-pork-inspiredsm/



able to estimate what the NPB would expect to spend on an annual basis from the Valuation Date over 7 to 9 years in order to replace the Subject Assets.

### 3. Cost Approach: "The Other White Meat" Historical Expenditures

In addition to the previously described analyses, we utilized the historical marketing expenditures that the NPB incurred to promote "The Other White Meat," which centered on the Subject Assets. We believe that these costs are relevant to the valuation as they are directly tied to the promotion and development of the awareness of the Subject Assets of the Valuation Date. However, as noted before, the cost to replace the Subject Assets only requires investment of expenditures for a period between 7 and 9 years. As a result, as shown in Exhibits 4A and 4B in Appendix F of this report, we adjusted the historical expenditures the NPB incurred from 1987 and beyond to present dollar figures using CPI factors. We estimated the expenditures the NPB would expect to incur in order to develop an aided awareness between 35% and 45% by adjusting the historical expenditures for inflation for the first 7 and 9 years of the promotion of the PTOWM campaign (1987-1993 and 1987-1995).

### 4. Cost/Market Hybrid Approach: Other Checkoff Program Marketing Campaigns

As another indication of value, we estimated the expenditures the NPB would expect to incur utilizing publicly available market information. A 2011 Natural Products Expo West presentation by Alex Bogusky, the former chief creative officer of Crispin Porter & Bogusky, outlined the estimated annual expenditures

made by different commodity industry funds similar to the NPB. These expenditures are outlined in Exhibit 5.1A, Exhibit 5.1B, and the following table:[65]

| Industry Checkoff Program | Annual Promotional Expenditures |
|---|---|
| Milk | $27 million |
| Beef | $42 million |
| Orange Juice | $16 million |
| Pistachios | $15 million |

In order to compare these expenditures to what the NPB would expect to spend, we compared the annual costs incurred by the different industries to their relative industry revenue in 2011. We calculated the ratio of the average annual expenditure in the comparable industries to the average size of the industries.[66] After applying this ratio to the 2011 comparable farmer-level revenue for the pork industry, we calculated that the NPB would spend approximately $23 million every year promoting the replacement campaign for the Subject Assets as shown in Exhibits 5.1A and 5.1B. Once we determined the estimated annual marketing expenditure to develop a replacement of the Subject Assets, we projected these cost figures over the 7 or 9 year period of time that it would take to obtain an aided awareness among consumers between 35% and 45%.

**Discount Rate Determination**

After determining the projected costs associated with each indication of value, we discounted these figures to the Valuation Date in order to determine the present value of the marketing expenditures the NPB would incur to replace the Subject Assets. In order to discount these annual expenditures, we determined a discount

[65] http://newhope.com/blog/i-need-40-million-killer-slogan/.

[66] Per Exhibits 5.1A and 5.1B, the Yearly Expenditure per Industry Revenue Dollar = Average Annual Expenditure / Average 2011 Industry Revenue = ($25 million) / ($24 billion) = $0.00103 per industry revenue dollar.

rate that would properly account for the risks and uncertainties associated with the Subject Assets and the ability of the NPB to spend the projected cash outflows.

As mentioned previously in the Background section, the NPB is funded by the Checkoff. More specifically, United States pork producers and importers contribute $0.40 for every $100 of pork products sold or imported in the U.S.[67] Because the risk of funding for the NPB is partially attributable to the risk of the pork industry as a whole, we utilized the median weighted average cost of capital ("WACC") of the most comparable industry data available to form a basis for the risks associated with the costs to replace the Subject Assets. As detailed in Exhibit 8, the median WACC of the Meat Products industry, SIC 201, as of December 31, 2015 was 7.6%. In addition to the industry risk, there are additional risks specific to the nature of the Subject Assets that one must take into account in a cost of replacement analysis. For instance, there is the inherent uncertainty that the marketing expenditures made to replace the costs will actually be effective and gain the aided awareness expected in order to fully replace the Subject Assets.  In addition, we believe there are other risks above and beyond those associated with the meat industry as a whole. For instance, the NPB's funding is also subject to legislative change, or changes in the checkoff rate. These factors and other potential risks, are accounted for in our determination of a 1.5% "IP Risk Premium," which we added to the 7.6% industry WACC to conclude on a rounded discount rate of 9.0%.[68]

## Weightings of the Indications of Value

The weight given to the different indications of value is based on the facts and circumstances of each analysis and is subjectively determined by the valuation analyst. For the previously described Cost Approach analyses, we considered multiple factors, including the reliability of the underlying source information and the comparability of the source data to circumstances associated with the Subject Assets and this valuation. These weightings are used in order to determine our final conclusion of value. Outlined below is the reasoning behind the chosen weight for each approach used in our final valuation:

**1. Cost Approach: Third-Party Research for a Generic Marketing Campaign**

This approach, as described above, represents the expected costs incurred by large companies launching a new brand, slogan, or marketing campaign. Because the Subject Assets were developed to promote a brand for an entire industry, and not a share of a market held by a single player, as this example implies, this indication of value is not considered as reliable as others. Further support for a relatively low weighting relates to the fact that this indication is substantially lower than what the NPB and other similar organizations have historically spent on developing trademarks such as the Subject Assets. After considering all of these factors, we believe that this approach should be weighed at 15%.

**2. Cost Approach: "Be Inspired" Historical Expenditures**

This approach involved using the historical expenditure actually incurred by the NPB to develop the "Be Inspired" campaign from 2011 to 2015. Because this campaign represents the marketing costs the NPB actually paid to essentially replace the PTOWM campaign as the NPB's new primary marketing campaign, we believe that it is a very reliable indication of what the NPB would spend to replace the Subject Assets. As a result of the close correlation between the theoretical cost of replacement and the underlying data used in this analysis, we weighed this approach at 35%.

---

[67] http://www.pork.org/about-us/.

[68] Notably, additional support for a 1.5% IP-specific risk premium associated with trademarks can be found in a study conducted by Markables: http://www.markables.net/trademark_discount_rate.



### 3. Cost Approach: "The Other White Meat" Historical Expenditures

Similar to the previous Cost Approach, this analysis utilized actual historical costs incurred by the NPB. In this case, the costs are directly correlated to the development and promotion of the Subject Assets. The aided awareness as of the "The Other White Meat" as of the Valuation Date and in future periods can be directly attributed to these investments made by the NPB. However, from the perspective of determining a cost of replacement as of the Valuation Date, using marketing expenditure data from the late 1980s and early 1990s is less reliable than using more contemporary data. For instance, with the increasing importance of web and social media presence in marketing campaigns and brand promotion, which did not exist in 1987, we believe that there are a multitude of avenues for the NPB to invest in that did not exist in the 1980s and 1990s.[69] Because of this, the structure of costs and overall expenditure may not be comparable in today's terms in comparison to when the NPB began promoting "The Other White Meat." Further, these data are simply, relatively old and, therefore, of less relevance than contemporary data provided by other approaches we have relied upon.  As a result, we weighed this approach at 15%.

### 4. Cost/Market Hybrid Approach: Other Checkoff Program Marketing Campaigns

This approach utilized market data from other industry-related checkoff fund programs such as the NPB. These annual expenditures were size-adjusted to reflect expected annual replacement costs for the pork industry. Because this approach relied on market data for very similar trademark development efforts, we believe that is relatively more valuable than certain other of our other analyses. As a result, we weighed this approach at 35%

**Summary of Value Indications**

A summary of the value weighting given to each approach for both the 7 year and 9 year analyses is reflected in the exhibits below:

**7 Year Model: 35% Aided Awareness[70]**

| Approach | Description | | Value Indication | Weight | | Weighted Value |
|---|---|---|---|---|---|---|
| Cost | Independent Research | $ | 21,928,428 | 15% | $ | 3,289,264 |
| Cost | "Be Inspired" Campaign | $ | 156,305,828 | 35% | $ | 54,707,040 |
| Cost | PTOWM Campaign | $ | 84,943,610 | 15% | $ | 12,741,542 |
| Cost/Market | Other Industry Campaigns | $ | 120,854,812 | 35% | $ | 42,299,184 |
| **Total Weighted Value** | | | | | **$** | **113,000,000** |

**9 Year Model: 45% Aided Awareness[71]**

| Approach | Description | | Value Indication | Weight | | Weighted Value |
|---|---|---|---|---|---|---|
| Cost | Independent Research | $ | 24,357,707 | 15% | $ | 3,653,656 |
| Cost | "Be Inspired" Campaign | $ | 178,577,202 | 35% | $ | 62,502,021 |
| Cost | PTOWM Campaign | $ | 104,261,668 | 15% | $ | 15,639,250 |
| Cost/Market | Other Industry Campaigns | $ | 143,962,095 | 35% | $ | 50,386,733 |
| **Total Weighted Value** | | | | | **$** | **132,000,000** |

---

[69] http://www.nielsen.com/us/en/insights/news/2011/how-social-media-impacts-brand-marketing.html

[70] See Exhibit 1A.
[71] See Exhibit 1B.

 

# Section V

## Value Conclusion

## Value Conclusion

Based upon our implementation of the Cost Approach analyses and the Cost/Market Hybrid Approach analysis for the Subject Assets (as described in Section IV of this report), we have concluded that the Investment Value of the Subject Assets is between the range of $113 million and $132 million as of January 1, 2016 (see Exhibit 1 in Appendix F).

| Description | Weighted Value |
|---|---|
| 7 Year Model (35% Aided Awareness) | $  113,000,000 |
| 9 Year Model (45% Aided Awareness) | $  132,000,000 |

Our conclusion is subject to the Statement of Assumptions and Limiting Conditions found in Appendix C to this report and to the Representation of the Valuation Analyst found in Appendix D to this report. The Qualifications of the Valuation Analyst can be found at Appendix E to this report, which contains our curriculum vitae.

We have no obligation to update this report or our conclusions for information that comes to our attention after the date of this report, although we reserve the right to do so if requested.

## Reasonableness Tests

In an effort to determine the reasonableness of our value conclusion, we have performed various alternative analyses that are rely on the implementation of an Income Approach in the forms of a licensing business model or a Relief from Royalty analysis.

## Licensing Business Model

For this analysis we assumed that in the near future, if it wished, the NPB could reasonably license the Subject Assets to a participant within the pork industry similar to the CMPB's license of the "Got Milk?" trademark to a commercial player in the milk industry. The present value of future licensing revenues can reasonably be considered an indication of value for the Subject Assets. We performed various versions of this reasonableness test using various reasonable assumptions, but substantially following the same analytical steps. Assumptions that vary between each of the 10 iterations of this analysis that we performed include:

- The market share of the licensee;
- The overall size of the pork industry at the retail level;
- The length of the hypothetical license; and
- The increase in market share the licensee would attain as a result of the license.[72]

To calculate royalty cash flows that could be reasonably earned by the NPB, we multiplied a percentage-of-revenue royalty rate to each year of projected licensee sales revenue over the length of the license starting in 2017, and discounted these cash flows to the Valuation Date.[73] The royalty rate used for each analysis was solved for to calculate a $122.5 million net present value, which is equal to the mid-point of our range of concluded values.

The calculated royalty rates from these reasonableness tests ranged from 0.27% to 3.76%, depending on the assumptions used in each analysis. In order to determine the reasonableness of the royalty rates measured in our tests, we compared them to the best comparable licensed royalty rate we found in our search. This range falls

---

[72] Our research of the pork industry yielded multiple sizes of the market, depending on the source and the method of calculating retail-level pork consumption and prices. The market sizes ranged between approximately $21 billion and $62 billion in sales earned in 2015.

[73] We assumed that the NPB would not attain a license until one year after the Valuation Date to take into account the time necessary for negotiations and finalizing a license. The length of the analysis varies between reasonableness tests, but falls within a 5 or 10 year license period.

Valuation & Financial Opinions  SRR  STOUT | RISIUS | ROSS

below the 7% "Got Milk?" royalty rate earned by the CMPB. We have concluded from this set of tests that our concluded range of values is reasonable.

**Relief from Royalty Analysis**

A Relief from Royalty analysis was performed in order to determine the reasonableness of our final conclusion of value as well. As discussed earlier, because the Subject Assets were developed to benefit the entire pork industry, a Relief from Royalty analysis should properly be applied to all sales that benefit from the Subject Assets.

In these analyses, we multiplied the entire industry revenue by a royalty rate in order to determine the total royalties that one would receive in the hypothetical event that the entire pork industry was licensed. Similarly to the licensing business model, we utilized two indications of the size of the retail pork market in this analysis.[74] We applied this methodology to two retail-level industry sizes.

For both estimated industry sizes, we solved for the royalty rate that would determine a net present value equal to $122.5 million, the approximate mid-point of the range in our final value conclusion. This resulted in royalty rates as a percentage of total industry revenue of 0.036% and 0.011%.[75] In addition, this analysis calculates royalties paid to a hypothetical licensor of approximately $7 million to $8 million each year, which falls well within the annual budget the NPB currently has each year for its marketing campaigns. Our research of industry-wide royalty rates yielded royalty rates as a percentage of gross and net sales ranging from a minimum of 0.05% to a median of 5.00%.[76] Because the royalty rates calculated in our reasonableness tests are well below the minimum rates licensed within the industry, we believe that our concluded value is reasonable.

---

[74] See Exhibits 10.1 and 10.2.
[75] See Exhibits 10.1 and 10.2.

[76] Research performed using the ktMINE database for licenses related to the food industry in the U.S. This search yielded 391 agreements. We believe the maximum values yielded in this search represent outliers.



# Appendix A

## List of the Subject Asset

**The Subject Assets valued:**

| No. | Image/Text | Registration Number | Registration Date |
|-----|------------|---------------------|-------------------|
| 1 | | 1418703 | November 25, 1986 |
| 2 | THE OTHER WHITE MEAT [Typed Drawing] | 1486548 | April 26, 1988 |
| 3 | | 3126072 | August 8, 2006 |
| 4 | THE OTHER WHITE MEAT | 3129186 | August 15, 2006 |

# Appendix B

## Sources of Information

| | Source Name/Link |
|---|---|
| 1 | Complaint for Declaratory and Injunctive Relief, dated Septemeber 24, 2012 |
| 2 | First Amended Complaint for Delcaratory and Injuctive Relief, dated October 2, 2012 |
| 3 | Plaintiffs' Response to Motion to Intervene, dated December 31, 2015 |
| 4 | Defendant's Response to Motion to Intervene, dated December 31, 2015 |
| 5 | Reply Brief of Plaintiffs-Appellants, dated March 13, 2015 |
| 6 | 2008 Cost of Replacement Campaign |
| 7 | 2009 Cost of Replacement Campaign |
| 8 | 2010 Cost of Replacement Campaign |
| 9 | 2011 Cost of Replacement Campaign |
| 10 | 2014 Cost of Replacement Campaign |
| 11 | 2012 NPB "TOWM" Qualitative Analysis |
| 12 | 2013 NPB "TOWM" Qualitative Analysis |
| 13 | Harvard Business School "PORK- The Other White Mean" Campaign Case Study |
| 14 | "Recognition of Advertising Slogans", Northwestern Study dated May 2000 |
| 15 | National Pork Producers Council Submission of Information for Review of The Other White Meat dated February 15, 2016 |
| 16 | First Submission of Review Materials, dated February 15, 2016 |
| 17 | NPB Other White Meat Trademark Defense Schedule |
| 18 | NPB Supreme Lobster |
| 19 | NPB The Other White Meat Files |
| 20 | SRR Information Request List |
| 21 | USPTO Trademark Trial and Appeal Board Opinion National Pork Board and National Pork Producers Council v. Supreme Lobster and Seafood Company, dated December 16, 2009 |
| 22 | National Pork Producers Council Supplemental Submission of Information for Review of The Other White Meat dated February 29, 2016 |
| 23 | Second Submission of Review Materials, dated February 29, 2016 |
| 24 | Pork Checkoff Regional Pork Sales Quarter Report, 2011 - 2015 |
| 25 | Pork Checkoff Consumer Segmentation Study Results to Date July 20, 2010 |
| 26 | Correspondence regarding Pork The Other White Meat service mark registration |
| 27 | U.S. Trademark Registration 1,486,548 |
| 28 | Canadian Certificate of Registration No. TMA506,870 |
| 29 | Mexico Certificate of Registration No. 974892 |
| 30 | European Community Certificate of Registration No. 000926097 |
| 31 | PTOWM Licensing Agreement with Tyson Foods, Inc., dated August 19, 2004 |
| 32 | PTOWM Licensing Agreement with Swift and Company, dated July 19, 2004 |
| 33 | PTOWM Licensing Agreement with Schwan's Company, dated March 25, 2004 |
| 34 | PTOWM Licensing Agreement with J&B Group, dated March 25, 2004 |
| 35 | PTOWM Licensing Agreement with Iowa Quality Meats, dated July 19, 2004 |
| 36 | PTOWM Licensing Agreement with General Mills, dated July 8, 2003 |
| 37 | PTOWM Asset Purchase Agreement between NPPC and NPB, dated July 1, 2006 |



| | Source Name/Link |
|---|---|
| 38 | Pork Checkoff Tracking Study Results for Novermber 2014 |
| 39 | Pork, Be Inspired Cost of Replacement, dated June 7, 2011 |
| 40 | NPB The Other White Meat Advertising Costs |
| 41 | Pork Checkoff Historical Revenue |
| 42 | Pork Checkoff Volumetric Assessment of Pork in Foodservice: 2015 Update, dated May 2015 |
| 43 | Pork, Be Inspired Cost Analysis |
| 44 | Pork Revenues- Nielsen Data |
| 45 | Statement on Standards for Valuation Services (SSVS) |
| 46 | IBISWorld Industry Report 11221, Hog & Pig Farming in the US, dated April 2015 |
| 47 | USDA Report, "The Changing Economics of U.S. Hog Production" (December 2007), p. 5. |
| 48 | http://www.porkbeinspired.com |
| 49 | http://www.pork.org |
| 50 | Pork Promotion, Research, and Consumer Information Act of 1985, effective January 1, 1986 (http://www.pork.org/wp- |
| 51 | "The Pork Industry's 'Other White Meat' Campaign Is Taken in New Directions", dated March 4, 2005 |
| 52 | https://www.youtube.com/watch?v=EFE218yBxiw/ |
| 53 | http://www.nppc.org/about-us/. |
| 54 | http://www.humanesociety.org/ |
| 55 | http://www.choicesmagazine.org/2006-2/checkoff/2006-2-01.htm. |
| 56 | http://newhope.com/blog/i-need-40-million-killer-slogan. |
| 57 | http://www.nytimes.com/1987/01/15/business/advertising-dressing-pork-for-success.html |
| 58 | http://www.nytimes.com/2005/03/04/business/media/the-pork-industrys-other-white-meat-campaign-is-taken-in-new-directions.html |
| 59 | "PORK and Design" - U.S. Trademark Registration Number 1418703 |
| 60 | http://www.uspto.gov/trademarks-getting-started/trademark-basics |
| 61 | BrandZ™ Top 100 Most Valuable Global Brands 2015, p. 23 |
| 62 | Rule 26(a)(2) Notice of Disclosure of Expert Testimony for Anders Gronstedt, Ph.D., dated July 27, 2007 |
| 63 | http://adage.com/article/cmo-strategy/coming-grocery-stores-milk-branded-food/298727/ |
| 64 | PwC publication: "Brands: What's in a name?," dated March 2013 |
| 65 | http://www.ktmine.com/ |
| 66 | http://www.royaltysource.com/ |
| 67 | http://legacy.abc10.com/story/news/2015/05/20/firm-tries-to-seize-got-milk-trademark/27653805/ |
| 68 | http://www.markables.net/trademark_useful_life |
| 69 | Guide to Intangible Asset Valuation |
| 70 | http://www.webpagefx.com/blog/business-advice/the-cost-of-advertising-nationally-broken-down-by-medium/ |
| 71 | http://www.markables.net/trademark_discount_rate |
| 72 | http://www.nielsen.com/us/en/insights/news/2011/how-social-media-impacts-brand-marketing.html |
| 73 | https://hbr.org/1976/05/test-marketing-in-new-product-development |



| Source Name/Link |
|---|
| **74**  http://www.jasonfalls.com/marketing-pricing-guide/ |
| **75**  http://www.bls.gov/data/inflation_calculator.htm |
| **76**  http://newhope.com/blog/i-need-40-million-killer-slogan |
| **77**  http://www.acpistachios.org/statistics.shtml |
| **78**  http://fruitsandnuts.ucdavis.edu/files/74168.pdf |
| **79**  Duff & Phelps 2015 Valuation Handbook Guide to Cost of Capital with market results through December 31, 2015 |
| **80**  The Cost of Brand Licensing Incurred by the Licensor by Capstone Branding, dated October 2011 |
| **81**  IBISWorld Industry Report 42447: Beef & Pork Wholesaling in the US. |
| **82**  http://www.nationalchickencouncil.org/about-the-industry/statistics/per-capita-consumption-of-poultry-and-livestock-1965-to-estimated-2012-in-pounds/ |
| **83**  http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=PEP_2015_PEPANNRES&src=pt |
| **84**  http://www.ers.usda.gov/data-products/meat-price-spreads.aspx |

# Appendix C

## Assumptions and Limiting Conditions

This valuation report is subject to the following general assumptions and limiting conditions:

- The valuation is being performed for the purpose of determining the Investment Value of the Subject Assets to advise the Secretary of Agriculture on how to evaluate the 2006 contract for the purchase of the Subject Assets. At the NPB's request, the valuation is being performed using an Investment Value standard.  The use of this report is limited to the previous described use, no other use of this report is intended or inferred, and this report may not be used for any other purpose without our prior written consent.  The report's conclusions represent the considered opinion of SRR, based on information furnished to us by NPB and other sources.  Our analysis was conducted as of January 1, 2016.

- SRR assumes no responsibility and makes no representations with respect to the accuracy or completeness of information provided to us by the NPB's employees, its advisors, or obtained from public sources. Although we have considered the reasonableness of the information we have relied upon, ultimately we have accepted such information as materially correct after our limited investigation.  Changes to any of the information provided by NPB employees, its advisors, or public sources could materially change the conclusions reached in this report.

- We do not provide assurance on the achievability of the results forecasted herein. Differences between actual and expected results may be material and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

- Our conclusions of value are applicable for the stated date and may not be appropriate for any other date.

- The opinions expressed herein are not intended to be investment advice and should in no way be construed as such. Furthermore, this report does not constitute a "fairness opinion" or a "solvency opinion" with respect to any contemplated present or future transaction.

- None of our employees who worked on this engagement has any known financial interest in the NPB, or the outcome of this valuation.  Further, our compensation is neither based nor contingent on the results of our analysis.

- This valuation contemplates facts and conditions that were known or knowable as of the Valuation Date. Events and conditions occurring after the Valuation Date have not been considered as of the date of this report, and Stout Risius Ross, Inc. has no obligation to update our report for such events and conditions.

- We have performed a valuation engagement, as that term is defined in the Statement on Standards for Valuation Services of the American Institute of Certified Public Accountants. The estimate of value that results from a valuation engagement is expressed as a conclusion of value.

- By accepting this report, NPB acknowledges the terms and indemnity provisions provided in the executed engagement letter and the assumptions and limiting conditions contained herein. SRR is not providing legal, attest, or tax services.  Results and underlying analyses contained in this report do not constitute a legal, attest, or tax opinion and do not represent advice on legal, attest, or tax issues.

- It is our understanding and assumed for purposes of our analysis that there are no regulations of any government entity to control or restrict the use of the Subject Assets unless specifically referred to in this report.

- This report and the work supporting the report are included under the letter of engagement between SRR and NPB, dated February 3, 2016. All terms and conditions of the engagement letter apply to all work performed by SRR personnel creating and supporting this report.

- No change of any item in this report shall be made by anyone other than SRR, and we shall have no responsibility for such unauthorized changes.

 

# Appendix D

## Representation of the Valuation Analyst

We certify that, to the best of our knowledge and belief:

- The analyses, opinions, and conclusion included in this report are subject to the specified assumptions and limiting conditions (see Appendix C) and they are the personal analyses, opinions, and conclusions of the valuation analyst.

- Certain information included in this report have been obtained from various printed and electronic reference sources, both publicly-available and provided by NPB and its employees, which the valuation analyst believes to be reliable. The valuation analyst has performed only limited corroborating procedures to substantiate such data.

- This report has been created exclusively for the NPB, USDA, and the Secretary of the Agriculture (the "Primary Users") for the purposes described in the previous section.   To the extent this report is disseminated to people or organizations other than the Primary Users, SRR takes no responsibility for any reliance, quotation, or comment by/from such parties related to this report and its conclusions without SRR's prior written consent.   Further, the analyses, opinions, and conclusions in this report should be considered in their entirety.  The use of, or reliance on, any portion of this report outside of the context of the entire report may be misleading.   Finally, to the extent reasonably

possible, the Primary Users should consult, and obtain guidance from, SRR regarding any oral or written comments made relating to this report and analysis. Consistent with the description of specialists found in the SSVS, we have not relied on the work of specialists for purposes of performing this valuation.[77]

- Based on discussions with the NPB's management and its employees, SRR is aware of no jurisdictional exceptions or restrictions that are relevant to this report.

- The analyst's compensation is fee-based and is not contingent on the outcome of the analysis in this report.

- The valuation analyst has no obligation to update this report or its conclusions for information that comes to our attention after the date of this report, however, the valuation analyst may do so if requested.

- Bradley J. Sarna, Nicholas Vasdekas and Maureen Treacy provided significant professional assistance to the valuation analyst.


_____

Scott Weingust
Director
Stout Risius Ross, Inc.

March 30, 2016

---

[77] SSVS, p. 12.

# Appendix E

## Qualifications of the Valuation Analyst

# Scott Weingust

Scott Weingust is a Director in the Dispute Advisory & Forensic Services and Intellectual Property Groups, and is the leader of SRR's Intellectual Property Valuation practice. Mr. Weingust has over 19 years of experience providing consulting services to corporations, law firms, universities, and investment firms primarily in the areas of intellectual property valuation, damages, and licensing.

Mr. Weingust has provided testimony as a damages and valuation expert in intellectual property-related litigation including having offered opinions in Federal District Court. He has testified on a variety of dispute matters including those with claims associated with patent infringement, trade secret misappropriation, breach of contract, unfair competition, constructive fraud, and tortious interference. Mr. Weingust has also led project teams on a variety of pre-case and early-case assessments of intellectual property-related damages to assist with decisions related to whether a case should be filed and to support dispute resolution efforts.

Mr. Weingust has performed due diligence and valued intellectual property and other intangible assets for a variety of purposes including: transactions (licensing, purchase/sale, mergers and acquisitions), transfer pricing and other tax-related issues, corporate strategic decision-making, use of intellectual property to attract capital, financial reporting, and regulatory compliance, among others. He has been directly involved in intellectual property licensing negotiations and has developed reusable intellectual property pricing/valuation models for corporate licensing activities and various other purposes.

Mr. Weingust is currently an adjunct faculty member at The John Marshall Law School in Chicago where he teaches a course on intellectual property valuation. He has also taught classes on a variety of intellectual property-related topics at New York University School of Law, the University of Illinois at Chicago's College of Engineering, and the Illinois Institute of Technology's Chicago-Kent College of Law.  Mr. Weingust has delivered continuing legal education seminars to many outside and in-house counsel on a variety of intellectual property valuation and damages topics.

Mr. Weingust has provided services to clients in many industries including automotive, agriculture, beverages, packaged foods, chemicals, financial services, hospitality and gaming, imaging, manufacturing, medical devices and diagnostics, pharmaceuticals, semiconductors, software, steel and other metals, telecommunications, and many others.

**Director**
**Direct +1.312.752.3388**
**Mobile +1.312.420.7288**
**sweingust@srr.com**

**Education:**

B.A.
University of Wisconsin at Madison
Economics and International Relations

**Professional Affiliations:**

Intellectual Property Owners Association (IPO) – Member of IPO's Corporate IP Management Committee

Licensing Executives Society (LES)

National Association of Certified Valuation Analysts (NACVA)

American Intellectual Property Law Association (AIPLA)

 

# Appendix F

## Exhibits Supporting the Valuation Analysis

**National Pork Board Trademark Valuation**
**Summary of Value Range**
**Exhibit 1**

| | Description | | | Weighted Value |
|---|---|---|---|---|
| **1** | 7 Year Model (35% Aided Awareness) | [1] | $ | 113,000,000 |
| **2** | 9 Year Model (45% Aided Awareness) | [2] | $ | 132,000,000 |

[1] See Exhibit 1A.
[2] See Exhibit 1B.

247

**National Pork Board Trademark Valuation**
**Summary of Value - 7 Year Model (35% Aided Awareness)**
**Exhibit 1A**

| | Approach | Description | | | Value Indication | Weight | | Weighted Value |
|---|---|---|---|---|---|---|---|---|
| 1 | Cost Approach | Independent Research | [1] | $ | 21,928,428 | 15% | $ | 3,289,264 |
| 2 | Cost Approach | "Be Inspired" Campaign | [2] | $ | 156,305,828 | 35% | $ | 54,707,040 |
| 3 | Cost Approach | PTOWM Campaign | [3] | $ | 84,943,610 | 15% | $ | 12,741,542 |
| 4 | Cost/Market Approach | Other Industry Campaigns | [4] | $ | 120,854,812 | 35% | $ | 42,299,184 |
| 5 | **Total Weighted Value** | | | | | | $ | **113,000,000** |

[1] See Exhibit 2A.
[2] See Exhibit 3A.
[3] See Exhibit 4A.
[4] See Exhibit 5A.

248

**National Pork Board Trademark Valuation**
**Cost Approach - Independent Research - Present Value of Costs Incurred to Develop New Brand**
**Exhibit 2A**

| | | | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Upfront costs | | | | | | | | |
| 2 | Development and Testing | [1] $ | 2,200,000 $ | - $ | - $ | - $ | - $ | - $ | - |
| 3 | National TV Advertising | [2] | 8,000,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| 4 | National Magazine Advertising | [2] | 397,800 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| 5 | National Newspaper Advertising | [2] | 1,400,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| 6 | Direct Main Marketing | [2] | 7,200 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| 7 | Telemarketing | [2] | - | - | - | - | - | - | - |
| 8 | National Search Engine Optimization | [2] | 10,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| 9 | National Pay per Click Marketing | [2] | 10,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| 10 | National Email Marketing | [2] | 10,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| 11 | Web Content Marketing Campaign | [2] | 12,000 | - | - | - | - | - | - |
| 12 | Total | | $ 12,047,000 | $ 2,418,000 | $ 2,418,000 | $ 2,418,000 | $ 2,418,000 | $ 2,418,000 | $ 2,418,000 |
| | | | | | | | | | |
| 13 | Discount Rate | | 9.0% | 9.0% | 9 0% | 9.0% | 9.0% | 9.0% | 9.0% |
| 14 | Discount Factor | | 0.9578 | 0.8787 | 0 8062 | 0.7396 | 0.6785 | 0.6225 | 0.5711 |
| 15 | Total Present Value of Additional Cost of Replacement Campaign (2016 - 2022) | | $ 11,538,933 | $ 2,124,793 | $ 1,949,351 | $ 1,788,395 | $ 1,640,730 | $ 1,505,257 | $ 1,380,969 |
| | | | | | | | | | |
| 16 | Total Total Present Value of Additional Cost of Replacement Campaign (2016 - 2022) | | $ 21,928,428 | | | | | | |

[1] According to the Harvard Business Review, complete market testing for two levels of ad weight cost approximately $500,000. Adjusted for the valuation date, one would expect to spend approximately $2.2 million.
     (Source: https://hbr.org/1976/05/test-marketing-in-new-product-development).
[2] See Exhibit 2.1A and Exhibit 2.2A.

**National Pork Board Trademark Valuation**
**Cost Approach - Independent Research - Initial Setup Costs**
**Exhibit 2.1A**

| | Description | Setup Process | Setup Cost Low-End | Setup Cost Median | Setup Cost High-End | Include? |
|---|---|---|---|---|---|---|
| 1 | National TV Advertising | Design and Production | $ 63,000 | $ 4,031,500 | $ 8,000,000 | Yes |
| 2 | National Magazine Advertising | Design | $ 500 | $ 199,150 | $ 397,800 | Yes |
| 3 | National Newspaper Advertising | Design | $ 11 | $ 700,006 | $ 1,400,000 | Yes |
| 4 | Direct Main Marketing | Design | $ 50 | $ 3,625 | $ 7,200 | Yes |
| 5 | Telemarketing | Script Writing | $ 1,000 | $ 3,100 | $ 5,200 | No |
| 6 | National Search Engine Optimization | Website Configuration | $ 4,000 | $ 7,000 | $ 10,000 | Yes |
| 7 | National Pay per Click Marketing | Website Configuration | $ 4,000 | $ 7,000 | $ 10,000 | Yes |
| 8 | National Email Marketing | Email Template Design | $ 4,000 | $ 7,000 | $ 10,000 | Yes |
| 9 | Web Content Marketing Campaign | Development of web content assets and graphical elements | $ 6,000 | $ 9,000 | $ 12,000 | Yes |
| 10 | Total | | $ 82,561 | $ 4,967,381 | $ 9,852,200 | |

Source: http://www.webpagefx.com/blog/business-advice/the-cost-of-advertising-nationally-broken-down-by-medium/.

250

**National Pork Board Trademark Valuation**
**Cost Approach - Independent Research - Initial Annual Costs**
**Exhibit 2.2A**

| | Description | [1] Cost to Continue | [2] Number of Hours/Months | | [3] Cost per Period | Include? | Cost to Continue |
|---|---|---|---|---|---|---|---|
| 1 | National TV Advertising | Media Agency | 12 | months | $ 50,000 | Yes | $ 600,000 |
| 2 | National Magazine Advertising | Media Agency | 12 | months | $ 50,000 | Yes | $ 600,000 |
| 3 | National Newspaper Advertising | Media Agency | 12 | months | $ 50,000 | Yes | $ 600,000 |
| 4 | Direct Main Marketing | Media Agency | 12 | months | $ 50,000 | Yes | $ 600,000 |
| 5 | Telemarketing | 20-60 per hour | 20,000 | hours | $ 40 | No | $ - |
| 6 | National Search Engine Optimization | 500/month | 12 | months | $ 500 | Yes | $ 6,000 |
| 7 | National Pay per Click Marketing | 500/month | 12 | months | $ 500 | Yes | $ 6,000 |
| 8 | National Email Marketing | 500/month | 12 | months | $ 500 | Yes | $ 6,000 |
| 9 | Web Content Marketing Campaign | $ - | - | NA | $ - | Yes | $ - |
| 10 | Total | | | | | | $ 2,418,000 |

[1] Source: http://www.webpagefx.com/blog/business-advice/the-cost-of-advertising-nationally-broken-down-by-medium/.
[2] Assumed 20 telemarketers working for 1,000 hours each year.
[3] We understand that the National Pork Board typically works with agencies based out of Chicago, IL. (Source: http://www.jasonfalls.com/marketing-pricing-guide/).

**National Pork Board Trademark Valuation**
**Cost Approach - "Be Inspired" - Present Value of Costs Incurred to Develop New Brand**
**Exhibit 3A**

| | | | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Historical Marketing Expenditure (2011 - 2015) | [1] $ | 33,205,307 | $ 30,339,761 | $ 32,963,891 | $ 26,917,123 | $ 27,358,817 | | |
| 2 | CPI Index Factor | [2] | 1.05 | 1.03 | 1.02 | 1 00 | 1.00 | | |
| 3 | CPI Adjusted Value | [3] $ | 34,865,572 | $ 31,249,954 | $ 33,623,169 | $ 26,917,123 | $ 27,358,817 | $ 25,749,716 | $ 24,235,254 |
| 4 | 2011 - 2015 CPI Adjusted CAGR | | | | | | -5.9% | | |
| 5 | Discount Rate | [4] | 9.0% | 9.0% | 9 0% | 9.0% | 9.0% | 9.0% | 9.0% |
| 6 | Discount Factor | | 0.9578 | 0.8787 | 0.8062 | 0.7396 | 0.6785 | 0.6225 | 0.5711 |
| 7 | Present Value of Cost of Replacement Campaign (2016 - 2022) | $ | 33,395,162 | $ 27,460,575 | $ 27,106,435 | $ 19,908,379 | $ 18,564,278 | $ 16,029,748 | $ 13,841,251 |
| 8 | Total Present Value of Cost of Replacement Campaign (2016 - 2022) | $ | 156,305,828 | | | | | | |

[1] Source: Pork, Be Inspired Cost Analysis.xls.
[2] Values represent historical costs incurred from 2011 until 2015. Used CPI Inflation Calculator to convert $1 in each past year to dollars as of the Valuation Date. (Source: http://www.bls.gov/data/inflation_calculator.htm).
[3] 2021 - 2022 projected using 2011 - 2015 CPI Adjusted CAGR.
[4] See Exhibit 8.

252

**National Pork Board Trademark Valuation**
**Cost Approach - "The Other White Meat" - Present Value of Costs Incurred to Develop New Brand**
**Exhibit 4A**

| | | | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Historical Marketing Expenditure (1987 - 1993) | [1] $ | 5,940,158 $ | 6,188,696 $ | 8,041,532 $ | 8,241,301 $ | 11,762,671 $ | 12,017,433 $ | 13,057,000 |
| 2 | CPI Index Factor | [2] | 2.09 | 2.00 | 1.91 | 1 81 | 1.74 | 1.69 | 1.64 |
| 3 | CPI Adjusted Value | | $ 12,414,930 $ | 12,377,392 $ | 15,359,326 $ | 14,916,755 $ | 20,467,048 $ | 20,309,462 $ | 21,413,480 |
| 4 | Discount Rate | [3] | 9.0% | 9.0% | 9 0% | 9.0% | 9.0% | 9.0% | 9.0% |
| 5 | Discount Factor | | 0.9578 | 0.8787 | 0.8062 | 0.7396 | 0.6785 | 0.6225 | 0.5711 |
| 6 | Present Value of Cost of Replacement Campaign (2016 - 2022) | | $ 11,891,346 $ | 10,876,506 $ | 12,382,431 $ | 11,032,695 $ | 13,887,880 $ | 12,643,074 $ | 12,229,678 |
| 7 | Total Present Value of Cost of Replacement Campaign (2016 - 2022) | | $ 84,943,610 | | | | | | |

[1] Source: SRR Informa ion Request List cs.xls.
[2] Values represent historical costs incurred from 1987 until 1993. Used CPI Inflation Calculator to convert $1 in each past year to dollars as of the Valuation Date. (Source: http://www.bls.gov/data/inflation_calculator.htm).
[3] See Exhibit 8.

**National Pork Board Trademark Valuation**
**Cost/Market Approach - Present Value of Costs Incurred to Develop New Brand**
**Exhibit 5A**

| | | | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Marketing Expenditure | [1] $ | 23,000,000 $ | 23,000,000 $ | 23,000,000 $ | 23,000,000 $ | 23,000,000 $ | 23,000,000 $ | 23,000,000 |
| 2 | Discount Rate | [2] | 9.0% | 9.0% | 9.0% | 9.0% | 9.0% | 9.0% | 9.0% |
| 3 | Discount Factor | | 0.9578 | 0.8787 | 0.8062 | 0.7396 | 0.6785 | 0.6225 | 0.5711 |
| 4 | Present Value of Cost of Replacement Campaign | $ | 22,030,005 $ | 20,211,013 $ | 18,542,214 $ | 17,011,206 $ | 15,606,611 $ | 14,317,991 $ | 13,135,772 |
| 5 | Total Present Value of Cost of Replacement Campaign | $ | 120,854,812 | | | | | | |

[1] See Exhibit 5.1A.
[2] See Exhibit 8.

**National Pork Board Trademark Valuation**
**Cost/Market Approach - Other Industry Campaigns**
**Exhibit 5.1A**

| Industry Fund | | [1]<br>Total Annual<br>Branding Expenditure | | [2]<br>Industry Size<br>(2011 Revenue) |
|---|---|---|---|---|
| 1 Milk | $ | 27,000,000 | $ | 44,409,000,000 |
| 2 Beef | | 42,000,000 | | 48,621,000,000 |
| 3 Orange juice | | 16,000,000 | | 3,501,400,000 |
| 4 Pistachios | | 15,000,000 | | 896,653,061 |
| 5 Average | $ | 25,000,000 | $ | 24,357,013,265 |

| | | | |
|---|---|---|---|
| 6 Yearly Expenditure per Industry Revenue Dollar | [3] | $ | 0.00103 |
| 7 Pork Industry Revenue (2011) | [4] | $ | 21,961,800,000 |
| 8 **Implied Yearly Expenditure** | | $ | 22,541,557 |
| 9 **Selected Annual Expenditure** | | $ | 23,000,000 |

[1] Source: http://newhope.com/blog/i-need-40-million-killer-slogan.
[2] Note: All industry sizes utilized represent revenue at the producer level.
  **Milk:** Dairy Farms in the US industry revenue for 2011 per IBISWorld report.
  **Beef:** Beef Cattle Production in the US industry revenue for 2011 per IBISWorld report.
  **Orange Juice:** Orange & Citrus Groves in the US industry revenue for 2011 per IBISWorld report.
  **Pistachios:** This figure represents California pistachio production value in 2011
  (Source: http://www.acpistachios.org/statistics.shtml). Because California represents approximately
  98% of total US pistachio production, the value from the California statistics is divided by 98%.
  (Source: http://fruitsandnuts.ucdavis.edu/files/74168.pdf).
[3] Yearly Expenditure per Industry Revenue Dollar represents the average industry branding expenditure divided
  by the average industry size.
[4] Hog & Pig Farming in the US revenue for 2011 per IBISWorld report.

255

**National Pork Board Trademark Valuation**
**Summary of Value - 9 Year Model (45% Aided Awareness)**
**Exhibit 1B**

| | Approach | Description | | | Value Indication | Weight | | Weighted Value |
|---|---|---|---|---|---|---|---|---|
| 1 | Cost Approach | Independent Research | [1] | $ | 24,357,707 | 15% | $ | 3,653,656 |
| 2 | Cost Approach | "Be Inspired" Campaign | [2] | $ | 178,577,202 | 35% | $ | 62,502,021 |
| 3 | Cost Approach | PTOWM Campaign | [3] | $ | 104,261,668 | 15% | $ | 15,639,250 |
| 4 | Cost/Market Approach | Other Industry Campaigns | [4] | $ | 143,962,095 | 35% | $ | 50,386,733 |
| 5 | **Total Weighted Value** | | | | | | **$** | **132,000,000** |

[1] See Exhibit 2B.
[2] See Exhibit 3B.
[3] See Exhibit 4B.
[4] See Exhibit 5B.

256

**National Pork Board Trademark Valuation**
**Cost Approach - Independent Research - Present Value of Costs Incurred to Develop New Brand**
**Exhibit 2B**

| | | | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Upfront costs | | | | | | | | | | |
| 2 | Development and Testing | [1] $ | 2,200,000 $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - |
| 3 | National TV Advertising | [2] | 8,000,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| 4 | National Magazine Advertising | [2] | 397,800 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| 5 | National Newspaper Advertising | [2] | 1,400,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| 6 | Direct Main Marketing | [2] | 7,200 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| 7 | Telemarketing | [2] | - | - | - | - | - | - | - | - | - |
| 8 | National Search Engine Optimization | [2] | 10,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| 9 | National Pay per Click Marketing | [2] | 10,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| 10 | National Email Marketing | [2] | 10,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| 11 | Web Content Marketing Campaign | [2] | 12,000 | - | - | - | - | - | - | - | - |
| 12 | Total | $ | 12,047,000 $ | 2,418,000 $ | 2,418,000 $ | 2,418,000 $ | 2,418,000 $ | 2,418,000 $ | 2,418,000 $ | 2,418,000 $ | 2,418,000 |
| 13 | Discount Rate | | 9.0% | 9.0% | 9.0% | 9.0% | 9.0% | 9.0% | 9.0% | 9.0% | 9.0% |
| 14 | Discount Factor | | 0.9578 | 0.8787 | 0.8062 | 0.7396 | 0.6785 | 0.6225 | 0.5711 | 0.5240 | 0.4807 |
| 15 | Total Present Value of Additional Cost of Replacement Campaign (2016 - 2024) | $ | 11,538,933 $ | 2,124,793 $ | 1,949,351 $ | 1,788,395 $ | 1,640,730 $ | 1,505,257 $ | 1,380,969 $ | 1,266,944 $ | 1,162,334 |
| 16 | Total Total Present Value of Additional Cost of Replacement Campaign (2016 - 2024) | $ | 24,357,707 | | | | | | | | |

[1] According to the Harvard Business Review, complete market testing for two levels of ad weight cost approximately $500,000. Adjusted for the valuation date, one would expect to spend approximately $2.2 million.
(Source: https://hbr.org/1976/05/test-marketing-in-new-product-development).
[2] See Exhibit 2.1B and Exhibit 2.2B.

**National Pork Board Trademark Valuation**
**Cost Approach - Independent Research - Initial Setup Costs**
**Exhibit 2.1B**

| | Description | Setup Process | Setup Cost Low-End | Median | High-End | Include? |
|---|---|---|---|---|---|---|
| 1 | National TV Advertising | Design and Production | $ 63,000 | $ 4,031,500 | $ 8,000,000 | Yes |
| 2 | National Magazine Advertising | Design | $ 500 | $ 199,150 | $ 397,800 | Yes |
| 3 | National Newspaper Advertising | Design | $ 11 | $ 700,006 | $ 1,400,000 | Yes |
| 4 | Direct Main Marketing | Design | $ 50 | $ 3,625 | $ 7,200 | Yes |
| 5 | Telemarketing | Script Writing | $ 1,000 | $ 3,100 | $ 5,200 | No |
| 6 | National Search Engine Optimization | Website Configuration | $ 4,000 | $ 7,000 | $ 10,000 | Yes |
| 7 | National Pay per Click Marketing | Website Configuration | $ 4,000 | $ 7,000 | $ 10,000 | Yes |
| 8 | National Email Marketing | Email Template Design | $ 4,000 | $ 7,000 | $ 10,000 | Yes |
| 9 | Web Content Marketing Campaign | Development of web content assets and graphical elements | $ 6,000 | $ 9,000 | $ 12,000 | Yes |
| 10 | Total | | $ 82,561 | $ 4,967,381 | $ 9,852,200 | |

Source: http://www.webpagefx.com/blog/business-advice/the-cost-of-advertising-nationally-broken-down-by-medium/.

**National Pork Board Trademark Valuation**
**Cost Approach - Independent Research - Initial Annual Costs**
**Exhibit 2.2B**

| | Description | [1] Cost to Continue | [2] Number of Hours/Months | | [3] Cost per Period | | Include? | Cost to Continue |
|---|---|---|---|---|---|---|---|---|
| 1 | National TV Advertising | Media Agency | 12 | months | $ | 50,000 | Yes | $ 600,000 |
| 2 | National Magazine Advertising | Media Agency | 12 | months | $ | 50,000 | Yes | $ 600,000 |
| 3 | National Newspaper Advertising | Media Agency | 12 | months | $ | 50,000 | Yes | $ 600,000 |
| 4 | Direct Main Marketing | Media Agency | 12 | months | $ | 50,000 | Yes | $ 600,000 |
| 5 | Telemarketing | 20-60 per hour | 20,000 | hours | $ | 40 | No | $ - |
| 6 | National Search Engine Optimization | 500/month | 12 | months | $ | 500 | Yes | $ 6,000 |
| 7 | National Pay per Click Marketing | 500/month | 12 | months | $ | 500 | Yes | $ 6,000 |
| 8 | National Email Marketing | 500/month | 12 | months | $ | 500 | Yes | $ 6,000 |
| 9 | Web Content Marketing Campaign | $ - | - | NA | $ | - | Yes | $ - |
| 10 | Total | | | | | | | $ 2,418,000 |

[1] Source: http://www.webpagefx.com/blog/business-advice/the-cost-of-advertising-nationally-broken-down-by-medium/.
[2] Assumed 20 telemarketers working for 1,000 hours each year.
[3] We understand that the National Pork Board typically works with agencies based out of Chicago, IL. (Source: http://www.jasonfalls.com/marketing-pricing-guide/).

**National Pork Board Trademark Valuation**
**Cost Approach - "Be Inspired" - Present Value of Costs Incurred to Develop New Brand**
**Exhibit 3B**

| | | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 Historical Marketing Expenditure (2011 - 2015) | [1] $ | 33,205,307 $ | 30,339,761 $ | 32,963,891 $ | 26,917,123 $ | 27,358,817 | | | | |
| 2 CPI Index Factor | [2] | 1.05 | 1.03 | 1.02 | 1 00 | 1.00 | | | | |
| 3 CPI Adjusted Value | [3] $ | 34,865,572 $ | 31,249,954 $ | 33,623,169 $ | 26,917,123 $ | 27,358,817 $ | 25,749,716 $ | 24,235,254 $ | 22,809,864 $ | 21,468,309 |
| 4 2011 - 2015 CPI Adjusted CAGR | | | | | | -5.9% | | | | |
| 5 Discount Rate | [4] | 9.0% | 9 0% | 9 0% | 9.0% | 9.0% | 9 0% | 9 0% | 9.0% | 9.0% |
| 6 Discount Factor | | 0.9578 | 0 8787 | 0 8062 | 0.7396 | 0.6785 | 0 6225 | 0 5711 | 0.5240 | 0.4807 |
| 7 Present Value of Cost of Replacement Campaign (2016 - 2024) | $ | 33,395,162 $ | 27,460,575 $ | 27,106,435 $ | 19,908,379 $ | 18,564,278 $ | 16,029,748 $ | 13,841,251 $ | 11,951,543 $ | 10,319,831 |
| 8 Total Present Value of Cost of Replacement Campaign (2016 - 2024) | $ | 178,577,202 | | | | | | | | |

[1] Source: Pork, Be Inspired Cost Analysis.xls.
[2] Values represent historical costs incurred from 2011 until 2015. Used CPI Inflation Calculator to convert $1 in each past year to dollars as of the Valuation Date. (Source: http://www.bls.gov/data/inflation_calculator htm).
[3] 2021 - 2024 projected using 2011 - 2015 CPI Adjusted CAGR.
[4] See Exhibit 8.

**National Pork Board Trademark Valuation**
**Cost Approach - "The Other White Meat" - Present Value of Costs Incurred to Develop New Brand**
**Exhibit 4B**

| | | | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Historical Marketing Expenditure (1987 - 1995) | [1] $ | 5,940,158 $ | 6,188,696 $ | 8,041,532 $ | 8,241,301 $ | 11,762,671 $ | 12,017,433 $ | 13,057,000 $ | 13,142,000 $ | 11,069,000 |
| 2 | CPI Index Factor | [2] | 2.09 | 2.00 | 1.91 | 1 81 | 1.74 | 1.69 | 1.64 | 1 60 | 1.56 |
| 3 | CPI Adjusted Value | $ | 12,414,930 $ | 12,377,392 $ | 15,359,326 $ | 14,916,755 $ | 20,467,048 $ | 20,309,462 $ | 21,413,480 $ | 21,027,200 $ | 17,267,640 |
| 4 | Discount Rate | [3] | 9.0% | 9 0% | 9 0% | 9.0% | 9.0% | 9 0% | 9 0% | 9.0% | 9.0% |
| 5 | Discount Factor | | 0.9578 | 0 8787 | 0 8062 | 0.7396 | 0.6785 | 0 6225 | 0 5711 | 0.5240 | 0.4807 |
| 6 | Present Value of Cost of Replacement Campaign (2016 - 2024) | $ | 11,891,346 $ | 10,876,506 $ | 12,382,431 $ | 11,032,695 $ | 13,887,880 $ | 12,643,074 $ | 12,229,678 $ | 11,017,491 $ | 8,300,567 |
| 7 | Total Present Value of Cost of Replacement Campaign (2016 - 2024) | $ | 104,261,668 | | | | | | | | |

[1] Source: SRR Information Request List cs.xls.
[2] Values represent historical costs incurred from 1987 until 1995. Used CPI Inflation Calculator to convert $1 in each past year to dollars as of the Valuation Date. (Source: http://www.bls.gov/data/inflation_calculator htm).
[3] See Exhibit 8.

**National Pork Board Trademark Valuation**
**Cost/Market Approach - Present Value of Costs Incurred to Develop New Brand**
**Exhibit 5B**

| | | | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Marketing Expenditure | [1] $ | 23,000,000 $ | 23,000,000 $ | 23,000,000 $ | 23,000,000 $ | 23,000,000 $ | 23,000,000 $ | 23,000,000 $ | 23,000,000 $ | 23,000,000 |
| 2 | Discount Rate | [2] | 9.0% | 9.0% | 9.0% | 9 0% | 9.0% | 9.0% | 9 0% | 9.0% | 9.0% |
| 3 | Discount Factor | | 0.9578 | 0 8787 | 0.8062 | 0.7396 | 0.6785 | 0 6225 | 0.5711 | 0.5240 | 0.4807 |
| 4 | Present Value of Cost of Replacement Campaign | $ | 22,030,005 $ | 20,211,013 $ | 18,542,214 $ | 17,011,206 $ | 15,606,611 $ | 14,317,991 $ | 13,135,772 $ | 12,051,167 $ | 11,056,116 |
| 5 | Total Present Value of Cost of Replacement Campaign | $ | 143,962,095 | | | | | | | | |

[1] See Exhibit 5.1B.
[2] See Exhibit 8.

**National Pork Board Trademark Valuation**
**Cost/Market Approach - Other Industry Campaigns**
**Exhibit 5.1B**

| | | [1] Total Annual Branding Expenditure | [2] Industry Size (2011 Revenue) |
|---|---|---|---|
| | **Industry Fund** | | |
| 1 | Milk | $ 27,000,000 | $ 44,409,000,000 |
| 2 | Beef | 42,000,000 | 48,621,000,000 |
| 3 | Orange juice | 16,000,000 | 3,501,400,000 |
| 4 | Pistachios | 15,000,000 | 896,653,061 |
| 5 | Average | $ 25,000,000 | $ 24,357,013,265 |
| | | | |
| 6 | Yearly Expenditure per Industry Revenue Dollar | [3] $ 0.00103 | |
| | | | |
| 7 | Pork Industry Revenue (2011) | [4] $ 21,961,800,000 | |
| | | | |
| 8 | **Implied Yearly Expenditure** | $ 22,541,557 | |
| | | | |
| 9 | **Selected Annual Expenditure** | $ 23,000,000 | |

[1] Source: http://newhope.com/blog/i-need-40-million-killer-slogan.

[2] Note: All industry sizes utilized represent revenue at the producer level.
   **Milk:** Dairy Farms in the US industry revenue for 2011 per IBISWorld report.
   **Beef:** Beef Cattle Production in the US industry revenue for 2011 per IBISWorld report.
   **Orange Juice:** Orange & Citrus Groves in the US industry revenue for 2011 per IBISWorld report.
   **Pistachios:** This figure represents California pistachio production value in 2011
   (Source: http://www.acpistachios.org/statistics.shtml). Because California represents approximately
   98% of total US pistachio production, the value from the California statistics is divided by 98%.
   (Source: http://fruitsandnuts.ucdavis.edu/files/74168.pdf).

[3] Yearly Expenditure per Industry Revenue Dollar represents the average industry branding expenditure divided
   by the average industry size.

[4] Hog & Pig Farming in the US revenue for 2011 per IBISWorld report.

**National Pork Board Trademark Valuation**
**National Pork Board Financial Information**
**Exhibit 6**

| ($ in 000s) | | Actuals | | | Unaudited | Forecast | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| | Revenue | | | | | | |
| 1 | Checkoff Revenue | $ 81,022 | $ 84,871 | $ 95,275 | $ 75,061 | $ 69,036 | $ 67,807 |
| 2 | Interest Income | 292 | 172 | 221 | 141 | 500 | 500 |
| 3 | Miscellaneous | 1,868 | 2,398 | 2,589 | 2,834 | 300 | - |
| 4 | Total Revenue | $ 83,182 | $ 87,441 | $ 98,085 | $ 78,036 | $ 69,836 | $ 68,307 |
| | Expenses | | | | | | |
| 5 | National Spending | $ (64,934) | $ (68,165) | $ (62,038) | $ (62,352) | $ (58,026) | $ (59,500) |
| 6 | Pending decision on TOWM | - | - | - | - | (3,000) | - |
| 7 | Marketing project/Supplemental | (2,076) | (2,965) | (5,053) | (3,150) | (350) | - |
| 8 | Swine Health Information Center | (2,275) | (5,735) | - | (10,000) | (2,000) | (2,000) |
| 9 | Return to State | (15,605) | (16,303) | (18,190) | (14,278) | (13,167) | (12,921) |
| 10 | Total Expenses | $ (84,890) | $ (93,168) | $ (85,281) | $ (89,780) | $ (76,543) | $ (74,421) |
| 11 | Surplus / (Deficit) | $ (1,708) | $ (5,727) | $ 12,804 | $ (11,744) | $ (6,707) | $ (6,114) |
| 12 | Beginning Cash Reserve | $ 25,162 | $ 22,454 | $ 17,727 | $ 20,531 | $ 22,264 | $ 16,857 |
| 13 | Designated Transfer | (1,000) | 1,000 | (10,000) | 13,477 | 1,300 | 2,000 |
| 14 | Ending Cash Reserve | $ 22,454 | $ 17,727 | $ 20,531 | $ 22,264 | $ 16,857 | $ 12,742 |
| 15 | Designated Cash Reserve | 8,777 | 7,777 | 17,777 | 4,300 | 3,000 | 1,000 |
| 16 | Total Cash Reserve | $ 31,231 | $ 25,504 | $ 38,308 | $ 26,564 | $ 19,857 | $ 13,742 |

Source: SRR Information Request List cs.xls.

264

**National Pork Board Trademark Valuation**
**Awareness Studies**
**Exhibit 7**

| Year Count "The Other White Meat" | | 0 1986 | 1 1987 | 2 1988 | 3 1989 | 4 1990 | 5 1991 | 6 1992 | 7 1993 | 8 1994 | 9 1995 | 10 1996 | 11 1997 | 12 1998 | 13 1999 | 14 2000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Aided Awareness % | [1] | 0% | 4 93% | 9 86% | 14.79% | 19.71% | 24 64% | 29 57% | 34 50% | 39.43% | 44 36% | 49 29% | 54 21% | 59.14% | 64 07% | 69.0% |

| Year Count | | 15 2001 | 16 2002 | 17 2003 | 18 2004 | 19 2005 | 20 2006 | 21 2007 | 22 2008 | 23 2009 | 24 2010 | 25 2011 | 26 2012 | 27 2013 | 28 2014 | 29 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 Aided Awareness % | [2] | 85.5% | 86.3% | 87.1% | 87.9% | 88.7% | 89.4% | 90.2% | 91.0% | 91.8% | 92.6% | 92.6% | 90.6% | 90.7% | 85.8% | 82.3% |
| 3 2011 - 2015 CAGR | | | | | | | | | | | | | | | | -2.9% |

| Year Count "Be Inspired" | | | | | | | | | | | | 0 2011 | 1 2012 | 2 2013 | 3 2014 | 4 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 Aided Awareness % | [1] & [2] | | | | | | | | | | | 0% | 5.5% | 11.0% | 16.5% | 22.0% |

Note: For periods where awareness was not provided, we evenly grew aided awareness percentage between data points. Colored figures indicate years where we calculated aided awareness.

[1] We assumed 0% awareness at the very inception of "The Other White Meat" related trademarks and the "Be Inspired" Campaign. 2000 awareness percentage per Northwestern study.
(Source: Rule 26(a)(2) Notice of Disclosure of Expert Testimony for Anders Gronstedt, Ph D., dated July 27, 2007).

[2] 2001 is the median of the range of awareness percentage indicated by an August 1, 2001 JRC&A report. 2010 - 2015 awareness figures provided by "The Other White Meat Awareness and Valuation Studies Conducted by The National Pork Board During 2010 - 2015.

**National Pork Board Trademark Valuation**
**Discount Rate**
**Exhibit 8**

**Discount Rate - NPB Cost of Replacement**

| | | | |
|---|---|---|---|
| 1 | Industry WACC | [1] | 7.60% |
| 2 | IP Risk Premium | [2] | 1.50% |
| 3 | Discount Rate | | 9.10% |
| 4 | **Selected** | | **9.00%** |

**Discount Rate - Licensing Business**

| | | | |
|---|---|---|---|
| 5 | Licensing-Specific Risk Premium | [3] | 5.00% |
| 6 | Licensing Business Discount Rate | | 14.00% |

[1] Duff & Phelps 2015 Valuation Handbook Guide to Cost of
Capital with market results through December 31, 2015.
Represents the median WACC for companies in SIC 201:
Meat Products.
[2] See report Section IV in the accompanying report.
[3] This additional premium incorporates the risk associated with uncertainty
around the implementation of a new licensing program, the likelihood of
reaching a licensing agreement, and the possibility licensees developing
their own replacement trademark or slogan.
[4] This discount rate is used in the reasonableness tests.
See Exhibits 9.1.1 through 9.2.5.

**National Pork Board Trademark Valuation**
**Reasonableness #1 - Royalty Income Model - USDA Data: PV of Royalties (5 Year License) - 5% Share with No Growth**
**Exhibit 9.1.1**

| | | Inputs | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|
| 1 | 2015 Pork Industry Revenue (Retail) | [1]  $ 61,544,051,339 | | | | | | |
| 2 | Retail Level Pork Industry Growth (2000 - 2015) | [1]  3.4% | | | | | | |
| 3 | Retail Level Pork Industry Revenue | | $ 63,666,429,110 | $ 65,861,998,154 | $ 68,133,282,508 | $ 70,482,893,253 | $ 72,913,531,514 | $ 75,427,991,566 |
| 4 | Portion of Pork Industry Licensed | [2]  5.0% | 0.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| 5 | Revenue Subject to License | | $          - | $ 3,293,099,908 | $ 3,406,664,125 | $ 3,524,144,663 | $ 3,645,676,576 | $ 3,771,399,578 |
| 6 | Royalty Rate for Exclusive Trademark License | [3]  **1.15%** | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% |
| 7 | Additional Revenue due to Licensing Program | | $          - | $ 37,763,500 | $ 39,065,794 | $ 40,412,998 | $ 41,806,660 | $ 43,248,384 |
| 8 | Cost of Licensing Program | [4]  5% | $          - | $ 1,888,175 | $ 1,953,290 | $ 2,020,650 | $ 2,090,333 | $ 2,162,419 |
| 9 | Profit Associated with Licensing Program | | $          - | $ 35,875,325 | $ 37,112,504 | $ 38,392,348 | $ 39,716,327 | $ 41,085,965 |
| 10 | Discount Rate | [5] | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% |
| 11 | Discount Factor | | 0.9366 | 0.8216 | 0.7207 | 0.6322 | 0.5545 | 0.4864 |
| 12 | Present Value of Licensing Profit (2016 - 2021) | | $          - | $ 29,473,966 | $ 26,745,956 | $ 24,270,442 | $ 22,024,053 | $ 19,985,582 |
| 13 | **Total Present Value of Incremental Profit** | | $ 122,500,000 | | | | | |

[1] See Exhibit 9.4.
[2] See Exhibit 9.3. It is likely that a rela ively small player would license the Pork The Other White Meat brand. In this test, we have assumed no growth in market share over time.
[3] Solved for royalty rate.
[4] Major drivers of cost are product innovation rate and the extent of common marketing initia ives, according to "The Cost of Brand Licensing Incurred by the Licensor" by Capstone Branding, dated October 2011. Because PTOWM is an established brand for a single product that does not frequently change, we chose the upper range in margin, as food licensing with fewer products and less innovation require less licensing management costs.
[5] See Exhibit 8.

**National Pork Board Trademark Valuation**
**Reasonableness #1 - Royalty Income Model - USDA Data: PV of Royalties (5 Year License) - 5% Share with Growth**
**Exhibit 9.1.2**

| | | Inputs | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|
| 1 | 2015 Pork Industry Revenue (Retail) | [1] $ 61,544,051,339 | | | | | | |
| 2 | Retail Level Pork Industry Growth (2000 - 2015) | [1]  3.4% | | | | | | |
| 3 | Retail Level Pork Industry Revenue | | $ 63,666,429,110 | $ 65,861,998,154 | $ 68,133,282,508 | $ 70,482,893,253 | $ 72,913,531,514 | $ 75,427,991,566 |
| 4 | Portion of Pork Industry Licensed | [2]  5.0% | 0.00% | 5.00% | 5.25% | 5.50% | 5.75% | 6.00% |
| 5 | Revenue Subject to License | | $          - | $ 3,293,099,908 | $ 3,576,997,332 | $ 3,876,559,129 | $ 4,192,528,062 | $ 4,525,679,494 |
| 6 | Royalty Rate for Exclusive Trademark License | [3]  **1.05%** | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% |
| 7 | Additional Revenue due to Licensing Program | | $          - | $ 34,635,020 | $ 37,620,898 | $ 40,771,525 | $ 44,094,713 | $ 47,598,617 |
| 8 | Cost of Licensing Program | [4]  5% | $          - | $ 1,731,751 | $ 1,881,045 | $ 2,038,576 | $ 2,204,736 | $ 2,379,931 |
| 9 | Profit Associated with Licensing Program | | $          - | $ 32,903,269 | $ 35,739,853 | $ 38,732,949 | $ 41,889,977 | $ 45,218,686 |
| 10 | Discount Rate | [5] | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% |
| 11 | Discount Factor | | 0.9366 | 0.8216 | 0.7207 | 0.6322 | 0.5545 | 0.4864 |
| 12 | Present Value of Licensing Profit (2016 - 2021) | | $          - | $ 27,032,224 | $ 25,756,725 | $ 24,485,760 | $ 23,229,416 | $ 21,995,876 |
| **13** | **Total Present Value of Incremental Profit** | | $ 122,500,000 | | | | | |

[1] See Exhibit 9.4.
[2] See Exhibit 9.3. It is likely that a rela ively small player would license the Pork The Other White Meat brand. In this test, we have assumed growth in market share over time.
[3] Solved for royalty rate.
[4] Major drivers of cost are product innovation rate and the extent of common marketing initia ives, according to "The Cost of Brand Licensing Incurred by the Licensor" by Capstone Branding, dated October 2011. Because PTOWM is an established brand for a single product that does not frequently change, we chose the upper range in margin, as food licensing with fewer products and less innovation require less licensing management costs.
[5] See Exhibit 8.

**National Pork Board Trademark Valuation**
**Reasonableness #1 - Royalty Income Model - USDA Data: PV of Royalties (5 Year License) - 20% Share with Growth**
**Exhibit 9.1.3**

| | | Inputs | | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2015 Pork Industry Revenue (Retail) | [1] | $ 61,544,051,339 | | | | | | |
| 2 | Retail Level Pork Industry Growth (2000 - 2015) | [1] | 3.4% | | | | | | |
| 3 | Retail Level Pork Industry Revenue | | | | $ 63,666,429,110 | $ 65,861,998,154 | $ 68,133,282,508 | $ 70,482,893,253 | $ 72,913,531,514 | $ 75,427,991,566 |
| 4 | Portion of Pork Industry Licensed | [2] | 20.0% | | 0.00% | 20.00% | 20.50% | 21.00% | 21.50% | 22.00% |
| 5 | Revenue Subject to License | | | | $ - | $ 13,172,399,631 | $ 13,967,322,914 | $ 14,801,407,583 | $ 15,676,409,275 | $ 16,594,158,145 |
| 6 | Royalty Rate for Exclusive Trademark License | [3] | 0.27% | | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |
| 7 | Additional Revenue due to Licensing Program | | | | $ - | $ 36,131,667 | $ 38,312,128 | $ 40,600,008 | $ 43,000,122 | $ 45,517,492 |
| 8 | Cost of Licensing Program | [4] | 5% | | $ - | $ 1,806,583 | $ 1,915,606 | $ 2,030,000 | $ 2,150,006 | $ 2,275,875 |
| 9 | Profit Associated with Licensing Program | | | | $ - | $ 34,325,083 | $ 36,396,521 | $ 38,570,007 | $ 40,850,116 | $ 43,241,617 |
| 10 | Discount Rate | [5] | | | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% |
| 11 | Discount Factor | | | | 0.9366 | 0.8216 | 0.7207 | 0.6322 | 0.5545 | 0.4864 |
| 12 | Present Value of Licensing Profit (2016 - 2021) | | | | $ - | $ 28,200,339 | $ 26,229,967 | $ 24,382,753 | $ 22,652,778 | $ 21,034,163 |
| 13 | **Total Present Value of Incremental Profit** | | | | $ 122,500,000 | | | | | |

[1] See Exhibit 9.4.
[2] See Exhibit 9.3. It is possible that a larger player would license he Pork The Other White Meat brand. In this test, we have assumed growth in market share over time.
[3] Solved for royalty rate.
[4] Major drivers of cost are product innovation rate and the extent of common marketing initia ives, according to "The Cost of Brand Licensing Incurred by the Licensor" by Capstone Branding, dated October 2011. Because PTOWM is an established brand for a single product that does not frequently change, we chose the upper range in margin, as food licensing with fewer products and less innovation require less licensing management costs.
[5] See Exhibit 8.

269

**National Pork Board Trademark Valuation**
**Reasonableness #1 - Royalty Income Model - USDA Data: PV of Royalties (10 Year License) - 5% Share with No Growth**
**Exhibit 9.1.4**

| | Inputs | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 2015 Pork Industry Revenue (Retail) | [1] $61,544,051,339 | | | | | | | | | | | |
| 2 Retail Level Pork Industry Growth (2000 - 2015) | [1] 3.4% | | | | | | | | | | | |
| 3 Retail Level Pork Industry Revenue | | $63,666,429,110 | $65,861,998,154 | $68,133,282,508 | $70,482,893,253 | $72,913,531,514 | $75,427,991,566 | $78,029,164,046 | $80,720,039,276 | $83,503,710,701 | $86,383,378,445 | $89,362,352,988 |
| 4 Portion of Pork Industry Licensed | [2] 5.0% | 0.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| 5 Revenue Subject to License | | $ - | $ 3,293,099,908 | $ 3,406,664,125 | $ 3,524,144,663 | $ 3,645,676,576 | $ 3,771,399,578 | $ 3,901,458,202 | $ 4,036,001,964 | $ 4,175,185,535 | $ 4,319,168,922 | $ 4,468,117,649 |
| 6 Royalty Rate for Exclusive Trademark License | [3] 0.71% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% |
| 7 Additional Revenue due to Licensing Program | | $ - | $ 23,378,407 | $ 24,184,623 | $ 25,018,642 | $ 25,881,422 | $ 26,773,956 | $ 27,697,270 | $ 28,652,424 | $ 29,640,517 | $ 30,662,686 | $ 31,720,104 |
| 8 Cost of Licensing Program | [4] 5% | $ - | $ 1,168,920 | $ 1,209,231 | $ 1,250,932 | $ 1,294,071 | $ 1,338,698 | $ 1,384,863 | $ 1,432,621 | $ 1,482,026 | $ 1,533,134 | $ 1,586,005 |
| 9 Profit Associated with Licensing Program | | $ - | $ 22,209,486 | $ 22,975,392 | $ 23,767,710 | $ 24,587,351 | $ 25,435,258 | $ 26,312,406 | $ 27,219,803 | $ 28,158,491 | $ 29,129,551 | $ 30,134,099 |
| 10 Discount Rate | [5] | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% |
| 11 Discount Factor | | 0.9366 | 0.8216 | 0.7207 | 0.6322 | 0.5545 | 0.4864 | 0.4267 | 0.3743 | 0.3283 | 0.2880 | 0.2526 |
| 12 Present Value of Licensing Profit (2016 - 2026) | | $ - | $ 18,246,570 | $ 16,557,730 | $ 15,025,203 | $ 13,634,522 | $ 12,372,557 | $ 11,227,396 | $ 10,188,226 | $ 9,245,239 | $ 8,389,531 | $ 7,613,025 |
| 13 **Total Present Value of Incremental Profit** | | $ 122,500,000 | | | | | | | | | | |

[1] See Exhibit 9.4.
[2] See Exhibit 9.3. It is likely that a relatively small player would license the Pork The Other White Meat brand. In this test, we have assumed no growth in market share over time.
[3] Solved for royalty rate.
[4] Major drivers of cost are product innovation rate and the extent of common marketing initiatives, according to "The Cost of Brand Licensing Incurred by the Licensor" by Capstone Branding, dated October 2011. Because
PTOWM is an established brand for a single product that does not frequently change, we chose the upper range in margin, as food licensing with fewer products and less innovation require less licensing management costs.
[5] See Exhibit 8.

**National Pork Board Trademark Valuation**
**Reasonableness #1 - Royalty Income Model - USDA Data: PV of Royalties (10 Year License) - 5% Share with Growth**
**Exhibit 9.1.5**

| | Inputs | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 2015 Pork Industry Revenue (Retail) | [1] $ 61,544,051,339 | | | | | | | | | | | |
| 2 Retail Level Pork Industry Growth (2000 - 2015) | [1] 3.4% | | | | | | | | | | | |
| 3 Retail Level Pork Industry Revenue | | $ 63,666,429,110 | $ 65,861,998,154 | $ 68,133,282,508 | $ 70,482,893,253 | $ 72,913,531,514 | $ 75,427,991,566 | $ 78,029,164,046 | $ 80,720,039,276 | $ 83,503,710,701 | $ 86,383,378,445 | $ 89,362,352,988 |
| 4 Portion of Pork Industry Licensed | [2] 5.0% | 0.00% | 5.00% | 5.25% | 5.50% | 5.75% | 6.00% | 6.25% | 6.50% | 6.75% | 7.00% | 7.25% |
| 5 Revenue Subject to License | | $ - | $ 3,293,099,908 | $ 3,576,997,332 | $ 3,876,559,129 | $ 4,192,528,062 | $ 4,525,679,494 | $ 4,876,822,753 | $ 5,246,802,553 | $ 5,636,500,472 | $ 6,046,836,491 | $ 6,478,770,592 |
| 6 Royalty Rate for Exclusive Trademark License | [3] 0.60% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% |
| 7 Additional Revenue due to Licensing Program | | $ - | $ 19,719,319 | $ 21,419,317 | $ 23,213,114 | $ 25,105,159 | $ 27,100,094 | $ 29,202,765 | $ 31,418,230 | $ 33,751,769 | $ 36,208,891 | $ 38,795,343 |
| 8 Cost of Licensing Program | [4] 5% | $ - | $ 985,966 | $ 1,070,966 | $ 1,160,656 | $ 1,255,258 | $ 1,355,005 | $ 1,460,138 | $ 1,570,912 | $ 1,687,588 | $ 1,810,445 | $ 1,939,767 |
| 9 Profit Associated with Licensing Program | | $ - | $ 18,733,353 | $ 20,348,351 | $ 22,052,459 | $ 23,849,901 | $ 25,745,089 | $ 27,742,626 | $ 29,847,319 | $ 32,064,181 | $ 34,398,446 | $ 36,855,576 |
| 10 Discount Rate | [5] | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% |
| 11 Discount Factor | | 0.9366 | 0.8216 | 0.7207 | 0.6322 | 0.5545 | 0.4864 | 0.4267 | 0.3743 | 0.3283 | 0.2880 | 0.2526 |
| 12 Present Value of Licensing Profit (2016 - 2026) | | $ - | $ 15,390,695 | $ 14,664,494 | $ 13,940,875 | $ 13,225,581 | $ 12,523,269 | $ 11,837,665 | $ 11,171,692 | $ 10,527,589 | $ 9,907,013 | $ 9,311,127 |
| 13 Total Present Value of Incremental Profit | | $ 122,500,000 | | | | | | | | | | |

[1] See Exhibit 9.4.
[2] See Exhibit 9.3. It is likely that a relatively small player would license the Pork The Other White Meat brand. In this test, we have assumed growth in market share over time.
[3] Solved for royalty rate.
[4] Major drivers of cost are product innovation rate and the extent of common marketing initiatives, according to "The Cost of Brand Licensing Incurred by the Licensor" by Capstone Branding, dated October 2011. Because
    PTOWM is an established brand for a single product that does not frequently change, we chose the upper range in margin, as food licensing with fewer products and less innovation require less licensing management costs.
[5] See Exhibit 8.

271

**National Pork Board Trademark Valuation**
**Reasonableness #1 - Royalty Income Model - Nielsen Data: PV of Royalties (5 Year License) - 5% Share with No Growth**
**Exhibit 9.2.1**

| | | Inputs | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|
| 1 | 2015 Pork Industry Revenue (Retail) | [1]  $ 20,564,651,322 | | | | | | |
| 2 | Retail Level Pork Industry Growth (2014 - 2015) | [1]  1.0% | | | | | | |
| 3 | Retail Level Pork Industry Revenue | | $ 20,766,668,202 | $ 20,970,669,595 | $ 21,176,674,996 | $ 21,384,704,092 | $ 21,594,776,761 | $ 21,806,913,080 |
| 4 | Portion of Pork Industry Licensed | [2]  5.0% | 0.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| 5 | Revenue Subject to License | | $        - | $ 1,048,533,480 | $ 1,058,833,750 | $ 1,069,235,205 | $ 1,079,738,838 | $ 1,090,345,654 |
| 6 | Royalty Rate for Exclusive Trademark License | [3]  3.76% | 3.8% | 3.8% | 3.8% | 3.8% | 3.8% | 3.8% |
| 7 | Additional Revenue due to Licensing Program | | $        - | $ 39,423,360 | $ 39,810,636 | $ 40,201,716 | $ 40,596,637 | $ 40,995,438 |
| 8 | Cost of Licensing Program | [4]  5% | $        - | $ 1,971,168 | $ 1,990,532 | $ 2,010,086 | $ 2,029,832 | $ 2,049,772 |
| 9 | Profit Associated with Licensing Program | | $        - | $ 37,452,192 | $ 37,820,104 | $ 38,191,630 | $ 38,566,806 | $ 38,945,667 |
| 10 | Discount Rate | [5] | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% |
| 11 | Discount Factor | | 0.9366 | 0.8216 | 0.7207 | 0.6322 | 0.5545 | 0.4864 |
| 12 | Present Value of Licensing Profit (2016 - 2021) | | $        - | $ 30,769,467 | $ 27,255,904 | $ 24,143,555 | $ 21,386,604 | $ 18,944,470 |
| **13** | **Total Present Value of Incremental Profit** | | $  122,500,000 | | | | | |

[1] Nielsen data provided by the National Pork Board. We understand that this data represents only 79% of the total retail market, as a result we divided the retail sales figure in the Nielsen schedule by 79% to indicate the en ire retail market. From discussions with the NPB, we understand that the retail sales include most major retailers, except for Costco and a number of smaller retailers and independents.

[2] See Exhibit 9.3. It is likely that a rela ively small player would license the Pork The Other White Meat brand. In this test, we have assumed no growth in market share over time.

[3] Solved for royalty rate.

[4] Major drivers of cost are product innovation rate and the extent of common marketing initia ives, according to "The Cost of Brand Licensing Incurred by the Licensor" by Capstone Branding, dated October 2011. Because PTOWM is an established brand for a single product that does not frequently change, we chose the upper range in margin, as food licensing with fewer products and less innovation require less licensing management costs.

[5] See Exhibit 8.

**National Pork Board Trademark Valuation**
**Reasonableness #1 - Royalty Income Model - Nielsen Data: PV of Royalties (5 Year License) - 5% Share with Growth**
**Exhibit 9.2.2**

| | | Inputs | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|
| 1 | 2015 Pork Industry Revenue (Retail) | [1] $ 20,564,651,322 | | | | | | |
| 2 | Retail Level Pork Industry Growth (2014 - 2015) | [1] 1.0% | | | | | | |
| 3 | Retail Level Pork Industry Revenue | | $ 20,766,668,202 | $ 20,970,669,595 | $ 21,176,674,996 | $ 21,384,704,092 | $ 21,594,776,761 | $ 21,806,913,080 |
| 4 | Portion of Pork Industry Licensed | [2] 5.0% | 0.00% | 5.00% | 5.25% | 5.50% | 5.75% | 6.00% |
| 5 | Revenue Subject to License | | $ - | $ 1,048,533,480 | $ 1,111,775,437 | $ 1,176,158,725 | $ 1,241,699,664 | $ 1,308,414,785 |
| 6 | Royalty Rate for Exclusive Trademark License | [3] **3.46%** | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% |
| 7 | Additional Revenue due to Licensing Program | | $ - | $ 36,236,328 | $ 38,421,910 | $ 40,646,936 | $ 42,911,969 | $ 45,217,581 |
| 8 | Cost of Licensing Program | [4] 5% | $ - | $ 1,811,816 | $ 1,921,096 | $ 2,032,347 | $ 2,145,598 | $ 2,260,879 |
| 9 | Profit Associated with Licensing Program | | $ - | $ 34,424,512 | $ 36,500,815 | $ 38,614,589 | $ 40,766,371 | $ 42,956,702 |
| 10 | Discount Rate | [5] | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% |
| 11 | Discount Factor | | 0.9366 | 0.8216 | 0.7207 | 0.6322 | 0.5545 | 0.4864 |
| 12 | Present Value of Licensing Profit (2016 - 2021) | | $ - | $ 28,282,026 | $ 26,305,129 | $ 24,410,936 | $ 22,606,338 | $ 20,895,571 |
| 13 | **Total Present Value of Incremental Profit** | | $ 122,500,000 | | | | | |

[1] Nielsen data provided by the National Pork Board. We understand that this data represents only 79% of the total retail market, as a result we divided the retail sales figure in the Nielsen schedule by 79% to indicate the en ire retail market. From discussions with the NPB, we understand that the retail sales include most major retailers, except for Costco and a number of smaller retailers and independents.

[2] See Exhibit 9.3. It is likely that a rela ively small player would license the Pork The Other White Meat brand. In this test, we have assumed growth in market share over time.

[3] Solved for royalty rate.

[4] Major drivers of cost are product innovation rate and the extent of common marketing initia ives, according to "The Cost of Brand Licensing Incurred by the Licensor" by Capstone Branding, dated October 2011. Because PTOWM is an established brand for a single product that does not frequently change, we chose the upper range in margin, as food licensing with fewer products and less innovation require less licensing management costs.

[5] See Exhibit 8.

**National Pork Board Trademark Valuation**
**Reasonableness #1 - Royalty Income Model - Nielsen Data: PV of Royalties (5 Year License) - 20% Share with Growth**
**Exhibit 9.2.3**

| | | Inputs | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|
| 1 | 2015 Pork Industry Revenue (Retail) | [1] | $ 20,564,651,322 | | | | | |
| 2 | Retail Level Pork Industry Growth (2014 - 2015) | [1] | 1.0% | | | | | |
| 3 | Retail Level Pork Industry Revenue | | | $ 20,766,668,202 | $ 20,970,669,595 | $ 21,176,674,996 | $ 21,384,704,092 | $ 21,594,776,761 | $ 21,806,913,080 |
| 4 | Portion of Pork Industry Licensed | [2] | 20.0% | 0.00% | 20.00% | 20.50% | 21.00% | 21.50% | 22.00% |
| 5 | Revenue Subject to License | | | $ - | $ 4,194,133,919 | $ 4,341,218,374 | $ 4,490,787,859 | $ 4,642,877,004 | $ 4,797,520,878 |
| 6 | Royalty Rate for Exclusive Trademark License | [3] | **0.90%** | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% |
| 7 | Additional Revenue due to Licensing Program | | | $ - | $ 37,762,720 | $ 39,087,024 | $ 40,433,703 | $ 41,803,068 | $ 43,195,435 |
| 8 | Cost of Licensing Program | [4] | 5% | $ - | $ 1,888,136 | $ 1,954,351 | $ 2,021,685 | $ 2,090,153 | $ 2,159,772 |
| 9 | Profit Associated with Licensing Program | | | $ - | $ 35,874,584 | $ 37,132,673 | $ 38,412,018 | $ 39,712,915 | $ 41,035,663 |
| 10 | Discount Rate | [5] | | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% |
| 11 | Discount Factor | | | 0.9366 | 0.8216 | 0.7207 | 0.6322 | 0.5545 | 0.4864 |
| 12 | Present Value of Licensing Profit (2016 - 2021) | | | $ - | $ 29,473,357 | $ 26,760,492 | $ 24,282,877 | $ 22,022,161 | $ 19,961,114 |
| 13 | **Total Present Value of Incremental Profit** | | | $ 122,500,000 | | | | | |

[1] Nielsen data provided by the National Pork Board. We understand that this data represents only 79% of the total retail market, as a result we divided the retail sales figure in the Nielsen schedule by 79% to indicate the en ire retail market. From discussions with the NPB, we understand that the retail sales include most major retailers, except for Costco and a number of smaller retailers and independents.
[2] See Exhibit 9.3. It is possible that a larger player would license  he Pork The Other White Meat brand. In this test, we have assumed growth in market share over time.
[3] Solved for royalty rate.
[4] Major drivers of cost are product innovation rate and the extent of common marketing initia ives, according to "The Cost of Brand Licensing Incurred by the Licensor" by Capstone Branding, dated October 2011. Because PTOWM is an established brand for a single product that does not frequently change, we chose the upper range in margin, as food licensing with fewer products and less innovation require less licensing management costs.
[5] See Exhibit 8.

**National Pork Board Trademark Valuation**
**Reasonableness #1 - Royalty Income Model - Nielsen Data: PV of Royalties (10 Year License) - 5% Share with No Growth**
**Exhibit 9.2.4**

| | Inputs | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 2015 Pork Industry Revenue (Retail) | [1] $ 20,564,651,322 | | | | | | | | | | | |
| 2 Retail Level Pork Industry Growth (2014 - 2015) | [1] 1.0% | | | | | | | | | | | |
| 3 Retail Level Pork Industry Revenue | | $ 20,766,668,202 | $ 20,970,669,595 | $ 21,176,674,996 | $ 21,384,704,092 | $ 21,594,776,761 | $ 21,806,913,080 | $ 22,021,133,320 | $ 22,237,457,953 | $ 22,455,907,651 | $ 22,676,503,290 | $ 22,899,265,951 |
| 4 Portion of Pork Industry Licensed | [2] 5.0% | 0.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| 5 Revenue Subject to License | | $ - | $ 1,048,533,480 | $ 1,058,833,750 | $ 1,069,235,205 | $ 1,079,738,838 | $ 1,090,345,654 | $ 1,101,056,666 | $ 1,111,872,898 | $ 1,122,795,383 | $ 1,133,825,165 | $ 1,144,963,298 |
| 6 Royalty Rate for Exclusive Trademark License | [3] 2.43% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% |
| 7 Additional Revenue due to Licensing Program | | $ - | $ 25,510,383 | $ 25,760,984 | $ 26,014,047 | $ 26,269,596 | $ 26,527,656 | $ 26,788,250 | $ 27,051,404 | $ 27,317,144 | $ 27,585,494 | $ 27,856,480 |
| 8 Cost of Licensing Program | [4] 5% | $ - | $ 1,275,519 | $ 1,288,049 | $ 1,300,702 | $ 1,313,480 | $ 1,326,383 | $ 1,339,413 | $ 1,352,570 | $ 1,365,857 | $ 1,379,275 | $ 1,392,824 |
| 9 Profit Associated with Licensing Program | | $ - | $ 24,234,864 | $ 24,472,935 | $ 24,713,345 | $ 24,956,116 | $ 25,201,273 | $ 25,448,838 | $ 25,698,834 | $ 25,951,287 | $ 26,206,219 | $ 26,463,656 |
| 10 Discount Rate | [5] | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% |
| 11 Discount Factor | | 0.9366 | 0.8216 | 0.7207 | 0.6322 | 0.5545 | 0.4864 | 0.4267 | 0.3743 | 0.3283 | 0.2880 | 0.2526 |
| 12 Present Value of Licensing Profit (2016 - 2026) | | $ - | $ 19,910,552 | $ 17,636,968 | $ 15,623,004 | $ 13,839,015 | $ 12,258,739 | $ 10,858,915 | $ 9,618,936 | $ 8,520,551 | $ 7,547,590 | $ 6,685,731 |
| 13 Total Present Value of Incremental Profit | | $ 122,500,000 | | | | | | | | | | |

[1] Nielsen data provided by the National Pork Board. We understand that this data represents only 79% of the total retail market, as a result we divided the retail sales figure in the Nielsen schedule by 79% to indicate the entire retail market. From discussions with the NPB, we understand that the retail sales include most major retailers, except for Costco and a number of smaller retailers and independents.
[2] See Exhibit 9.3. It is likely that a relatively small player would license the Pork The Other White Meat brand. In this test, we have assumed no growth in market share over time.
[3] Solved for royalty rate.
[4] Major drivers of cost are product innovation rate and the extent of common marketing initiatives, according to "The Cost of Brand Licensing Incurred by the Licensor" by Capstone Branding, dated October 2011. Because PTOWM is an established brand for a single product that does not frequently change, we chose the upper range in margin, as food licensing with fewer products and less innovation require less licensing management costs.
[5] See Exhibit 8.

**National Pork Board Trademark Valuation**
**Reasonableness #1 - Royalty Income Model - Nielsen Data: PV of Royalties (10 Year License) - 5% Share with Growth**
**Exhibit 9.2.5**

| | | Inputs | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2015 Pork Industry Revenue (Retail) | [1] $ 20,564,651,322 | | | | | | | | | | | |
| 2 | Retail Level Pork Industry Growth (2014 - 2015) | [1] 1.0% | | | | | | | | | | | |
| 3 | Retail Level Pork Industry Revenue | | $ 20,766,668,202 | $ 20,970,669,595 | $ 21,176,674,996 | $ 21,384,704,092 | $ 21,594,776,761 | $ 21,806,913,080 | $ 22,021,133,320 | $ 22,237,457,953 | $ 22,455,907,651 | $ 22,676,503,290 | $ 22,899,265,951 |
| 4 | Portion of Pork Industry Licensed | [2] 5.0% | 0.00% | 5.00% | 5.25% | 5.50% | 5.75% | 6.00% | 6.25% | 6.50% | 6.75% | 7.00% | 7.25% |
| 5 | Revenue Subject to License | | $ - | $ 1,048,533,480 | $ 1,111,775,437 | $ 1,176,158,725 | $ 1,241,699,664 | $ 1,308,414,785 | $ 1,376,320,833 | $ 1,445,434,767 | $ 1,515,773,766 | $ 1,587,355,230 | $ 1,660,196,781 |
| 6 | Royalty Rate for Exclusive Trademark License | [3] 2.07% | 2.1% | 2.1% | 2.1% | 2.1% | 2.1% | 2.1% | 2.1% | 2.1% | 2.1% | 2.1% | 2.1% |
| 7 | Additional Revenue due to Licensing Program | | $ - | $ 21,689,195 | $ 22,997,372 | $ 24,329,158 | $ 25,684,889 | $ 27,064,910 | $ 28,469,564 | $ 29,899,205 | $ 31,354,186 | $ 32,834,867 | $ 34,341,614 |
| 8 | Cost of Licensing Program | [4] 5% | $ - | $ 1,084,460 | $ 1,149,869 | $ 1,216,458 | $ 1,284,244 | $ 1,353,245 | $ 1,423,478 | $ 1,494,960 | $ 1,567,709 | $ 1,641,743 | $ 1,717,081 |
| 9 | Profit Associated with Licensing Program | | $ - | $ 20,604,736 | $ 21,847,503 | $ 23,112,700 | $ 24,400,645 | $ 25,711,664 | $ 27,046,086 | $ 28,404,244 | $ 29,786,476 | $ 31,193,124 | $ 32,624,533 |
| 10 | Discount Rate | [5] | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% |
| 11 | Discount Factor | | 0.9366 | 0.8216 | 0.7207 | 0.6322 | 0.5545 | 0.4864 | 0.4267 | 0.3743 | 0.3283 | 0.2880 | 0.2526 |
| 12 | Present Value of Licensing Profit (2016 - 2026) | | $ - | $ 16,928,160 | $ 15,744,892 | $ 14,611,126 | $ 13,530,987 | $ 12,507,010 | $ 11,540,454 | $ 10,631,557 | $ 9,779,753 | $ 8,983,856 | $ 8,242,204 |
| 13 | **Total Present Value of Incremental Profit** | | $ 122,500,000 | | | | | | | | | | |

[1] Nielsen data provided by the National Pork Board. We understand that this data represents only 79% of the total retail market, as a result we divided the retail sales figure in the Nielsen schedule by 79% to indicate the entire retail market. From discussions with the NPB, we understand that the retail sales include most major retailers, except for Costco and a number of smaller retailers and independents.
[2] See Exhibit 9.3. It is likely that a relatively small player would license the Pork The Other White Meat brand. In this test, we have assumed growth in market share over time.
[3] Solved for royalty rate.
[4] Major drivers of cost are product innovation rate and the extent of common marketing initiatives, according to "The Cost of Brand Licensing Incurred by the Licensor" by Capstone Branding, dated October 2011. Because PTOWM is an established brand for a single product that does not frequently change, we chose the upper range in margin, as food licensing with fewer products and less innovation require less licensing management costs.
[5] See Exhibit 8.

276

**National Pork Board Trademark Valuation**
**Reasonableness #1 - Royalty Income Model - Wholesale Industry Major Players**
**Exhibit 9.3**

| | Major Beef & Pork Industry Participants | % Market Share |
|---|---|---|
| 1 | Tyson Foods | 20.3% |
| 2 | Smithfield Foods Inc. | 18.9% |
| 3 | SYSCO Corporation | 13.7% |
| 4 | Hormel Foods Corporation | 7.3% |
| 5 | US Foods | 6.6% |
| 6 | Percentage of Market Represented | 66.8% |
| 7 | Mean | 13.4% |
| 8 | Selected | 5.0% |

Source: IBISWorld Industry Report 42447: *Beef & Pork Wholesaling in the US.*

**National Pork Board Trademark Valuation**
**Reasonableness #1 - Royalty Income Model - Pork Industry Historical Revenue Summary - Retail Pricing**
**Exhibit 9.4**

| | | | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Pork Consumption per Capita (pounds) | [1] | 51 | 50 | 51 | 52 | 51 | 50 | 49 | 50 |
| 2 | US Population | [2] | 282,162,411 | 284,968,955 | 287,625,193 | 290,107,933 | 292,805,298 | 295,516,599 | 298,379,912 | 301,231,207 |
| 3 | Total Pork Consumed (pounds) | | 14,333,850,479 | 14,248,447,750 | 14,755,172,401 | 14,969,569,343 | 14,933,070,198 | 14,657,623,310 | 14,620,615,688 | 15,151,929,712 |
| 4 | Yearly Average Price per pound | [3] | $ 2.58 | $ 2.69 | $ 2.66 | $ 2.66 | $ 2.79 | $ 2.83 | $ 2.81 | $ 2.87 |
| 5 | Total Retail Pork Revenue | | $ 37,010,071,694 | $ 38,384,594,061 | $ 39,212,114,883 | $ 39,788,452,065 | $ 41,688,913,134 | $ 41,436,198,993 | $ 41,044,250,216 | $ 43,493,777,001 |
| 6 | *YoY Growth %* | | | *7.07%* | *3.71%* | *2.16%* | *1.47%* | *4.78%* | *-0.61%* | *-0.95%* | *5.97%* |

| | | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|
| 7 | Pork Consumption per Capita (pounds) | [1] | 49 | 50 | 47 | 45 | 45 | 47 | 46 | 50 |
| 8 | US Population | [2] | 304,093,966 | 306,771,529 | 309,349,689 | 311,718,857 | 314,102,623 | 316,427,395 | 318,907,401 | 321,418,820 |
| 9 | Total Pork Consumed (pounds) | | 14,870,194,937 | 15,215,867,838 | 14,601,305,321 | 14,058,520,451 | 14,228,848,822 | 14,808,802,086 | 14,797,303,406 | 15,974,515,354 |
| 10 | Yearly Average Price per pound | [3] | $ 2.94 | $ 2.92 | $ 3.11 | $ 3.43 | $ 3.47 | $ 3.64 | $ 4.02 | $ 3.85 |
| 11 | Total Retail Pork Revenue | | $ 43,666,350,176 | $ 44,426,330,000 | $ 45,460,747,636 | $ 48,270,370,157 | $ 49,328,067,983 | $ 53,961,935,134 | $ 59,466,832,847 | $ 61,544,051,339 |
| 12 | *YoY Growth %* | | | *0.40%* | *1.74%* | *2.33%* | *6.18%* | *2.19%* | *9.39%* | *10 20%* | *3.49%* |

| 13 | 2000 - 2015 CAGR | 3.4% |
|---|---|---|

[1] Source: http://www.nationalchickencouncil.org/about-the-industry/sta istics/per-capita-consumption-of-poultry-and-livestock-1965-to-es imated-2012-in-pounds/.

[2] 2000 - 2015 Population data per: http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=PEP_2015_PEPANNRES&src=pt.

[3] Pork pricing per month: http://www.ers.usda.gov/data-products/meat-price-spreads.aspx. We computed  he average price for each year.

278

**National Pork Board Trademark Valuation**
**Reasonableness #2 - Relief-from-Royalty Income Model - Present Value of Total Industry Royalties**
**Exhibit 10.1**

| | | Inputs | 2016 | 2017 | 2018 | 2019 | 2020 | | Terminal Value 2020 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2015 Pork Industry Revenue (Retail) | [1]  $ 20,564,651,322 | | | | | | | |
| 2 | Retail Level Pork Industry Growth (2000 - 2015) | [1]    1.0% | | | | | | | |
| 3 | Retail Level Pork Industry Revenue | | $ 20,766,668,202 | $ 20,970,669,595 | $ 21,176,674,996 | $ 21,384,704,092 | $ 21,594,776,761 | | |
| 4 | Royalty Rate | [2]    **0.036%** | 0.036% | 0 036% | 0.036% | 0 036% | 0.036% | | |
| 5 | Royalties Paid | | $      7,539,645 | $   7,613,711 | $   7,688,505 | $   7,764,033 | $   7,840,303 | $ | 134,591,860 |
| 6 | Discount Rate | | 9.0% | 9.0% | 9.0% | 9.0% | 9.0% | | |
| 7 | Discount Factor | | 0.9578 | 0.8787 | 0.8062 | 0.7396 | 0.6785 | | 0.6785 |
| 8 | Present Value of Royalty Payments (2016 - 2020) | | $      7,221,671 | $   6,690,470 | $   6,198,343 | $   5,742,415 | $   5,320,024 | $ | 91,327,076 |
| 9 | Total Present Value of Royalty Payments (2016 - 2020) | | $      31,172,924 | | | | | | |
| 10 | Terminal Value After 2020 | | $      91,327,076 | | | | | | |
| 11 | **Total Present Value of Royalty Payments** | | $    122,500,000 | | | | | | |

[1] Nielsen data provided by the National Pork Board. We understand that this data represents only 79% of the total retail market, as a result we divided the retail sales figure in the Nielsen schedule by 79% to indicate the entire retail market. From discussions with the NPB, we understand  hat the retail sales include most major retailers, except for Costco and a number of smaller retailers and independents.

[2] Solved for royalty rate.

**National Pork Board Trademark Valuation**
**Reasonableness #2 - Relief-from-Royalty Income Model - Present Value of Total Industry Royalties**
**Exhibit 10.2**

| | | Inputs | 2016 | 2017 | 2018 | 2019 | 2020 | Terminal Value 2020 |
|---|---|---|---|---|---|---|---|---|
| 1 | 2015 Pork Industry Revenue (Retail) | [1]  $ 61,544,051,339 | | | | | | |
| 2 | Retail Level Pork Industry Growth (2000 - 2015) | [1]     3.4% | | | | | | |
| 3 | Retail Level Pork Industry Revenue | | $ 63,666,429,110 | $ 65,861,998,154 | $ 68,133,282,508 | $ 70,482,893,253 | $ 72,913,531,514 | |
| 4 | Royalty Rate | [2]     **0.011%** | 0.011% | 0 011% | 0.011% | 0 011% | 0.011% | |
| 5 | Royalties Paid | | $     6,934,308 | $  7,173,441 | $  7,420,821 | $  7,676,732 | $  7,941,468 | $   136,328,532 |
| 6 | Discount Rate | | 9.0% | 9.0% | 9.0% | 9.0% | 9.0% | |
| 7 | Discount Factor | | 0.9578 | 0.8787 | 0.8062 | 0.7396 | 0.6785 | 0.6785 |
| 8 | Present Value of Royalty Payments (2016 - 2020) | | $     6,641,863 | $  6,303,588 | $  5,982,541 | $  5,677,846 | $  5,388,669 | $   92,505,492 |
| 9 | Total Present Value of Royalty Payments (2016 - 2020) | | $     29,994,508 | | | | | |
| 10 | Terminal Value After 2020 | | $     92,505,492 | | | | | |
| 11 | **Total Present Value of Royalty Payments** | | $     122,500,000 | | | | | |

[1] See Exhibit 9.4.
[2] Solved for royalty rate.

**National Pork Board Trademark Valuation**
**Qualitative Assessment**
**Exhibit 11**

Subject Trademark:

[1]

| Item | Attributes | Positive Influence on Value | Negative Influence on Value | SRR Observations | SRR Assessment (Positive/Neutral/ Negative) | Source of Information |
|---|---|---|---|---|---|---|
| 1 | Age - absolute | Long-established trademark | Newly-created trademark | The Subject Assets were registered over twenty years ago. | Positive | USPTO. |
| 2 | Age - relative | Older than competing trademarks | Newer than competing trademarks | The Subject Assets have been in existence for about the same amount of time as competing trademarks used in the beef industry. | Neutral | USPTO. |
| 3 | Use - consistency | Name used consistently on related products and services | Name used inconsistently on unrelated products and services | From 1988 until 2011, the Subject Assets were used consistently in marketing efforts. In addition, NPB licensed the Subject Assets out to several market participants within the pork industry. | Positive | Various license agreements sent by the NPB (see appendix B) |
| 4 | Use - specificity | Name is general and can be used on a broad range of products and services | Name is specific and can only be used on a narrow range of products and services | The use of the Subject Assets is restricted to the pork industry. | Negative | SRR Observation. |
| 5 | Use - geography | Name has wide appeal, e.g., can be used internationally | Name has narrow appeal, e.g., can only be used locally | The Subject Assets were used in a national advertising campaign. | Positive | Discussions with NPB. |
| 6 | Potential for expansion | Unrestricted ability to use name on new or different products and services | Restricted ability to use name on new or different products and services | The NPB has the ability to license the Subject Assets in the future. However, the use of the Subject Assets is restricted to the pork industry. | Neutral | SRR Observation. |
| 7 | Potential for exploitation | Unrestricted ability to license name into new industries and uses | Restricted ability to license name into new industries and uses | The NPB has actively defended the protective rights of the Subject Assets against other industries. | Negative | Discussions with NPB. |
| 8 | Associations | Name associated with positive person, event, location | Name associated with negative person, event, location | No known associations. | Neutral | NPB Website. |
| 9 | Connotations | Name has positive connotations and reputation among consumers | Name has negative connotations and reputation among consumers | The Subject Assets are associated with a leaner, healthier pork product. | Positive | SRR Observation. |
| 10 | Timeliness | Name is perceived as modern | Name is perceived as old-fashioned | The Subject Assets are have been phased out by a new advertising campaign and awareness is decreasing | Negative | First Submission of Review Materials – February 15, 2016 |
| 11 | Quality | Name is perceived as respectable | Name is perceived as less respectable | The Subject Assets can be perceived as respectable or less respectable by different consumers. | Neutral | SRR Observation. |
| 12 | Profitability - absolute | Profit margins or investment returns on products and services higher than industry average | Profit margins or investment returns on products and services lower than industry average | The Subject Assets benefit the entire pork industry. | Neutral | SRR Observation. |
| 13 | Profitability - relative | Profit margins or investment returns on products and services higher than competing names | Profit margins or investment returns on products and services lower than competing names | The Subject Assets benefit the entire pork industry. | Neutral | SRR Observation. |
| 14 | Expense of promoting | Low cost of advertising, promotion, deals, or other marketing of name | High cost of advertising promotion, deals, or other marketing of name | The NPB has invested hundreds of millions of dollars to promote the Subject Assets in a nationwide marketing campaign over time, but current and future expenditure is expected to be minimal. | Neutral | Historical Advertising Expenditures provided by the NPB. |
| 15 | Means of promoting | Numerous means available to promote name | Few means available to promote name | The NPB has multiple means available to promote their name including TV ads, print ads, online ads, banner ads, streaming videos, and cook books. | Positive | The Pork Industry's 'Other White Meat' Campaign is Taken in New Direction, NY Times, March 4, 2005. |
| 16 | Market share - absolute | Products and services have high market share | Products and services have low market share | The Subject Assets are used to promote the entire pork industry. | Neutral | SRR Observation. |

281

**National Pork Board Trademark Valuation**
**Qualitative Assessment**
**Exhibit 11**

Subject Trademark:

[1]

| Item | Attributes | Positive Influence on Value | Negative Influence on Value | SRR Observations | SRR Assessment (Positive/Neutral/ Negative) | Source of Information |
|---|---|---|---|---|---|---|
| 17 | Market share - relative | Products and services have higher market share than competing names | Products and services have lower market share than competing names | The Subject Assets are used to promote the entire pork industry. | Neutral | SRR Observation. |
| 18 | Market potential - absolute | Products and services are in an expanding market | Products and services are in a contracting market | The Hog and Pig Farming Industry is expected to grow at an annualized 2.0% in the next five years. This is attributed to steady input prices, increasing red meat prices, and steady demand. | Positive | IBIS World. |
| 19 | Market potential - relative | Market for products and services expanding faster than competing names | Market for products and services expanding slower than competing names | The Subject Assets do not compete against other trademarks within the pork industry, thus there are no competing names. | Neutral | SRR Observation. |
| 20 | Name recognition | Name has high recognition, e.g., high aided or unaided recall among consumers | Name has low recognition, e g., low aided or unaided recall among consumers | In 2000, the Subject Assets included the 5th most nationally recognized slogan. In recent years, NPB has conducted a survey tracking brand awareness. In an aided survey in 2015, 82 3% of respondents recognized the Subject Assets. | Positive | 2000 Advertising Slogan Survey, Northwestern University; NPB Tracking Study. |
| 21 | Product Pricing | Name allows for a price premium compared to competing products and services | Name does not allow for a price premium compared to competing products and services | The Subject Assets are used to promote the entire pork industry, thus do not influence product pricing for any one particulate product or market participant. | Neutral | SRR Observation. |

[1] Attributes 1 through 20 and related descriptions based on "Valuing Intangible Assets," Robert F. Reilly and Robert P. Schweihs, p. 426.

## Second Submission of Review Materials – February 29, 2016*

1) **Opinion Letter – CONSOR**
   a. Producers have already paid well in excess of PTOWM's total value.
   b. "[T]he Board was likely one of a few, if not the only, potential buyers. Typically, in a situation where there are few potential buyers, a discount is applied to the purchase price."
   c. "Based on our experience, the two impending years in which they were only scheduled to make $1 in royalty payments would have significantly diminished [NPPC's] negotiating leverage in any arm's-length transaction."
   d. "Based on the actual 5 year remaining useful life, the annual payment of $3,000,000 exceeded the fair market value of PTOWM in July 2006."
   e. "Regardless of the value of PTOWM in 2006, it is no longer justifiable to make payments of $3,000,000 annually for a trademark that has 'played itself out.'"
   f. "The value of PTOWM as an unutilized heritage brand is significantly lower than its value in 2006, and likely de minimus.

2) **2006 Email from Steve Murphy, CEO of Pork Board**
   a. Valuations would not be useful for establishing Fair Market Value of PTOWM.
   b. Accepting the appraisals would have caused problems because of FOIA potential.
   c. Allowing the valuation data into the public domain would be harmful and he "would prefer to keep the information sealed."

3) **2003 Email from Steve Murphy, CEO of Pork Board**
   a. Concludes that NPPC wants $881,000 a year, but believes the deal they've suggested can't be sold to AMS (or Alan Guebert).
   b. So Pork Board CEO offers an alternative formula *for the same payout* so that NPPC can "get the money they need for the next four years."
   c. "[L]et's be honest, 4 years from now these other issues should be behind us."

4) **National Pork Board Conference Call Minutes (February 2006)**
   a. PTOWM was "built with producer dollars."
   b. PTOWM's "value was built with a lot of goodwill and producer dollars."
   c. "The valuations were not brought to the discussion because there was only one buyer, which was [the Pork Board]."
   d. The "interest was in maintaining the size of the industry revenue pie … for both organizations."

5) **PTOWM Purchase Negotiations**
   a. The PTOWM purchase is an "efficient strategy for transferring dollars to the NPPC."
   b. The purchase "retains the size of the 'funding pie.'"
   c. Defines fair market value as any agreement to terms between a willing buyer and seller.
   d. "[T]here is political sensitivity regarding the exchange of funds between the industry's checkoff and policy organization."
   e. The Pork Board will offer a "strategy that could ensure a continuous flow of funding for the National Pork Producer's Council ad infinitum."

6) **Statement of Parke Wilde, Ph.D.**
   a. Once PTOWM was retired, it would be the duty of officials to cancel the contract.
   b. "[T]he existing value of this trademark asset was built in large part with checkoff money, so pork producers are apparently paying twice for the consumer awareness achieved by the slogan."
   c. There were no competing bids for the mark to justify a high sale price of $60 million over 20 years.
   d. "It was never plausible" that NPPC would walk away from a license renewal if a purchase wasn't made.
   e. "The interest rate on the self-financing is greatly inflated."

7) **Testimony of Steve Murphy, CEO of the Pork Board**
   a. Purchase made business sense "if" the mark was to be the one "on which we built our promotions of the industry's interest."
   b. Decision to purchase based on intended use of the mark as the platform on which the Pork Board would build "for the long term."

8) **2004 Email from Steve Murphy, CEO of the Pork Board**
   a. Relates to NPPC an exchange with AMS about keeping "the review [of the PTOWM license] within their department, and out of OGC."
   b. Expectation is that if OGC attorneys "get their hands on it that a delay is likely."

9) **2005 Email from Steve Murphy, CEO of the Pork Board**
   a. Discusses $300,000 shortfall for PTOWM annual license fee and directs overspending an account to cover it.
   b. Directs PTOWM to be classified as an overhead expense rather than a programming expense.
   c. "[F]rankly, we don't need to lay the [PTOWM license fee] out there for everyone to second guess."

284

10) **2004 Email from USDA Official**

> Only signed and dated agreements can receive official approval from the agency.

11) **National Hog Farmer: The New NPPC Unveiled**
   a. NPPC needs an additional $4.7 million dollars annually to be effective.
   b. NPPC will not represent all producers, but only those who "choose to play" (i.e., "pay-to-play").

12) **First Submission of Review Materials – February 15, 2016**

> Submitters re-list the materials from their first submission in the current submission (to ensure that those materials will be considered by both USDA's outside reviewer and also by USDA itself as part of its overall review).

*Submitters understand from an email received on February 3, 2016, that there are now two submission dates for materials: February 15 and 29, 2016. We have attempted to sort materials according to the email and we are making this second submission in accordance with the timeline.

*The comments included in the above list and on the separator pages are added only to highlight certain information of particular relevance, but are not intended to limit consideration of the submitted materials in their entirety.

*The materials include testimony and exhibits from U.S. Trademark Trial and Appeal Board Case No. 91166701. Submitters include selected excerpts from relevant testimony in order to avoid an excessively voluminous submission, but transcripts of the referenced testimonies are available online from the TTAB site: http://ttabvue.uspto.gov/ttabvue/v?qt=adv&procstatus=All&pno=91166701. (Submitters note, however, that these records should already be in possession of the government in their entirety.)

285

## Opinion Letter – CONSOR

a. Producers have already paid well in excess of PTOWM's total value.

b. "[T]he Board was likely one of a few, if not the only, potential buyers. Typically, in a situation where there are few potential buyers, a discount is applied to the purchase price."

c. "Based on our experience, the two impending years in which they were only scheduled to make $1 in royalty payments would have significantly diminished [NPPC's] negotiating leverage in any arm's-length transaction."

d. "Based on the actual 5 year remaining useful life, the annual payment of $3,000,000 exceeded the fair market value of PTOWM in July 2006."

e. "Regardless of the value of PTOWM in 2006, it is no longer justifiable to make payments of $3,000,000 annually for a trademark that has 'played itself out.'"

f. "The value of PTOWM as an unutilized heritage brand is significantly lower than its value in 2006, and likely de minimus."

286



**PRIVILEDGED AND CONFIDENTIAL**
**OPINION LETTER**


**February 26, 2016**

Mr. Matthew Penzer
Special Counsel
Animal Protection Litigation
The Humane Society of the United States
2100 L Street NW
Washington D.C. 20037
Ph. 240.271.6144


*Re: Pork the Other White Meat Trademark Valuation*

Dear Mr. Penzer:

This letter summarizes the conclusions we have reached, pursuant to our engagement to provide our professional opinion to the Humane Society of the United States ("HSUS"). Specifically, we were asked to provide an opinion regarding the value of the trademark "Pork, The Other White Meat" and related intellectual property (collectively "PTOWM"), as of July 1, 2006 when the National Pork Board (the "Board") entered an Asset Purchase Agreement with the National Pork Producers Council ("NPPC").[1]

PTOWM consists of the following registered trademarks and service marks:[2]

1.  "PORK and Design," Registration Number 1418703;
2.  "THE OTHER WHITE MEAT," Registration Number 1486548;
3.  "THE OTHER WHITE MEAT and Design," Registration Number 3126072;
4.  "THE OTHER WHITE MEAT," Registration Number 3129186;

The analysis detailed in this report is conducted with a valuation date of July 1, 2006 (the "Valuation Date") and presented as of February 26, 2016 (the "Report Date"). Our opinions are subject to the conditions presented at Appendix A.  CONSOR qualifications are presented at Appendix C.

---

[1] Doc 4
[2] Doc 4

©2016 CONSOR® Confidential

7342 Girard Avenue, Suite 8
La Jolla, California 92037-5159 USA
Telephone: 858 / 454 9091
Fax: 858 / 454 7819
www.consor.com

287



## I.    OVERVIEW

Our analysis included the following tasks:

- **Research of Parties to the Litigation** – CONSOR conducted research on HSUS, the Board, and NPPC.

- **Market Research –** Extensive research was conducted of commodity checkoff programs, and licensing of trademarks for marketing purposes.

- **Review of Documents** – See the attached Appendix B for a complete list of all documents reviewed.

## II.    COMPANY BACKGROUND

### Humane Society of the United States ("HSUS")

HSUS "is a nonprofit animal protection organization headquartered in the District of Columbia… HSUS is the largest animal protection organization in the United States, representing 11 million members and constituents. HSUS actively advocates against practices that injure, harass, or abuse animals, and provides its members and the public with information regarding inhumane treatment on a variety of topics, including the application of state and federal laws that protect farm animals."[3]

### National Pork Board (the "Board")

"The Board is a quasi-governmental entity created as a result of Congress' passage of the Pork Act. Under the Pork Act and its implementing regulations, the Board collects a mandatory checkoff assessment, which is a per-capita fee on all hogs sold or imported in the United States. The Board consists of 15 members, all of whom are pork producers or importers nominated by Pork Act Delegates at the National Pork Forum and appointed by the Secretary of Agriculture. The Board also has an administrative staff that carries out the Board's activities."[4]

As stated on www.pork.org, the vision and mission statement of the Board are as follows:

- **Vision**: "The [Board] will elevate U.S. pork as the global protein of choice by continuously and collaboratively working to do what's right for people, pigs and the planet."[5]

- **Mission**: "The [Board] is the catalyst that unites pork producers with key stakeholders focused on building a bright future for the pork industry through research, promotion and education." [6]

---

[3] Doc 1
[4] Doc 1
[5] Doc 21
[6] Doc 21



As of the Report Date, "U.S. pork producers and importers pay $0.40 per $100 of value when pigs are sold and when pigs or pork products are brought into the United States."[7] These funds are intended to be used for "carrying out an effective and coordinated program of promotion, research, and consumer information designed to" benefit the pork industry.[8]

Each year the Board must prepare and submit a proposal to the Secretary of the United States Department of Agriculture ("USDA") for approval.[9] Funds are expressly prohibited from being used in an attempt to influence government policy.[10] As stated in 7 U.S. Code § 4809, "[n]o funds collected through assessments authorized by this section may, in any manner, be used for the purpose of influencing legislation."[11]

On July 1, 2006, the Board entered into an Asset Purchase Agreement with NPPC to acquire PTOWM for $60,000,000 via 20 annual payments of $3,000,000.[12] Under the terms of the agreement the Board "may at any time and for any reason elect to terminate its obligation to pay the unpaid balance of the purchase price."[13]

**National Pork Producers Council ("NPPC")**

NPPC engages in public policy activities on behalf of 43 affiliated state associations.[14] "NPPC's mission is to fight for reasonable legislation and regulations, develop revenue and market opportunities and protect the livelihoods of America's 67,000 pork producers. Public-policy issues on which it focuses are in the areas of agriculture and industry, animal health and food safety, environment and energy and international trade."[15]

"In addition to working on legislation, regulations and trade initiatives, NPPC gets involved in the political process through its political action committee, PorkPAC. The PAC educates and supports candidates at the state and federal levels who support the U.S. pork industry."[16]

"In March 1999, the USDA Office of Inspector General ("OIG") issued an audit report that concluded, among other things, that the Board had 'relinquished too much authority to its primary contractor, [NPPC], and has placed the NPPC in a position to exert undue influence over Board budgets and grant proposals.' The OIG recommended separation of operations and greater accountability for checkoff expenditures."[17]

---

[7] Doc 21
[8] Doc 22
[9] Doc 23
[10] Doc 24
[11] Doc 24
[12] Doc 2
[13] Doc 2
[14] Doc 25
[15] Doc 25
[16] Doc 25
[17] Doc 1

©2016 CONSOR® Confidential

Pork The Other White Meat
Intellectual Property Valuation
February 26, 2016

**PRIVILEDGED AND CONFIDENTIAL**
Opinion Letter
Page 4

**CONSOR®**
Intellectual Asset Management

**Figure 1. 2008 NPPC Revenue**



Revenue from the sale of PTOWM to the Board continues to provide a significant source of financing for NPPC's activities. In 2008, revenue from the Asset Purchase Agreement accounted for 32% of NPPC revenue.[18] As of 2014, NPPC no longer disclosed the percentage of revenue generated from the sale of PTOWM. Instead they presented a category labeled as "Other." A complete breakdown of NPPC 2008 revenue is presented at Figure 1. NPPC 2014 budgeted revenue is presented at Figure 2.

**Figure 2. 2014 NPPC Revenue (Budgeted)**



---

[18] Doc 26

©2016 CONSOR® Confidential

## III.    CASE BACKGROUND

In 2012, HSUS filed Civil Action No. 1:12-cv-1582 ABJ against the USDA and the Board challenging expenditures related to the $60,000,000 acquisition of PTOWM from NPPC. The complaint alleges ongoing payments of $3,000,000 per year "violate provisions of the Pork Promotion, Research, and Consumer Information Act of 1985 ("Pork Act"), 7 U.S.C. § 4801 et seq., the Pork Promotion, Research, and Consumer Information Order ("Pork Order"), 7 C.F.R. § 1230.1 et seq., and the USDA guidelines for checkoff program operations…they also allow the Board and the NPPC to evade federal restrictions against the use of pork checkoff dollars for purposes of influencing legislation and government policy."[19]

## IV.    USEFUL LIFE OF A SECONDARY TRADEMARK

As defined in the Trademark Act of 1946 (the "Lanham Act"), a trademark is "any word, name, symbol, or device, or any combination thereof" used in commerce to identify and distinguish the goods of one manufacturer or seller from those of another and to indicate the source of the goods.[20]

While trademarks can have an indefinite life from a legal perspective, many trademarks have a finite useful life as the passage of time creates functional obsolescence. This is especially true of secondary trademarks used in advertising. Typically, marketing campaigns are forced to evolve over time to maintain relevance to the consuming public.

As an example, the primary Coca-Cola trademark would be valued as if it has an indefinite useful life. However, the slogans (or secondary trademarks) that have been used in their advertising campaigns have evolved over the decades. Figure 3 lists several of the secondary trademarks used by Coca-Cola in advertising.

**Figure 3.[21]**

| Slogans Used by The Coca-Cola Company | |
|---|---|
| Slogan | Period of Use |
| "Delicious and Refreshing" | 1915-1920s |
| "The Pause that Refreshes" | 1930s |
| "It's the Real Thing" | 1940s and 1970s |
| "Things go better with Coke" | 1960s |
| "Have a Coke and a smile" | 1980s |
| "Coke is it!" | 1980s |

The functional obsolescence of secondary trademarks used in advertising has been described as follows. "[T]rademarks can get old. Not in name but in design. The name is on the lips of the

---

[19] Doc 1
[20] Doc 28
[21] Doc 17, Page 110

©2016 CONSOR® Confidential

Pork The Other White Meat
Intellectual Property Valuation
February 26, 2016

PRIVILEDGED AND CONFIDENTIAL
Opinion Letter
Page 6

CONSOR®
Intellectual Asset Management

target audience, but the perception of the trademark as a vital, contemporary communication may not have kept pace with the times… It's time for a facelift. Such redesigns are important to not only maintain the momentum of the company or product but also to thrust it into a new cycle of growth."[22]

In his book 'Trademark Valuation,' Gordon V. Smith also notes the finite life of secondary trademarks in advertising. "In general, we have observed that slogans or symbols that are used subordinately to a primary trademark tend to have finite lives. This is because many of them are developed in order to respond to a relatively temporary situation. As an example, we used to see a phrase such as 'lead-free' in connection with gasoline brands. Now, all gasoline is without lead and such a differentiating element is meaningless. Competition may cause the introduction of a slogan, such as the use of "The Right Choice" by AT&T when a choice of a long-distance service provider became a reality."[23]

Since it is rare that a slogan would have an indefinite useful life, we conducted our analysis of the value of PTOWM under three scenarios. First, to determine a maximum value, we assumed PTOWM would have an indefinite useful life. Next, we assumed PTOWM would have a 20 year remaining useful life as of July 1, 2006. This corresponds to the duration of time the Board agreed to make payments to NPPC under the Asset Purchase Agreement. As a final indication of value, we used a 5 year remaining useful life. This is the actual duration of use of PTOWM before it was replaced by the new brand campaign *Pork. Be Inspired* in 2011.[24]

Even a 20 year remaining useful life may have been an overly optimistic assumption for an independent party calculating the fair market value of PTOWM. There is some indication that executives at NPPC and the Board believed the remaining useful life of PTOWM was less than 20 years at the time the Asset Purchase Agreement was entered. In a September 2003 email, NPPC President John Caspers valued PTOWM using a 15 year remaining useful life.[25] Under this assumption, the Board would be scheduled to make payments to NPPC approximately 8 years beyond the useful life of PTOWM.

In reality, even the 15 year remaining useful life estimate relied upon by John Caspers extended beyond the actual remaining useful life of PTOWM. In 2011, the Board transitioned away from use of PTOWM to the new brand campaign *Pork. Be Inspired*.[26] This reason for the transition was described by the Board's Executive Vice President of Governance and Operations, Jim Meimann:

> "*Research showed us that Pork. The Other White Meat may have played itself out…*
> *Consumers' views on pork's healthfulness had changed, so it wasn't having the same*
> *level of impact it once had. Consumers had gotten the message, so we needed something*

---

[22] Doc 17, Page 111
[23] Smith, Page 111
[24] Doc 10
[25] Doc 19
[26] Doc 10

©2016 CONSOR® Confidential

Pork The Other White Meat
Intellectual Property Valuation
February 26, 2016

**PRIVILEDGED AND CONFIDENTIAL**
Opinion Letter
Page 7



*that could drive us further down the road and touch consumers in a fresh creative way.*"[27]

## V.    VALUATION METHODOLOGIES

When valuing intellectual properties, we consider each of the different valuation methodologies, in light of the information available and the specific circumstances, in order to determine the best method for ascertaining value. The methodologies commonly used to determine the value of intellectual properties are: the Cost Approach, the Market Approach, the Income Approach, and a hybrid methodology known as the Relief from Royalty Approach.

### Income Approach

The income approach calculates the present value of future income streams specifically attributable to the intellectual property asset.  This method utilizes forecasted financial results based on factors such as historical financial results, appropriate discount rates, industry trends, and the competitive environment.  Generally, the income approach is best suited for the valuation of intellectual properties utilized by companies with a history of profitability. The income approach has not been relied upon.

### Cost Approach

The historical cost to develop an asset is sometimes used to determine its value.  However, the cost to develop an intellectual asset is rarely representative of its ultimate value.  This approach is less useful for intellectual properties used with products that have reached the market and generated revenues.  Generally, the cost approach is better suited to analysis of intellectual properties and products that have not yet been developed commercially, or that could be re-created quickly, as it reflects the cost a company could avoid by purchasing, rather than duplicating, a similar development effort.  For these reasons the cost approach does not provide an accurate measure of value of PTOWM.

### Market Approach

The market approach values intellectual property by comparing the subject asset to publicly available transactions involving similar assets with similar uses.  This provides a reasonable indication of value if an active market exists that can provide examples of recent arm's-length transactions, with adequate information regarding terms and conditions.  Transactions involving intellectual properties can involve the purchase or transfer of the assets separate from a business or a license to use the assets.  However, active markets for the purchase and sale of comparable trademarks often do not exist, and information available may be skewed towards large deals as smaller transactions are rarely publicized.

---



[27] Doc 20

©2016 CONSOR® Confidential

Pork The Other White Meat
Intellectual Property Valuation
February 26, 2016

**PRIVILEDGED AND CONFIDENTIAL**
Opinion Letter
Page 8

**CONSOR** ®
Intellectual Asset Management

Due to the lack of sufficient information available regarding the sale or transfer of comparable trademarks, we did not rely on the market approach as an indication of value. However, we did use the market approach in determining appropriate royalty rates, as described in our Royalty Rate Research and Analysis section.

**Relief from Royalty Approach**

The relief from royalty approach is a hybrid methodology which relies on aspects of the market and income approaches. In the relief from royalty approach a hypothetical situation is created to estimate what a business would pay to license its own intellectual property assets in an arms-length transaction. The value is then calculated as the present value of the avoided hypothetical royalty charges.

**Methods Applied**

Based on the context of the situation, we have chosen to employ the relief from royalty approach as the most reasonable indication of value of PTOWM.

## VI.    REVENUE PROJECTIONS

During the course of our research and analysis, we were provided with historical financial data for the Board from 2004 through 2014. During this time annual revenues increased at a compound annual growth rate ("CAGR") of 4.83%.

We have assumed this would remain consistent for the first 5 years of our projections from 2015 through 2019. From 2020 through the end of the forecast period, we have assumed that revenue growth would revert to 3.22%. This is the average annual U.S. rate of inflation since the government began tracking it in 1913.[28]

The Board's historical income statements are presented at Exhibit 10. Revenue projections are presented at Exhibits 2, 3 and 4. Assumptions relied upon are presented at Exhibit 6.

## VII.    ROYALTY RATE RESEARCH AND ANALYSIS

Establishing appropriate market-based royalty rates for the use of PTOWM is a critical step in the analysis of this assignment. For more than twenty years, our firm has worked exclusively in the valuation and licensing of trademarks and other intellectual property assets. Our experience includes working as agents for international licensors; acting as licensors ourselves; managing patent portfolios; and acting as licensing consultants to a broad range of international clients. In each scenario, we have been involved in the negotiation of royalty rates and licensing agreements. As such, our cumulative experience is measured in decades of experience and our access to licensing information and royalty rate data is extensive and global.

---

[28] Doc 18



Pork The Other White Meat
Intellectual Property Valuation
February 26, 2016

**PRIVILEDGED AND CONFIDENTIAL**
Opinion Letter
Page 9

To determine the fair market value of a royalty fee for use of PTOWM, we used the market approach to identify comparable license agreements. Royalty rate transaction data was collected from various sources. Specifically, we used annual royalty rate industry surveys, public documentation from corporate 10-Q and 10-K forms, the RoyaltyStat® database of over 35,000 publicly available licensing transactions, as well as the Intangible Spring® database.

A summary of royalty rate data collected is presented at Exhibit 8.

When performing a market based analysis of royalty rates it is critical that comparable agreements share similar criteria. Factors such as exclusivity, timeframe, payment timing mechanisms, constraints, and other restrictions should ideally be aligned with the subject transaction. However, the unique nature of intellectual property assets and the numerous methods for structuring transactions often preclude the identification of a perfect set of comparables. Nevertheless, a close correlation among factors allows for the triangulation of a rate likely to be realized in an arm's-length transaction.

Six comparable agreements for the use of trademarks similar to those used by the Board were identified. The range of fees, as a percentage of gross revenue, for comparable agreements is presented at Figure 4. Complete agreement details are provided at Exhibit 9.

**Figure 4.**

| Comparable Licensee Fees for Trademarks Similar to PTOWM | |
|---|---|
| Minimum | 0.10% |
| **Median** | **0.92%** |
| Average | 1.19% |
| Maximum | 3.20% |

As an indication of the fair market value for use of PTOWM by the Board, we relied on the median royalty rate from comparable market transactions.

## VIII.    DISCOUNT RATE ANALYSIS

To discount future earnings, we used a discount rate representative of the level of risk involved in an investment in PTOWM. To determine the appropriate rate, we conducted a benchmark analysis of discount rates using Ibbotson Associates' CAPM and WACC calculations for investments in similar asset classes. As the Board's revenues are directly tied to the pork industry, we have applied a discount rate of 7.25%, which equals the median weighted average cost of capital ("WACC") for the Meat Products industry SIC Composite 201.[29]

As the Board generates revenue throughout each forecast period, we have used mid-period discounting.

---

[29] Doc 29

Pork The Other White Meat
Intellectual Property Valuation
February 26, 2016

PRIVILEDGED AND CONFIDENTIAL
Opinion Letter
Page 10

CONSOR®
Intellectual Asset Management

## IX.    RELIEF FORM ROYALTY ANALYSIS CONCLUSION

Our relief from royalty analysis has been conducted under three scenarios. First, PTOWM has an indefinite useful life, second, PTOWM had a 20 year remaining useful life on July 1, 2006, and third, PTOWM had a five year remaining useful life. Assuming an indefinite useful life results in a value of PTOWM of $17,588,403 on July 1, 2006. Complete relief from royalty analysis (assuming an indefinite life) is presented at Exhibit 2.

Assuming a 20 year remaining useful life results in a value of PTOWM of $9,520,460 on July 1, 2006. Complete relief from royalty analysis (assuming a 20 year useful life) is presented at Exhibit 3.

Assuming a 5 year remaining useful life results in a value of PTOWM of $2,553,595 on July 1, 2006. Complete relief from royalty analysis (assuming a 5 year useful life) is presented at Exhibit 4.

## X.    COMPARISON TO PRESENT VALUE (AS OF JULY 1, 2006) OF ACQUISITION PAYMENTS

To compare the value of PTOWM in July 2006, to the value of payments made under the Asset Purchase Agreement, we calculated the present value (as of July 1, 2006) of payments made by the Board through July 2016. The July 2016 payment of $3 million was included in the present value calculation since it is within the 365 day notice of termination period outlined at Section 1.7 of the agreement.[30]

The present value (as of July 1, 2006) of payments made by the Board, from July 1, 2006 through July 1, 2016, to acquire PTOWM is $23,829,385. This vastly exceeds the value of PTOWM at the acquisition date, even if PTOWM was assumed to have an indefinite useful life. Overpayments by the Board for PTOWM are summarized at Figure 5.

**Figure 5.**

| Useful Life Assumption | PTOWM Valuation (Indefinite) | PTOWM Valuation (20 Years From Acq. Date) | PTOWM Valuation (5 Years From Acq. Date) |
|---|---|---|---|
| Value of PTOWM at July 1, 2006 | $17,558,403 | $9,520,460 | $2,553,595 |
| Payments by the Board | $23,829,385 | $23,829,385 | $23,829,385 |
| **Overpayments** | **($6,270,982)** | **($14,308,925)** | **($21,275,790)** |

Based on the actual 5 year remaining useful life, the annual payment of $3,000,000 exceeded the fair market value of PTOWM in July 2006. Complete analysis of the present value of payments made under the Asset Purchase Agreement is presented at Exhibit 5.

---

[30] Doc 2



## XI.    NEGOTIATING AN ARM'S LENGTH TRANSACTION FOR PTOWM IN 2006

There are several factors to indicate that if NPPC and the Board had entered arm's length negotiations in 2006, the Board would have been in a position to negotiate a price lower than the value conclusions outlined in our relief from royalty analysis.

First, while widespread use of PTOWM has led to strong recognition in the marketplace, its use to promote the entire industry would likely preclude any commercial company from engaging in acquisition discussions. As a result, the Board was likely one of a few, if not the only, potential buyers. Typically, in a situation where there are few potential buyers, a discount is applied to the purchase price. Based on our experience, this could range from 20-50 percent.

Secondly, at the time the Asset Purchase Agreement was entered there were three years remaining on the March 2004 Amended and Restated Trademark License Agreement by and between NPPC and the Board (the "2004 License"). Under the terms of the agreement the Board agreed to pay "an annual royalty of $818,451 for each [c]ontract [y]ear commencing July 1, 2003 to and including July 1, 2006, and an annual royalty of $1 for each [c]ontract [y]ear commencing July 1, 2007 and 2008."[31] As presented at Figure 6 and detailed at Exhibit 7, these royalty payments of approximately $3.3 million scheduled over six years were the equivalent of a 0.88% royalty.

**Figure 6.**

| Effective Royalty Payments | | | | | | |
|---|---|---|---|---|---|---|
| **Year Ended June 30** | **2004** | **2005** | **2006** | **2007** | **2008** | **2009** |
| National Pork Board Revenue | 59,850,551 | 62,136,663 | 60,789,153 | 61,888,723 | 65,316,626 | 62,574,840 |
| PTOWM Royalty Payment | 818,451 | 818,451 | 818,451 | 818,451 | 1 | 1 |
| Effective Royalty Rate | 1.37% | 1.32% | 1.35% | 1.32% | 0.00% | 0.00% |
| **Effective Royalty Rate Over Life of Contract** | **0.88%** | | | | | |

Effective July 1, 2006, with three years remaining on the 2004 License, the Board entered an Asset Purchase Agreement to acquire PTOWM from NPPC. Under the terms of the agreement the Board agreed to make annual payments of $3 million. This is approximately 5.5x the average annual payment the parties had agreed to two years prior.

---

[31] Doc 4

©2016 CONSOR® Confidential



**Figure 7.**

| Effective Royalty Payments | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Year Ended June 30 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
| National Pork Board Revenue | 59,850,551 | 62,136,663 | 60,789,153 | 61,888,723 | 65,316,626 | 62,574,840 |
| PTOWM Royalty Payment | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 |
| Effective Royalty Rate | 5.01% | 4.83% | 4.94% | 4.85% | 4.59% | 4.79% |
| Effective Royalty Rate Over Life of Contract | 4.83% | | | | | |

If the 2004 Agreement mandated payments of $3 million annually the effective royalty over the life of the agreement would have been 4.83%. This significantly exceeds any of the comparable trademark license agreements outlined at Exhibit 9.

Since the 2004 License only required royalty payments of $1 in the last two years of the contract, the average annual royalty payment over the three remaining years was approximately $273,000. However, rather than continue to license PTOWM, the Board entered an asset purchase agreeing to pay more than 10x their previously scheduled payments over those three years.

Prior to the asset purchase agreement, licensing PTOWM was a significant revenue generator for NPPC. Based on our experience, the two impending years in which they were only scheduled to make $1 in royalty payments would have significantly diminished their negotiating leverage in any arm's-length transaction.

## XII.    TRADEMARK IMPAIRMENT

In 2011, the Board transitioned away from use of PTOWM to the new brand campaign *Pork. Be Inspired*.[32] This transition was discussed in an interview by the Board's Executive Vice President of Governance and Operations, Jim Meimann:

> *"This past spring, NPB rolled out the new 'Pork. Be Inspired' campaign as pork's promotional program. 'Research showed us that Pork. The Other White Meat may have played itself out,' Meimann says. Consumers' views on pork's healthfulness had changed, so it wasn't having the same level of impact it once had. 'Consumers had gotten the message, so we needed something that could drive us further down the road and touch consumers in a fresh creative way,' he adds."[33]*

As discussed at Section IV of this Report, Mr. Meimann's statements reflect the typical life cycle of a secondary trademark. Over time slogans used in advertising campaigns are forced to evolve to maintain relevance with consumers. "[E]ven the best-recognized trademarks must be

---

[32] Doc 10
[33] Doc 20



maintained continually by advertising and by being associated with a product or products that continue to find favor with the buying public. This requires continued investment of labor and capital."[34]

At the time the Board and NPPC entered the Asset Purchase Agreement, it was impossible to determine the remaining useful life of PTOWM with complete certainty. However, five years later the Board acknowledged that it was time to move on to a new brand campaign.[35] According to the terms of the Asset Purchase Agreement, "[the Board] may at any time and for any reason elect to terminate its obligations to pay the unpaid balance of the [p]urchase [p]rice."[36] Regardless of the value of PTOWM in 2006, it is no longer justifiable to make payments of $3,000,000 annually for a trademark that has "played itself out."[37]

Arguably, the Board should already have ownership of PTOWM as they have already paid in excess of its actual worth in 2006. Based on the discontinued use of PTOWM in 2011, and the subsequent five year period in which it has not been used in advertising, PTOWM has become a heritage brand. Additionally, google searches for 'Pork the Other White Meat' are now redirected to www.porkbeinspired.com.[38] The value of PTOWM as an unutilized heritage brand is significantly lower than its value in 2006, and likely de minimus; however, such an analysis is beyond the scope of this report.

## XIII.    CONCLUSION

Based on our review of the documents we have received, our own internal research, and our analysis of the information available, we have arrived at the following opinions:

- Assuming an indefinite useful life the value of PTOWM at July 1, 2006 was  **$17,558,403**

- Assuming an 20 year useful life the value of PTOWM at July 1, 2006 was  **$9,520,460**

- Assuming an 5 year useful life the value of PTOWM at July 1, 2006 was  **$2,553,595**

- The present value (at July 1, 2006) of payments to acquire PTOWM, through 2016 was **$23,829,385**

    o Assuming an indefinite useful life of PTOWM the Board has paid **$6,270,982 in excess of its value** at July 1, 2006

    o Assuming an 20 year useful life of PTOWM **$14,308,925 in excess of its value** at July 1, 2006

---

[34] Doc 16, Page 235
[35] Doc 20
[36] Doc 2
[37] Doc 20
[38] Doc 36

©2016 CONSOR® Confidential

**PRIVILEDGED AND CONFIDENTIAL**
Opinion Letter
Page 14



o  Assuming an 5 year useful life of PTOWM **$21,275,790 in excess of its value** at July 1, 2006

This opinions are based upon the documents and information reviewed as of the date of this report, as well as our expertise in financial analysis and intellectual property valuation.  We reserve the right to revisit this analysis and amend these conclusions should additional information and/or documents become available for review.

Sincerely,

**Jeff Anderson**
Director, Valuation and Analytics



## APPENDIX A
## STATEMENT OF LIMITING CONDITIONS

1.  Information furnished by others, upon which all or portions of this analysis are based, is believed to be reliable but has not been verified except as set forth in this Letter. No warranty is given as to the accuracy of such information.

2.  Neither CONSOR nor any individual signing or associated with this Letter shall be required by reason of this Letter to give further consultation, provide testimony, or appear in court or at other legal proceedings unless specific arrangements therefor have been made.

3.  No responsibility is taken for changes in market conditions, and no obligation is assumed to revise this Letter to reflect events or conditions which occur subsequent to the date hereof.

4.  Responsible ownership and competent management are assumed.

301



# APPENDIX B
## DOCUMENTS CONSIDERED

| Doc # | Description |
| --- | --- |
| 1 | First Amended Complaint for Declaratory and Injunctive Relief |
| 2 | ASSET PURCHASE AGREEMENT dated as of July 1, 2006 by and between National Pork Producers Council, an Iowa non profit corporation ("Seller") and National Pork Board, an instrumentality of the United States of America created under the Pork Promotion Research and Consumer Information Act of 1985 ("Buyer") |
| 3 | 2003 National Pork Producers Council Pork the Other White Meat "PORK and Design" Trademark License Agreement with the National Pork Board |
| 4 | 2004 Pork the Other White Meat "PORK and Design" Amended and Restated Trademark License Agreement |
| 5 | National Pork Board 2005 Annual Report |
| 6 | National Pork Board 2006 Annual Report |
| 7 | National Pork Board 2007 Annual Report |
| 8 | National Pork Board 2008 Annual Report |
| 9 | National Pork Board 2009 Annual Report |
| 10 | National Pork Board 2010 Annual Report |
| 11 | National Pork Board 2011 Annual Report |
| 12 | National Pork Board 2012 Annual Report |
| 13 | National Pork Board 2013 Annual Report |
| 14 | National Pork Board 2014 Annual Report |
| 15 | National Pork Board Financial Report for the Year Ended December 31, 2014 |
| 16 | Smith, Gordon V. and Parr, Russell L. Intellectual Property: Valuation, Exploitation and Infringement Damages. John Wiley & Sons, Inc. 2005 |
| 17 | Smith, Gordon V. Trademark Valuation. John Wiley & Sons, Inc. 1997 |



| | |
|---|---|
| **18** | Long Term U.S. Inflation. InflationData.com |
| **19** | Email Correspondence: John Caspers, Craig Christensen, and Steve Murphy. September 14-15, 2003 |
| **20** | Miller, Marlys. Tallying 25 years of NP and National Pork Checkoff. November 15, 2011. Pork Network. http://www.porknetwork.com/pork-news/Tallying-25-years-of-NPB-and-National-Pork-Checkoff--133923673.html |
| **21** | About Pork Checkoff and the National Pork Board. http://www.pork.org/about-us/ |
| **22** | 7 U.S. Code § 4801 - Congressional findings and declaration of purpose. https://www.law.cornell.edu/uscode/text/7/4801 |
| **23** | 7 U.S. Code § 4808 - National Pork Board. http://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUSC-prelim-title7-section4808&num=0&saved=%7CZ3JhbnVsZWlkOlVTQy1wcmVsaW0tdGl0bGU3LXNlY3Rpb2240ODA5%7C%7C%7C0%7Cfalse%7Cprelim |
| **24** | 7 U.S. Code § 4809 – Assessments. http://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUSC-prelim-title7-section4809&num=0&saved=%7CZ3JhbnVsZWlkOlVTQy1wcmVsaW0tdGl0bGU3LXNlY3Rpb2240ODA5%7C%7C%7C0%7Cfalse%7Cprelim |
| **25** | About Us. Mission and Governance. National Pork Producers Council. http://www.nppc.org/about-us/ |
| **26** | NPPC Revenue Chart 2008 |
| **27** | NPPC Revenue Chart 2014 |
| **28** | U. S. TRADEMARK LAW. RULES OF PRACTICE & FEDERAL STATUTES. U. S. PATENT & TRADEMARK OFFICE. August 9, 2012 |
| **29** | Ibbotson Associates Cost of Capital 2005 Yearbook. Standard and Poor's Compustat. McGraw-Hill Companies, Inc. |
| **30** | LICENSE AGREEMENT effective July 1, 2008, between the AMERICAN ANIMAL HOSPITAL ASSOCIATION and MWI Veterinary Supply Co. |
| **31** | LICENSE AGREEMENT made January 1, 1981 by and between KING FEATURES SYNDICATE, Division of THE HEARST CORPORATION and POPEYES FAMOUS FRIED CHICKEN, INC. |

©2016 CONSOR® Confidential



Pork The Other White Meat
Intellectual Property Valuation
February 26, 2016

**PRIVILEDGED AND CONFIDENTIAL**
Opinion Letter
Page 18

| | |
|---|---|
| **32** | AGREEMENT dated as of June 20, 2000, by and between AGWAY, INC., a Delaware corporation ("Agway") and SOUTHERN STATES COOPERATIVE, INC., a Virginia agricultural cooperative corporation |
| **33** | Agreement, made this 22nd day of September, 1999 (the "Effective Date"), by THE FRESH JUICE COMPANY OF CALIFORNIA, INC. and HANSEN BEVERAGE COMPANY |
| **34** | LICENSE AGREEMENT, made this 24th day of July, 2002 by and between Land O'Lakes, Inc. and Dean Foods Company |
| **35** | SERVICE MARK LICENSE AGREEMENT SERVICE MARK LICENSE AGREEMENT dated as of November 18, 1999 by and between AT&T CORP., a New York corporation ("Licensor"), and KIRI INC. |
| **36** | Google search. "Pork the Other White Meat" |

©2016 CONSOR® Confidential

**PRIVILEDGED AND CONFIDENTIAL**
Opinion Letter
Page 19



## APPENDIX C
## CONSOR Qualifications

CONSOR specializes in providing intellectual property valuations, royalty rate opinions, and intellectual property licensing.  For the past 25 years, we have had a focused approach to this area, basing our opinions on well-documented research and on our proprietary personal knowledge of intellectual property transactions.  In addition, we are active in all major intellectual property and licensing organizations around the world.

CONSOR personnel have served on the Board of Directors of the French Licensing Association, MICEL, as well as being active in the American Intellectual Property Law Association (AIPLA), the American Society of Appraisers (ASA), and The Institute of Property Taxation (IPT).  Our Chairman is a certified official arbitrator/mediator for the World Intellectual Property Organization (WIPO).  We are also active in the American Bankruptcy Institute.  Our Chairman has also served as the Chair and Co-Chair of the Global IP Standards Committee for WIPO and LESI.

CONSOR personnel have served for 15 years on the International Board of Delegates of the Licensing Executives Society (LES).  LES functions as a non-profit professional and educational society encouraging high standards and ethics among persons engaged in the domestic and international licensing of intellectual property rights. In addition, Weston Anson has served as Chairman of the following committees: the Valuation Committee, the Trademark Licensing Committee, the Internet Committee, and the Asset Sales Committee.

CONSOR personnel belong to the International Trademark Association (INTA), and our Chairman has served on multiple committees. Presently, he is serving as section head on the ROP committee. INTA is dedicated to the support and advancement of trademark and related intellectual property concepts.  The organization serves the common purposes of its worldwide members through advocacy, communication, and education to members. He has also served on various IP related committees for the American Bar Association (ABA).

CONSOR personnel have also served on the Board of the Licensing Industry Merchandisers' Association (LIMA) for a decade.  With its main office in New York City, LIMA is a non-profit organization of licensors, manufacturers, and support organizations working to advance professionalism in licensing.  Its main objectives are to institute and maintain a standard of ethical business practices in the licensed merchandise industry and to establish and promote the industry with the government, the business community, other associations, the public, and the trade and consumer media. Members of our firm have served as members of both LES and LESI, as Chairman of the Trademark, Copyright and Character committee, and Chairman of the valuation committee.

Pork The Other White Meat
Intellectual Property Valuation
February 26, 2016

**PRIVILEDGED AND CONFIDENTIAL**
Opinion Letter
Page 20

CONSOR®
Intellectual Asset Management

Some of our clients over the years include:

      
      
      
      
      
      
      
      
       
      

Our professionals have published well over 100 articles worldwide and are active in all of the major international trademark and licensing associations as speakers and/or officers.  Our Chairman has also published a series of six books on the topic of intellectual property valuation for the American Bar Association. We travel extensively, counseling major multi-national corporations and small companies in the U.S. and overseas.

# Exhibit 1

| Summary of Findings | | | |
|---|---|---|---|
| | **PTOWM Valuation (Indefinite Life)** | **PTOWM Valuation (20 Year Useful Life)** | **PTOWM Valuation (5 Year Useful Life)** |
| *Value of PTOWM Source:* | *Exhibit 2* | *Exhibit 3* | *Exhibit 4* |
| *Present Value of Acquisition Payments Source:* | *Exhibit 5* | *Exhibit 5* | *Exhibit 5* |
| Value of PTOWM at July 1, 2006 | $17,558,403 | $9,520,460 | $2,553,595 |
| Present Value (at July 1, 2006) of Payments to Acquire PTOWM (through 2016) | $23,829,385 | $23,829,385 | $23,829,385 |
| Payments in Excess of Value | $6,270,982 | $14,308,925 | $21,275,790 |

CONFIDENTIAL
© 2016 CONSOR®, La Jolla, CA

## Exhibit 2

**Valuation of Pork the Other White Meat - Relief from Royalty Method - Perpetual Life Valuation**

| (for the year ended December 31, unless otherwise noted) | 2004 | 2005 | Historical 2006 (Jan 1 - Jun 30) | 2006 (July 1 - Dec 31) | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Forecast 2015 | 2016 (Jan 1 - Jun 30) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| National Pork Board Revenue | 61 188 000 | 63 271 000 | 30 105 011 | 30 603 989 | 63 088 000 | 67 395 000 | 57 861 979 | 71 461 947 | 83 665 879 | 83 182 85 | 87 440 953 | 98 084 623 | 101 242 948 | 51 965 958 |
| growth % | | | | | 3.9% | 6.8% | -14.1% | 23.5% | 17.1% | -0.6% | 5.1% | 12.2% | 3 2% | |
| Reasonable Royalty Rate | | | | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% |
| **Hypothetical Royalty Charge** | | | | 281,557 | 580,410 | 620,034 | 532,330 | 657,450 | 769,726 | 765 276 | 804,457 | 902,379 | 931,435 | 478,087 |
| Less: Taxes @  0% | | | | - | - | - | - | - | - | - | - | - | - | - |
| **After Tax Hypothetical Royalty Charge** | | | | 281 557 | 580 410 | 620 034 | 532 330 | 657 450 | 769 726 | 765 276 | 804 457 | 902 379 | 931 435 | 478 087 |
| Discount Period (midpoint) | | | | 0.25 | 1 00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 9.75 |
| Discount Factor @  7.25% | | | | 0.98 | 0.93 | 0.87 | 0.81 | 0.76 | 0.70 | 0.66 | 0.61 | 0.57 | 0.53 | 0.5053 |
| **PV of Royalty Income** | | | | 276,633 | 541 019 | 538,885 | 431,384 | 496,762 | 542,281 | 502 701 | 492,716 | 515,330 | 495,966 | 241,574 |

| Net PV of Cash Flow | 5,075,251 |
|---|---|

| Terminal Value | |
|---|---|
| Terminal Period Cash Flow[1] | 947 632.19 |
| Discount Rate | 7% |
| Terminal Growth Rate[2] | 3.2% |
| Terminal Value | 24 271 612 |
| Discount Factor[3] | 0.51 |
| PV of Terminal Value | 12 483 152 |

| Trademarks Valuation | |
|---|---|
| PV of Forecast Cash Flows | 5 075 251 |
| PV of Terminal Value | 12 483 152 |
| **Pork the Other White Meat** | **17,558,403** |

*Notes*
*1* National Pork Board Cash flows for the twelve months ended June 30  2016
*2* Long-term US rate of inflation (Source: Doc 18)
*3* The discount factor for the terminal value is calculated using the midpoint of the twelve months ended June 30  2016. This is a discount period 9.5 years from the valuation date of July 1  2006.

CONFIDENTIAL
© 2016 CONSOR® La Jolla  CA

**Exhibit 3**

Valuation of Pork the O her White Meat - Relief from Royalty Method - 20 Year Useful L fe

| (for the year ended December 31, unless otherwise noted) | 2004 | 2005 | 2006 (Jan 1 - Jun 30) *Historical* | 2006 (July 1 - Dec 31) | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 *Forecast* | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 (Jan 1 - Jun 30) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nat onal Po k Boa d Revenue | 61,188 000 | 63 271,000 | 30,105,011 | 30,603 989 | 63 088,000 | 67,395,000 | 57,861 979 | 71 461,947 | 83,665 879 | 83,182,185 | 87 440,953 | 98,084 623 | 102 823,976 | 107,792,330 | 113,000 751 | 118 460,836 | 124,184,748 | 128,183 497 | 132 311,006 | 136,571 420 | 140,969,020 | 145 508,222 | 150,193 587 | 76,877,802 |
| g owth % |  |  |  |  | 3 9% | 6 8% | 14 1% | 23 5% | 17 1% | -0 6% | 5 1% | 12 2% | 4 8% | 4 8% | 4 8% | 4 8% | 4 8% | 3 2% | 3 2% | 3 2% | 3 2% | 3 2% | 3 2% | 3 2% |
| Reasonable Royalty Rate |  |  |  | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% | 0 9% |
| Hypothetical Royalty Charge |  |  |  | 281,557 | 580 410 | 620,034 | 532 330 | 657,450 | 769,726 | 765 276 | 804,457 | 902,379 | 945 981 | 991,689 | 1,039,607 | 1,089 840 | 1 142,500 | 1,179 288 | 1,217,261 | 1 256,457 | 1,296 915 | 1,338,676 | 1,381,781 | 707 276 |
| Less Taxes @ 0% |  |  |  | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| After Tax Hypothetical Royalty Charge |  |  |  | 281,557 | 580 410 | 620,034 | 532 330 | 657,450 | 769,726 | 765 276 | 804,457 | 902,379 | 945 981 | 991,689 | 1,039,607 | 1,089 840 | 1 142,500 | 1,179 288 | 1,217,261 | 1 256,457 | 1,296 915 | 1,338,676 | 1,381,781 | 707 276 |
| D scount Pe od (m dpo nt) |  |  |  | 0.25 | 1 00 | 2.00 | 3.00 | 4 00 | 5.00 | 6 00 | 7.00 | 8.00 | 9 00 | 10.00 | 11.00 | 12 00 | 13.00 | 14.00 | 15 00 | 16.00 | 17 00 | 18.00 | 19.00 | 9.75 |
| D scount Facto @ 7 25% |  |  |  | 0.98 | 0 93 | 0.87 | 0.81 | 0 76 | 0.70 | 0 66 | 0.61 | 0.57 | 0 53 | 0.50 | 0.46 | 0 43 | 0.40 | 0.38 | 0 35 | 0.33 | 0 30 | 0.28 | 0.26 | 0.5053 |
| PV of Roya ty Income |  |  |  | 276,633 | 541 019 | 538,885 | 431 384 | 496,762 | 542,281 | 502 701 | 492,716 | 515,330 | 503 711 | 492,354 | 481,254 | 470 403 | 459,797 | 442 520 | 425,892 | 409,889 | 394 487 | 379,664 | 365,398 | 357 381 |

| Net PV of Cash Flow | 9 520,460 |
|---|---|

CONFIDENTIAL
© 2016 CONSOR®, La Jolla, CA

# Exhibit 4

| Valuation of Pork the Other White Meat - Relief from Royalty Method - 5 Year Useful Life | | | | Historical | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *(for the year ended December 31, unless otherwise noted)* | | 2004 | 2005 | 2006 (Jan 1 - Jun 30) | 2006 (July 1 - Dec 31) | 2007 | 2008 | 2009 | 2010 | 2011 (Jan 1 - Jun 30) |
| National Pork Board Revenue | | 61,188,000 | 63,271,000 | 30,105,011 | 30,603,989 | 63,088,000 | 67,395,000 | 57,861,979 | 71,461,947 | 41,489,107 |
| *growth %* | | | | | | 3.9% | 6.8% | -14.1% | 23.5% | |
| Reasonable Royalty Rate | | | | | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% |
| **Hypothetical Royalty Charge** | | | | | 281,557 | 580,410 | 620,034 | 532,330 | 657,450 | 381,700 |
| Less Taxes @ | 0% | | | | - | - | - | - | - | - |
| **After Tax Hypothetical Royalty Charge** | | | | | 281,557 | 580,410 | 620,034 | 532,330 | 657,450 | 381,700 |
| Discount Period (midpoint) | | | | | 0.25 | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 |
| Discount Factor @ | 7.25% | | | | 0.98 | 0.93 | 0.87 | 0.81 | 0.76 | 0.70 |
| **PV of Royalty Income** | | | | | 276,633 | 541,019 | 538,885 | 431,384 | 496,762 | 268,912 |
| **Net PV of Cash Flow** | 2,553,595 | | | | | | | | | |

CONFIDENTIAL
© 2016 CONSOR®, La Jolla, CA

310

# Exhibit 5

| Present Value (as of July 1, 2006) of Payments Made to Acquire PTOWM Through 2016 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(For the Period Commencing July 1 of each year)* | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| National Pork Board Revenue | | 3 000 000 | 3 000 000 | 3 000 000 | 3 000 000 | 3 000 000 | 3 000 000 | 3 000 000 | 3 000 000 | 3 000 000 | 3 000 000 | 3 000 000 |
| Less: Taxes @ | 0% | - | - | - | - | - | - | - | - | - | - | - |
| **After Tax Hypothetical Royalty Charge** | | 3 000 000 | 3 000 000 | 3 000 000 | 3 000 000 | 3 000 000 | 3 000 000 | 3 000 000 | 3 000 000 | 3 000 000 | 3 000 000 | 3 000 000 |
| Discount Period (midpoint) | | 0.00 | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 |
| Discount Factor @ | 7% | 1.00 | 0.93 | 0.87 | 0.81 | 0.76 | 0.70 | 0.66 | 0.61 | 0.57 | 0.53 | 0.50 |
| **PV of Royalty Income** | | **3,000,000** | **2,797,203** | **2,608,114** | **2,431,808** | **2,267,420** | **2,114,145** | **1,971,231** | **1,837,977** | **1,713,732** | **1,597,885** | **1,489,870** |

| Net PV of Cash Flow | 23,829,385 |
|---|---|

CONFIDENTIAL
© 2016 CONSOR® La Jolla CA

**Exhibit 6**

| Assumptions | | Source |
|---|---|---|
| Reasonable Royalty for PTOWM | 0.92% | Exhibit 8 |
| Valuation Date | July 1, 2006 | Doc 2 |
| Tax Rate | 0% | Note 1 |
| Discount Rate | 7.25% | Doc 29 |
| National Pork Board Revenue Growth (Yrs. 1-5) | 4.83% | Note 2 |
| National Pork Board Long-Term Revenue Growth | 3.22% | Note 3 |

*Notes*

1  The Board is exempt from income tax pursuant to a Private Letter Ruling received from the Internal Revenue Service, dated August 28, 1987. Therefore there is no income tax filing requirements for the Board. (Source: Doc 10)

2  From 2004 through 2014 the National Pork Board had a compound annual growth rate of 4.83%. (See Exhibit 9) We have assumed this would remain consistent for the first 5 years of the forecast period. (2015 - 2019)

3  From 2020 through the end of the forecast period we have assumed that revenue growth would revert to 3.22%, the U.S. long-term rate of inflation (1913-2013). Source: Doc 18

CONFIDENTIAL
© 2016 CONSOR®, La Jolla, CA

**Exhibit 7**

| Historical Effective Royalty Payments | | | | | | |
|---|---|---|---|---|---|---|
| **Year Ended June 30** | **2004** | **2005** | **2006** | **2007** | **2008** | **2009** |
| National Pork Board Revenue[1][2] | 59,850,551 | 62,136,663 | 60,789,153 | 61,888,723 | 65,316,626 | 62,574,840 |
| PTOWM Royalty Payment[3] | 818,451 | 818,451 | 818,451 | 818,451 | 1 | 1 |
| Effective Royalty Rate | 1.37% | 1.32% | 1.35% | 1.32% | 0.00% | 0.00% |
| **Effective Royalty Rate Over Life of Contract** | **0.88%** | | | | | |

*Notes*

**1** The National Pork Board reports their financial statements with a fiscal year ending on December 31. Since each contract year under the 2004 Pork the Other White Meat "PORK and Design" Amended and Restated Trademark License Agreement commences on July 31 we have adjusted the National Pork Board revenues to estimate each years revenue for the twelve months ended June 30th. In adjusting the National Pork Board financials we have assumed that revenues were generated evenly throughout the year.

**2** National Pork Board financial statements for calendar year 2003 were not available on the website www.pork.org. To estimate revenues for the twelve months ended June 30, 2004, we projected revenues for calendar year 2003 using the National Pork Board's compound annual revenue growth rate of 4.83% from 2004 through 2014. This resulted in estimated revenues for calendar year 2003 of $58,367,728.

**3** Source: Doc 4

CONFIDENTIAL
© 2016 CONSOR®, La Jolla, CA

## Exhibit 8

| Royalty Rate Analysis Summary | | |
|---|---|---|
| *Review of available trademark licensing data pertaining to PTOWM* | | |

| Comparable Payment Process Patent License Agreements | | *Source:* |
|---|---|---|
| Minimum | 0.10% | Exhibit 9 |
| **Median** | **0.92%** | **Exhibit 9** |
| Average | 1.19% | Exhibit 9 |
| Maximum | 3.20% | Exhibit 9 |

| Average Effective Royalty for PTOWM Based on 2004 License Agreement | | |
|---|---|---|
| Average Effective Royalty | 0.88% | Exhibit 7 |

| Concluded Royalty Rate | 0.92% | |
|---|---|---|

CONFIDENTIAL
© 2016 CONSOR®, La Jolla, CA

## Exhibit 9

| Comparable License Agreements | | | | | |
|---|---|---|---|---|---|
| **Licensor** | **Licensee** | **Date** | **Description of Agreement** | **Royalty Rate** | *Source* |
| American Animal Hospital Association | MWI Veterinary Supply Co. | 2008 | License agreement granting the right to use the AAHA MARKETLINK mark and AAHA name  membership and mailing lists. | 0.10% | *Doc 30* |
| King Features Syndicate; The Hearst Corp. | Popeyes Famous Fried Chicken  Inc. | 1981 | License agreement granting the right to use the Licensed Trademarks in connection with the  operation of restaurants under the name POPEYES specializing in the sale of food items such as fried chicken. | 0.50% | *Doc 31* |
| Agway  Inc. | Southern States Cooperative Inc. | 2000 | License agreement granting Southern States Cooperative  a farmer-owned agricultural supply cooperative  the right to use the Agway trademarks | 0.84% | *Doc 32* |
| Gary Hansen  Anthony Kane  and Burton S. Rosky  as Trustees for the benefit of Hansens Juices  Inc. | Hansens Juice Creations | 1996 | License to use the Trademark in conjunction with the manufacture  sale and distribution of fresh brewed coffee  coffee flavored drinks  coffee beans and/or ground coffee  food spreads  and baked goods | 1.00% | *Doc 33* |
| Land O' Lakes  Inc. | Dean Foods Co. | 2002 | License agreement granting the right to use the Licensed Trademarks in connection with the marketing and sale of refrigerated dairy products | 1.50% | *Doc 34* |
| AT&T Corp. | Kiri Inc. | 1999 | License agreement granting the right to use the ATT trademark and slogan "It's all within your reach." | 3.20% | *Doc 35* |

| | |
|---|---|
| Minimum | 0.10% |
| **Median** | **0.92%** |
| Average | 1.19% |
| Maximum | 3.20% |

CONFIDENTIAL
© 2016 CONSOR®  La Jolla  CA

315

**Exhibit 10**

| National Pork Board Historical Income Statements | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Years Ended December 31,* | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| *Source* | *Doc 5* | *Doc 6* | *Doc 7* | *Doc 8* | *Doc 9* | *Doc 10* | *Doc 10* | *Doc 11* | *Doc 12* | *Doc 13* | *Doc 15* |
| Revenue | | | | | | | | | | | |
| Producer Checkoff | 60,270,000 | 60,868,000 | 57,518,000 | 59,426,000 | 63,779,000 | 55,986,635 | 68,454,914 | 81,339,189 | 81,022,411 | 84,870,817 | 95,275,055 |
| Other Revenue | | | | | | | | | | | |
| State Pork Producer Associations | | | | | | 755,690 | 740,881 | 1,174,145 | 1,424,612 | 1,442,626 | 1,051,974 |
| Interest | | | | | | 269,810 | 336,759 | 790,413 | 309,442 | 114,029 | 92,956 |
| Other, Net | | | | | | 849,844 | 1,929,393 | 362,132 | 425,720 | 1,013,481 | 1,664,638 |
| Total Other Revenue | 918,000 | 2,403,000 | 3,191,000 | 3,662,000 | 3,616,000 | 1,875,344 | 3,007,033 | 2,326,690 | 2,159,774 | 2,570,136 | 2,809,568 |
| **Total Revenue** | **61,188,000** | **63,271,000** | **60,709,000** | **63,088,000** | **67,395,000** | **57,861,979** | **71,461,947** | **83,665,879** | **83,182,185** | **87,440,953** | **98,084,623** |
| Expenses | | | | | | | | | | | |
| Mandatory Distribution to State Producer Associations | 11,896,000 | 11,983,000 | 11,391,000 | 11,502,000 | 12,403,000 | 11,235,530 | 13,324,879 | 15,816,560 | 15,955,075 | 16,764,515 | 18,851,786 |
| Demand Enhancement | 24,503,000 | 30,907,000 | 27,572,000 | 25,935,000 | 26,879,000 | 31,092,348 | 22,825,797 | 39,233,644 | 37,484,087 | 40,496,025 | 34,267,645 |
| Science and Technology | 7,346,000 | 7,830,000 | 15,597,000 | 8,717,000 | 8,418,000 | 7,172,137 | 5,880,262 | 8,378,033 | 10,024,126 | 11,807,127 | 10,689,360 |
| Shareholder Outreach | 3,777,000 | 4,495,000 | 4,337,000 | 4,518,000 | 4,978,000 | 4,392,486 | 3,992,260 | 8,300,223 | 11,114,022 | 9,927,291 | 8,176,729 |
| Channel Outreach | | | | | | | | | | 3,586,024 | 1,459,606 |
| Communications | 2,169,000 | 2,145,000 | 2,132,000 | 2,039,000 | 2,288,000 | 2,658,749 | 1,342,803 | 1,894,398 | 2,227,035 | 2,028,691 | 2,743,914 |
| Policy and Management | 3,732,000 | 4,810,000 | 5,587,000 | 5,837,000 | 5,053,000 | 7,192,681 | 6,202,510 | 5,278,569 | 5,085,522 | 5,558,176 | 6,091,844 |
| Interest Expense | - | - | 1,066,000 | 2,104,000 | 2,043,000 | 1,978,421 | 1,909,465 | 1,835,853 | 1,757,274 | 1,673,390 | 1,583,844 |
| **Total Expenses** | **53,423,000** | **62,170,000** | **67,682,000** | **60,652,000** | **62,062,000** | **65,722,352** | **55,477,976** | **80,737,280** | **83,647,141** | **91,841,239** | **83,864,728** |
| **Total Surplus for Period** | **7,765,000** | **1,101,000** | **(6,973,000)** | **2,436,000** | **5,333,000** | **(7,860,373)** | **15,983,971** | **2,928,599** | **(464,956)** | **(4,400,286)** | **14,219,895** |

CONFIDENTIAL
© 2016 CONSOR®, La Jolla, CA

316

# Exhibit 11

| National Pork Board Historical Balance Sheet | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Source | Doc 5 | Doc 6 | Doc 7 | Doc 8 | Doc 9 | Doc 10 | Doc 10 | Doc 11 | Doc 12 | Doc 13 | Doc 15 |
| **Assets** | | | | | | | | | | | |
| **Current Assets** | | | | | | | | | | | |
| Cash and Cash Equivalents | | | | | | 798,290 | 298,010 | 2,603,879 | 1,089,981 | 2,089,192 | 1,710,621 |
| Short-Term Investments | | | | | | 27,733,479 | 42,114,743 | 44,465,243 | 46,194,558 | 42,621,617 | 51,023,543 |
| Cash & Short-Term Investments Total | 36,188,000 | 37,928,000 | 30,865,000 | 33,215,000 | 38,480,000 | 28,531,769 | 42,412,753 | 47,069,122 | 47,284,539 | 44,710,809 | 52,734,164 |
| | | | | | | | | | | | |
| Investments, Designated for Payment of Deferred Compensation | | | | | | | 83,037 | 83,321 | 86,221 | | |
| Accounts Receivable | | | | | | 106,194 | 71,135 | 76,860 | 173,410 | 182,108 | 318,086 |
| Prepaid Expenses | | | | | | 200,108 | 336,150 | 294,729 | 428,355 | 382,048 | 511,395 |
| Accounts Receivable / Other Assets Total | 1,102,000 | 1,472,000 | 482,000 | 379,000 | 407,000 | 306,302 | 490,322 | 454,910 | 687,986 | 564,156 | 829,481 |
| **Current Assets** | 37,290,000 | 39,400,000 | 31,347,000 | 33,594,000 | 38,887,000 | 28,838,071 | 42,903,075 | 47,524,032 | 47,972,525 | 45,274,965 | 53,563,645 |
| | | | | | | | | | | | |
| **Leasehold Improvements and Equipment** | | | | | | | | | | | |
| Leasehold Improvements | | | | | | 703,219 | 728,790 | 781,027 | 802,811 | 802,811 | 1,251,632 |
| Furniture, Equipment and Automobiles | | | | | | 600,005 | 607,214 | 615,697 | 592,274 | 592,274 | 723,254 |
| Data Processing Equipment | | | | | | 2,286,965 | 1,771,383 | 2,296,734 | 2,143,111 | 2,333,717 | 2,548,946 |
| Total Leasehold Improvements and Equipment | | | | | | 3,590,189 | 3,107,387 | 3,693,458 | 3,538,196 | 3,728,802 | 4,523,832 |
| Less Accumulated Depreciation | | | | | | 2,822,605 | 2,530,628 | 2,926,536 | 2,859,411 | 3,162,348 | 3,323,537 |
| Total Leasehold Improvements and Equipment (Net) | 516,000 | 496,000 | 35,670,000 | 35,616,000 | 35,648,000 | 767,584 | 576,759 | 766,922 | 678,785 | 566,454 | 1,200,295 |
| | | | | | | | | | | | |
| Long Term Securities | | | | | | | | | | | 1,977,223 |
| Investments, Designated for Payment of Deferred Compensation | | | | | | 555,518 | 503,255 | 440,964 | 392,097 | 420,040 | 343,887 |
| Intangibles, Trademarks | | | | | | 34,673,440 | 34,673,440 | 34,673,440 | 34,673,440 | 34,673,440 | 34,673,440 |
| **Total Assets** | 37,806,000 | 39,896,000 | 67,017,000 | 69,210,000 | 74,535,000 | 64,834,613 | 78,656,529 | 83,405,358 | 83,716,847 | 80,934,899 | 91,758,490 |
| **Liabilities** | | | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | | | |
| Current Maturities of Long-Term Debt | | | | | | 1,054,931 | 1,126,139 | 1,202,154 | 1,283,299 | 1,369,922 | 1,462,391 |
| Deferred Compensation, Current Portion | | | | | | | 82,166 | 83,321 | 86,221 | | 100,000 |
| Accounts Payable | 5,004,000 | 5,218,000 | 8,222,000 | 8,404,000 | 9,011,000 | | | | | | |
| Research Grants Payable | 4,186,000 | 4,988,000 | 5,383,000 | 5,883,000 | 6,258,000 | | | | | | |
| Accounts and Grants Payable | 9,190,000 | 10,206,000 | 13,605,000 | 14,287,000 | 15,269,000 | 11,164,458 | 10,102,800 | 12,600,151 | 13,059,016 | 17,404,013 | 15,242,645 |
| Accrued Expenses | | | | | | 1,543,201 | 1,489,609 | 2,091,470 | 3,527,863 | 2,287,226 | 2,060,572 |
| Deferred Revenues | 62,000 | 35,000 | | | | 256,963 | 141,585 | 54,111 | 202,771 | 70,524 | 415,749 |
| **Total Current Liabilities** | 9,252,000 | 10,241,000 | 13,605,000 | 14,287,000 | 15,269,000 | 14,019,553 | 12,942,299 | 16,031,207 | 18,159,170 | 21,131,685 | 19,281,357 |
| | | | | | | | | | | | |
| Deferred Compensation, Less Current Portion | | | | | | 463,870 | 505,208 | 438,684 | 370,465 | 386,210 | 302,624 |
| Long Term PTOWM/Long Term Debt, Less Current Maturities | | | 30,730,000 | 29,805,000 | 28,816,000 | 27,760,902 | 26,634,763 | 25,432,609 | 24,149,310 | 22,779,388 | 21,316,998 |
| **Total Liabilities** | 9,252,000 | 10,241,000 | 44,335,000 | 44,092,000 | 44,085,000 | 42,244,325 | 40,082,270 | 41,902,500 | 42,678,945 | 44,297,283 | 40,900,979 |
| **Fund Balance** | | | | | | | | | | | |
| Designated | 5,329,000 | 5,329,000 | 6,115,000 | 7,114,000 | 8,217,000 | 7,886,777 | 7,831,962 | 7,777,146 | 8,777,146 | 7,777,146 | 17,777,146 |
| Undesignated | 23,225,000 | 24,326,000 | 16,567,000 | 18,004,000 | 22,233,000 | 14,703,511 | 30,742,297 | 33,725,712 | 32,260,756 | 28,860,470 | 33,080,365 |
| **Total Fund Balance** | 28,554,000 | 29,655,000 | 22,682,000 | 25,118,000 | 30,450,000 | 22,590,288 | 38,574,259 | 41,502,858 | 41,037,902 | 36,637,616 | 50,857,511 |
| | | | | | | | | | | | |
| **Total Liabilities and Fund Balance** | 37,806,000 | 39,896,000 | 67,017,000 | 69,210,000 | 74,535,000 | 64,834,613 | 78,656,529 | 83,405,358 | 83,716,847 | 80,934,899 | 91,758,490 |

*Notes*

*1* In their Financial Report for the year ended December 31, 2010, the National Pork Board changed their "Long Term PTOWM" line item to "Long Term Debt, Less Current Maturities."

CONFIDENTIAL
© 2016 CONSOR®, La Jolla, CA

## 2006 Email from Steve Murphy, CEO of Pork Board

a. Valuations would not be useful for establishing Fair Market Value of PTOWM.

b. Accepting the appraisals would have caused problems because of FOIA potential.

c. Allowing the valuation data into the public domain would be harmful and he "would prefer to keep the information sealed."

**From:**   Steve Murphy

**Sent:**   Tuesday, March 07, 2006 3:29 PM

**To:**   Jim Meimann; Steve Meyer

**Subject:** RE: PTOWM Valuations

Steve:

We realized early on in the process that the valuations would add little value to determining fair market value, and in fact accepting the appraisals have made the negotiating and approval process more problematic due to FOIA potential. Therefore, I never saw the appraisals nor took possession of them, so we elected to use a rebuild cost as our strategy for determining FMV. Mark Williams coordinated the appraisal work and frankly I'm not sure if even he took possession of them. It's my view that getting this data into the public domain can only do us harm at this point and would prefer to keep the information sealed. NPPC has an appraisal they may be able to share with you.

Steve Murphy

## 2003 Email from Steve Murphy, CEO of Pork Board

a. Concludes that NPPC wants $881,000 a year, but believes the deal they've suggested can't be sold to AMS (or Alan Guebert).

b. So Pork Board CEO offers alternative formula *for the same payout* so that NPPC can "get the money they need for the next four years."

c. "[L]et's be honest, 4 years from now these other issues should be behind us."

**Steve Murphy**

| | |
|---|---|
| **From:** | Steve Murphy |
| **Sent:** | Wednesday, September 17, 2003 5:49 PM |
| **To:** | Craig Christensen |
| **Cc:** | Steve Murphy |
| **Subject:** | RE: PTOWM |

Craig:

I have read this a number of times, and still not able to fully understand what it is they are offering. Without the information you gave me on the phone the other day, I wouldn't have a clue.

Clearly what they are wanting to do is get immediate cash flow at a rate of $881,000 per year, but they have created a process that I believe would have a hard time passing muster. Paying $1.6 million for an option that provides an agreement worth $1.7 million does not sound like a valid business deal. I believe AMS and Alan Guebert may have difficulty accepting that concept.

Let me throw out an alternative:

1. A four year extension on the current two year agreement.
2. NPB pays $881,00/year for PTOWM rights for years 1 through 4 of the agreement ( gets them the cash they want) 3. Years 5 and 6 are at the current rate of $1/year (let's be honest, 4 years from now these other issues should be behind us.) 4. Deductions are made to the $1.6 million reserve at the same rate of the license payments. When the reserve is zero, NPPC has no future rights to it.

This would allow NPPC to get the money they need for the next four years. NPB could use the reserve to pay for basically the first couple of years, limiting the direct impact on current budget challenges. And the 2 free years are deferred to a point in time we can all live with. I think this has a chance to be sold to AMS, although the press may find ways to chew it up. Your thoughts?

Steve

## National Pork Board Conference Call Minutes (February 2006)

a. PTOWM was "built with producer dollars."

b. PTOWM's "value was built with a lot of goodwill and producer dollars."

c. "The valuations were not brought to the discussion because there was only one buyer, which was [the Pork Board]."

d. The "interest was in maintaining the size of the industry revenue pie … for both organizations."

**Board Conference Call**
**February 8, 2006**
**8:00 a.m. (CT)**

**CALL TO ORDER:**  President Danita Rodibaugh called the meeting to order at 8:00 a.m. on February 8, 2006.

**ROLLCALL**  Attending the meeting were the following Pork Board members: J. Adams, T. Bierman, C. Christensen, D. Culbertson, C. Hein, L. Harrison, D. Johnson, D. Michael, W. Peugh, M. Reding, D. Rodibaugh, B. Samson, S. Weaver, and B. Zimmerman. Absent: D. Bettin.

The following NPB staff were in attendance: S. Murphy, J. Meimann, and L. Garner.  Also attending was AMS representative Shethir Mustafa.

**MURPHY CONTRACT**  Danita Rodibaugh announced to the board that an agreement was reached with Steve Murphy, CEO on terms for a long time contract renewal. The contract will be forwarded to USDA for their approval. Rodibaugh thanked the Compensation Committee and the board for their support. She noted that we can now focus on the opportunities and challenges ahead.

Murphy thanked the board for their confidence in him and noted that he looks forward to his continuing role as CEO.

**PTOWM PURCHASE**  Steve Murphy and Danita Rodibaugh reported on the recent meeting with NPPC regarding the purchase of Pork. The Other White Meat. Evaluations on the replacement costs were completed and presented to NPPC at the meeting in Omaha on February 6.  Ultimately, full agreement on the terms below was reached by both NPB (willing buyer) and NPPC (willing seller).
- Purchase price is $34.5M spread over 20 years.
- Interest locked in at 6.75%.
- Total price over 20 years of $60M.
- Protecting NPB's ability to pay over time - the checkoff rate would not drop below $0.40%, a level that future Pork Boards would not be able to pay.
- If the checkoff did fall below the .40, NPB could revert back to the 3 years remaining on the present PTOWM Licensing Agreement and would suspend any future purchase payments.  At that time, NPB could walk away; renegotiate the purchase; or build another new brand. Equity paid would remain intact; NPB wouldn't lose what it's invested
- Locking in a $0.40% rate is important to both NPB and NPPC, as it protects NPB's ability to pay into the future, and protects the stream of payments to NPPC.

- The agreement would be dependent on approval of both Boards and USDA.

Murphy commented that, going into the process, we were committed to get the best price for producers. Rodibaugh noted that since this was built with producer dollars, it was important that all producers, through the Pork Board, own PTOWM. She had heard comments ever since the separation that it should be something all producers own. Owning PTOWM would allow us to build it even further. This is the best point in time to secure ownership before we continue to invest more dollars in it and grow the value even more.

Murphy noted that when considering the opportunity to either rebuild a new brand or purchase PTOWM the National Pork Board was the only buyer and that costs to rebuild a brand became the driver for establishing value. Rather than building a new brand, purchasing the established PTOWM was a quicker, better, and cheaper way to go. The purchase price of the PTOWM brand was 5% below what it would cost to build a replacement brand.

Danita explained that when we looked at placing a value on PTOWM we needed to look at it in many different ways. Value was built with a lot of goodwill and producer dollars and those things are hard to put a price on. A number of factors went into evaluating the replacement cost of the PTOWM brand, including switching all of our materials, doing ideation, and then launching a new concept.

Ultimately, it was agreed that the current value of PTOWM is $34.5M, which is less than the replacement cost. All related items to this brand would be part of the purchase agreement, including designs and terminology built around PTOWM. To pay for this over time the price had to be what future boards can afford. Thus, it is critical that the checkoff not go below $.40 per $100 value. So a provision was added to protect the ability to pay and still leave enough assets to do significant programming. That provision is this: if the rate drops below $.40 the purchase deal is off, and we have the option to revert back to the remaining 3 year terms of our current PTOWM license agreement. We would also have the option to walk away or re-negotiate the purchase.

Murphy explained that the equity that will have been paid in the purchase price, the part that would go to the principal, would remain intact through the 3-year period of the licensing agreement. In the event of a negotiation for a new purchase price, based on our ability to pay, that equity would be applied towards the purchase price. 3 years gives us time to decide what we want to do. That protects our financial situation.

Murphy noted that they felt all parties were satisfied with where we ended up. The negotiators hope both the NPB and NPPC boards will

324

support the deal, which is dependent on approval from both boards and USDA.

The agency that created and built PTOWM, worked with us on what the real re-branding costs would be. The process took a look at the transition costs over 3 years; the ideation costs; and incremental consumer marketing costs each year over 7 years in order to establish a new brand at approximately the level we are right now with PTOWM. PTOWM is an established brand and we would have a difficult time finding a better solution. Acquiring this at 5% below replacement costs makes sense.

Language on the provision was key to the negotiations. All provisions within the existing licensing agreement between NPPC and NPB would be suspended effective June 30, 2006. However, there were good reasons to default to the 3 remaining year's provisions if the rate dropped below $0.40%. That's because there is a scaled pricing structure: in the first year of the remaining 3 years it's $818,000 if the checkoff rate is 35 cents or higher; if it goes below 35 cents the rate goes down to $616,000; at 30 cents it's a reduced price depending on the level to which the rate might be reduced.

NPPC seemed to be pleased, as this solves some real financial problems for them for the foreseeable future. They did express some concern over the provision to protect the $.40 cents because the Pork Act Delegates control the rate and NPPC is at their mercy.

The valuations were not brought to the discussion because there was only one buyer, which was NPB. Through the process of appraisals, it became clear that brand-rebuilding costs were what mattered. Dave Culbertson noted that from a producer standpoint, it was felt that NPB has added a lot of equity to PTOWM over the many years of investments. Considering that, the price is very reasonable.

**A motion was made by Steve Weaver to approve the terms that were agreed upon by NPPC and NPB pending AMS approval. Seconded by Lynn Harrison.**

John Adams made a friendly amendment that he would like to see this proposal in black and white. Murphy explained that is was a gentlemen's agreement at this point and that a more formal business proposal was being prepared to submit to USDA's Barry Carpenter. He noted that both NPPC and NPB agreed to talk about it in only in general terms to at this time, pending USDA's decision.

John Adams withdrew the request.

Danita noted that it was not for lack of trust in the Board that there was not full transparency on the detailed terms. However, it is such a sensitive issue that the deal must be protected until we can talk to

Barry Carpenter at USDA giving him the straight facts. That meeting is scheduled for next week.

Danita noted that the basis on which the negotiations occurred was the desire of the Pork Board to control the ways it invests its money. We do not want to be spending precious checkoff dollars building a brand owned by someone else, which, if made more valuable, would increase the fees NPB would be forced to pay to use it. It's an indefensible position. On the other hand, NPPC owns an asset NPB wants. NPPC needs a revenue stream and selling a valuable asset provides the opportunity for it to solve an important issue. So, NPB buying PTOWM provides a win-win scenario for both organizations.

There had been general consensus by all persons at the negotiating table that there was no interest in a checkoff reduction for its own sake. Rather, the interest was in retaining the size of the industry revenue pie and capturing as much opportunity with those dollars as possible for both industry organizations. Through the last checkoff reduction, the industry truly shrunk the size of the pie. Steve noted that the way the agreement is structured, the reduction of the checkoff is not in NPPC's interest. Based on their own numbers, if the checkoff rate were to go down a nickel NPPC would only realize $1M. This is because they would only capture in SIP a percentage of the reduced checkoff dollars and of those they would have to return 40% to States. So, in order to equal the $3M per year revenue stream from sale of PTOWM, the checkoff rate would have to go down $0.15%. Danita noted that keeping the checkoff rate at $0.40% was also important to states, unless you are a state who has 80-90% of your industry signed up on SIP.

Tim Bierman, Resolutions Committee Chair,   reported that we received two Missouri resolutions that are on hold until we know the outcome of this agreement.  Assuming NPPC and AMS agree to this, it looks like MO may pull their resolutions. One of them deals with buying PTOWM and one with reducing the checkoff rate by $0.05%. Bierman explained there were a couple different options: 1) to go ahead and put them in the manual and let MO decide later if they want to withdraw them; or, 2) don't put them in the manuals, but carry them with us to insert them later if we need to. Carol Hein explained that she will take this information back to MO to decide how they want to deal with their resolutions.  It was noted that this information needs to be kept confidential between NPPC and NPB boards until AMS/USDA has had a chance to review it. The Missouri Executive Committee will also need to look at it in order to make the decision on how to handle their resolutions. It may take a while to work through the USDA channels for the approval.  Danita noted that we are hopeful we will have a final answer by Forum.

**MOTION PASSED**

326

Danita thanked Wayne Peugh, Hugh Dorminy and Dave Culbertson for their work on this. She expressed her appreciation of the negotiating experience Steve Murphy brought to the table as well as his input and guidance.

Danita stated that this agreement, in addition to Steve Murphy's contract renewal, will provide a level of long term stability for the industry and for Pork Board that we have not enjoyed for a long time.

Tim Bierman, along with other board members, acknowledged Danita and the team for a job well done, especially for having the foresight to add the checkoff reduction provision language.

Meeting adjourned at 1:05 p.m.

## PTOWM Purchase Negotiations

a. The PTOWM purchase is an "efficient strategy for transferring dollars to the NPPC."

b. The purchase "retains the size of the 'funding pie.'"

c. Defines fair market value as any agreement to terms between a willing buyer and seller.

d. "[T]here is political sensitivity regarding the exchange of funds between the industry's checkoff and policy organization."

e. The Pork Board will offer a "strategy that could ensure a continuous flow of funding for the National Pork Producer's Council ad infinitum."

# PTOWM Purchase Negotiations
## February 6, 2006
## Omaha, Nebraska

### Key Concepts

1. The objective is for the National Pork Board to purchase PTOWM and all associated pork marketing trademarks owned by the National Pork Producers Council at terms that reflect fair market value.
2. Why is market value important? Because the USDA must approve the transaction plus there is political sensitivity regarding the exchange of funds between the industry's checkoff and public policy organization.
3. Fair market value is defined as an agreement to terms between a willing buyer and a willing seller. Valuations, appraisals and market comparisons are mere data points, and do not necessarily translate to fair market value.
4. The NPB negotiating team will select a spokesperson who will speak for the group.
5. Successful negotiators have strong listening and intuition skills, and are always prepared to walk away from the negotiation if the right deal cannot be made. A "poker face" is important as body language can signal a position to the other side and weaken your negotiating leverage.
6. The seller should make the first proposal.

### Strategy

1. The NPB will open the meeting.
   a. Thanking the NPPC for their interest in exploring the sale of PTOWM.
   b. Remind everyone around the table that the industry is anxiously awaiting the outcome of our discussion.
   c. Relay the feedback we've received from producers is that the PTOWM purchase makes a lot of sense because it retains the size of the "funding pie" and is a more efficient strategy for transferring dollars to the NPPC.
   d. Ask the NPPC if they would like to make an opening statement then suggest they put their terms on the table for consideration.
2. The NPPC representatives make their opening statement, followed by a presentation of their proposed terms.
3. After asking clarifying questions, the NPB could react to the NPPC proposal in three different ways; Present a counterproposal, Accept the NPPC offer or ask for a moment to caucus to determine our reaction.
4. The NPB will respond with one of 4 optional proposals. The counter offer will be tailored to offset the NPPC's original proposal.

### The National Pork Board Proposal

1. The NPB proposal will be centered on a "solution" versus a price. The solution is based on a lottery payout philosophy that takes into account price over time at the cost of money versus a solitary focus on present value.
2. When selling the terms to the government, however, the NPB proposal will be centered on present value. Frankly we will be looking at the same number from two different perspectives, tailored to the individual needs of our audience.
3. Additional components of the NPB proposal will include "an ability to pay" clause that deals with future rate reductions as well as a default declaration that they have requested.
4. And finally we will suggest a potential business strategy that could ensure a continuous flow of funding for the National Pork Producers Council ad infinitum.

CONFIDENTIAL
7/24/2007

## Statement of Parke Wilde, Ph.D.

a. Once PTOWM was retired, it would be the duty of officials to cancel the contract.

b. "[T]he existing value of this trademark asset was built in large part with checkoff money, so pork producers are apparently paying twice for the consumer awareness achieved by the slogan."

c. There were no competing bids for the mark to justify a high sale price of $60 million over 20 years.

d. "It was never plausible" that NPPC would walk away from a license renewal if a purchase wasn't made.

e. "The interest rate on the self-financing is greatly inflated."

## Statement of Parke Wilde, Ph.D.

**Introduction**

I am an agricultural economist and associate professor at the Friedman School of Nutrition Science and Policy at Tufts University in Boston, MA. I have a Ph.D. in agricultural economics from Cornell University. For more than 12 years, I have covered federal commodity promotion or "checkoff" programs in my teaching, including a master's level class in U.S. Food Policy (NUTR 303). I provide an overview of these programs in my textbook, *Food Policy in the United States: An Introduction* (Wilde, 2013). I worked for USDA for five years, from 1998 to 2003, in the Economic Research Service, conducting research on the economics of federal nutrition assistance programs. And I like to eat pork.

**History of My Interest in this Issue**

I first became aware of the proposed sale of "The Other White Meat", from the National Pork Producers Council (NPPC) to the National Pork Board (NPB), in late 2005 or early 2006. I requested to see the appraisals justifying the sales price. USDA denied my request, saying the information was pre-decisional and deliberative. Without being able to see the appraisals, it appeared the sale might be greatly overpriced. In a June, 2006, post for a blog that I keep in connection with my teaching on U.S. food policy (Wilde, 2006a), I wrote: "The Council has nobody else to whom it could sell the brand, so it is hard to imagine there are any competitors bidding up the price of the brand. Until the documents are made public, one has to suspect these 'appraisals' are just window dressing for an insider deal to benefit the National Pork Producers Council."

Next, I appealed the decision not to release the appraisals to the administrator of the Agricultural Marketing Service. USDA sent me partly blacked out copies of several documents, which still provided no ability to confirm that the appraisals justified the sale

1

price. In a December, 2006, blog post, I summarized the main problems with the then-public information justifying the sale price (Wilde, 2006b):

> Clearly, therefore, there is an important public interest in having transparent information about the appraisal on which this sale is based. It is difficult to believe that $60 million is truly the fair market value for this sale, for three reasons:
>
> - First, the existing value of this trademark asset was built in large part with checkoff money, so pork producers are apparently paying twice for the consumer awareness achieved by the slogan.
>
> - Second, no buyer other than the National Pork Board would see this slogan as valuable, so there are no competing buyers to bid up the price. What amount do you think pomegranate producers would pay for "The Other White Meat"?
>
> - Third, the documents actually quote an appraised value of $36 million and a sale price of $34.5 million. This value is based on the costs of rebuilding an alternative brand from scratch over seven years. The much higher $60 million figure comes from scheduling payments of $3 million per year for 20 years, with an interest rate of 6.75%, which has the same present value as $34.5 million today….

Over the years, I came to think of this sale as one of the worst examples that I knew of in which USDA oversight had failed to protect the producers whose mandatory assessments make the pork checkoff program possible. When the pork checkoff program later retired "The Other White Meat" as a slogan, without stopping payments on the sale price for the slogan, it appeared to me quite wrong for pork producers to have $3 million per

2

year of their assessments used in this manner. Yet, USDA was unwilling to share the appraisals, and I had no interest or funds to pursue litigation under the Freedom of Information Act (FOIA), so I simply had to give up and set this issue aside.

Years later, in 2012, I heard that the Humane Society of the United States also was seeking information about the sale of "The Other White Meat" slogan. Until 2012, I had no communication with the Humane Society about this issue (nor about any other issue that I can recall). In 2012, and again more recently in January, 2016, the Humane Society shared with me some of the checkoff documents and USDA documents that I had previously requested from USDA without success. The next section of this statement is based on my independent assessment of those documents.

**Assessment of the Sale Price for "The Other White Meat"**

Several things are striking about the analysis and reasoning that were said to justify the $60 million sale price for "The Other White Meat" as a property (to be paid as $3 million per year for 20 years).

1. The sale of "The Other White Meat" was far more costly to the National Pork Board than the option of simply continuing annual payments. The email from Craig Christensen to Steve Murphy (September 13, 2003) justifies a lease rate of $818,000 per year. It never was plausible that the NPPC would walk away from these annual payments as punishment if NPB refused to make a purchase at a high price. The testimony of Neil Dierks confirms that there was no such threat. Yet, in the USDA decision memo approving the sale, by Barry Carpenter on February 28, 2006, USDA says that there was pressure to agree to a sale because NPPC might walk away from the previous annual payments. It is difficult to know what to make of the USDA decision memo. Either USDA had been told (wrongly) that the previous annual payments were in jeopardy or USDA decided (on its own initiative) to argue that

3

they were in jeopardy even though this wasn't really true. Both of those possibilities make the USDA decision memo look quite wrong.

2. There were no competing bids for "The Other White Meat", to justify a high sale price of $60 million over 20 years. All the way back in my 2006 blog post (Wilde, 2006b), it was obvious that no other commodity or industry organization would be willing to pay for this slogan, so the National Pork Board held a terrific bargaining position. The testimony of Neil Dierks confirms that there were no other offers.

3. The interest rate on the self-financing is greatly inflated. For the reasons given earlier, rebuilding a new brand never was the correct way to appraise the price of "The Other White Meat"; but, even if that had been the right approach to appraisal, the actual estimate of the cost of rebuilding the brand was only $36.1 billion. The National Pork Board paid an interest rate much above market rates to justify paying $60 million in total ($3 million per year over 20 years).

4. Much of the value of "The Other White Meat" as a slogan over many years was due to the contributions of the National Pork Board, not the NPPC. For example, advertising paid for by the National Pork Board generated the public awareness of the slogan, which was at the core of the slogan's value as a property.

5. The fair market value of "The Other White Meat" declined further when the major use of the slogan was retired. The National Pork Board can cancel this contract at any time. It would be the duty of NPB and USDA officials to do so when the value of the slogan declined.

**Conclusion**

Several features of this issue would make a reasonable and impartial reader suspect that USDA in 2006 gave willing approval to a sales price that already at the time was clearly inflated. That 2006 oversight was a long time ago, under a different presidential

4

administration. At the time, there was no media interest or public understanding of how checkoff programs really worked.

Now, all of this has changed. The $60 million sales price always was too high to justify, and the fair market value of "The Other White Meat" has now fallen due to disuse. Today, USDA can give a correct economically valid and publically transparent assessment of the value of this property. Any decision to approve an inflated valuation now will be the subject of a great amount of well-informed public discussion. For pork producers in particular, a new USDA endorsement of an inflated valuation will be met with justifiable distress and anger. This issue was formerly one of the worst failures of USDA oversight over checkoff programs, and it would be terrific to see it set right.

Feb 27, 2016

_____              _____
Parke Wilde, Ph.D.                    Date

**Sources**

Wilde, Parke. 2006a. "National Pork Board to purchase 'Other White Meat' brand rights for

$60 million; USDA keeps financial details secret." U.S. Food Policy blog:

http://usfoodpolicy.blogspot.com/2006/06/national-pork-board-to-purchase-other.html

Wilde, Parke. 2006b. "USDA releases partly-blacked-out details about sale of pork

industry's 'Other White Meat' brand" U.S. Food Policy blog:

http://www.usfoodpolicy.blogspot.com/2006/12/usda-releases-partly-blacked-out.html

Wilde, Parke. 2013. *Food Policy in the United States: An Introduction*. London and New

York: Routledge/Earthscan.

6

# National Pork Board to purchase "Other White Meat" brand rights for $60 million; USDA keeps financial details secret

In a deal that is scheduled to take effect July 1, the federal government's National Pork Board plans to purchase rights to the "Other White Meat" brand from the National Pork Producers Council, a private trade association, for $60 million.

The deal will not help pork producers improve demand for their product, because the Pork Board already uses the "Other White Meat" slogan in well-known national advertising campaigns.

Instead, the sale will circumvent federal restrictions on how the National Pork Board may use money that it collects in taxes or mandatory assessments on pork producers and importers. The sale will funnel $3 million each year for 20 years to the National Pork Producers Council, a private industry association whose heavy influence over the federal government's Pork Board has long been controversial. The Council, in turn, can spend the $60 million without federal government oversight.

The general description of the sale was provided in a press release from the National Pork Board in March, and the latest news was reported by Brownfield Ag News on Friday.

The National Pork Board was established by Congress in 1985, and the Board members are appointed by the Secretary of Agriculture. As with other "checkoff" promotion programs, the federal government enforces the collection of the mandatory assessments, amounting in the case of pork to more than $60 million per year. Some pork farmers oppose these industry schemes (see here and here), but even a successful referendum to end the program was overturned through the influence of the Council.

Government and industry officials sometimes describe the Board as a producer self-help organization, but its role as a government program was finally settled by the Supreme Court in a May, 2005, ruling on the related beef "checkoff" program. In this case, the federal government argued -- and the Supreme Court agreed -- that such government sponsored advertising campaigns for dairy, beef, and pork are "government speech" and farmers must pay the mandatory assessments as they would any government tax.

The National Pork Producers Council is a private trade association that gets paid as a subcontractor to the National Pork Board. A USDA Inspector General report (.pdf) in 1999 explained:

> Our evaluation did not disclose material misuse or loss of checkoff funds, but it did find the Board has relinquished too much authority to its primary contractor, the National Pork Producers Council (NPPC), and has placed the NPPC in a position to exert undue influence over Board budgets and grant proposals. The Board has awarded all program grants to the NPPC since 1996. The Board itself has not hired sufficient staff to administer and provide adequate oversight of the checkoff program. The Board employs only two persons (an Executive Vice President and an assistant), to

337

oversee $60 million in annual checkoff collections, distribution, and use. The Board's degree of dependence on the NPPC to administer subcontracts and carry out much of the Board's work resulted in a weakened accountability over contributed funds.

In response to the Inspector General's report and related litigation, USDA began to insist (.pdf) that the Board's operations be strengthened and that contracting relationships between the Pork Board and the National Pork Producers Council have an "arm's length character." For example, the Pork Board staff moved out of the National Pork Producers Council's office to a nearby location leased from the Council.

It is not clear whether the new proposed sale of the "Other White Meat" brand has an "arm's length" character. The press release from the National Pork Board claims that the $60 million sale price is based on unspecified "appraisals." The press release argues that this price reflects the cost of replacing the "Other White Meat" brand, should the Pork Board choose to develop a new brand instead.

That reasoning is questionable, however, because much of the intangible equity in the "Other White Meat" brand comes from the investment of millions of dollars per year in advertising funded by the Pork Board, not by the National Pork Producers Council. The Council has nobody else to whom it could sell the brand, so it is hard to imagine there are any competitors bidding up the price of the brand. Until the documents are made public, one has to suspect these "appraisals" are just window dressing for an insider deal to benefit the National Pork Producers Council.

Clearly, it is important for the public to see these appraisals before the deal is completed. Otherwise, the miscarriage of the public interest will be apparent only after it is too late to reverse the decision.

Unfortunately, in response to repeated inquiries of both program and public information staff at the Agricultural Marketing Service at USDA, nobody would answer my questions or provide the appraisals. Consequently, I filed a Freedom of Information Act request in April, requesting these documents.

The response I received today is clever. It says USDA has found 12 pages of documents that are responsive to my request for information, but 10 of those pages are being withheld from the public for now because they are "pre-decisional" or "deliberative." These will be shared with the public as soon as USDA finalizes the deal -- when the information will be too late to do any good.

What were the 2 pages that USDA did share with me? A photocopy of the National Pork Board's press release from March!

In the never-ending struggle between those who would share information needed for sound public policy, and those who would hide it, I feel that I have been beaten by a real talent.

Perhaps a sharper reporter will pick up this story before the USDA approval is finalized.

### Testimony of Steve Murphy, CEO of the Pork Board

a. States that purchase made business sense "if" the mark was to be the one "on which we built our promotions of the industry's interest."

b. Decision to purchase based on intended use of the mark as the platform on which the Pork Board would build "for the long term."

00009

to determine the best strategy for promoting the industry's interest in the future. And in 2005, I believe it was, we selected the Richard's Group who brought the theme continuing to build around THE OTHER WHITE MEAT as our slogan moving forward.

With both of those things in place and the fact that we were leasing the mark from the National Pork Producers Council, it just made good business sense if we were now going to be in business for the long term and if THE OTHER WHITE MEAT was going to be the mark on which we built our promotions of the industry's interest, then it was much smarter for us to own that mark than to continue leasing it because as we built the value of that mark, the lease price was going to continually go up over time. It was my opinion, and the Board of Directors agreed with me that the best strategy would be to own it.

Q. In reaching that conclusion that the National Pork Board should own the mark THE OTHER WHITE MEAT, had you also made a conclusion that the National Pork Board intended to continue to use the mark THE OTHER WHITE MEAT for the foreseeable future?

Murphy, Steve (Testimony)    Page 9

340

00010

A.    That was the outcome of our review of our marketing strategies:  One, to identify the platform for which we would market going forward and, two, to select an agency that would help us execute that platform and the OTHER WHITE MEAT had been selected as the platform we would build on going forward.  We were committed to it for the long term.

Q.    Having reached a conclusion that the National Pork Board wished to acquire the mark THE OTHER WHITE MEAT, what did you do to implement that decision?

A.    Well, first thing that we did was we had a number of discussions with the Board to get everyone comfortable with the strategy and we did.

The second step was to approach the National Pork Producers Council who owned the mark and inquire about their interest in selling it, and while they had not been thinking about that previously, I think we did generate enough interest that they began to think about it and over a period of time indicated their willingness to sell if we could agree, reach business terms that were acceptable to both parties.

**Murphy, Steve  (Testimony)    Page 10**

341

## 2004 Email from Steve Murphy, CEO of the Pork Board

a.  Relates to NPPC an exchange with AMS about keeping "the review [of the PTOWM license] within their department, and out of OGC."

b.  Expectation is that if OGC attorneys "get their hands on it that a delay is likely."

**From:**     Steve Murphy

**Sent:**     Wednesday, February 25, 2004 9:56 AM

**To:**       Neil Dierks

**Cc:**       Craig Christensen; David Culbertson; Jim Meimann

**Subject:** PTOWM License Update

Neil:

Just a brief update on the disposition of the PTOWM extension agreement. It has been sent to AMS and they are trying to keep the review within their department, and out of OGC. They realize if attorney's at OGC get their hands on it that a delay is likely, and I've given them until March 1 for approval. They had a few questions this morning, but those dealt with language that existed in the original agreement. I simply suggested that if this language was OK in October of 2001, it should be OK now. They agreed, and I should get an answer from them regarding next steps by Friday.

Steve Murphy

## <u>2005 Email from Steve Murphy, CEO of the Pork Board</u>

a. **Discusses $300,000 shortfall for PTOWM annual license fee and directs overspending an account to cover it.**

b. **Directs PTOWM to be classified as an overhead expense rather than a programming expense.**

c. **"[F]rankly, we don't need to lay the [PTOWM license fee] out there for everyone to second guess."**

| | |
|---|---|
| **From:** | Steve Murphy |
| **Sent:** | Friday, June 24, 2005 2:34 PM |
| **To:** | Jim Meimann; Lana Morrissey; Lynette Webster |
| **Cc:** | Dallas Hockman |
| **Subject:** | RE: The Other White Meat License |

Let's overspend this year then see where we fall. I think it should be in overhead versus programming for next year because it's a non-negotiable commitment and frankly we don't need to lay it our there for everyone to second guess.

Steve

-----Original Message-----
**From:** Jim Meimann
**Sent:** Friday, June 24, 2005 2:23 PM
**To:** Lana Morrissey; Lynette Webster
**Cc:** Dallas Hockman; Steve Murphy
**Subject:** The Other White Meat License

Dallas has $500K in his budget for the annual license fee for The Other White Meat. We need to find another $300K, which I don't think was budgeted. Perhaps we should just overspend that account and see where we are at the end of the year, when we typically have some unspent funds.

Should this be considered overhead rather than programming expense? We need to get it into the 2006 budget we're beginning to develop.

*Jim*

**James Meimann**
Sr. VP Governance and Operations
**National Pork Board**
Des Moines, IA
tel: 515-223-2634
fax: 515-223-2646
e-mail: jim.meimann@porkboard.org

1

345

## <u>2004 Email from USDA Official</u>

**Only signed and dated agreements can receive official approval from the agency.**

| From: | Steve Murphy |
|---|---|
| Sent: | Friday, February 27, 2004 10:00 AM |
| To: | Neil Dierks |
| Cc: | Craig Christensen; David Culbertson; Steve Murphy; Jim Meimann |
| Subject: | FW: PTOWM Lic.Agr |
| Importance: | High |

Neil:

FYI...we can execute the agreement at Forum then hand it off to AMS. I will bring a number of clean copies of the agreement. We'll need to set aside a moment or two for signatures.

Steve Murphy

-----Original Message-----
**From:** Kenneth Payne
**Sent:** Friday, February 27, 2004 6:55 AM
**To:** Steve Murphy
**Cc:** Mustafa, Shethir
**Subject:** PTOWM Lic.Agr
**Importance:** High

Steve:

   We have reviewed the agreement and are comfortable with it as written. However, before we can officially approve it, I will need a signed and dated copy. If you can get me a front page and signature page to me today or Monday. We should be able to get the approval letter to you by COB Monday, March 1.

Please give me a call if you have any questions on 202-720-1115.

Thanks....

*Kenneth R. Payne, Chief*

Marketing Programs Branch

USDA, AMS, Livestock and Seed Program

1400 Independence Avenue; SW

STOP 0251

Washington, DC  20250-0251

202-720-1115--Office

202-720-1125--FAX

Kenneth.Payne@usda.gov

347

### National Hog Farmer: *The New NPPC Unveiled*

a.  **NPPC needs an additional $4.7 million dollars annually to be effective.**

b.  **NPPC will not represent all producers, but only those who "choose to play" (i.e., "pay-to-play").**

# The New NPPC Unveiled

**Dale Miller**                                                                                   Feb 15, 2002



Editor's Note: A period of confusion and uncertainty has reigned over the U.S. pork industry for the past 16 months. Set in motion by a controversial referendum on the mandatory pork checkoff, the outcome was challenged, and finally a settlement agreement was negotiated that allowed the mandatory program to continue. The agreement stipulated a distinct separation of the National Pork Board and the

**Editor's Note: A period of confusion and uncertainty has reigned over the U.S. pork industry for the past 16 months. Set in motion by a controversial referendum on the mandatory pork checkoff, the outcome was challenged, and finally a settlement agreement was negotiated that allowed the mandatory program to continue.**

**The agreement stipulated a distinct separation of the National Pork Board and the National Pork Producers Council (NPPC). In our January issue, we presented an update on restructuring efforts (See "Industry Infrastructure Revamped," p. 6) and some thoughts from the new National Pork Board CEO, Steve Murphy (See "New CEO's Business Approach," p. 6). This month, we detail the "new" NPPC structure and purpose.**

Since 1987, the National Pork Producers Council (NPPC) had served as the general contractor to the National Pork Board, providing pork promotion, consumer education and research programs supported by checkoff funds.

"We had the contract to provide the programs that the checkoff provided for," explains NPPC President Barb Determan. It was not an exclusive contract, however. "In fact, the Pork Board took bids from different groups, not only for the general contractor position, but also for sub-contracts," she explains.

Before and since the mandatory checkoff, NPPC has also led the charge in addressing public-policy related, legislative and regulatory issues funded solely by non-checkoff (unrestricted) funds.

The dual-purpose NPPC troubled the U.S. Department of Agriculture (USDA) and it became a driving force in the drafting of the separation agreement.

## SO-10 Initiates Restructuring

Delegates to the 2001 NPPC annual meeting, armed with the separation agreement, passed a "shareholder outreach" resolution (SO-10) that deals directly with overhauling NPPC's organizational structure. A 39-member task force included pork producers, allied industry representatives and state pork producer groups. Recognizing that NPPC would now be focused on public policy and regulatory

issues, the task force was charged with formulating a "new" NPPC, concentrating on five key areas:

1. Funding

2. Deliverables to the membership

3. Membership Structure

4. Governance (purpose)

5. Organizational priorities

Chaired by pork producer Roy Henry, Longford, KS, the task force recently released a "final draft" of their recommendations. Delegates to the NPPC annual meeting in Denver, Feb. 28-March 2, will act on the proposal.

## Deliverables to Members

Key programs and services proposed by the task force focus on these key areas:

- **Public Policy** — Establish and maintain an effective, national, political, legislative and regulatory presence representing the interests of pork producers and the pork industry. Primary public policy issues would include food safety, the environment, swine health and welfare and world trade.

  "When producers think about policy, they tend to think in terms of strictly legislative issues. But we also need to recognize the regulatory challenges," says Determan. She lists environmental regulations, animal health issues, legitimate animal welfare research and biosecurity risks as examples.

  The biggest challenge faced by NPPC will be generating ample funds to address these key issues, Determan says.

- **Advocacy communications** — "There is an urgent need to represent the pork industry to the popular press — the Wall Street Journal, USA Today, etc. — to be sure we are getting the right information out to policy makers, regulators, key federal agencies, foreign governments and the general public," says Determan.

  "In the past, we've tried to represent all pork producers. Now, we will represent those who choose to play," explains Henry.

  Determan adds: "We don't want to exclude anybody, but producers also have to understand that it's the members that are going to direct that activity. It's not the old NPPC where everybody paid checkoff, therefore everybody was represented."

350

- **Pork Industry Action Committee** — The pork industry must have an appropriately funded political action committee (PAC) for use on the federal level. "PACs are part of effective communications with our lawmakers, letting them know we are concerned about whether they are representing us the way we want," Determan says.

- **Legal Coordination** — Although the new organization does not intend to provide legal representation for individual members, it proposes to coordinate legal-challenge information significant to the pork industry, such as ongoing legal cases and case law. The goal is to be involved in precedent-setting legal cases that threaten to adversely affect members.

- **Certification and Training** — Anticipating that pork producers will someday need to certify or verify various performance standards or regulations in areas such as the environment, food safety or animal welfare, the task force proposes the new organization provide such certification/auditing systems. Environmental Management Solutions (EMS), LLC, a wholly owned, for-profit subsidiary of NPPC, has been formed for this purpose. (See sidebar.)

- **Proprietary research** — Unlike checkoff-funded research that must be made available to all contributing producers, some targeted research utilizing non-checkoff funds would be reserved for members only. "Our whole purpose for proprietary research is that there will be some issues that the Pork Board doesn't feel they can tackle but that are very consequential to our industry," Determan explains.

- **State Coordination** — Deliverables and services must be coordinated with state association and council members.

## Who Will Be Represented?

This was admittedly a dicey question for the task force. Striving to include all segments of the pork chain, they see membership as a "pay-to-play" proposition and thus proposed these principles:

- Pork producers (all sizes and types), input suppliers/allied industry, packers and processors may join. Benefits, services and voting privileges will be available to members only.

  "We had a great cross-section of the industry in the task force and I felt there was actually a compassion by the small guy for the large producers and vice versa. They respected each others' positions," notes Henry.

- Pork producers must have a majority, but not exclusive, voice.

- Shares and membership will be based on the prior year's financial participation. Shares are established by state contribution, not by individual producer contribution.

  In a state like Iowa, with the largest number of hogs raised and probably the largest number of

351

producers, their state shares will be impacted by total contribution.

- No one state or entity may have a majority share of the votes at the delegate session.

## Membership Categories

Committed to include all segments of the industry's product, processing and distribution chain, the task force proposed these membership categories:

- **Pork Producers** — All manner and types of business arrangements are eligible. It generally includes those participating in "implied consent" or "voluntary remittance" programs. Membership will be made available to those who raise pigs but do not sell them, such as a contract grower or employee.

- **State Associations or Councils, Regional or Area Units** — To be determined in the new by-laws.

- **Input Suppliers/Allied Industry** — All companies, organizations or other business entities that provide goods and services to the pork industry.

- **Packers and Processors** — Cooperatives, independent and integrated pork packers, as well as companies that add value to pork and pork products.

- **Retail/Food Services** — All domestic and foreign entities engaged in the distribution and sale of pork and pork products.

- **Trade** — Exporters and importers of pork and pork products.

## Funding

The primary sources of income for NPPC are revenues from the World Pork Expo (estimated $1 million annually); contributions from industry stakeholders ($1 million annually includes allied industry's $300,000 and Packer/Processor Industry Council's $700,000); $300,000 contributed through state assessments; and another $300,000 from rent on the NPPC-owned building rented by the National Pork Board (total = $2.6 million).

The task force estimated NPPC needs roughly $7.3 million annually "to be effective," therefore leaving a $4.7 million funding shortfall. The simplest solution would be to collect 10¢/$100 market value through a voluntary contribution program or a reallocation of dollars currently collected.

NPPC has no authority to reallocate checkoff contributions. However, pork producer groups in some states have passed resolutions that call for reducing the checkoff rate from 45¢/$100 market value to

352

35¢, then allowing that dime to be collected through an "implied consent" program similar to the old voluntary checkoff program. Those funds could then be directed to the NPPC as unrestricted funds. The state resolutions will be brought before the National Pork Board delegates at the annual meeting.

Whether the 10¢ is collected through a separate voluntary program or a reallocation of the current per-market hog contribution, roughly $10 million could be collected on the 100 million market hogs sold annually. Using that figure for budget projections only, the task force predicted no more than 70% participation in the implied consent proposals, dropping contributions to $7 million. Assuming at least 35% would be returned to states ($2.45 million), $4.55 million could be added to NPPC's annual budget, bringing them near the $7.3 million budget projected for 2002.

In their budget breakdown, they estimated about two-thirds of the funds would be used for program expenses, while the remaining would cover administration costs, wages, travel, governance and meeting expenses.

## Chairman's Closing Thoughts

"What's in the document is important, but what's most important is the attitude with which we take this document forward," explains Henry. "We can change the document in the future if we find out that we have erred. This is still a work in progress."

## EMS Up and Running

Environmental Management Solutions (EMS), a limited liability company formed to provide thirdparty oversight of on-farm environmental assessment programs, relocated to new offices in Des Moines, IA, on Jan. 1. EMS is a wholly owned, for-profit subsidiary of the National Pork Producers Council (NPPC).

EMS was formed in response to a push from the Environmental Protection Agency (EPA) to make the On-Farm Assessment & Environmental Review (OFAER) program available to all species of livestock, explains EMS President/CEO Earl Dotson.

The OFAER program, funded by EPA through $5 million in grants from America's Clean Water Foundation (ACWF) in 1999 and 2000, was originally developed to provide a comprehensive evaluation of water quality, odor risks and other environmental challenges associated with pork production systems. Pork producers could request a confidential assessment of the environmental risks in their operation at no charge. Development of the OFAER program was also supported by checkoff funds from the National Pork Board.

"At the end of the 1999 grant, the EPA told us they could no longer give this money to pork exclusively," Dotson explains. "But, from a practical standpoint, producers of other livestock probably wouldn't be keen on having the pork assessment program applied to their operations. Therefore, NPPC staff began developing assessment programs for dairy, poultry and beef feedlots." However, doubts began to surface that programs developed using pork checkoff dollars, provided for in the Pork Act, could be applied to other species.

353

In the summer of 2000, the NPPC began investigating the possibility of forming a limited liability company (LLC). They approached the National Pork Board about attaining the rights to the OFAER project, fully realizing that the program was the intellectual property of the Pork Board because checkoff dollars were used in its development.

Two major challenges loomed — establishing the value of the program, and how to develop a reasonable payment schedule for a startup company.

"The NPPC and the National Pork Board, with the help of legal counsel, established the value using the amount of checkoff dollars spent to develop it — roughly $1.2 million," explains Dotson. Of course, neither NPPC nor EMS had the funds to buy it outright. "They set up a payment schedule using a 'time value of money' basis to determine the length of the loan. It's how we all bought our farms — but instead of [paying] interest, we used time value of money," he continues.

Naturally, both parties wanted EMS to be successful, so they set up a 15-year payback. Payments weren't to start until the end of the fourth year. "Essentially, this gives us a perpetual license to the program," Dotson says. "If we cannot pay it back, the intellectual property goes back to the Pork Board."

The LLC became functional in Nov. 2000 and elected a board of managers in Jan. 2001. The intellectual property was officially licensed to NPPC, who in turn licensed it to EMS. The entire agreement was reviewed and approved by AMS (Agricultural Marketing Services), the regulatory arm of the U.S. Department of Agriculture (USDA) that oversees all commodity checkoff programs.

## Why Bother?

"EMS was formed to protect the intellectual property pork producers had paid for through their checkoff contributions," explains Dotson. "I think pork was 18 months to three years ahead of all of the other species, environmentally. It's to our advantage to bring the other species to the same level as we are." And by sharing the program, other livestock species avoid duplication of time and developmental costs, while pork producers are provided the opportunity to reclaim some of their investment, he adds.

## EMS Today

"Our goal, as stated in the EMS mission statement, is to move agriculture to a scientific-based, economically viable and politically acceptable industry," Dotson notes.

He sees EMS's primary business opportunities as:

- On-farm assessments;

- Audits — environmental and possibly animal welfare and food safety, in the future.

- Education and training — strictly environmental; short-term service contracts with the National Pork Board provides seminar oversight on a cost reimbursement basis only;

354

- Government grants — continue to apply for ACWF grants, plus others; and

- Environmental Consulting — planned for the future.

EMS currently has seven full-time employees and three contract employees. Dotson estimates about 75% of their operating income will come from on-farm assessments of pork operations, eventually with other species. The $5 million ACWF grant, covering the cost of assessments, runs through July 2003.

For further information about EMS, call (515) 278-5835, or write: Environmental Management Systems, P.O. Box 14586, Des Moines, IA 50322.
— Dale Miller

## Dierks Named New CEO

Neil Dierks has been named the new Chief Executive Officer of the National Pork Producers Council (NPPC). He succeeds Al Tank, who resigned on Oct. 15.

Dierks, with the NPPC since 1990, has served in a series of senior executive positions including executive director of operations, vice-president for research and education and senior vice-president for programs. Prior to joining NPPC, Dierks was the special activities director for the Iowa Pork Producers Association and the marketing director for the Iowa Corn Promotion Board.

A graduate of Iowa State University, Dierks grew up on a livestock farm in eastern Iowa and remains involved in a family farming operation.

"The NPPC Board wanted a candidate who understood pork production and was equipped with the vision, knowledge and expertise to lead our industry into a confident and prosperous future," says NPPC President Barb Determan.

Dierks will work from the Des Moines, IA, and the Washington, D.C. offices.
— Dale Miller

<u>**First Submission of Review Materials – February 15, 2016\***</u>

1) **2003 Email from Steve Murphy, CEO of Pork Board, to National Pork Producers Council (NPPC)**
   a. Pork Board's position is that PTOWM *has less value when used less.*
   b. Also questions whether PTOWM has even 10 years remaining useful life.

2) **Research Findings Reported in the 2009 National Pork Board Five-Year Strategic Plan (pp. 25-26)**
   **a.** "There is significant questioning of the value of The Other White Meat"
   **b.** "The Other White Meat is viewed as a defensive position versus leadership position."
   c. "Recognition of The Other White Meat is very high – but it may be time to look at other brand identities that are more relevant and effective with consumers."
   d. "Don't be Blah has no meaning for consumers." (This was the campaign cited in the Board's PTOWM acquisition proposal—as an extension of PTOWM. Both slogans have since been replaced as the Pork Board's brand.)

3) **Pork Board comments upon replacing PTOWM in 2011**
   a. National Pork Board News Release: PTOWM will not be featured in advertising.
   b. Pork Magazine, *"Tallying 25 Years of NPB and National Pork Checkoff"*: Includes statement from Board executive that research showed them that PTOWM may have played itself out, wasn't having the same level of impact it once had, and that consumers had "gotten the message" of PTOWM.
   c. USA Today, *"Pork Board swaps 'White Meat' for 'Be Inspired'"*: Times had changed and *consumption was flat*, so it was time to take pork in a new direction.

4) **2011 National Pork Board Financial Report (pp. 7-8)**
   a. States that intangible assets are carried at cost and that impairment tests are performed annually, "as well as when an event triggering impairment may have occurred."
   b. The report finds that "[no] indicators of impairment were identified" in 2011 (which was the year PTOWM was replaced).

5) **USDA Payment Authorizations (2010-12)**
   Payment approvals for the years before, of, and after replacement of PTOWM.

6) **D.C Circuit Opinion (re decrease in value with less use)**
   a. "Now that it is no longer the Board's primary brand identity, the slogan is likely worth substantially less than the $3 million per year the Board pays for it."
   b. "The Board's replacement of the mark with Pork: Be Inspired justifies the inference that the mark is no longer worth $3 million annually."

7) **Meyer Valuations (2001 and 2003)**
   a. The valuations of the JRC&A report "are unacceptable as neither consider the future value/income of the asset in question."
   b. "A critical component in determining a purchase priced will be to decide how much of the current value of Pork. The Other White Meat is attributable to prior expenditures by the National Pork Board."
   c. "Seventy-five percent of the ultimate value [of PTOWM] will be garnered in the first 10-12 years."

8) **2003 NPPC Email re PTOWM Value**
   a. Adopts Steve Meyer's valuation methodology (during negotiations over licensing rate) and proposes a total NPV for PTOWM of $4.9 million.
   b. Gives no credit for the value contributed to PTOWM from the millions of producer dollars that were used to fund the entirety of PTOWM's promotion campaigns.

9) **National Pork Board Acquisition Proposal (2006)**
   a. Premised on claim that PTOWM would serve as the Pork Board's primary advertising brand (i.e., choice was either purchase or replace).
   b. "The [Pork Board] adopted PTOWM in 1986."
   c. Claims that the Board must act "decisively and quickly."
   d. "NPPC is in need of monies."
   e. The Pork Board "was the only potential buyer of PTOWM."
   f. Replacement cost "essentially became the market value."
   g. No consideration of value developed in PTOWM through two decades of producer-funded campaigns (i.e., producer contribution).

10) **National Pork Board Purchase Terms Sheet**
   a. Total payout would be $60 million (20 years of $3 million payments, includes a fixed 6.75% interest rate).
   b. Requires the Pork Board to "maintain the quality of [PTOWM] through appropriate use."
   c. Finality of agreement requires approval of USDA.

11) **Testimony of Neil Dierks, CEO of NPPC (excerpt)**
   a. He never told the Pork Board that it needed to act "decisively and quickly."
   b. There were no other offers for PTOWM.

12) **Testimony of Mark Williams (excerpt)**
   a. "[L]ogic suggested that there really would be a limited number of real potential buyers and so that changes the dynamics of the marketplace."
   b. Replacement cost valuation was based on cost of putting a new advertising campaign into the market at a similarly weighted level. It was not designed to measure the cost of generating the same level of awareness as PTOWM.
   c. The funding source for the PTOWM campaign has from the start been producer checkoff dollars.

13) **Testimony of Steve Meyer (excerpt)**
   a. "NPPC is in a very weak position as a seller."
   b. NPPC spent none of their own money to develop PTOWM. It was always done with checkoff funds.

14) **2007 Letter from Steve Murphy, Pork Board CEO**
   The *value* of the PTOWM trademark "was built slowly and thoughtfully through 20 years of marketing investments, the funds for which were producer's hard-earned dollars."

15) **Testimony of Steve Murphy, Pork Board CEO (excerpt)**
   a. Never asked about whether the Board could secure a license renewal at the same rate before agreeing to purchase at significantly higher payment.
   b. He "did not look into … how much the National Pork Board could claim it had put into the mark over 20 years."

16) **Williams Valuation Letter (2006)**
   a. While 'The Other White Meat' is extremely well known, it is recognized … as being synonymous with (fresh) 'pork,' which strongly suggests that no branded marketer would be able to gain enough benefit from its use to make them a likely buyer."
   b. Recommends replacement cost as "the only reasonable valuation." [This valuation method would yield significantly lower values for a mark that has already been replaced.]

17) **2005 National Pork Board PTOWM Tracking Study (excerpt)**
   Findings include that pork "underperforms on most attributes when compared to other meats" and that pork's "brand personality" at the time was most closely associated with "genuine and dull."

358

18) **USDA Decision Memo (2006)**
   a. Presumes continued use of PTOWM as Pork Board brand identity (i.e., use PTOWM or replace it).
   b. Although the Pork Board never even discussed renewal with NPPC, Decision Memo suggests that approval partly based on the Board's argument that the license rate was expected to "increase significantly."
   c. No competing buyers for PTOWM.
   d. No consideration of value developed in PTOWM through two decades of producer-funded campaigns (i.e., producer contribution).
   e. "The Board is paying nearly half of its total payment in interest to NPPC."
   f. Recognizes that critics perceive this deal as an attempt to support and provide long-term income to NPPC.

19) **Prime Rate Chart**
   Shows that current prime rate is less than half the prime rate in 2006, when the Secretary approved the fixed 6.75% interest rate for the purchase.
   Source: Federal Reserve

20) **2001 Agreement between USDA and NPPC**
   States, among other things, that contracts between the Pork Board and NPPC must be at *fair market value*.

21) **Termination Provision of PTOWM Purchase Contract**
   Buyer may "at any time and for any reason elect to terminate…"

*Submitters understand from an email received on February 3, 2016, that there are now two submission dates for materials: February 15 and 29, 2016. We have attempted to sort materials according to the email and we will make our second submission in accordance with the timeline.

*The comments included in the above list and on the separator pages are added only to highlight certain information of particular relevance, but are not intended to limit consideration of the submitted materials in their entirety.

*The materials include testimony and exhibits from U.S. Trademark Trial and Appeal Board Case No. 91166701. Submitters include selected excerpts from relevant testimony in order to avoid an excessively voluminous submission, but transcripts of the referenced testimonies are available online from the TTAB site: http://ttabvue.uspto.gov/ttabvue/v?qt=adv&procstatus=All&pno=91166701. (Submitters note, however, that these records should already be in possession of the government in their entirety.)

359

**First Submission of Review Materials – February 15, 2016\***

1) **2003 Email from Steve Murphy, CEO of Pork Board, to National Pork Producers Council (NPPC)**
    a. Pork Board's position is that PTOWM *has less value when used less.*
    b. Also questions whether PTOWM has even 10 years remaining useful life.

2) **Research Findings Reported in the 2009 National Pork Board Five-Year Strategic Plan (pp. 25-26)**
    **a.** "There is significant questioning of the value of The Other White Meat"
    **b.** "The Other White Meat is viewed as a defensive position versus leadership position."
    c. "Recognition of The Other White Meat is very high – but it may be time to look at other brand identities that are more relevant and effective with consumers."
    d. "Don't be Blah has no meaning for consumers." (This was the campaign cited in the Board's PTOWM acquisition proposal—as an extension of PTOWM. Both slogans have since been replaced as the Pork Board's brand.)

3) **Pork Board comments upon replacing PTOWM in 2011**
    a. National Pork Board News Release: PTOWM will not be featured in advertising.
    b. Pork Magazine, *"Tallying 25 Years of NPB and National Pork Checkoff"*: Includes statement from Board executive that research showed them that PTOWM may have played itself out, wasn't having the same level of impact it once had, and that consumers had "gotten the message" of PTOWM.
    c. USA Today, *"Pork Board swaps 'White Meat' for 'Be Inspired'"*: Times had changed and *consumption was flat*, so it was time to take pork in a new direction.

4) **2011 National Pork Board Financial Report (pp. 7-8)**
    a. States that intangible assets are carried at cost and that impairment tests are performed annually, "as well as when an event triggering impairment may have occurred."
    b. The report finds that "[no] indicators of impairment were identified" in 2011 (which was the year PTOWM was replaced).

5) **USDA Payment Authorizations (2010-12)**
    Payment approvals for the years before, of, and after replacement of PTOWM.

6) **D.C Circuit Opinion (re decrease in value with less use)**
   a. "Now that it is no longer the Board's primary brand identity, the slogan is likely worth substantially less than the $3 million per year the Board pays for it."
   b. "The Board's replacement of the mark with Pork: Be Inspired justifies the inference that the mark is no longer worth $3 million annually."

7) **Meyer Valuations (2001 and 2003)**
   a. The valuations of the JRC&A report "are unacceptable as neither consider the future value/income of the asset in question."
   b. "A critical component in determining a purchase priced will be to decide how much of the current value of Pork. The Other White Meat is attributable to prior expenditures by the National Pork Board."
   c. "Seventy-five percent of the ultimate value [of PTOWM] will be garnered in the first 10-12 years."

8) **2003 NPPC Email re PTOWM Value**
   a. Adopts Steve Meyer's valuation methodology (during negotiations over licensing rate) and proposes a total NPV for PTOWM of $4.9 million.
   b. Gives no credit for the value contributed to PTOWM from the millions of producer dollars that were used to fund the entirety of PTOWM's promotion campaigns.

9) **National Pork Board Acquisition Proposal (2006)**
   a. Premised on claim that PTOWM would serve as the Pork Board's primary advertising brand (i.e., choice was either purchase or replace).
   b. "The [Pork Board] adopted PTOWM in 1986."
   c. Claims that the Board must act "decisively and quickly."
   d. "NPPC is in need of monies."
   e. The Pork Board "was the only potential buyer of PTOWM."
   f. Replacement cost "essentially became the market value."
   g. No consideration of value developed in PTOWM through two decades of producer-funded campaigns (i.e., producer contribution).

10) **National Pork Board Purchase Terms Sheet**
   a. Total payout would be $60 million (20 years of $3 million payments, includes a fixed 6.75% interest rate).
   b. Requires the Pork Board to "maintain the quality of [PTOWM] through appropriate use."
   c. Finality of agreement requires approval of USDA.

11) **Testimony of Neil Dierks, CEO of NPPC (excerpt)**
   a. He never told the Pork Board that it needed to act "decisively and quickly."
   b. There were no other offers for PTOWM.

12) **Testimony of Mark Williams (excerpt)**
   a. "[L]ogic suggested that there really would be a limited number of real potential buyers and so that changes the dynamics of the marketplace."
   b. Replacement cost valuation was based on cost of putting a new advertising campaign into the market at a similarly weighted level. It was not designed to measure the cost of generating the same level of awareness as PTOWM.
   c. The funding source for the PTOWM campaign has from the start been producer checkoff dollars.

13) **Testimony of Steve Meyer (excerpt)**
   a. "NPPC is in a very weak position as a seller."
   b. NPPC spent none of their own money to develop PTOWM. It was always done with checkoff funds.

14) **2007 Letter from Steve Murphy, Pork Board CEO**
   The *value* of the PTOWM trademark "was built slowly and thoughtfully through 20 years of marketing investments, the funds for which were producer's hard-earned dollars."

15) **Testimony of Steve Murphy, Pork Board CEO (excerpt)**
   a. Never asked about whether the Board could secure a license renewal at the same rate before agreeing to purchase at significantly higher payment.
   b. He "did not look into … how much the National Pork Board could claim it had put into the mark over 20 years."

16) **Williams Valuation Letter (2006)**
   a. While 'The Other White Meat' is extremely well known, it is recognized … as being synonymous with (fresh) 'pork,' which strongly suggests that no branded marketer would be able to gain enough benefit from its use to make them a likely buyer."
   b. Recommends replacement cost as "the only reasonable valuation." [This valuation method would yield significantly lower values for a mark that has already been replaced.]

17) **2005 National Pork Board PTOWM Tracking Study (excerpt)**
   Findings include that pork "underperforms on most attributes when compared to other meats" and that pork's "brand personality" at the time was most closely associated with "genuine and dull."

439

18) **USDA Decision Memo (2006)**
   a. Presumes continued use of PTOWM as Pork Board brand identity (i.e., use PTOWM or replace it).
   b. Although the Pork Board never even discussed renewal with NPPC, Decision Memo suggests that approval partly based on the Board's argument that the license rate was expected to "increase significantly."
   c. No competing buyers for PTOWM.
   d. No consideration of value developed in PTOWM through two decades of producer-funded campaigns (i.e., producer contribution).
   e. "The Board is paying nearly half of its total payment in interest to NPPC."
   f. Recognizes that critics perceive this deal as an attempt to support and provide long-term income to NPPC.

19) **Prime Rate Chart**
   Shows that current prime rate is less than half the prime rate in 2006, when the Secretary approved the fixed 6.75% interest rate for the purchase.
   Source: Federal Reserve

20) **2001 Agreement between USDA and NPPC**
   States, among other things, that contracts between the Pork Board and NPPC must be at *fair market value*.

21) **Termination Provision of PTOWM Purchase Contract**
   Buyer may "at any time and for any reason elect to terminate…"

*Submitters understand from an email received on February 3, 2016, that there are now two submission dates for materials: February 15 and 29, 2016. We have attempted to sort materials according to the email and we will make our second submission in accordance with the timeline.

*The comments included in the above list and on the separator pages are added only to highlight certain information of particular relevance, but are not intended to limit consideration of the submitted materials in their entirety.

*The materials include testimony and exhibits from U.S. Trademark Trial and Appeal Board Case No. 91166701. Submitters include selected excerpts from relevant testimony in order to avoid an excessively voluminous submission, but transcripts of the referenced testimonies are available online from the TTAB site: http://ttabvue.uspto.gov/ttabvue/v?qt=adv&procstatus=All&pno=91166701. (Submitters note, however, that these records should already be in possession of the government in their entirety.)

440

## 2003 Email from Steve Murphy, CEO of Pork Board, to National Pork Producers Council (NPPC)

a. Pork Board CEO takes position that PTOWM *has less value when used less*.

b. CEO also questions whether PTOWM has even 10 years remaining useful life. [In fact, it would be replaced just eight years later.]

## Steve Murphy

**From:** Steve Murphy
**Sent:** Thursday, July 31, 2003 5:22 PM
**To:** Neil Dierks
**Subject:** PTOWM Valuation

Neil:

Here is Steve Meyer's revised estimate of the valuation using the same method that he used in 2000. He still believes this is the best of the alternatives we had presented
then. This version arrives at substantially LOWER values for PTOWM mainly because we are not spending as much money on media advertising where PTOWM is used.
We simply aren't using it as much and so it has less value. In addition, he have used a lower discount rate given the lower performance of equity markets over the past 2 years. Opportunity costs just aren't as high as they once were.

Finally there is the issue of remaining life. I used 10 years in the paper (just as I did 2 years ago) but some questions were raised in Kohler that suggests a shorter life may be more appropriate. I leave this for your review.

Clearly our numbers still have some distance between them, but we do have interest in getting this done and would move off of Meyer's current position given some solid argument against his model. The other possibility might be that in return for getting closer to our number, we would agree to a six year term, pay the full fee in the first 4, then take the $1 term the last two. This would get us away from the 50% discount issue we're faced with now. Give me a call if you wish to discuss.



PTOWM Valuation
Narrative 7-30...

   Steven D. Murphy
   Chief Executive Officer
   National Pork Board
   Phone (515) 223-2627

1

## Research Findings Reported in the 2009 National Pork Board Five-Year Strategic Plan (pp. 25-26)

    a. "There is significant questioning of the value of The Other White Meat"

    b. "The Other White Meat is viewed as a defensive position versus leadership position"

    c. "Recognition of The Other White Meat is very high – but it may be time to look at other brand identities that are more relevant and effective with consumers"

    d. "Don't be Blah has no meaning for consumers" (This was the campaign cited in the Board's PTOWM acquisition proposal— as an extension of PTOWM. Both slogans have since been replaced as the Pork Board's brand.)

443

# Leading a world-class food industry

Responsible.  Sustainable.  Professional.  Profitable.

## SETTING A NEW DIRECTION
### FOR THE U.S. PORK INDUSTRY

*A Five-Year Strategic Plan*



pork.org | 800.456.7675



**25**

## C.    Input from the Informed Futurist Panel, May 2009

| Comments and Questions |
|---|

- With the recent success of HSUS in California and pressure in other states, the industry needs to consider production practices that are less vulnerable to pressure.
- H1N1 and public health concerns undermine confidence in pork products as well as in production practices.
- Will the increasing concern about the industry, public health and nutrition issues lead to a gradual decrease in domestic red meat consumption?
- Are the interest groups expanding their platform from animal welfare to public health, nutrition, sustainability, etc.?
- Concern about antibiotic use is rising.
- We've engineered the taste out of pork; we have to fix that.
- There is a growing global interest in livestock production and the relationship to global warming.
- There is strong interest in the industry's carbon footprint, emissions and sustainability.
- Cost implication of pork grown using more acceptable practices:  the financial impact on individual consumers in overseas markets is likely to have a more lingering impact than in the U.S. as many markets were barely able to introduce meat into their diets.
- Long term – not just short term – the increased demand for corn is likely to cause an upward trend in feed prices.
- The new administration's lack of knowledge about agriculture is a serious problem.
- Will there be an abundant and competent workforce?

## D.    Input from 3 Regional Listening Sessions, July 2009

| Regional Meetings |
|---|

- We conducted three regional "listening sessions:"
  - Omaha, Neb., July 23
  - Indianapolis, Ind.,  July 24
  - Clinton N.C., July 27
- In each, we made several short presentations and then asked for input on three topics.
  - Additional issues affecting the pork industry
  - Priorities for national programs
  - Recommendations for organizational improvement

445



| Short List of "Take-Aways" from Listening Meetings |
|---|

- There is a huge diversity of opinion within the industry.
- There is strong concern for the "little guy" – at least from a few vocal people.
- The national organizations haven't done enough to fight back against the ethanol policy – at least from a few vocal people.
- Product marketing is very important – but maybe not to the extent it currently occupies in the budget.
- There is significant questioning of the value of The Other White Meat.®
- Pork exports are our "bright spot." Maybe we need to promote exports more.
- Addressing the "social & political & PR issues" is becoming much more important.
- Issues management is absolutely critical.
- Reducing production costs is very low priority for the National Pork Board.

## E.    Input from Domestic Marketing, August 2009

| Key Findings from Branding Research |
|---|

- The Other White Meat is viewed as a defensive position versus leadership position.
- Recognition of The Other White Meat is very high – but it may be time to look at other brand identities that are more relevant and effective with consumers.
- Don't be Blah has no meaning for consumers.
- Cooking temperature and general cooking knowledge are critical barriers to increased pork consumption.
- New pork positioning should probably be based on ease of preparation, flavor, economic value.
- New positioning concepts should be tested in selected cities and measured for effectiveness before going national.

## F.    Input from the Web-based Survey Instrument, August 2009

A web-based survey was created in July and August of 2009 to solicit input from a broad array of producers, industry stakeholders, and staff. Almost 400 individuals, including more than 300 producers, completed this on-line survey to provide feedback to the Strategic Planning Task Force.

The following charts reflect the results from all survey participants. The Task Force did, however, study the results according to breakouts of producers, industry stakeholders, and staff. The Task Force also looked at the results according to size of operation and geography.

The Board and the Task Force appreciate those producers who took time to complete the survey. The results were an important input in the development of this Strategic Plan.



## Pork Board comments upon replacing PTOWM in 2011

a) National Pork Board News Release: PTOWM will not be featured in advertising.

b) Pork Magazine, *"Tallying 25 Years of NPB and National Pork Checkoff"*: Includes statement from Board executive that research showed them that PTOWM may have played itself out, wasn't having the same level of impact it once had, and that consumers had "gotten the message" of PTOWM.

c) USA Today, *"Pork Board swaps 'White Meat' for 'Be Inspired'"*: Times had changed and *consumption was flat*, so it was time to take pork in a new direction.

Log In



 ECON & MARKETS | 🛒 PORK STORE | 📶 RSS FEEDS

≥ NEWS          ≥ CERTIFICATION          ≥ RESOURCES          ≥ PROGRAMS          ≥ RESEARCH

**Publications**

*Annual Report*

*Pork Checkoff Report magazine*

*Pork Checkoff Report Special Edition Newsletter*

*Pork Leader Newsletter*

*Research REVIEW Newsletter*

*Pork Industry News for Swine Extension & Educators*

**News Releases**

**PorkPod**

**Interact with Pork Checkoff**

**Features**

**Spotlight**

Home > News > News Releases > New National Pork Board Campaign Evolves To Celebr

### New National Pork Board Campaign Evolves To Celebrate Proud New Brand Identity: Pork® Be inspiredsm

March 4, 2011
Contact: Cindy Cunningham
National Pork Board
CCunningham@pork.org
515-223-2600

**New National Pork Board Campaign Evolves To Celebrate Proud New Brand Identity:**
**Pork® Be inspired**sm
*Updated Positioning Creates New Role for The Other White Meat®*

With a new focus on reaching creative, flavor-seeking home cooks who already prepare, eat and love pork, the National Pork Board today announced a new branding position celebrating pork's ability to offer a wide range of options in the kitchen.  With PORK® now as the brand, the new campaign of: *Pork® Be inspired*sm shows pork's place in almost any menu, day part, cuisine and lifestyle, based on pork's unique combination of flavor and versatility as the source of kitchen inspiration.

The new, fully integrated campaign features an updated look and feel, along with a new consumer target: the more than 82 million Americans who already cook, eat and love pork. Moving from a functional to a more emotional positioning, the campaign voice is proud, energetic, approachable and unapologetically optimistic about the unique attributes of the world's most popular protein.

Evoking the taste of backyard barbeques, new and attainable flavor combinations or mid-week meals on the go, the bold product imagery celebrates one juicy, tender, flavorful pork meal after another.

"Our research shows that pork's top consumers are looking for more than basic education; they're looking for inspiration. With its great taste and versatility, pork is the ideal catalyst to inspire great meals," said Ceci Snyder, vice president of domestic marketing for the National Pork Board. "While our new target represents our biggest fans, we believe they have the potential and desire to enjoy pork more often - and to inspire others to do the same."

"We produce pork and are proud of it," said Dianne Bettin, chair of the Domestic Marketing Committee and a producer from Truman, Minn. "*Pork Be inspired* will celebrate the wide range of meals that pork offers, give new ideas to our new consumer target and influencers and move the needle on pork sales both at retail and foodservice."

The new campaign rolls out this March and April, and includes national advertising, public relations, social media, retail and foodservice marketing, as well as activation by state pork associations. Enthusiastic about this renewed approach, 2011 advertising media spending has more than doubled that of recent years. All elements will showcase inspiring new ways to enjoy pork more frequently, with a range of meal and menu options, Snyder said.

**Rallying "Pork Champions"**
Recent consumer segmentation research from the National Pork Board found that 82 million Americans are "Pork Champions" - men and women who are predominantly medium to heavy fresh pork eaters with a strong passion for pork that they are eager to share. This group of "flavor-seeking creatives:"

- Represents approximately 28 percent of U.S. households but accounts for roughly 68 percent of all in-home fresh pork consumption and 50 percent of all away-from-home fresh pork consumption.
- Enjoys cooking and experimenting with new flavors in the kitchen, understands how to cook pork, and in general looks at life with a positive outlook.

**A New Role for The Other White Meat® Campaign**
Nearly 25 years ago, the *Pork® The Other White Meat®* campaign was conceived to reposition pork as a healthful protein source. Today, *Pork Be inspired* goes beyond basic cooking education and health to promote a deeper, more personal level of engagement with existing pork consumers, Snyder said.  However, *The Other White Meat* campaign will play a role as a heritage brand, with use on the consumer web site and in nutrition communications.  *The Other White Meat* campaign will not be featured in advertising.

"Our new campaign communicates to the legion of pork fans that pork is delicious, versatile and can stand on its own," added Snyder. "Pork is what consumers write on their shopping list or order in a restaurant.  To those that love pork, it requires no comparison to the other meats.  The range of meals drives new ideas - and appetites - for pork."

≥ Contact Us

≥ About Pork Checkoff

≥ Other Sites

Share  |

**Latest Pork Checkoff Report**



**Quick Facts**



Videos  PorkPod  Interact



Food Comes from Farms!

448

Digital advertising starts March 7 with paid search and web sites that reach the National Pork Board's new target, with creative directing to a new website URL, www.PorkBeInspired.com.  Starting April 11, national television advertising includes both network and cable.   Print advertising begins in April in food and lifestyle publications, using a unique three-page, consecutive right-hand pages to communicate pork's ability to inspire numerous meal ideas.

The National Pork Board has responsibility for Checkoff-funded research, promotion and consumer information projects and for communicating with pork producers and the public. Through a legislative national Pork Checkoff, pork producers invest $0.40 for each $100 value of hogs sold. The Pork Checkoff funds national and state programs in advertising, consumer information, retail and foodservice marketing, export market promotion, production improvement, technology, swine health, pork safety and environmental management.

-30-

Return to News Releases

More Videos

PORK CHECKOFF SERVICE CENTER 800-456-7675

**Email Updates** Sign up for pork industry news from Pork Checkoff     Sign Up

Home     Sitemap     Privacy Policy     Report a Bug     Login

449

**pork Network**

# Tallying 25 years of NPB and National Pork Checkoff

Marlys Miller, Editor, Pork Magazine | Updated: 11/15/2011

Today, current and former National Pork Board directors, staff and supporters celebrated the first meeting of the NPB, as well as 25 years of the National Pork Checkoff.

While pork producers first organized in the 1940s under the umbrella of the National Swine Growers Council, the producer efforts and priorities have grown dramatically and become increasingly diverse over the years.

Jim Meimann, executive vice president of governance and operations, discussed the evolution of the checkoff with AgriTalk on Tuesday. Meiman is one of nine staff members who has been with NPB for the past 25 years.

In the 1960s, the National Swine Growers became the National Pork Producers Council. "They changed their name from swine to pork to indicate that they were producing food for the consuming public," Meimann notes.

Funding was nearly non-existent, which prompted a group known as the Moline 90—"a landmark group in our history," Meiman adds, to put their own money on the table to get the organization's programs and activities moving forward. This also resulted in the formation of the first voluntary checkoff program. It was known as "Nickels for Profit." Under the program, pork producers contributed 5 cents for every hog marketed.

It was a grassroots, county, state and national effort. "It required strong communication between producers to convince fellow producer to invest," Meimann says, "as well as convincing markets that it was a wise investment to collect those dollars."

While "Nickels for Profit" evolved into programs involving dime and double-dimes contributions, which ran for the next 20 years, there was a ceiling to the voluntary producer participation level—at about 50 percent to 55 percent. But that ceiling also was limiting NPPC's programs and abilities to serve producers.

In the mid-80s a producer committee investigated the checkoff needs and options and decided to pursue a legislative checkoff program that would require everyone to participate. After much negotiation and compromise, the industry took their proposal to Congress, which included the National Pork Checkoff in the 1985 Farm Bill. Today, all U.S. pork producers and importers pay 40 cents per $100 of value of each hogs sold, as well as when pigs or pork products are brought into the United States.

As part of Pork Act legislation, USDA received oversight responsibilities of checkoff funds and NPB was created out of NPPC. Only NPB receives the mandatory checkoff dollars and that money is spent on the U.S. pork industry's efforts in the areas of promotion, education and research.

NPPC meanwhile, is a separate member-driven group, which focuses on legislation, regulations and public policy. It receives no checkoff funding.

Among the best known programs associated with the pork checkoff is Pork. The Other White Meat advertising campaign. "It was one of the first items brought to the Pork Board," Meimann notes, "and it was met with a great deal of skepticism." Of course, the campaign went on to become one of the top five most recognizable slogans.

"It was a resounding success. It did what we needed it to do at the time," Meimann says. "People thought of pork as fat, unhealthy, inferior; but we had the product and the science to compare it to the healthier perceptions of a white meat."

This past spring, NPB rolled out the new "Pork. Be Inspired" campaign as pork's promotional program. "Research showed us that Pork. The Other White Meat may have played itself out," Meimann says. Consumers' views on pork's healthfulness had changed, so it wasn't having the same level of impact it once had.

"Consumers had gotten the message, so we needed something that could drive us further downt the road and touch consumers in a fresh creative way," he adds.

The pork checkoff and NPB may have 25 years under their belt, but they're looking forward to 25 more.

© Copyright 2013 Vance Publishing Corporation | All rights reserved.

**pork Network**

# Pork board swaps 'White Meat' for 'Be Inspired'

By Michael J. Crumb, Associated Press

Updated 3/4/2011 7:21:20 PM |  |   Share

DES MOINES — "The Other White Meat" has another slogan.



By Jeff Roberson, AP file

Hogs are seen at a finishing facility in Auxvasse, Mo., in 2009.

The National Pork Board on Friday replaced the decades-old ad campaign with a new message: "Pork: Be Inspired."

Board officials said after nearly 25 years, it was time to move on from the old message that compared pork to chicken and instead try to increase sales by focusing on the estimated 82 million Americans who already eat pork.

"The overall goal is to move sales of our product," said Ceci Snyder, the Des Moines, Iowa-based board's vice president of marketing. "We want to increase pork sales by 10% by 2014. To do that, we needed to make a stronger connection, a more emotional connection to our product."

Pork sales totaled about $117 per person in 2010. Pork consumption averages about 50 pounds per person per year, according to data from the U.S. Department of Agriculture.

Snyder said research done by the Pork Board shows 28% of U.S. households make up nearly 70% of the nation's at-home consumption of fresh pork. The new campaign is aimed at getting existing pork consumers to think more about how they can incorporate it into their meal planning.

"We want to move that needle, go after that core group of consumers," she said. "These people love pork, know how to prepare it and are eager to share recipes."

The new marketing effort marks the end to a ubiquitous advertising slogan launched in 1987 to convince consumers that pork was healthy and had fewer calories than most people thought. The campaign stemmed a decline in pork consumption, Snyder said.

Times have changed and with consumption continuing to be flat, Snyder said it's time to take pork in a new direction.

Pork remains behind beef and chicken in consumption, according to the USDA. Americans ate about 61 pounds of beef per capita last year and about 80 pounds of chicken. While beef consumption has been gradually declining and pork consumption has remained flat, chicken consumption has increased in the past two decades, the USDA data shows.

More than 31 billion pounds of pork was produced in the U.S. in 2010, according to the Pork

451

Board. Iowa is the nation's top pork producer followed by North Carolina and Minnesota.

The old slogan will remain on the Pork Board's website and on apparel sold by the board, but Internet searches for "Pork: The Other White Meat" will direct people to the new campaign, Snyder said.

Gail Carter, a partner at Schafer Condon Carter, the Chicago-based ad agency that helped develop the new campaign, said "Pork: The Other White Meat" succeeded in creating awareness of pork as an option to chicken, and now it's time to update the message.

"There is no need to rely on comparisons for this audience," she said. "We know more about who the target is and how to talk to them in more relevant terms."

The board will spend more than $11 million to roll out the campaign in March and April. It will include national print and broadcast advertising, public relations, social media and foodservice marketing. Online advertising will begin March 7, and national television ads will begin April 11. Print ads will also begin running in food and lifestyle publications in April.

John Mabry, the director of the Iowa Pork Industry Center at Iowa State University, said the "Pork: The Other White Meat" campaign helped pork overcome an image that it was fatty and has helped increase the ways in which pork is used.

"I can see them trying to expand on the market," he said. "We are exporting 25% of the product now and we need to maintain the export market but also need to ramp up consumption here in the U.S."

He said targeting a specific audience may give the Pork Board the "biggest bang for its buck."

Through the national Pork Checkoff program, pork producers invest 40 cents per $100 value of hogs sold to fund research and promotion of pork.

## 2011 National Pork Board Financial Report (pp. 7-8)

a.  States that intangible assets are carried at cost and that impairment tests are performed annually, "as well as when an event triggering impairment may have occurred."

b.  The report finds that "[no] indicators of impairment were identified" in 2011 (which was the year PTOWM was replaced).

# National Pork Board

Financial Report
December 31, 2011

**National Pork Board**

## Notes to Financial Statements

Leasehold improvements and equipment: Leasehold improvements and equipment are stated at cost. Equipment is depreciated on the straight-line method over the estimated useful lives of the assets. Leasehold improvements are amortized over the lesser of the estimated useful lives of the assets or the lease term.

Deferred revenue and prepaid expenses: Receipts and disbursements relating to selected multi-year programs and the National Pork Industry Forum are accounted for as deferred revenue and prepaid expenses. The related revenues and expenses are recognized when earned and incurred, respectively.

Intangible assets: The trademarks are carried at cost. The Board has determined that the trademarks have indefinite lives and has accounted for them under the Goodwill and Other Intangible Assets accounting guidance. This guidance prescribes a process for impairment testing of indefinite life intangibles, which is performed annually, as well as when an event triggering impairment may have occurred. The impairment tests consist of a comparison of the fair value of the intangible asset with its carrying amount. No indicators of impairment were identified during the years ended December 31, 2011 and 2010.

Income taxes: The Board is exempt from income tax pursuant to a Private Letter Ruling received from the Internal Revenue Service, dated August 28, 1987. Therefore there is no income tax filing requirements for the Board.

Fair value measurement: In general, fair value measurements are based upon quoted market prices, where available. If quoted market prices are not available, fair value measurements are estimated using relevant market information and other assumptions. Fair value estimates involve uncertainties and require some degree of judgment regarding interest rates, credit risk, prepayments and other factors. The use of different assumptions or estimation techniques may have a significant effect on the fair value amounts reported. See Note 9 for additional information.

Subsequent events: Subsequent events have been evaluated through May 29, 2012, the date financial statements are available for issuance.

## Note 2.    Accounts Payable

Included in accounts payable at December 31, 2011 and 2010 were amounts totaling approximately $1,453,000 and $1,110,000, respectively, due to state pork producer associations representing their share of assessments collected but not yet distributed.

## Note 3.    Long-Term Debt

The Board has a note payable with a balance of $26,634,763 and $27,760,902 as of December 31, 2011 and 2010, respectively, with National Pork Producers Council (the Council) due in annual installments of $3,000,000, including interest at 6.75% through July 2025 when the remaining balance is due. The note is secured by intangible assets. See also Note 5.

**National Pork Board**

**Notes to Financial Statements**

Aggregate maturities of the long-term note are as follows as of December 31, 2011:

| Year ending December 31: | | |
|---|---|---|
| 2012 | $ | 1,202,154 |
| 2013 | | 1,283,299 |
| 2014 | | 1,369,922 |
| 2015 | | 1,462,391 |
| 2016 | | 1,561,103 |
| Thereafter | | 19,755,894 |
| | $ | 26,634,763 |

**Note 4.    Lease and Commitments**

The Board leases its main facility from the Council under an operating lease which expires December 2037. In addition to the rental payments, the Board is responsible for the real estate taxes associated with the facility. The agreement may be terminated with two years' written notice. The lease requires monthly payments of $20,074 until December 2013, when rent will be appraised every two years thereafter by an independent certified appraiser to establish a new fair market value payment.

The Board also has one noncancelable operating lease for office equipment with quarterly payments of $13,425 with expiration date of June 2013.

The related expense for the years ended December 31, 2011 and 2010 under the operating leases totaled approximately $328,000 and $335,000, respectively.

Approximate future minimum rental payments under the operating leases as follows for the year ending December 31, 2011:

| Year ending December 31: | | |
|---|---|---|
| 2012 | $ | 295,000 |
| 2013 | | 254,000 |
| 2014 | | 241,000 |
| 2015 | | 241,000 |
| 2016 | | 241,000 |
| Thereafter | | 5,059,000 |
| | $ | 6,331,000 |

**Note 5.    Intangible Asset**

During the year ended December 31, 2006, the Board acquired trademarks from the Council totaling approximately $34,673,000. The intangible asset has been determined to have an indefinite life under the Goodwill and Other Intangible Assets accounting guidance. Since the intangible asset has an indefinite life, there is no related amortization expense; however, the Board performs impairment tests at least annually. Under the asset purchase agreement, the Board may voluntarily terminate the agreement and promissory note (see Note 3) by giving written notice of 365 days. The Board will be obligated to make the next annual installment of $3,000,000 following written notice of termination. Also included in the asset purchase agreement, if there is an "adverse pork checkoff event," as defined in the agreement, no further installments shall be due under the promissory note.

456

# USDA Payment Authorizations (2010-12)

**Payment approvals for the years before, of, and after replacement of PTOWM.**

# PURCHASE ORDER

OUR PURCHASE ORDER NUMBER MUST APPEAR ON ALL INVOICES, PACKAGES, ETC.

## National Pork Board



NO. **16348**

1776 NW 114th St
Des Moines, Iowa 50325
USA

Phone:   (515) 223-2600    FAX:   (515) 223-2646

Vendor:

**NATIONAL PORK PRODUCERS COUNCIL**
**NEIL DIERKS**
**10664 JUSTIN DRIVE**

**URBANDALE IA 50322**

| VENDOR TYPE | |
|---|---|
| Competitive Bid: | No |
| Preferred Vendor: | No |
| Contract On File: | Yes |
| Standard Research: | No |
| Documentation: | Yes |

National Pork Board is purchasing of the Pork the Other White Meat

| PROJECT MANAGER USE ONLY | |
|---|---|
| Vendor Start Date: | 07/01/2010 |
| Vendor End Date: | 06/30/2011 |

| SERVICES/ITEMS TO BE PURCHASED | ACCOUNT NO. & COST |
|---|---|
| 2010-2011 Yearly contract amount for purchase of Pork the Other White Meat. | 4206-002-000-0 (2010)   $3,000,000.00 |
| | Total PO  $3,000,000.00 |

## SPECIALTY

Describe in detail what the unique qualities/capabilities this vendor possess that would exempt them from the bidding process.

## PO APPROVALS

| | Approved By | Date Approved |
|---|---|---|
| Originator: | Calvin VandeKrol | 07/01/2010 |
| Primary: | Jim Meimann | |
| Backup: | | 07/01/2010 |
| Secondary: | John Johnson | |
| Verified By: | Jim Meimann | |

0 0635

[X] AMS Approved PO By: _____ James Brow _____   Date Returned To NPB: _____

[ ] AMS Reject PO By: _____   Date Returned To NPB: _____

AMS Comments: _____

3/29/2012  3:37:15PM        Page 1 of 1                    458

# PURCHASE ORDER

**OUR PURCHASE ORDER NUMBER MUST APPEAR ON ALL INVOICES, PACKAGES, ETC.**

## National Pork Board



1776 NW 114th St
Des Moines, Iowa 50325
USA

Phone:    (515) 223-2600    FAX:  (515) 223-2646

Vendor:

**NATIONAL PORK PRODUCERS COUNCIL
NEIL DIERKS
10664 JUSTIN DRIVE**


**DES MOINES IA 50322**

## NO.  *16703*

| VENDOR TYPE | |
|---|---|
| Competitive Bid: | No |
| Preferred Vendor: | No |
| Contract On File: | Yes |
| Standard Research: | No |
| Documentation: | Yes |

| PROJECT MANAGER USE ONLY | |
|---|---|
| Vendor Start Date: | 07/01/2011 |
| Vendor End Date: | 06/30/2012 |

| SERVICES/ITEMS TO BE PURCHASED | ACCOUNT NO. & COST | |
|---|---|---|
| 2011-2012 Yearly contract amount for purchases of Pork the Other White Meat | 4206-002-000-0 (2011) | $3,000,000.00 |
| | Total PO | $3,000,000.00 |

## SPECIALTY

Describe in detail what the unique qualities/capabilities this vendor possess that would exempt them from the bidding process.

## PO APPROVALS

| | Approved By | Date Approved |
|---|---|---|
| Originator: | **Lynette Webster** | 01/25/2011 |
| Primary: | **Calvin VandeKrol** | |
| Backup: | | 02/08/2011 |
| Secondary: | **Jim Meimann** | |
| Verified By: | **Jim Meimann** | |

0 0636

[X] AMS Approved PO By: _____ **James Brow** _____    Date Returned To NPB: _____

[ ] AMS Reject PO By: _____    Date Returned To NPB: _____

AMS Comments: _____

3/29/2012  4:12:10PM        Page 1 of 1                459

# PURCHASE ORDER

OUR PURCHASE ORDER NUMBER MUST APPEAR ON ALL INVOICES, PACKAGES, ETC.

## National Pork Board



1776 NW 114th St
Des Moines, Iowa 50325
USA

Phone:    (515) 223-2600    FAX:   (515) 223-2646

Vendor:

**NATIONAL PORK PRODUCERS COUNCIL**
**NEIL DIERKS**
**10664 JUSTIN DRIVE**

**DES MOINES IA 50322**

## NO.  *17365*

| VENDOR TYPE | |
|---|---|
| Competitive Bid: | No |
| Preferred Vendor: | No |
| Contract On File: | Yes |
| Standard Research: | No |
| Documentation: | Yes |

| PROJECT MANAGER USE ONLY | |
|---|---|
| Vendor Start Date: | 07/01/2012 |
| Vendor End Date: | 06/30/2013 |

| SERVICES/ITEMS TO BE PURCHASED | ACCOUNT NO. & COST | |
|---|---|---|
| 2012-2013 Yearly contract amount for purchases of Pork the Other White Meat | 4206-002-000-0 (2012) | $3,000,000.00 |
| | Total PO | $3,000,000.00 |

## SPECIALTY

Describe in detail what the unique qualities/capabilities this vendor possess that would exempt them from the bidding process.

2012-2013 Yearly contract amount for purchases of Pork the Other White Meat

## PO APPROVALS

| | Approved By | Date Approved |
|---|---|---|
| Originator: | **Lynette Webster** | **12/12/2011** |
| Primary: | **Calvin VandeKrol** | |
| Backup: | | **12/19/2011** |
| Secondary: | **Jim Meimann** | |
| Verified By: | **Jill Criss** | |

0 0637

[X] AMS Approved PO By:  **Kenny Payne**   Date Returned To NPB: _____

[ ] AMS Reject PO By: _____   Date Returned To NPB: _____

AMS Comments: _____

## D.C Circuit Opinion (re decrease in value with less use):

a. "Now that it is no longer the Board's primary brand identity, the slogan is likely worth substantially less than the $3 million per year the Board pays for it."

b. "The Board's replacement of the mark with Pork: Be Inspired justifies the inference that the mark is no longer worth $3 million annually."

461

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 7, 2015                    Decided August 14, 2015

No. 13-5293

HUMANE SOCIETY OF THE UNITED STATES,
APPELLANT

HARVEY DILLENBURG AND IOWA CITIZENS FOR COMMUNITY
IMPROVEMENT,
APPELLEES

v.

THOMAS J. VILSACK, SECRETARY OF THE U.S. DEPARTMENT
OF AGRICULTURE,
APPELLEE

———

Consolidated with 13-5307

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:12-cv-01582)

———

*Matthew E. Penzer* argued the cause for appellants. With him on the briefs was *Jonathan R. Lovvorn*. *Ralph E. Henry* entered an appearance.

*Abby C. Wright*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were

2

*Ronald C. Machen Jr.*, U.S. Attorney at the time the brief was filed, and *Scott R. McIntosh*, Attorney.

Before: GRIFFITH, SRINIVASAN and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  The plaintiffs, a pork producer named Harvey Dillenburg and two animal welfare organizations who count pork producers among their members, claim that the National Pork Board has misappropriated millions of dollars from a fund for pork promotion into which pork producers are required to pay. The plaintiffs filed suit in federal district court and the court dismissed their claim for a lack of standing.  We reverse.

**I.**

The National Pork Board is a quasi-governmental entity responsible for administering a federal regulatory scheme known as the "Pork Order."  *See* 7 U.S.C. § 4808; *see also* 7 C.F.R. Part 1230.  The Order implements the Pork Act, 7 U.S.C. §§ 4801-19, the purpose of which is to promote pork in the marketplace, *see* 7 U.S.C. § 4801(b)(1).  The Board strengthens, maintains, develops, and expands markets for pork and pork products through research and consumer information campaigns.  In exchange for the Board's efforts on behalf of their industry, pork producers pay the Board a special assessment on each hog they import or sell.  *See* 7 C.F.R. § 1230.71(b).

In 2006, the Board, with the approval of the Secretary of the Department of Agriculture, bought four trademarks associated with the slogan *Pork: The Other White Meat*

3

(hereinafter "the slogan" or "the mark") from the National Pork Producers Council, an industry trade group, for $60 million.[1]  The payment terms provide that the Board will pay the Council $3 million annually for twenty years.  The Board can terminate the payments at any time with one year's notice, in which case ownership of the phrase reverts back to the Council.  Five years after buying the mark, the Board replaced it with a new motto, *Pork: Be Inspired*.  Now the Board keeps the initial slogan around as a "heritage brand" that it does not feature in its advertising.

The plaintiffs claim that the Board did not buy the slogan for its value as a marketing tool.  They allege that the Board used the purchase of the slogan as a means to cut a sweetheart deal with the Council to keep the Council in business and support its lobbying efforts.  They maintain that the Board overpaid for the slogan and that the Board's shift to the *Pork: Be Inspired* campaign makes the initial slogan all but worthless.  According to the plaintiffs, the purchase of the mark and continued payment for it was and is arbitrary and capricious.   The plaintiffs also argue that the Board's purchase of the slogan with the purpose of supporting the Council's lobbying efforts violates the Pork Act and Order's prohibitions against the Board spending funds to influence legislation.  *See* 7 U.S.C. § 4809(e); 7 C.F.R. § 1230.74.

The plaintiffs sued the Secretary of the Department of Agriculture under the Administrative Procedure Act seeking

---

[1] The Secretary of the Department of Agriculture is charged with reviewing and approving the Board's actions.  *See* 7 U.S.C. § 4808(b)(3); 7 C.F.R. § 1230.60(a).  In this opinion, for clarity and concision, we attribute Board-recommended, Secretary-approved actions to the Board even though ultimate authority and liability for those actions runs against the Secretary.

4

an order enjoining the Board's further payments to the Council and directing the Secretary to claw back what payments he can from the deal. The district court dismissed the plaintiffs' suit for lack of Article III standing. *See Humane Soc'y v. Vilsack*, 19 F. Supp. 3d 24, 29 (D.D.C. 2013). The court held that Dillenburg failed to establish an injury in fact fairly traceable to the Board's actions that is likely to be redressed by a favorable decision. *Id.* at 34-42. It also held that the two plaintiff organizations could not establish standing to sue in their own right or on behalf of their pork-producing members. *Id.* at 42-47. The plaintiffs appealed via separate notices and we consolidated the cases for review.

For the reasons that follow, we reverse and remand. This case involves a concrete and particularized harm caused by an agency's failure to confer a direct economic benefit on a statutory beneficiary. We also reject the government's argument that the plaintiffs have failed to exhaust their administrative remedies. The statute's provision for administrative review would not offer the plaintiffs adequate relief, and therefore they were not required to pursue it.

## II.

This suit ended on a motion to dismiss. We review such dismissals *de novo*. *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). To survive a motion to dismiss for lack of standing, a complaint must state a plausible claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Determining a claim's plausibility is "a context-specific task that requires the

5

reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  We accept facts alleged in the complaint as true and draw all reasonable inferences from those facts in the plaintiffs' favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007).

**A.**

Dillenburg has made out a plausible claim to Article III standing.  His argument is simple.  He says that his return on his investment has been diminished by the Board's unlawful payments of $3 million per year for *Pork: The Other White Meat*.  If the Board stopped paying for the slogan, recouped funds unlawfully channeled to the Council, and devoted the money saved to more effective pork promotions, Dillenburg's alleged harm would be at least partially redressed.  Amend. Compl. ¶¶ 15, 128, J.A. 11, 34.  That claim, if supported by sufficient factual allegations to "nudge [it] . . . from conceivable to plausible," *Twombly*, 550 U.S. at 570, is sufficient to establish Article III standing.  Dillenburg's claim readily clears that line.

As an initial matter, Dillenburg has alleged a "concrete and particularized" injury. *Lujan*, 504 U.S. at 560.  He has alleged facts plausibly showing that the mark was worth less than its $60 million purchase price.  Between 2001 and 2004, the Board paid the Council one dollar per year to license the slogan.  Amend. Compl. ¶ 59, J.A. 20.  In 2004, the Board negotiated a new five-year license with the Council, providing that payments would increase from one dollar per year to $818,000 for three years before reverting back to one dollar per year for the final two years. *Id.* ¶¶ 63, 109, J.A. 21-22, 30-31.  The plaintiffs allege that the Board's CEO wrote that the increased license fee was negotiated to "allow the [Council] to get the money they need for the next four years."

466

6

*Id.* ¶ 63, J.A. 21-22. Before the Board entered the new licensing agreement, the Board's own economist recommended that the Board pay no more than $375,000 annually to license the mark. *Id.* ¶ 64, J.A. 22. He also advised the Board that it was in a powerful position to dictate favorable terms to the Council because there would be few other buyers willing to purchase a generic slogan closely identified with the promotion of pork. *Id.* ¶ 83, J.A. 25-26. Indeed, there were no competing offers to purchase the slogan. *Id.* ¶ 84, J.A. 26. Those facts raise a plausible inference that the slogan was not worth its purchase price at the time, and is not worth $3 million per year now.

Dillenburg also alleged facts tending to show that the Board's purchase of the mark was not negotiated at arm's length, which increased the plausibility of allegations that the Board paid too much. According to the complaint, the Council and the Board have been intertwined intimately since the Board's formation in the mid-1980s. *Id.* ¶¶ 43-45, 55, J.A. 17, 19-20. The Council lobbied for passage of the Pork Act, and it proposed the text that ultimately served as the foundation for the Pork Order. *Id.* ¶¶ 43, 45, J.A. 17. The Council played an instrumental role in developing the slogan, vetting possible promotions for the Board to undertake, and engaging with advertising agencies to develop them. *Id.* ¶¶ 46-54, J.A. 18-19. Even though the Board paid for the mark's development, the Council registered the mark in its own name and as its sole owner. *Id.* ¶¶ 52-53, J.A. 19. The Board and the Council were so enmeshed that, in 1986 when the Board voted to adopt the campaign and so committed itself to spend tens of millions of dollars in assessment funds over two decades on the promotion, it did not execute any licensing agreement or fee contract to formalize that arrangement. *Id.* ¶ 51, J.A. 19. The Department of Agriculture's Office of Inspector General concluded in a 1999

7

audit that the Board had "relinquished too much authority to its primary contractor, the [Council], and ha[d] placed the [Council] in a position to exert undue influence over Board budgets and grant proposals." *Id.* ¶ 55, J.A. 19-20. That history, as alleged, raises a plausible inference that the Board's purchase was not the product of arm's-length negotiation.

Dillenburg has also alleged facts plausibly showing that, whatever its value when the Board purchased it, the mark is no longer worth $3 million per year. In 2011, the Board replaced the slogan with a "proud new brand identity"—*Pork: Be Inspired*. *Id.* ¶ 100, J.A. 28. In the same press release in which it announced that it would be adopting *Pork: Be Inspired*, the Board stated that the initial mark would be treated as a "heritage brand," and that "*The Other White Meat* campaign will not be featured in advertising." *Id.* ¶ 101, J.A. 29. The Board's replacement of the mark with *Pork: Be Inspired* justifies the inference that the mark is no longer worth $3 million annually.

That inference is strengthened by the fact that when the Board valued the mark and negotiated its purchase in 2006, it expressly assumed that it would be using the slogan as its primary brand identity for the indefinite future. *Id.* ¶¶ 105-106, J.A. 29-30. At that time, the Board reasoned that it could either purchase the mark from the Council, or spend millions of dollars building a new brand identity. *Id.* ¶¶ 68-72, J.A. 22-23. The Board chose to purchase the slogan. *Id.* ¶ 71, J.A. 23. In a letter seeking approval for the purchase from the Department of Agriculture, the Board stated that its "primary objective" was to purchase the mark for less than the estimated cost of establishing the new brand identity. *Id.* ¶ 72, J.A. 23. The Board's valuation of the slogan incorporated the assumption that it would serve as the Board's

8

primary brand identity in the future.  Now that it is no longer the Board's primary brand identity, the slogan is likely worth substantially less than the $3 million per year the Board pays for it.

Those allegations establish Dillenburg's Article III standing.  Dillenburg's injury is a classic form of concrete and particularized harm:  actual economic loss.  *See Sierra Club v. Morton*, 405 U.S. 727, 736-37 (1972); *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1042 (D.C. Cir. 2010).  The Board's allegedly unlawful overpayments for an advertising campaign it does not use divert funds from other promotions.  Because of that pork demand is lower, and thus the price at which pork producers can sell their hogs is lower than it would be if the Board were spending those funds on legitimate promotions and other demand-enhancing campaigns rather than squandering them with the Council.  The misuse of the assessment funds cognizably harms Dillenburg's bottom line.  *See, e.g.*, *United Transp. Union v. ICC*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989) (explaining that "courts routinely credit" allegations founded on the "application of basic economic logic"); *see also Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998) (explaining that a "petitioner who is likely to suffer economic injury as a result of [governmental action] that changes market conditions satisfies" Article's III injury-in-fact requirement) (alterations in original) (quoting 3 Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* 13-14 (3d ed. 1994)).

Traceability and redressability readily follow.  Dillenburg's harm is caused by the Board's failure to spend his mandatory assessment funds on legitimate promotions.  The harm is thus "fairly traceable" to the challenged action.  *Lujan*, 504 U.S. at 560 (internal quotation marks omitted).  Furthermore, if the Board were ordered to stop paying $3

9

million annually for the mark, it would be required by law to use those funds reasonably and for legitimate purposes, an outcome likely at least partially to redress his injury. *See Massachusetts v. EPA*, 549 U.S. 497, 525-26 (2007) (explaining that litigation success need only partially redress a plaintiff's injury to meet the redressability requirement). The close relationship between a holding that the funds are being unlawfully used and a remedy that would make them available for lawful, more effective uses makes it "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted).

We therefore conclude that Dillenburg has alleged a plausible claim to Article III standing. Because we find that Dillenburg has standing, we need not and do not reach the arguments of the other plaintiffs regarding their standing. *See Mendoza*, 754 F.3d at 1010; *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012).

**B.**

The government argues that we should affirm the district court's order dismissing the complaint on the alternative ground that the plaintiffs failed to exhaust their administrative remedies. We reject that argument because the statute offers administrative relief that, in the context of this case, is too "doubtful and limited" to justify requiring the plaintiffs to pursue it. *Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988).

Under the relevant provision of the Pork Act, any person subject to "an order" may petition the Secretary of the Department of Agriculture (1) "stating that such order, a provision of such order, or an obligation imposed in connection with such order is not in accordance with law" and (2) "requesting a modification of such order or an exemption

470

10

from such order." 7 U.S.C. § 4814(a)(1). The government contends that the plaintiffs were required to petition the agency to exempt them from their payment obligations under the Pork Order, or seek a modification of the Pork Order prohibiting the Board from making the expenditures to which they objected. Appellee Br. 17-19.

There is reason to doubt that the exhaustion provision applies to the plaintiffs' claims at all. The statute provides that an individual subject to the Pork Order must "stat[e]" in his petition for relief "that such order, a provision of such order, or an obligation imposed in connection with such order is not in accordance with law." 7 U.S.C. § 4814(a)(1)(A). But the plaintiffs are not claiming that any provision of the Pork Order itself is "not in accordance with law." The government asserts, however, that the plaintiffs fall within the provision because the Board's misappropriation of assessment funds transforms otherwise lawful assessments into "obligation[s] imposed in connection with" the Pork Order "not in accordance with law." *Id.* That is a strained reading of the provision.

Even assuming the plaintiffs came within the Pork Act's administrative relief provision, the only relief they could obtain would be inadequate. *See Bowen*, 487 U.S. at 901. The Act provides only two administrative remedies: "an exemption from" the Pork Order, or "a modification" of it. 7 U.S.C. § 4814(a)(1)(B). Neither of those remedies would provide plaintiffs anything like the relief they seek. *See Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (explaining that administrative relief must be of the "same genre" as Administrative Procedure Act relief sought).

An exemption from assessments would not remedy the plaintiffs' harms. The plaintiffs seek specific performance.

11

An exemption is more akin to rescission. The two are not equivalent. Moreover, making exemptions from payment the only relief available to pork producers would undermine the program: Producers who identify actionable abuses of the Board's discretion would be exempted, narrowing the Board's base even as it failed to correct its malfeasance.

Alternatively, a modification of the Pork Order would offer the plaintiffs only doubtful relief. The plaintiffs' claim is that the Secretary is failing to comply with the Pork Act and Order. The plaintiffs do not want to change the rules; they want to see the existing rules enforced. Modifying the Order will not get them that. Because neither an exemption nor a modification of the Pork Order would offer the plaintiffs adequate relief, they were not required to pursue an administrative path that offered only those two remedies.

\* \* \*

For the foregoing reasons, we reverse and remand for further proceedings consistent with this opinion.

*So ordered.*

472

## Meyer Valuations (2001 & 2003)

a. The valuations of the JRC&A report "are unacceptable as neither consider the future value/income of the asset in question."

b. "A critical component in determining a purchase price will be to decide how much of the current value of Pork. The Other White Meat is attributable to prior expenditures by the National Pork Board."

c. "Seventy-five percent of the ultimate value [of PTOWM] will be garnered in the first 10-12 years."

Pork. The Other White Meat Valuation Review

Steve R. Meyer, Ph.D.
August 28, 2001

I have reviewed the estimates of the value of the Pork. The Other White Meat brand/tagline. The two estimates take very different approaches and thereby provide a broad range of value estimates.

JRC&A

I believe both of the estimates arrived at by this valuation are unacceptable as neither consider the future value/income of the asset in question.

JRC&A's computation of the cost of achieving the phenomenal awareness that consumers have of Pork. The Other White Meat is, at first glance, reasonable. The problem is that awareness cannot be used to directly infer action on the part of consumers. Therefore, neither can it be used to infer sales or consumption and thus economic return.

JRC&A's valuation of past communication investment also has nothing to do with future value. Investing in an asset does not establish the value of an asset.

Buettel & Jackson

I do not know form the report what firm these authors represent. Their approach to valuing Pork. The Other White Meat is better since they do recognize that the value of an asset is the discounted stream of cash flows generated by the asset. However, they take some rather quirky views of computing initial value and then "terminal" value and then prorating the sum of these two over the estimated life of this intangible asset.

Their "Consumption" method is pretty reasonable in that they compare actual consumption to what many would accept as a reasonable 1988 forecast of consumption from FAPRI. They value it with actual prices and use another reasonable assumption regarding the debt free cash flows that might be generated by the income stream.

The problems with the "Consumption" method are two-fold. First, one has to accept a heroic assumption about the percent of the consumption differential attributable to the trademark. I have no idea whether 50% is right and I don't think anyone else does either. You could argue any number and no-one would have anything objective with which to refute it.

474

The second problem is, in my mind, more serious. The FAPRI forecasts are the result of a large model that allows many variables to change. The consumption pattern used here is dependent upon national income levels in many countries, the quantities and prices of many other goods (including grains and other livestock), exchange rates, etc., etc. Change any of these in the model and you will get a different consumption pattern and therefore a different value of consumption and therefore a different set of debt free cash flows and therefore a different value for the asset. There is possibly only one set of variable values that would result in this asset valuation. There is almost certainly very few sets of variable values that would do so.

This brings us to the best estimate offered by the outside sources: Beuttel and Jackson's "Estimated Return" method. This method uses the estimated return per dollar spent on demand enhancing programs from Texas A & M's evaluation of the pork checkoff program. I find this to be clearly superior to the other methods mainly because the TAMU estimates come from economic models capable of holding all other factors constant. The estimated benefits-cost ratios are solely the result of varying demand enhancing expenditures.

The "Estimated Return" calculations which use Pork Media Expenditures as their starting point (the very last set of estimates presented) are, I think, the most appropriate since media expenditures probably get closer to isolating that portion of demand enhancement expenditures most closely aligned with building and utilizing the Pork. The Other White Meat brand.

But Beuttel and Jackson's method of discounting to 1988 value and then prorating over a 40-year life of the asset is, I think, incorrect and unnecessary. There is a much simpler method.

<u>Present Value Analysis</u>

Figure 1 below shows Beuttel and Jackson's estimate of debt free cash flow from 1988 to 1997. After a steep increase in 1992, these have been remarkably stable over the last 6 years of the period. The average for 1992 through 1997 is $2.8275 million per year. This number represents the amount of annual cash flow expected to come to the pork industry if:

- Pork media expenditures are about the same as for 1992-1997
- Pork media expenditures yield the average benefit estimated by the Texas A & M checkoff evaluation.

Due to its stability, this would seem to be a reasonable estimate of the future debt free cash flows.

To estimate the net present value of a future income stream of $2.8275 million per year, one must assume a life for the asset and a discount rate.

475

Beutel and Jackson used 40 years as the estimated life of the Pork. The Other White Meat brand because that is the life allowed for an intangible asset by GAAP accounting principles.   This implies that Pork. The Other White Meat has 27 years of remaining useful life.  However, using an accounting rule to determine the life of an advertising/marketing asset strikes me as a bit simplistic. I think managers must make a realistic estimate of how much longer this brand/tagline might work.  Recent problems with poultry demand suggest that it may not have much more useful life.  Nearly universal awareness and a generally positive view from consumers suggest that it has plenty of useful life.

While the choice of an expected remaining life for Pork. The Other White Meat is important, readers need to realize that half of the ultimate net present value will be generated by the cash flows in the first 5 to7 years, depending upon the discount rate. Seventy-five percent of the ultimate value will be garnered in the first 10-12 years.  Lower discount rates cause the time to be longer.  Higher ones make it shorter.

The discount rate can be viewed as the opportunity cost incurred by not investing in some other activity.  I think Beuttel and Jackson's 15 to 25 percent discount rates are too high.  I know of few investments that will get close to those returns over an extended length of time such as we are addressing here.  The long-term rate of return form stock indexes is generally 10-12 percent.  A discount rate in this range makes more sense, I think.

The table below shows Net Present Values for the estimated debt free cash flows using selected remaining lives and discount rates.

Net Present Value of Annual Cash Flow = $2.8725 Million

| Discount Rate | Years of Remaining Life | | | | |
|---|---|---|---|---|---|
| | 5 | 7 | 10 | 12 | 27 |
| 10% | $12,915,556 | $15,820,761 | $19,261,149 | $21,065,053 | $27,393,050 |
| 11% | $12,602,587 | $15,330,074 | $18,488,937 | $20,107,568 | $25,463,522 |
| 12% | $12,302,748 | $14,864,891 | $17,767,643 | $19,221,471 | $23,766,858 |

## Assigning Value to Pork. The Other White Meat

Remember that the values above are the net present values of to future cash flow streams generated by all media expenditures. Pork. The Other White Meat is just one part of that broad array of activities. It has not been the main message point in recent National Pork Board ad campaigns.  It no doubt contributes to these campaigns but it is certainly not the only factor of them.

So, one must decide what proportion of the estimated cash flows are attributable to just Pork. The Other White Meat.  I see no objective evidence that leads to a

476

conclusion on this point.   This will have to be a point of negotiation.  Note that multiplying the numbers above by whatever percentage you feel appropriate yields the estimate of the net present value of Pork. The Other White Meat.  For example, if you agree that Pork. The Other White Meat has 10 years of remaining life, that the appropriate discount rate is 12 percent and that Pork. The Other White Meat was responsible for 40 percent of the success of media expenditures, then the net present value would be:

$$\$17,767,643 \times 40\% = \$7,107,057.20$$

## Determining a Purchase Price or Lease/Royalty Rate

A critical component in determining a purchase price will be to decide how much of value or Pork. The Other White Meat is attributable to prior expenditures by the National Pork Board.  This is another negotiating point.  It's a real chicken and egg problem – Would Pork. The Other White Meat have been as valuable without National Pork Board spending and would National Pork Board spending have been as valuable without Pork. The Other White Meat?   Again, multiply a percentage times the result of the calculation immediately above to get an estimate of an outright purchase price that has not already been paid.

If the National Pork Board decides to lease the brand, the purchase price determined in the paragraph above would be multiplied by some percentage which would provide an amount sufficient to amortize the value and provide a return sufficient to offset NPPC's opportunity cost.  A linear amortization over the remaining life (decided above) plus 7 to 9 percent opportunity cost seems reasonable.  So, if 10 years of remaining life has been accepted, one would multiply the final price by 17 to 19 percent (100/10 + 7 = 17, 100/10 + 9 = 19) to get an annual lease rate.

Note that the shorter the life chosen, the lower the net present value (page 3) but the higher will be the amortization portion of the lease rate.

## Example

Assume that we have accepted the following:
1. Remaining life = 10 years
2. Discount rate = 12 percent
3. Pork. The Other White Meat share = 50%
4. National Pork Board prior contribution = 50%
5. Lease rate opportunity cost = 8%

From the information above, the value, purchase price and lease would be:

Net Present Value of Media Expenditures = $17,767,643
Net Present Value of Pork. The Other White Meat = $8,883,821.50

477

Price give prior NPB contribution = $4,441,910.75
Royalty fee   = $4,441,910.75 * (100%/10 + 8%)
              = $4,441,910.75 * 18%
              ≈ $799,543.94

This would represent the highest price that the National Pork Board should pay.

478



Debt Free Cash Flows
Estimated Return Method

2 (2)

Pork. The Other White Meat Valuation – Computation as of July 2003

Steve R. Meyer, Ph.D.
Paragon Economics, Inc.
July 29, 2003

Beuttel and Jackson's "Estimated Return" method (discussed in my previous review of PTOWM valuations) was, in my opinion, the most appropriate method for valuing PTOWM and its future usage. This method uses the estimated return per dollar spent on demand enhancing programs from Texas A & M's evaluation of the pork checkoff program. I find this to be clearly superior to the other methods because the TAMU estimates come from economic models capable of holding all other factors constant. The estimated benefit-cost ratios are solely the result of varying demand enhancing expenditures.

The "Estimated Return" calculations which used Pork Media Expenditures as their starting point (the very last set of estimates presented by Beuttel and Jackson) are, I think, the most appropriate since media expenditures probably get closer to isolating that portion of demand enhancement expenditures most closely aligned with building and utilizing the Pork. The Other White Meat brand.

Present value analysis using 1998-2002 data

Campbell Mithun has recently provided data for pork checkoff media expenditures for 1998 through 2002. This is the same data provided by Bozell for the original Beuttel and Jackson estimation, just extended to cover the period 1998 through 2002. Table 1 below presents these expenditures and the computations used to arrive at Debt-Free Cash Flows for pork producers. Figure 1 below shows estimated debt free cash flow from 1988 to 2002. After a steep increase in 1992, these were remarkably stable through 1997 before falling dramatically since that time.

My original estimates depended upon the high media expenditure levels of 1992 through 1997 which averaged $11.615 million. These expenditures provided an estimated debt-free cash flow of $2.8275 million per year. This number represents the amount of annual cash flow expected to come to the pork industry if:

- Pork media expenditures are about the same as for 1992-1997
- Pork media expenditures yield the average benefit estimated by the Texas A & M checkoff evaluation.
- Debt-free cash flow equals 1.3% of total benefit where the 1.3% is based on the actual performance of Smithfield Foods over the period 1998-2000. Smithfield was chosen because they were a pure pork company involved in all aspects of the pork industry. I

NPB 015681

2 (3)

did not update this estimate due to the short time frame. Smithfield changed significantly in 2000 following the purchase of Carroll's and Murphy Family Farms. Good hog markets in 2000 and early 2001 probably yielded higher cash flows. 2002 undoubtedly yielded lower cash flows. Without further analysis and based on these changes, the 1.3% may be low but not by a large amount. I can update these data if there is still a need to do so.

Checkoff media expenditures have declined dramatically since 1997. **In fact, the average for 1999 through 2002 is just $5.260 million.** Based on the computations in Table 1, these expenditures would yield **average debt-free cash flows of $1.291 million.** Even these levels may be high given the decided downtrend of media expenditures in recent years.

To estimate the net present value of a future income stream, one must assume a life for the asset and a discount rate.

Beuttel and Jackson used 40 years as the estimated life of the Pork. The Other White Meat brand because that is the life allowed for an intangible asset by GAAP accounting principles. This implies that Pork. The Other White Meat now has 25 years of remaining useful life. As I pointed out in my earlier paper, I believe using an accounting rule to determine the life of an advertising/marketing asset is too simplistic. I think managers must make a realistic estimate of how much longer this brand/tagline might work, especially in light of the discussions about PTOWM Version 2 at the Strategic Planning Meeting in Wisconsin.

While the choice of an expected remaining life for Pork. The Other White Meat is important, readers need to realize that half of the ultimate net present value will be generated by the cash flows in the first 5 to 7 years, depending upon the discount rate. Seventy-five percent of the ultimate value will be garnered in the first 10-12 years. Lower discount rates cause the time to be longer. Higher ones make it shorter.

The discount rate can be viewed as the opportunity cost incurred by not investing in some other activity. I think Beuttel and Jackson's 15 to 25 percent discount rates were too high. I know of few investments that will get close to those returns over an extended length of time such as is being considered here. The long-term rate of return from stock indexes, given the performance of the past few years, is 8-10 percent. A discount rate in this range makes more sense, I think.

The table below shows Net Present Values (in millions of dollars) for $1.219 million of debt free cash flow using selected remaining lives and discount rates.

### Net Present Value of Annual Cash Flow = $1.219 Million     NPB 015682

| Discount Rate | Remaining Useful Life | | | | |
|---|---|---|---|---|---|
| | 5 | 10 | 15 | 15 | 25 |
| 8% | $5,154,589 | $8,662,715 | $11,050,287 | $11,050,287 | $13,781,136 |
| 9% | $5,021,540 | $8,285,196 | $10,406,349 | $10,406,349 | $12,680,950 |
| 10% | $4,893,906 | $7,932,636 | $9,819,449 | $9,819,449 | $11,718,459 |

481

2 (4)

### Assigning Value to Pork. The Other White Meat

Remember that the values above are the net present values of to future cash flow streams generated by all media expenditures. Pork. The Other White Meat is just one part of that broad array of activities. It has not been the main message point in recent National Pork Board ad campaigns. It no doubt contributes to these campaigns but it is certainly not the only factor of them.

So, NPB leadership and management must decide what proportion of the estimated cash flows are attributable specifically to Pork. The Other White Meat. I know of no objective evidence that leads to a conclusion on this point. This will have to be a point of negotiation. Note that multiplying the numbers above by whatever percentage you feel appropriate yields the estimate of the net present value of Pork. The Other White Meat. For example, if you agree that Pork. The Other White Meat has 10 years of remaining life, that the appropriate discount rate is 9 percent and that Pork. The Other White Meat was responsible for 40 percent of the success of media expenditures, then the net present value would be:

$$\$8,285,196 \times 40\% = \$3,314,078$$

### Determining a Purchase Price or Lease/Royalty Rate

A critical component in determining a purchase price will be to decide how much of the current value of Pork. The Other White Meat is attributable to prior expenditures by the National Pork Board. This is another negotiating point. It's a real chicken and egg problem – Would Pork. The Other White Meat have been as valuable without National Pork Board spending and would National Pork Board spending have been as valuable without Pork. The Other White Meat? Again, multiply a percentage times the result of the calculation immediately above to get an estimate of an outright purchase price that has not already been paid.

If the National Pork Board decides to lease the brand, the purchase price determined in the paragraph above would be multiplied by some percentage which would provide an amount sufficient to amortize the value and provide a return sufficient to offset NPPC's opportunity cost. A linear amortization over the remaining life (decided above) plus 7 to 9 percent opportunity cost seems reasonable. So, if 10 years of remaining life has been accepted, one would multiply the final price by 17 to 19 percent (100/10 + 7 = 17, 100/10 + 9 = 19) to get an annual lease rate.

NPB 015683

482

2 (s)

Note that the shorter the life chosen, the lower the net present value (page 3) but the higher will be the amortization portion of the lease rate.

<u>Example</u>

Assume that we have accepted the following:
1. Remaining life = 10 years
2. Discount rate = 9 percent
3. Pork. The Other White Meat share = 50%
4. National Pork Board prior contribution = 50%
5. Lease rate opportunity cost = 8%

From the information above, the value, purchase price and lease would be:

Net Present Value of Media Expenditures = $8,285,196
Net Present Value of Pork. The Other White Meat = $4,142,598
Price given prior NPB contribution = $2,071.299
Royalty fee = $2,071,299 * (100%/10 + 8%)
= $2,071,299 * 18%
= $372,834

This would represent the highest price that the National Pork Board should pay give the assumptions above.

The Excel Workbook provided with this paper includes my computations and a page (titled "Computation Sheet) that can be used to arrive at these estimates for different remaining lives, discount rates, PTOWM and NPB shares and lease rate opportunity costs.

**NPB 015684**

483

2 (6)

Table 1

**Pork Checkoff Media Expenditures and Debt-Free Cash Flow Computations**

| Year | Media Expenditures | Low Payoff | High Payoff | Average | Pct. Debt-Free Cash Flow | Debt-Free Cash Flow, Dollars |
|---|---|---|---|---|---|---|
| TAMU Low and High Multipliers | | 15.26 | 22.49 | | | |
| 1988 | $6.300 | $96.138 | $141.687 | $118.913 | 1.30% | $1.546 |
| 1989 | $5.100 | $77.826 | $114.699 | $96.263 | 1.30% | $1.251 |
| 1990 | $5.065 | $77.292 | $113.912 | $95.602 | 1.30% | $1.243 |
| 1991 | $6.800 | $103.768 | $152.932 | $128.350 | 1.30% | $1.669 |
| 1992 | $12.800 | $195.328 | $287.872 | $241.600 | 1.30% | $3.141 |
| 1993 | $10.363 | $158.139 | $233.064 | $195.602 | 1.30% | $2.543 |
| 1994 | $11.029 | $168.303 | $248.042 | $208.172 | 1.30% | $2.706 |
| 1995 | $11.772 | $179.641 | $264.752 | $222.197 | 1.30% | $2.889 |
| 1996 | $12.228 | $186.599 | $275.008 | $230.804 | 1.30% | $3.000 |
| 1997 | $11.500 | $175.490 | $258.635 | $217.063 | 1.30% | $2.822 |
| 1998 | $13.500 | $206.010 | $303.615 | $254.813 | 1.30% | $3.313 |
| 1999 | $7.600 | $115.976 | $170.924 | $143.450 | 1.30% | $1.865 |
| 2000 | $5.800 | $88.508 | $130.442 | $109.475 | 1.30% | $1.423 |
| 2001 | $5.200 | $79.352 | $116.948 | $98.150 | 1.30% | $1.276 |
| 2002 | $4.500 | $68.670 | $101.205 | $84.938 | 1.30% | $1.104 |
| 2003 | $3.200 | $48.832 | $71.968 | $60.400 | 1.30% | $0.785 |

Figure 1



Debt Free Cash Flow from Pork Checkoff Media Expenditures

NPB 015685

## 2003 NPPC Email re PTOWM Value

a. Adopts Steve Meyer's valuation methodology (during negotiations over licensing rate) and proposes a total NPV for PTOWM of $4.9 million.

b. Gives *no* credit for the value contributed to PTOWM from the millions of producer dollars that were used to fund the entirety of PTOWM's promotion campaigns.

**Steve Murphy**                                    Exhibit 3  n)

| | |
|---|---|
| **From:** | Craig Christensen |
| **Sent:** | Monday, September 15, 2003 9:25 AM |
| **To:** | Steve Murphy |
| **Subject:** | FW: PTOWM |

Steve,
Below is John Caspers/NPPC's proposal. I had a good talk with him. (b)(5)
(b)(5)                              I will be tied up most of the day but call my cell (b)(6)
or email me your thoughts. Craig

-----Original Message-----
From: jcaspers@frontiernet.net [mailto:jcaspers@frontiernet.net]
Sent: Sunday, September 14, 2003 6:40 PM
To: craiger@netins.net
Subject: PTOWM


Per our phone discussion, I'd suggest the following for the PTOWM license
agreement:

In return for compensation described below, NPPC will grant the NPB a two year extension
of the license agreement
* NPB would have the option annually, for two years beginning 7/1/05, to continue use of
the PTOWM trademark
* NPB will provide NPPC notice of it's decision whether to exercise the option one year in
advance ( by 7/1/04 for the first year and by 7/1/05 for the second)
* If NPB elects not to exercise it's option for the use of PTOWM for the first year of the
extension, NPB forfeits its right to exercise its option for the second year of the
extension

Compensation:

* Those funds held in reserve by NPB and described as "Contigent Compensation" in the
current license agreement will be paid to NPPC upon signing this agreement or at another
time thereafter designated by NPPC.
* NPB will pay an annual fee, described below, for each year it exercises its option the
use the PTOWM trademark. Such annual fee will be due and payable by the first day of the
annual extension period (7/1/05 for the first year and 7/1/06 for the second)

Annual fee calculation:

Inputs per Meyer example (PTOWM Valuation - July 2003):
1. Remaining Life = 15 years
2. Discount Rate = Stock market return - 88 through present (est. 10%) 3. PTOWM Share =
50% 4. NPB Prior Contribution = N/A 5. Lease Rate Opportunity Cost = Same as discount rate

Lease Rate Calculations:

NPV of Media Expenditures = $9,819,449 (from Meyer chart)
NPV of PTOWM = $4,909,724
Price given prior NPB contribution - $0.00
Royalty fee = $4,909,724 * (100%/15 + 10)
        = $4,909,724 * 16.67%
        = $818,451 per year

Explanation:

We would use a stock market (Wilshire 5000) rate of return for the time period Beuttel and
Jackson started with (1988) up through the present for the discount rate and the
opportunity cost. I have estimated this to be 10% in the calculations, but it is probably

1

486



in actuality somewhere between 9% and 11%.

I have given no credit for the NPB Prior Contribution for the following
reasons:

* NPPC has received no compensation in the past for NPB's use of the trademark
* Until the start of the curent agreement NPPC had to defend the trademark at its own
expense
* There was no agreement, neither written, verbal nor implied, that any value created by
NPB use of the trademark would accrue to NPB
* The current agreement explicitly states that NPPC is the "sole and exclusive" owner of
the trademark and all goodwill and rights

Let me know if you have any questions or comments.  This is a rough outline and there are
details I've probably left out, but let me know what you think.

Jon

2

487

## PTOWM Acquisition Proposal (2006)

a. Premised on claim that PTOWM would serve as the Pork Board's primary advertising brand (i.e., choice was *either* purchase *or* replace).

b. "The [Pork Board] adopted PTOWM in 1986."

c. Claims that the Board must act "decisively and quickly."

d. "NPPC is in need of monies."

e. The Pork Board "was the only potential buyer of PTOWM."

f. Replacement cost "essentially became the market value."

g. No consideration of value developed in PTOWM through two decades of producer-funded campaigns (i.e., producer contribution).

# The National Pork Board
# *"Pork, the Other White Meat"*
# Acquisition Proposal

## February 14, 2006

### Intent

The National Pork Board (NPB) suggests there is strong business rationale and it is in the industry's best interest to purchase the asset *"Pork, the Other White Meat"* (PTOWM) from the National Pork Producers Council (NPPC) at this time.

### Rationale

The NPB adopted PTOWM in 1986.  Since then it has become nationally recognized and in 2000, Northwestern University found it to be the 4th most recognized tagline in US marketing.

Substantial consumer research led the NPB in March of 2005 to elevate PTOWM to the industry's brand, creating an opening to establish a new marketing slogan, "Don't be blah!"  The campaign strategy has proven successful, and as a result, the NPB is scheduled to invest over $100 million in the marketing of this brand to consumers through a variety of platforms over the balance of the current PTOWM license agreement.  The current license agreement with the NPPC expires on June 30, 2009.

The future holds a sizeable investment by the NPB in the PTOWM brand, and as such, the licensing fee in any subsequent PTOWM agreement is expected to increase substantially.  In short, any investment in the PTOWM brand between now and July of 2009 will work against the NPB and its ability to negotiate a favorable license fee in the future.

### Why Now?

Business experts will substantiate the principle that no organization should build its business model around a brand it doesn't own.  This strategy carries substantial, and in this case, unnecessary risk.

The NPB has the strongest negotiating position it will have regarding its ability to negotiate favorable purchase terms for PTOWM.

First, minimal investment has been put into the brand strategy to date, resulting in minimal brand equity.  And second, the NPPC is in need of monies and is challenged with no income from the licensing agreement during its final two years.

CONFIDENTIAL
Page 1

489

Rationale Continued...

## Failure to Act

The NPB must act decisively and quickly.  The NPB holds maximum negotiating leverage today and believes that failure to act would force the organization to walk away from a brand within which the industry has built tremendous equity and for which it has great emotional attachment.

## Exploring the Possibility

As a result of discussions with Barry Carpenter in December 2005, the NPB began the process of exploring terms for a potential acquisition of PTOWM from the NPPC,

Appraisals from independent experts were sought, and a wide range of values were received.  But at the end of the day, it was determined that the NPB was the only potential buyer of PTOWM, and it was decided that the only options for the NPB were to purchase the brand or rebuild it.

## Establishing Value

The NPB acquisition efforts were put towards determining the rebuild price and later it was calculated that the brand could be rebuilt over a period of 7 years at an incremental cost of $36.1 million.  In the view of the NPB, the rebuild cost essentially became the market value as it entered negotiations with the NPPC.

## Negotiations with the NPPC

On February 6, 2006, a negotiating team for the NPB met with a negotiating team for the NPPC in Omaha, NE.  The primary objective of the NPB was to arrive at a purchase price less that the rebuild cost, and to protect the organization's ability to pay by including a provision linking the purchase agreement to the national pork checkoff rate.

A tentative agreement was reached with the NPPC pending approval by AMS of the USDA.  The tentative agreement with the NPPC and the "rebuild cost" strategy and calculation follow.

CONFIDENTIAL

490

## PTOWM Purchase Term Sheet (2006)

a. Total payout would be $60 million (20 years of $3 million payments, includes a fixed 6.75% interest rate).

b. Requires the Pork Board to "maintain the quality of [PTOWM] through appropriate use."

c. Finality of agreement requires approval of USDA.

# The National Pork Board
## PTOWM Purchase
### Tentative Term Sheet

The National Pork Board will purchase the *Pork, the Other White Meat* trademark and all accompanying designs associated with *Pork, the Other White Meat* from the National Pork Producers Council per the following terms:

1. The purchase price is $34.597 million to be paid over 20 years with an interest rate of 6.75% resulting in an annual payment of $3.0 million.

2. The purchase will be a "Contract for Deed" meaning the National Pork Board will have full use of all designs, the trademark, etc. through the course of the payment period and will have full and unrestricted ownership upon completion of the $60 million obligation.

   (Since no legal expertise was available during the negotiation, the NPB's agreement to the "Contract for Deed" structure is contingent on advice from legal counsel regarding suitable legal structure options.)

3. The effective date of this agreement is July 1, 2006 with the first installment due on that date and subsequent annual installments paid on the anniversary date.

4. All provisions within the existing license agreement between the National Pork Board and the National Pork Producers Council will be suspended effective June 30, 2006. The three remaining years (2006, 2007 and 2008) and all provisions of the current license agreement will automatically be reinstated should the national pork checkoff rate fall below 40 cents per $100 value. If the license agreement is reinstated, the NPB's equity in the PTOWM mark generated through NPB purchase payments will remain intact during the reinstated license period and applied to any newly negotiated purchase arrangement.

5. During the "contract for deed" period, the NPB may not sell the PTOWM mark without prior approval from the NPPC. (See bold copy in point #2)

6. In the event the National Pork Board is more than 30 days late on its annual payment obligation, the National Pork Producers Council may serve notice of default to the National Pork Board and the National Pork Board shall have a 30 day remedy period. If remedy is not made, the trademark Pork, the Other White Meat and all trademarks purchased from the NPPC by the NPB as a part of this transaction shall transfer back to the National Pork Producers Council.

7. The National Pork Board will maintain the quality of the purchased property through appropriate use.

8. For this agreement to be final, it must first be approved by the full Board of Directors of the National Pork Board, the National Pork Producers Council and the Agricultural Marketing Services within the USDA.

CONFIDENTIAL

492

## <u>Testimony of Neil Dierks, CEO of NPPC (excerpt)</u>

a.  He never told the Pork Board that it needed to act "decisively and quickly."

b.  There were no other offers for PTOWM.

34

A. To also allow recognition of what's called an individual member.

Q. So just, say, for example, one hog producer somewhere in America?

A. Yes, recognize them as an individual.

Q. And they pay fees, I take it?

A. We have entities in the industry from a pork production side that participate in a program we call the Strategic Investment Program, which is a voluntary funding mechanism.

Q. And the voluntary funding mechanism, is that where the NPPC gets the money that it needs to survive?

A. That's one source of revenue for NPPC.

Q. What's the other source of revenue?

A. Participation by the Packer Processor Industry Council, the participation by the Allied Industry Council.

We have other activities, including our annual trade show that is another major funding source.

Q. And also the revenue that it collects off of the trademark?

A. Yeah. My understanding of your question was to survive. Those are the ones needed to survive.

35

NPPC does receive revenue from the sale of "The Other White Meat" trademark.

Q. Could the NPPC survive without the moneys that it has collected from the sale of "The Other White Meat"?

A. Yes.

Q. Would it have to downsize at all if it did not have that money?

A. Define downsize.

Q. Reduce staff and employee count.

A. I'm not sure we'd have to reduce employee count or staff. We might reduce some of our programming presence in some places; but it would not be like a reduction in force type thing, I don't believe.

Q. Would any executives lose their jobs?

A. I don't believe so.

Q. If there were documents that discussed the possibility of having to downsize or lose executive jobs due to the loss of trademark funds, you're not aware of them?

A. No. Can I add to just this last list?

Q. Yes.

A. Just in the the nature of being complete.

Q. Yes.

36

A. We have other--there are other sponsorships and other miscellaneous types of revenue that are received that aren't vastly significant; but we do have some other sources of sponsorships for an event or a function that we also have.

Q. Now, at the time we were talking about the justification for the license fee post-separation, and you said that the NPPC was re-evaluating its focus and direction.

Did the NPPC at that point around the time of the separation have any other parties that wanted to license "Pork, The Other White Meat," other than the National Pork Board.

A. I do not--I am not aware of any firm offers at that juncture.

I am aware of some conversations that I had in the the industry with folks in the packing industry, things on this order, over--and I think that they're all speculative discussions.

But of people saying, well, gee, maybe there would be an interest with someone other than the National Pork Board purchasing the trademark or using the trademark.

Q. But that's all speculative?

A. That's all speculative.

37

Q. So for all practical purposes, the only customer, as we would say, for the trademark "Pork, The Other White Meat" was the National Pork Board?

A. At that time of the separation.

Q. Okay. And has that changed? Did that change, rather, at some point?

A. That there?

Q. That there was some other customer, other than the National Pork Board?

A. Other than speculation and discussion, there were no hard offers that I'm aware of.

Q. Now, after the separation after the National Pork Producers Council relinquished its role as general contractor, did the National Pork Producers Council have any responsibility with regard to licensing after the separation?

A. No, not that I'm aware of.

Q. Did the National Pork Producers Council have any responsibility to execute advertising initiatives for "Pork, The Other White Meat" after the separation?

A. We had no programming to do that, no.

Q. Did the National Pork Producers Council have any responsibility with regard to monitoring the use of potentially infringing trademarks after the

114

Q. Thank you. Could you explain that to me?

A. I can't explain.

Q. I'm not sure I understand.

A. I cannot explain it to you.

Q. You don't understand it either?

A. It looks like that was the view of the Pork Board.

Q. Is it your understanding that what the Pork Board is saying here is that if they invest more into the "Pork, The Other White Meat" brand, that only means that their license fee would go up?

A. That would appear--your observation would appear to be what it says.

Q. And is that true? Would that--was that the position of the National Pork Producers Council?

A. I only see that as speculation from my perspective. I'm not aware of any discussions at NPPC.

Q. So it's true that NPPC never said to the National Pork Board, "Hey, the more you invest, the higher your license is going to be"?

A. No, that was never said by the National Pork Producers Council.

Q. Because that just doesn't make any sense, does it?

115

A. I mean from an NPPC perspective, we're responsible to our investors, and we see this as we're going to do whatever we can do to get the best value for our investors, thus in the future--I mean, this takes you back in the past, but I try to bring-- whatever I do with the organization, we try to get the best deal for producers.

But NPPC never had, to my knowledge, never had discussions with the Pork Board about that.

If we were going to negotiate, we always tried to negotiate a win/win situation; but I'm not aware of NPPC telling the Pork Board this.

Q. Okay. Did the NPPC ever tell the NPB that, for purposes of renewing this particular license that was to expire June 30th, 2009, did it ever tell the NPB that it would not renew that license or that others were in the market for the trademark?

THE WITNESS: Can you repeat that question.

(Question read by the reporter.)

A. Okay. Two questions.

I don't believe NPPC ever told the Pork Board that it wouldn't be open to discussions on renewing the license.

Q. Uh-huh.

A. And the second question is, that I don't

116

know if NPPC told the Pork Board that there were others that were interested or not.

I will tell you all I can say is from an NPPC perspective, we listen to all offers.

Q. Okay. I think you told me earlier that there were no--there were not any hard offers?

A. That I was aware of, that's correct.

Q. And as far as there being offers, that would be speculative?

A. I believe that it would be--yes, it would be speculative.

I do not recall any hard offers.

Q. Okay. All right. Would you go to the last paragraph on this first page.

Last sentence, it says, "And, second, the NPPC is in need of moneys and is challenged with no income from the licensing agreement during its final 2 years."

Do you see that?

A. I see that.

Q. Okay. Do you agree with that statement?

A. NPPC's always in need of money. And that's--I mean that's--our attitude is, it takes money to do what we're doing.

I would not necessarily agree that we were

117

challenged with no income, depending on how you want to read the semantics there; but it is true that it would go to 1 dollar per year in the final 2 years of the lease agreement.

Q. This statement here, Failure to Act, quote The NPB must act decisively and quickly. The NPB holds maximum negotiating leverage today and believes that failure to act would force the organization to walk away from a brand within which the industry has built tremendous equity and for which it has a great emotional attachment.

Do you see that?

A. Uh-huh.

Q. Yes?

A. Yes, I see that.

Q. Now, when whoever wrote this uses "the industry," is it your understanding that that is the same industry that you described to me earlier, when you described the pork chain?

A. I don't know.

Q. Is it true that the National Pork Board would have to walk away from its brand "Pork, The Other White Meat"? Is that what the National Pork Producers Council was telling it, if it didn't act decisively and quickly?

118

A. Not from what I recall.

Q. Who is Barry Carpenter?

A. Barry Carpenter is a--I believe his title was deputy administrator of the agricultural marketing service of the of United States Department of Agriculture.

Q. Okay. Do you see--under Exploring the Possibility, do you see where it says "Appraisals from independent experts were sought, and a wide range of values were received"?

A. Okay. Yes, I see that.

Q. Do you agree with that?

A. I have no way of knowing.

Q. Okay. Do you see where it says, quote, But at the end of the day it was determined that the National Pork Board was the only potential buyer of "Pork, The Other White Meat", and it was decided that the only options for the NPB were to purchase the brand or rebuild it.

Do you see that?

A. I see that.

Q. Do you recall there being in the negotiations the option of the National Pork Board purchasing the brand or rebuilding it?

A. Not as that's stated.

119

Q. What do you recall?

A. I recall negotiations or discussions of the Pork Board purchasing the "Pork, The Other White Meat" or "The Other White Meat, or the brand.

An option the Pork Board had that if it did not or that if it--or if it, you know, at the end of the lease that there was no agreement to go forward, that--I mean NPPC owned it, and that if the Pork Board was going to continue to do something in the promotion, there would have to be rebuilding of some promotional program.

Q. It would have to have a new trademark?

A. It would have to have a new trademark, but that's all speculation on my part.

Q. It says that there were negotiating teams. Who comprised the negotiating teams?

A. From the National Pork Producers Council, we had the president of the council.

Q. Can you give me names?

A. His name is Don Buhl. We had Don Butler, who is a member of our board of directors. And I'd have to go look it up for the rest. We had one or two other producers.

Q. Okay. And you, too; right?

A. And I was party to the discussions. I think

120

we had two other producers. One was a past president, named John Kaspers, and another one was a current board member named Sam Carney; but I'd want to confirm that.

Q. Do you recall who was on the negotiating team for the National Pork Board?

A. Steve Murphy. Boy, I'd be at a loss. I believe Donita Rotabaugh.

Again, this is all foggy.

Q. That's fine, just what you can recall.

A. I think Donita Rotabaugh, I believe Wayne Pugh, and I believe a couple of other members of the Pork Board, but I don't recall if it was Lynn Harrison specifically.

Q. Now, the term sheet, the final document in this exhibit, Sir, this term sheet, was that created before the date of this document, February 14, 2006; or is this consistent with being created at around February 2006?

A. This term sheet was an outcome of the first sit-down negotiation, as I recall, and that was in February of 2006.

I don't recall the specific date. I was thinking it was somewhere around the 6th or 7th of February, but that's how this term sheet was put

121

forth.

I don't know about this other--the first two pages of this document specifically, if they were--that was created then or another time or where it was.

Q. Now, this sets the purchase price at 34.5 million, or 34.6 if we round up; right?

A. Uh-huh.

Q. You have to say yes.

A. Oh, yes.

Q. And to be paid over 20 years with interest at a rate of 6.75 percent?

A. That's correct.

Q. Now, what--in your mind during these negotiations what justifies a 6.75 percent interest rate?

A. It's a seller-financed sale.

Q. Okay. Was a bank involved coming up with that?

A. No. It's a seller-financed sale.

Q. Sir, who is Mark Williams, do you know?

A. Mark Williams is an individual that was associated with the Bozell Advertising Agency and manifestations, whatever other names that company had, and worked in conjunction with the agency and

**122**

the National Pork Producers Council and then the National Pork Board as related to the agency things.

Q. So he worked for both?

A. Well, he worked dealing with "The Other White Meat" accounts when NPPC was general contractor with the agency; and then after NPPC relinquished that, I believe he stayed on.

I do know that he is no longer associated with the account, but I don't know what his specific situation is.

Q. Do you know who Steve Meyer is, M-E-Y-E-R?

A. That would be Steve Mayer, M-A-Y-E-R?

Q. No, M-E-Y-E-R.

A. It would be Steve Meyer.

Q. Meyer?

A. Steve Meyer is a consulting economist in the pork industry.

Q. And did he, to your knowledge, perform any valuations for the National Pork Board?

A. I have no knowledge if he did for the National Pork Board.

It is totally possible he did.

(Deposition Exhibit No. 3 was marked for identification.)

Q. I'm going to show you Deposition Exhibit 3.

**123**

Now, I know you haven't seen this before, I don't think, because these are e-mails within the National Pork Board and with their consultants, I believe.

A. Uh-huh.

Q. True?

A. I believe that is the case.

Q. Okay. I just want to ask you about some things that are mentioned in here, though, so I just wanted to show you for point of reference.

A. Okay.

Q. Do you see the top e-mail dated March 7, 2006?

A. Yes.

Q. It states, "We realized early on in the process that the valuations would add little value to determining fair market value, and in fact accepting the appraisals have made the negotiating and approval process more problematic due to FOIA potential."

Do you see that?

A. I see that.

Q. Do you know what is meant by that?

A. No, I do not, other than I do understand what FOIA is; but I do not--I don't know why it's made negotiating and approval problems more

**124**

problematic.

Q. All right. Do you recall the NPB raising concerns with having sale documents and negotiations subject to FOIA requests?

A. I don't recall.

Q. Do you recall there being a problem in the negotiations due to the appraisals?

A. As I recall, there was a negotiation--there was a difference of opinion over values, but I looked at that as being negotiation. I don't know if it was driven by appraisals or not.

Q. Okay.

A. I thought it was negotiating.

(Deposition Exhibit No. 4 was marked for identification.)

Q. I'll show you Deposition Exhibit 4, Sir.

A. Sure.

Q. This appears to be some e-mails with Mr. Meimann and some other people cc'd in February of 2003.

A. Uh-huh.

Q. Yes?

A. Yes.

Q. And these are e-mails that you received and wrote; correct?

**125**

A. It appears that is the case, yes.

Q. And I believe you're discussing a company using "People, The Other White Meat"?

A. Could very well be the--yes, from reading this, that is the case.

Q. Now, it appears that you're involved in this, and that you were glad that the situation was solved; true?

A. Correct.

Q. Okay. I'm wondering, should there be other e-mails like this where you're involved in the monitoring of other uses of the trademark?

A. There may very well be other e-mails like this.

Q. Were you--do you recall being involved in more than one situation where the National Pork Board was fighting to keep another entity from using something they thought was infringing?

A. Well, can I just relate how I manage this?

Q. Yes, yes.

A. Because back to the separation when I was hired, we had a limited number of staff, and I had a limited number of hours in the day.

But having had the experience I had at the Pork Board and the familiarity I had at the Pork

## Testimony of Mark Williams (excerpt)

a. "[L]ogic suggested that there really would be a limited number of real potential buyers and so that changes the dynamics of the marketplace."

b. Replacement cost valuation was based on cost of putting a new advertising campaign into the market at a similarly weighted level. It was not designed to measure the cost of generating the same level of awareness as PTOWM.

c. The funding source for the PTOWM campaign has from the start been producer checkoff dollars.

00269

speaking, from different perspectives and ask them
to provide their input of and use that as a basis
to begin to start making a determination of what is
the most appropriate method.

Q.   Is the work that --

(Interruption.)

BY MR. BEALL:

Q.   Is the work that you did in connection
with valuation review in 2006 on the marks, the
mark THE OTHER WHITE MEAT, was that work consistent
with the work that you had previously done?

MS. KIRK:   Objection.   Form.

THE WITNESS:   Yes.

BY MR. BEALL:

Q.   In connection with that valuation work in
2006 on the mark THE OTHER WHITE MEAT, did you ever
actually provide the data, the raw numbers to the
National Pork Board?

A.   No.

Q.   Did you provide any specific valuation
numbers to the National Pork Board?

A.   The summary of the selected method of
valuation.

Q.   And what was the selected method of

00270

valuation?

A.    The replacement cost basis.

Q.    What in your understanding is a replacement cost basis?

A.    Well, the way it was done.

MS. KIRK:  Objection.  Foundation.

THE WITNESS:  The way it was done was to look at what the cost of developing and ultimately then placing in media a similar, an advertising campaign at somewhat of a similar weight level.

BY MR. BEALL:

Q.    And would this valuation or evaluation of a replacement cost, would it attempt to measure the cost of replacing the recognition of the mark THE OTHER WHITE MEAT?

MS. KIRK: Objection.  Foundation.  Form.

THE WITNESS:  No.  There would be no basis for that.  There would be nothing to base that on that would be able to be supported.

BY MR. BEALL:

Q.    As a result when you are describing a replacement cost valuation, what exactly are you replacing?  What are you costing out in the context of a replacement cost?

**Williams, Mark - Vol III (TestimoPage 270**

00271

A. The cost of making ads and running them.

Q. Not for, say, the success of the ads?

A. Correct. There would be no way to determine that.

Q. Ms. Kirk asked you questions about what the significance or what the phrase pork THE OTHER WHITE MEAT is intended to signify, and you indicated that you don't believe the mark is PORK.THE OTHER WHITE MEAT, why is that?

MS. KIRK: Objection. We will see what the transcript says. I don't think that was his response to that.

MR. GRACE: Ask a fresh question.

BY MR. BEALL:

Q. What is the mark that you understand to be at issue in this case?

A. THE OTHER WHITE MEAT.

Q. And do you --

Was the mark ever PORK.THE OTHER WHITE MEAT?

A. No.

MS. KIRK: I want to just lodge an objection, calling for a legal conclusion.

BY MR. BEALL:

00209

opinions about this campaign that he has worked on for the last 20 years.

MS. KIRK: And your client has also not disclosed any experts or any opinion witnesses, and, again, I'm not going to fight with you on the record. I made my record. You made yours. We will put our arguments to The Trial and Trademark Board.

BY MR. GRACE:

Q. The source of funding of your activities for the last 20 years with respect to THE OTHER WHITE MEAT campaign has been what?

A. Just clarify, it's actually gotten to be 22 years. The funding source is ultimately pork producers that pay into a mechanism that we commonly referred to as the check-off.

Q. And is that money funded through the government in any way before it gets to be paid towards you in your advertising agency?

A. The check-off mechanism itself is a Federal law that requires that it be collected and how it is collected and the specifics of how it is collected and it is also then over the collection of it and the distribution of those dollars is

### Testimony of Steve Meyer (excerpt)

a. "NPPC is in a very weak position as a seller."

b. NPPC spent none of their own money to develop PTOWM. It was always done with checkoff funds.

CONFIDENTIAL

67

# REDACTED

Q.  You wrote, "Furthermore, it appears to me that NPPC is in a very weak position as a seller." Why was NPPC in a very weak position?

A.  Well, this paragraph goes on to point out why they really are, and there's several reasons.

Q.  Okay.

A.  Should I just go on?

Q.  Yes, please.

A.  At the time NPPC was a newly independent organization that was trying to fund its operations, and they didn't have extra money to do that, to fund--to build that brand name.

I questioned here whether any branded companies like Hormel or Smithfield would really want to invest in a label that represents generic pork.  I mean if I was those companies, I would want my name on it.  I wouldn't want something that had represented all of pork in the past.

Finally, I didn't think--since NPPC had producer members, that's their membership, I didn't think that they could politically sell this brand name to anybody other than the National Pork Board,

504

CONFIDENTIAL

68

which was also producers.  I just didn't think politically they could get that done.

Q.    Why is that, sir?

A.    Well, it would be very unpopular if you were to sell it to a corporation or if--you know, and I don't have any evidence that this was ever an idea that was thrown around.  If the chicken business bought the thing and just buried it, I mean it would be very politically unpopular.

Q.    It would be politically unpopular because pork producers were basically paying taxes for it?

A.    No, I'm not talking about politics in Washington.  I'm talking about politics within the organization.

Q.    Got it.  And I hope I didn't interrupt you. Were there any other reasons why you felt that NPPC was in a weak position?

A.    No.  I think I've listed them there.

Q.    And what did you mean by generic label, sir?

A.    I meant a label that represents a generic product.  I realize that generic label has some legal meanings, but I'm not a legal person, so that has no connotation to me.

"Pork.  The Other White Meat" has represented all pork for many years, and I couldn't

CONFIDENTIAL

69

imagine why somebody that had a brand name, like Hormel or Smithfield or Tyson, would want to use something that represented all pork.

Q.    What do you mean by all pork?

A.    Well, it had been used as a label on pork sold in the United States.

Q.    By all pork producers?

A.    Well, yeah.  It could have been used in all those instances.  There were restrictions.  I mean it had to be applied to some products, and those kind of things, but it represented the generic product we know as pork.

Q.    And not any particular producer of pork?

A.    Correct.

**REDACTED**

CONFIDENTIAL                                             78

anything.

Q.    Are you aware-- Now, you used to work for the National Pork Producers Council, correct?

A.    Yes.

Q.    Are you aware of the National Pork Producers Council expending any amount of money to help develop the trademark "Pork. The Other White Meat"?

A.    No, not of their own money.

Q.    It was always the National Pork Board's money, correct?

A.    That's correct.

**REDACTED**

PETERSEN COURT REPORTERS
317 Sixth Avenue, Suite 606
Des Moines, IA 50309-4155
(515) 243-6596

## 2007 Letter from Pork Board CEO

The *value* of the PTOWM trademark "was built slowly and thoughtfully through 20 years of marketing investments, the funds for which were producer's hard-earned dollars."

# National Pork Board



P.O. Box 9114   Des Moines, Iowa 50306 USA   Phone: 515-223-2600   Fax: 515-223-2646

February 2, 2007

Dear Jennifer,

I'm writing in response to your concern about the legal correspondence from the National Pork Board requesting that your organization discontinue the use of the slogan "the other white milk".  Please understand the letter was in no way intended to challenge your cause or demean breastfeeding or those who support it.  We sincerely apologize if that is how the letter was interpreted.

Jennifer, this letter was about the National Pork Board doing its job on behalf of 70,000 US pork producers to protect pork industry investments.   "The Other White Meat®" is a pork industry trademark whose value was built slowly and thoughtfully through 20 years of marketing investments, the funds for which were producer's hard-earned dollars.  Any infringement on that mark would substantially lessen its value and impact for US pork producers.

It's also important to understand that the National Pork Board cannot pick and choose which infringement challenges it decides to address.   We have a responsibility to the industry to challenge all viable infringements (and we do so on a weekly basis) or face the possibility of losing trademark protection and allowing the industry's valued trademark to become public domain, and thus worthless.

Again, the National Pork Board takes no issue with your important cause.  Our only interest is in protecting US pork producer's investment in The Other White Meat trademark.  We apologize if the tone of the letter was impersonal or harsh, and will use your feedback to improve our communication processes in the future.  Thank you for bringing your concerns to our attention.  We wish you and your Lactivist program great future success.

Sincerely,

Steve Murphy
Chief Executive Officer
The National Pork Board

## Testimony of Steve Murphy, CEO of Pork Board (excerpt)

a.  Never asked about whether the Board could secure a license renewal at the same rate before agreeing to purchase at significantly higher payment.

b.  He "did not look into … how much the National Pork Board could claim it had put into the mark over 20 years."

00041

Q.    Did you ever ask National Pork Producers Council what the license would be?

A.    Their motivation had and was always to get the highest price.

Q.    Did you ever ask the NPPC for a new license fee?

A.    We decided that it was best to purchase the agreement rather than license it.

Q.    Did you ask them for a new license fee?

A.    No.  We decided to ask them to purchase rather than continue to license.

Q.    So you never considered that you could have attempted to keep the license at $818,000 for 75 years.  You didn't take that into consideration?

A.    We did not explore that possibility.

Q.    You, sir, as the CEO of the National Pork Board didn't know about the Supreme Lobster filing until June of 2006?

A.    I became aware at least in June that the issue had risen in importance.  There were periods of time I knew different pieces of information about it, but it was in June, but I can't remember exactly what happened, but we knew it was a very serious situation at that time that would not go

## Williams Valuation Letter (2006)

a.  "While 'The Other White Meat' is extremely well known, it is recognized … as being synonymous with (fresh) 'pork,' which strongly suggests that no branded marketer would be able to gain enough benefit from its use to make them a likely buyer."

b.  Recommends replacement cost as "the only reasonable valuation." [This valuation method would yield significantly lower values for a mark that has already been replaced.]

512

# mark h williams    company

February 3, 2006

Mr. Steve Murphy
National Pork Board
1776 N.W. 114th Street
Clive, IA 50325

Subject: "The Other White Meat"

Dear Steve:

We have reviewed various methods of establishing the market value of the "The Other White Meat" trademark presented by two different firms (Ostrow Reisin Berk and Abrams, Ltd. and JPGroup USA). In our view, two key factors make the valuation of this trademark a completely different exercise than the valuation of most commercial marks.

1) While "The Other White Meat" is extremely well known, it is recognized (principally in the U.S.) as being synonymous with (fresh) "pork," which strongly suggests that no branded marketer would be able to gain enough benefit from its use to make them a likely buyer.
2) Because the mark has been used to promote the entire industry's product, rather than one marketer's product, there is very little of the data most often used in establishing the good will value of commercial brands.

As such, we believe that the only reasonable valuation would be one based on the projected cost to replace "The Other White Meat." Simply stated, this method best reflects the actual situation – the realistic cost of the alternative from the buyer's perspective.

Using such a method indicates that the Present Value should be considered to be somewhere between $30,000,000 and $40,000,000. (The attached schedule is an example of our Replacement Cost analysis).

Mark H Williams & Company, LLC
150 North Michigan Avenue
Suite 2800
Chicago, Illinois 60601
312.664.3500
Facsimile: 312.664.2979
info@markhwilliams

513

Mr. Steve Murphy
February 3, 2006
Page 2

At the same time, a one-time payment of any such an amount would be unlikely if not irresponsible. As such, the longer-term cost including reasonable interest would be somewhere between $50,000,000 and $100,000,000 (paid over 20 to 30 years).

Please let me know if you would like us to expand on any of this.

Yours Sincerely,

Mark Williams

## 2005 National Pork Board PTOWM Tracking Study (excerpt)

**Findings include that pork "underperforms on most attributes when compared to other meats" and that pork's "brand personality" at the time was most closely associated with "genuine and dull."**

## Brand Personality Ratings



Respondents asked to rate each meat on 18 different personality attributes. Target consumers were most likely to agree that <u>pork</u>, <u>chicken</u>, and <u>beef</u> is traditional, All-American, reliable, old-fashioned and approachable.   Seafood is seen as sophisticated, modern/contemporary, creative and engaging.  These ratings did not change from the baseline wave.

When the ratings were placed on a correspondence map, <u>pork was most closely associated with genuine and dull</u>.

- ➢ <u>Chicken</u> was most closely associated with approachable and reliable.
- ➢ <u>Beef</u> was most closely associated with All-American.
- ➢ <u>Seafood</u> was most closely associated with unique, sophisticated and exciting.



54

NPB 064362

516

## USDA Decision Memo (2006)

a. Presumes continued use of PTOWM as Pork Board brand identity (i.e., use PTOWM *or* replace it).

b. Although the Pork Board never even discussed renewal with NPPC, Decision Memo suggests that approval partly based on the Board's argument that the license rate was expected to "increase significantly."

c. No competing buyers for PTOWM.

d. No consideration of value developed in PTOWM through two decades of producer-funded campaigns (i.e., producer contribution).

e. "The Board is paying nearly half of its total payment in interest to NPPC."

f. Recognizes that critics perceive this deal as an attempt to support and provide long-term income to NPPC.

517



| United States | Agricultural | STOP 0249 - Room 2092-S |
|---|---|---|
| Department of | Marketing | 1400 Independence Avenue, SW. |
| Agriculture | Service | Washington, D.C.  20250-0249 |

## DECISION MEMORANDUM FOR THE ACTING UNDER SECRETARY

**THROUGH:**   Lloyd C. Day    FEB 2 8 2006
Administrator
Agricultural Marketing Service

**FROM:**   For Barry L. Carpenter   /s/ Randall D. Jones
Deputy Administrator   February 22, 2006
Livestock and Seed Program

**SUBJECT:**   National Pork Board Acquisition of the "Pork, the Other White Meat" Tag Line and Related Materials

### ISSUE:

The National Pork Board (Board) would like to purchase the "Pork, the Other White Meat" (PTOWM) trademarked tag line and related marks from the National Pork Producers Council (NPPC), the pork industry's primary trade association, using assessments collected under the Pork Promotion, Research, and Information Act—more commonly known as the Pork Checkoff Program.

### DISCUSSION:

NPPC currently owns the tag line and the associated marks of PTOWM, which it filed with the U.S. Patent and Trademark Office on August 24, 1987. Substantial ideation, strategy development efforts, and producer and consumer research investment preceded the Pork Checkoff Program and all at NPPC's expense.

NPPC grants the Board exclusive license, and originally entered into a trademark license agreement in 2001. In 2003, the Board and NPPC renegotiated the terms of the agreement and amended and extended the agreement until June 30, 2009. Under the amended agreement, the Board pays NPPC an annual royalty of $818,451, until July 1, 2006. During the last two contract years, the Board must pay $1 per year until the contract ends on June 30, 2009. In the contract, there are terms that reduce the royalty payment in the event the pork checkoff assessment rate is reduced (see attachments).

The Board believes that it is in a strong negotiating position to purchase PTOWM prior to the remaining 2 years of the contract at a time when the $1 royalty payments are due because NPPC will be in need of additional income during the $1 contract years. Furthermore, the

518

**DECISION MEMORANDUM FOR THE ACTING UNDER SECRETARY**
**Page 2**

Board believes there is a sense of urgency to purchase the well-known PTOWM trademark because of the Board's investment in tag line and related brand marketing materials.

To determine the purchase and rebuilding prices, a fair purchase price for the tag line, and to determine the costs for developing an entirely new campaign in the event PTOWM is not owned by the Board, Board staff solicited appraisals from independent advertising experts. The appraisals varied widely from approximately $35 million to in excess of $200 million. To rebuild the brand, experts estimate that the brand could be rebuilt over a 7-year period at an incremental cost of $36.1 million. The Board believes this projected rebuilding cost equates to a fair-market value.

Based on the estimate of costs to rebuild the brand and ongoing negotiations with NPPC, the Board believes that it is in its best interest to purchase PTOWM. Through its negotiations with NPPC, the Board has proposed a purchase price of $34.597 million to be paid over 20 years with an interest rate of 6.75 percent, which results in annual payments of $3 million. In the event that the assessment rate is reduced below 0.40 percent of the market value, the provisions of the current license agreement will automatically be reinstated. If the license agreement is reinstated, then equity in PTOWM generated through the Board's purchase payments will remain intact during the reinstated license period and applied to any newly negotiated purchase arrangement.

## OPTIONS:

### OPTION 1: ALLOW THE BOARD TO PURCHASE THE PTOWM TAG LINE

Pros:
1. PTOWM is a nationally recognized tag line.
2. The Board has a strong negotiating position to negotiate favorable purchase terms.
3. The Board can own and further invest in the PTOWM brand.
4. The Board argues that the licensing royalty is expected to increase significantly after 2009.

Cons:
1. Critics of the checkoff believe that this acquisition supports and provides long-term income to NPPC.
2. The Board is paying nearly half of its total payment in interest to NPPC.
3. Long-term payment plan obligates future Board's to this type of expenditure.

519

DECISION MEMORANDUM FOR THE ACTING UNDER SECRETARY
Page 3

OPTION 2: PROHIBIT THE PURCHASE OF THE PTOWM TAG LINE BY THE BOARD

Pros:
1. Satisfies the critics' concerns that the Board is merely funding NPPC.
2. At this time, the Board is unaware of any other organization competing to purchase PTOWM.
3. Current licensing agreement is in place until 2009.

Cons:
1. Does not permit the Board to own the asset for which it is investing.
2. The Board may lose negotiating power.
3. Licensing agreement cost may increase significantly after 2009.

RECOMMENDATION:

We recommend Option 1 which would allow the Board to enter into an agreement with NPPC and purchase the PTOWM tag line and associated marks.

DECISION BY THE ACTING UNDER SECRETARY:

Approve:                      ✓

Disapprove:                _____

Discuss with me:       _____

Date:                          2/28/06

Reviewed by:              JWS

Attachments

520

521

## Prime Rate Chart (2006-2016)

Chart from Federal Reserve that shows current prime rate is less than half the prime rate in 2006, when the Secretary approved the fixed 6.75% interest rate for the purchase.

◀ Prime rate



Source: Federal Reserve Board 2016

## 2001 Agreement between USDA and NPPC

Contracts between the Pork Board and NPPC must be at *fair market value*.

## SETTLEMENT AGREEMENT

**I.    General Purpose.**

The parties to this Settlement Agreement -- the Michigan Pork Producers Association, Inc. ("MPPA"), National Pork Producers Council ("NPPC"), Pete Blauwiekel, Bob Bloomer, and High Lean Pork, Inc. (collectively "Plaintiffs"), and Ann Veneman, Secretary, United States Department of Agriculture ("USDA"), and the Acting Administrator, Agricultural Marketing Service ("AMS") (collectively "Defendants") – by their undersigned Counsel,  agree to conclude, based on the Guiding Principle, and Specific and Miscellaneous Agreements set out below, the litigation styled:  <u>MPPA, et al., v. Ann Veneman, Secretary, USDA, and the Acting Administrator, AMS, and Defendant-Intervenors, Campaign for Family Farms, et al.</u>, Number 1:01-CV-34 (W. D. Mich.).

**II.    Guiding Principle.**

This Settlement Agreement is based on the guiding principle that the National Pork Board ("Board") should operate independently of the NPPC, and any successor or similar organizations<u>, while the Pork Checkoff Program[1] is in effect.</u>  The Specific Agreements that follow are intended to promote and ensure such independent operation.

**III.    Specific Agreements.**

A.    The Board shall adopt rules and regulations for selecting producers and importers for consideration by the National Pork Producers Delegate Body ("Delegate Body") as nominees to the Board.  NPPC, and any successor or similar organizations, shall have no involvement in the nominating process.  Such rules and regulations shall become effective following the March 2001 meeting of the Board.

B.    The Board shall cease all joint communications with NPPC on a national level.  However, this Settlement Agreement shall not prevent state pork producer organizations from sponsoring communications containing both Checkoff and non-Checkoff issues or materials.

C.    The Board shall employ its own staff sufficient to provide administrative services, resource management, policy development, and industry communications.  All NPPC staff who perform predominantly Checkoff-related functions, i.e., all staff whose current compensation is allocated more than 50 percent to the Pork Checkoff Program, shall be given the opportunity to transfer their employment to the Board.

D.    The Board shall execute, administer, and manage its own contracts for promotion, research, and consumer information projects.  These contracts are presently administered and managed by NPPC and are budgeted for approximately $40

---

[1]    This reference is to the Pork Checkoff Program established by the Pork Promotion, Research and Consumer Information Act ("the Pork Act"), 7 U.S.C. § 4801, et seq., and its implementing regulations, 7 C.F.R §§ 1230.1-1230.639.

million for fiscal year 2001.  All Checkoff-related contracts (i.e., contracts that are funded by the Checkoff) shall be assigned by NPPC to the Board.  NPPC may no longer act as general contractor to the Board.  However, all non-Checkoff assets of NPPC shall remain assets of NPPC.  Further, nothing herein shall prevent the Board from entering into specific contracts with NPPC, or successor or similar organizations, provided any such contracts are at fair market value.  The parties to this Settlement Agreement recognize that the transfer of functions, contracts, and employees from NPPC to the Board will involve certain reasonable expenses to be incurred by NPPC, including legal expenses, and agree that such expenses may be paid from Checkoff funds.

E.    The Delegate Body and also NPPC, or successor or similar organizations, shall conduct separate annual meetings. However, these organizations may conduct their annual meetings at the same geographic locale and in multi-day sessions provided the sessions are separate and distinct, and provided Checkoff funds do not subsidize any activities of the NPPC, or successor or similar organizations. The parties agree that the March 2001 meeting of the Board may proceed as planned, but this change shall become effective following the 2001 meeting of the Board.

F.    The Board may lease the current NPPC headquarters in Clive, Iowa at fair market value from NPPC or its successor organization(s).  Nothing herein is intended to prevent other entities (other than NPPC) from leasing space at this building for fair market value.

G.    The Board shall hire its own Chief Executive Officer ("CEO").  Current employees of NPPC who perform predominantly Checkoff-related functions are eligible for consideration for this CEO position.

H.    The Board shall hire its own Chief Financial Officer ("CFO").  Current employees of NPPC who perform predominantly Checkoff-related functions are eligible for consideration for this CFO position.

I.    The following restrictions shall apply to employment by the Board of current employees of NPPC:

1.    No officer of NPPC or any successor organization(s) may serve as a member of the Board or the Delegate Body while holding that officer position or for two years after leaving that officer position.

2.    No board member of NPPC or any successor organization(s) may serve as a member of the Board while holding that board position or for two years after leaving that board position.  (However, such persons may serve on the Delegate Body.)

3.    No CEO or CFO of NPPC or any successor organization(s) may serve as CEO or CFO of the Board while holding that position with NPPC or any

successor organization(s) or for two years after leaving that position with NPPC or any successor organization(s).

4.    No vendor to the Board may serve on the Board during that vendor arrangement or for two years after that arrangement ceases, provided, however, that this does not apply to importers acting as vendors to the Board.

5.    No NPPC employee who has performed predominantly non-Checkoff-related functions (of a policy-setting nature) may serve as CEO or CFO of the Board while performing those non-Checkoff-related functions for NPPC or for two years after ceasing to perform those non-Checkoff-related functions for NPPC.  (However, employees who have performed predominantly Checkoff-related functions for NPPC are not subject to this restriction).

6.    No NPPC employee who has performed predominantly non-Checkoff-related functions may be employed by the Board while performing those non-Checkoff-related functions for NPPC or for two years after ceasing to perform those non-Checkoff-related functions for NPPC.  (However, employees who have performed predominantly Checkoff-related functions for NPPC are not subject to this restriction).

J.    Nothing in this Settlement Agreement is intended to affect the current ability of state pork producer organizations to perform both Checkoff and non-Checkoff-related functions, provided that there is adequate accounting for, and separation of, all Checkoff and non-Checkoff funds and assets.

K.    To evaluate the effectiveness of the Guiding Principle and Specific Agreements encompassed in this Settlement Agreement, USDA, or its successor, through the AMS, or its successor, will conduct, no earlier than June 2003, a survey of eligible pork producers and importers to determine if 15% of those eligible producers and importers favor a referendum.  The costs of this survey will be paid for by the USDA, or its successor (i.e., not with Checkoff funds).  If 15% of eligible producers and importers favor a referendum, one will be held in accordance with the Pork Act, 7 U.S.C. § 4812(b), and pertinent implementing regulations and rules.

L.    USDA will take no action to terminate the Pork Checkoff Program based on the January 11, 2001 announcement of then-Secretary Glickman and/or the survey and referendum discussed in that announcement.

M.    This Settlement Agreement is subject to any changes in pertinent law, regulations, or rules and USDA shall not be obligated to carry out any term(s) of this Settlement Agreement in the event any such changes preclude USDA from complying with, or withdraw USDA's authority to perform, such term(s).  Should

526

any such change in law prevent USDA from complying with any term of this Settlement Agreement, USDA will notify Counsel for Plaintiffs accordingly.

N.    Nothing in this Settlement Agreement is intended to affect the Secretary's authority or discretion to take any action not covered by one or more of the Specific Agreements in this Settlement Agreement.

O.    Plaintiffs will move to dismiss their claims against Defendants with prejudice, including any and all potential claims for attorney's fees, costs, and/or expenses in connection with this action, no later than thirty (30) days from the effective date of this Settlement Agreement.  It is expressly understood and agreed that this dismissal is for settlement purposes and the parties to this Settlement Agreement reserve their respective legal positions in the event it becomes necessary to litigate any of the same legal issues in the future.

P.    Terms not defined in this Settlement Agreement, but used in the Pork Act or its implementing regulations, shall have their meaning as used in the Pork Act or its implementing regulations.


IV.    **Miscellaneous Agreements.**

A.    The undersigned parties to this Settlement Agreement acknowledge that they have entered into this Settlement Agreement freely and voluntarily and that, other than as provided for herein, no promise or threat of any kind whatsoever has been made by the United States or by any employee or representative of the United States, or by any of the Plaintiffs or by any representative of any of the Plaintiffs, to induce any party to this Settlement Agreement to enter into this Settlement Agreement.

B.    The parties to this Settlement Agreement acknowledge that this Settlement Agreement shall not constitute an admission of a violation of any law, regulation, or rule by any of the parties to this Settlement Agreement, or any current or former employee of any such party.

C.    The parties to this Settlement Agreement acknowledge that there is adequate consideration for each and every Specific and/or Miscellaneous Agreement contained in this Settlement Agreement, and that this writing contains the entire Settlement Agreement between the parties to this Settlement Agreement, and that any modification to this Settlement Agreement must be made in writing and signed by all parties to this Settlement Agreement.

D.    The parties to this Settlement Agreement acknowledge that each has read, reviewed, and understood in its entirety this Settlement Agreement, and that each party to this Settlement Agreement has had adequate time to confer with their undersigned counsel concerning this Settlement Agreement, and that each party to

this Settlement Agreement has agreed to each of the provisions of this Settlement Agreement.

E.      This Settlement Agreement may be executed in counterparts and all such executed counterparts shall constitute one Settlement Agreement, binding on all the parties hereto, notwithstanding the fact that all the parties hereto are not signatories to the original or to the same counterpart.  Further, an executed copy and an executed facsimile of this Settlement Agreement shall be deemed to be as binding and effective as an executed original Settlement Agreement.  However, this Settlement Agreement shall be effective only when it has been executed by all the parties to this Settlement Agreement and/or their legal representatives, and Plaintiffs have moved to dismiss their claims against Defendants, as provided in paragraph III.O. above.

F.      The undersigned Counsel represent, warrant, and guarantee that they have been authorized to execute this Settlement Agreement, where indicated, on behalf of the party(ies) named.

DATED this ___ day of February, 2001.

UNITED STATES DEPARTMENT OF AGRICULTURE/
AGRICULTURAL MARKETING SERVICE
By_____          Its

Counsel_____

MICHIGAN PORK PRODUCERS ASSOCIATION, INC.

By_____          Its

Counsel

By_____
Its President

NATIONAL PORK PRODUCERS COUNCIL

By_____                    Its

Counsel

By_____
Its Chief Executive Officer

By_____
Its President

_____

Peter Blauwiekel

_____
Robert Bloomer

End of Document

MOA-govt4.dft.wpd

# Termination Provision of PTOWM Purchase Contract

**Buyer may "at any time and for any reason elect to terminate…"**

b. Such other appropriate Bill of Sale, Assignment and Assumption Agreement and other documents conveying, transferring and assigning to Buyer all of the Acquired Assets free and clear of any defect, security interest, lien, obligation, or encumbrance, in form and substance reasonably satisfactory to Buyer and its counsel.

c. Where appropriate, such other certificates of title or separate instruments of sale, assignment or transfer in form suitable for filing and recording the Trademark Assignment at the U.S. Patent and Trademark Office and other appropriate U.S., state or foreign office or agency, for various items of the Trademarks where the same are necessary or desirable in order to vest or evidence title thereto in Buyer.

d. All other documents to be delivered by Seller to the Buyer on the Closing Date pursuant to Article V of this Agreement.

1.6    Further Assurances. Following the Closing, Seller shall also execute and deliver without expense to Buyer such further instruments of conveyance, sale, assignment or transfer and shall take or cause to be taken such other or further actions as Buyer may reasonably request in order to vest, confirm or evidence in Buyer title to all or any part of the Acquired Assets.

1.7    Voluntary Termination of Purchase Obligations. Buyer may at any time and for any reason elect to terminate its obligations to pay the unpaid balance of the Purchase Price, including all sums of principal and interest due or to become due under the Promissory Note, provided:

a. Buyer gives the Seller a written notice of its election to terminate its obligations under Section 1.3 of this Agreement and the Promissory Note (the "Voluntary Termination Notice") of not less than 365 days;

b. Buyer shall be obligated to pay Seller on the next July 1 following the written notice of termination an amount equal to $3,000,000, in consideration of the use of the Trademarks as provided in subparagraph (d), below;

c. Except with respect to the payment referred to in subparagraph (b) above, upon the elected termination date all obligations of the Buyer under the Promissory Note, including all sums owed (other than any installment payment that was due and payable prior to the date the Voluntary Termination Notice was given) or which may become owing under the Promissory Note, shall be extinguished and the Seller shall return the Promissory Note to Buyer marked "cancelled";

d. During the 365 day period following the July 1 payment date referred to in subparagraph (b) above, Buyer shall continue to own all right, title and interest in and to the Trademarks and shall be entitled to full rights to and use of to the Trademarks;

e. At the end of the 365 day period following the July 1 payment date referred to in subparagraph (b) above Buyer shall reconvey (including a reconveyance of the Trademarks pursuant to a Trademark Assignment in the form of Exhibit 1.9(g)(ii)(C)) all of its right, title and interest in and to the Acquired Assets (as then constituted), to

3

Seller, free and clear of all liabilities, obligations or encumbrances whatsoever, other than any exclusive or nonexclusive licenses theretofore granted by Buyer. Buyer, as assignor, shall be responsible for paying all expenses of transfer and assignment, including without limitation any applicable sales and use taxes, and all other transfer fees related to the reconveyance of the Acquired Assets, including the reassignment of the Trademarks. Such reconveyance and reassignment shall be made by such appropriate assignment(s) or other documents in a form reasonably satisfactory to Seller and its counsel, including such other certificates of title or separate instruments of sale, assignment and transfer in form suitable for filing and recording at the U.S. Patent and Trademark Office and other appropriate U.S., state or foreign office or agency, for various items of the Trademarks where the same are necessary or desirable in order to vest or evidence the title thereto in Seller, as assignee; and

f.  By way of illustration, if Buyer gives Seller its written notice of election to terminate on April 1, 2007, Buyer would be obligated to pay Seller $3,000,000 on July 1, 2007, Buyer would have no further obligations to pay any amounts due or to become due under the Promissory Note or under Section 1.3 of this Agreement, the Buyer would be entitled to continue to own the Trademarks and enjoy full rights and use thereof until June 30, 2008, and on June 30, 2008 Buyer would reconvey the Trademarks to Seller as described in subparagraph (e) above.

1.8    Non-Recourse Obligation. Other than as provided in the Trademark Security Agreement (as defined below) and Section 1.7 of this Agreement, Seller agrees that: (i) the payment of the unpaid balance of the Purchase Price, including all sums of principal and interest due or to become due under the Promissory Note, shall be enforced solely from the Collateral (as defined in the Trademark Security Agreement); and (ii) no deficiency or personal judgment as to any unpaid portion of the Purchase Price shall ever be sought against Buyer, or its successors and assigns. Except as otherwise expressly provided in Section 1.7 of this Agreement, the obligations of the Buyer under Section 1.3 of this Agreement and the Promissory Note are and shall be considered "non-recourse" in all respects.

1.9    Post-Closing Modifications Resulting From a Adverse Pork-Checkoff Event or a Lobster Trademark Decision.

a.  For the purposes of this Section 1.9 the following terms shall have the following meanings:

"Adverse Pork Checkoff Event" shall mean:

i.    the effective date of the final termination of the mandatory 100% legislative National Pork Checkoff (the "Pork Checkoff") due to any of the following:

(A)  a judicial determination or court ruling;

(B)  congressional action; or

4

535



# Trademark Valuation Discussion

February 3rd, 2006

# Preliminary

# Purpose of Today's Discussion



- Review three valuation analyses
- Discuss key assumptions
- Determine next steps

**Interbrand**

544

# Review of Initial Analyses

Preliminary
Findings

- Historic/Replacement Cost Analysis

    - Present value of the investments made to build and establish the 'Pork. The Other White Meat.' Campaign.

- Brand Valuation

    - Interbrand's methodology to determine the value of a brand to a non-profit organization.

- Estimated purchase price

    - The calculation is based on the traditional brand valuation methodology as it calculates the value created by the brand after deducting all costs associated with maintaining the brand.

CONFIDENTIAL - February 7th 2008

Interbrand

545

# Historic/Replacement Cost Approach

Preliminary Findings

### Description

The historic/replacement cost does not equal the purchase price.

However, the historic cost calculation is a valid measurement of all investments made to build the trademark. Between 1987 and 2002 the NPPC invested $229 million in the trademark.*

Using historic costs as a proxy for estimating the investment required to build a comparable campaign, we estimate that a minimum of $94 million will need to be spent to build a brand of similar status. This estimate is based on measuring the present value of all advertising expenditure between 1987 and 1994 (in 1994 the awareness levels reached a plateau).

Replacement cost

### Estimate

> $94 Million*

Interbrand

546

# Interbrand's Brand Valuation Methodology
## *Simple, profound & transparent*

Preliminary Findings

### Financial Analysis

Brand valuation starts by forecasting the current and future revenue specifically attributable to branded products. The cost of doing business is subtracted to arrive at intangible earnings, or economic value.

### Role of Branding Analysis

A measure of how the brand influences customer demand at the point of purchase, applied to intangible earnings to arrive at Branded Earnings.

### Brand Strength Analysis

A benchmark of the brand's ability to secure on-going customer demand (loyalty, re-purchase, retention) and thus sustain future earnings, translating branded earnings into a net present value.



Brand Value Calculations

Branded Revenues

Intangible Earnings

Brand Earnings

Year 1 Year 2 Year 3 Year 4 Year 5

Role of Branding Analysis

Brand Strength Analysis = Discount Rate → Brand Value

Interbrand

# Key steps of brand valuation

Preliminary Findings

| Financial Analysis | X | Role of Branding | X | Brand Strength Score |

Interbrand

# Step One – Financial Analysis

Preliminary
Findings

| Financial Analysis | X | Role of Branding | X | Brand Strength Score |

**Application & Calculation for PTOWM**

NPB's income is a function of the hog supply (domestic production & imports) and is collected by a mandatory check-off payment (0.4% of market value of hogs produced). Interbrand forecasted overhead costs at the 2001-2004 compounded annual growth rate of 1.2 % annually. The working capital calculation (excluding cash & other liquid marketable securities) resulted with a negative working capital figure; therefore the capital charge was negligible. All financials were forecasted through 2010.

**Source**

Interbrand worked with Dr. Steve Meyer's check-off income forecasts.

Interbrand

549

# Step Two – Role of Branding

Preliminary Findings

| Financial Analysis | X | Role of Branding | X | Brand Strength Score |
|---|---|---|---|---|

**Application & Calculation for PTOWM**

Swine producers value the PTOWM marketing activities as expressed by their allocation of funds to promotional activities. The allocation of the check-off budget is decided by the producers (through a rigorous committee process).

We have used the percentage of check off funds allocated to promotional activities as as a proxy for the Role of Branding.

**Value & Source**

We calculated 56% for the Role of Branding index based on the average percent allocated to promotional activities as stated in the 2001-2004 annual report.

Interbrand

550

# Brand Value – Role of Branding

Preliminary
Findings

| Financial Analysis | X | Role of Branding | X | Brand Strength Score |
| --- | --- | --- | --- | --- |

**Application & Calculation for PTOWM**

The Brand Strength was calculated using the Interbrand's four pillar analysis. Each equal weighted pillar (25 points each) contains attributes that measure the strength of the brand in the marketplace, the sum of the pillars results in a Brand Strength Score (max 100).

Once calculated the brand strength score is converted to a discount rate using Interbrand's proprietary model.

**Value & Source**

The Brand Strength Score is 59 / 100 which was based on proprietary market research received from Dallas Hockmann as well as publicly available market research from the USDA.

Interbrand

# Brand Value – summary of inputs

Preliminary
Findings

| | Financial Analysis | X | Role of Branding | X | Brand Strength Score |
|---|---|---|---|---|---|
| Application for PTOWM | Mandatory Check-off payment, 0.4% of market value of hogs minus overhead costs, for NPB. Excludes all other revenue (e.g. interest). A five year EVA forecast was used to | | Percent of funds allocated to promotional activities as an expression of swine producers' appreciation of PTOWM marketing activities | | Assessment of PTOWM on four dimensions<br>1) Market Position (market share pork vs. other meats)<br>2) Customer Franchise (including favorability metrics)<br>3) Image (perception metrics)<br>4) Support (ad spend) |
| Value | Five year EVA forecast | | 2001 – 2004 historic average = 56% | | 59 / 100 |
| Source | Dr. Steve Meyers Check off forecasts – Average of the high & low ranges | | Annual reports | | USDA statistics; Market research provided by Dallas Hockmann |

16  CONFIDENTIAL  February  2006

Interbrand

552

# Brand Valuation Output



Preliminary
Findings

- We estimate the value that the PTOWM trademark is expected to contribute over the next five years to be $127 million.

- However, this only represents the value of the trademark to the NPB.

- This value should not be considered a purchase price as the NPB is required to invest the majority of the check-off income back into promotional activities to support the trademark.

CONFIDENTIAL - February 2ⁿ 1005

Interbrand

553

# Estimated Purchase Price

Preliminary Findings

| Description | Estimate |
|---|---|

**Purchase Price** → Estimate of the trademark value to the NPB after deducting all **promotional costs** associated with brand building activities.

~ $35 Million

This analysis is based on a five year forecast of Check-off income. This approach deducts both overhead costs and all maintenance costs associated with brand building activities (promotional budget excluding Hispanic & other non-PTOWM costs) to derive the additional value secured by the trademark.

12 | CONFIDENTIAL   February 2nd 2006

**Interbrand**

# Discussion


Preliminary Findings

- **Assumptions**
  - ➢ Financial
    - Check-off funds
    - Costs associated with brand building activities
    - Time horizon – five year outlook
  - ➢ Role of brand
    - Interbrand estimated that the 56% allocation would remain constant over the next five years

- **Next Steps**
  - ➢ Questions / comments

**Interbrand**

555

# Appendix A - Brand Strength Score

Preliminary Findings

| Brand Strength Pillar<br>Underlying Attribute | Source |
|---|---|
| **Market Position** | |
| Market Share | USDA Website (pork benchmarked against other meats) |
| Consumption % | PTOWM Campaign Success |
| | |
| **Customer Franchise** | |
| Brand awareness | PTOWM Campaign Success |
| Consideration (nat'l) | TOWM - Don't be blah - 'a food I could eat regularly' was used as a proxy for consideration |
| Preference (nat'l) | TOWM - Don't be blah - 'a family favorite' was used as a proxy for preference |
| Consideration (Target Mkt) | TOWM - Don't be blah - 'a food I could eat regularly' was used as a proxy for consideration |
| Preference (Target Mkt) | TOWM - Don't be blah - 'a family favorite' was used as a proxy for preference |
| Favorability | PTOWM Campaign Success - Rate favorability from 1-5 (top 2 box) |
| | |
| **Image** | |
| Perception | PTOWM Campaign Success |
| Proud to serve | PTOWM Campaign Success |
| | |
| **Support** | |
| Ad Recall | |
| Unaided Awareness (nat'l) | TOWM - Don't be blah |
| Aided Awareness (nat'l) | TOWM - Don't be blah |
| Unaided Awareness (Target Mkt) | TOWM - Don't be blah |
| Aided Awareness (Target Mkt) | TOWM - Don't be blah |
| Ad Spend | 2004 Annual Report (Advertising Budget) |

CONFIDENTIAL  February 24, 2005

Interbrand



associated with any third party claim, proceeding, investigation, or action (collectively, "Claims"), relating to or arising as a result of the services or our engagement except to the extent caused by the gross negligent or willful acts or omissions of our employees, contractors or agents in performing the services.

(b)     We will indemnify and hold harmless NPB and USDA, and their respective affiliates, members, officers, directors, agents, and employees ("Indemnified Parties") against all Losses associated with Claims, relating to or arising as a result of the services or our engagement to the extent caused by the gross negligent or willful acts or omissions of our employees, contractors or agents in performing the services.   We agree to list NPB as an additional insured on all insurance policies held by us that relate to the services provided under this Agreement.

(c)     We agree to defend at our expense, indemnify and hold the Indemnified Parties harmless from all Losses resulting from Claims that the our work product infringes or violates any copyright, trademark, patent or other intellectual property right, defames or invades any right of privacy, publicity or any other personal right of any third party

(d)     Neither of us will be liable for any delays or failures in performance due to circumstances beyond our reasonable control.

(e)     Our total liability relating to this engagement will in no event exceed an amount equal to the fees we receive for the portion of the engagement giving rise to liability, and will not include any special, consequential, incidental or exemplary damages or loss (nor any lost profits, savings or business opportunity).

(f)     Any action against either of us by the other in connection with this engagement must be brought within 18 months after the cause of action arises.

**9. Response to Subpoena**  In the event we are required to respond to a subpoena (e.g., producing documents in our possession, providing testimony, cooperating with your legal counsel, etc.) related to this engagement (regardless of whether such subpoena is served during or subsequent to the completion of our work), we will invoice you at 85% of our standard hourly rates applicable at the time such services are rendered. We will also invoice you for our related out-of-pocket expenses, including, but not limited to, copying charges, courier fees, travel expenses and attorney fees. Under no circumstances shall we release any deliverables to anyone other than you without review and written approval by you and USDA AMS.

**10. Non-Solicitation**  During the term of this engagement, and for a period of one year following its expiration or termination, you will not actively solicit, employ or otherwise engage any of our employees (including former employees) who were involved directly in the engagement.

**11. Termination**  (a) This Agreement shall be effective and work may commence as of the date USDA approves this Agreement and shall expire on 12/31/2016. USDA's approval

shall be attached to, and become incorporated by reference in, this Agreement. Work undertaken prior to approval of the Agreement by USDA is at our own risk, as NPB is not financially liable if the Agreement is not approved by USDA. This Agreement may be terminated by either party at any time upon thirty days written notice of such termination, or immediately by NPB for cause or the loss of checkoff funding. In addition, the United States Secretary of Agriculture may terminate this Agreement in its sole discretion upon thirty days written notice. Following notice of termination, NPB's liability shall be limited to reasonable compensation for actual services performed and expenses approved by NPB through and including the date of termination. The provisions of this Agreement that, by their nature, shall survive termination or expiration of this Agreement, including, without limitation, Sections 4, 5, 6, 7, 8, 9, 10, 11 and 15, shall survive any such termination or expiration of this Agreement.

(b)     Stout Risius Ross, Inc. may suspend or terminate this engagement immediately and without notice in the event of non-payment of amounts due us.

**12.  Our Financial Interest / Compensation**  None of our employees who will work on this engagement have any known financial interest in the Company or the outcome of our analysis, and our compensation is neither based upon nor contingent upon the conclusions we reach.  We do not warrant or predict results or final developments in this matter.

**13.  Staffing**  While we will attempt to comply with your requests for specific individuals, we retain the right to assign and reassign our personnel, as appropriate, to perform the services.

**14.  Compliance with Laws**  We agree that, during the performance of this Agreement, in accordance with Federal civil rights law and USDA civil rights regulations and policies that prohibit the USDA, its agencies, offices, and employees, and institutions participating in or administering USDA programs, from such discrimination, we will not discriminate against any employee or applicant for employment because of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident. . We agree that we will fully comply with any and all applicable Federal, State, and local equal employment opportunity statutes, ordinances, and regulations, including, but not limited to, Title VII of the Civil Rights Act of 1964; the Americans with Disabilities Act of 1990; the Age Discrimination in Employment Act of 1967; and the Equal Pay Act of 1963. Nothing in this section shall require us to comply with or become liable under any law, ordinances, regulation, or rule that does not otherwise apply to us. We agree that the consideration we receive under this Agreement, including, without limitation, checkoff funds received in the performance of this project, will not, in any way, be involved in, nor be used for the purpose of,



## Section III • Valuation Approaches and Methodologies

We will consider the following valuation approaches/methodologies when estimating the Fair Value of the TOWM trademark: the Income Approach, the Cost Approach, and/or the Market Approach.

### Income Approach

The Income Approach is a valuation technique by which Fair Value is estimated based upon the cash flows that the subject asset can be expected to generate over its remaining useful life. The Income Approach can take many forms depending on the unique characteristics of the asset. The Income Approach is typically applied using some form of the Discounted Cash Flow Method.

Some variations of the Income Approach used in the valuation of trademarks include the following:

- Net Revenue Generated Method; and
- Royalty Savings Method.

The following are brief descriptions of each of these variations:

*Net Revenue Generated Method:* This method values the intangible asset as the present value of the after-tax cash flow attributed to the trademark. To arrive at the after-tax net cash flow, the revenue stream for the trademark is projected over its remaining useful life. Next, the costs associated with supporting the trademark must be subtracted. These costs may include a return on and a return of the other assets, both tangible and intangible, supporting this revenue generation. This pretax income stream is then tax affected and discounted to present value over the remaining life of the trademark at the appropriate risk-adjusted cost of capital. This method is appropriate when the trademark being valued represents a principal income-generating asset of a business enterprise.

*Royalty Savings Method:* This methodology is considered a standard technique in the valuation of intangible assets such as trademarks. In this methodology, the value of a trademark is estimated by capitalizing the royalties saved as a result of the ownership of the asset. In other words, the owner realizes a benefit from owning the asset rather than paying a rent or royalty for the use of the asset. The first step of the Royalty Savings Method is the estimation of an arm's length royalty rate. After the appropriate royalty rate is determined, the after-tax royalty savings are then discounted to their present value over the remaining useful life of the trademark.

### Cost Approach

The Cost Approach is a valuation technique that uses the concept of replacement cost as an indicator of Fair Value. The premise of the Cost Approach is that, if it were possible to replace the trademark, a prudent investor would pay no more for a trademark than the amount for which the trademark could be replaced. The Cost Approach establishes value based on the cost of reproducing or replacing the trademark, less any depreciation from functional obsolescence and economic obsolescence, if present and measurable.

Page 7

United States Department of Agriculture
Agricultural Marketing Service

GUIDELINES FOR AMS OVERSIGHT
OF COMMODITY RESEARCH AND PROMOTION PROGRAMS

I.    <u>Overview</u>

Congress delegated to the Department of Agriculture (USDA) the responsibility for implementation and oversight of commodity promotion, research, and consumer information programs established under freestanding legislation, commonly known as "checkoff" programs.  In 1996, the Commodity Promotion, Research, and Information Act, commonly known as the "Generic Act" was enacted to allow commodity groups to create programs for their commodities under a generic statute.  Prior to the Generic Act, many of today's programs overseen by USDA's Agricultural Marketing Service (AMS) were established under commodity specific legislation (see Appendix 1).  The Secretary has delegated all functions to AMS for these programs except those delegated to USDA's Foreign Agricultural Service (FAS), which has been given the authority to oversee international marketing activities.

The funding for such programs is industry specific, usually through deductions from sales by producers, marketers, and/or importers, and the programs are directed by industry boards.  However, the Federal legislation which provides the authority for the collection and expenditure of funds also mandates for all of the programs that the Secretary of Agriculture appoint the board members and approve the boards' budgets, plans, projects, and contracts.  USDA is committed to oversight of research and promotion (R&P) boards in ways that allow them to grow and adapt to a fast-changing marketplace, including leadership to serve on the boards that reflects a diversity of perspectives and opinions.

The boards' staff and appointed membership determine the direction of and carry out board programs and manage the boards.  Every R&P program has a mission to maintain and expand the markets for its commodity.  The boards are composed primarily of those

in the marketing chain who pay assessments and sometimes others, and those board members decide how their funds are spent. Because these R&P programs use assessment money to carry out their functions, transparency and oversight of these funds is critical. AMS' role is one of oversight—to ensure compliance with all applicable legislation, regulations, and policies.

Various State and regional promotion programs have been established under State and other statutes. Those State statutes and State regulations are controlling for those programs. Many of the State programs fall under the oversight of States Department of Agriculture, Consumer Affairs, or other state agency, which apply State guidance.

If the Federal legislation or regulations specifically require AMS oversight of State and local programs, portions of the guidelines may apply. If not directed by statute or regulation, the guidelines do not apply as a whole to State, regional, and local programs. Some State, regional, or local programs receive and expend funds from the national checkoff program. Though AMS does not have direct oversight of these State and local programs, AMS has an obligation to ensure that national checkoff funds are expended appropriately in accordance with the Federal legislation, regulations, and any applicable policies. State, regional and local programs cannot use national checkoff funds to carry out an activity unless authorized by the national program.

These guidelines are not meant to cover all aspects of AMS' day-to-day responsibilities in interacting with and supporting activities of the R&P boards. They are designed to facilitate the application of legislative and regulatory provisions of the acts and orders to promote consistency in AMS' oversight of all commodity promotion and research programs.

References to boards in this document also can mean board staff unless otherwise specified. The guidelines provide information on AMS' expectations for how boards will operate and for how AMS will approach oversight of the programs. These guidelines shall be reviewed and amended as necessary. However, in all cases, provisions in the

authorizing legislation and order for all programs provide the legal framework for all board actions and will take precedence over the guidelines in establishing parameters for board activities.

II.   Budget Approval

A.      USDA will review and approve all budgets.  When submitting budgets to AMS for approval, the boards must include detailed information regarding administrative expenses and other costs.  Budget submissions must include, at a minimum, all of the following components:

1.  A statement of objectives and strategy in each major program area (research, advertising, etc.), including reasons for significant changes from the preceding budget period.

2.  A summary of anticipated revenue (assessments, interest, donations, etc.) and anticipated refunds, where applicable, with comparative data for at least the preceding year.

3.  A summary of proposed expenditures by major program areas with comparative data for at least the preceding year.

4.  Staff and administrative expense breakdown, with comparative data for at least the preceding year.  Boards must submit CEO and/or Executive Director salaries and compensation and for other staff as requested by AMS.  This information may be supplied in a document separate from the budget.

5.  Other legislative requirements as applicable to the budget process.

B.  AMS will review budgets for compliance with legislative, regulatory, and policy requirements.  Boards must receive AMS' approval of budgets prior to obligating any

funds.  AMS also will approve amendments or additions to approved budgets, including shifting of program funds from one major area to another.  Approval for initial budgets will be granted by the respective program Deputy Administrator.  Approval for amendments will also be made by the respective program Deputy Administrator if the changes are 30 percent or more of the total budget.  Otherwise, the Deputy Administrator's designee will approve the amendments.

C.  Budgets shall be reviewed and approved by the full board prior to submission to AMS.

D.  Annual budget summaries by major category will be posted on the board's Web site and made available to the public.

III.    Donations to Boards

The legislation governing the boards ranges from total prohibition of donations to a specific authorization to accept donations.  In cases where donations are not prohibited, AMS will allow boards to accept donated funds.

Donated funds must be clearly listed in the budget and incorporated into the budget process to be used for activities permitted under the authorizing legislation, and AMS will review and approve these budgets, including budget amendments, before funds are expended.  Also, boards must not accept contributions which create a conflict of interest situation or a situation which could reasonably be perceived by a third party as a conflict of interest.

Donations made by the boards are discussed in XI.G.

IV.    Contracts

AMS recognizes that boards may enter into a variety of contracts, including for projects, consultation, services, and administration, and boards select contractors based on criteria that may include cost, skills, successful proposals, or other factors.

A.  Contracting Procedures.  Each board shall establish written contracting procedures and submit to AMS for review and approval by the respective program Deputy Administrator.  Each board has broad discretion on contracting procedures provided they meet the fiduciary responsibilities of the board, and avoid any conflict of interest or a situation that could reasonably be perceived by a third party as a conflict of interest. Boards shall comply with the approved contracting procedures.  Contracting procedures shall include prohibitions on lobbying and must require:

1. A statement by the board explaining why a contract was awarded to a particular contractor, including justifications when the lowest bid is not awarded or when non-competitive contracts are awarded.
2. Boards to formally notify potential contractors that any work they undertake prior to contract approval by AMS is at their own risk as boards are not financially liable if the contract is not approved.

B.  Contract Approval.  AMS will approve contracts for the development and carrying out of programs or projects of research, development, advertising, promotion, or education, as well as contracts for administration, services, legal assistance, and consultants.  The contracts will be reviewed for conformance with provisions required by AMS and USDA, including language regarding the prohibition on lobbying.  Contracts must be approved by AMS before funds are obligated.  AMS will not require boards to submit for approval pure service contracts, such as those for janitorial services, copier repairs, hotel arrangements, maintenance, etc.

C.  Contract Compliance.  Boards shall monitor contract compliance including that all work performed by and payments to contractors are allowable and appropriate under the terms of the contract and maintain documentation to support contract compliance. Boards are responsible for ensuring that funds are spent appropriately, including with any subcontracts.  AMS will review a sampling of subcontractor expenses during management reviews.  Contractors' records of all subcontractor transactions are subject to USDA review at any time.

D.  Multi-Year Contracts.   With AMS approval, boards may enter into multi-year contracts provided:  (1) all funding is obligated during the budget year, or (2) contracts require extensions consistent with the budget year and include an "escape clause"—clear language that the board may cancel the project at any time and for any reason without incurring the full contract cost.  Leases are exempt from these requirements.

V.     Financial, Compliance, and Program Accountability

A.  Financial Statements.  AMS shall review financial statements for each accounting period (monthly or quarterly) for proper accountability of funds collected and expended. The financial statements will consist of (1) a balance sheet, and (2) a statement of revenues and expenditures (budget vs. actual) during the reporting period including unexpended budget and changes in net assets.

B.  Refund Requirements.  Where refunds are applicable, the financial statement shall include a monthly collection and refund report showing (1) year-to-date collection of assessments, number of requests for refunds, and total assessments refunded, and (2) comparative data for the preceding year, if applicable.

Refunds are also discussed in VI.

C.  Activities and Expenditures.  AMS shall review and approve program activities and expenditures for conformance with applicable legislation, regulations, and policies.

Boards, contractors, and subcontractors are accountable for how board funds are spent. When projects are contracted, boards must be aware of how the funds are to be used.

Boards must expend all funds—whether the funds are from assessments or from an outside source—in accordance with the act, order, regulations, and AMS policy. Unless otherwise directed by authorizing legislation, boards may not conduct projects with non-assessment funds that could not be conducted with assessment funds. For example, boards may not conduct activities to influence government policy or action, even if the activities are paid for with non-assessment funds.

Boards are responsible for taking action to remedy any fraud or misuse of funds. Such action should be approved by AMS. Any inappropriate or misuse of funds must be reported to AMS or to USDA's Office of the Inspector General at (800) 424-9121 for investigation or other appropriate action.

D.  Annual Financial Audits.  Boards shall have independent audits performed annually in accordance with Generally Accepted Government Auditing Standards (GAGAS). AMS staff will review the board's letter of engagement with the auditors, participate in any entrance and exit conferences, and participate in the resolution of findings. AMS participation may be via conference call. AMS shall review these annual audits to determine if the auditor identified any misuse of board funds and if the audit adequately addressed whether (1) funds were discovered to be used for influencing government policy or action, (2) the board adhered to the AMS investment policy (Appendix 3), (3) internal controls over funds met auditing standards, (4) funds were used only for projects and other expenses authorized in a budget approved by USDA, and (5) funds were used in accordance with this guidance.

E.  Management Reviews.  AMS shall conduct internal/management control reviews of national R&P board operations (programmatic, financial, and compliance) at least once every 3 years, in accordance with these and other applicable guidelines such as the

Government Accountability Office guidance and standards for internal control, to ensure that policies are followed and adequate records are maintained.  AMS will: 1) give reasonable notice; 2) coordinate with the boards for scheduling management reviews; 3) conduct an exit interview to review findings and 4) provide a written report to the appropriate board committee, as determined by AMS.  The report will ask for a written response from the board.  AMS will establish a deadline for the board's response and will ensure that corrective actions are taken.

F.  Independent Evaluation.  AMS will ensure that the boards conduct an independent evaluation of the effectiveness of their promotion programs every 5 years, unless otherwise required by authorizing legislation, and make the report available to assessment payers and AMS, as required by the Federal Agriculture Improvement and Reform Act of 1996.  AMS expects such evaluations to have a credible methodology, articulate shareholder returns, and present the results in a non-technical manner.

G.  Travel Expense Claims.  Boards shall establish travel policies and procedures, approved by AMS, including the individual(s) designated to approve travel.  The board's policies and procedures shall address and incorporate all of the following:

1.      A process for travel pre-approval where all travel is approved by a supervisor or the board's designee.  Pre-approval could be accomplished via e-mail.  In the case of board meetings, an invitation to board members will suffice.

2.      Travel rules, which shall include type of carrier (POV, rental, rail, air, etc.) and rates (non-refundable, economy, business, first-class).

3.      A standard expense claim form for any reimbursement from assessment funds.

4.      The form must include claimant's name, address, position, and travel dates and times (departure and return).

5.      If the claimant is an employee of the board, the claim shall be approved by the supervisor or the board's designee.

D.  Refund information released be limited to dollar amount and number of refunders by State, region, or nationwide and presented in a manner that protects the identity of individual persons or firms.

Refund reporting is discussed in V.B.

VII.   Influencing Legislation and/or Government Policy

In the process of monitoring board activities, it is important for AMS to be aware of any actions which may conflict with legislative prohibitions regarding influencing legislative and/or government policy.  This prohibition on the use of checkoff funds applies equally to any trade/producer organizations funded wholly or in part by a particular board or contractor to the boards.  However, this does not affect a trade/producer organization's ability to lobby with non-checkoff funds.  Likewise, there are no restrictions on individual board members, except when acting in an official capacity for the board.  The following definitions serve as a guide for commodity programs (see also Appendix 2).

A.      "Influencing of legislation" is defined as:

1.      Any attempt to influence any legislation or any attempt to affect the opinions of the general public or any segment thereof concerning legislation; or

2.      Any attempt to influence any legislation through communication with any member or employee of a legislative body or with any government official who may participate in the formulation of legislation.

B. "Influencing of governmental policy or action" is defined as any action the principal purpose of which is to bring about a change in existing policy or regulation or affect the outcome of proposed policy or regulation, except those actions which are specifically provided for in the act, order and/or rules and regulations.

X.      Policy on Brand Names

Concerning the boards' funding of promotion or advertising involving brand name or trade name products, AMS first requires that boards operate within their legal framework. The various legislation governing the boards provides different thresholds of acceptable brand-name advertising.

XI.     Administration

A. Legal Counsel.  USDA's Office of the General Counsel (OGC) will provide all legal counsel to the boards, except as may be provided for under a Memorandum of Understanding between the individual boards and OGC.  On a case-by-case basis, OGC may also grant approval for boards to use outside counsel for specific issues or timeframes.  In these cases, a memo from AMS and concurrence from OGC shall serve as approval.

B. Investment of Funds.  AMS requires boards to follow the AMS investment policy (Appendix 3) to ensure proper investment of board funds.  AMS will review the investment statement for each accounting period (monthly or quarterly) to verify that board funds were invested in accordance with this policy.

C. Bylaws, Policy Statements and Annual Reports.  Boards will be required to establish bylaws and policy statements that AMS will review and approve.  Approval will be granted by the respective program Deputy Administrator.   These bylaws and policy statements will be posted on the board's Web site and/or otherwise made available.   In order to be transparent, boards will prepare an annual report containing detailed information on all board expenditures, projects (including costs and outcomes), administrative expenses and results of any audits/reviews that will be published on board Web sites and/or otherwise made available to those paying assessments.

D.  Meetings.  Boards must provide advance notification to AMS of all board meetings, including but not limited to meetings of the full board, executive committee, advisory committee, standing committees, ad hoc committees, and task forces.  The term "meetings" includes but is not limited to on-site meetings, conferences, and webinars. Organizations that receive board funds also must notify AMS of any meetings involving board funds, unless exempted by AMS.  AMS will attend board meetings and participate in conference calls, webinars, committee meetings, and any other meetings involving the boards when deemed necessary by AMS.  Meetings with other Government agencies are addressed in Section XI.N.

E.  Board Administrative Expenses.

1.  Recognizing inherent differences in implementing laws or regulations, scope, and funding among commodity promotion and research programs, AMS expects each board and State association or other organization, authorized by law to receive assessment funding, to establish and maintain the minimum level of annual administrative expenses necessary to efficiently and effectively carry out the programs mandated by law.  Each board shall include its annual administrative expenses as a separate item in its annual report.  Each State association or other organization may be required to report its annual administrative expenses in a similar manner.

2.  The Secretary's costs for oversight of the research and promotion boards and OGC fees will not be considered as an administrative expense of the boards as these charges are outside commodity boards' control and management.

3.   AMS does not specify which expenses the boards must include under administration, and certain costs may be billed back as program costs as deemed appropriate by AMS.  Board members must be aware of how the boards calculate administrative costs and whether and how they are charged to programs.  As a

APPENDIX  2

## ACTIVITIES FUNDED BY CHECKOFF DOLLARS

Legislation governing research and promotion boards prohibits checkoff funds to be used for influencing legislation and/or Federal, State, or local government action or policy.  The USDA Agricultural Marketing Service (AMS) has addressed this issue in its guidelines for oversight of research and promotion boards.

### EXAMPLES OF ACTIVITIES INVOLVING GOVERNMENT POLICY OR ACTION

| ALLOWED ACTIVITIES | PROHIBITED ACTIVITIES |
|---|---|
| Recommending changes to regulations governing the research and promotion program | Attempting to influence any legislation |
| | Attempting to affect the opinions of the public or segment of it concerning legislation |
| Providing factual information to Federal, State, or local government officials, but must be unbiased and may not state a specific course of action | Attempting to influence any legislation by communicating with a member or employee of a Federal, State, or local legislative body |
| Providing results of studies to Federal, State, or local government officials, provided no course of action is stated | Attempting to influence a Federal, State, or local government official who may participate in the formulation of legislation or government action or policy |
| Providing comments on Federal regulations, as long as the comments are purely factual and do not register support for or disapproval of the regulation or advocate a course of action | Taking any action to bring about a change in existing policy or regulation (other than as allowed in the act, order, and regulations) |
| | Taking any action to affect the outcome of proposed policy or regulation (other than as allowed in the act, order, and regulations) |

### ENTITIES SUBJECT TO RESTRICTION ON INFLUENCING LEGISLATION AND/OR GOVERNMENT POLICY

| | |
|---|---|
| Checkoff boards | Restrictions apply |
| Board members and alternates | No restriction on individuals, except when acting in an official capacity for the board |
| Board staff/individuals paid by the board | Restrictions apply |
| Trade/producer organizations funded wholly or in part by the board or board contractor(s) | Restrictions apply when check-off funds are used |
| Contractors, organizations, and other groups | No restrictions unless using checkoff funds |

September 2015
Page 26
802

APPENDIX 3

**United States Department of Agriculture**
**Marketing and Regulatory Programs**
**Agricultural Marketing Service**

# Directive      AMS 2210.2            2/7/11

## INVESTMENT OF PUBLIC FUNDS

1.      **PURPOSE**

This Directive states the policy and responsibilities for investment of public funds maintained by the Agricultural Marketing Service (AMS).

2.      **REPLACEMENT HIGHLIGHTS**

This Directive replaces AMS Directive 2210.2, Investment of Public Funds, dated August 2005.

3.      **AUTHORITIES**

a.      Title 31, Code of Federal Regulations (CFR), Parts 202-226, Money and Finance: Treasury.

b.      Volume I, Treasury Financial Manual 6-9000, Securing Government Deposits in Federal Agency Accounts.

4.      **DEFINITIONS OF TERMS**

a.      Agency.  Any department, agency, or instrumentality of the U.S. Government.

b.      Designated Depositary.  A financial institution designated by the Department of the Treasury as a depositary and financial agent of the Federal Government which has been selected by an agency to hold public funds.

c.      Federal Reserve Districts and Banks.  The Federal Reserve Bank or branch of the district within the geographic area where the agency's designated depositary is located.

d.      Government Deposits.  Public money, including, but not limited to, revenue and funds of the United States and deposited funds subject to the control or regulation of the United States or any of its officers, agents, or employees.

e.      Recognized Insurance Coverage.  The insurance provided by the Federal Deposit Insurance Corporation (FDIC), National Credit Union Share Insurance Fund, and

the insurance organizations specifically approved by the Secretary of the Treasury under Title 31, CFR, Part 226.

5.    **POLICY**

It is AMS policy to:

    a.    Exercise prudent cash management of funds collected

through: (1)    Fees for services,

        (2)    Assessments from handlers and producers to finance research and promotion efforts, and

        (3)    Assessments to administer marketing agreements and orders. This also applies to payments received by producer settlement funds and interest or other charges collected on overdue accounts.

    b.    Require that a formal agreement or Memorandum of Understanding be signed between parties before funds are deposited with a financial institution.  This agreement is to state the responsibilities of both the custodial agency and the financial institution, and must conform with the policies and guidelines established by the U.S. Treasury with respect to the deposits of, and collateral for, public funds.

    c.    Require complete safety of invested funds.  In this regard, AMS adheres to U.S. Department of the Treasury Regulations, Title 31, CFR, Parts 202-226.

6.    **RESPONSIBILITIES**

    a.    The fund custodians for AMS who maintain public funds are the Budget Division, the Research and Promotion Boards, Milk Market Administrators, and the Fruit and Vegetable Marketing Order Administrative Committees.  When investing funds held in public trust, fund custodians must follow these guidelines:

        (1)    **Investments.**  All investments must be short-term, risk-free, interest- bearing instruments.

        (a)    **Short-Term.**  All investments must have a maturity period of 1 year or less to ensure availability and rapid conversion of the principal to cash.

        (b)    **Risk-Free.**  All investments must be federally insured or fully collateralized with Federal Government securities.

804

(2)    **Insurance Coverage.**  All investments must be fully secured.  Accounts are to be established at financial institutions having FDIC insurance which protects the funds depositor's place in banks and savings associations. Accounts at individual institutions should not exceed, in the aggregate, FDIC insured thresholds in order to ensure full insurance for both account principal and interest.  The standard insurance amount currently is $250,000 per depositor through December 31, 2013.  On January 1, 2014, the standard insurance amount will return to $100,000 per depositor for all deposit accounts.

(3)    **Collateralization.**  All investments exceeding FDIC insured thresholds, within said institutions, must be fully collateralized.

(a)    Before sending funds to an institution for investment, eligible collateral must be pledged to an account under the control of the investing custodian.

(b)    Only those securities specified in U.S. Department of the Treasury Regulations, Title 31, CFR, Part 202, are acceptable collateral. They include securities issued, fully insured or guaranteed by U.S. Government agencies, or U.S. Government-sponsored corporations.  Regulations that govern the types of acceptable collateral that may be pledged to secure deposits of public monies, as well as the valuation of that collateral are addressed in Title 31 CFR, Part 380.  For a current list of acceptable classes of securities and instruments described within this Code and their valuations, see the Bureau of the Public Debt's Web site at www.publicdebt.treas.gov.

(c)    Collateral must be pledged at face value.  Financial institutions must provide the investor with quarterly inventories of pledged collateral showing both face and market value.

(d)    Pledged collateral must be separately segregated in the name of the investor (i.e., AMS-Budget Division, Board, Milk Market Administrator, or Administrative Committee), in order to prevent double pledging.

(e)    Collateral not held by the Federal Reserve Board must be held by a financial institution authorized by Treasury as a Federal Depositary, having FDIC insurance, and approved by the Federal Reserve Board.

(f)    Investment records must be maintained for 6 years and 3 months, as required by the AMS Records Management Program.

b.    The Planning and Accountability Division, AMS, will conduct a biennial review of the investment decisions process for the AMS investment program. Investment authorities outside of the AMS investment program will continue to be reviewed as outlined in their investment authority.  The Budget Division will issue quarterly investment letters that will apprise committee members of their investment earnings. The Budget Division will also host an annual meeting with

the Investment Committee to provide an overview of the investment program activities.

c.      On an annual basis, all <u>employees</u> authorized to conduct business with any financial institution participating in the AMS investment program must complete an AMS Investment Program Disclosure Statement Form which indicates any personal relationships with those financial institutions with which business is conducted.

d.      The Budget Program and Analysis Branch Chief and the AMS Budget Officer share the responsibility of approving daily investment decisions respectively. In their absence, acting staff (GS-13 and above) assume these responsibilities provided they have signed disclosure statements and have confidential disclosure reports on file.

## 7.      INQUIRIES

a.      For further information, please contact the AMS Budget Office.

b.      This Directive is available online at http://www.ams.usda.gov/amsissuances

/s/
Ellen King
Deputy Administrator
Compliance and Analysis Programs

 **United States** **Agricultural** **STOP 0249 - Room 2092-S**
**Department of** **Marketing** **1400 Independence Avenue, SW.**
**Agriculture** **Service** **Washington, D.C.  20250-0249**


## DECISION MEMORANDUM FOR THE ACTING UNDER SECRETARY

**THROUGH:**    Lloyd C. Day        FEB  2 8  2006
Administrator
Agricultural Marketing Service

**FROM:**  For  Barry L. Carpenter    /s/ Randall D. Jones
Deputy Administrator        February 22, 2006
Livestock and Seed Program

**SUBJECT:**    National Pork Board Acquisition of the "Pork, the Other White Meat" Tag Line
and Related Materials

**ISSUE:**

The National Pork Board (Board) would like to purchase the "Pork, the Other White Meat"
(PTOWM) trademarked tag line and related marks from the National Pork Producers Council
(NPPC), the pork industry's primary trade association, using assessments collected under the
Pork Promotion, Research, and Information Act—more commonly known as the Pork
Checkoff Program.

**DISCUSSION:**

NPPC currently owns the tag line and the associated marks of PTOWM, which it filed with the
U.S. Patent and Trademark Office on August 24, 1987.  Substantial ideation, strategy
development efforts, and producer and consumer research investment preceded the Pork
Checkoff Program and all at NPPC's expense.

NPPC grants the Board exclusive license, and originally entered into a trademark license
agreement in 2001.  In 2003, the Board and NPPC renegotiated the terms of the agreement and
amended and extended the agreement until June 30, 2009.  Under the amended agreement, the
Board pays NPPC an annual royalty of $818,451, until July 1, 2006.  During the last two
contract years, the Board must pay $1 per year until the contract ends on June 30, 2009.  In the
contract, there are terms that reduce the royalty payment in the event the pork checkoff
assessment rate is reduced (see attachments).

The Board believes that it is in a strong negotiating position to purchase PTOWM prior to the
remaining 2 years of the contract at a time when the $1 royalty payments are due because
NPPC will be in need of additional income during the $1 contract years.  Furthermore, the

**DECISION MEMORANDUM FOR THE ACTING UNDER SECRETARY**
**Page 2**

Board believes there is a sense of urgency to purchase the well-known PTOWM trademark because of the Board's investment in tag line and related brand marketing materials.

To determine the purchase and rebuilding prices, a fair purchase price for the tag line, and to determine the costs for developing an entirely new campaign in the event PTOWM is not owned by the Board, Board staff solicited appraisals from independent advertising experts. The appraisals varied widely from approximately $35 million to in excess of $200 million. To rebuild the brand, experts estimate that the brand could be rebuilt over a 7-year period at an incremental cost of $36.1 million. The Board believes this projected rebuilding cost equates to a fair-market value.

Based on the estimate of costs to rebuild the brand and ongoing negotiations with NPPC, the Board believes that it is in its best interest to purchase PTOWM. Through its negotiations with NPPC, the Board has proposed a purchase price of $34.597 million to be paid over 20 years with an interest rate of 6.75 percent, which results in annual payments of $3 million. In the event that the assessment rate is reduced below 0.40 percent of the market value, the provisions of the current license agreement will automatically be reinstated. If the license agreement is reinstated, then equity in PTOWM generated through the Board's purchase payments will remain intact during the reinstated license period and applied to any newly negotiated purchase arrangement.

## OPTIONS:

### OPTION 1: ALLOW THE BOARD TO PURCHASE THE PTOWM TAG LINE

Pros:
1. PTOWM is a nationally recognized tag line.
2. The Board has a strong negotiating position to negotiate favorable purchase terms.
3. The Board can own and further invest in the PTOWM brand.
4. The Board argues that the licensing royalty is expected to increase significantly after 2009.

Cons:
1. Critics of the checkoff believe that this acquisition supports and  provides long-term income to NPPC.
2. The Board is paying nearly half of its total payment in interest to NPPC.
3. Long-term payment plan obligates future Board's to this type of expenditure.

DECISION MEMORANDUM FOR THE ACTING UNDER SECRETARY
Page 3

OPTION 2: PROHIBIT THE PURCHASE OF THE PTOWM TAG LINE BY THE BOARD

Pros:
1. Satisfies the critics' concerns that the Board is merely funding NPPC.
2. At this time, the Board is unaware of any other organization competing to purchase PTOWM.
3. Current licensing agreement is in place until 2009.

Cons:
1. Does not permit the Board to own the asset for which it is investing.
2. The Board may lose negotiating power.
3. Licensing agreement cost may increase significantly after 2009.

RECOMMENDATION:

We recommend Option 1 which would allow the Board to enter into an agreement with NPPC and purchase the PTOWM tag line and associated marks.

DECISION BY THE ACTING UNDER SECRETARY:

Approve:          _____✓_____

Disapprove:       _____

Discuss with me:  _____

Date:             _2/28/06_

Reviewed by:      _JWS_

Attachments

812

# The National Pork Board
## *"Pork, the Other White Meat"*
## Acquisition Proposal

### February 14, 2006

### Intent

The National Pork Board (NPB) suggests there is strong business rationale and it is in the industry's best interest to purchase the asset *"Pork, the Other White Meat"* (PTOWM) from the National Pork Producers Council (NPPC) at this time.

### Rationale

The NPB adopted PTOWM in 1986. Since then it has become nationally recognized and in 2000, Northwestern University found it to be the 4th most recognized tagline in US marketing.

Substantial consumer research led the NPB in March of 2005 to elevate PTOWM to the industry's brand, creating an opening to establish a new marketing slogan, "Don't be blah!" The campaign strategy has proven successful, and as a result, the NPB is scheduled to invest over $100 million in the marketing of this brand to consumers through a variety of platforms over the balance of the current PTOWM license agreement. The current license agreement with the NPPC expires on June 30, 2009.

The future holds a sizeable investment by the NPB in the PTOWM brand, and as such, the licensing fee in any subsequent PTOWM agreement is expected to increase substantially. In short, any investment in the PTOWM brand between now and July of 2009 will work against the NPB and its ability to negotiate a favorable license fee in the future.

### Why Now?

Business experts will substantiate the principle that no organization should build its business model around a brand it doesn't own. This strategy carries substantial, and in this case, unnecessary risk.

The NPB has the strongest negotiating position it will have regarding its ability to negotiate favorable purchase terms for PTOWM.

First, minimal investment has been put into the brand strategy to date, resulting in minimal brand equity. And second, the NPPC is in need of monies and is challenged with no income from the licensing agreement during its final two years.

813

# The National Pork Board
# PTOWM Purchase
### Tentative Term Sheet

The National Pork Board will purchase the *Pork, the Other White Meat* trademark and all accompanying designs associated with *Pork, the Other White Meat* from the National Pork Producers Council per the following terms:

1. The purchase price is $34.597 million to be paid over 20 years with an interest rate of 6.75% resulting in an annual payment of $3.0 million.

2. The purchase will be a "Contract for Deed" meaning the National Pork Board will have full use of all designs, the trademark, etc. through the course of the payment period and will have full and unrestricted ownership upon completion of the $60 million obligation.

   (Since no legal expertise was available during the negotiation, the NPB's agreement to the "Contract for Deed" structure is contingent on advice from legal counsel regarding suitable legal structure options.)

3. The effective date of this agreement is July 1, 2006 with the first installment due on that date and subsequent annual installments paid on the anniversary date.

4. All provisions within the existing license agreement between the National Pork Board and the National Pork Producers Council will be suspended effective June 30, 2006. The three remaining years (2006, 2007 and 2008) and all provisions of the current license agreement will automatically be reinstated should the national pork checkoff rate fall below 40 cents per $100 value. If the license agreement is reinstated, the NPB's equity in the PTOWM mark generated through NPB purchase payments will remain intact during the reinstated license period and applied to any newly negotiated purchase arrangement.

5. During the "contract for deed" period, the NPB may not sell the PTOWM mark without prior approval from the NPPC. (See bold copy in point #2)

6. In the event the National Pork Board is more than 30 days late on its annual payment obligation, the National Pork Producers Council may serve notice of default to the National Pork Board and the National Pork Board shall have a 30 day remedy period. If remedy is not made, the trademark Pork, the Other White Meat and all trademarks purchased from the NPPC by the NPB as a part of this transaction shall transfer back to the National Pork Producers Council.

7. The National Pork Board will maintain the quality of the purchased property through appropriate use.

8. For this agreement to be final, it must first be approved by the full Board of Directors of the National Pork Board, the National Pork Producers Council and the Agricultural Marketing Services within the USDA.

814

CONFIDENTIAL

Rationale Continued...

**Failure to Act**

The NPB must act decisively and quickly. The NPB holds maximum negotiating leverage today and believes that failure to act would force the organization to walk away from a brand within which the industry has built tremendous equity and for which it has great emotional attachment.

**Exploring the Possibility**

As a result of discussions with Barry Carpenter in December 2005, the NPB began the process of exploring terms for a potential acquisition of PTOWM from the NPPC,

Appraisals from independent experts were sought, and a wide range of values were received. But at the end of the day, it was determined that the NPB was the only potential buyer of PTOWM, and it was decided that the only options for the NPB were to purchase the brand or rebuild it.

**Establishing Value**

The NPB acquisition efforts were put towards determining the rebuild price and later it was calculated that the brand could be rebuilt over a period of 7 years at an incremental cost of $36.1 million. In the view of the NPB, the rebuild cost essentially became the market value as it entered negotiations with the NPPC.

**Negotiations with the NPPC**

On February 6, 2006, a negotiating team for the NPB met with a negotiating team for the NPPC in Omaha, NE. The primary objective of the NPB was to arrive at a purchase price less that the rebuild cost, and to protect the organization's ability to pay by including a provision linking the purchase agreement to the national pork checkoff rate.

A tentative agreement was reached with the NPPC pending approval by AMS of the USDA. The tentative agreement with the NPPC and the "rebuild cost" strategy and calculation follow.

# mark h williams    company

February 3, 2006

Mr. Steve Murphy
National Pork Board
1776 N.W. 114th Street
Clive, IA 50325

Subject: "The Other White Meat"

Dear Steve:

We have reviewed various methods of establishing the market value of the "The Other White Meat" trademark presented by two different firms (Ostrow Reisin Berk and Abrams, Ltd. and JPGroup USA). In our view, two key factors make the valuation of this trademark a completely different exercise than the valuation of most commercial marks.

1) While "The Other White Meat" is extremely well known, it is recognized (principally in the U.S.) as being synonymous with (fresh) "pork," which strongly suggests that no branded marketer would be able to gain enough benefit from its use to make them a likely buyer.
2) Because the mark has been used to promote the entire industry's product, rather than one marketer's product, there is very little of the data most often used in establishing the good will value of commercial brands.

As such, we believe that the only reasonable valuation would be one based on the projected cost to replace "The Other White Meat." Simply stated, this method best reflects the actual situation – the realistic cost of the alternative from the buyer's perspective.

Using such a method indicates that the Present Value should be considered to be somewhere between $30,000,000 and $40,000,000. (The attached schedule is an example of our Replacement Cost analysis).

Mark H Williams & Company, LLC
150 North Michigan Avenue
Suite 2800
Chicago, Illinois 60601
312.664.3500
Facsimile: 312.664.2979

816

## BELIN LAMSON McCORMICK ZUMBACH FLYNN
### A PROFESSIONAL CORPORATION
### ATTORNEYS AT LAW

| | | | | | |
|---|---|---|---|---|---|
| Mark McCormick | Sue Luettjohann Seitz | Sheila K. Tipton | Garth D. Adams | Silvia J. Hansell | Of Counsel |
| Steven E. Zumbach | Jeremy C. Sharpe | Mark E. Weinhardt | Michael R. Reck | Nathan J. Barber | Jeffrey E. Lamson |
| Thomas L. Flynn | John T. Seitz | Dennis P. Ogden | Wayne E. Reames | Michael B. Abbott | Danielle M. Shelton |
| Jon L. Staudt | Robert A. Mullen | Edward M. Mansfield | S. Christian Nelson | Nathanael J. Blake | |
| James L. Krambeck | Patricia A. Shoff | Stephen R. Eckley | Holly M. Logan | Tricia A. Johnston | David W. Belin |
| Richard W. Lozier, Jr. | William D. Bartine | David Swinton | Lance W. Lange | | (1928 – 1999) |
| James V. Sarcone, Jr | Quentin R. Boyken | Margaret C. Callahan | Christopher McDonald | | Roger T. Stetson |
| James R. Swanger | Charles F. Becker | Robert D. Sharp | Matthew C. McDermott | | (1953 – 2004) |

S. Christian Nelson
Direct Dial: (515) 283-4612
Direct Fax: (515) 558-0612
E-mail: scnelson@belinlaw.com

October 9, 2006

**VIA HAND DELIVERY**

Jim Meimann
National Pork Board
1776 Northwest 114th Street
Clive, IA 50325

Dear Jim:

Please find enclosed an original and one copy of the closing book for the acquisition of the PTOWM Mark. Please call me with any questions or concerns you may have regarding this matter. Best regards.

Sincerely,

S. Christian Nelson
For the Firm

SCN/sl
d:\n0117\93\ltr-meimann 100906-scn.doc

Enclosure

666 Walnut Street, Suite 2000, Des Moines, Iowa 50309-3989
(515) 243-7100    www.belinlaw.com

## ASSET PURCHASE AGREEMENT

### dated as of July 1, 2006

### by and between

### National Pork Producers Council, an Iowa non profit corporation ("Seller")

### and

### National Pork Board, an instrumentality of the United States of America created under the Pork Promotion Research and Consumer Information Act of 1985 ("Buyer")

## TABLE OF CONTENTS

1.   Asset Purchase Agreement

2.   Schedules and Exhibits

3.   Trademark Assignment

4.   Non-Negotiable Promissory Note

5.   Trademark Security Agreement

6.   Reinstated Trademark License Agreement

7.   Seller's Certificate of Representations, Warranties and Covenants

8.   Buyer's Certificate of Representations, Warranties and Covenants

9.   Waiver Letter

10.  Secretary's Certificate

11.  Ratification Certificate

d:\n0117\93\toc-closing book.doc

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ("Agreement") is made and entered into effective as of the 1st day of July, 2006, by and between the National Pork Producers Council, an Iowa non profit corporation ("Seller") and the National Pork Board, an instrumentality of the United States of America created under the Pork Promotion Research and Consumer Information Act of 1985 ("Buyer")

### WITNESSETH:

WHEREAS, Seller is owner of the Trademarks (as defined below) and certain rights and goodwill associated therewith; and

WHEREAS, Buyer desires to acquire from Seller all of the Trademarks and certain rights owned by Seller and goodwill associated therewith.

NOW, THEREFORE, in consideration of the premises, the mutual covenants and agreements contained herein, and for other good and valuable consideration, the parties hereby agree as follows:

## ARTICLE I
## SALE OF ASSETS

1 1    Assets To Be Sold.  On the basis of the representations and warranties herein contained and subject to the terms and conditions stated in this Agreement, on the Closing Date (as hereinafter defined), Seller shall sell, convey, transfer, assign and deliver to Buyer, and Buyer will acquire from Seller, all right, title and interest of Seller in and to certain assets of Seller set forth below (the "Acquired Assets"):

a.   The trademarks and service marks set forth on Exhibit 1.1(a) hereto, together with: (i) all trademark and service mark registrations and applications with regard to such trademarks and service marks; (ii) all logos, URLs and domain names with regard to such trademarks and service marks; (iii) all renewals, extensions, and continuations (in-whole or in-part) thereof; (iv) all income, royalties damages and payments now and hereafter due and/or payable with respect to such trademarks and service marks (other than payments from Buyer to Seller as provided in this Agreement), including, without limitation, payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (v) the right to sue for past, present and future infringements and dilutions thereof, (vi) all of such Seller's rights corresponding thereto throughout the world and (vii) all related artwork or materials (all of the foregoing,  including the items described in clauses (i)-(vii), being sometimes hereinafter individually and/or collectively referred to as the "Trademarks");

b.   All goodwill of such Seller's business symbolized by the Trademarks; and

c.   Not used.

d. Any business records in the possession of Seller directly related to the Trademarks, including any Licenses, advertising and promotional materials, customer lists, vendor and dealer lists, contractor and supplier lists, logs, government reports, books or records, files, documents, correspondence, drawings, specifications, creative materials (including artwork), , studies, reports, and all other printed or written materials relating to the Trademarks, and including without limitation all of its historical materials relating to the Trademarks.

The conveyance, transfer, assignment and delivery of the Acquired Assets shall be made free and clear of all liabilities, obligations and encumbrances whatsoever. Except as provided herein, Seller shall be responsible for paying all expenses of transfer and assignment including without limitation any applicable sales and use taxes.

1.2   No Assumption of Liabilities of Seller. Buyer is not assuming or undertaking to assume and shall have no responsibility for any expenses, debts, obligations, liabilities, claims, demands, fines or penalties, whether fixed or contingent, past, present or future, or direct or indirect out of or in connection with the ownership and use of the Acquired Assets or any other acts or omissions of Seller in connection therewith on or prior to the Closing Date (the "Excluded Liabilities"); provided, however, that this Section 1.2 shall not affect Buyer's obligations to Seller as to the Acquired Assets under the Existing Exclusive License (as defined in Section 2.4 hereof) as set forth in Section 7.4 hereof, and such obligations of Buyer shall not be Excluded Liabilities.

1.3   Consideration. In consideration of Seller's performance of this Agreement and Seller's transfer and delivery of the Acquired Assets, Buyer will pay Seller Thirty-four Million Five Hundred Ninety-seven Thousand and 00/100 Dollars ($34,597,000.00) (the "Purchase Price") payable as follows:

a. A sum equal to Three Million and 00/100 Dollars ($3,000,000.00) shall be payable in immediately available funds on the Closing Date, and

b. The balance of the Price Purchase shall bear interest at the rate of 6.75% per annum and shall be evidenced by the Buyer's executed and delivered Promissory Note in the form attached hereto as Exhibit 1.3, which Promissory Note shall be subject to the provisions of Sections 1.7, 1.8 and 1.9 hereof;

1.4   The Closing. The execution of the closing documents provided for in this Agreement shall take place in Des Moines, Iowa at the offices of Belin Lamson McCormick Zumbach Flynn, A Professional Corporation, at date and time as is mutually agreeable to the parties promptly after all required approvals for the purchase and sale of the Acquired Assets are received by Buyer and Seller (the "Closing" or the "Closing Date").

1.5   Conveyances. At the Closing Seller shall execute or endorse and deliver to Buyer:

a   The Trademark Assignment in the form attached hereto as Exhibit 1.5(a) (the "Trademark Assignment").

2

822

b. Such other appropriate Bill of Sale, Assignment and Assumption Agreement and other documents conveying, transferring and assigning to Buyer all of the Acquired Assets free and clear of any defect, security interest, lien, obligation, or encumbrance, in form and substance reasonably satisfactory to Buyer and its counsel.

c. Where appropriate, such other certificates of title or separate instruments of sale, assignment or transfer in form suitable for filing and recording the Trademark Assignment at the U.S. Patent and Trademark Office and other appropriate U.S., state or foreign office or agency, for various items of the Trademarks where the same are necessary or desirable in order to vest or evidence title thereto in Buyer.

d. All other documents to be delivered by Seller to the Buyer on the Closing Date pursuant to Article V of this Agreement.

1.6   Further Assurances. Following the Closing, Seller shall also execute and deliver without expense to Buyer such further instruments of conveyance, sale, assignment or transfer and shall take or cause to be taken such other or further actions as Buyer may reasonably request in order to vest, confirm or evidence in Buyer title to all or any part of the Acquired Assets.

1.7   Voluntary Termination of Purchase Obligations. Buyer may at any time and for any reason elect to terminate its obligations to pay the unpaid balance of the Purchase Price, including all sums of principal and interest due or to become due under the Promissory Note, provided:

a. Buyer gives the Seller a written notice of its election to terminate its obligations under Section 1.3 of this Agreement and the Promissory Note (the "Voluntary Termination Notice") of not less than 365 days;

b. Buyer shall be obligated to pay Seller on the next July 1 following the written notice of termination an amount equal to $3,000,000, in consideration of the use of the Trademarks as provided in subparagraph (d), below;

c. Except with respect to the payment referred to in subparagraph (b) above, upon the elected termination date all obligations of the Buyer under the Promissory Note, including all sums owed (other than any installment payment that was due and payable prior to the date the Voluntary Termination Notice was given) or which may become owing under the Promissory Note, shall be extinguished and the Seller shall return the Promissory Note to Buyer marked "cancelled";

d. During the 365 day period following the July 1 payment date referred to in subparagraph (b) above, Buyer shall continue to own all right, title and interest in and to the Trademarks and shall be entitled to full rights to and use of to the Trademarks;

e. At the end of the 365 day period following the July 1 payment date referred to in subparagraph (b) above Buyer shall reconvey (including a reconveyance of the Trademarks pursuant to a Trademark Assignment in the form of Exhibit 1 9(g)(ii)(C)) all of its right, title and interest in and to the Acquired Assets (as then constituted), to

3

823

Seller, free and clear of all liabilities, obligations or encumbrances whatsoever, other than any exclusive or nonexclusive licenses theretofore granted by Buyer  Buyer, as assignor, shall be responsible for paying all expenses of transfer and assignment, including without limitation any applicable sales and use taxes, and all other transfer fees related to the reconveyance of the Acquired Assets, including the reassignment of the Trademarks.  Such reconveyance and reassignment shall be made by such appropriate assignment(s) or other documents in a form reasonably satisfactory to Seller and its counsel, including such other certificates of title or separate instruments of sale, assignment and transfer in form suitable for filing and recording at the U S. Patent and Trademark Office and other appropriate U.S., state or foreign office or agency, for various items of the Trademarks where the same are necessary or desirable in order to vest or evidence the title thereto in Seller, as assignee; and

f.  By way of illustration, if Buyer gives Seller its written notice of election to terminate on April 1, 2007, Buyer would be obligated to pay Seller $3,000,000 on July 1, 2007, Buyer would have no further obligations to pay any amounts due or to become due under the Promissory Note or under Section 1.3 of this Agreement, the Buyer would be entitled to continue to own the Trademarks and enjoy full rights and use thereof until June 30, 2008, and on June 30, 2008 Buyer would reconvey the Trademarks to Seller as described in subparagraph (e) above.

1.8   Non-Recourse Obligation.  Other than as provided in the Trademark Security Agreement (as defined below) and Section 1.7 of this Agreement, Seller agrees that: (i) the payment of the unpaid balance of the Purchase Price, including all sums of principal and interest due or to become due under the Promissory Note, shall be enforced solely from the Collateral (as defined in the Trademark Security Agreement); and (ii) no deficiency or personal judgment as to any unpaid portion of the Purchase Price shall ever be sought against Buyer, or its successors and assigns.  Except as otherwise expressly provided in Section 1.7 of this Agreement, the obligations of the Buyer under Section 1.3 of this Agreement and the Promissory Note are and shall be considered "non-recourse" in all respects.

1.9   Post-Closing Modifications Resulting From a Adverse Pork-Checkoff Event or a Lobster Trademark Decision

a.  For the purposes of this Section 1.9 the following terms shall have the following meanings:

"Adverse Pork Checkoff Event" shall mean:

i.        the effective date of the final termination of the mandatory 100% legislative National Pork Checkoff (the "Pork Checkoff") due to any of the following:

(A)   a judicial determination or court ruling;

(B)   congressional action; or

4

824

(C) an administrative ruling or order declaring that: (a) the Pork Checkoff is not effectuating, or is obstructing, the policy of the Pork Promotion, Research and Consumer Information Act of 1985, as amended) (commonly referred to as the Pork Act), its implementing regulations, or the related order issued by the Secretary of the U.S. Department of Agriculture, or (b) a valid referendum, properly called and conducted under the Pork Act, has concluded that the Pork Checkoff should be terminated, and such termination has been properly effectuated;

ii.  the Pork Checkoff Assessment Rate shall be at any time reduced to an amount of less than U.S. $0.40 (40 U.S. cents);

iii.  the Pork Checkoff ceases to be mandatory; or

iv.  the Pork Checkoff ceases to be non-refundable.

"Lobster Trademark Decision" shall mean any determination by the Trademark Trial and Appeal Board ("TTAB") of the U.S. Patent and Trademark Office ("PTO") in TTAB Case No. 91,166,701, or by any court of competent jurisdiction, permitting the registration of the trademark THE OTHER RED MEAT by Supreme Lobster and Seafood Company, its successors or assigns.

"Pork Checkoff Assessment Rate" shall mean the rate of assessment to be paid per $100 of the value of pork and pork products, as determined from time to time by the duly constituted "Delegate Body", as defined and as called for under the Pork Act.

b  Buyer shall promptly provide Seller written notice of the occurrence of an Adverse Pork Checkoff Event, describing the Adverse Pork Checkoff Event.

c  Buyer shall promptly provide Seller written notice of the occurrence of Lobster Trademark Decision, describing the Lobster Trademark Decision

d.  Following the occurrence of an Adverse Pork Checkoff Event or a Lobster Trademark Decision, no further installments shall be due and payable under the Promissory Note, and failure of Buyer to make any annual installment payment otherwise called for under the Promissory Note shall not constitute an Event of Default under the Promissory Note, the Trademark Security Agreement or this Agreement.

e  During the sixty (60) day period following notification of an Adverse Pork Checkoff Event or a Lobster Trademark Decision, Buyer and Seller agree to negotiate in good faith on modifications to the Purchase Price set forth in Section 1.3, including, among other matters, adjustments the Purchase Price amount. By mutual written agreement Buyer and Seller may extend the 60 day negotiation period, and may seek third party valuations and cash flow analysis to assist in their negotiations.

f.  In the event Buyer and Seller are able to mutually agree upon a renegotiated Purchase Price, repayment terms, and the terms of an amended and substituted promissory note

5

as a replacement for the Promissory Note, Buyer and Seller shall enter into a modification to this Agreement changing the provisions of <u>Section 1.3</u> accordingly, and shall substitute an amended and substituted promissory note reflecting the agreed upon changes as a replacement for the Promissory Note. Seller agrees that the initial Purchase Price payment made by Buyer on the Closing Date and the principal component of any annual installment payments made by Buyer prior to the Adverse Pork Checkoff Event or a Lobster Trademark Decision shall be credited against the renegotiated Purchase Price and shall reduce the renegotiated Purchase Price accordingly.

g. In the event the Buyer and Seller are unable to mutually agree upon a renegotiated Purchase Price and new repayment terms prior to the expiration of the sixty (60) day negotiation period (or any mutually agreed extension thereof):

    i. Either party may provide written notice to the other of its election to terminate further negotiations as to a modification to the Purchase Price (the "<u>Termination Notice</u>");

    ii. Upon the date the Termination Notice is received by the party not providing said Termination Notice (the "<u>Termination Notice Date</u>"):

        (A) this Agreement shall automatically terminate, and all rights and obligations of the parties relating to the Trademarks shall be governed by the Reinstated Trademark License Agreement attached hereto as <u>Exhibit 1.9(g)(ii)(A)</u>, together with those provisions of this Agreement which expressly survive termination;

        (B) all obligations of the Buyer under the Promissory Note, including all sums owed or which may become owing under the Promissory Note, shall be extinguished and Seller shall return the Promissory Note to Buyer marked "Cancelled";

        (C) Buyer shall reconvey (including a reconveyance of the Trademarks pursuant to a Trademark Assignment in the form of <u>Exhibit 1.9(g)(ii)(C)</u>) all of its right, title and interest in and to the Acquired Assets (as then constituted), to Seller, free and clear of all liabilities, obligations or encumbrances whatsoever, other than any exclusive or nonexclusive licenses theretofore granted by Buyer. Buyer, as assignor, shall be responsible for paying all expenses of transfer and assignment, including without limitation any applicable sales and use taxes, and all other transfer fees related to the reconveyance of the Acquired Assets, including the reassignment of the Trademarks. Such reconveyance and reassignment shall be made by such appropriate assignment(s) or other documents in a form reasonably satisfactory to Seller and its counsel, including such other certificates of title or separate instruments of sale, assignment and transfer in form suitable for filing and recording at the U.S. Patent and

6

Trademark Office and other appropriate U.S., state or foreign office or agency, for various items of the Trademarks where the same are necessary or desirable in order to vest or evidence the title thereto in Seller, as assignee;

(D)   the Reinstated Trademark License Agreement shall automatically become effective; and

(E)   Seller shall credit to Buyer, such credit to be applied to royalties due Seller under the Reinstated Trademark Agreement, with the balance retained by Seller, an amount equal to the Pro Rata Share (as defined below) of the most recent $3,000,000 payment "Pro Rata Share" shall mean (i) $3,000,000, *times* (ii) a fraction, the numerator of which is equal to (i) 365, *minus* (iii) the number of days elapsed since the most recent July 1 to the Termination Notice Date, and the denominator of which is 365 By way of illustration, if the Termination Notice Date occurs on an October 1, 2007 then Seller is obligated to credit to Buyer against future royalties due under Reinstated Trademark Agreement an amount not to exceed $2,243,832.62, calculated as follows: (365 - 92) ÷ by 365 X $3,000,000 = $2,243,835 62, but in no event in amount greater than the amount of royalties due Seller under the Reinstated Trademark Agreement.

## **ARTICLE II**
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as follows; as of the date of this Agreement and as of the Closing Date:

2.1    <u>Organization, Power and Authority.</u> Seller is a nonprofit corporation duly organized, validly existing and in good standing under the laws of the State of Iowa. Seller is duly qualified and is in good standing under the laws of the State of Iowa. Seller has full power and authority to enter into and perform this Agreement

2.2    <u>Authorization of Agreement.</u> This Agreement and each of the transactions contemplated herein have been duly authorized by all necessary corporate or individual actions necessary for Seller to enter into this Agreement and to enable Seller to carry out its terms and to make this Agreement and transactions contemplated hereby the legal, valid and binding obligations of Seller. This Agreement and all of the other agreements contemplated hereby are legal and binding on Seller, and are enforceable against Seller in accordance with their terms. Neither the execution nor the delivery of this Agreement nor the consummation of the transactions contemplated herein is an event which, of itself or with the giving of notice or passage of time or both, constitutes the violation of any provision of Seller's articles of incorporation or bylaws or any member or board of directors resolution now in effect, or violates or results in the breach of or accelerates or permits the acceleration of the performance required by the term of any license or any

7

applicable law, ordinance, rule or regulation of any governmental body having jurisdiction, or any agreement, indenture, mortgage, lien, security agreement or lease to which Seller is a party, or by which Seller may be bound, or of any judgment, decree, writ, injunction, order or award of any arbitration panel, court or governmental authority, applicable to Seller, or results in the creation of any claim, lien, charge or encumbrance upon any of the property or assets of Seller, or terminates or cancels or results in the termination or cancellation of any such agreement.

2.3    Litigation.  Except as provided on Exhibit 2.3, there is no claim, litigation, action, suit, proceeding, investigation or inquiry before any federal, state, or local court, administrative agency, arbitration panel or governmental authority, pending or known to be threatened against or affecting the Acquired Assets.  To its knowledge, Seller has not failed to materially comply with and is not in default in any material respect under any provision of any federal, state or local law, regulation, ordinance, rule or order whether executive, judicial, legislative or administrative, or under any judgment, order, writ, injunction or decree of any court, agency or instrumentality which would have a material adverse effect on the Acquired Assets

2.4    Intellectual Property and Trademarks.  The Trademarks have been registered (or, as applicable, registration has been applied for) with the United States Patent and Trademark Office, are currently in compliance with the formal legal requirements (including the timely post-registration filing of affidavits of use and incontestability and renewal applications), are valid and enforceable and are not subject to any maintenance fees or taxes or actions falling due within ninety (90) days after the Closing Date.  Except as provided on Exhibit 2.4, no Trademark has been or is now involved in any opposition, invalidation or cancellation proceeding and to Seller's knowledge, no such action is threatened with respect to any of the Trademarks.  Except as provided on Exhibit 2.4, to Seller's knowledge, there is no potentially interfering trademark or trademark application of any other party.  To Seller's knowledge, no Trademark is infringed or has been challenged or threatened in any way.  None of the Trademarks infringe or are alleged to infringe any trade name, trademark or service mark of any other party.  To Seller's knowledge, all products and materials containing a Trademark bear the proper federal registration notice where permitted by law.  The Trademarks are owned by Seller and no third party agreement, license or other document grants any other person or entity the right to use the Trademarks, other than Amended and Restated Trademark License Agreement dated as of March 3, 2004 between Seller, as licensor, and Buyer, as licensee (the "Existing Exclusive License")  Except as provided on Exhibit 2.8 and Exhibit 3.3, there are no required third party consents necessary to assign the right to use the Acquired Assets to Buyer.  Seller is authorized to transfer exclusive ownership of all of the Trademarks to Buyer free and clear of any adverse claims, liens and interests.  Seller is not required to pay any license fee, royalty or any other payment to use any of the Trademarks, nor, except as contemplated in Section 1.9 hereof, will any fee or payment be required of Buyer and its successors and assigns after or in connection with the transfer of the Trademarks to Buyer at Closing.  Upon transfer of the Trademarks to Buyer, subject to the terms of the Trademark Security Agreement (including specifically Section 6(v) thereof, which prohibits transfers of the Trademarks), Buyer will have the right to transfer or assign the Trademarks to any subsequent third party free and clear of

8

any adverse claims, liens and interest other than any in which Buyer after the date of Closing suffers, permits or incurs with respect thereto

2.5   Good Title   Seller holds good and valid title to the Acquired Assets sold hereunder free and clear of all liens and encumbrances.

2.6   Contracts and Commitments.   Other than pursuant to or as permitted by the Existing Exclusive License, there are no other licenses or authorized uses of the Trademarks by any other person or entity.

2.7   Compliance.   Seller has complied with, and is in present compliance with, governmental laws, regulations and orders applicable to the Acquired Assets.   Seller has not received notice from any applicable governmental authority of any alleged violation of any such laws, regulations and orders, and knows of no basis existing for a violation thereof which may occur or be asserted in the future.

2.8   Consents.   Except as set forth in Exhibit 2.8, no consents or waivers are required to be given by (1) governmental authorities, (2) other persons to permit the performance by Seller of this Agreement or to permit Seller to lawfully transfer the Acquired Assets under this Agreement   All such consents and waivers shall be obtained by Seller prior the Closing.

2.9   No Bankruptcy Proceedings.   Seller is not bankrupt and Seller is not a party to any current or threatened bankruptcy, insolvency or similar proceeding.

2.10   Full Disclosure.   This Agreement does not contain any untrue statement of a material fact or omit to state any material fact required to be stated or necessary to make the statements made in the representations set forth in Sections 2.1 through 2.9 not misleading

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows; as of the date of this Agreement and as of the Closing Date:

3.1   Organization, Power and Authority.   Buyer is an instrumentality of the United States of America duly organized, validly existing and in good standing under the laws of the United States of America, and has full power and authority to enter into and perform this Agreement.

3.2   Authorization of Agreement   This Agreement and each of the transactions contemplated herein have been duly authorized by all necessary organizational and regulatory action of or applicable to Buyer necessary for Buyer to enter into this Agreement and to enable Buyer to carry out its terms and to make this Agreement and the transactions contemplated hereby the legal, valid and binding obligations of Buyer   This Agreement and all of the other Agreements contemplated hereby are legal and binding on Buyer, and are enforceable against Buyer in accordance with their terms   Neither the execution nor the delivery of this Agreement nor the consummation of the transactions contemplated

9

herein is an event which, of itself or with the giving of notice or passage of time or both, constitutes the violation of any provision of, or results in the breach of or accelerates or permits the acceleration of the performance required by the term of any license or any applicable law, ordinance, rule or regulation of any governmental body having jurisdiction, the organizational instruments of Buyer, or any agreement, indenture, mortgage, lien, security agreement or lease to which Buyer is a party, or of any judgment, decree, writ, injunction, order or award of any arbitration panel, court or governmental authority, applicable to either of them, or results in the creation of any claim, lien, charge or encumbrance upon any of the property or assets of Buyer, or terminates or cancels or results in the termination or cancellation of any such agreement.

3.3   Consents.  Except as set forth in Exhibit 3.3, no consents or waivers are required to be given by (1) governmental authorities, (2) other persons to permit the performance by Buyer of this Agreement or to permit Buyer to lawfully purchase the Acquired Assets under this Agreement.  All such consents and waivers shall be obtained by Buyer prior the Closing.

**ARTICLE IV**
**CONDITIONS PRECEDENT TO THE OBLIGATIONS OF SELLER**

The obligations of Seller to be performed on the Closing Date shall be subject to the satisfaction at or before the Closing of the following conditions:

4.1   Representations, Warranties and Covenants.  Buyer's representations and warranties contained in this Agreement shall have been true and correct in all material respects at and as of the Closing Date as though such representations and warranties were made at and as of such date and shall have fully performed and complied with all covenants, terms and conditions to be complied with by Buyer on or before the Closing Date, and Buyer shall have delivered to Seller a certificate, dated the Closing Date, to such effect, signed by the Chief Executive Officer of Buyer in the form attached hereto as Exhibit 4.1.

4.2   Litigation.  At the Closing Date there shall be no pending or threatened claim, litigation, action, suit, proceeding, investigation or inquiry before any court or governmental body, for the purpose of enjoining or prohibiting the consummation of this Agreement or otherwise claiming that this Agreement or the consummation hereof is improper, nor shall there be outstanding an order of any court or governmental authority which enjoins or prohibits the consummation of this Agreement.

4.3   Deliveries.

a.   Buyer shall have executed and delivered to Seller an original copy of the Trademark Security Agreement in the form attached hereto as Exhibit 4.3(a) (the "Trademark Security Agreement").

b.   Buyer shall have executed and delivered to Seller the original Promissory Note in the form attached hereto as Exhibit 1.3.

10

c. Buyer shall have executed and delivered to Seller an original copy of the Reinstated Trademark License Agreement in the form attached hereto as Exhibit 1.9(g)(ii) (A).

d. Buyer shall have delivered to Seller the executed Chief Executive Officer's certificate in the form attached hereto as Exhibit 4.1.

e. Buyer shall have executed and delivered such other instruments or documents as Seller may reasonably require in order to perfect the liens and security interest granted by Buyer under the Trademark Security Agreement.

f Buyer shall have delivered the consents set forth on Exhibit 3.3.

## ARTICLE V
### CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer to be performed on the Closing Date shall be subject to the satisfaction at or before the Closing of the following conditions:

5.1 Representations, Warranties and Covenants. The representations and warranties of Seller set forth in this Agreement shall have been true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date as though such representations and warranties were made at and as of such date except for changes therein expressly permitted hereby, Seller shall have fully performed and complied with all covenants, terms and conditions to be performed and complied with by Seller on or before the Closing Date, and Seller shall have delivered to Buyer a certificate, dated the Closing Date, to such effect signed by the CEO and Secretary of Seller in the form attached hereto as Exhibit 5.1.

5.2 Litigation. Except for the TTAB Case No 91, 166, 701 pending before the TTAB of the PTO, at the Closing Date there shall be no pending or threatened claim, litigation, action, suit, proceeding, investigation or inquiry before any court or governmental body which if adversely determined would materially and adversely affect the Acquired Assets or which has been brought or threatened for the purpose of enjoining or prohibiting consummation of this Agreement or the transactions contemplated hereby, nor shall there be outstanding an order of any court or governmental authority which enjoins or prohibits consummation of this Agreement.

5.3 Deliveries.

a. Seller shall have executed and delivered to Buyer the Trademark Assignment in the form attached hereto as Exhibit 1.5(a).

b Seller shall have executed and delivered to Buyer an original copy of the Reinstated Trademark License Agreement in the form attached hereto as Exhibit 1.9(g)(ii)(A)

c Seller shall have delivered the CEO's and Secretary's Certificate in the form attached hereto as Exhibit 5.1.

11

831

d. Seller shall cause certificates of the CEO and Secretary of Seller to be executed and delivered to Buyer in the form of Exhibit 5.3(f) and shall attach hereto the resolutions of the Seller authorizing the sale of the Acquired Assets pursuant to this Agreement

e. Seller shall have executed and delivered to Buyer such other bills of sale and assignment and assumption agreements in form and substance satisfactory to Buyer which Buyer requests in order to convey all of Seller's right, title and interest in the Acquired Assets to Buyer in conformity with this Agreement.

f. Seller shall have delivered the consents set forth on Exhibit 2.8.

5.4    Consents to Assignments. Seller shall have received consents in form and substance satisfactory to Buyer of any contract or any other document or agreement to be assigned to Buyer pursuant to Section 1.1(c) of this Agreement which is not by its terms assignable without such consent If Buyer elects to waive any such consent which is not obtained on or prior to the Closing Date, Seller shall continue to use all reasonable efforts to obtain any consents not obtained on or prior to the Closing Date or to otherwise obtain for Buyer the practical benefit of the contract, document or other agreement which is the subject of any required consent which is not obtained by Seller.

## ARTICLE VI
### TERMINATION AND AMENDMENT

6.1    Termination. This Agreement may be terminated at any time prior to the Closing:

a    by mutual consent of Buyer and Seller;

b. by either Buyer or Seller if any permanent injunction or other order of a court or other competent governmental authority preventing the consummation of the transactions contemplated hereby shall have become final and nonappealable;

c. by Buyer if Seller remains in material breach of any representation or warranty contained herein for 15 days after the date on which Buyer has notified Seller in writing of such breach;

d. by Seller if Buyer remains in material breach of any representation or warranty contained herein for 15 days after the date on which Seller has notified Buyer in writing of such breach;

e. by Buyer if any material obligation, term or condition to be performed, kept or observed by Seller under this Agreement has not been performed, kept or observed in any material respect at or prior to the time specified in this Agreement and such failure continues for 15 days after the date on which Buyer has notified Seller in writing of such failure;

f    by Seller if any material obligation, term or condition to be performed, kept or observed by Buyer under this Agreement has not been performed, kept or observed in any material respect at or prior to the time specified in this Agreement and such

12

failure continues for 15 days after the date on which Seller has notified Buyer in writing of such failure; or

g. by either Buyer or Seller if the Closing shall not have occurred on or before the date that is 180 calendar days after the date hereof, unless extended by the Boards of Directors of Seller and the board of the Buyer (provided that the right to terminate this Agreement under this Section 6.1(g) shall not be available to any party whose failure or whose affiliate's failure to perform any material covenant or obligation under this Agreement has been the cause of or resulted in the failure of the Closing to occur on or before such date).

6.2   Effect of Termination.   In the event of the termination of this Agreement pursuant to Section 6.1, this Agreement, except for the provisions of Section 1.9 (regarding obligations resulting from Adverse Pork Checkoff Event), this Section 6.2, Section 7.7 (regarding governing law), and Section 7.2 (regarding expenses), shall become void and have no effect, without any liability on the part of any party. Notwithstanding the foregoing, nothing in this Section 6.2 shall relieve any party to this Agreement of liability for a material breach of any provision of this Agreement.

6.3   Amendment.   This Agreement may be amended by Buyer and the Seller only by a written instrument duly executed by both parties.

6.4   Extension; Waiver.   At any time prior to the Closing, Seller, by action taken and authorized by its Board of Directors (or the Executive Committee of its Board of Directors) or Buyer, by action taken or authorized by its Boards of Directors, may, to the extent legally allowed, (a) extend the time for the performance of any of the obligations or other acts of such party, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions contained herein. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if expressly set forth in a written instrument signed on behalf of such party.

**ARTICLE VII**
MISCELLANEOUS

7.1   Deliveries Subsequent to Closing.   Seller, upon the request of Buyer, shall deliver such additional documents, instruments and materials as may be necessary or advisable in order to carry out the provisions and purposes of this Agreement or to report the transaction to appropriate governmental authorities, including additional specific bills of sale, deeds and instruments of assignment.

7.2   Expenses.   Each of the parties to this Agreement shall bear all expenses incurred by it in connection with this Agreement and in the consummation of the transactions provided for herein and the preparation therefor, including, but not limited to counsel's fees.

7.3   Seller Indemnification.   Seller shall indemnify and hold Buyer free and harmless from and against any losses, damages, costs and expenses (including without limitation reasonable attorneys fees and court costs) incurred by Buyer as a result of:

13

833

a. any inaccuracy in or breach of any representation or warranty of Seller contained in this Agreement which is the subject of any claim brought by Buyer during the time period during which the representation and warranty survives the Closing Date; and/or

b. any statutory lien or other claim or demand arising out of or related to the Acquired Assets prior to Closing; and/or

c. any costs of litigation (including attorneys fees) or settlements or judgments arising therefrom which relate to Seller's ownership of the Acquired Assets prior to the Closing (including but not limited to litigation involving infringement), other than those arising from any adverse claim described in Exhibit 2.4; and/or

d. any breach of the warranties of title as to the Acquired Assets or any of the other warranties contained in any bill of sale, certifications or other documents delivered by Seller to Buyer pursuant to this Agreement; and/or

e. any Excluded Liability (including without limitation any liability or any alleged liability that becomes, or is alleged to have become, a liability of the Buyer under any applicable bulk sales law, under any doctrine of de facto merger or successor liability, or otherwise by operation of law)

In the event Seller owes Buyer indemnification obligations for any of the foregoing matters, Seller shall pay and all losses, damages, costs and expenses, including without limitation reasonable attorney fees and court costs, incurred by Buyer as a result of any such indemnification matter and Buyer may, at Buyer's option, set-off the Buyer's losses, damages, costs and expenses, including without limitation court costs and attorney fees, against future payments to be made to Seller pursuant to Section 1.3 of this Agreement

7.4    Buyer Indemnification. Buyer shall indemnify and hold Seller free and harmless from and against any losses, damages, costs and expenses (including without limitation reasonable attorneys fees and court costs) incurred by Seller as a result of:

a. any inaccuracy in or breach of any representation or warranty of Buyer contained in this Agreement; and/or

b. any breach or default by Buyer under any of Buyer's covenants or agreements under this Agreement; and/or

c. any costs of litigation (including attorneys fees) or settlements or judgment arising therefrom which relate to Buyer's ownership of the Acquired Assets after the Closing or which were filed against Buyer prior to the Closing Date which relate to Buyer's unauthorized use of the Trademarks prior to the Closing under the Existing Exclusive License (including without limitation, in both cases, litigation involving infringement from Buyer's unauthorized use of the Trademarks).

In the event Buyer owes Seller indemnification obligations for any of the foregoing matters, Buyer shall pay any and all losses, damages, costs and expenses, including

14

834

without limitation attorney fees and court costs, incurred by Seller as a result of any such indemnification matter.

7.5 Limitations on Liability. Notwithstanding anything contained herein to the contrary, except as set forth in the following sentence, Seller's obligation to indemnify the Buyer for its losses under Section 7.3(a), shall in no event exceed $60,000,000 (the "Cap") Nothing contained herein shall in any way limit, or be deemed to limit, or otherwise affect the rights of the Buyer indemnification under or with respect to, and the Cap shall not apply to, losses arising from breaches of the representations and warranties of Seller in Sections 2.1, 2.2 and 2.5. Buyer shall in its sole discretion have the right to either offset any indemnification claim against future payments payable by Buyer to Seller or require Seller to pay Buyer said indemnification amount, provided, Buyer cannot require the repayment of any amount in excess of cash actually paid by Buyer to Seller. For purposes of clarity, if Buyer has made 3 payments of $3,000,000 each and Buyer has an indemnification claim against Seller for $15,000,000, then Buyer may require Seller to repay up to $9,000,000 to Buyer and offset the balance due against any future payments made to Seller by Buyer

7.6 Survival. The representations, warranties, covenants, indemnification obligations and all other agreements of the parties set forth in this Agreement shall be deemed to have been made on the date hereof and on and as of the Closing Date only, are conditions to the transactions contemplated by this Agreement, are material and are being relied upon by both Buyer and the Seller, and shall survive the Closing. The agreements and obligations of the parties under Section 1.9 shall survive the termination of this Agreement until such agreements and obligations are fulfilled.

7.7 Applicable Law, Jurisdiction and Venue. This Agreement shall in all respects be construed in accordance with and governed by the laws of the State of Iowa. The parties hereto further agree and consent that jurisdiction and venue for any action brought related to or arising out of this Agreement shall be limited to the Iowa District Court in Polk County, Iowa and the Federal District Court for the Southern District of Iowa, central division.

7.8 Notices. All notices, demands and other communications which may or are required to be given pursuant to this Agreement shall be given in writing either by personal delivery or by certified mail and shall be deemed to have been given or made when personally delivered, or when deposited in the mail postage prepaid and addressed as follows:

If to Buyer: National Pork Board
Chief Executive Officer
The National Pork Board
Des Moines, Iowa 50325

Attention. Steven D. Murphy
Facsimile: 515-223-2646

15

|  |  |
|---|---|
| With a copy to: | Belin Lamson McCormick Zumbach Flynn<br>  A Professional Corporation<br>666 Walnut, Ste. 2000<br>Des Moines, Iowa 50309 |
|  | Attention: Steven E. Zumbach<br>Facsimile: 515-558-0625 |
| If to Seller: | National Pork Producers Counsel<br>Chief Executive Officer<br>10664 Justin Drive<br>Urbandale, IA 50322 |
| Attention: | Neil Dierks<br>Facsimile: (515) 278-8011 |
| With a copy to: | Brown, Winick, Graves, Gross, Baskerville &<br>Schoenebaum, P.L.C.<br>4500 Westown Parkway, Suite 277<br>West Des Moines, IA 50266<br>Attn: Michael R. Blaser<br>Facsimile: 515-242-2448 |

or to the attention of such other persons or to such other addresses as may be given by due notice

7.9 Successors and Assigns. Buyer may not assign this Agreement without receiving the prior written consent of Seller or its permitted assignees. Seller may not assign this Agreement without receiving the prior written consent of Buyer or its permitted assignees All of the terms of this Agreement shall be binding upon and shall inure to the benefit of each party's successors and permitted assigns.

7.10 Counterparts. This Agreement may be signed in counterparts, none of which shall be deemed to be binding unless and until all parties have signed this Agreement.

7.11 Severability. Should any part of provision contained in this Agreement be rendered or declared invalid by reason of any existing or subsequently enacted legislation or by any decree of a court of competent jurisdiction, the remaining provisions shall nevertheless remain in full force and effect to the maximum extent permitted by law.

7.12 Entire Agreement. This Agreement, including all schedules and exhibits hereto, constitutes the entire agreement between the parties and supersedes any and all prior agreements between them relating to the subject matter hereof and may not be amended except in writing signed by the party to be bound.

7.13 Termination of Existing Exclusive License. As of the effective time and date of the Closing, Buyer and Seller agree that the Existing Exclusive License shall be terminated

16

836

and of no further force or effect, except Buyer's indemnification obligations to Seller under the Existing Exclusive License shall survive.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first written above.

BUYER:

NATIONAL PORK BOARD

By: _____

Steven D. Murphy, its Chief Executive Officer

SELLER:

NATIONAL PORK PRODUCERS COUNCIL

By: _____

Neil Dierks, its CEO and Secretary

d:\n0117\93\agr-apa 014.doc

17

837

## SCHEDULES AND EXHIBITS

Exhibit 1.1              Trademarks

Exhibit 1.3              Promissory Note

Exhibit 1.5(a)           Trademark Assignment

Exhibit 1.9(g)(ii)(A)    Reinstated Trademark License Agreement

Exhibit 1.9(g)(ii)(C)    Reconveyance Trademark Assignment

Exhibit 2.3              Litigation

Exhibit 2.4              Adverse Claims

Exhibit 2.8              Seller's Consents

Exhibit 3.3              Buyer's Consents

Exhibit 4.1              Buyer's Closing Certificate

Exhibit 4.3(a)           Trademark Security Agreement

Exhibit 5.1              Seller's Closing Certificate

Exhibit 5.3(f)           Seller's CEO and Secretary Certificate, with resolutions attached

18

838

## EXHIBIT 1.1(a)

Registered Trademarks and Service Marks:

1) "PORK and Design", Registration Number 1418703
2) "THE OTHER WHITE MEAT", Registration Number 1486548
3) "THE OTHER WHITE MEAT and Design", Registration Number 3126072
4) "THE OTHER WHITE MEAT", Registration Number 3129186

19

839

**EXHIBIT 1.3**

NON-NEGOTIABLE PROMISSORY NOTE

$31,597,000.00                                             July 1, 2006

FOR VALUE RECEIVED, the National Pork Board, an instrumentality of the United States of America created under the Pork Promotion Research and Consumer Information Act of 1985, as amended ("Maker"), promises to pay to the National Pork Producers Council, an Iowa non-profit corporation ("Payee"), in lawful money of the United States of America, the principal sum of Thirty-One Million Five Hundred Ninety-Seven Thousand and No/100 Dollars ($31,597,000.00), together with interest in arrears on the unpaid principal balance at an annual rate equal to Six and Three Quarters percent (6.75%), in the manner provided below. Interest shall be calculated on the basis of a year of 365 or 366 days, as applicable, and charged for the actual number of days elapsed.

This Note has been executed and delivered pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, dated effective as of July 1, 2006, by and between Maker and Payee (the "Agreement") and is subject to the terms and conditions of the Agreement, which are, by this reference, incorporated herein and made a part hereof. Capitalized terms used in this Note without definition shall have the respective meanings set forth in the Agreement.

1.    PAYMENTS

1.1.    PRINCIPAL AND INTEREST

The unpaid principal balance of this Note shall be due and payable in nineteen (19) equal consecutive annual installments of principal and interest each in the amount of $3,000,000 commencing on July 1, 2007, and on July 1 of each year thereafter until paid in full. Any principal amounts not paid when due shall bear interest at the rate of 8.75% until paid and shall be payable on demand from Payee. All unpaid amounts of principal and interest under this Note shall be due and payable in full on July 1, 2025.

1.2.    MANNER OF PAYMENT

All payments of principal and interest on this Note shall be made: (a) by check delivered to Payee at 10664 Justin Drive, Urbandale, Iowa 50322, or at such other place in the United States of America as Payee shall designate to Maker in writing, or (b) by wire transfer of immediately available funds to an account designated by Payee in writing. If any payment of principal or interest on this Note is due on a day that is not a Business Day, such payment shall be due on the next succeeding Business Day, and such extension of time shall be taken into account in calculating the amount of interest payable under this Note. "Business Day" means any day other than a Saturday, Sunday or legal holiday in the State of Iowa.

840

1.3.    PREPAYMENT

Maker may, without premium or penalty, at any time and from time to time, prepay all or any portion of the outstanding principal balance due under this Note, provided that each such prepayment is accompanied by accrued interest on the amount of principal prepaid calculated to the date of such prepayment. Any partial prepayments shall be applied to installments of principal in inverse order of their maturity

1.4.    RIGHT OF SETOFF AND CANCELLATION

Maker shall have the right to withhold and set off against any amount due hereunder the amount of any claim for indemnification or payment of damages to which Maker may be entitled under the Agreement, as provided in Section 7.3 thereof. Maker shall have the right to cancel this Note and terminate its obligations hereunder upon the circumstances and subject to the terms of Section 1.9 of the Agreement.

2.    DEFAULTS

2.1.    EVENTS OF DEFAULT

This Note shall be in default (an "Event of Default") at such time when Maker shall fail to pay when due any amount due from Maker to Payee hereunder and such failure continues for thirty (30) days after Payee notifies Maker thereof in writing.

2.2.    REMEDIES

Upon the occurrence of an Event of Default hereunder (unless timely cured by Maker or waived in writing by Payee), Payee may, at its option, (i) by written notice to Maker, declare the entire unpaid principal balance of this Note, together with all accrued interest thereon, immediately due and payable regardless of any prior forbearance and (ii) exercise any and all rights and remedies available to it under the Trademark Security Agreement (as defined below). Subject to the provisions of Section 4 below, Maker shall pay all reasonable costs and expenses incurred by or on behalf of Payee in connection with Payee's exercise of any or all of its rights and remedies under this Note, including, without limitation, reasonable attorneys' fees.

3.    SECURITY

The Note is secured by the security interest and liens granted pursuant to that certain Trademark Security Agreement dated as of this same date from Maker in favor of Payee (as from time to time amended, modified or restated, the "Trademark Security Agreement") and Payee is entitled to all of the benefits and security provided for thereby.

4.    NON RECOURSE OBLIGATION

Without in any way impairing the liens and security interests granted by Maker pursuant to the Trademark Security Agreement as security for the payment of this Note or Payee's rights to enforce the terms of the Trademark Security Agreement as to matters other than payment of the indebtedness evidenced hereby, Payee hereby agrees that the payment of all indebtedness

-2-

841

evidenced hereby, including all sums of principal and interest due or to become due under this Note, shall be enforced solely from Collateral as defined in the Trademark Security Agreement, and that no deficiency or personal judgment for the indebtedness evidenced hereby shall ever be sought against Maker, its successors and assigns. This Note is and shall be considered "non-recourse" in all respects.

## 5.    MISCELLANEOUS

### 5.1.    WAIVER

No waiver by Payee of any right or remedy under this Note shall be effective unless in a writing signed by Payee.

### 5.2.    NOTICES

Any notice required or permitted to be given hereunder shall be given in accordance with Section 7.8 of the Agreement.

### 5.3.    SEVERABILITY

If any provision in this Note is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Note will remain in full force and effect. Any provision of this Note held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

### 5.4.    GOVERNING LAW

This Note will be governed by and construed under the laws of the State of Iowa without regard to conflicts-of-laws principles that would require the application of any other law.

### 5.5    PARTIES IN INTEREST

This Note shall not be assigned or transferred by Payee without the express prior written consent of Maker. Subject to the preceding sentence, this Note will be binding in all respects upon Maker and inure to the benefit of Payee, its successors and its permitted assigns or transferees.

### 5.6.    SECTION HEADINGS; CONSTRUCTION

The headings of Sections in this Note are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Note unless otherwise specified. All words used in this Note will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the words "hereof" and "hereunder" and similar references refer to this Note in its entirety and not to any specific section or subsection hereof, the words "including" or "includes" do not limit the scope of the preceding words or terms and the word "or" is used in the inclusive sense.

-3-

842

IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.

IN WITNESS WHEREOF, Maker has executed and delivered this Note as of the date first stated above.

National Pork Board

By:_____
    Steven D. Murphy, Chief Executive Officer

d:\n0117\93\note prom non-neg.007.doc

-4-

EXHIBIT 1.5(a)

**TRADEMARK ASSIGNMENT**

WHEREAS, National Pork Producers Council, an Iowa non-profit corporation with a principal business address at 10664 Justin Drive, Urbandale, Iowa 50322, USA (hereinafter called "ASSIGNOR"), is the owner of all right, title and interest in and to the trademarks identified on Exhibit "A" attached hereto (the "MARKS") together with all trademark registrations and applications with regard to the MARKS; and

WHEREAS, National Pork Board, an instrumentality of the United States of America created under the Pork Promotion Research and Consumer Information Act of 1985, as amended, with a principal business address at 1776 N.W. 114th Street, Clive, Iowa 50325, USA (hereinafter called "ASSIGNEE"), desires to acquire all right, title and interest in and to the MARKS together with all trademark registrations and applications with regard to the MARKS:

NOW, THEREFORE, TO ALL WHOM IT MAY CONCERN:

1. BE IT KNOWN that for and in consideration of good and valuable consideration paid to ASSIGNOR by said ASSIGNEE, the receipt and sufficiency of which is hereby acknowledged, said ASSIGNOR, by these presents does hereby sell, assign, set over and transfer unto the said ASSIGNEE its successors, legal representatives or assigns, the entire right, title and interest in and to the MARKS and any applications or registrations therefore in the United States or elsewhere in the world, together with the business goodwill symbolized by the MARKS; and

2. ASSIGNOR HEREBY covenants and it has the full right to convey the entire rights, titles and interests herein assigned and that it has not executed and will not execute any assignment or other instrument in conflict herewith; and

3. ASSIGNOR HEREBY further covenants and agrees to execute and deliver to said ASSIGNEE on request all lawful papers required to make any of the foregoing provisions effective; and to perform the aforesaid executing and delivering without any payment therefore except expenses.

For ASSIGNOR:

NATIONAL PORK PRODUCERS COUNCIL

By: _____
　　　Neil Dierks, CEO and Secretary

844

-2-

For ASSIGNEE:

NATIONAL PORK BOARD

By: _____
       Steven D. Murphy, Chief Executive Officer

-2-

845

## EXHIBIT "A"

Registered Trademarks and Service Marks:

1)   "PORK and Design", Registration Number 1418703
2)   "THE OTHER WHITE MEAT", Registration Number 1486548
3)   "THE OTHER WHITE MEAT and Design", Registration Number 3126072
1)   "THE OTHER WHITE MEAT", Registration Number 3129186

d:\n0117\93\agr-assign trademark.003.doc

-3-

846

EXHIBIT 1.9(g)(ii)(A)

## REINSTATED TRADEMARK LICENSE AGREEMENT

This Agreement ("Agreement") is entered into effective as of the 1st day of July, 2006 by and between the National Pork Producers Council, an Iowa non-profit corporation ("NPPC") and the National Pork Board, an instrumentality of the United States of America ("Pork Board") but is effective as of the Termination Notice Date (if any), as defined in the Asset Purchase Agreement referred to below.

### RECITALS

WHEREAS, NPPC and the Pork Board have entered into a certain Asset Purchase Agreement effective as of July 1, 2006, as the same may be from time to time amended, modified or restated (the "Asset Purchase Agreement"), pursuant to which NPPC has agreed to sell, among other assets, the trademarks set forth in Schedule 1 attached hereto (each a "Mark" and collectively the "Marks"), including certain rights and goodwill associated therewith;

WHEREAS, the Asset Purchase Agreement provides that in the event of an Adverse Pork Checkoff Event or a Lobster Trademark Decision (as defined therein) NPPC and the Pork Board will during a sixty (60) day period of time following notification thereof negotiate in good faith on adjustments to the purchase price provided for in the Asset Purchase Agreement, but in the event that they were unable to mutually agree upon a re-negotiated purchase price and new repayment terms prior to the expiration of the sixty (60) day negotiation period (or any mutually agreed extension thereof) either party may provide the other with written notice of its election to terminate further sales negotiation;

WHEREAS, upon the date a written notice (a "Termination Notice", as defined in Section 1.9(g) of the Asset Purchase Agreement) is received by one party from the other party, (the "Termination Notice Date", as defined in the Asset Purchase Agreement) this Agreement shall automatically become effective (the "Effective Date") and all rights and obligations of NPPC and the Pork Board relating to the Marks shall be governed by this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and other valuable and legally sufficient consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    Definitions. The following terms shall have the following meaning when used in this Agreement, unless expressly noted otherwise:

    (a)    "Adverse Pork Checkoff Event" is defined in the Asset Purchase Agreement.

    (b)    "Asset Purchase Agreement" is defined in the recitals above.

847

(c)   "Contract Year" shall mean each twelve (12) month period commencing as of the Effective Date.

(d)   "Effective Date" is defined in the recitals above.

(e)   "Expiration Date" shall mean the last day of the third Contract Year.

(f)   "Licensed Marks" shall mean the Marks, together with any applications or registrations therefor, whether now existing or later acquired, in any jurisdiction covering all or any of the Pork Board's programs.

(g)   "Lobster Trademark Decision" is defined in the Asset Purchase Agreement.

(h)   "Mark" and "Marks" is defined in the recitals above.

(i)   "Pork Check Off Assessment Rate" shall mean the rate of assessment to be paid per $100 of the value of pork and pork products, as determined from time to time by the duly constituted "Delegate Body", as defined and as called for under the Pork Act.

(j)   "Termination Notice Date" is defined in the Asset Purchase Agreement.

2.   License. In consideration of the royalty payments referred to in paragraph 3 below, and other good and valuable consideration, NPPC hereby grants to the Pork Board an exclusive world-wide license to use the Licensed Marks in connection with the Pork Board's programs for any application or purpose during the term of this Agreement, and to sublicense others (each, an "Authorized Sublicensee") to use the Licensed Marks in connection with the Pork Board's programs during the term of this Agreement. Except with respect to any existing licenses of the Licensed Marks outstanding on the date of the Effective Date, the license granted to the Pork Board pursuant to this Agreement shall be exclusive, even as to NPPC.

3.   Royalty.

(a)   Subject to the adjustment provisions described in paragraph 3(b) below, the Pork Board shall pay to NPPC an annual royalty payment provided for in the table set forth in paragraph (b) below for the first Contract Year commencing on the Effective Date and an annual royalty payment of $1 for the second and third Contract Years commencing the first anniversary date and second anniversary date of the Effective Date. The annual royalty payment for each Contract Year shall be payable in advance on or prior to the commencement of such Contract Year.

(b)   The parties acknowledge that at the Closing Date of the Asset Purchase Agreement (as defined therein) the Pork Checkoff Assessment Rate is $0.40 (40¢). The annual royalty payment for the first Contract Year commencing on

-2-

848

-3-

the Effective Date shall be the amount set forth opposite the Pork Checkoff Assessment Rate as in effect on the Effective Date of this Agreement:

849

| Pork CheckOff Assessment Rate | Annual Royalty Payment |
|---|---|
| Equal to or greater than 35 ¢ | $818,451 |
| Equal to or greater than 30 ¢ but less than 35 ¢ | $613,838 |
| Equal to or greater than 25 ¢ but less than 30 ¢ | $409,225 |
| Equal to or greater than 20 ¢ but less than 25 ¢ | $204,613 |
| Less than 20 ¢ | $1 |

4.    Ownership of Licensed Marks. All use of any of the Licensed Marks by the Pork Board and/or any Authorized Sublicensee shall inure exclusively to the benefit of NPPC. The Pork Board understands and agrees that nothing in this Agreement shall be interpreted to confer ownership rights upon the Pork Board and/or any Authorized Sublicensee with respect to the Licensed Marks, and the Pork Board shall take no action inconsistent with NPPC's ownership rights in the Licensed Marks, including any attack on the validity or ownership of the Licensed Marks.

5.    Quality Control.

(a)    The Pork Board shall assure that the Pork Board programs in which the Licensed Marks are used will be of the same high quality as the NPPC programs in which the Licensed Marks were used previously. The Pork Board further agrees to cooperate with and assist NPPC in any manner reasonably necessary for retaining or enforcing NPPC's rights in the Licensed Marks and to assist in obtaining any trademark protection that NPPC may hereafter seek to obtain.

(b)    The Pork Board agrees that each Authorized Sublicensee's services and products in which any Licensed Mark may be used shall be of the highest quality and shall conform to the high standard and reputation of the Licensed Marks. The Pork Board further agrees that all packages, labels or promotional materials bearing the Licensed Mark will place the symbol "R" next to the Licensed Mark and indicate that the Licensed Mark is a registered trademark of NPPC.

(c)    The Pork Board agrees to make use of each of the Licensed Marks for the purpose of maintaining rights therein, unless instructed by NPPC that it may cease use of the mark.

-4-

(d)     The Pork Board agrees to utilize "The Other White Meat" in its pork marketing efforts and to invest an appropriate amount of its budget in "The Other White Meat" efforts as determined by the Pork Board's producer-led "Plan of Work and Budget Task Force", or any successor task force(s) or group(s) responsible for planning the use of and/or for budgeting for the promotion of "The Other White Meat" in the Pork Board's marketing efforts.

6.   Books and Audits. The Pork Board shall maintain accurate records of all sublicenses of Licensed Marks and its annual advertising and promotional expenditures associated with the Licensed Marks and shall make this information available to NPPC for use in enforcing, registering or protecting any of the Licensed Marks. It is understood that reasonable accommodations will be made to protect the Pork Board's confidential business information and trade secret information associated with such information, as long as such information is identified in writing at the time of disclosure as confidential business information or trade secret information, as the case may be.

7.   Authorized Sublicensees. Any sublicense of Licensed Marks to any Authorized Sublicensee shall be subject to the following terms and conditions:

(a)     each sublicense shall be in the form and with the content as set forth in Schedule A attached hereto and made a part hereof or as may be amended from time to time as use of the Licensed Marks evolves. Each sublicense shall otherwise be subject to the limitations and qualifications set forth in this Agreement.

(b)     the termination of this Agreement shall not adversely impair or terminate the sublicense, provided that upon termination of this Agreement all sublicenses shall be assigned to NPPC. The Pork Board agrees to undertake such further assurances and execute such instruments as shall be required in order to effectively assign all of its rights in and to any outstanding sublicenses to NPPC upon termination of this Agreement.

The Pork Board shall be responsible for assuring compliance by each Authorized Sublicensee with the terms of such sublicense in the same high quality as the NPPC programs in which the Licensed Marks were used previously, and the Pork Board shall be entitled to receive and retain all royalties payable under such sublicenses

8.   Third Party Use of Licensed Marks. In the ordinary course of business, Pork Board or its Authorized Sublicensees may discover the use and/or registration by third parties of any trademark, service mark, trade name, trade dress, design or copyright which is identical or confusingly or deceptively similar to any Mark (a "Third Party Use"). Pork Board agrees to notify the NPPC immediately upon learning of any Third Party Use, but to take no action at that time unless and except in collaboration with NPPC. NPPC, in collaboration with Pork Board, may decide to pursue any cause of action relating to such Third Party Use. Pork Board will be responsible for reimbursing NPPC for reasonable costs associated with defending the Licensed Marks from unauthorized use,

-5-

less any award of damages or other relief based on such action which NPPC may receive. If NPPC decides not to pursue efforts to abate such Third Party Use, the Pork Board may pursue efforts to abate such Third Party Use.

9. Term. This Agreement shall commence as of the Effective Date and shall continue for a period of thirty-six months (three Contract Years) thereafter, unless terminated earlier pursuant to paragraph 10 below. NPPC will first negotiate an extension of this Agreement with Pork Board for an additional renewal term of five (5) years (and if renewed successive renewal terms) prior to negotiating any license of any of the Licensed Marks to any third party. The first negotiation period will commence six (6) months prior to the then current expiration date of this Agreement and continue for a period of ninety (90) days. Such period may be extended by mutual agreement, if conditions are such that reasonable time is not available for said negotiations. During such period of negotiation, this Agreement may be extended by mutual agreement, provided satisfactory progress is being achieved.

10 Termination. This Agreement may be terminated as follows:

(a)    By mutual agreement of the parties;

(b)    By NPPC in the event that any breach of this Agreement by the Pork Board remains uncured for more than sixty (60) days after written notice of such breach is provided to the Pork Board by NPPC, provided, however, that if the breach is of such a nature that it cannot be cured within the sixty (60) day period with the exercise of reasonable diligence but the Pork Board begins to cure the breach and diligently continues to cure the breach, then the period for cure shall be extended until the cure is accomplished. In no event, however, shall the total cure period extend beyond one hundred twenty (120) days after written notice of breach. It is understood that no provision of this agreement limits, waives, or otherwise precludes NPPC from any claim, cause of action, or remedy (including injunctive relief) if the Pork Board fails to pursue cure of any breach in good faith;

(c)    By the Pork Board, at any time following the occurrence of an Adverse Pork Checkoff Event or Lobster Trademark Decision, by giving written notice to NPPC of the Pork Board's election to terminate this Agreement effective as of a date specified in such notice, which date shall be not sooner than ninety (90) days following the date such notice is given.

Following termination of this Agreement for any reason, the License granted to Pork Board shall terminate and the Pork Board shall promptly take all reasonable steps requested by NPPC to: (i) fully vest all right, title and interest in the Licensed Marks in NPPC; (ii) transfer and assign to NPPC all rights to any and all sublicenses with Authorized Sublicenses then in effect; and (iii) will transfer to NPPC a copy of all business records in the possession of Pork Board directly related to the Licensed Marks or to Authorized Sublicenses then

-6-

852

in effect, including advertising and promotional materials, customer lists, vendor and dealer lists, contractor and supplier lists, logs, government reports, books or records, files, documents, correspondence, drawings, specifications, creative materials (including artwork), studies, reports, and all other printed or written materials relating to the Trademarks, and including without limitation all of its historical materials relating to the Trademarks all other printed or written materials related to the Licensed Marks and the Authorized Sublicenses then in effect.

11.  Notice. Any notice required or permitted to be given under this Agreement shall be sufficient if: (a) in writing and sent by first class mail with postage prepaid to the party to whom the same is directed at the address shown above; or (b) sent by facsimile and confirmation of receipt thereof is documented. The effective date for notices sent by first class mail shall be three business days after deposit in the mail and the effective date of a notice sent via facsimile shall be the date shown on the confirmation receipt. Either party may change its address for purposes of the Agreement by giving the other party notice in writing of the new address.

12.  Enforceability. If any term, covenant, condition, or provision hereof is deemed illegal, the remainder of the Agreement shall not be affected thereby and each remaining term, covenant, condition, and provision shall be valid and enforceable to the fullest extent permitted by law. The invalid term, covenant, condition, or provision shall be replaced by the valid term, covenant, condition, or provision closest in financial terms to that which the parties attempted to achieve with the invalid term, covenant, condition, or provision. The same applies to any contractual gap.

13.  Governing Law. This Agreement shall be construed, enforced and governed in accordance with the laws of the State of Iowa, without regard to principles of conflicts of laws.

14.  Amendments. This Agreement cannot be changed, modified, or discharged orally, but only by an amendment in writing, signed by the party against whom enforcement of the change, modification, or discharge is sought.

15.  Assignment. This Agreement shall be binding upon and shall inure to the benefit of NPPC and the Pork Board and their respective successors and permitted assigns. Neither party shall have the right to assign any of its rights, powers, duties, or obligations under this Agreement without the consent of the other party, except with respect to Authorized Sublicensees as described in paragraph 7.

16.  Entire Agreement. This Agreement constitutes the entire Agreement of the parties hereto with respect to the subject matter hereof. All prior agreements between the parties, whether written or oral, are merged herein.

17.  Indemnification. The Pork Board agrees to indemnify and hold harmless NPPC, its agents, employees, officers, and trustees from and against any and all claims, demands,

-7-

853

actions, causes of action, losses, and expense (including reasonable attorneys' fees) resulting from any suit, demand, or claim by any third party alleging facts or circumstances which involve any negligent act or omission by the Pork Board or any breach by the Pork Board of any obligation imposed upon it pursuant to this Agreement.

IN WITNESS WHEREOF, the parties hereto have, through their duly authorized representatives, executed this Agreement below.

NATIONAL PORK PRODUCERS COUNCIL    NATIONAL PORK BOARD

By: _____    By: _____
Print Name: _____    Print Name: _____
Title: _____    Title: _____

d:\n0117\93\agr-trademark license.007.doc

-8-

854

EXHIBIT 1.9(g)(ii)(C)

## TRADEMARK ASSIGNMENT

WHEREAS, National Pork Board, an instrumentality of the United States of American created under the Pork Promotion Research and Consumer Information Act of 1985, as amended, with a principal business address at 1776 N.W. 114th Street, Clive, Iowa 50325, USA (hereinafter called "ASSIGNOR"), is the owner of all right, title and interest in and to the trademarks identified on Exhibit "A" attached hereto;

WHEREAS, National Pork Producers Council, an Iowa non-profit corporation with a principal business address at 10664 Justin Drive, Urbandale, Iowa 50322, USA (hereinafter called "ASSIGNEE"), desires to acquire all right, title and interest in and to the MARKS (the "MARKS") together with all trademark registrations and applications with regard to the MARKS; and

NOW, THEREFORE, TO ALL WHOM IT MAY CONCERN:

1. BE IT KNOWN that for and in consideration of good and valuable consideration paid to ASSIGNOR by said ASSIGNEE, the receipt and sufficiency of which is hereby acknowledged, said ASSIGNOR, by these presents does hereby sell, assign, set over and transfer unto the said ASSIGNEE its successors, legal representatives or assigns, the entire right, title and interest in and to the MARKS and any applications or registrations therefore in the United States or elsewhere in the world, together with the business goodwill symbolized by the MARKS; and

2. ASSIGNOR HEREBY covenants and it has the full right to convey the entire rights, titles and interests herein assigned and that it has not executed and will not execute any assignment or other instrument in conflict herewith; and

3. ASSIGNOR HEREBY further covenants and agrees to execute and deliver to said ASSIGNEE on request all lawful papers required to make any of the foregoing provisions effective; and to perform the aforesaid executing and delivering without any payment therefore except expenses.

For ASSIGNOR:

NATIONAL PORK BOARD

By: _____

Steven D. Murphy, Chief Financial Officer

855

-2-

For ASSIGNEE:

NATIONAL PORK PRODUCERS COUNCIL

By: _____

      Neil Dirks, CEO and Secretary

## EXHIBIT 2.3

### Litigation

1. Supreme Lobster and Seafood Company and its successors or assigns, TTAB Case No. 91, 166, 701 pending before the TTAB of the PTO, with regard to permitting the registration of the trademark "The Other Red Meat" for Salmon.

2. Ieya Neeley, application to register "Beaver the other PINK meat" for "shirts", application number 78903779 filed June 8, 2006.

3. David Patragnoni, application to register "The Other Cheesesteak" for "sandwiches", application number 78840216 filed March 29, 2006

20

## EXHIBIT 2.4

### Adverse Claims

1. See all items listed on Exhibit 2 3, which items are incorporated herein by reference as if fully set forth.

2. A potentially infringing trademark "Not Just Another White Meat" has been used in commerce by Carolina Turkey.

21

**EXHIBIT 2.8**

Seller's Consents

1. The National Pork Producers Council Board of Directors and Members

2. The United States Department of Agriculture, Agricultural Marketing Service

22

# EXHIBIT 3.3

Buyer's Consents

1.    The National Pork Board Board of Directors

2    The United States Department of Agriculture

23

860

**Minutes**
**Board Conference Call**
**September 20, 2006 - 12:00 Noon Central Time**

**CALL TO ORDER:**

President Wayne Peugh called the meeting to order at Noon on Wednesday, September 20, 2006.

**ROLL CALL**

Pork Board members present included: J. Adams, D. Bettin, T. Bierman, R. Brown, J. Galle, L. Harrison, D. Michael, G. Nemechek, W. Peugh, D. Rodibaugh, B. Samson, S. Weaver, A. Wilhoite, and B. Zimmerman. Carol Hein was absent. Also attending were NPB staff members: S. Murphy, J. Meimann, L. Kline, M. Wegner, M. Laughery, J. Johnson, and L. Garner.

**PTOWM PURCHASE**

Steve Murphy reviewed the approved term sheet for the purchase of the Pork the Other White Meat trademark. He noted that the OGC had made some minor adjustments in some legal technical language, but it did not affect the terms. USDA has approved all documents. The documents have also been approved by NPPC as drafted. Final documents are being prepared to conclude the sale. They should be ready to sign and finalize the deal after a 30 day discovery process.

**A Motion was made by Steve Weaver to approve the business term sheet dated September 20, 2006 for the purchase of the Pork The Other White Meat trademark as well as to give approval to Steve Murphy, as CEO, to sign off on the final documents on behalf of the board. Seconded by Danita Rodibaugh.**

**MOTION PASSED**

**TECHNOLOGY SUPPORT**

Larry Kline, VP Finance & Business Development, reviewed the Technology Support Policy reimbursement process. He noted that board members simply need to submit an expense form with attached invoices for any technology support purchases or monthly fees incurred within the policy guidelines.

**POW REVIEW**

The board gave a brief critique of the Plan of Work meeting that adjourned earlier that day. They noted that the Strawman process was a very organized and easy way to present the information. They suggested that more time limits should be put on participant's comments and that a timer should be used to address this next year. It was also suggested that a follow up evaluation be sent to participants.

**ADJOURNED**

At 12:35 p.m. Dennis Michael motioned to adjourn the meeting. Seconded by Jeff Galle.

**MOTION PASSED**

Board Minutes 9/20/06

 **USDA**

United States
Department of
Agriculture

Agricultural
Marketing
Service

STOP 0249 - Room 2092-S
1400 Independence Avenue, SW.
Washington, D.C. 20250-0249

September 13, 2006

Mr. Steve Murphy
Chief Executive Officer
National Pork Board
Post Office Box 9114
Des Moines, Iowa 50306

Dear Steve:

This is in response to a July 18, 2006, letter requesting approval of the business and legal terms for the purchase of the trademark *Pork, the Other White Meat* (Agreement) between the National Pork Board and the National Pork Producers Council. The Agreement is composed of four separate documents: the Asset Purchase Agreement, the Reinstated Trademark Licensing Agreement, the Non-Negotiable Promissory Note, and the Trademark Security Agreement.

We have reviewed and approve the terms of the Agreement.

Sincerely,

Barry L. Carpenter
Deputy Administrator
Livestock and Seed Program

Case 1:12-cv-01582-ABJ   Document 64   Filed 06/02/17   Page 407 of 431

# EXHIBIT 4.1

Buyer's Closing Certificate

24

863

**BUYER'S**
## CERTIFICATE OF REPRESENTATIONS, WARRANTIES AND COVENANTS

The undersigned, Steven D Murphy, is the Chief Executive Officer of National Pork Board, an instrumentality of the United States of America created under the Pork Promotion Research and Consumer Information Act of 1985 ("Buyer") National Pork Producers Council, an Iowa non profit corporation ("Seller") and Buyer have entered into an Asset Purchase Agreement dated as of July 1, 2006 (the "Agreement") Pursuant to Section 4.1 of the Agreement, the undersigned hereby certifies as follows:

1       The representations and warranties of Buyer set forth in the Agreement were true and correct in all material respects when made and are true and correct in all material respects at and as of the date hereof as though made on the date hereof.

2.      Buyer has fully performed and complied with all covenants, terms and conditions to be performed and complied with by Buyer on or before the date hereof.

Dated as of October 3, 2006

National Pork Board


By:_____
Steven D Murphy, its CEO

d:\n0117\93\ccr-reps & war (buyer) doc 001 doc

864

EXHIBIT 4.3(a)

## TRADEMARK SECURITY AGREEMENT

This TRADEMARK SECURITY AGREEMENT ("Agreement") dated effective as of July 1, 2006, by National Pork Board, an instrumentality of the United States of America created under the Pork Promotion Research and Consumer Information Act of 1985, as amended (the "Grantor") in favor of National Pork Producers Council, an Iowa nonprofit corporation (the "Secured Party")

### W I T N E S S E T H:

WHEREAS, the Grantor and the Secured Party have entered into a certain Asset Purchase Agreement effective as of July 1, 2006 (as the same may be from time to time amended, modified or restated the "Asset Purchase Agreement") pursuant to which the Secured Party has agreed to sell the Acquired Assets (as defined therein) to the Grantor; and

WHEREAS, the Secured Party has agreed to defer payment of substantially all of the Purchase Price (as defined in the Asset Purchase Agreement) for the Acquired Assets to be paid in installments over a term of nineteen (19) years and the parties have agreed that the deferred portion of the Purchase Price, together with interest thereon at the rate of 6.75% per annum, shall be evidenced by the Promissory Note dated as of this date (as the same may be from time to time be amended, modified or restated, and any notes given in substitution or replacement therefore, the "Promissory Note"); and

WHEREAS, the Secured Party has required as a condition, among others, the deferral of the Purchase Price, including all amounts owing under the Promissory Note that the Grantor enter into this Agreement in order to secure the prompt and complete payment, observance and performance of the Grantor's Liabilities (as defined below); and

NOW THEREFORE, in consideration of the premises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor agrees as follows:

1.    Defined Terms. Unless otherwise defined herein, each capitalized term used herein shall have the meaning given such term in the Asset Purchase Agreement. For the purposes of this Agreement, the capitalized words and phrases shall have the meaning set forth below:

"*Asset Purchase Agreement*" is defined in the recitals set forth above.

"*Collateral*" shall have the meaning given such term in Section 4 hereof.

"*Grantor*" is defined in the initial paragraph hereof.

"*Liabilities*" shall have the meaning given such term in Section 2 hereof.

"*Licenses*" is defined in Section 3(iii) hereof.

865

"*Promissory Note*" is defined in the recitals set forth above.

"*Secured Party*" is defined in the initial paragraph hereof.

"*Trademarks*" is defined in Section 4(i) hereof

"*UCC*" shall mean Article 9 of the Uniform Commercial Code then in effect in the State of Iowa or in such other state or the District of Columbia as may be applicable to the creation, preservation, perfection or enforcement of the security interest granted by the Grantor hereunder.

2.    Liabilities Secured Hereby.    The following liabilities, whether now existing or hereafter incurred (collectively, "Liabilities") are secured by this Agreement:

i.    All liabilities of the Grantor arising under or in connection with or otherwise evidenced by the Promissory Note; and

ii.    Any costs incurred by the Secured Party to collect or enforce the Promissory Note; and to collect and enforce the Collateral; and

iii.    All costs incurred by the Secured Party to enforce this Agreement and the pledge and security interest granted hereby and to maintain, preserve, collect and enforce the Collateral (as defined below) as required to do so under this Agreement;

3.    Incorporation of Recitals and of Exhibits. The recitals set forth above and the Exhibits attached hereto or referenced herein are incorporated into this Agreement by this reference thereto and are made a part hereof.

4.    Grant of Security Interest in Trademarks. To secure the complete and timely payment, performance and satisfaction of the Liabilities, the Grantor hereby grants to the Secured Party, a first lien and security interest having priority over all other security interests, in, to and under all of the following personal property, whether now owned or existing and filed, or hereafter acquired or arising and filed, by the Grantor or arising in favor of the Grantor (collectively the "Collateral"):

i.    The trademarks and service marks set forth on Exhibit 4.(i) hereto, together with: (i) all trademark and service mark registrations and applications with regard to such trademarks and service marks; (ii) all logos, URLs and domain names with regard to such trademarks and service marks; (iii) all renewals, extensions, and continuations (in-whole or in-part) thereof; (iv) all income, royalties damages and payments now and hereafter due and/or payable with respect to such trademarks and service marks (other than payments from Buyer to Seller as provided in this Agreement), including, without limitation, payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (v) the right to sue for past, present and future infringements and dilutions thereof, (vi) all of such Seller's rights corresponding thereto throughout the world and (vii) all related artwork or materials (all of the foregoing, including the items described in clauses (i)-(vii), being sometimes hereinafter individually and/or collectively referred to as the "Trademarks");

-2-

866

ii.    the goodwill of such Grantor's business symbolized by the Trademarks;

iii.    license agreements with any other party in connection with any Trademarks or such other party's trademarks, registered trademarks, trademark applications, trade names, service marks, registered service marks and service mark applications, whether the Grantor is a licensor or licensee under any such license agreements, together with any goodwill connected with and symbolized by any such trademark license agreements or service mark license agreements, and the right upon the occurrence and during the continuance of Event of Default to use the foregoing in connection with the enforcement of the Secured Party's rights under the Promissory Note (all of the foregoing being hereinafter referred to collectively as the "Licenses");

iv.    Any business records in the possession of Grantor directly related to the Trademarks, including any Licenses, advertising and promotional materials, customer lists, vendor and dealer lists, contractor and supplier lists, logs, government reports, books or records, files, documents, correspondence, drawings, specifications, creative materials (including artwork), , studies, reports, and all other printed or written materials relating to the Trademarks, including without limitation all of its historical materials relating to the Trademarks; and

v.    to the extent not otherwise included, the proceeds of and all accessions to, substitutions and replacements for, each of the foregoing.

5.    Representations and Warranties. The Grantor hereby warrants and represents to the Secured Party that the Grantor has the unqualified right to execute and deliver this Agreement and perform its terms.

6.    Covenants of Grantor.

i    The Grantor authorizes Secured Party to file this Agreement with the U.S. Patent and Trademark Office, together with such cover letters or other instruments as the U.S. Patent and Trademark Office may require in order to perfect the lien and security interest created hereby in the Collateral.

ii    The Grantor authorizes the Secured Party to file from time to time such lien filings, UCC financing statements or continuation statements or amendments thereto, in such filing offices as the Secured Party may determine to be necessary or desirable, to perfect and preserve the lien and security interest created hereby in the Collateral.

iii.    The Grantor shall at its expense, at any time and from time to time, promptly execute and deliver all further instruments, documents, and agreements, and take all further action that may be necessary or appropriate, or that the Secured Party may request, (i) to evidence, perfect, and protect the security interests created or purported to be created hereby in the Collateral; (ii) to enable the Secured Party to exercise and enforce its rights hereunder in respect of the Collateral; or (iii) to otherwise effect the purposes of this Agreement.

iv.    The Grantor shall notify the Secured Party immediately of any change in the Grantor's chief place of business or chief executive office, any matter represented or warranted by the Grantor herein, or any Event of Default  The Grantor shall preserve its

-3-

867

organizational existence and shall not, in one transaction or a series of related transactions, merge into or consolidate with any other entity, or sell all or substantially all of its assets, or change its organizational status. The Grantor shall not change its organizational name without providing Secured Party with 30 days' prior written notice of such change, including the new name which Grantor intends to adopt.

v. The Grantor shall not sell, assign (by operation of law or otherwise), exchange, or otherwise dispose of any Trademark, or create or suffer to exist any lien upon any Collateral.

vi. The Grantor shall upon demand pay to the Secured Party the amount of any and all costs and expenses, including the disbursements and reasonable fees of counsel and , which the Secured Party may incur in connection with (i) during the existence of any Event of Default, the preservation, use, operation, defense, enforcement, sale, or collection of, or other realization upon any Collateral; (ii) during the existence of any Event of Default, the exercise or enforcement of any rights hereunder or under this Agreement; or (iii) upon the failure by the Grantor to perform or observe any of the provisions hereof, without any obligation to do so and without waiving the Grantor's default for failure to make any such payment, the Secured Party at its option may pay any such costs and expenses, discharge liens on the Collateral and any such payment shall be part of the Liabilities, and shall bear interest at a per annum rate equal to 8.75% The Grantor agrees to reimburse the Secured Party on demand for any costs so incurred.

7. Restrictions on Future Agreements. The Grantor agrees that until the Liabilities shall have been satisfied in full in cash and the Promissory Note shall have been cancelled, the Grantor shall not, without the Secured Party's prior written consent enter into any agreement which is inconsistent with this Agreement in any material respect, and the Grantor further agrees that it will not take any action, and will use its best efforts not to permit any action to be taken by others subject to its control, including, without limitation, licensees, or fail to take any action, which would in any material respect affect the validity or enforcement of the rights the Secured Party under this Agreement or the rights associated with the Trademarks or the Licenses.

8. Nature and Continuation of Secured Party's Security Interest. This Agreement is made for collateral security purposes only. This Agreement shall reaffirm the continuing security interest in the Collateral and shall remain in full force and effect until the Liabilities have been paid in full in cash and the Promissory Note has been cancelled, at which time this Agreement shall also terminate.

9. Security Interest Absolute. All rights of the Secured Party, all security interests, and all obligations of the Grantor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Asset Purchase Agreement or the Promissory Note; (b) any change in the time, manner, or place of payment of, or in any other term in respect of, any Liabilities, or any other amendment, modification, waiver, consent, release, or other action with respect to the Asset Purchase Agreement or the Promissory Note; (c) any increase in, addition to, exchange or release of, or non-perfection of any lien or security interest on any other collateral, or any release or amendment, modification, waiver, consent, release, or other action with respect to any guaranty, for any Liabilities; (d) any other

-4-

circumstance which might otherwise constitute a defense available to, or a discharge of, the Grantor in respect of the Liabilities; or (e) the absence of any action on the part of the Secured Party to obtain payment or performance of the Liabilities from the Grantor.

      10.    Right to Inspect; Further Assignments and Security Interests. The Secured Party shall have the right, from time to time upon reasonable notice, to inspect any Grantor's premises and to examine any Grantor's books, records and operations relating to the Collateral, including, without limitation, its quality control processes related to the licensing and use of the Trademarks; provided, that in conducting such inspections and examinations, the Secured Party shall use reasonable efforts not to disturb unnecessarily the conduct of such Grantor's ordinary business operations. Upon the occurrence and during the continuance of an Event of Default, the Grantor agrees that the Secured Party or a conservator appointed by the Secured Party, shall have the right to establish such reasonable additional product quality controls related to the licensing and use of the Trademarks as the Secured Party or such conservator, in its sole and absolute judgment, may deem necessary to assure maintenance of the quality of products sold under the Trademarks and the Licenses or in connection with which such Trademarks and Licenses are used. The Grantor agrees (i) not to directly or indirectly sell or assign its interest in the Trademarks without the prior and express written consent of the Secured Party, (ii) not to grant any license under the Trademarks except exclusive or nonexclusive licenses in the ordinary course of the Grantor's programs for any application or purpose, (iii) to maintain the quality of any and all products in connection with which the Trademarks are used, consistent with the quality of said products as of the date hereof, and (iv) not to change the quality of such products in any material respect without the prior and express written consent of the Secured Party, which consent shall not be unreasonably withheld.

      11.    Duties of the Grantor. The Grantor shall have the duty, to the extent desirable in the normal conduct of its business and operations, (i) to prosecute diligently any trademark application or service mark application that is part of the Trademarks pending as of the date hereof until the termination of this Agreement, and (ii) to take reasonable steps to preserve and maintain all of the Grantor's rights in the trademark applications and trademark and service mark registrations that are part of the Trademarks and which are necessary or economically desirable in the operation of Grantor's business. Any expenses incurred in connection with the foregoing shall be borne by the Grantor. Grantor shall not abandon the use of any Trademark in the United States which is the subject of a U.S. registered trademark or application in the U.S. Patent and Trademark Office. The Grantor agrees to retain an experienced trademark attorney reasonably acceptable to the Secured Party for the filing and prosecution of all such applications and other proceedings. Except as set forth in the Asset Purchase Agreement, the Secured Party shall not have any duty with respect to the Trademarks and Licenses. Without limiting the generality of the foregoing, except with respect to claims arising or alleged to arise prior to the Closing which are the responsibility of the Secured Party rather than the responsibility of the Grantor under the Existing Exclusive License and as set forth in Section 7.13 of the Asset Purchase Agreement, the Secured Party shall not be under any obligation to take any steps necessary to preserve rights in the Trademarks and Licenses against any other parties, but may do so at its option upon the occurrence and during the continuance of an Event of Default, and all expenses incurred in connection therewith shall be for the sole account of the Grantor and shall be added to the Liabilities secured hereby.

-5-

869

12.    Secured Party's Right to Sue. Upon the occurrence and during the continuance of an Event of Default, the Secured Party shall have the right, but shall not be obligated, to bring suit to enforce the Trademarks and the Licenses and, if the Secured Party shall commence any such suit, the Grantor shall, at the reasonable request of the Secured Party, do any and all lawful acts and execute any and all proper documents required by the Secured Party in aid of such enforcement. The Grantor shall, upon demand, promptly reimburse and indemnify the Secured Party for all costs and expenses incurred by the Secured Party in the exercise of its rights under this Section 12 (including, without limitation, all reasonable attorneys' fees and expert witness fees). If, for any reason whatsoever, the Secured Party is not reimbursed with respect to the costs and expenses referred to in the preceding sentence, such costs and expenses shall be added to the Liabilities secured hereby.

13.    Waivers. No course of dealing between the Grantor and the Secured Party, nor the Secured Party's failure, at any time or times hereafter, to require strict performance by the Grantor of any provision of this Agreement shall waive, affect or diminish any right of the Secured Party thereafter to demand strict compliance and performance therewith No single or partial exercise of any right hereunder shall preclude any other or further exercise thereof or the exercise of any other right. None of the undertakings, agreements, warranties, covenants and representations of the Grantor contained in this Agreement shall be deemed to have been suspended or waived by the Secured Party unless such suspension or waiver is in writing signed by an officer of the Secured Party and directed to the Grantor specifying such suspension or waiver.

14.    Event of Default. An event of default ("Event of Default") shall occur upon any of the following: (a) an Event of Default under the Promissory Note; or (b) the failure by Grantor to take any action under this Agreement or Grantor's failure to act when required to do so under this Agreement when such failure is not cured within thirty (30) days after notice of such failure is delivered by Secured Party to Grantor If an Event of Default shall occur and be continuing, the Secured Party may do any one or more of the following:

(a)    The Secured Party may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce or satisfy any Liabilities then owing, whether by acceleration or otherwise.

(b)    The Secured Party shall have the right to pursue any of the following remedies separately, successively or simultaneously:

(i)    File suit and obtain judgment and, in conjunction with any action, the Secured Party may seek any ancillary remedies provided by law, including levy of attachment and garnishment

(ii)    Sell, license or otherwise dispose of the Collateral at public or private sale in accordance with the UCC.

The Secured Party agrees that the Liabilities set forth in Section 2, including all sums of principal and interest or to become due under the Promissory Note, shall be enforced solely from

-6-

the Collateral and that no deficiency or personal judgment as to any unpaid portion of the Purchase Price shall ever be brought against the Grantor, or its successor and assignees.

15.   Rights and Remedies upon Default. Anything set forth herein to the contrary notwithstanding, it is hereby expressly agreed that upon the occurrence and during the continuance of an Event of Default, the Secured Party may exercise any of the rights and remedies provided in this Agreement, the Asset Purchase Agreement, or the Promissory Note executed in connection therewith.

16.   Severability. The provisions of this Agreement are severable, and if any clause or provisions hall be held invalid and unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction, and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Agreement in any jurisdiction.

17.   Modification. This Agreement cannot be altered, amended or modified in any way, except by a writing signed by the parties hereto.

18.   Cumulative Remedies; Power of Attorney. All of the Secured Party's rights and remedies with respect to the Collateral, whether established hereby, by any other agreements or by law, shall be cumulative and may be exercised singularly or concurrently. The Grantor hereby irrevocably appoints the Secured Party as the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise to carry out the acts described below. Upon the occurrence and during the continuance of an Event of Default and the giving by the Secured Party of written notice to the Grantor of the Secured Party's intention to enforce its rights and claims against the Grantor, the Grantor hereby authorizes the Secured Party to, in its commercially reasonable direction, (i) endorse any Grantor's name on all applications, documents, papers and instruments necessary or desirable for the Secured Party in the use of the Trademarks and the Licenses, (ii) take any other actions with respect to the Collateral as the Secured Party deems is in its best interest, (iii) grant or issue any exclusive or nonexclusive license under the Trademarks to anyone on commercially reasonable terms, and (iv) assign, pledge, convey or otherwise transfer title in or dispose of the Collateral to anyone on commercially reasonable terms. The Grantor hereby ratifies all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof. This power of attorney is coupled with an interest and shall be irrevocable until this Agreement shall have been terminated pursuant to Section 8 above. The Secured Party shall have, in addition to all other rights and remedies given it by the terms of this Agreement, all rights and remedies allowed by law and the rights and remedies of a secured party under the Uniform Commercial Code as enacted in any jurisdiction in which the Trademarks may be located or deemed located. The provisions of this Section 18 shall survive termination of this Agreement.

19.   Binding Effect; Benefits. This Agreement shall be binding the Grantor and its successors and assigns, and shall inure to the benefit of the Secured Party and its nominees, successors, and assigns. The Grantor's successors and assigns shall include, without limitation, a receiver, trustee or Grantor-in-possession of or for Grantor; provided, however, that the Grantor shall not voluntarily assign or transfer any of its rights or obligations hereunder without the prior written consent of the Secured Party.

-7-

20.    Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws (as distinguished from the conflicts of law provisions) and decisions of the State of Iowa.

21.    Notices. All notices or other communications hereunder shall be given in the manner and to the addresses set forth in Section 7.7 of the Asset Purchase Agreement.

22.    Section Headings. The section headings herein are for convenience of reference only, and shall not affect in any way the interpretation of any of the provisions hereof.

23.    Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

24    Further Assurances. The Grantor hereby agree to execute and deliver such further agreements, instruments and documents, and to perform such further acts as the Secured Party shall reasonably request from time to time in order to carry out the purpose of this Agreement and agreements set forth herein.

25    Survival of Representations. All representations and warranties of the Grantor contained in this Agreement shall survive the execution and delivery of this Agreement.

[Signature Pages to Follow]

-8-

872

-9-

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the day and year first above written:

**GRANTOR:**

NATIONAL PORK BOARD

By:_____
Name: Steven D. Murphy
Title: Chief Executive Officer

Accepted and agreed to as of the day and year first above written:

NATIONAL PORK PRODUCERS COUNCIL

By:_____
Name: Neil Dierks
Title: CEO

STATE OF IOWA    )
                          SS
COUNTY OF POLK) .

        The foregoing Trademark Security Agreement was acknowledged before me this _____ day of _____, 2006 by Steven D. Murphy, Chief Executive Officer of National Pork Board, an instrumentality of the United States of America created under the Pork Promotion Research and Consumer Information Act of 1985, on behalf of such entity.

                                                    _____
                                                    Notary Public
                                                    Polk County, Iowa
                                                    My Commission Expires:_____

873

## EXHIBIT 4.(i)

<u>Registered Trademarks and Service Marks</u>:

1)    "PORK and Design", Registration Number 1418703
2)    "THE OTHER WHITE MEAT", Registration Number 1486548
3)    "THE OTHER WHITE MEAT and Design", Registration Number 3126072
4)    "THE OTHER WHITE MEAT", Registration Number 3129186

d:\n0117\93\agr-trademark security.012.doc

-10-

**EXHIBIT 5.1**

Seller's Closing Certificate

25

# SELLER'S
# CERTIFICATE OF REPRESENTATIONS, WARRANTIES AND COVENANTS

The undersigned, Neil Dierks, is the CEO and Secretary of National Pork Producers Council, an Iowa non profit corporation ("Seller"). Seller and the National Pork Board, an instrumentality of the United States of America created under the Pork Promotion Research and Consumer Information Act of 1985 ("Buyer"), have entered into an Asset Purchase Agreement dated July 1, 2006 (the "Agreement"). Pursuant to Section 5.1 of the Agreement, the undersigned hereby certify as follows:

1    The representations and warranties of Seller set forth in the Agreement were true and correct in all material respects when made and are true and correct in all material respects at and as of the date hereof as though made on the date hereof.

2.   Seller has fully performed and complied with all covenants, terms and conditions to be performed and complied with by Seller on or before the date hereof

Dated as of October 3, 2006.

National Pork Producers Council

By: _____
Neil Dierks, its CEO and Secretary

d:\n0117\93\cer-reps & war (sellers) 001.doc

876

**EXHIBIT 5.3(1)**

Seller's CEO & Secretary Certificate
(with attached resolution)

26

877

Exhibit 5.3(f)

## SECRETARY'S CERTIFICATE

## NATIONAL PORK PRODUCERS COUNCIL

The undersigned, Neil Dierks, does hereby certify that he is the secretary of the National Pork Producers Council, an Iowa non profit corporation, (the "Company"), and further certifies that:

1. Attached hereto as Exhibit A is a true and complete copy of a Certificate of Existence from the Iowa Secretary of State

2. Attached hereto as Exhibit B is a true and complete copy of the Articles of Incorporation of the Company.

3. Attached hereto as Exhibit C is a true and complete copy of the Bylaws of the Company, with all amendments thereto.

4. Attached hereto as Exhibit D is a true, correct and complete copy of Resolutions duly adopted by the unanimous vote of the voting Delegates of the Company at a meeting of the Delegate Body of the Company held on June 8, 2006, and such resolutions have not been amended, rescinded or modified since their adoption, remain in full force and effect as of the date hereof, and are the only resolutions adopted by the Company's voting Delegates in connection with the subject matter contained in that certain Asset Purchase Agreement made and entered into effective as of the 1st day of July, 2006, by and between the Company and the National Pork Board, an instrumentality of the United States of America created under the Pork Promotion Research and Consumer Information Act of 1985 (the "Agreement"), and the transactions contemplated thereby

5. Attached hereto as Exhibit E is a term sheet dated June 1, 2006 regarding the Agreement, which term sheet was unanimously approved by resolution of the Board of Directors of the Company on June 6, 2006; and said resolution has not been amended, rescinded or modified since its adoption, remains in full force and effect as of the date hereof.

6. Attached hereto as Exhibit F is a portion of the minutes from the meeting of the Company's Board of Directors ф held September 12, 2006, where the Board of Directors unanimously approved a resolution to approve the final Agreement and related documents, pending final review by the Company's legal counsel that no substantive changes were made to the Agreement and related documents during the review of the documents by the Agricultural Marketing Service of the United States Department of Agriculture, and said resolution has not been amended, rescinded or modified since its adoption, remains in full force and effect as of the date hereof

878

-2-

7. On October 2, 2003, the Company's legal counsel confirmed to the Company's Board of Directors that, after final review, that no substantive changes were made to the Agreement and related documents during the review of the documents by the Agricultural Marketing Service of the United States Department of Agriculture.

8. Attached hereto as Exhibit G is a standing resolution of the Board of Directors of the Company authorizing the undersigned, as CEO of the Company, to execute contracts and agreements on behalf of the Company and said resolution has not been amended, rescinded or modified since its adoption, remains in full force and effect as of the date hereof.

A facsimile signature shall be accepted as an original signature for all purposes in connection with the execution of this Secretary's Certificate.

IN WITNESS WHEREOF, the undersigned has duly executed this certificate as of the 3rd day of October, 2006, effective as of the 1st day of July, 2006.

_____
Neil Dierks, Secretary

d:\n0\117\93\cer-secretary seller.doc

-2-

879

Certificate Print

EXHIBIT A

# IOWA SECRETARY OF STATE
## CHESTER J. CULVER



Date: 10/02/2006

## CERTIFICATE OF EXISTENCE

Name: NATIONAL PORK PRODUCERS COUNCIL (504RDN - 61230)
Date of Incorporation: 3/28/1968
Duration: PERPETUAL

I, CHESTER J. CULVER, Secretary of State of the State of Iowa, custodian of the records of incorporations, certify that the nonprofit corporation named on this certificate is in existence and was duly incorporated under the laws of Iowa on the date printed above, that all fees required by the Revised Iowa Nonprofit Corporation Act have been paid by the corporation, that the most recent biennial corporate report has been filed by the Secretary of State, and that articles of dissolution have not been filed.

Certificate ID: CS9051

To validate this certificate please visit the following web site and enter the certificate ID.

www.sos.state.ia.us/ValidateCertificate

CHESTER J. CULVER    SECRETARY OF STATE

https://www.sos.state.ia.us/Cert/GoodStanding/Print.aspx?c=B91AA3F832C11EC204CD709071AE3A7    10/2/2006

880

*Exhibit B*    11/8/72

#61230
0000 61078

## RESTATED ARTICLES OF INCORPORATION 1972

### OF

### NATIONAL PORK PRODUCERS COUNCIL

#### TO THE SECRETARY OF STATE OF THE STATE OF IOWA:

Pursuant to the provisions of Section 39 of the Iowa Nonprofit Corporation Act, the undersigned corporation adopts the following Restated Articles of Incorporation:

I.

The name of the corporation is National Pork Producers Council.

II

The purpose for which the corporation is organized is to give national direction to and to do any and all things to improve or increase the quality, production, distribution, and sale of pork and pork products, and to do any lawful act or conduct any lawful business which corporations organized under Chapter 504A, Code of Iowa, 1971, may do or conduct. However, this corporation shall not conduct or carry on any activities not permitted to be conducted or carried on by an organization exempt under Section 501 (c) (5) of the Internal Revenue Code and its regulations as they now exist or as they may hereafter be amended.

III

The corporation may have one or more classes of members. The designation, the manner of election or appointment, and the qualifications and rights of which shall be set forth in the Bylaws.

406

(2)

881

- 2 -

IV

These Restated Articles of Incorporation:

1. Correctly set forth the provisions of the Articles of Incorporation of the corporation as heretofore and hereby amended;

2. Have been duly adopted as required by law; and

3. Supersede the original Articles of Incorporation and all amendments and restatements thereof.

Dated _____, 1972.

_____ President

_____ Secretary

STATE OF IOWA:
                    :SS
COUNTY OF POLK:

On this 2 day of _____, 1972, before me, the undersigned, a Notary Public in and for the state of Iowa, personally appeared _____ and _____ to me personally known, who being by me duly sworn, did say that they are the President and Secretary, respectively, of said corporation executing the within and foregoing instrument; that said instrument was signed on behalf of said corporation by authority of its Board of Directors; and that the said _____ and _____ as such officers acknowledged the execution of said instrument to be the voluntary act and deed of said corporation, by it and by them voluntarily executed.

_____, NOTARY PUBLIC
IN AND FOR THE STATE OF IOWA

407

EXHIBIT C

# BYLAWS

*And*

*Articles of Incorporation*

*of the*

## NATIONAL PORK PRODUCERS COUNCIL

*This revision was approved on March 3 and 4, 2006 in Kansas City, Missouri.*

# RESTATED ARTICLES OF
# INCORPORATION OF
# NATIONAL PORK PRODUCERS COUNCIL

*INCORPORATED UNDER THE*
*IOWA NONPROFIT CORPORATION ACT (CHAPTER 504A)*

## I.

The name of the corporation is National Pork Producers Council.

## II.

The purpose for which the corporation is organized is to give national direction to and to do any and all things to improve or increase the quality, production, distribution, and sale of pork and pork products, and do any lawful act or conduct any lawful business which corporations organized under Chapter 504A, Code of Iowa, 1971, may do or conduct. However, this corporation shall not conduct or carry on any activities not permitted to be conducted or carried on by an organization exempt under Section 501 (c) (5) of the Internal Revenue Code and its regulations as they now exist or as they may hereafter be amended.

## III.

The corporation may have one or more classes of members. The designation, the manner of election or appointment, and the qualifications and rights of which shall be set forth in the Bylaws

1

884

# Bylaws
# National Pork Producers Council

### ARTICLE I.
### Offices

Section 1. Registered Office. The registered office shall be maintained in a place determined by the Board of Directors.

### ARTICLE II.
### Members

Section 1. Qualified Member Organization(s). The National Pork Producers Council (hereinafter called the Corporation) is a federation of the qualified member states or other units (state pork producer associations or regional or area units) hereinafter referred to as "Qualified Member Organization(s)". NPPC may admit to membership one (1) pork producer association from each state or other qualified unit that meets the following qualifications:

A. Agrees to endorse the general objectives of the Corporation and to cooperate in its programs as evidenced by a Memorandum of Agreement approved by the Delegate Body and signed by the Qualified Member Organization and the Corporation.

B. Elects its officers and develops policy only by action of its members.

C. Give a voice to contributors, and contributors only on the matters of NPPC.

D. Qualified Member Organization offers membership which:

1. shall be composed of any individual entity, partnership, corporation or firm that is actively engaged in the production of porcine animals (hereinafter referred to as producer member) ("Actively engaged" is defined as an owner, operator, contract feeder, manager or employee of an enterprise involved in the production of porcine animals). In order for a Producer members to have the right to voice and vote as included in these Bylaws the producer member must have a financial commitment through participation with Producer Consent or a minimum fee as established by the NPPC Board of Directors. The minimum fee may

2

885

# NPB Strategic Plan and Budget

| General Information | | |
|---|---|---|
| **Budget Year:** 2012 | **Total $ Value:** | $3,000,000 |
| **Tactic Title:** The Other White Meat (TOWM) Payment | | |

| Issues & Outcomes |
|---|
| **This tactic addresses services and not a Critical Issue / Desired Outcome.** |

| Tactic Description |
|---|
| Payment of $3 million for The Other White Meat (TOWM) trademark to NPPC.<br>Interest = $1,202,154<br>Principle = $1,797,846 |

| Specific & Measurable Objectives |
|---|
| Interest Expense |

### Detailed Budget

| Expenditure Description | Cost $ |
|---|---|
| TOWM Payment to NPPC | $3,000,000 |

### Account Information

| Account # | Account Description | Total $ |
|---|---|---|
| 5200-000-999-0 | The Other White Meat (TOWM) | $3,000,000 |

 **Agricultural Marketing Service**

Office of the
Deputy Administrator
Livestock and Seed Program

1400 Independence Avenue, SW.
Room 2092-S, STOP 0249
Washington, DC 20250-0249

December 7, 2011

Mr. Calvin VandeKrol
National Pork Board
Post Office Box 9114
Des Moines, Iowa 50306

Dear Mr. VandeKrol:

This is in response to your November 18, 2011, email requesting approval of the fiscal year 2012 National Pork Board (Board) budget as approved by the Board at its November 16, 2011, meeting.

After clarification and additional information provided by the Board, we have reviewed and approve the Board's critical issues and tactics in the budget as submitted, including the projected 2012 checkoff revenues of $78.4 million and total available revenues of $84.9 million. The total revenues will include a drawdown in 2012 of $6.0 million from the end-of-year 2011 cash reserves of $ 19.2 million. We also approve the Board's 2012 administrative budget at $1.91 million compared to $1.77 million in 2011.

We understand that the Board will forward to the Foreign Agricultural Service (FAS) for their review and approval a copy of the 2012 tactical detail reports relating to international marketing activities. The Agricultural Marketing Service (AMS) has reviewed and approved the budget portion of these activities in accordance with the Memorandum of Understanding between AMS and FAS.

As a reminder, the Board may not expend any checkoff funds for plans, projects, or any other activities prior to the U.S. Department of Agriculture's approval. All activities that are conducted by using checkoff funds must be carried out in compliance with the Pork Promotion, Research, and Consumer Information Act and Order. Moreover, checkoff funds must not be used to influence Federal Government policy or action.

Finally, in accordance with section XI(N) "Other Government Agencies" of the November 4, 2010, Guidelines for AMS Oversight of Commodity Research and Promotion Programs, boards are required to provide advance notice of meetings with any other Federal Government agencies, and AMS must be aware of communications with those agencies. Additionally, AMS must pre-approve any correspondence with other Federal Government agencies, including comments on federal rulemaking.

Sincerely,

Craig A. Morris
Deputy Administrator
Livestock and Seed Program

Supp. 1049