# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                 )

THE HUMANE SOCIETY OF       )
THE UNITED STATES, *et al.*,       )
                                 )

             Plaintiffs,       )
                                 )

       v.                )      Civil Action No. 12-1582 (ABJ)
                                 )

SONNY PERDUE,[1]          )
*Secretary of the U.S.*        )
*Department of Agriculture*,      )
                                 )

             Defendant.      )
_____)

## MEMORANDUM OPINION

The U.S. Department of Agriculture ("USDA") oversees multiple federal programs established by Congress to promote certain agricultural commodities. These programs are funded by "checkoffs" – mandatory assessments that producers and importers pay on the sale or import of the commodity. The assessments are used to pay for a range of activities, including research and marketing of the commodities, and they subsidize well-known advertising campaigns, such as "Got Milk?," "Beef: It's What's for Dinner," and "The Incredible, Edible Egg." This case involves the pork checkoff program and the trademarks associated with the slogan "Pork The Other White Meat."

The National Pork Board ("Board" or "NPB") is a fifteen-member board appointed by the Secretary of Agriculture that is responsible for developing and administering the pork checkoff

_____

1     Plaintiffs named former Secretary of Agriculture Thomas Vilsack as defendant. Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes his successor as defendant.

program.  Plaintiffs in this case challenge the Secretary's decision to approve the Board's purchase of the trademarks associated with "The Other White Meat" campaign.

Beginning in 2001 until it purchased the trademarks in 2006, the Board gained access to the trademarks through a licensing agreement with the National Pork Producers Council ("NPPC"), the private industry trade association that developed the trademarks.  The fee for the exclusive license to use the trademarks was one dollar per year, until 2004 when it increased to $818,000 per year.  In 2006, with the Secretary's approval, the Board entered into an agreement to purchase the trademarks from NPPC for approximately $34.6 million (the "Purchase Agreement"), which it agreed to finance over twenty years at an interest rate of 6.75%, for a total cost of $60 million including interest.  Under the Purchase Agreement, the Board agreed to pay NPPC $3 million annually for twenty years.

Pursuant to the Pork Promotion, Research, and Consumer Information Act, 7 U.S.C. § 4801 *et seq.* ("Pork Act" or "the Act"), which established the pork checkoff program, the Secretary is required to approve the Board's annual budget each year.  Through that process, the Secretary has approved the $3 million payment every year since the Board purchased the trademarks.  In 2016, the agency undertook a review of the annual payments under the Purchase Agreement and re-approved the annual payments.

Plaintiffs challenge the Secretary's approval of the initial purchase of the trademarks and the subsequent approval of the annual payments under the Purchase Agreement on the grounds that they resulted in the use of pork checkoff dollars to influence legislation, which is prohibited by the Pork Act, and on the basis that the Secretary's actions were arbitrary, capricious, and contrary to law.

Pending before the Court are plaintiffs' motion for summary judgment,[2] defendant's motion to dismiss for lack of subject matter jurisdiction or, in the alternative, motion for summary judgment,[3] and intervenor-defendant NPPC's motion to dismiss or motion for summary judgment,[4] all of which are fully briefed.[5] Upon review of the parties' submissions, the administrative record in this case, and the applicable law, the Court will grant in part and deny in part plaintiffs' motion for summary judgment and grant in part and deny in part defendant's and intervenor-defendant's motions for summary judgment. The Court agrees with defendants that plaintiffs' challenge to the approval of the 2006 Purchase Agreement itself was untimely, and that their claims concerning the approval of any annual payments made in the past are moot. But the Court concludes that decision to continue to approve the annual payments based on the review of the Purchase Agreement that was undertaken in 2016 was arbitrary and capricious and unmoored from the facts and circumstances before the agency, so it will rule in favor of the plaintiffs on that issue.

---

2       Pls.' Mot. for Summ. J. [Dkt. # 52] ("Pls.' Mot.") and Pls.' Mem. of P. & A. in Supp. of Mot. for Summ. J. [Dkt. # 52-1] ("Pls.' Mem.").

3       Def.'s Mot. to Dismiss for Lack of Subject Matter Juris. or in the Alternative for Summ. J. [Dkt. # 54] ("Def.'s Mot.") and Def.'s Mem. in Supp. of Def.'s Mot. and in Opp. to Pls.' Mot. [Dkt. # 54-1] ("Def.'s Mem.").

4       NPPC's Mot. to Dismiss or in the Alternative for Summ. J. and Opp. to Pls.' Mot. [Dkt. # 55] ("NPPC's Mot.") and Mem. of P. & A. in Supp. of NPPC's Mot. [Dkt. # 55-1] ("NPPC's Mem.").

5       *See* Pls.' Combined Reply in Supp. of Pls.' Mot. and Opp. to Def.'s Mot. and NPPC's Mot. [Dkt. # 57] ("Pls.' Opp."); Def.'s Reply in Supp. of Def.'s Mot. [Dkt. # 61]; Reply in Supp. of NPPC's Mot. [Dkt. # 62] ("NPPC's Reply").

The Secretary approved spending $3 million per year for the purchase of the trademarks for another ten years based on an expert's determination of their replacement cost, that is, what it would cost to develop and market an entirely new promotional campaign today.  But neither the agency nor the expert adequately explains why this calculation sheds any light on what the 2016 review was supposed to ascertain:  the current value of the set of four trademarks to the agency. The fundamental problem is that the three trademarks that include The Other White Meat slogan have been declared to be obsolete, and they have been retired from active use.  So their value is minimal, or at best, undetermined.  And the record contains no effort to ascertain the value of the fourth mark – the "Pork and Design" logo that consists of the word "pork" written across a blue triangular "pork loin silhouette" – at all.

The Secretary's 2016 decision also fails to explain why it makes sense to predicate future payments on the cost of replacing The Other White Meat when the cost of replacing The Other White Meat has already been incurred.  Moreover, while the agency states that the expert endeavored to calculate the value of the marks based upon the cost of developing a new trademark with the same level of effectiveness as the old trademarks, "as measured by aided awareness studies of the percentage of people who are aware of the trademark," there is no data in the record underlying the expert's selection of 40% awareness as the target measure.  The expert simply cut the high level of awareness garnered by The Other White Meat slogan in its heyday in half and calculated what it would cost to buy something else that effective now.  But without any analysis of how much The Other White Meat still resonates in the consumer consciousness today, or, more important, whether the blue triangular logo has gained any traction in the market at all, this approach to quantifying "current value" is completely arbitrary and cannot pass muster under the APA.

**BACKGROUND**

## I.  LEGAL FRAMEWORK

Congress created the pork checkoff program when it passed the Pork Act in 1985.  7 U.S.C. § 4801 *et seq.*  The Act's purpose is to "financ[e], through adequate assessments, . . . an effective and coordinated program of promotion, research, and consumer information" to "strengthen the position of the pork industry in the marketplace; and . . . maintain, develop, and expand markets for pork and pork products."  7 U.S.C. § 4801(b) (2012).  Pursuant to the Act, the Secretary issued the Pork Promotion, Research, and Consumer Information Order, which sets forth regulations to implement the Act.  7 U.S.C. § 4803; *see* 7 C.F.R. pt. 1230(A) (2013) (the "Pork Order" or "Order").

Under the terms of the Pork Act, defendant established the National Pork Board, made up of members who serve three-year terms.  7 U.S.C. § 4808(a)(1)–(3).  The Board is responsible for developing "proposals for promotion, research, and consumer information plans and projects" for the Secretary's approval.  7 U.S.C. § 4808(a)–(b); 7 C.F.R. § 1230.60(a).  It is also responsible for periodically reviewing plans or projects for effectiveness and terminating those that do not further the purposes of the Act.  7 C.F.R. § 1230.60(b) ("Each plan and project shall be periodically reviewed or evaluated by the Board to ensure that the plan and project contributes to an effective and coordinated program of promotion, research, and consumer information.  If it is found by the Board that any such plan and project does not further the purposes of the Act, the Board shall terminate such plan and project.").  The Board's activities are funded by the assessments that pork producers and importers are required to pay to the Board.  7 U.S.C. §4809(a), (c); 7 C.F.R. § 1230.71(a)(1).

The Act and the Order grant the Board certain powers to carry out its responsibilities. *See* 7 U.S.C. § 4808; 7 C.F.R. § 1230.58 ("Powers and duties of the Board"). These include the authority to incur expenses the Secretary finds "reasonable and likely to be incurred by the Board . . . to enable it to exercise its powers and perform its duties." 7 C.F.R. 1230.70(a). Also, the Board, "with the approval of the Secretary, may enter into contracts . . . for the development and conduct of activities authorized under" the Pork Order. 7 U.S.C. § 4808(b)(4)(A)(i).

Within the agency, the Secretary has delegated oversight responsibility for the pork and other checkoff programs to the USDA's Agricultural Marketing Service ("AMS"). AMS's role is "to ensure compliance with all applicable legislation, regulations, and policies," Admin. Record, Joint App. [Dkt. # 64] ("AR") 778,[6] and to that end, has issued its Guidelines for AMS Oversight of Commodity Research and Promotion Programs ("Guidelines"). *See* AR 779–806. Among their requirements, the Guidelines allow for multi-year contracts only if "all funding is obligated during the budget year" or they "require extensions consistent with the budget year and include an 'escape clause' – clear language that the board may cancel the project at any time and for any reason without incurring the full contract cost." Guidelines IV.D, AR 782.

The Pork Act, the Pork Order, and AMS's Guidelines all prohibit the Board from using assessment funds "for the purpose of influencing legislation." 7 U.S.C. § 4809(e); 7 C.F.R. § 1230.74.

---

6      The administrative record submitted to the Court case appears in the Joint Appendix. Citations to documents in the administrative record will be incited using "AR" and the Bates number that appears in the bottom right of each page.

## II.    FACTUAL BACKGROUND

Plaintiff Harvey Dillenburg is an individual pork producer who has paid assessments into the pork checkoff program since it began.  Decl. of Harvey Dillenburg, Att. to Pls.' Mot.  [Dkt. # 52-2] ¶ 3.  Plaintiff Humane Society of the United States ("HSUS") is an organization that works to "protect[ ] the interests of its farmer members who share the organization's values of humane animal care."  Am. Compl. [Dkt. # 3] ¶ 14.  Plaintiff Iowa Citizens for Community Improvement is an organization that "advocates against practices and policies that are harmful to family and independent farmers,"  including its members who pay assessments and "are adversely affected by misuse of checkoff funds."  Am. Compl. ¶¶ 19–20.  Together, plaintiffs challenge the Secretary of Agriculture's approval of the Board's purchase of The Other White Meat trademarks from NPPC, as well as the Secretary's approval of the annual payments made in accordance with the Purchase Agreement.

The National Pork Producers Council is an trade association that lobbies on behalf of the industry, and it advocated in favor of the passage of the Pork Act.  *See* NPPC's Am. Ans. to First Am. Compl. [Dkt. # 44] ¶¶ 1, 45; *see also* http://nppc.org (stating the NPPC "fights for reasonable federal legislation and regulations, maintains and develops export market opportunities, and protects producers' livelihoods," focusing on "areas of agriculture and industry, animal well-being and food safety, environment and energy, and international trade").  Under the Pork Act, NPPC received a portion of the mandatory checkoff assessments early in the Act's and Order's implementation.  7 U.S.C. § 4809(c)(2) (providing for the association to receive declining amounts of assessment funds until the Board was established and other milestones were met and allowing "no funds thereafter except . . . such funds from the Board pursuant to sections 4808 or 4809 of this title").

In the 1980s, NPPC developed The Other White Meat slogan and registered the four separate trademarks that comprise the slogan and the logo as its intellectual property.[7] *See* NPPC's Mem. at 4, citing Am. Compl ¶¶ 46–53. Three of the four trademarks relate to the use of the slogan The Other White Meat, and the fourth is the "Pork and Design" logo, which consists of the word "pork" inside a blue stylized pork chop:



AR 216; Def.'s Mem. at 2, 6, 19, 20. In 1987, the Board adopted The Other White Meat campaign and used it in a variety of advertisements to promote pork. AR 489, 217, 219; Am. Compl. ¶¶ 52, 99–100.

In 2001, the USDA and NPPC settled a lawsuit brought by the Michigan Pork Producers Association that concerned a referendum by pork producers seeking to terminate the pork checkoff program. *See* Settlement Agreement (settling *Michigan Pork Producers Ass'n, Inc. v. Campaign for Family Farms*, 1:01-CV-34 (W.D. Mich.),[8] AR 524–32. As part of the agreement, the parties agreed not to terminate the checkoff program, but they specified that the Board "should operate independently of the NPPC" while the pork program remained in effect. Settlement Agreement,

---

7    The four trademarks are "PORK and Design," Registration Number 1418703; "THE OTHER WHITE MEAT," Registration Number 1486548; "THE OTHER WHITE MEAT and Design," Registration Number 3126072; and "THE OTHER WHITE MEAT," Registration Number 3129186. *See* AR 839.

8    Although the settlement agreement in the administrative record is unsigned, there appears to be no dispute that USDA and NPPC entered into this agreement. *See* Am. Compl. ¶ 57 (describing the settlement agreement); Def.'s Mem. at 35 (referring to the settlement agreement).

AR 524–26.  The settlement agreement set forth certain requirements for how the two entities would operate, including that any contracts entered into between them would be "at fair market value."  Settlement Agreement, AR 524–25.

At that time in 2001, NPPC owned the trademarks, and the Board had licensed the exclusive right to use them.  AR 518.  In 2001 and 2002, the Board paid $1 a year for the license.  *See* AR 321 (2003 email suggesting increasing the license fee from "the current rate of $1/year").  In 2003, the Board and NPPC renegotiated the licensing agreement to increase the annual fee to $818,451 until the last two years of the contract, when it would revert to $1 per year.  AR 518.  The licensing agreement was scheduled to end on June 30, 2009.  *Id.*  In early 2004, the Secretary approved the revised licensing agreement.  *See* AR 347.

In late 2005, the Board began negotiating with NPPC to purchase the trademarks.  *See* Feb. 14, 2006 Acquisition Proposal, AR 489–90.  The Board pursued purchasing the trademarks because it planned to make a "sizeable investment" in The Other White Meat brand; it feared that its planned investment in the brand would "work against . . . its ability to negotiate a favorable license fee in the future," and that the fee in any subsequent agreement would increase "substantially."  AR 489 (noting also that business experts would confirm "that no organization should build its business model around a brand it doesn't own").

As part of its efforts to purchase the trademarks, the Board sought appraisals from independent experts.  AR 490.  It received a "wide range of values," but decided to base its valuation on the replacement value approach, which involves estimating the cost of building an entirely new brand.  AR 490.  Mark Williams, whom plaintiffs allege created The Other White Meat slogan in the 1980s, Am. Compl. ¶ 46, advised the Board that the replacement value of the

trademarks was "somewhere between $30,000,000 and $40,000,000." Feb. 3, 2006 Letter from Williams to Board CEO Steve Murphy, AR 513–14.

In early February 2006, Board and NPPC officials met and agreed to a purchase price of $34.597 million to be paid over twenty years at an interest rate of 6.75%, resulting in a total cost of $60 million. AR 11, 337, 492. The Agreement provided that this amount would be paid at the rate of $3 million per year for twenty years. Feb. 14, 2006 Acquisition Proposal, AR 490; Tentative Term Sheet, AR 492.

On February 22, 2006, AMS issued a memorandum regarding the Board's proposal to acquire the trademarks. Decision Mem., AR 810–12. The Decision Memorandum, from the Deputy Administrator for the AMS Livestock and Seed Program to the AMS Administrator, set forth two options: Option 1 was to permit the Board to make the purchase and Option 2 would prohibit the purchase. AR 810–12. The Decision Memorandum listed the "Pros" and "Cons" of each and recommended Option 1. AR 811–12. There was a space prepared at the bottom of the Decision Memorandum where the "Decision by the Acting Undersecretary" could be entered, and the completed form bears a check mark next to "Approve," initialed and dated February 28, 2006. AR 812.

With the Decision Memorandum in hand, the Board set about negotiating the specific terms of the purchase from NPPC. The record shows that the Board and NPPC reached agreement on the terms of the purchase on July 1, 2006. Purchase Agreement, AR 820–85. On July 18, 2006, the Board sent a letter to the agency "requesting approval of the business and legal terms" for its purchase of the trademarks. Sept. 13, 2006 AMS Letter, AR 862. The agency responded by letter dated September 13, 2006, stating that it "reviewed and approve[d] the terms of the Agreement." *Id.* On a September 20, 2006 conference call, the Board approved the term sheet dated September

20, 2006. Sept. 20, 2006 Board Minutes, AR 861. On September 25, 2006, the Board and NPPC signed an agreement to defer the annual license fee that the Board owed NPPC under their existing licensing agreement while the negotiations continued. *See* Amendment to Payment Deferral Agreement [Dkt. # 11-1], Ex. A. An unsigned certification by NPPC's Secretary dated October 3, 2006 included a statement that NPPC's counsel confirmed that no substantive changes had been made to the Purchase Agreement and related documents during the agency's review. AR 878–79. The closing book for the purchase appears in the record, AR 820–885, with a cover letter dated October 9, 2006. AR 819.

As required by AMS's Guidelines, AR 782, the Purchase Agreement authorizes the Board to terminate the agreement for any reason by giving advance written notice of 365 days. Purchase Agreement ¶ 1.7, AR 823–24. The Board would be obligated to make a one final payment, after which ownership of the trademarks would revert back to NPPC. *Id.* The Board has never exercised this right; the Secretary has approved and the Board has paid $3 million to NPPC each year under the agreement. *See, e.g.*, AR 458–60, AR Suppl. 903 (Pork Board budget detail for Fiscal Year 2012 showing $3 million "TOWM Payment to NPPC"), AR Suppl. 1049 (approving budget).

In March 2011, the Board announced that it was replacing The Other White Meat with a new slogan and campaign: "Pork Be Inspired." AR 448–49. The Board explained that with the adoption of the Be Inspired campaign, The Other White Meat campaign will play a role as a heritage brand," and "will not be featured in advertising." AR 448. The Be Inspired campaign does not use the words The Other White Meat, although it does incorporate the Pork and Design logo.



The Board's prior use of The Other White Meat slogan is described on the Board's website, and the record states that it appears on nutritional materials.  AR 218.

## III.  PROCEDURAL HISTORY

Plaintiffs filed this lawsuit on September 24, 2012, challenging the Secretary's 2006 approval of the Purchase Agreement, the subsequent approvals of the annual payments for the trademarks, and the agency's failure to terminate the agreement to pay for The Other White Meat trademarks after it launched a new campaign.  Compl. [Dkt # 1].  Defendant moved to dismiss, and on September 25, 2013, the Court dismissed the case for lack of subject matter jurisdiction on standing grounds.  *Humane Soc'y v. Vilsack* , 19 F. Supp. 3d 24, 34–47 (D.D.C. 2013) ("*Vilsack I*") (holding that individual plaintiff Dillenburg did not have Article III standing and that the two plaintiff organizations could not establish standing to sue in their own right or on behalf of their pork-producing members).  Plaintiffs appealed, and on August 14, 2015, the Court of Appeals for the D.C. Circuit reversed.  *Humane Soc'y v. Vilsack*, 797 F.3d 4, 6 (D.C. Cir. 2015) ("*Vilsack II*") (holding that this "case involves a concrete and particularized harm caused by an agency's failure to confer a direct economic benefit on a statutory beneficiary" and rejecting defendant's argument that plaintiffs failed to exhaust their administrative remedies because the administrative remedies available would not provide adequate relief to plaintiffs).

On December 9, 2015, after the case was remanded to this Court, NPPC moved to intervene.  Mot. to Intervene [Dkt. # 25].  On December 31, 2015, plaintiffs and defendant filed a stipulation and motion to stay the case.  Joint Stipulation & Req. for Stay of Proceedings [Dkt. # 29] ("Stipulation").  The Stipulation provided that the Secretary would, "consistent with [his] own independent judgment and authority, review the Pork Board's contract for the purchase of 'The Other White Meat' trademark."  *Id.*  It further provided that the review would "include a

valuation" of the trademark and "consideration of relevant materials" submitted by plaintiffs, and that the Secretary would not authorize the July 1, 2016 annual payment until after the review was complete. *See id.* At the same time, plaintiffs agreed to "dismiss with prejudice the portion of their request for relief seeking retrospective relief, namely, their request for an order requiring Defendant 'to recover [] already distributed funds from NPPC.'" *Id.*

On January 6, 2016, the Court granted the parties' motion to stay and denied NPPC's motion to intervene without prejudice. Min. Order of Jan. 6, 2016. The Court also ordered that both plaintiffs and NPPC should be permitted to submit materials for the Secretary to consider, and that defendant was required to consider those materials as part of his review. *Id.*

On January 18, 2016, plaintiffs dismissed their request for retrospective relief, as agreed in the Stipulation. Notice of Dismissal of One Form of Requested Relief Pursuant to Terms of Joint Stipulation [Dkt. # 35] ("Notice of Dismissal").

As part of its review, the agency received information from plaintiffs and NPPC, and valuations from three experts: defendant's expert, Stout Risius Ross, Inc. ("SRR"); NPPC's expert, Cupitor Consulting; and plaintiffs' expert, CONSOR. AR 4–9. The agency concluded its review on April 20, 2016, and it decided to approve ongoing payments under the Purchase Agreement rather than terminate the agreement. *See* Review of Contract for the Purchase of Trademarks Related to Pork, AR 2–12 ("2016 Review"); Joint Status Report [Dkt. # 40] (advising the Court on May 4, 2016 that defendant had completed its review and decided to approve continuing annual payments).

On May 5, 2016, the Court granted NPPC's motion to intervene, Min. Order of May 5, 2016, and on June 10, 2016, it set a schedule for the parties to brief summary judgment and any remaining jurisdictional issues. Min. Order of June 10, 2016.

The Court heard oral argument on the summary judgment motions on September 27, 2017. In light of the 2016 Review, the Court asked whether the amended complaint needed to be further amended to reflect a challenge to that review and to ongoing payments made in accordance with the Secretary's recent decision. Both sides advised the Court that they did not believe the complaint needed to be amended, and they agreed that the Court should deem the amended complaint to contain such a challenge. Defs.' Joint Notice [Dkt. # 66]; Resp. to Court's Order re Amendment [Dkt. # 67].

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in cases involving review of agency action under the Administrative Procedure Act, Rule 56 does not apply due to the limited role of a court in reviewing the administrative record. *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011). Under the APA, the agency's role is to resolve factual issues and arrive at a decision that is supported by the administrative record, and the court's role is to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985), citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *see also Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

A court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedure required by law." *Id.* § 706(2)(D). "The court's role in reviewing

agency contract decisions is limited to determining whether the agency acted in accord with applicable statutes and regulations and had a rational basis for its decisions." *LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham*, 347 F.3d 315, 320 (D.C. Cir. 2003), quoting *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984). "As with other agency cases, [the] review is limited to the administrative record, and the agency is entitled to a presumption of regularity." *Id.* (citations omitted).

## ANALYSIS

The defense has raised a number of jurisdictional and procedural challenges that the Court must address before turning to the merits of the case.

## I. JURISDICTIONAL AND PROCEDURAL ISSUES

Defendant and intervenor-defendant argue that plaintiffs do not have standing. They also contend that particular claims are either untimely, not subject to judicial review, or moot.

### A. Plaintiffs Have Article III Standing

Both defendant and intervenor-defendant contend that plaintiffs have failed to demonstrate standing. They argue that the D.C. Circuit's decision overturning this Court's dismissal of the case for lack of standing was premised on the legal requirement that the Court must accept all facts alleged as true at the pleading stage. *See Vilsack II*, 797 F.3d at 8 (holding that the complaint presented sufficient facts to plausibly allege that the Board's unlawful payments for the trademarks diminished plaintiff Dillenburg's return on investment on his assessments). Now that the case has proceeded to summary judgement, defendants contend that plaintiffs have failed to come forward with the evidence needed to demonstrate standing at this stage of the litigation. Def.'s Mem. at 12–14; NPPC's Mem. at 15–27.

The Constitution limits the power of federal courts to decide only cases involving actual cases or controversies. *See* U.S. Const. art. III, § 2; *Raines v. Byrd*, 521 U.S. 811, 818 (1997). The doctrine of standing implements this requirement by "limit[ing] the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To have standing, plaintiffs must satisfy three elements: they must show that they have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). At the pleading stage, plaintiffs must "allege facts demonstrating" each element of standing. *See Warth v. Seldin,* 422 U.S. 490, 518 (1975). At the summary judgment stage, plaintiffs "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" to support standing. *Lujan*, 504 U.S. at 561.

The Court of Appeals ruled that plaintiff Dillenburg had sufficiently alleged that he had standing by claiming "that his return on his investment has been diminished by the Board's unlawful payments of $3 million per year," and that "if the Board stopped paying for the slogan, recouped funds unlawfully channeled to [NPPC]," and used that money for more effective pork promotions, "his alleged harm would be at least partially redressed." *Vilsack II*, 797 F.3d at 160. Defendants argue that at this stage of the case, Dillenburg fails to establish standing under his return-on-investment theory because he failed to present evidence that market demand for pork affects the price at which he sells hogs. *See* Def.'s Mem. at 13. "Merely alleging that he sells pork does not do that, because, for instance, he might sell to friends, acquaintances, or neighbors at a price set merely to recoup his own costs (and dependent in no way on market demand for pork)." *Id.*; *see also* NPPC's Mem. at 16–17 (asserting that Dillenburg "must provide 'specific facts' in

support of his theory that if the Board stopped paying the $3 million per year for [The Other White Meat] trademarks, he would receive a better return on his checkoff investment"). Defendant and intervenor-defendant assert that the declaration Dillenburg provided in connection with plaintiffs' motion for summary judgment is cursory and inadequate. *See* Def.'s Mem. at 13; NPPC's Mem. at 16–17. But this argument ignores who must pay assessments under the law and demands more than the D.C. Circuit decision requires.

The Pork Order requires a "producer" to pay assessments into the checkoff program. 7 C.F.R. § 1230.71(a)(1). A "producer" is "a person who produces porcine animals in the United States for sale *in commerce*." *Id.* § 1230.21 (emphasis added); 7 U.S.C. § 4802(11). So only commercial producers must pay into the program. Plaintiffs' motion for summary judgment includes a declaration from Dillenburg stating that he is an "independent pork producer" who is required to and has "paid [pork checkoff] assessments every year since the program began." Dillenburg Decl. [Dkt. # 52-2] ¶¶ 2–3. Thus, his declaration sets forth specific facts establishing he is a commercial producer who is required to fund the Board's activities and whose prices are affected by market demand for pork, 7 C.F.R. § 1230.71(a)(1); 7 C.F.R. § 1230.21; 7 U.S.C. § 4802(11), and it dispels the Secretary's musing that plaintiff may merely be a hobby farmer.

NPPC argues that because the D.C. Circuit ruled that the alleged misuse of checkoff funds cognizably harmed Dillenburg's bottom line, Dillenburg must now provide evidence of his alleged economic loss to demonstrate standing at this stage of the case. *See* NPPC's Reply at 6–7, citing *Spokeo,* 136 S. Ct. 1540. *Spokeo* reaffirmed that to satisfy the injury-in-fact element of standing, all plaintiffs, including statutory beneficiaries like Dillenburg, must have an injury that is both concrete and particularized "even in the context of a statutory violation." *Spokeo,* 136 S. Ct. at 1549. According to NPPC, while Dillenburg is a statutory beneficiary of the Act, he has not

provided evidence of the economic loss that underpins his theory for standing. NPPC's Reply at 6–7. The Court disagrees.

As explained above, Dillenburg has presented evidence to show that he is a commercial producer, so he is affected by the market price for pork. A "petitioner who is likely to suffer economic injury as a result of [governmental action] that changes market conditions satisfies the injury-in-fact requirement." *Clinton v. City of New York*, 524 U.S. 417, 432–33 (1998) (alteration in original) (internal quotation marks omitted), quoting 3 Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise 13–14 (3d ed. 1994).

Applying this principle, the D.C. Circuit recently reversed a lower court ruling on summary judgment that a union and counties claiming economic loss did not have standing to challenge the government's designation of critical habitat for northern spotted owl. *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017). The Court held that when "a plaintiff alleges that it will suffer economic harm as the result of a government action, the complaint and declarations must together demonstrate a substantial probability of injury-in-fact, causation, and redressability." *Id.* at 5. "[C]ourts do not conduct separate mini-trials on injury-in-fact, causation, and redressability," but "do their best based on the complaint and declarations to assess whether the plaintiff's assertions suffice to show the elements of standing." *Id.*

Further, plaintiffs are not required to quantify their economic harm, even at the summary judgment stage. *Carpenters Indus. Council*, 854 F.3d at 5. "Economic harm to a business clearly constitutes an injury-in-fact," and "the amount is irrelevant. A dollar of economic harm is still an injury-in-fact for standing purposes." *Id.*, citing *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) ("The

consumers' alleged economic harm – even if only a few pennies each – is a concrete, non-speculative injury.").[9]

To be sure, plaintiffs must provide sufficient facts to link their claimed economic harm to the challenged action. *See Carpenters Indus. Council*, 854 F.3d at 9 (declaration stating that the challenged habitat designation would decrease timber supply from designated lands and cause plaintiffs union's member companies to suffer economic harm "link[ed] the member companies alleged economic harms – harms ranging from lost sales and diminished production to closures and layoffs – with the decrease in the supply of timber from designated lands"); *see also id.* (noting that the declaration stated one member company's closure and layoffs were "due to its inability to secure enough federal timber from designated lands" and another member company was "experiencing log shortages leading to economic losses . . . due to restrictions imposed by" the designation); *cf. Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 238, 242, 245 (D.C. Cir. 2015) (finding no standing because plaintiffs did not proffer sufficient evidence of injury resulting from the challenged government action).

Based on the amended complaint and Dillenburg's declaration, the Court holds that Dillenburg has demonstrated that he has suffered an injury-in-fact by virtue of the alleged misue and waste of his checkoff dollars, and therefore, he has standing. If defendant's approvals are unlawful, as alleged, then they diverted millions of checkoff dollars, including Dillenburg's, from a program that is required to "maintain, develop, and expand markets for pork and pork products,"

---

9       This legal authority makes clear that NPPC's arguments comparing the current value of the trademarks compared to Dillenburg's asserted loss, *see* NPPC's Mem. at 17–18, NPPC's Reply at 4–5, are irrelevant to the standing analysis.

7 U.S.C. § 4801(b)(1)(B), for Dillenburg's and other producers' benefit. While Dillenburg's economic loss may in fact be small and is not quantified, the facts in his declaration link his asserted loss with the challenged government activity.[10] Accordingly, the Court hold that Dillenburg has standing.

The Court need not reach NPPC's challenge to the organizational plaintiffs' standing because Dillenburg has standing, and the organizational plaintiffs are advancing the same claims. *See Massachusetts v. EPA,* 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."); *see also Ass'n of Am. Physicians and Surgeons, Inc. v. FDA,* 539 F. Supp. 2d 4, 14 (D.D.C. 2008), *aff'd sub nom. Ass'n of Am. Physicians v. FDA*, 358 F. App'x 179 (D.C. Cir. 2009) ("For each claim, if constitutional and prudential standing can be shown for at least one plaintiff, [the court] need not consider the standing of the other plaintiffs to raise that claim."), citing *Mountain States Legal Found. v. Glickman,* 92 F.3d 1228, 1232 (D.C. Cir. 1996); *George E. Warren Corp. v. EPA*, 159 F.3d 616, 620–21 (D.C. Cir. 1998), *amended*, 164 F.3d 676 (D.C. Cir. 1999) (noting that if constitutional and prudential standing can be shown for at least one plaintiff, the court need not consider the standing of the other plaintiffs to raise that claim, but examining the plaintiff trade association's standing separately from the corporate plaintiff's because the association advanced several additional claims).

---

10    NPPC also argues that plaintiffs' dismissal of its request for retrospective relief means that Dillenburg must produce evidence of an imminent prospect of future injury to his return on investment. NPPC's Reply at 4. Dillenburg has done this since he faces the ongoing harm that the $3 million payment approved for 2016 will continue to be used for purposes that allegedly violate the Act, and defendant has stated he will continue to approval the annual payments.

## B.       Plaintiffs' Claims

The amended complaint filed in 2012 alleges that defendant's approval of the trademark purchase and the approvals of the annual payments under the Purchase Agreement are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Specifically, Count I challenges the Secretary's 2006 approval of the Board's agreement to spend $60 million to acquire the trademarks "and each of the subsequent annually approved payments."  Am. Compl. ¶¶ 111–15.  It alleges that those decisions were "arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law" for several reasons, including because they result in the use of checkoff dollars to influence legislation and policy.  Am. Compl. ¶¶ 111–15.  Count II challenges the March 2011 approval to spend more than $5.6 million to launch "a new brand position for pork" without terminating the Purchase Agreement for The Other White Meat trademarks.  Am. Compl. ¶¶ 116–22.  And Count III challenges the approval of the 2012 annual payment for the trademarks without requiring termination of future payments.  Am. Compl. ¶¶ 123–29.  The amended complaint asks the Court to declare these approvals unlawful and set them aside, to order the recovery of "already distributed funds from NPPC," and to enjoin further unlawful authorizations or expenditures of checkoff funds related to the trademarks.  *Id.* at 30.  But since the time the amended complaint was filed, events have transpired to make plaintiffs' claims concerning the annual payment approvals challenged in Counts I–III moot.

### 1.       Plaintiffs Challenge to the 2006 Approval of the Purchase Agreement was Untimely.

Defendant argues that the portions of Count I that challenge to the 2006 approval of the Purchase Agreement was untimely in light of the six-year statute of limitations that applies to APA claims.  *Hardin v. Jackson*, 625 F.3d 739, 743 (D.C. Cir. 2010).  This case was filed on September

24, 2012, six years and eleven days after the final agency action in question: USDA's September 13, 2006 letter to the Board approving the agreement. *See* Def.'s Mem. 30–32, citing AR 862; Am. Compl. [Dkt. # 3]. Accordingly, the Court holds that the challenge to the 2006 contract approval was untimely, and it does not have jurisdiction under the APA to review that decision.

Plaintiffs assert that the final agency action took place later – between September 25 and October 3, 2006, when the Board and NPPC finalized their agreement. Pls.' Opp. at 12–13. But the Board's execution of the contract cannot constitute final agency action, because the Board is not the agency. Under the Pork Act, Secretarial approval is a distinct event that must occur for the Board to be authorized to enter into a contract. 7 U.S.C. § 4808(b)(4)(A)(i). The September 13, 2006 letter reflected the agency's last word on whether the Board could "enter into" a contract with NPPC to buy the trademarks. *See id.*; AR 862. The fact that the Board and NPPC continued to finalize the specific terms of the Purchase Agreement after September 13, 2006 and did not close on the purchase until early October 2006 does not undermine this conclusion.[11]

### 2. Plaintiffs' Challenges to Defendant's Past Payment Approvals are Moot.

Defendant also argues that plaintiffs' claims concerning past annual payment approvals are moot. Article III of the Constitution permits federal courts to adjudicate only "actual, ongoing controversies." *Honig v. Doe,* 484 U.S. 305, 317 (1988). Even if a case poses a live controversy when filed, the doctrine of mootness requires a federal court "to refrain from deciding it if 'events

---

11      Plaintiffs' reliance on *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 562 (2005), for the proposition that the Board is the agent of defendant, Pls.' Opp. at 5 n.1, is misplaced because that case concerned whether the promotional messages of checkoff programs constitute government speech for First Amendment purposes. It did not address whether checkoff boards are arms of the federal government for purposes of the APA.

have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990), quoting *Transwestern Pipeline Co. v. FERC,* 897 F.2d 570, 575 (D.C. Cir. 1990). Courts are constitutionally forbidden to render advisory opinions or 'to decide questions that cannot affect the rights of litigants in the case before them.'" *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 90–91 (D.C. Cir. 1986), quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971).

In December 2015, after the D.C. Circuit remanded the matter to this Court, the parties agreed to the following:

> Defendant will . . . review the Pork Board's contract for the purchase of "The Other White Meat" trademark ("TOWM"). That review will include a valuation of TOWM and consideration of relevant materials that Plaintiffs have offered to submit by February 15, 2016. . . . Plaintiffs will, by January 18, 2016, dismiss with prejudice the portion of their request for relief seeking retrospective relief, namely, their request for an order requiring Defendant "to recover [] already distributed funds from NPPC," . . . .

Stipulation at 1–2. Thereafter, plaintiffs dismissed their request for retrospective relief, Notice of Dismissal at 1, and the agency conducted its review. 2016 Review, AR 1–12.

Defendant argues that these events rendered the challenges to all past payment approvals moot. Def.'s Mem. at 29. The Court agrees. Pursuant to the Stipulation, the agency undertook a fresh review of the Purchase Agreement, "consistent with [defendant's] own independent judgment and authority," and the 2016 review included a new valuation of the trademarks as well as consideration of materials submitted by the plaintiffs and the intervenor. Stipulation at 1. The parties agreed that regardless of its outcome, the 2016 Review would "produce an administrative record that would facilitate the Court's ultimate resolution of any remaining issues in dispute." Stipulation at 2. As defendant points out in his memorandum, by "reconsider[ing] and

determin[ing] anew USDA policy with regard to continued payments" under the Purchase Agreement, Def.'s Mem. at 29, the agency created a new administrative record which formed the basis for its 2016 decision to approve the annual payment and it intended to rely on that record going forward.

Also pursuant to the Stipulation, plaintiffs withdrew their request "to recover [] already distributed funds from NPPC." Stipulation at 2. The withdrawal narrowed the relief requested in Count I to a declaration that the approvals based on the 2006 record were unlawful and an injunction against future payments under the contract.

In light of these developments, the Court holds that the portion of Count I that was not untimely is moot. The issue of whether any annual approvals based solely on the 2006 record were arbitrary and capricious is moot because no *future* payments will be made based on the admittedly thin administrative record that was before the agency at that time; the approval of any further payments under the agreement will be based on the record of the 2016 Review alone. And since plaintiffs have withdrawn all claims for disgorgement of amounts that have already been paid, a declaration by the Court that the past approvals were arbitrary or contrary to law would be purely advisory and have no legal effect.[12]

For the same reasons, plaintiffs' challenges in Counts II and III to payments made after the Board abandoned The Other White Meat campaign are also moot with respect to any payments that preceded the 2016 Review. No *future* payment approvals will be based on the record existing in 2011 and 2012, and the issues of whether the agency should have terminated the agreement after

---

12    At the hearing, plaintiffs were unable to articulate why a legal ruling on the validity of payment approvals made on the basis of the 2006 approval would not be advisory. *See* Transcript of Sept. 17, 2017 Hearing [Dkt. # 68] ("Tr.") at 29–36.

it approved Board expenditures for a new advertising slogan presents a live controversy only as to future payments.

This does not end the matter, however, since the parties and the Court agree that there are some live controversies for the Court to decide.

### C. The Court Deems the First Amended Complaint to Challenge Future Payment Approvals based on the 2016 Review.

The parties' summary judgment briefs addressed not only the validity of the 2006 contract and the payment approvals through 2015, but also the decision made in 2016 to continue to pay for the trademarks in the future. Since the amended complaint filed in 2012 did not (and could not) challenge the 2016 Review, the Court asked the parties at the September 17, 2017 hearing whether they believed it was necessary to amend the complaint again to add allegations concerning the validity of ongoing annual payments based on the 2016 Review, or whether, in their view, the existing complaint encompassed this claim that the parties had already briefed. Tr. at 9.

The parties all took the position that no formal amendment was necessary. *See* Defs.' Joint Notice at 1–2 (proposing that the Court deem the amended complaint to include a Count IV that challenges the 2016 decision to continue authorizing payments);[13] Resp. to Court's Order re Amendment at 3 (stating that a challenge to the 2016 Review decision is encompassed within Count III, which challenges ongoing payments under the contract after a new trademark was developed).

---

13    Intervenor-defendant took the position that such a challenge is already encompassed in Count I but stated that it would not object to defendant's proposal. Defs.' Joint Notice at 1–2.

The Court will deem the First Amended Complaint to include a Count IV that challenges the decision made in 2016 not to terminate the Purchase Agreement and all future payments based on that decision as arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law. Specifically, it will consider two questions: (1) whether the approval of ongoing payments under the Purchase Agreement violate the Pork Act and the Pork Order – a purely legal question that both sides agree remains a live controversy for the Court to decide, Tr. at 5–6, 41–42; and (2) whether the decision to continue to approve future annual payments is supported by the administrative record that was before the agency when it undertook the 2016 Review.[14]

## II. PAYMENTS UNDER THE PURCHASE AGREEMENT ARE LAWFUL, BUT THE 2016 DECISION IS NOT SUPPORTED BY THE RECORD.

### A. The 2016 Review and Decision at Issue

Pursuant to the parties' Stipulation and "[i]n light of questions raised in th[is] litigation and the change in the use of the Pork trademarks associated with the introduction of the 'Pork: Be Inspired' campaign," USDA determined in 2016 that it was appropriate to review the 2006 Purchase Agreement[15] and obtain an independent valuation of the trademarks covered by the agreement before deciding whether to approve further payments.[16] 2016 Review at 2, AR 3.

---

14    Because plaintiffs withdrew their request for disgorgement of past payments and seek only an injunction against future annual payments, this count challenges only future approvals and not any payments already made to NPPC based on the 2016 decision. *See* Notice of Dismissal at 1 (dismissing with prejudice plaintiffs' request "to recover [] already distributed funds from NPPC").

15    Plaintiffs complain that the agency failed to review the original contract as part of the 2016 Review, but since their challenge to the original contract approval was untimely, and their claims challenging all past approvals based on the original record are moot, the Court will not address the issue.

16    Payment approvals before 2016 were based on the original 2006 decision approving the Board's purchase of the trademarks. *See* Def's. Mem. at 29.

At the agency's direction, the Board contracted with an expert to obtain a valuation of the trademarks, which the agency received on March 30, 2016.  Valuation of Certain Trademarks Owned by Nat'l Pork Bd. as of Jan. 1, 2016 ("SRR Report"), AR 204–82.  The agency also received materials from plaintiffs and NPPC, including valuations prepared by plaintiffs' expert CONSOR and NPPC's expert Cupitor.  *See* CONSOR Op. Letter (Feb. 26, 2016), AR 283–359; AR 437–535; 2016 Review at 8–9 (discussing Cupitor's valuation); AR 199–203.  CONSOR also provided comments on SRR's valuation, CONSOR Suppl. Op. Letter (Apr. 13, 2016), AR 156–192, and SRR commented in response on CONSOR's supplement.  Email from SRR Director Scott Weingust to Craig Morris and Mai Dinh (Apr. 15, 2016), AR 71–73.  In each of these reports, the experts were assessing the value of the four trademarks, including the slogan, that the Board acquired in the 2006 Purchase Agreement:  The Other White Meat campaign.

In its review, the agency noted that there are three methods commonly used to value an asset.  The first, and typically the preferred, method is a market approach that uses comparable sales or transactions involving similar assets to arrive at an asset's value.  2016 Review, AR 4.  The second is a cost approach, which considers how much it would cost to replace the asset.  AR 4.  The third is an income approach, which examines the amount of income an asset may generate, which would be royalties in the case of a trademark.  AR 4, 5.  Another method, called the "relief from royalty" approach, is a hybrid of the market and income approaches.  AR 4.  The parties' experts all agreed that these approaches are commonly accepted valuation methods.  *See* SRR Report, AR 224; CONSOR Report, AR 293–92.

Not surprisingly, the experts differed on which approach to use, the assumptions to be made in applying the approaches, and even the dates to be used in the valuation of the trademarks.  AR 4.  These differences resulted in dramatically different conclusions.  SRR valued the trademarks as of

January 1, 2016 at $113 million to $132 million, while CONSOR valued them as of July 1, 2006 at $2.5 million to $17.6 million. 2016 Review, AR 4. The agency received a valuation from Cupitor of $175 million, along with two other valuations pre-dating the Board's purchase of the trademarks. Because the agency did not rely on these other valuations in making its decision, and it addressed only the SRR and CONSOR valuations in any detail, *see* AR 5, 8–9, the Court will address only the SRR and CONSOR valuations.

SRR used a cost approach to value the trademarks, citing "problems with valuing the trademarks using an income or market approach and the availability of reliable data for use in the cost approach." AR 4. According to the 2016 decision, the expert aimed to determine the cost of replacing The Other White Meat trademarks by calculating "the cost for an organization to develop a new trademark with the same level of effectiveness as measured by aided awareness studies of the percentage of people who are aware of the trademark."[17] AR 4. The agency explained the resulting valuation as follows:

> "THE OTHER WHITE MEAT" had an aided awareness of 82%, one of the most recognizable trademarks in the United States. SRR took into account the discontinued use of three trademarks in NPB's primary marketing campaign by modeling the replacement cost to achieve only 35% and 45% aided awareness. In calculating the replacement cost, SRR calculated the cost of four indications of value: expected costs of launching a new brand, slogan, or marketing campaign by a generic large company, NPB's cost to develop the "Pork: Be Inspired" campaign, NPB's cost in the development and promotion of the Pork trademarks, and cost of other checkoff program marketing campaigns. SRR then weighed these four indications to calculate

---

17    "Aided awareness" is a measure of consumers' knowledge of a brand or product. Market researchers distinguish between "unaided awareness," which is measured by open-ended questions without a stimulus or other prompt that suggests the name of the brand tested, and "aided awareness," which is measured by questions that give respondents a defined list of brands and ask if they have heard of any. *Wreal, LLC v. Amazon.com, Inc.*, No. 14-21385-CIV, 2016 WL 8793317, at *12 (S.D. Fla. Jan. 7, 2016).

its final valuation range for the Pork trademarks at $113 million to $132 million.

AR 4–5.  The agency found this valuation helpful because it used "four separate indications" of the trademarks' value and weighed "each indicia of value according to its usefulness to produce a single blended estimate."  AR 5.[18]  The agency also examined CONSOR's critiques of SRR's valuation, and found them "to be unpersuasive."  AR 5.[19]

The agency also considered CONSOR's competing valuation, which utilized a relief from royalty approach.  AR 5.  It found the valuation to be problematic for three reasons:  (1) because CONSOR used the Board's revenues instead of the pork industry's revenues as the base against which to calculate the trademarks' potential royalty revenue; (2) because the valuation was calculated for 2006, not 2016; and (3) because the agency did not think the trademarks CONSOR used to calculate the royalty rate were comparable to the trademarks at issue here.  AR 8 (stating that that the royalty rate derived from licensing agreements of American Animal Hospital Association, King Features Syndicate, Agway, Inc., Inc., and AT&T would be considered speculative).

------

18    SRR also conducted "reasonableness checks" of its valuation "to test the consistency of its estimate with alternative valuation methodologies, finding its estimate to satisfy these tests." AR 5.

19    The agency rejected CONSOR's critique of SRR's use of the cost approach, because even though the market approach is the preferred method for valuing intellectual property, there was "little or no public information on transactions" to conduct such an analysis. AR 5.  It rejected the critique of SRR's use of aided awareness as a valid indicator of value because SRR provided articles supporting its use.  AR 5–7.  It found that the provision in the 2001 settlement agreement requiring contracts between the Board and NPPC be at fair market value inapplicable since the review concerned only the decision to approve future annual payments under the contract.  AR 7.  Finally, it accepted SRR's use of the trademarks' exclusivity, their option value, and the annualized growth rate of the pork industry as appropriate since SRR used them to support the conclusion that the trademarks have value, but not directly to calculate their value.  AR 7.

The agency considered plaintiffs' arguments against continuing the annual payments, including plaintiffs' assertions:  that there should be no future payments in light of the Board's transition to a different ad campaign; the Board could obtain access to the trademarks at a lower price; and the original 2006 agreement was not negotiated at arms-length.  AR 9–11.

After reviewing the valuations and the comments on them, the agency found SRR's valuation to be the "most accurate and reliable of the valuations reviewed by AMS, and . . . the best basis for deciding whether to approve continuing payments under the Contract at this time." AR 4.  It also found that the Board's current uses of the trademarks – the fact that The Other White Meat slogan appears on the Board's website and in nutritional materials, and the fact that the "pork" and blue triangular design logo have been incorporated into the Be Inspired campaign – comport with the Act's purpose of promoting the pork industry.  AR 12, citing 7 U.S.C. § 4801. AMS's Deputy Administrator based his conclusion on these two findings:

> [G]iven that the value of the Pork trademarks is so much greater than the cost of NPB's remaining payments under the Contract and the significance that the Pork trademarks continue to play in NPB's promotion efforts, I have approved NPB's request to make continued payments for the trademarks under the Contract.

AR 12.  With that, the Secretary authorized the payment of an additional $30 million to NPCC over the next 10 years.

**B.**      **The Agency's Decision Does Not Violate the Statutory Prohibition on Using Checkoff Funds to Influence Legislation or Policy.**

Plaintiffs ask the Court to enjoin these future annual payments under the Purchase Agreement.  They argue first that since NPPC is a lobbying organization, checkoff funds that flow from the Board to the trade association are being unlawfully diverted for use to influence legislation or government policy in violation of the Act.  Pls.' Mem. at 3–4, 36.

The purpose of the checkoff program is to "finance[e] . . . promotion, research, and consumer information" to strengthen the pork industry and expand markets for pork and pork products. 7 U.S.C. § 4801(b)(1) (2012). The Pork Act authorizes the payment of costs associated with contracts for activities authorized by the Pork Order. *Id.* § 4808. The Pork Order allows checkoff funds to be used for "plans and projects" that comply with the Act, 7 C.F.R. § 1230.73, and it authorizes the Board to incur expenses that "the Secretary finds are reasonable and likely to be incurred" to perform its duties under the Order, including to finance "plans and projects." 7 C.F.R. §§ 1230.70; 1230.17 (defining plans and projects to include those involving promotion and consumer information). But the Pork Act expressly prohibits the use of assessment funds "for the purpose of influencing legislation." 7 U.S.C. 4809(e); *see also* Pork Order, 7 C.F.R. § 1230.74 (same).

The National Pork Producers Council, the intervenor-defendant in this action, argues that plaintiffs have failed to prove that the money NPPC receives under the contract goes to lobbying, Tr. at 60–61, but the Court is not persuaded by this argument. According to its own website and promotional materials, NPPC is without doubt a lobbying organization:

> The National Pork Producers Council, representing 42 affiliated state associations, works to ensure that the U.S. pork industry remains a consistent and responsible supplier of high-quality pork to domestic and international markets.
>
> Through public-policy outreach, NPPC fights for reasonable legislation and regulations, develops revenue and market opportunities, and protects the livelihood of America's 60,000 pork producers.
>
> In addition to working on legislation, regulations and trade initiatives, NPPC has its own political action committee, PorkPAC, dedicated to educating and supporting federal lawmakers and candidates who support pork producers.

*See* About Us, National Pork Producers Council, http://nppc.org/about-us/ (last visited Jan. 31, 2018).

The money NPPC receives under the contract constitutes approximately thirty percent of the organization's annual budget, and the funds are not segregated in any manner. Tr. at 61–62. Given these undisputed facts, the Court holds that plaintiffs have shown that at least some portion of the money the Board pays NPPC under the Purchase Agreement ultimately goes to influencing legistation.

But the Court is also not persuaded that NPPC's use of payments it received under the contract for lobbying purposes means that checkoff funds are being spent unlawfully "for the purpose of influencing legislation." 7 U.S.C. § 4809(e). While plaintiffs assert that the approval of each annual payment "*results* in checkoff expenditures being used to further NPPC programs that are intended to influence legislation and government policy," Am. Compl. ¶ 114 (emphasis added); *see also* Pls.' Mem. at 1, 36, they have not alleged or shown that that the payments are *for* lobbying services. At bottom, plaintiffs' argument is that the Board cannot ever enter into a contract with any lobbying organization, since that contract would result in assessment funds flowing to an organization that engages in lobbying. But the statute's prohibition is not that broad. The Pork Act does not prohibit the Board from using assessment funds to pay for an actual good or service purchased from an entity involved in influencing legislation. Indeed, the 2001 settlement agreement, which according to plaintiffs, governs the relationship between the Board and NPPC, expressly contemplates that the Board and NPPC can contract. *See* Pls.' Mem. at 6–7, 9.

There is no dispute that the trademarks the Board purchased from NPPC were used as part of a long-running campaign to promote the pork industry. *See, e.g.*, Am. Compl. ¶¶ 46–54. And

plaintiffs acknowledge that before the purchase, NPCC was the registered owner of the trademarks.[20]  Accordingly, the contract and payments made in accordance with its terms are for an activity authorized by the Pork Order:  promotion of the pork industry.  Given this, the Court holds that the Secretary's approval of the expenditure of checkoff funds to make payments under the Purchase Agreement do not violate the prohibition against using the assessments to influence legislation.[21]

## C.       The Agency's Decision is Arbitrary and Capricious

Plaintiffs also allege that defendant's 2016 decision to continue making payments under the Purchase Agreement is arbitrary, capricious, and not in accordance with law.  The scope of the review to be conducted under the APA is narrow.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The "arbitrary and capricious" standard of review is a deferential one, *WorldCom, Inc. v. FCC*, 238 F.3d 449, 457 (D.C. Cir. 2001), and an agency's decision is presumed to be valid.  *See Citizens to Preserve Overton Park*, 401 U.S. at 415.  The court is "not to substitute its judgment for that of the agency" but, rather, it must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *S. Co. Servs., Inc., v. FCC,* 313 F.3d 574, 579–80 (D.C. Cir. 2002), quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  When the record reflects the

---

20       Plaintiffs do argue that the trademarks are already the property of the U.S. Government by operation of law because the trademarks were developed using assessment funds.  Pls.' Mem. at 19–23, citing 7 C.F.R. § 1230.88.  But plaintiffs did not challenge the ownership of the trademarks in their lawsuit, nor do they dispute that the trademarks were registered to NPPC and owned by NPPC after "the Separation" the organizations in 2001.  Pls.' Mem. at 9.

21       The Court notes that plaintiffs did not challenge as illegal the licensing agreement that the Board entered into with NPPC after the organizations separated in 2001, supporting the conclusion that a contract between the two entities for non-lobbying activities does not violate the Pork Act.

"conflicting views" of experts, the law affords an agency the "discretion to rely on the reasonable opinions of its own qualified experts." *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989); *Mississippi v. EPA*, 744 F.3d 1334, 1348 (D.C. Cir. 2013) (stating "it is not our job to referee battles among experts").

This is not to say, however, that courts are expected to rubber stamp agency decisions. *NRDC v. Daley,* 209 F.3d 747, 755 (D.C. Cir. 2000). Courts need not defer to "conclusory or unsupported suppositions." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010), quoting *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004). The Court's job is "to evaluate the rationality of [the agency's] decision." *Mississippi*, 744 F.3d at 1348. It must be satisfied that the agency has examined the relevant data and articulated a satisfactory explanation for its action, "including a 'rational connection between the facts found and the choice made.'" *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006), quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Chem. Mfrs. Ass'n v. EPA*, 217 F.3d 861, 865–66 (D.C. Cir. 2000) (holding that agency action was arbitrary and capricious where agency offered an explanation that was not supported by the evidence in the record). Based on the agency's 2016 Review memorandum and the administrative record, the Court holds that defendant's decision to continue payments lacks the necessary rational connection between facts found and the choice to continue approving payments.

Defendant made two key findings in its 2016 decision: 1) that the continued use of the trademarks as currently utilized promotes the pork industry in furtherance of the Pork Act; and 2) that the value of the Pork trademarks as calculated by SRR is "much greater than the cost of NPB's remaining payments under the Contract." AR 12. The record supports the conclusion that the Board still makes some use of The Other White Meat trademarks to promote the industry, even if

only as a "heritage brand." AR 218. Therefore, the Court agrees with defendant that the limited use that is being made is consistent with the statutory scheme.

But the decision to approve future payments for the set of four trademarks based on SRR's valuation does not bear up under review for several reasons. First, the agency states that it undertook to ascertain "the *current* value of the Pork trademarks." AR 3 (emphasis added). But the valuation it adopted to justify future payments is based on the cost of replacing a campaign that is no longer in use and that the agency has already paid to replace. So it is not clear how that calculation sheds light on the value of the three obsolete Other White Meat trademarks to the agency *today,* and it is not clear why the agency would predicate future payments based on replacement costs that have already been incurred.

Second, the agency explains in its decision document that when its expert utilized this "cost approach," it made an effort to calculate "the cost for an organization to develop a new trademark with the same level of effectiveness as measured by aided awareness studies of the percentage of people who are aware of the trademark." AR 4. But the expert's analysis did not do that either. SRR based its calculation on what appears to be an arbitrary target level of consumer awareness – approximately 40% – that was arrived at without the benefit of any current research or statistical analysis. AR 5. The desired level of consumer awareness was derived simply by cutting the historic level of effectiveness attained by The Other White Meat slogan in half. AR 5. But the record contains no evidence of the effectiveness – and certainly no evidence of the level of effectiveness "as measured by aided awareness studies" – of the only one of the four trademarks that the Board intends to use on an active basis: the Pork and Design logo consisting of the word "pork" on the so-called "pork loin silhouette" – a flat, blue triangular background. AR 3. Since the valuation failed to establish a logical connection between the price

to be paid and the actual value of the trademarks to the agency today, it does not survive APA review.

As noted at the start of this opinion, the 2006 Purchase Agreement involved the acquisition of four trademarks: "PORK and Design," Reg. # 1418703; "THE OTHER WHITE MEAT," Reg. # 1486548; "THE OTHER WHITE MEAT and Design," Reg. # 3126072, and "THE OTHER WHITE MEAT," Reg. # 3129186. AR 2. The 2016 decision reports:

> In 2011, [the Board] designated "THE OTHER WHITE MEAT" as a "heritage" brand and ceased to use the three trademarks that include the slogan as part of its primary marketing campaign, though it continues to use the three trademarks on its website and in nutritional materials.

AR 3.[22]

The record underlying the 2016 decision also makes it quite clear that The Other White Meat slogan plays no role in current marketing, and that only the Pork and Design logo remains in

_____

22    While The Other White Meat trademark appears on the website, the assertion that the Board "uses" The Other White Meat trademarks on its website is something of an overstatement. If one visits the home page for Pork Checkoff, www.pork.org (last visited Jan. 31, 2017), one has to scroll down a significant distance to get to the bottom of the page, where in a banner consisting of a list of links to other pages, one can find a link to a "The Other White Meat" trademark page: The Other White Meat® Brand, Pork Checkoff (Jan. 31, 2017), https://www.pork.org/about/towm/ (last visited Jan. 31, 2018). The link is also available on the Board's "About" page. About, Pork Checkoff (Jan. 31, 2017), https://www.pork.org/about/. If one follows this link, The Other White Meat® Brand page describes the history, purpose, and success of the prior campaign, and it displays the blue silhouette with the words "The Other White Meat" on it. But the trademarked slogan is not used for promotional purposes anywhere on the website; every other page bears the blue Pork and Design logo and a "pork checkoff" logo instead. There is no effort made in the record to ascribe any value to this limited "use."

active use.[23]  The Board adopted a new primary marketing program – Pork Be Inspired – in 2011, and it spent tens of millions of dollars to develop and promote the campaign, which introduced an entirely new slogan and incorporated only the fourth trademark involved in the Purchase Agreement, the Pork and Design logo.  *See* AR 252 (marketing expenditures since launching the campaign are at least $26 million each year).  The record indicates there are no plans to return The Other White Meat trademarks to the active roster, AR 448–49; *see also* AR 225; at this point, the Board simply intends to continue its own limited use of The Other White Meat trademarks, to permit state associations use them for free, and to prevent others from infringing on them.  AR 3, 7.[24]

It is true that the agency's expert made some effort to account for the diminished use of the complete set of trademarks.  *See* AR 225 (explaining that trademarks experience "functional

---

23      The trademarks' growing functional obsolescence became apparent, and the Board's investment in them was in decline, even before they were officially replaced.  *See* AR 443–46 (2009 Board research showed that despite widespread awareness, producers were already questioning the value of The Other White Meat and its effectiveness as a brand); AR 450 (November 2011 statement by Board official that "[c]onsumers had gotten the message" of the brand and that it was time for the Board to move in a new brand direction with a new marketing campaign); AR 448 (March 4, 2011 Board press release announcing the new brand and the corresponding increase in spending for advertising: "2011 advertising media spending has more than doubled that of recent years").

Indeed, even before the Board entered into the original Purchase Agreement in 2006, its CEO suggested that the trademarks might have only a ten-year useful life ahead and that even a "shorter life may be appropriate."  Email July 31, 2003, AR 441–42 ("We simply aren't using it as much and so it has less value.;"); *see also* July 29, 2003 valuation by Steve R. Meyer to the Board, AR 481 (stating that seventy-five percent of the trademarks "ultimate value will be garnered in the first 10–12 years").

24      Thus, while the Board's interest in maintaining its ownership of The Other White Meat trademarks is largely motivated by its desire to defend them, the Court cannot quite agree with plaintiffs' assertion that the trademarks' value "[d]ropped to [z]ero" when the Board replaced the campaign in 2011.  Pls.' Mem. at 36–38.

obsolescence" as their ability to perform the function for which they were designed declines, causing their economic value to decline). But it is the incomplete and conclusory way the expert went about this that makes the resulting opinion unreliable. SRR took note of the high level of consumer awareness that The Other White Meat campaign had achieved (82.3% aided awareness in 2015), AR 265, and it stated that it expected this aided awareness to decrease to "as low as approximately 1%." AR 219. Given those two points at either end of the spectrum, it selected the middle of the range between 1% and 80% as the foundation for its valuation. AR 226–27. To calculate the current value of the trademarks based on their replacement cost today, SRR estimated the cost of a "replacement marketing campaign that would garner approximately 40% aided awareness." AR 226; *see also* 2016 Decision, AR 5 ("SRR took into account the discontinued use of three trademarks in [the Board's] primary marketing campaign by modeling the replacement cost to achieve only 35% and 45% aided awareness.").

The problem is that the expert's decision to split the difference between 82% and 1% was not based on any research or factual analysis, and the choice to land on either 35% or 45% was entirely arbitrary. In the absence of any explanation for the assumption that the marks had only experienced a 50% decline in value to date, and that it would take a mark with approximately 40% of aided awareness to replace them, the Court finds that the agency's endorsement of the expert's approach lacks a foundation in the record.

More important, the 82% figure that the agency's expert cut in half was a measure of the effectiveness of The Other White Meat campaign, including its slogan, but the only trademark the Board intends to use in any meaningful way in the future is the plain blue triangular shape that says "pork" – without any reference to the slogan. Thus, the Court has a concern that using 82% as a starting point unnecessarily inflated the outcome. The record contains no aided awareness

studies of the percentage of consumers who are aware of the design standing alone; indeed, there is no evidence that any portion of the population recognizes the blue shape, even with the generic word "pork" italicized on it, in connection with the Board's promotional activities at all. And therefore, there is no basis in the record to support the conclusion that a valuation based on modeling the cost of replacing a campaign with a sizeable 40% level of awareness is an appropriate way to calculate the current value of the trademarks to the Board today. In other words, the agency purports to be basing its decision on the cost of creating a trademark with similar value – "with the same level of effectiveness as measured by aided awareness studies," AR 4 – but there was no effort made to ascertain whether the primary mark being used and paid for has *any* effectiveness or value.

Moreover, while the Court is bound to defer to the experts' opinion that a cost approach is a generally accepted methodology for determining value, it finds the approach to be quite disconnected from the stated goal of the exercise in this particular case: to generate "an independent valuation of the current value of the Pork trademarks." AR 3. SRR concluded that it took The Other White Meat brand seven to nine years to reach the level of 40% aided awareness, so it calculated the cost of developing a new campaign and promoting it for a period of seven years, and for nine. AR 226–27; AR 249–63 (calculating costs from 2016 to 2022 and from 2016 to 2024). "Development costs" include the costs of designing and producing marketing materials for television, print, internet, and direct marketing efforts, and "promotional costs" cover what the Board would have to spend to run those materials on those various media over the time period in question. *See* AR 249–51. The development and promotional costs utilized in SRR's calculation came from four sources: third parties, the Board's ongoing "Be Inspired" campaign, the prior Other White Meat campaign, and other checkoff programs. AR 224, 227–28. SRR weighted these

costs, AR 229, and came up with two replacement cost estimates: $113 million to develop and promote a new campaign achieving 35% aided awareness for seven years, and $132 million to develop and promote a new campaign achieving 45% aided awareness for nine years. AR 232.

CONSOR and plaintiffs criticize a number of the decisions and assumptions that SRR made in its valuation. AR 156–85; Pls.' Opp. at 36–45 (arguing that using an investment value rather than a fair market value was improper, that consumer awareness is a poor indicator of value, that SRR incorrectly applied the royalty rate to the revenue of the entire pork industry in its relief from royalty test, and that the conclusion that the trademarks can generate revenues from future sale or licensing fees is speculative). But the Court has a more overarching concern, which is that the valuation is not based on the trademarks' current use as reflected in the record.

While replacement cost may be a legitimate approximation of the value of trademarks in use, and it made sense for the Board to look to replacement cost in 2006 when ascertaining the price it would pay NPCC for the marks it wanted to continue to use, replacement cost does not make sense as the measure of the value of intellectual property that has been shelved and that the Board has already paid to replace. The record does not explain why the cost to create a new campaign that *would* be in use is a fair approximation of the value of retired marks that are not being used today. Nor does it explain why it makes sense to approve the ongoing expenditure of check-off funds based on the amount it would cost to replace the trademarks when the agency has already paid to replace those very trademarks. In effect, the Board is incurring the expense of replacing the trademarks for a second time.

When one couples the fact that the three distinctive and valuable trademarks that were purchased in 2006 are no longer in use, with the fact that the Board has already invested millions in developing and supporting a new campaign that incorporates only the fourth trademark – a logo

with undetermined value, it is not logical to assume that the current value of the three "heritage" trademarks plus the logo is the same as the cost of developing an entirely new campaign from scratch, even if SRR's experts accurately predicted what such an effort would involve. The expert does not explain why the methodology is valid under these circumstances, and 2016 decision does not grapple with these obvious deficiencies, and therefore, it ignores relevant evidence before the agency about the Board's current and expected use of the trademarks. *See El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.,* 396 F.3d 1265, 1278 (D.C. Cir. 2005) (finding agency action arbitrary and capricious in failing to address relevant evidence before it).

Since the expert valuation relied upon by the agency does not answer the question the inquiry was supposed to answer – what is the "current value of the Pork trademarks?" – and it does not, as the agency directed, calculate that value based upon "the cost for an organization to develop a new trademark with the same level of effectiveness as measured by aided awareness studies of the percentage of people who are aware of the trademark," AR 3, 4, the Court holds that defendant's decision is arbitrary, capricious, and not supported by the record, and the agency is enjoined from approving any future payments based on the 2016 Review.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion for summary judgment [Dkt. # 52] is GRANTED IN PART and DENIED IN PART, defendant's motion to dismiss for lack of subject matter jurisdiction or in the alternative for summary judgment [Dkt. # 54] and intervenor-defendant's motion to dismiss or in the alternative for summary judgment [Dkt. # 55] are GRANTED IN PART and DENIED IN PART. The Court will grant defendants' motions to

dismiss Counts I, II, and III, and the Court will enter judgement in favor of the plaintiffs on what has been deemed to be Count IV.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  February 1, 2018